JUDGE PAULEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

10 CV 7820

-------------------------------------------------------------- x

AMY BARTOLETTI, CHIA SIU,
NADINE MENTOR, LISA CONLEY, BRITTANY
SHARPTON and DORLY HAZAN-AMIR, on behalf
of themselves individually and on behalf of all similarly-
situated persons,

Civil Action No.

                       Plaintiffs,

**CLASS ACTION COMPLAINT**

                     v.

**JURY TRIAL DEMANDED**

CITIGROUP INC. and CITIGROUP GLOBAL
MARKETS, INC.,

OCT 1 3 2010

                       Defendants.

U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------------- x

      Plaintiffs Amy Bartoletti, Chia Siu, Nadine Mentor, Lisa Conley, Brittany Sharpton and

Dorly Hazan-Amir (collectively, "Plaintiffs"), on behalf of themselves and all similarly-situated

persons, by and through their counsel, Thompson Wigdor & Gilly LLP, as and for their

Complaint in this action against Citigroup Inc. and Citigroup Global Markets Inc. (together

"Citigroup," "Defendants" or the "Company"), hereby allege as follows:

## NATURE OF THE CLAIMS

      1.      The outdated "boys club" is alive and well at Citigroup where women are denied

equal terms and conditions of employment that are provided to similarly-situated male

employees. As a result of this "boys club," men dominate the senior ranks of Citigroup's

management and executive positions. In fact, Citigroup's Senior Leadership Committee is

dominated by men as it is comprised of 39 men and 5 women, while all 19 members of the

Executive Committee are men. Given this disparity in the most senior level positions, it is not

surprising to find that the "boys club" filters down through the management ranks to affect all

senior and junior level professional positions at Citigroup. The fact that Citigroup turns a blind

eye towards its discrimination against women (in violation of well-established federal, state and local anti-discrimination laws) stands in stark contrast to the federal government's willingness to bail out Citigroup through the Troubled Asset Relief Program ("TARP").  While Citigroup has worked so hard to right the ship and repay TARP funds borrowed from the federal government, it has failed to address the pervasive discrimination and retaliation that its female employees have been subjected to throughout the course of their employment with the Company.  Plaintiffs have filed this lawsuit to seek redress on behalf of themselves and all other similarly situated female former and current employees for the systematic and pervasive discrimination and retaliation that they have suffered throughout their employment with Citigroup.

2.      Prior to November 21, 2008, Plaintiffs Bartoletti, Siu, Mentor, Conley and Sharpton ("Public Finance Class Representatives") were employed in the Public Finance Department within Citigroup's Municipal Services Division.  Consistent with the extreme disparity between men and women in management level positions, the Company-wide layoffs that Citigroup underwent on November 21, 2008, had a disparate impact on the Company's female employees.  Indeed, with respect to the November 21, 2008 layoff, Citigroup engaged in recessionary discrimination when, rather than fulfill its obligation to its shareholders and retain the most qualified employees, it terminated the employment of the Public Finance Department Class Representatives, as well as hundreds of other similarly-situated female professional employees, as part of the Company-wide layoffs that were announced on November 21, 2008. While thousands of well-qualified women were terminated as a result of the November 21, 2008, in most circumstances Citigroup retained less qualified male employees.  Indeed, upon information and belief, a statistically significant percentage of female employees were terminated as a result of the November 21, 2008 Company-wide layoff.  Thus, the significant

disparity between the percentage of female employees terminated as part of the November 21, 2008 reduction in force and the percentage of male employees terminated as part of the November 21, 2008 reduction in force was statistically unlikely to have occurred by chance, and instead was the result of intentional gender discrimination and any facially neutral policy allegedly employed by Defendants in making layoff decisions had a statistically relevant adverse impact on female employees.

3.　　While Ms. Hazan-Amir is currently employed by Citigroup in the Asset Finance Group, where she has been employed since June 2006, throughout the course of her employment with Citigroup she has been subjected to inappropriate and offensive comments based on her gender as well as discriminatory treatment which has manifested itself in the form of significantly less compensation than similarly-situated male colleagues and a recent demotion to a less prestigious and less lucrative position mere days after she returned from a Family Medical Leave Act ("FMLA") designated maternity leave.  Thus, while Ms. Hazan-Amir is a current employee, the pervasive gender discrimination at Citigroup has had a similar adverse effect on her employment.

4.　　This class action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including unlawful discrimination, against Plaintiffs in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

5.　　As set forth below, Plaintiffs and a class of similarly-situated female former employees of Citigroup are victims of a "glass ceiling" or discriminatory barrier to equal

opportunity advancement which has included the unlawful denial of promotions, compensation commensurate with male employees, and equality with respect to the terms and conditions of their employment, including, in many cases, the termination of such employment.

6.     Citigroup's compensation, assignment and promotion policies, practices and/or procedures incorporate the following discriminatory practices: (a) failing to compensate females the same as similarly-situated male employees; (b) failing to promote females at the same rate and on the same terms and conditions as similarly-situated male employees; (c) relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of gender stereotypes and bias by Citigroup's predominantly male managerial and supervisory staff in making compensation, assignment, promotion and termination decisions; (d) generally refusing to provide equal terms and conditions of employment for female employees; and (e) selecting female employees for termination as part of the Company-wide layoffs at rates that are statistically unlikely to have occurred by chance.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of the rights of Plaintiffs, the class members, and the subclass members under federal civil rights laws.  The Court has supplemental jurisdiction over Plaintiffs' related individual claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

8.     This Court has original jurisdiction over the NYSHRL and NYCHRL claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a class action in which: (i) there are 100 or more members in the Class; (ii) at least some members of the

proposed class have a different state of citizenship from at least one Defendant; and (iii) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants reside in this district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PROCEDURAL REQUIREMENTS

10.      Except for Plaintiff Hazan-Amir, Plaintiffs have complied with all statutory prerequisites to their Title VII claims, having each filed a charge of discrimination, on behalf of themselves and on behalf of all other similarly-situated employees, with the Equal Employment Opportunity Commission ("EEOC"), and having each received notice of their right to sue from the EEOC.  This action is being filed within 90 days of receipt of their EEOC right to sue letters.[1]

11.      Prior to the commencement of this action, a copy of this Complaint was served on the New York City Commission on Human Rights and the Offices of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

12.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

### PLAINTIFFS AND CLASS REPRESENTATIVES

13.      Plaintiff Amy Bartoletti is female former employee of Citigroup who resides in New York, New York.  At the time of her unlawful termination, Ms. Bartoletti was employed as

---

[1]      On March 16, 2010, Plaintiff Hazan-Amir filed an EEOC charge of discrimination, on behalf of herself and on behalf of all other similarly-situated employees, arising out of the same facts alleged herein.  While Plaintiff Hazan-Amir's EEOC charge has been pending for more than 180 days the EEOC has not yet issued Plaintiff Hazan-Amir a right to sue letter.  When it does, Plaintiffs will seek leave to amend this Complaint to add class claims of retaliation and pregnancy discrimination pursuant to Title VII.

a Director in the Housing Group of the Public Finance Department within the Municipal Securities Division in Citigroup's New York office.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

14.     Plaintiff Nadine Mentor is a female former employee of Citigroup who resides in Orlando, Florida.  At the time of her unlawful termination, Ms. Mentor was employed as a Director in the Southeast Regional Group of the Public Finance Department within the Municipal Securities Division in Citigroup's Orlando, Florida office.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

15.     Plaintiff Lisa Conley is a female former employee of Citigroup who resides in Chicago, Illinois.  At the time of her unlawful termination, Ms. Conley was employed as a Director in the Health Care Group of the Public Finance Department within the Municipal Securities Division in Citigroup's Chicago office.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

16.     Plaintiff Chia Siu is a female former employee of Citigroup who resides in Long Island City, New York.  At the time of her unlawful termination, Ms. Siu was employed as an Analyst in the Housing Group of the Public Finance Department within the Municipal Securities Division in Citigroup's New York office.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

17.     Plaintiff Brittany Sharpton is a female former employee of Citigroup who resides in New York, New York.  At the time of her unlawful termination, Ms. Sharpton was employed as an Analyst in the Infrastructure Group of the Public Finance within the Municipal Securities Division in Citigroup's New York office.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

18.     Plaintiff Dorly Hazan-Amir is a female current employee of Citigroup who resides in Hoboken, New Jersey.  Throughout the course of her employment with Citigroup, she has been employed as an Associate in the Asset Finance Group ("AFG") which is currently within the Capital Markets Origination Division.  At all relevant times, she met the definition of any "employee," under all applicable regulations.

**DEFENDANTS**

19.     Defendant Citigroup Inc. is a Delaware corporation with a principal place of business at 399 Park Avenue, New York, New York.  Citigroup Inc. is a global financial services holding company providing financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. Citigroup Inc. has approximately 16,000 offices and 300,000 employees worldwide.  At all relevant times, Defendant Citigroup Inc. met the definition of an "employer" under all relevant statutes.

20.     Defendant Citigroup Global Markets Inc. is a New York corporation with a principal place of business at 388 Greenwich Street, New York, New York.  Citigroup Global Markets Inc. is a subsidiary of Citigroup Inc. and provides investment banking services on a global basis with approximately 8,600 employees.  At all relevant times, Defendant Citigroup Global Markets Inc. met the definition of "employer" under all relevant statutes.

<u>**CLASS WIDE PRACTICES**</u>

21.     As set forth in more detail below, Plaintiffs and a class of similarly-situated female employees, were routinely subjected to a pattern and practice of gender discrimination affecting the terms and conditions of their employment at Citigroup.

22.     Additionally, Ms. Hazan-Amir and a subclass of female employees who engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees have been subjected to a pattern and practice of retaliation for engaging in such protected activity.

23.     Further, Ms. Hazan-Amir and a subclass of female employees who have become pregnant, have taken a maternity leave or have childcare obligations have been subjected to a pattern and practice of discrimination by Citigroup which has denied them equal terms and conditions of employment available to employees who are not pregnant or who do not have children or childcare obligations.

24.     These practices reflect that discrimination is the standard operating procedure – the regular, rather than the unusual practice at Citigroup.  As a result of this Company-wide discrimination, there is a glass ceiling adversely affecting female employees, especially those female employees who become pregnant, take a maternity leave, or have childcare obligations, at Citigroup in all facets of their employment.

25.     Citigroup's compensation, assignment and promotion policies, practices and/or procedures incorporate the following discriminatory practices: (a) failing to compensate its female employees the same as similarly-situated male employees; (b) failing to promote female employees at the same rate and on the same terms and conditions as similarly-situated male employees; (c) relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of gender stereotypes and bias by Citigroup's predominantly male managerial and supervisory staff in making compensation, assignment, promotion and termination decisions; (d) generally refusing to provide equal terms and conditions of

employment for female employees; and (e) selecting female employees for termination as part of

the Company-wide layoffs at rates that are statistically unlikely to have occurred by chance.

DISCRIMINATION IN COMPENSATION

26.     Citigroup has a discriminatory pattern and practice of paying female employees,

especially those female employees who become pregnant, take a maternity leave, or have

childcare obligations, salaries and bonus compensation which are substantially lower than the

salaries and bonus compensation paid to male employees performing similar work, with similar

or lesser skills, and with similar or lesser experience.  The result is a significant disparity in the

total compensation paid to female employees compared to similarly-situated male employees.

DISCRIMINATION IN ASSIGNMENT AND PROMOTION

27.     Citigroup has a discriminatory pattern and practice of failing to promote or assign

female employees, especially those female employees who become pregnant, take a maternity

leave, or have childcare obligations, to the same levels as similarly-situated male employees

performing similar work, with similar or lesser skills, and with similar or lesser experience,

which is caused by Citigroup's policies and procedures which provide the Company's managers

with broad discretion in choosing who to nominate and select for promotion.  The result is a

significant disparity in the representation of female employees in the higher management ranks

of Citigroup as compared to male employees.

DISCRIMINATION IN NOVEMBER 21, 2008 REDUCTION IN FORCE

28.     In terms of the November 21, 2008 Company-wide reduction in force which

resulted in the termination of the employment of the Public Finance Class Representatives,

Citigroup entrusted its supervisors and managers with unfettered discretion in selecting those

employees to be terminated, which afforded these supervisors and managers the opportunity to

provide their own personal preferences and biases in making these employment decisions. Collectively, these decisions comprise a practice which is excessively subjective and has no legitimate business justification.

29.     This facially neutral policy and practice directly resulted in the unlawful termination of the Public Finance Class Representatives, as well as hundreds of other similarly-situated female former employees, as part of Citigroup's November 21, 2008 Company-wide layoffs.  Upon information and belief, there is a statistically significant disparity between the number of female employees and male employees selected for termination as part of the November 21, 2008 layoff that was unlikely to have occurred by chance, and instead was the result of intentional gender discrimination.

## POLICY AND PRACTICE OF DISCRIMINATION AND RETALIATION

30.     Citigroup's supervisors are entrusted with discretion in the discharge of their duties, which has been unfettered, and affords them the opportunity to apply their own personal preferences and biases in making employment decisions. Collectively, these decisions comprise a practice which is excessively subjective and has no legitimate business justification. Additionally, the discretion entrusted to supervisor in the discharge of these duties afford them the opportunity to retaliate against those female employees who oppose and/or complaint about their discriminatory treatment.

31.     There are alternative policies, practices and procedures available to Citigroup with respect to compensation, assignments, promotions and terminations that are objective, more valid, and more closely related to actual responsibilities and performance.  However, Citigroup has failed or refused to use such alternative procedures.

32.     As a result, qualified female employees have been intentionally denied employment opportunities, compensation and benefits that are available to similarly-situated male employees.  Moreover, female employees have been adversely affected in all facets of their employment with Citigroup by these excessively subjective policies and practices.  Accordingly, the policies and practices identified herein are being challenged under systemic disparate treatment and disparate impact theories of discrimination.

## CLASS ACTION ALLEGATIONS

### CLASS DEFINITION

33.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of female current and former Citigroup employees who have been employed by Citigroup as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, between February 2006 and the present (the "Class").  Upon information and belief, there are thousands of members of the proposed Class.  Plaintiffs reserve the right to amend the definition of the Class based on additional facts obtained in discovery or other legal developments.

34.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of female current and former Citigroup employees assigned to Citigroup's offices in New York State who have been employed by Citigroup as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, between February 2006 and the present ("New York State Subclass").  Upon information and belief, there are thousands of members of the proposed New York State Class.  Plaintiffs reserve the right to amend the definition of the New York State Class based on additional facts obtained in discovery or other legal developments.

35.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of female current and former Citigroup employees assigned to Citigroup's offices in New York City who have been employed by Citigroup as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, between February 2006 and the present ("New York City Subclass").  Upon information and belief, there are thousands of members of the proposed New York State Class.  Plaintiffs reserve the right to amend the definition of the New York City Class based on additional facts obtained in discovery or other legal developments.

36.     Plaintiffs also seek to maintain claims on their own behalf and on behalf of a subclass of current and former female Citigroup employees assigned to Citigroup's offices in New York State who have been employed as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees and have experienced retaliation by Citigroup between March 16, 2007 and the present ("New York State Retaliation Subclass").  Upon information and belief, there are more than 50 members of this proposed subclass.  Plaintiffs reserve the right to amend the definition of this subclass based on additional facts obtained in discovery or other legal developments.

37.     Plaintiffs also seek to maintain claims on their own behalf and on behalf of a subclass of current and former female Citigroup employees assigned to Citigroup's offices in New York City who have been employed as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's

discriminatory practices against themselves and other female employees and have experienced retaliation by Citigroup between March 16, 2007 and the present ("New York City Retaliation Subclass").  Upon information and belief, there are more than 50 members of this proposed subclass.  Plaintiffs reserve the right to amend the definition of this subclass based on additional facts obtained in discovery or other legal developments.

38.     Plaintiffs also seek to maintain claims on their own behalf and on behalf of a proposed subclass of current and former female employees assigned to Citigroup's offices in New York State who have been employed as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, who have become pregnant, taken a maternity leave or have childcare obligations and have experienced gender discrimination between March 16, 2007 ("New York State Pregnancy Subclass").  Upon information and belief, there are more than 50 members of this proposed subclass.  Plaintiffs reserve the right to amend the definition of this subclass based on additional facts obtained in discovery or other legal developments.

39.     Plaintiffs also seek to maintain claims on their own behalf and on behalf of a proposed subclass of current and former female employees assigned to Citigroup's offices in New York City who have been employed as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, who have become pregnant, taken a maternity leave or have childcare obligations and have experienced gender discrimination between March 16, 2007 ("New York City Pregnancy Subclass").  Upon information and belief, there are more than 50 members of this proposed subclass.  Plaintiffs reserve the right to amend the definition of this subclass based on additional facts obtained in discovery or other legal developments.

40.     Plaintiffs also seek to maintain claims on their own behalf and on behalf of a proposed subclass of current and former female employees who have been employed by Citigroup as, or at levels equivalent to, Managing Director, Director, Vice-President, Assistant Vice-President, Associate, and Analyst, who have exercised their rights under the FMLA by taking an FMLA-designated maternity leave and whose FMLA rights have been interfered with and/or have been subject to retaliation for exercising such rights between October 13, 2010 and the present ("FMLA Subclass").  Upon information and belief, there are hundreds of members of this proposed subclass.  Plaintiffs reserve the right to amend the definition of this subclass based on additional facts obtained in discovery or other legal developments.

**EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS**

41.     Certification of a Class of current and former female employees similarly-situated to Plaintiffs is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the Class.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination and retaliation against its female employees.  Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class and Citigroup.

42.     Certification of a subclass of current and female former employees assigned to Citigroup's offices in New York State is the most efficient and economical means of resolving

the questions of law and fact that are common to Plaintiffs' claims and those of the New York State Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination and retaliation against its female employees.  Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York State Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York State Subclass and Citigroup.

43.     Certification of a subclass of current and female former employees assigned to Citigroup's offices in New York City is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the New York City Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination and retaliation against its female employees.  Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York City Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York City Subclass and Citigroup.

44.     Certification of the subclass of current and former female Citigroup employees assigned to Citigroup's offices in New York State who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees and have experienced retaliation is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the New York State Retaliation Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of retaliation against those female employees who oppose Citigroup's discriminatory practices.  Plaintiffs have standing to seek such relief because of the adverse effect that such retaliation has had on them individually and on the members of the New York State Retaliation Subclass generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York State Retaliation Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York State Retaliation Subclass and Citigroup.

45.     Certification of a subclass of current and former female Citigroup employees assigned to Citigroup's offices in New York City who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees and have experienced retaliation is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the New York City Retaliation Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a

systemic pattern and/or practice of retaliation against those female employees who oppose Citigroup's discriminatory practices.  Plaintiffs have standing to seek such relief because of the adverse effect that such retaliation has had on them individually and on the members of the New York City Retaliation Subclass generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York City Retaliation Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York City Retaliation Subclass and Citigroup.

46.      Certification of a subclass of current and former female employees assigned to Citigroup's offices in New York State who have become pregnant, taken a maternity leave or have childcare obligations and have experienced gender discrimination is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the New York State Pregnancy Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination against the members of the New York State Pregnancy Subclass.  Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on the subclass generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York State Pregnancy Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York State Pregnancy Subclass and Citigroup.

47.     Certification of a subclass of current and former female employees assigned to Citigroup's offices in New York City who have become pregnant, taken a maternity leave or have childcare obligations and have experienced gender discrimination is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the New York City Pregnancy Subclass.  Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination against the members of the New York City Pregnancy Subclass. Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on the subclass generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed New York City Pregnancy Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the New York City Pregnancy Subclass and Citigroup.

48.     Certification of a subclass of current and former female employees assigned to Citigroup's offices exercised their rights under the FMLA by taking an FMLA-designated maternity leave and whose FMLA rights have been interfered with and/or have been subject to retaliation for exercising such rights is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the FMLA Subclass. Plaintiffs' individual claims require resolution of the common question of whether Citigroup has engaged in a systemic pattern and/or practice of discrimination and/or retaliation against the members of the FMLA Subclass.  Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on the subclass

generally.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed FMLA Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the FMLA Subclass and Citigroup.

**NUMEROSITY AND IMPRACTICABILITY OF JOINDER**

49.     The individuals in the Class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees during the relevant time period.  Although the number of class members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

50.     The individuals in the New York State Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York State during the relevant time period.  Although the number of class members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

51.     The individuals in the New York City Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York City during the relevant time period.  Although the number of class members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

52.     The individuals in the New York State Retaliation Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York State during the relevant time period and hundreds of these female employees have complained of and/or opposed Citigroup's discriminatory practices and have experienced retaliation as a result thereof during the relevant time period.  Although the number of subclass members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

53.     The individuals in the New York City Retaliation Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York City during the relevant time period and hundreds of these female employees have complained of and/or opposed Citigroup's discriminatory practices during the relevant time period and experienced retaliation as a result thereof.  Although the number of subclass members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

54.     The individuals in the New York State Pregnancy Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York State during the relevant time period and hundreds of these female employees have become pregnant, taken a maternity leave an/or have had childcare obligations and have experienced discrimination as a result thereof during the relevant time period.

Although the number of subclass members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

55.     The individuals in the New York City Pregnancy Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees in New York City during the relevant time period and hundreds of these female employees have become pregnant, taken a maternity leave an/or have had childcare obligations and have experienced discrimination as a result thereof during the relevant time period. Although the number of subclass members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

56.     The individuals in the FMLA Subclass are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time, upon information and belief, Citigroup has employed thousands of female employees during the relevant time period and hundreds of these female employees have taken a FMLA-designated maternity leave and have experienced discrimination and/or retaliation as a result thereof during the relevant time period.  Although the number of subclass members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of Rule 23.

## COMMON QUESTIONS OF LAW AND FACT

57.     There are questions of law common to the Class that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of denying female employees compensation commensurate with similarly-situated male employees and/or has otherwise intentionally discriminated against the members of the class in assignments,

promotions, termination and/or the terms, conditions and/or privileges of employment in violation of Title VII; (b) whether Citigroup has policies and practices that have a disparate impact on women; (c) whether Citigroup has failed to implement policies and procedures to prevent retaliation against employees who challenged perceived gender bias in the workplace, has failed to address complaints and has failed to conduct proper investigations; (d) if discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the members of the Class and prevent future discrimination against members of the Class; (e) whether Citigroup's conduct constitutes a pattern or practice of discrimination against the Class justifying an award of lost wages, benefits or other similar remedies to individual members of the Class; and (f) whether Citigroup's conduct constitutes a pattern of discrimination against members of the Class justifying an award of compensatory and punitive damages to individual members of the Class.

58.     There are questions of law common to the New York State Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of denying female employees compensation commensurate with similarly-situated male employees and/or has otherwise intentionally discriminated against the members of the class in assignments, promotions, termination and/or the terms, conditions and/or privileges of employment in violation of the NYSHRL; (b) whether Citigroup has policies and practices that have a disparate impact on women; (c) whether Citigroup has failed to implement policies and procedures to prevent retaliation against employees who challenged perceived gender bias in the workplace, has failed to address complaints and has failed to conduct proper investigations; (d) if

discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the members of the New York State Subclass and prevent future discrimination against members of the New York State Subclass; (e) whether Citigroup's conduct constitutes a pattern or practice of discrimination against the New York State Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York State Subclass; and (f) whether Citigroup's conduct constitutes a pattern of discrimination against members of the New York State Subclass justifying an award of compensatory and punitive damages to individual members of the New York State Subclass.

59.     There are questions of law common to the New York City Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of denying female employees compensation commensurate with similarly-situated male employees and/or has otherwise intentionally discriminated against the members of the class in assignments, promotions, termination and/or the terms, conditions and/or privileges of employment in violation of the NYCHRL; (b) whether Citigroup has policies and practices that have a disparate impact on women; (c) whether Citigroup has failed to implement policies and procedures to prevent retaliation against employees who challenged perceived gender bias in the workplace, has failed to address complaints and has failed to conduct proper investigations; (d) if discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the members of the New York City Subclass and prevent future discrimination against members of the New York City Subclass; (e) whether Citigroup's conduct

constitutes a pattern or practice of discrimination against the New York City Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York City Subclass; and (f) whether Citigroup's conduct constitutes a pattern of discrimination against members of the New York City Subclass justifying an award of compensatory and punitive damages to individual members of the New York City Subclass.

60.     There are questions of law common to the New York State Retaliation Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of retaliation against current and former female Citigroup employees who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees in violation of the NYSHRL; (b) whether Citigroup has failed to implement policies and procedures to prevent retaliation against employees who challenged perceived gender bias in the workplace, has failed to address complaints and has failed to conduct proper investigations; (c) if a pattern or practice of retaliation is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination and retaliation against the members of the New York State Retaliation Subclass and prevent future retaliation against members of the New York State Retaliation Subclass; (d) whether Citigroup's conduct constitutes a pattern or practice of retaliation against the New York State Retaliation Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York State Retaliation Subclass; and (e) whether Citigroup's conduct constitutes a pattern of retaliation against members of the New York State Retaliation

Subclass justifying an award of compensatory and punitive damages to individual members of the New York State Retaliation Subclass.

61.     There are questions of law common to the New York City Retaliation Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of retaliation against current and former female Citigroup employees who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees in violation of the NYCHRL; (b) whether Citigroup has failed to implement policies and procedures to prevent retaliation against employees who challenged perceived gender bias in the workplace, has failed to address complaints and has failed to conduct proper investigations; (c) if a pattern or practice of retaliation is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination and retaliation against the members of the New York City Retaliation Subclass and prevent future retaliation against members of the New York City Retaliation Subclass; (d) whether Citigroup's conduct constitutes a pattern or practice of retaliation against the New York City Retaliation Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York City Retaliation Subclass; and (e) whether Citigroup's conduct constitutes a pattern of retaliation against members of the New York City Retaliation Subclass justifying an award of compensatory and punitive damages to individual members of the New York City Retaliation Subclass.

62.     There are questions of law common to the New York State Pregnancy Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a)

whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of discrimination against current and former female employees who have become pregnant, taken a maternity leave or have childcare obligations; (b) whether Citigroup has failed to implement policies and procedures to prevent discrimination against employees who have become pregnant, taken a maternity leave or have childcare obligations; (c) if a pattern or practice of discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the members of the New York State Pregnancy Subclass and prevent future discrimination against members of the New York State Pregnancy Subclass; (d) whether Citigroup's conduct constitutes a pattern or practice of discrimination against the New York State Pregnancy Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York State Pregnancy Subclass; and (e) whether Citigroup's conduct constitutes a pattern of discrimination against members of the New York State Pregnancy Subclass justifying an award of compensatory and punitive damages to individual members of the New York State Pregnancy Subclass.

63.     There are questions of law common to the New York City Pregnancy Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of discrimination against current and former female employees who have become pregnant, taken a maternity leave or have childcare obligations; (b) whether Citigroup has failed to implement policies and procedures to prevent discrimination against employees who have become pregnant, taken a maternity leave or have childcare obligations; (c) if a pattern or practice of discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten

policies and practices, is needed to adequately remedy past and present discrimination against the members of the New York City Pregnancy Subclass and prevent future discrimination against members of the New York City Pregnancy Subclass; (d) whether Citigroup's conduct constitutes a pattern or practice of discrimination against the New York City Pregnancy Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the New York City Pregnancy Subclass; and (e) whether Citigroup's conduct constitutes a pattern of discrimination against members of the New York City Pregnancy Subclass justifying an award of compensatory and punitive damages to individual members of the New York City Pregnancy Subclass.

64.     There are questions of law common to the FMLA Subclass that predominate over any questions affecting only individuals.  Among these questions are: (a) whether Citigroup maintains discriminatory policies and/or has engaged in an unlawful pattern of discrimination and/or retaliation against current and former female employees who have taken an FMLA designated maternity leave; (b) whether Citigroup has failed to implement policies and procedures to prevent discrimination and/or retaliation against employees who have taken an FMLA-designated maternity leave; (c) if a pattern or practice of discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the members of the FMLA Subclass and prevent future discrimination against members of the FMLA Subclass; (d) whether Citigroup's conduct constitutes a pattern or practice of discrimination against the FMLA Subclass justifying an award of lost wages, benefits or other similar remedies to individual members of the FMLA Subclass; and (e) whether Citigroup's conduct constitutes a

pattern of discrimination against members of the FMLA Subclass justifying an award of compensatory and punitive damages to individual members of the FMLA Subclass.

65.     There are questions of fact common to the Class that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees; (b) Citigroup has precluded its female employees from eligibility for promotions by denying them training afforded to male employees; (c) Citigroup has subjected its female employees to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated male employees; and (d) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

66.     There are questions of fact common to the New York State Class that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees; (b) Citigroup has precluded its female employees from eligibility for promotions by denying them training afforded to male employees; (c) Citigroup has subjected its female employees to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated male employees; and (d) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

67.     There are questions of fact common to the New York City Class that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees; (b) Citigroup has precluded its female employees from eligibility for promotions by denying them training afforded to male employees; (c) Citigroup has subjected its female employees to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated male employees; and (d) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

68.     There are questions of fact common to the New York State Retaliation Subclass that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has subjected current or former female employees who have engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees to adverse employment actions; (b) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace;  and (c) whether the members of the New York State Retaliation Subclass have suffered damages as a result of Citigroup's conduct.

69.     There are questions of fact common to the New York State Retaliation Subclass that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has subjected current or former female employees who have engaged in protected activity by opposing and/or

participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees to adverse employment actions; and (b) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace; and (c) whether the members of the New York City Retaliation Subclass have suffered damages as a result of Citigroup's conduct.

70.     There are questions of fact common to the New York State Pregnancy Subclass that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees who have become pregnant, taken a maternity leave or have childcare obligations; (b) Citigroup has precluded its female employees who have become pregnant, taken a maternity leave or have childcare obligations from eligibility for promotions by denying them training afforded to non-protected class members; (c) Citigroup has subjected its female employees who have become pregnant, taken a maternity leave or have childcare obligations to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated, non-protected class employees; and (d) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the pregnancy discrimination in its workplace.

71.     There are questions of fact common to the New York City Pregnancy Subclass that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees who have become pregnant, taken a maternity leave or have childcare obligations; (b) Citigroup has precluded its female employees who have become

pregnant, taken a maternity leave or have childcare obligations from eligibility for promotions by denying them training afforded to non-protected class members; (c) Citigroup has subjected its female employees who have become pregnant, taken a maternity leave or have childcare obligations to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated, non-protected class employees; and (d) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the pregnancy discrimination in its workplace.

72.     There are questions of fact common to the FMLA Subclass that predominate over any questions affecting only individuals.  Among these questions are, whether, through its policies, practices, or procedures: (a) Citigroup has denied or delayed the promotion of its female employees who have become have taken an FMLA-designated maternity leave; (b) Citigroup has precluded its female employees who have taken an FMLA-designated maternity leave from eligibility for promotions by denying them training afforded to non-protected class members; (c) Citigroup has subjected its female employees who have taken an FMLA-designated maternity leave to differential treatment, including but not limited to, less preferable work assignments, lower compensation, inequitable evaluations, stricter discipline and inequitable demotions and/or terminations, as compared to similarly-situated, non-protected class employees; (d) whether Citigroup has failed to reinstate its female employees who have taken an FMLA-designated maternity to the same or a substantially similar position following their return from FMLA leave; and (e) Citigroup has engaged in a pattern or practice of failing to take prompt and effective action to remedy the interference with and/or retaliation for exercising rights protected by the FMLA in its workplace.

73.     The discriminatory employment policies, practices and/or procedures to which Plaintiffs and the members of the Class and subclasses were subjected are established at Citigroup's corporate level and apply universally to all members of the Class and subclasses throughout the country.  These employment policies, practices and/or procedures are not unique or limited to any department; rather, they apply to all departments.

74.     Throughout the liability period, a disproportionately large percentage of the managers, supervisors, division heads, and executives at Citigroup are and have been male.

75.     Discrimination and retaliation in selection, promotion advancement and termination occurs as a pattern and practice throughout all levels and divisions of Citigroup. Selection, promotion and advancement opportunities, as well as layoff decisions, are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male managers, supervisors, and subordinates rather than by merit or equality of opportunity.  As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than female employees and are selected for layoff at a rate significantly less than better qualified and more experienced female employees.

**TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

76.     Plaintiffs are members of the Class and subclasses they seek to represent. Plaintiffs' claims are typical of the claims of the proposed Class and subclasses.  One or all of the Plaintiffs assert claims in each of the categories of claims they assert on behalf of the proposed Class and subclasses.  Discrimination in compensation, promotions, assignments and termination decisions affect the Plaintiffs and the proposed Class and subclass members in similar ways.  The relief the Plaintiffs seek for the discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed Class and subclasses.

77.     Citigroup has failed to create adequate incentive for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and/or procedures referenced in this Complaint and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination and anti-retaliation laws.  These failures have affected the Plaintiffs, the members of the Class and the members of the subclasses in similar ways.

78.     The relief necessary to remedy the claims of the Plaintiffs are exactly the same as that necessary to remedy the claims of the proposed Class and subclasses in this case.  Plaintiffs seek the following relief for their individual claims and for those of the members of the proposed Class and subclasses: (a) a declaratory judgment that Citigroup has engaged in systematic gender discrimination, pregnancy discrimination and retaliation against female employees; (b) a permanent injunction against such continuing discriminatory and retaliatory conduct; (c) injunctive relief which effects a restructuring of Citigroup's promotion, transfer, training, performance, evaluation, compensation, work environment and discipline policies, practices and/or procedures so that female employees will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) equitable relief which effects a restructuring of the Citigroup workforce so that female employees are promoted into higher and better paying classifications that they would have held in the absence of Citigroup's past gender discrimination; (e) economic damages to compensate for unequal pay among other monetary losses; (f) compensatory damages; (g) punitive and nominal damages to prevent and deter Citigroup from engaging in similar discriminatory and retaliatory practices in the future; and (h) attorneys' fees, costs and expenses.

**ADEQUACY OF REPRESENTATION**

79.     Plaintiffs' interests are co-extensive with those of the members of the proposed Class and subclasses of female employees that they seek to represent in this case.  Plaintiffs seek to remedy Citigroup's discriminatory and retaliatory employment policies, practices and/or procedures so that female employees will no longer be subject to differential treatment. Plaintiffs are willing and able to represent the proposed Class and subclasses fairly and vigorously as they pursue their similar individual claims in this action.

80.     Plaintiffs have retained counsel who are qualified, experienced and able to conduct this litigation and to meet the time and fiscal demands to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience and resources of Plaintiffs and their counsel to litigate competently the individual and class claims at issue in this case satisfy the adequacy of representation requirement of Fed. R. Civ. P. 23(a)(4).

**REQUIREMENTS OF RULE 23(B)(2)**

81.     Citigroup has acted on grounds generally applicable to Plaintiffs and the proposed Class and subclasses by adopting and following systemic policies, practices and/or procedures that are discriminatory on the basis of gender.  This discrimination is Citigroup's standard operating procedure rather than a sporadic occurrence.  Citigroup has refused to act on grounds generally applicable to the Class by, *inter alia*: (a) refusing to adopt and apply compensation, assignment and promotion policies, practices and/or procedures which do not have a disparate impact on, or otherwise systemically discriminate against, female employees; and (b) refusing to provide equal terms and conditions of employment for female employees.  Citigroup's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

82.     Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Citigroup's individual and class-wide liability and the essential predicate for Plaintiffs' and the Class and subclass members' entitlement to monetary and non-monetary remedies to be determined at a later stage of the proceedings. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against female employees at Citigroup generally.  Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Class and subclass members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by such systemic discrimination.

**REQUIREMENTS OF RULE 23(B)(3)**

83.     The common issues of fact and law affecting Plaintiffs' claims and those of the proposed Class and subclasses, including, but not limited to, the common issues identified in the paragraphs above, predominate over any issues affecting only individual claims.

84.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the members of the proposed Class and subclasses.

85.     The cost of proving Citigroup's pattern and practice of discrimination makes it impracticable for Plaintiffs and the members of the proposed Class and subclasses to pursue their claims individually.

<u>**CULTURE OF DISCRIMINATION WITHIN CITIGROUP**</u>

86.     Defendants' pattern and practice of discriminatory conduct towards female employees is an outgrowth of the general discriminatory attitude towards women that pervades

all departments and divisions of the Company.  Indeed, it is a well-known mantra at Citigroup

that, "if there's a layoff, it's women and children first."

## CULTURE OF DISCRIMINATION WITHIN THE MUNICIPAL SECURITIES DIVISION

87.     The culture of discrimination that exists at Citigroup, and within the Municipal

Services Division in particular, is most simply proven by statistical evidence.  For example,

based on data current as of July 2006, in Citigroup's Municipal Securities Division, women filled

only five (5) out of the fifty-eight (58) (or 9%) total Managing Directors positions.  The

Managing Director position is the highest executive level at the Company and represents the top

management of the Company.

88.     At the second highest level, women filled only sixteen (16) out of 121 (or 13%) of

the Director positions in the Municipal Securities Division.  Thus, at these two high-level

executive positions, 158 out of 179 total positions (or 88%) were filled by men.

89.     At the Vice-President level, women filled thirty-two (32) of the seventy-six (76)

(or 42%) positions within the Municipal Securities Division.  Similarly, at the junior professional

level (which includes Assistant Vice Presidents, Associates, and Analysts), women filled forty-

five (45) of the 109 (or 41%) of these positions within the Municipal Securities Division.

90.     As a percentage of the overall population of professional employees within the

Municipal Securities Division, women filled only 27% of those 364 total professional positions.

91.     Thus, as a percentage of the overall population of female employees in the

Municipal Securities Division as of July 2006, only five of the ninety-eight (98) female

employees (or 5%) were employed as Managing Directors and only 16% were employed as

Directors.  Conversely, 20% of the 266 male employees were employed as Managing Directors

with 39% of the male employees assigned to Director positions.  Thus, 59% of the 266 male

employees in the Municipal Securities Division were either Managing Directors or Directors which is a far greater percentage as compared to female employees.

92.     At the Vice President level (which is subordinate to Managing Directors and Directors), while thirty-two (32) of the seventy-six (76) (or 42%) total positions are filled by women, these thirty-two (32) women make up 33% of the total female population in the Municipal Securities Division while the forty-four (44) male Vice Presidents comprise only 17% of total male population in the Municipal Securities Division.

93.     Similarly, while forty-five (45) of the 109 (or 41%) junior professional positions (which includes the Assistant Vice President, Associates and Analyst positions) are filled by women, these forty-five (45) women make up 46% of the total female population in the Municipal Securities Division while the sixty-four (64) male junior professional employees comprise only 24% of the total male population in the Municipal Securities Division.  Thus, it is clear that women are relegated to the Vice-President and junior professional positions, all of which are non-officer positions, while the top management positions are overwhelmingly dominated by men.

94.     While the total number of Managing Director and Director positions increased steadily from 2000 to 2006, the stark disparity between the number of male and female employees in these positions remained constant.  Indeed, during this time period, the number of male Managing Directors increased from thirty-four (34) to fifty-three (53), while the number of female Managing Directors increased from three (3) to five (5).  Similarly, during the same time period, the number of male Directors increased from sixty-three (63) to one hundred five (105), while the number of female Directors increased from nine (9) to sixteen (16).  Thus, the culture

of discrimination that permeates Citigroup is well-established in the Municipal Securities

Division and continued unabated through the November 21, 2008 reduction in force.

**CULTURE OF DISCRIMINATION WITHIN THE PUBLIC FINANCE DEPARTMENT**

95.     The culture of discrimination that exists within the Municipal Securities Division

is also evident within the Public Finance Department.

96.     Similar to the Municipal Securities Division, the culture of discrimination that

exists within Public Finance is most simply proven by statistical evidence.  For example, based

on data current prior to the November 21, 2008 layoff, in Citigroup's Public Finance

Department, women filled only four (4) out of the thirty-three (33) (or 12%) total Managing

Directors positions.  Similarly, women filled only five (5) out of the fifty-one (51) (or 10%)

Director positions.  Thus, at these two high-level executive positions within Public Finance,

seventy-five (75) out of eighty-four (84) total positions (or 89%) were filled by men.

97.     Similarly, prior to the November 21, 2008 layoff, women filled two (2) of the six

(6) (or 33%) Vice President positions and filled twenty-six (26) of the sixty-six (66) (or 39%)

junior professional positions.

98.     As a percentage of the overall total of professional employees, women filled 24%

of the 156 total professional positions within Public Finance.

99.     Thus, as a percentage of female employees in the Public Finance Department

prior to the November 21, 2008 layoff, only 11% of the thirty-seven (37) female employees were

employed as Managing Directors and only 14% were employed as Directors.  Conversely, of the

119 male employees in the Public Finance Department, 24% were employed as Managing

Directors and 39% of the total male population was employed as Directors.

100.    At the junior professional level (which includes Assistant Vice President, Associate and Analyst), while twenty-six (26) of the sixty-six (66) (or 39%) junior professional positions are filled by women, these twenty-six (26) women make up 70% of the total female population in Public Finance while the forty (40) male junior professionals comprise only 34% of the total male population within Public Finance.  Thus, it is clear that women are relegated to the junior professional positions, all of which are non-officer positions, while the top positions are dominated by men.

## GENDER DISCRIMINATION WITHIN THE PUBLIC FINANCE DEPARTMENT IN THE NOVEMBER 21, 2008 LAYOFF

101.    The Company-wide layoffs which were announced on November 21, 2008, had a disparate impact on women across the entire Public Finance Department, Municipal Securities Division and, upon information and belief, the entire Company.

102.    As explained above, there was already a high disparity among the number of male and female officer positions within Public Finance, yet six (6) male and five (5) female Managing Directors and Directors were terminated.  Thus, while 89% of the Managing Directors and Directors were men, only 55% of Managing Directors and Directors selected for layoff in the November 21, 2008 reduction in force were men.

103.    As a result of the November 21, 2008 reduction in force, the number of female Managing Directors and Directors decreased from nine (9) to only five (5), and the percentage of the total number of these positions filled by women decreased from 11% to 7%.  Indeed, as a result of the November 21, 2008 layoff, the number of female Directors in Public Finance decreased from five (5) to only one (1) – thus, only 2% of the Director positions after the reduction in force were filled by women.

104.     With respect to the junior professional positions (Assistant Vice President, Associate and Analyst), male employees were laid off at a significantly lower rate than female employees despite comprising a substantial majority of the pre-layoff population.  Specifically, of the thirteen (13) employees in these positions which were laid off, seven (7) were women and six (6) were men.  Thus, as a result of the November 21, 2008 layoff, the number of female junior professional employees decreased from twenty-six (26) to nineteen (19) while the percentage of women in the overall junior professional population decreased from 39% to 36%.

**CULTURE OF DISCRIMINATION WITHIN THE ASSET FINANCE GROUP**

105.     While Ms. Hazan-Amir did not work in the Public Finance Department and was not terminated as part of the November 21, 2008 reduction in force, her claims are linked to the Public Finance Class Representatives (and those of all the members of the Class) by the intentional gender discrimination that she has suffered throughout her employment with Citigroup.

106.     Soon after Ms. Hazan-Amir started her employment with Citigroup, she came to realize that AFG was a cold and ostracizing environment for women, which was primarily the result of the favoritism toward men exhibited by Gary Rothschild, the regional head of AFG.

107.     Indeed, at the time that Ms. Hazan-Amir joined AFG in a junior transactor role, there were approximately 25 transactional employees in AFG North America, yet only three of these positions were filled by women.  At present, there are currently 20 transactional employees in AFG, yet following Ms. Hazan-Amir's demotion, only two of these positions are filled by women.

## CLAIMS OF REPRESENTATIVE PARTIES

### I.   AMY BARTOLETTI

108.   At the time that Amy Bartoletti was notified that she was being laid off in November 2008, she had been a 16 year employee of Citigroup.  As reflected uniformly in her performance reviews and bonus compensation, throughout her employment with Citigroup, Ms. Bartoletti was an outstanding, dedicated and hard-working employee of the Company who always demonstrated a high level of performance.  Always the consummate team player, Ms. Bartoletti was well respected by her peers, immediate supervisors and subordinates alike.

109.   Notwithstanding the above, on November 21, 2008, Ms. Bartoletti was notified by Mr. Brownstein that her employment was terminated as part of a Company-wide reduction in force.

110.   In July 2008, Ms. Bartoletti was employed as a Director assigned to Public Finance's Housing Group, a position she had held for approximately seven years, and reported to Nicholas Fluehr, Managing Director and Head of the Housing Group.  In July 2008, Mr. Fluehr's employment was terminated as part of a reduction in force.

111.   Following Mr. Fluehr's July 2008 layoff, the Housing Group consisted of seven employees: two Directors (Ms. Bartoletti and Michael Koessel), one Vice President (Ping Hsieh), two Associates (Ray High and Michael Murad) and two Analysts (Chia Siu and Tian Yang).

112.   Immediately following Mr. Fluehr's layoff, David Brownstein selected Ms. Bartoletti to serve as the new Head of the Housing Group.  Ms. Bartoletti was the logical choice as she was more qualified for the position than Mr. Koessel, as reflected by their respective performance reviews, their respective 360 degree reviews by their peers, and their respective

performance bonuses.  Indeed, in stark contrast to Ms. Bartoletti, Mr. Koessel was not well-regarded by his peers and subordinates.  Indeed, Ms. Bartoletti's former supervisor previously stated that, "Ms. Bartoletti's performance exceeded that of Mr. Koessel in every category," and "there is no question that Ms. Bartoletti's managerial experience and understanding of working of the Housing Group far exceeded that of Mr. Koessel's."

113.    Indeed, prior to his termination, Mr. Fluehr regularly asked Ms. Bartoletti to assume many of his management responsibilities when he was traveling for business or was otherwise unavailable.  In addition, Ms. Bartoletti had significant management experience as she had been the Analyst/Associate coordinator in the Housing Group for several years until she passed this responsibility on to Ms. Hsieh.

114.    When Mr. Koessel learned that Mr. Brownstein selected Ms. Bartoletti to replace Mr. Fluehr as Head of the Housing Group, Mr. Koessel complained to Mr. Brownstein and threatened to quit if he was not selected to serve as co-Head of the Housing Group.

115.    Rather than explain to Mr. Koessel that Ms. Bartoletti was more qualified for the position, Mr. Brownstein, who maintains a close, personal relationship with Mr. Koessel, acquiesced to Mr. Koessel's demands and appointed Mr. Koessel to serve as co-Head of the Housing Group along with Ms. Bartoletti.

116.    Shortly after they were named as co-Heads of the Housing Group, both Ms. Bartoletti and Mr. Koessel were told by Citigroup's Business Controls – Risk Management department that, in order to remain in their positions as co-Heads of the Housing Group, they needed to take and pass the Municipal Securities Principal Qualification (Series 53) examination within 90 days.  Ms. Bartoletti and Mr. Koessel were told that this licensure is required of all group heads within the Municipal Securities Division.

117.     While Ms. Bartoletti took and passed the Series 53 examination on October 29, 2008, at the time of her termination, Mr. Koessel had not (and still has not) obtained this licensure which Citigroup stated was a necessary requirement of the position of co-Head of the Housing Group.  Citigroup, however, permitted Mr. Koessel to remain as the co-Head of the Housing Group position and now permits him to serve as Head of the Housing Group.

118.     Ms. Bartoletti had significantly more experience with Citigroup as she had been employed with the Company since 1992 while Mr. Koessel began his employment with the Company in 2002.

119.     In addition to being longer tenured, Ms. Bartoletti's performance reviews and bonus compensation reflect that she was significantly more qualified than Mr. Koessel.  Indeed, while Mr. Koessel was frequently rated "Effective," Ms. Bartoletti always received the highest ratings (either "Exceptional" or "Highly Effective") on her performance reviews.  Similarly, Mr. Koessel's 360 degree reviews reflect that he was not well-regarded among his peers and subordinates.  Further, while Mr. Koessel and Ms. Bartoletti received the same base salary, Ms. Bartoletti's performance-based bonus always far exceeded Mr. Koessel's performance-based bonus.

120.     Notwithstanding the fact that Ms. Bartoletti was clearly more qualified for the position of Head of the Housing Group, on November 21, 2008, she was notified by Mr. Brownstein that he selected her for termination as part of a reduction in force.  However, Mr. Koessel was retained as the Head of the Housing Group.

121.     Based on any objective business criteria, the elimination of Ms. Bartoletti in favor of Mr. Koessel cannot be justified.  Instead, Mr. Brownstein was given unfettered discretion in

whom to select for layoff, and he chose to keep the male employee with whom he maintained a personal friendship rather than a significantly more qualified female employee.

122.    Indeed, Ms. Bartoletti's former supervisor stated that he was shocked when he learned that Citigroup had decided to terminate Ms. Bartoletti has part of a reduction in force and retain Mr. Koessel and he could think of no set of circumstances in which Citigroup could have selected Ms. Bartoletti for termination over Mr. Koessel.

123.    As further evidence of the discriminatory animus employed by Mr. Brownstein in selecting employees to layoff within the Housing Group, the only other women in the group (Ms. Ping and Ms. Siu) also were selected for layoff, despite being more qualified than those male employees that were retained.

124.    Thus, following the November 21, 2008 reduction in force, Mr. Brownstein had eliminated all of the female employees in the Housing Group.

125.    The foregoing actions by Citigroup, through the actions of the Company's management, including but not limited to Mr. Brownstein, constitute unlawful disparate treatment and/or disparate impact discrimination against Ms. Bartoletti on the basis of her gender.

126.    On February 17, 2009, Ms. Bartoletti filed a formal charge of discrimination with the EEOC on behalf of herself and other similarly-situated employees stating the same facts alleged herein.

127.    As a result of Defendants' unlawful discrimination and retaliation, including, but not limited to, the termination of her employment, Ms. Bartoletti has suffered monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits.

128.     As a further result of Defendants' unlawful and discriminatory actions, Ms. Bartoletti has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

129.     Defendants' discriminatory and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Bartoletti's civil rights.

## II.   CHIA SIU

130.     Ms. Siu began her career with Citigroup in July 2006 as an Analyst assigned to the Housing Group.  Prior to accepting this position, Ms. Siu took part in a one-year rotational internship from July 2005 to June 2006, where she spent six months working for Citigroup and six months working for the New York State Housing Finance Agency.  In July 2006, following this rotational internship, Ms. Siu was hired as an Analyst within the Housing Group.

131.     Throughout her employment with Citigroup, Ms. Siu was, according to all quantifiable metrics, a top-performer.  Indeed, in her June 2008 year end review, Ms. Siu received a rating of "Superior" – the highest rating – and Mr. Fluehr provided the following comments: "Chia is very reliable and does a fantastic job with clients and projects.  She takes initiative and is a very valuable member of our Housing Group."

132.     As further evidence of her commitment and dedication to Citigroup, though not a requirement for her position, Ms. Siu was pursuing the designation of Chartered Financial Analyst and had passed two of the three examinations required for this designation, both on her first attempt.

133.    In further recognition of her outstanding performance, in August 2008, Ms. Bartoletti and Mr. Koessel, along with Mr. Brownstein, told Ms. Siu that she was to be promoted to an Associate position in January 2009 – six months ahead of the normal three-year schedule for Analysts.  While this promotion was confirmed by Human Resources, the promotion was effectuated prior to Ms. Siu's termination as part of the November 21, 2008 discriminatory reduction in force and was confirmed by Human Resources approximately two weeks prior.

134.    On November 21, 2008, Ms. Siu was notified that she was being terminated as part of a reduction in force.  Prior to this date, there were four individuals employed as either Analysts or Associates, yet Ms. Siu – the only female in either of these positions – was the only employee to be involuntarily eliminated.  Michael Murad, a July 2008 hire, was also terminated, but he had already decided to look for work outside the Housing Group.

135.    In July 2008, Citigroup hired Tian Yang (male) as an Analyst assigned to the Housing Group.  When he was hired, Mr. Yang had no experience in the industry and had not obtained his required licensure for the position.

136.    At the time Ms. Siu was laid off, Defendants retained Tian Yang, a male Analyst hired by Citigroup in July 2008.  At the time that Mr. Brownstein decided to retain Mr. Yang, he had not yet been given any independent responsibility and the majority of his work involved assisting other Analysts and Associates.

137.    The majority of Mr. Yang's training was provided by Ping Hsieh – a female Vice President who also was terminated as part of the November 21, 2008 reduction in force.  And, as of November 21, 2008, Mr. Yang had not obtained his Series 63 licensure, a requirement of the position, as he failed his first attempt at this licensing exam.  Yet Mr. Brownstein made the

decision to retain Mr. Yang and not Ms. Siu who had obtained all required licenses on her first attempt.  Mr. Yang also was significantly less experienced than Ms. Siu.

138.   In addition to retaining Mr. Yang instead of Ms. Siu, Mr. Brownstein also elected to retain Raymond High, a male Associate two years senior to Ms. Siu.  Despite having two years of experience less than Mr. High, Ms. Siu was regularly assigned more responsibility and, as evidence of her higher level of performance and value to the Group, worked on more senior-managed single family deals than any of the other junior bankers in the Housing Group, which included Messrs. High and Yang.  Also, because she was two years junior to Mr. High, she represented a significant cost savings to the Housing Group over the retention of Mr. High.

139.   When Mr. Brownstein chose to retain Messrs. High and Yang – and chose to terminate Ms. Siu – he did not do so because of any objective business criteria, but because of her gender.

140.   Defendants claim that Ms. Siu was selected for layoff because she expressed that she was dissatisfied with her placement in the Group and that she intended to leave the firm, yet Defendants ignore the fact that these concerns were expressed prior to Ms. Siu's promotion and prior to numerous conversations between Ms. Siu and management, including Mr. Brownstein and Mr. Koessel, whereby they convinced her right after the prior layoff in June 2008 that Citigroup was committed to the Housing Group and that her position within Citigroup was secure.

141.   Thus, following Mr. Fluehr's June 2008 layoff, Ms. Siu continued to dedicate herself to the Company as evidenced by her willingness to work through weekends and holidays in order to meet the accelerated needs of clients.  Indeed, one day prior to her termination, Ms. Siu completed and presented a long term project which is considered the most quantitative and

labor intensive assignment in the Housing Group.  It entailed producing a 200 page book and running a number of complex financial models.

142.    Similarly, in the months prior to her unlawful termination, Ms. Siu spent a significant amount of her time ensuring not only the success of the particular deal or transaction, but also ensuring that the Company's clients were satisfied with the service that the Company was providing.

143.    Relying on Mr. Brownstein and Mr. Kossel's representations – and Human Resources confirmation of the promotion only two weeks before her termination – Ms. Siu declined interviews that could have led to other employment and did not pursue other opportunities.  Instead, Defendants convinced Ms. Siu that her employment was safe, then terminated her employment – while retaining less qualified male employees – as part of the November 21, 2008 layoffs.

144.    As with Ms. Bartoletti, Ms. Siu's former supervisor has stated that he can think of no set of circumstances in which Citigroup could have selected Ms. Siu for termination over the male employees that were retained.

145.    The foregoing actions by Citigroup, through the actions of the Company's management, constitute unlawful disparate treatment and/or disparate impact discrimination against Ms. Siu on the basis of her gender.

146.    On February 17, 2009, Ms. Siu filed a formal charge of discrimination with EEOC stating the same facts alleged herein.

147.    As a result of Defendants' unlawful discrimination and retaliation, including, but not limited to, the termination of her employment, Ms. Siu has suffered monetary and/or

economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits.

148.    As a further result of Defendants' unlawful and discriminatory actions, Ms. Siu has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

149.    Defendants' discriminatory and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Siu's civil rights.

## III.    NADINE MENTOR

150.    Ms. Mentor began her career with the Company in June 2005 when she was recruited by Citigroup to leave her employment at UBS Investment Bank ("UBS") when her supervisor at UBS, Norman Pellegrini, transitioned from UBS to Citigroup.  Ms. Mentor was assigned to the Southeast Regional Group as a Vice President where she reported to Mr. Pellegrini.

151.    Throughout her employment with Citigroup, Ms. Mentor was an outstanding employee – always rated as either "Exceptional" or "Highly Effective" – on her performance reviews.

152.    In January 2008, in recognition of the successful accounts that she had worked on, the strong client relationships that she developed over the prior two and a half years, and the senior banker role that she took on many new accounts, Ms. Mentor was promoted to a Director position in advance of the normal promotion cycle to a Director position.  This promotion was approved by a panel of Managing Directors within the Public Finance Department.

153.    While Ms. Mentor was given the title of Director, she was not given any corresponding salary increase, and was instead paid the same Vice President salary that she had been paid prior to her promotion.  Thus, throughout 2008 Ms. Mentor was paid significantly less in salary then similarly-situated male Directors in her group.

154.    While both Mr. Pellegrini and his boss, Frank Chin, assured Ms. Mentor that she was be made whole and would be paid her salary difference at the time bonuses were paid in January 2009, she was terminated prior to that date and thus did not receive this promised compensation.

155.    Consistent with the gender disparity among management positions in the Municipal Securities Division and the Public Finance Department, at the time of her promotion to Director in January 2008, Ms. Mentor was the only female Director or Managing Director in the Southeast Regional Group, which included four male Directors and three male Managing Directors.

156.    Despite being one of the more junior Directors in her group, Ms. Mentor was the primary banker for several key clients – unlike other junior Directors that had been terminated in earlier rounds of layoffs – and had been awarded appointments on upcoming lucrative transactions.  Her forward calendar was more profitable than other male Directors that were retained as part of the November 21, 2008 reduction in force.

157.    Though the severely depressed economy seriously impacted her group, Ms. Mentor continued to bring in new business for the Company while many of her similarly-situated male colleagues struggled to bring in any new business.  Specifically, Ms. Mentor played a significant role in (i) securing two major deals with the State of Connecticut; (ii) securing a $180 million deal with Broward County, Florida – Citigroup's first deal with Broward County in

fifteen years; and (iii) served as the senior banker on Citigroup's U.S. Virgin Islands account and successfully secured the Company's appointment on a $400 million transaction with the U.S. Virgin Islands. Conversely, most of Ms. Mentor's similarly-situated male colleagues were unable to secure any new business throughout 2008.

158. Despite these significant achievements, on November 21, 2008, Ms. Mentor was notified she was being terminated as part of a Company-wide reduction in force.

159. Indeed, at the time that Defendants selected Ms. Mentor for termination as part of the November 21, 2008 reduction in force, Ms. Mentor was in the middle of working on a major transaction while many of the male Directors that were retained were not bringing in any revenue for Citigroup and whose elimination would not impact any pending transactions. In fact, following Ms. Mentor's termination, one of the male Directors that was retained replaced Ms. Mentor as the primary banker on a large transaction that she secured for the Company because he had minimal business.

160. Similarly, as explained above, at the time that Ms. Mentor was terminated, she was still being paid as a Vice President, thus, she also represented a significant cost savings over the retention of underperforming male Directors that were paid a higher salary.

161. While Mr. Pellegrini told Ms. Mentor that the decision to terminate her employment was not performance based, he admitted that she "should not have been let go" and said that the decision, which "did not make sense," was made by someone above him in the New York office. Upon information and belief, this decision was made by Mr. Brownstein. Furthermore, after her termination, Mr. Pellegrini sought to retain Ms. Mentor as a contractor so as not to upset clients and lose several lucrative contracts for the Company that she had secured while employed at Citigroup.

162.    When Ms. Mentor notified the clients that she had worked closely with on behalf of the Company that her employment was terminated, they were equally confused and upset by the Company's decision and some of Ms. Mentor's clients contacted Mr. Pellegrini to express their disappointment with the decision to lay off Ms. Mentor.

163.    The foregoing actions by Citigroup, through the actions of the Company's management, constitute unlawful disparate treatment and/or disparate impact discrimination against Ms. Mentor on the basis of her gender.

164.    On February 17, 2009, Ms. Mentor filed a formal charge of discrimination with EEOC stating the same facts alleged herein.

165.    As a result of Defendants' unlawful discrimination and retaliation, including, but not limited to, the termination of her employment, Ms. Mentor has suffered monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits.

166.    As a further result of Defendants' unlawful and discriminatory actions, Ms. Mentor has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

167.    Defendants' discriminatory and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Mentor's civil rights.

## IV.    LISA CONLEY

168.    Ms. Conley began her career with Citigroup 1997.  Throughout her career with the Company, Ms. Conley always received positive reviews from her managers.  Similarly, her

peers relied heavily on her strong banking skills and her clients regarded her performance and advice very highly.

169.    Notwithstanding her high level of performance, Ms. Conley's employment was terminated on November 21, 2008 as part of Citigroup's company-wide reduction in force.

170.    At the time of her termination, Ms. Conley was employed as a Director in the Health Care Group of the Public Finance Department.  While Ms. Conley worked out of the Chicago office, her direct supervisors, David Cyganowski and Fred Hessler, both worked out of Citigroup's New York office and the decision to terminate her employment was made out of the New York office.

171.    Prior to her termination, Ms. Conley was the only female Director among ten Directors in the Health Care Group.  As part of the reduction in force, however, Citigroup retained all nine male Directors in the Health Care Group, including two male Directors assigned to the Chicago office.

172.    There is no business justification for the termination of Ms. Conley's employment as she had brought in more revenue for Citigroup in 2008 than in the prior two years combined. Additionally, Ms. Conley had a number of transactions "in the queue" that would have resulted in revenue for Citigroup in 2009, some of which were executed shortly after Ms. Conley's termination.

173.    Further, Ms. Conley's ability to manage up to the Managing Director level and manage down to the junior banker level, as well as the strong relationships that she maintained with clients and her ability to gain additional revenue from existing clients were a key attribute in the difficult 2009 revenue environment that warranted retaining Ms. Conley over many of the male Directors that Defendants retained.

174. Conversely, Citigroup retained similarly-situated but underperforming male colleagues with less experience that had brought in less revenue throughout 2008 and did not have as many significant deals projected to close in early 2009.

175. One of these retained Directors, Ryan Freel, had significantly less experience than Ms. Conley as he had just started with Citigroup in 2007.

176. The foregoing actions by Citigroup, through the actions of the Company's management, constitute unlawful disparate treatment and/or disparate impact discrimination against Ms. Conley on the basis of her gender.

177. On February 17, 2009, Ms. Conley filed a formal charge of discrimination with the EEOC stating the same facts alleged herein.

178. As a result of Defendants' unlawful discrimination and retaliation, including, but not limited to, the termination of her employment, Ms. Conley has suffered monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits.

179. As a further result of Defendants' unlawful and discriminatory actions, Ms. Conley has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

180. Defendants' discriminatory and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Conley's civil rights.

## V.   BRITTANY SHARPTON

181.    Ms. Sharpton began her career with Citigroup in 2006 as a summer intern.  In July 2007, Ms. Sharpton was hired as a full time Analyst in the Infrastructure Group of the Public Finance Department.

182.    Throughout her career with Citigroup, Ms. Sharpton performed her job with the highest degree of professionalism and competence.  Indeed, Ms. Sharpton frequently sought out more complex assignments and more responsibility, which was noted in her July 2008 performance review where she was giving the highest rating in the "Takes Initiative" category.

183.    Prior to the November 21, 2008 layoff, the Infrastructure Group was predominantly male.  Indeed, of the sixteen (16) employees, there were four (4) Managing Directors (all male), four (4) Directors (three male, one female), two (2) Assistant Vice Presidents (one male, one female), three (3) Associates (all male) and three (3) Analysts (two male, one female).  Among the Analysts, Ms. Sharpton and Matthew Chin were hired in 2007, while Alan Dockeray was hired in July 2008.

184.    With the November 21, 2008 layoff, four employees in the Infrastructure Group– including all three female employees – were terminated.  Thus, following the reduction in force the Infrastructure Group consisted of twelve (12) employees – all of whom were men.

185.    Despite the fact that the two other male Analysts – Mr. Chin and Mr. Dockeray – were less experienced and less qualified than Ms. Sharpton, they were both retained, presumably at the behest of Mr. Brownstein along with Thomas Green (male), Head of the Infrastructure Group.

186.    Indeed, Ms. Sharpton had far superior credentials than the male Analysts that were retained.  While both Mr. Chin and Ms. Sharpton started with Citigroup in July 2007, Ms.

Sharpton was more experienced as she had been a Summer Intern with the Housing Group from May to August 2006.  Further, Ms. Sharpton worked on more deals than Mr. Chin, worked with more varied Managing Directors, and was more proactive in seeking out complex assignments and responsibility.

187.     Indeed Ms. Sharpton was assigned to work on deals with the following groups: Water and Sewer, Tobacco, Convention Centers, and Sports Stadiums & Convention Centers, Pensions, the U.S. Virgin Islands and Puerto Rico Region as well s the Mid-Atlantic region. Additionally, after two Analysts assigned to the Transportation Group quit, Mr. Sharpton offered to work with the Transportation Group and was immediately staffed on multiple projects and live deals that were bringing in revenue for the Company for that Group.

188.     Because Ms. Sharpton was assigned to more deals that Mr. Chin, she was required to work longer hours and on weekends.  Conversely, when the Managing Director that Mr. Chin primarily worked with went on a one month vacation in the fall of 2008, Mr. Chin's work load drastically reduced – a fact which he boasted about to friends and colleagues – which permitted him to spend most days during this time period running personal errands and perusing non-business websites.  Management was aware of Mr. Chin's lack of productivity during this period, yet decided to retain Mr. Chin anyway.

189.     Additionally, Ms. Sharpton was well-regarded among her supervisors and colleagues, while Mr. Chin had been instructed by Mr. Green that he could no longer work with certain individuals because of his unprofessional behavior.  Similarly, Mr. Chin was not well-regarded by fellow Analysts as one colleague requested that her seat be moved away from his as a result of his unprofessional behavior.

190.    With respect to Alan Dockeray, who had only been with the Company since July 2008, Ms. Sharpton was clearly more experienced.  Indeed, Ms. Sharpton's supervisors and managers recognized that she was more experienced as they frequently assigned Mr. Dockeray to work with Ms. Sharpton projects where Ms. Sharpton was the lead Analyst.  Even Mr. Dockeray recognized this fact as he frequently sought out Ms. Sharpton's assistance on various projects and assignments.

191.    Further, Ms. Sharpton was more qualified than Mr. Dockeray as she possessed all of the required licenses (Series 52 and 63), while Mr. Dockeray had not obtained his Series 63.

192.    Notwithstanding this disparity in qualifications and experience, Citigroup terminated Ms. Sharpton but retained Messrs. Chin and Dockeray, presumably at the behest of Mr. Brownstein along with Thomas Green (male), Head of the Infrastructure Group.

193.    The foregoing actions by Citigroup, through the actions of the Company's management, constitute unlawful disparate treatment and/or disparate impact discrimination against Ms. Sharpton on the basis of her gender.

194.    On February 17, 2009, Ms. Sharpton filed a formal charge of discrimination with EEOC stating the same facts alleged herein.

195.    As a result of Defendants' unlawful discrimination and retaliation, including, but not limited to, the termination of her employment, Ms. Sharpton has suffered monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits.

196.    As a further result of Defendants' unlawful and discriminatory actions, Ms. Sharpton has suffered severe mental anguish and emotional distress, including, but not limited to,

depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

197.   Defendants' discriminatory and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Sharpton's civil rights.

## VI.   DORLY HAZAN-AMIR

198.   Ms. Hazan-Amir began her employment with Citigroup following her graduation, with distinction, from Georgetown University's M.B.A. program.  In addition to possessing her M.B.A., Ms. Hazan-Amir also has a B.A. in Communications and a LL.B. in Law from Tel Aviv University.

199.   Ms. Hazan-Amir joined Citigroup as an Associate within the Asset Finance Group ("AFG") in 2006 where she was employed as a junior transactor.  As a junior transactor, Ms. Hazan-Amir was responsible for supporting senior transactors on a deal team in originating, structuring and executing deals in various asset classes in the AFG portfolio (primarily power, rail and aviation).

200.   Soon after Ms. Hazan-Amir began her employment with Citigroup, she came to realize that AFG was a cold and ostracizing environment for women, which was primarily the result of the favoritism toward men exhibited by Gary Rothschild, the regional head of AFG.

201.   Throughout her employment with AFG, Ms. Hazan-Amir has been subjected to disparate treatment and harassment as a result of her gender, which has manifested itself in significantly less salary and bonus compensation than her male colleagues and her January 2010 demotion to a far less prestigious position only days after she returned from a FMLA-designated maternity leave.

202.     Indeed, at the time that Ms. Hazan-Amir joined AFG, there were approximately 25 transactional employees in AFG North America, yet only three of these positions were filled by women.  At present, there are currently 21 transactional employees in AFG, yet following Ms. Hazan-Amir's recent demotion to a less prestigious and less lucrative position, only three of these positions are filled by women, including one female Analyst who was only recently hired after Ms. Hazan-Amir had filed her EEOC Charge.

### A.     Denial of Accreditation

203.     Upon joining AFG, Ms. Hazan-Amir completely dedicated herself to the group and worked hard to seek out new clients and transactions to bring to AFG.  While Ms. Hazan-Amir was successful in establishing relationships with a number of high-level investors, she was often denied credit when these relationships led to significant deals for AFG.

204.     As just one example of Ms. Hazan-Amir being denied credit for her hard work and client relationships, when the group needed to find new sources of funding for a Brazilian wind project, which was in jeopardy of falling apart, Ms. Hazan-Amir reached out to Bill Lyons, Managing Director of Climate Change and Technology Development at AES Corporation ("AES"), for whom she worked during a summer internship prior to joining the Company, and introduced him to Dale Vander Woude, AFG's lead on the project.

205.     As a result of Ms. Hazan-Amir's introduction, Mr. Lyons introduced Mr. Vander Woude to Ned Hall, Chairman of Global Wind Generation and Grid Stability for AES.  This relationship ultimately led to a deal between AFG and AES whereby AES provided much-needed funds for the Brazilian wind-project, which saved the deal from collapsing.

206.     Despite being directly responsible for establishing this relationship, Ms. Hazan-Amir was denied any credit and has instead been criticized by Mr. Rothschild for failing to bring in clients and new transactions.

### B.     Denial of Business Opportunities

207.     In addition to being denied appropriate credit for the work that she does, Ms. Hazan-Amir is frequently denied opportunities to interact with high-level clients and other Citigroup employees as a result of her gender.

208.     For example, prior to her demotion, Mr. Rothschild routinely excluded Ms. Hazan-Amir from luncheons and dinners with clients, while more junior male employees were included in these meetings.

209.     Additionally, Ms. Hazan-Amir was frequently denied the opportunity to engage with existing and potential clients outside of the office.  For example, in November 2008, Ms. Hazan-Amir was scheduled to travel to San Diego with Anu Yadav to meet with representatives of an Israeli-based geothermal company regarding a potential transaction on which Ms. Hazan-Amir had been working.  While George Revock, the lead transactor and a Managing Director in AFG, and Ms. Yadav felt that Ms. Hazan-Amir – who had worked extensively on the deal and was Israeli – could add value in client-facing situations with the company, Mr. Rothschild disagreed and canceled Ms. Hazan-Amir's travel arrangements without even discussing it with her.  When Ms. Hazan-Amir complained and told Mr. Rothschild that she would not have been taken off the business trip had she been a male associate, Mr. Rothschild angrily rebuked her for expressing these concerns, informing her that he is the Managing Director and that she was not in a position to question his decision-making or authority and explained that the decision was due to "cost cutting."

210.     As yet another example of Ms. Hazan-Amir's denial of business opportunities, in July 2009, Ms. Hazan-Amir's colleague, Larry Manis, was selected to attend a rail conference in Pittsburgh for the second year in a row.  When Ms. Hazan-Amir asked Brad Holley, one of the three Managing Directors in AFG, why she was never selected to attend these conferences, he responded, "When you learn how to play golf, you can go to the rail conference."

### C.     Inappropriate And Vulgar Comments In The Workplace

211.     In addition to being denied professional development opportunities afforded to similarly-situated male employees, Ms. Hazan-Amir is required to work in an environment where women are subjected to inappropriate and vulgar comments on a regular basis.

212.     This inappropriate conduct, which is fostered by Mr. Rothschild, only serves to reaffirm the second-class status of the few women in AFG.  For example, Mr. Rothschild revealed his true thoughts regarding the place that women occupy on his team, when on one occasion, he walked by when three male colleagues were assisting Ms. Hazan-Amir on a work-related project in her cubicle and commented, "I'm all for this 'hiring women thing,' but not if it's going to cost me three of my men every time you can't do something."

213.     Similarly, Dale Vander Woude is well known within AFG for his inappropriate and vulgar comments towards and at the expense of the group's female employees, of which Ms. Hazan-Amir is a frequent target.

214.     Despite being made aware of Mr. Vander Woude's comments, Ms. Hazan-Amir's managers have not taken any appropriate corrective action.  Indeed, on one occasion when Ms. Hazan-Amir objected to Mr. Vander Woude's vulgar description of his reaction to a client meeting, he crudely instructed others, "Don't mind Dorly, she just likes to blow."

215.    When Ms. Hazan-Amir objected to this vulgar reference to oral sex, Mr. Vander Woude, in a continuation of his vulgar joke, responded, "Wind, wind!  She likes to blow wind" – referring to the Brazilian wind project that Ms. Hazan-Amir was working on.

216.    On another occasion, Mr. Vander Woude told Ms. Hazan-Amir that he expected her to take a special liking to a client because he has a beard.  When Ms. Hazan-Amir seemed puzzled, Mr. Vander Woude explained, "You Jewish gals get hot for guys with beards, don't you?"

217.    When Ms. Hazan-Amir mentioned some of Mr. Vander Woude's discriminatory comments to her managers, however, her concerns were brushed off with the response, "That's Dale," implying that she was just going to have to accept this discriminatory treatment if she wanted to continue to work in AFG.

**D.    Unequal Compensation On the Basis of Gender**

218.    Throughout her employment with Citigroup, Ms. Hazan-Amir has been paid significantly less than similarly-situated male colleagues.

219.    For example, at the end of her first full year as an Associate in 2007, Ms. Hazan-Amir was awarded a bonus that was significantly less than the bonus that David Van Dorn (who is only one year senior to Ms. Hazan-Amir) had received the previous year.

220.    The significant disparity between Ms. Hazan-Amir's bonus compensation and that of her male colleagues grew worse, when in January 2009 (only a few months after Ms. Hazan-Amir's first pregnancy and subsequent to her complaints to Mr. Rothschild about being taken off the business trip) she was awarded a bonus of only $10,000 for calendar year 2008.  As a comparison, Mr. Van Dorn received a bonus in the mid-six figures the prior year when he was at the same level as Ms. Hazan-Amir.

221.    While Mr. Rothschild explained that bonuses were generally lower for 2008, Ms. Hazan-Amir's bonus was a mere fraction of the bonuses that were paid to other more junior male employees for this same time period.

222.    The trend of substantially smaller bonuses continued in 2009 as Ms. Hazan-Amir was awarded a bonus that was yet again dwarfed by those awarded to more junior male employees.  Additionally, while Ms. Hazan-Amir's salary has remained flat since 2008, all of her male colleagues in AFG received salary increases in January 2010 and June 2010.

223.    There is no legitimate business justification for paying Ms. Hazan-Amir significantly less salary and bonus compensation than similarly-situated male colleagues, especially male employees junior to Ms. Hazan-Amir.

### E.    Unlawful Pregnancy Discrimination

224.    In August 2008, Ms. Hazan-Amir became pregnant with her first child and promptly informed her managers of the good news.

225.    Upon hearing that she was pregnant, another manager in AFG questioned Ms. Hazan-Amir whether she planned to be a "career-mom" or a "mom-mom."

226.    Despite the inappropriate nature of this inquiry which implied that Ms. Hazan-Amir had to choose between her career and her family, Ms. Hazan-Amir responded that she intended to keep working and that her career was important to her.  Shortly after she shared this news with her managers, however, Ms. Hazan-Amir suffered a miscarriage.  Subsequent to this, Ms. Hazan-Amir noticed that Mr. Rothschild's attitude towards her changed as he viewed Ms. Hazan-Amir as not fully committed to her position, and not "transactor material," because she was interested in starting a family.

227.    In February 2009, Ms. Hazan-Amir notified her managers that she was again pregnant and expected to take a maternity leave beginning in September 2009.  In a continuation of the gender-based comments that she was regularly subjected to during her time working in AFG, Ms. Hazan-Amir's pregnancy became the butt of jokes in the office as her male co-workers discussed setting up a pool to guess how much weight Ms. Hazan-Amir would gain as a result of her pregnancy.

228.    Notwithstanding this, throughout her pregnancy, Ms. Hazan-Amir continued to work diligently, putting in long hours, and working up until the Friday before she gave birth.

229.    Following the birth of her daughter, Ms. Hazan-Amir began a FMLA-protected maternity leave and expected to return to work in January 2010.  She was shocked to hear from colleagues while she was still out on maternity leave that, upon her return, Mr. Rothschild was going to transfer her from her transactor role to a less prestigious and less lucrative role on AFG's credit team.

230.    On January 11, 2010, a mere five days after she returned from her maternity leave, these rumors were confirmed in a meeting with Mr. Rothschild and George Revock where Mr. Rothschild informed Ms. Hazan-Amir that her managers had discussed her future in AFG and have decided that her skill set is "less fitting for the role of transactor" and that instead she "appears to be a good fit for a role as a credit officer supporting AFG's transactors."

231.    In a clear reference to Ms. Hazan-Amir's new status as a working mother, Mr. Rothschild offered that Ms. Hazan-Amir may benefit from working fewer hours in this new position, and told Ms. Hazan-Amir that they could revisit her promotion to Vice President next year, after she had "earned her stripes" in the credit role.  While Mr. Rothschild ostensibly gave Ms. Hazan-Amir the choice to agree to this transfer – he reiterated that he did not see Ms. Hazan-

Amir having a future as a transactor in AFG – and instructed Ms. Hazan-Amir to think about the new credit role and get back to him.

232.    One week later, Ms. Hazan-Amir met with Mr. Rothschild to discuss this new position.  In this meeting, Ms. Hazan-Amir again notified Mr. Rothschild that she felt that she was being treated differently because she was not "one of the guys" and that, while she would prefer to remain a transactor, she would accept whatever role Mr. Rothschild assigned to her.

233.    Rather than address the merits of Ms. Hazan-Amir's complaints of disparate treatment, Mr. Rothschild told her that raising these concerns was both inappropriate and unprofessional.  With respect to Ms. Hazan-Amir's work performance, Mr. Rothschild advised her that "no senior transactor here thinks you're transactor material" and explained that this was why she was being asked to transfer to the credit role.

234.    When Ms. Hazan-Amir declined to "agree" to the transfer to the credit role, but reiterated that she would perform whatever role was assigned to her, Mr. Rothschild adjourned the meeting and told Ms. Hazan-Amir that he would think about it.  Later that day, Mr. Rothschild informed Ms. Hazan-Amir that he had decided that she would be reassigned to the credit role and that they should "try to make the best of it."

235.    Since this meeting, Ms. Hazan-Amir has been reassigned to AFG's credit team where she is paid significantly less than similarly-situated male employees who have remained in transactor roles.

### F.    History of Gender Discrimination In AFG

236.    Unfortunately, Ms. Hazan-Amir is only the latest in a long line of highly qualified women who have been subjected to gender discrimination and retaliation while assigned to AFG, particularly those assigned to work under the supervision of Mr. Rothschild.

237.    During the course of her employment in AFG, she has also learned that there is a history of female professional employees being subjected to disparate treatment (including denial of credit, lack of access for business opportunities and less compensation) and being held back from advancing on account of their gender which, in many cases, ultimately led these women to leave the Group.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Class Claims of Gender Discrimination in Violation of Title VII, 42 U.S.C. § 2000(e))

238.    Each allegation contained in paragraphs 1 through 237, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

239.    Citigroup has discriminated against Plaintiffs and the members of the proposed Class on the basis of their gender in violation of Title VII by treating them differently from and less favorably than similarly-situated male employees and by subjecting them to disparate working conditions, including, but not limited to, selecting them for layoff while retaining less qualified and/or less experienced male employees, and subjecting them to other disparate terms and conditions of employment on the basis of their gender in violation of Title VII.

240.    In addition or in the alternative, Citigroup's policies, practices and/or procedures for making decisions which provide managers with unchecked discretion in making decisions related to compensation, assignments, promotions, performance evaluations, discipline and terminations have produced a disparate impact against women, including Plaintiffs and the members of the proposed Class in violation of Title VII.

241.    As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of Title VII, Plaintiffs and the members of the proposed Class have suffered and continue to suffer monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

242.    As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of Title VII, Plaintiffs and the members of the proposed Class have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

243.    Citigroup's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiffs and the members of the proposed Class are entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Class Claims of Gender Discrimination in Violation of the New York State Human Rights Law)

244.    Each allegation contained in paragraphs 1 through 242, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

245.    Citigroup has discriminated against Plaintiffs and the members of the proposed New York State Subclass on the basis of their gender in violation of the NYSHRL by treating them differently from and less favorably than similarly-situated male employees and by subjecting them to disparate working conditions, including, but not limited to, selecting them for layoff while retaining less qualified and/or less experienced male employees, and subjecting them to other disparate terms and conditions of employment on the basis of their gender in violation of NYSHRL.

246.    In addition or in the alternative, Citigroup's policies, practices and/or procedures for making which provide manager with unchecked discretion in making decisions related to compensation, assignments, promotions, performance evaluations, discipline and terminations

have produced a disparate impact against women, including Plaintiffs and the members of the proposed New York State Subclass in violation of NYSHRL.

247.   As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the members of the proposed New York State Subclass have suffered and continue to suffer monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

248.   As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the members of the proposed New York State Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### AS AND FOR A THIRD CAUSE OF ACTION

**(Class Claim of Gender Discrimination in Violation of
the New York City Human Rights Law)**

249.   Each allegation contained in paragraphs 1 through 248, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

250.   Citigroup has discriminated against Plaintiffs and the members of the proposed New York City Subclass on the basis of their gender in violation of the NYCHRL by treating them differently from and less favorably than similarly-situated male employees and by subjecting them to disparate working conditions, including, but not limited to, selecting them for layoff while retaining less qualified and/or less experienced male employees, and subjecting them to other disparate terms and conditions of employment on the basis of their gender in violation of NYCHRL.

251.    In addition or in the alternative, Citigroup's policies, practices and/or procedures for making which provide manager with unchecked discretion in making decisions related to compensation, assignments, promotions, performance evaluations, discipline and terminations have produced a disparate impact against women, including Plaintiffs and the members of the proposed New York City Subclass in violation of NYCHRL.

252.    As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the members of the proposed New York City Subclass have suffered and continue to suffer monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

253.    As a direct and proximate result of Citigroup's unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the members of the proposed New York City Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

254.    Citigroup's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiffs and the members of the proposed New York City Subclass are entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

**(Class Claim of Retaliation in Violation of the New York State Human Rights Law)**

255.    Each allegation contained in paragraphs 1 through 254, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

256.     Citigroup retaliated against Ms. Hazan-Amir and the members of the proposed New York State Retaliation Subclass who engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees by, *inter alia*, subjecting them to materially adverse actions that would deter a reasonable person for engaging in protected activity in violation of NYSHRL.

257.     As a direct and proximate result of Defendant Citigroup's unlawful and retaliatory conduct in violation of NYSHRL, Ms. Hazan-Amir and the members of the proposed New York State Retaliation Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

## AS AND FOR A FIFTH CAUSE OF ACTION

**(Class Claim of Retaliation in Violation of the New York City Human Rights Law)**

258.     Each allegation contained in paragraphs 1 through 257, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

259.     Citigroup retaliated against Ms. Hazan-Amir and the members of the proposed Subclass of employees assigned to Citigroup's offices in New York City who engaged in protected activity by opposing and/or participating in lodging complaints against Citigroup's discriminatory practices against themselves and other female employees by, *inter alia*, subjecting them to materially adverse actions that would deter a reasonable person for engaging in protected activity in violation of NYCHRL.

260.     As a direct and proximate result of Defendant Citigroup's unlawful and retaliatory conduct in violation of NYCHRL, Ms. Hazan-Amir and the members of the proposed New York City Retaliation Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

261.     Citigroup's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Ms. Hazan-Amir and the members of the proposed New York City Retaliation Subclass of employees assigned to Citigroup's offices in New York City are entitled to an award of punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Class Claim of Pregnancy Discrimination in Violation of the New York State Human Rights Law)

262.     Each allegation contained in paragraphs 1 through 261, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

263.     Citigroup has discriminated against Ms. Hazan-Amir and the members of the proposed New York State Pregnancy Subclass who have become pregnant, taken a maternity leave or have childcare obligations by denying them equal terms and conditions of employment available to employees who are not pregnant or who do not have children or childcare obligations in violation of the NYSHRL.

264.     As a direct and proximate result of Defendant Citigroup's unlawful conduct in violation of the NYSHRL, Ms. Hazan-Amir and the members of the proposed New York State Pregnancy Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

**(Class Claim of Pregnancy Discrimination in Violation of
the New York City Human Rights Law)**

265.    Each allegation contained in paragraphs 1 through 264, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

266.    Citigroup has discriminated against Ms. Hazan-Amir and the members of the proposed New York City Pregnancy Subclass who have become pregnant, taken a maternity leave or have childcare obligations by denying them equal terms and conditions of employment available to employees who are not pregnant or who do not have children or childcare obligations in violation of the NYCHRL.

267.    As a direct and proximate result of Defendant Citigroup's unlawful conduct in violation of the NYCHRL, Ms. Hazan-Amir and the members of the proposed New York City Pregnancy Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

268.    Citigroup's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Ms. Hazan-Amir and the members of the proposed New York City Pregnancy Subclass are entitled to an award of punitive damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION

### (Class Claim of Interference with Rights Under the Family Medical Leave Act)

269.    Each allegation contained in paragraphs 1 through 268, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

270.    Citigroup has violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of Ms. Hazan-Amir's and the members of the FMLA Subclass' rights by, *inter alia*, failing to reinstate Ms. Hazan-Amir and the members of the FMLA Subclass to the same position or a position equivalent to the position that they occupied prior to their FMLA designated maternity leave.

271.    As a direct and proximate result of Citigroup's unlawful conduct in violation of the FMLA, Ms. Hazan-Amir and the members of the FMLA Subclass have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

272.    Defendants' unlawful actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Ms. Hazan-Amir and the members of the FMLA Subclass are entitled to an award of liquidated damages.

## AS AND FOR AN NINTH CAUSE OF ACTION

### (Retaliation in Violation of the Family Medical Leave Act)

273.    Each allegation contained in paragraphs 1 through 272, inclusive, is hereby repeated, realleged and incorporated by reference, as if fully set forth herein.

274.    At all times relevant herein, Ms. Hazan-Amir and the members of the FMLA Subclass were "eligible employees" within the meaning of the FMLA.  Similarly, at all times relevant herein, Citigroup was and is a "covered employer" within the meaning of the FMLA.

275.    Citigroup has violated the FMLA by unlawfully retaliating against Ms. Hazan-Amir's and the members of the FMLA Subclass' for exercising rights protected by the FMLA by, *inter alia*, subjecting Ms. Hazan-Amir and the members of the FMLA Subclass to adverse employment actions that would reasonably dissuade a reasonable person from exercising rights protected by the FMLA.

276.    As a direct and proximate result of Citigroup's unlawful and retaliatory conduct in violation of the FMLA, Ms. Hazan-Amir and the members of the FMLA Subclass have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

277.    Defendants' unlawful and retaliatory actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Ms. Hazan-Amir and the members of the FMLA Subclass are entitled to an award of liquidated damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the proposed class whom they seek to represent, request the following relief:

A.    Certification of the case as a class action maintainable under the Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), on behalf of the proposed plaintiff class and subclasses and designation of Plaintiffs as representative of this class and their counsel of record as class counsel;

B.    A declaratory judgment that Defendants' actions, conduct and practices complained of herein violate the laws of the United States and the State and City of New York;

C.    An injunction and order permanently restraining Defendants and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons

acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

D.      An order directing Defendants to place Plaintiffs and the members of class and subclasses in the position they would have occupied but for Defendants' discriminatory, retaliatory and otherwise unlawful treatment of them, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Plaintiffs and the members of the class and subclasses;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the members of the class and subclasses for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the members of the class and subclasses for all non-monetary and/or compensatory damages, including but not limited to, compensation for their mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

G.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the members of the class and subclasses for harm to their professional and personal reputations and loss of career fulfillment;

H.      An award of punitive damages, in an amount to be determined at trial;

I.      An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiffs and the members of the proposed class and subclasses in an amount to be

determined at trial, plus prejudgment interest;

J.      An award of costs that Plaintiffs and/or the class and subclasses has incurred in

this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees

and costs to the fullest extent permitted by law; and

L.      Such other and further relief as the Court may deem just and proper.


### JURY DEMAND

Plaintiffs, on behalf of themselves and the members of the proposed Class and Subclasses

hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: October 13, 2010
        New York, New York              Respectfully submitted,


**THOMPSON WIGDOR & GILLY LLP**

By: _____
        Douglas H. Wigdor
        Kenneth P. Thompson
        Scott B. Gilly

        85 Fifth Avenue
        New York, NY  10003
        Telephone:  (212) 257-6800
        Facsimile:  (212) 257-6845
        dwigdor@twglaw.com
        kthompson@twglaw.com
        sgilly@twglaw.com

        *Attorneys for Plaintiffs and the Class*