UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY BARTOLETTI, CHIA SIU, NADINE MENTOR, LISA CONLEY and BRITTANY SHARPTON,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CITIGROUP INC. and CITIGROUP GLOBAL MARKETS, INC.,<br><br>                    Defendants. | No. 1:10-cv-7820 (LGS)<br><br>*ORAL ARGUMENT REQUESTED* |

DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

MORGAN, LEWIS & BOCKIUS LLP
Kenneth J. Turnbull (KT 4458)
Leni D. Battaglia (LB 4704)
101 Park Avenue
New York, New York 10178
Telephone:     212-309-6000
Facsimile:     212-309-6001

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS.........................................................................................2

A.   Citigroup Global Markets Inc. and the Public Finance Department ..................2

B.   The Financial Crisis of 2007-08 and Resulting Reductions in Force................3

C.   Plaintiff Sharpton's Employment History with the Infrastructure Group .........4

    1.   Sharpton's Performance .........................................................................4

    2.   Reductions in Force in Infrastructure ....................................................6

D.   Plaintiff Siu's Employment with the Housing Group .......................................7

    1.   Siu's Concerns Regarding the Company's Commitment to Housing.................7

E.   Plaintiff Bartoletti's Employment with the Housing Group..............................9

    1.   Bartoletti's Performance and Promotions ..............................................9

    2.   Termination of Bartoletti's Employment in the November 2008 RIF ................11

F.   Plaintiff Conley's Employment with the Healthcare Group ............................12

    1.   Conley's Hiring and Promotions ..........................................................12

    2.   Termination of Conley's Employment in the November 2008 RIF ...................13

G.   Plaintiff Mentor's Employment with the Southeast Regional Group .............14

    1.   Pellegrini Hires and Promotes Mentor .................................................14

    2.   Termination of Mentor's Employment in the November 2008 RIF...................14

ARGUMENT ......................................................................................................15

I.   Summary Judgment Should Be Granted Where, As Here, Plaintiffs Cannot Identify Specific Facts Showing There Is A Genuine Issue For Trial............................15

    A.   Plaintiff Sharpton's Disparate Treatment Claim Should Be Dismissed..............17

    B.   Plaintiff Siu's Disparate Treatment Claim Should Be Dismissed.......................21

    C.   Plaintiff Bartoletti's Disparate Treatment Claim Should Be Dismissed .............23

    D.   Plaintiff Conley's Disparate Treatment Claim Should Be Dismissed.................27

    E.   Plaintiff Mentor's Disparate Treatment Claim Should Be Dismissed ...............31

    F.   Plaintiffs' Purported "Statistical Analysis" Cannot Save Their Disparate Treatment Claims ...................................................................................34

II.   TO THE EXTENT PLAINTIFFS ATTEMPT TO ASSERT A DISPARATE IMPACT CLAIM, THAT CLAIM ALSO FAILS. ..........................................38

CONCLUSION ...................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Ali v. Tribune Entm't Co.,
  No. 93-1398, 1996, WL 384913 (S.D.N.Y. July 10, 1996)....................................................23

Baker v. Randstad N. Am. L.P.,
  151 F. App'x 314 (5th Cir. 2005) ...........................................................................30, 31, 32

Braunstein v Napolitano,
  No. 07-1015, 2011 WL 867247 (E.D.N.Y. Mar. 11, 2011) ...................................................37

Brown v. Time, Inc.,
  No. 95-10081, 1997 WL 231143 (S.D.N.Y. May 7, 1997)..............................................18, 19

Byrnie v. Town of Cromwell Bd. of Educ.,
  243 F.3d 93, 103 (2d Cir. 2001) .....................................................................29, 32, 39, 40

Chin v. Port Auth. of NY & NJ,
  685 F.3d 135 (2d Cir. 2012),
  cert. denied sub nom. Eng v. Port Auth. of NY & NJ, 133 S. Ct. 1724 (2013) ...............35, 39

Corcoran v. Gab Bus. Servs., Inc.,
  723 F. Supp. 966 (S.D.N.Y. 1989) ........................................................................19

Crawford-Mulley v. Coming Inc.,
  194 F. Supp. 2d 212 (W.D.N.Y. 2002)................................................................20

Cruz v. Coach Stores, Inc.,
  202 F.3d 560 (2d Cir. 2000) .............................................................................16

Del Franco v. N.Y.C. Off-Track Betting Corp.,
  429 F. Supp. 2d 529 (E.D.N.Y. 2006), aff'd, 245 F. App'x 42 (2d Cir. 2007).....................34

DeMarco v. Holy Cross High Sch.,
  4 F.3d 166 (2d Cir.1993) ...................................................................................28

Drake v. Delta AirLines, Inc.,
  No. 94-5944, 2005 WL 1743816 (E.D.N.Y. July 21, 2005),
  aff'd, 216 F. App'x 95 (2d Cir. 2007) .................................................................37

Evans v. New York Botanical Garden,
  253 F. Supp. 2d 650 (S.D.N.Y. 2003), aff'd, 88 F. App'x 464 (2d Cir. 2004) ...................18

Evans v. Tech. Applications & Serv. Co.,
  80 F.3d 954 (4th Cir. 1996) ..............................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Farias v. Instructional Sys., Inc.,
　259 F.3d 91 (2d Cir. 2001) .......................................................................... 16

Figueroa v. New York Health & Hosps. Corp.,
　No. 03-9589, 2007 WL 943537 (S.D.N.Y. Mar. 27, 2007)................................. 20

Grady v. Affiliated Cent., Inc.,
　130 F.3d 553 (2d Cir. 1997), cert. denied, 525 U.S. 936 (1998).......................... 20

Graham v. Long Island R.R.,
　230 F.3d 34 (2d Cir. 2000) .......................................................................... 19

Grant Roche Diagnostics Corp.,
　No. 09-1540, 2011 WL 3040913 (E.D.N.Y. July 20, 2011) ................................. 37

Gupta v. NYC Sch. Constr. Auth.,
　305 F. App'x 687 (2d Cir. 2001)................................................................passim

Henry v. Wyeth Pharm., Inc.,
　616 F.3d 134 (2d Cir. 2010), cert. denied, 131 S. Ct. 1602 (2011)....................... 34

Hudson v. IBM Corp.,
　620 F.2d 351 (2d Cir. 1980) ........................................................................ 37

Hunt v. Tektronix, Inc.,
　952 F. Supp. 998 (W.D.N.Y. 1997)................................................................ 39

James v. New York Racing Ass'n,
　233 F.3d 149 (2d. Cir. 2000) ............................................................20, 21, 34

King v. Interstate Brands Corp.,
　No. 02-6470, 2009 WL 1162206 (E.D.N.Y. Apr. 29, 2009)................................ 18

Kourofsky v. Genencor Int'l, Inc.,
　459 F. Supp. 2d 206 (W.D.N.Y. 2006).................................................38, 39, 40

Lee v. Healthfirst, Inc.,
　No. 04-8787, 2007 WL 634445 (S.D.N.Y. March 1, 2007)................................. 32

Lester v. M&M Knopf Auto Parts,
　No. 04-850S, 2006 WL 2806465 (W.D.N.Y. Sept. 28, 2006) .............................. 18

Lichwick v. Verizon,
　No. 08-3892, 2011 WL 4000991 (S.D.N.Y. Aug. 30, 2011) ............................... 34

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Lizardo v. Denny's, Inc.,
    270 F.3d 94 (2d Cir. 2001) ........................................................................... 23, 24

Lizardo v. Denny's, Inc.,
    270 F.3d 94 (2d Cir. 2001) ........................................................................... 23, 24

MacSweeney v. ING Life Ins. & Annuity Co.,
    No. 11-971, 2011 WL 4839086 (S.D.N.Y. Oct. 12, 2011) ..................................... 17

Malave v. Potter,
    320 F.3d 321 (2d Cir. 2003) ................................................................................ 40

Martin v. MTA Bridges & Tunnels,
    610 F. Supp. 2d 238 (S.D.N.Y. 2009) ................................................................. 32

Matos v. City of New York Dep't of Homeless Servs.,
    No. 01-756, 2003 WL 169779 (S.D.N.Y. Jan. 23, 2003)...................................... 32

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ........................................................................................... 16

Moylan v. Nat'l Westminster Bank USA,
    687 F. Supp. 54 (E.D.N.Y. 1998) ........................................................................ 25

Murphy v. GE Co.,
    245 F. Supp. 2d 459 (N.D.N.Y. 2003) ................................................................. 40

Nicholls v. Phillips Semiconductor Mfg.,
    760 F. Supp. 2d 407 (S.D.N.Y. 2011) ................................................................. 21

Norton v. Sam's Club,
    145 F.3d 114 (2d Cir. 1998), cert. denied, 525 U.S. 1001 (1998)........................ 23

Norville v. Staten Island Univ. Hosp.,
    196 F.3d 89 (2d Cir. 1999) ................................................................................. 16

Ottaviani v. SUNY New Paltz,
    875 F.2d 365 (2d Cir. 1989) ............................................................................... 40

Pasha v. William M. Mercer Consulting, Inc.,
    No. 00-8362, 2004 WL 188077 (S.D.N.Y. Feb. 2, 2004),
    aff'd, 135 F. App'x 489 (2d Cir. 2005) ................................................................ 20

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Payami v. City of New York,
    No. 03-2785, 2007 WL 945529 (S.D.N.Y. Mar. 28, 2007)....................................................18

Pearson v. Merrill Lynch,
    No. 10-5119, 2012 WL 983546 (S.D.N.Y. Mar. 22, 2012)...................................................28

Pisana v. Merrill Lynch & Co.,
    No. 93-4541, 1995 WL 438715 (S.D.N.Y. July 24, 1995)....................................................16

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) .............................................................................................................16

Renaldi v. Manufacturers & Traders Trust Co.,
    954 F. Supp. 614 (W.D.N.Y. 1997)......................................................................................39

Rivera v. Nat'l Westminster Bank USA,
    801 F. Supp. 1123 (S.D.N.Y. 1992) ........................................................................26, 27, 28

Robinson v. Metro-North Commuter R.R.,
    No. 94-7374, 1998 WL 17742 (S.D.N.Y. Jan. 16, 1998),
    aff'd, 191 F.3d 283 (2d Cir. 1999) .................................................................................37, 39

Rodriguez v. Pierre N.Y.,
    299 F. Supp. 2d 214 (S.D.N.Y. 2004) ..................................................................................19

Rozenfeld v. Dep't of Design & Constr. of the City of N.Y.,
    875 F. Supp. 2d 189 (E.D.N.Y. 2012),
    aff'd, --- F. App'x ---, 2013 WL 2321600 (2d Cir. May 29, 2013)........................................19

Saidin v. NYC Dep't of Educ.,
    498 F. Supp. 2d 683 (S.D.N.Y. July 27, 2007)......................................................................17

Sanders v. Sw. Bell Tel., LP,
    544 F.3d 1101 (10th Cir. 2008) .....................................................................................35, 36

Seltzer v. Dresdner Kleinwort Wasserstein, Inc.,
    356 F. Supp. 2d 288 (S.D.N.Y. 2005) ..................................................................................19

Shabat v. Blue Cross Blue Shield of Rochester Area,
    925 F. Supp. 977 (W.D.N.Y. 1996), aff'd sub nom. Shabat v. Billoti, 108 F.3d 1370
    (2d Cir. 1997) ......................................................................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Sklar v. New York Life Ins. Co.,
No. 00-2254, 2001 WL 984724 (S.D.N.Y. Aug. 27, 2001)
aff'd, 34 F. App'x 403 (2d Cir. 2002), cert. denied, 537 U.S. 1126 (2003)......................22, 23

Smith v. City of Jackson, Miss.
544 U.S. 228 (2005) ............................................................................................................ 39

Smith v. Xerox Corp.,
196 F.3d 358 (2d Cir. 1999), overruled on other grounds, Meachem v. Knolls Atomic
Pwr. Lab., 461 F.3d 134, 141 (2d Cir. 2006)......................................................................40

Spiegel v. Schulmann,
604 F.3d 72 (2d Cir. 2010) .................................................................................................. 16

St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502 (1993) ............................................................................................................ 16

Strohmeyer v. Int'l Bd. of Painters & Allied Trades,
989 F. Supp. 455 (W.D.N.Y. 1997), aff'd, 164 F.3d 619 (2d Cir. 1998)..............................20

Texas Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248 (1981) ............................................................................................................ 16

Tutko v. James River Paper Co.,
No. 98-9663, 1999 WL 1024627 (2d Cir. Oct. 29, 1999) ....................................................26

Vuona v. Merrill Lynch & Co.,
--- F. Supp. 2d ---, 2013 WL 271745 (S.D.N.Y. Jan. 24, 2013)...........................19, 32, 33, 37

Wado v. Xerox Corp.,
991 F. Supp. 174 (W.D.N.Y. 1998), aff'd, 196 F.3d 358 (2d Cir. 1999)..............................38

Wal-Mart Stores, Inc. v. Dukes,
131 S. Ct. 2541 (2011) ........................................................................................................ 39

Weinstock v. Columbia Univ.,
224 F.3d 33 (2d Cir. 2000), cert. denied, 540 U.S. 811 (2003).......................................25, 26

Williams v. City of New York,
No. 11-3456, 2012 WL 2524726 (S.D.N.Y. June 26, 2012)................................................. 16

Zito v. Fried,
869 F. Supp. 2d 378 (S.D.N.Y. 2012) .............................................................................16, 37

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

OTHER AUTHORITIES

Fed. R. Civ. Pro. 56 ................................................................................................................17

# <u>PRELIMINARY STATEMENT</u>[1]

> ***"I KNOW I'm not competent in this stuff.  I KNOW I work far too slow.  I
> KNOW it takes me 10 years to learn a simple concept.  I KNOW I have not
> been paying close attention to detail as an analyst should. . .  I KNOW they
> for SURE know they made a mistake by hiring me."***

So wrote Plaintiff Brittany Sharpton just months before her manager selected her for

inclusion in a November 2008 reduction in force ("RIF").  Despite her candid self-assessment of

her skills and deficiencies, however, Sharpton has joined with four other women who were also

let go in that RIF to claim they were selected for termination simply because they are women.

Plaintiffs worked in different groups in the Company's Public Finance Department

("PFD").  Due to the drastic, unprecedented financial crisis, the PFD underwent four rounds of

reductions over twelve months in 2007-08 during which 70 employees were let go.  The five

Plaintiffs were retained through each of the first three rounds of reductions, while many male

colleagues were let go.  Indeed, 30 of the 41 employees terminated across the PFD were men.  In

the fourth round of reductions that occurred in November 2008, 29 employees were let go, 16 of

whom were men.  Each Plaintiff was selected for termination by her Group Head(s) based on

their assessment and judgment as to her contributions and value to the projected business needs

of each Group going forward.  Specifically:

- Tom Green, Head of the Infrastructure Group, selected Sharpton based on her
  well-documented performance deficiencies.  By her own admission, Sharpton was a poor
  performer and inferior to her counterpart.

- David Brownstein, who was overseeing the Housing Group, selected Plaintiff Chia Siu
  because, after the previous RIF had reduced the Housing Group to seven employees, Siu
  complained about the Company's lack of commitment to the Housing Group and
  expressed her intention to leave.  Management strongly believed that Siu would leave
  voluntarily once the Group was reduced to a skeletal staff of just three employees in the
  November RIF.

---

[1] Citations are to the 56.1 Statement of Undisputed Material Facts ("56.1 Stmt.").

- Brownstein selected Plaintiff Amy Bartoletti based on his determination that, of the two Directors in the Housing Group, the Director who was retained was fully focused on the Housing market, had organized and conducted industry-wide conferences concerning the financial crisis, and was better suited to lead the Group's clients through the financial crisis.  In contrast, Bartoletti had not engaged in any activities during the crisis to position herself as a leader, and a significant portion of her work had been focused on student loans, a market the Company was abandoning.

- Fred Hessler and David Cyganowski, Co-Heads of the Healthcare Group, selected Plaintiff Lisa Conley because she would present the least risk to the business if she were terminated, she did not lead or originate business as much as others, and she had not demonstrated as much proficiency in developing new business.

- Norman Pellegrini, Head of the Southeast Group, selected Plaintiff Nadine Mentor because he determined she would have a lesser economic impact on the Group than others as she was a new Director with limited established business or clients of her own.

Each of the Plaintiffs alleges that the wrong decision was made.  Each expresses her belief that she was better qualified than certain men in her Group who were retained.  Even if all of Plaintiffs' beliefs about their qualifications are sincere—and it is difficult to conclude they are in light of Sharpton's self-critique—Plaintiffs cannot avoid summary judgment by claiming Defendants made the wrong decisions.  Rather, they must show that the rationale for each of the decisions is pretextual and that the true reason was their gender.  This they cannot do.  While they may disagree with the decisions and wish they had been retained in the fourth RIF just as they had in the three earlier RIFs, they cannot show that each of the decision makers manufactured a rationale for their decision in order to mask a discriminatory motive.  Therefore, summary judgment should be entered.

## STATEMENT OF FACTS

### A.  Citigroup Global Markets Inc. and the Public Finance Department

Citigroup Global Markets, Inc. ("Citigroup" or "the Company") is an equal opportunity employer that prohibits unlawful discrimination and is dedicated to providing a work environment free of discrimination and harassment.  (56.1 Stmt. ¶ 1.)  The Company's Equal

Employment Opportunity Policy and Sexual Harassment / Unlawful Discrimination Policy expressly provides that all "[e]mployment decisions will be made without regard to one's race, color, sex, gender identity or expression, religion, national origin, age, sexual orientation, disability, veteran status, marital status, citizenship status or any other basis prohibited by law." (See Id.)

The PFD is one of several departments within the Company's Municipal Securities Division.  (Id. at ¶ 2.)  The PFD consists of 15 Product Groups (including Healthcare, Housing, and Infrastructure) and Regional Groups (including the Southeast Region).  (Id.)  Within these PFD Groups, professional employees could hold positions in a career that could progress in order of increasing seniority, from Analyst to Associate to Assistant Vice President to Vice President to Director to Managing Director.  (Id.)  The PFD Groups varied widely in terms of the expertise, skills, and client and professional networks required.  (Id.)  Accordingly, mobility of professionals across the different PFD Groups is virtually nonexistent.  (Id.)

Since 1993, Francis Chin has been a head of the PFD.  (Id. at ¶ 3.)  In early 2008, David Brownstein joined Chin as Co-Head.  (Id.)  Each of the Product and Regional Groups within PFD is led by its own Head or Co-Heads.  (Id.)  These Group Heads are responsible for running the business of their own Group, evaluating the employees in their Group, and making personnel decisions concerning those employees.  (Id.)

**B.      The Financial Crisis of 2007-08 and Resulting Reductions in Force**

Throughout 2007 and 2008, in the face of a severe, unprecedented, and sustained financial crisis, businesses across Citigroup, including the 15 PFD Groups, were required to help achieve savings through headcount reductions.  (Id. at ¶ 4.)[2]  When selecting which employees

---

[2] During this period of crisis, some competitors in the marketplace completely closed down their municipal securities departments.  (Id. at ¶ 5 n.3.)

would be retained and which would be let go, each of the Group Heads analyzed their own Group and considered a variety of factors, including the reduction's overall effect on the existing and future business of their Group.  (Id. at ¶ 6.)  In RIF 1, 22 PFD employees were terminated, 14 men and eight women.  (Id. at ¶ 4.)  In RIF 2, four PFD employees were let go, three men and one woman.  RIF 3 included 15 PFD employees, 13 men and two women.  (Id.)

In early October 2008, Citigroup's announced intention to purchase Wachovia failed, which had a very unfavorable effect on Citigroup's stock price.  (Id. at ¶ 5.)  As a result, Citigroup's leadership came under increasing pressure and, in November 2008, the Company underwent another RIF.  (Id.)  The layoff decisions in each PFD Group were again made by the respective Group Heads, who compared individuals in the same or similar positions within their own Group.  (Id. at ¶ 6.)  The Group Heads did not compare individuals in fundamentally dissimilar positions within the Groups; nor were they permitted to compare people in their Group with those in other Groups.  (Id. at ¶ 7.)  With the exception of the Housing Group, neither Chin nor Brownstein made a single termination decision—those decisions were left to the Group Heads.  (Id. at ¶ 8.)  The Plaintiffs, each of whom had been selected to remain through the first three RIF rounds, were selected by their respective Group Heads, for termination in the November RIF.  (Id. at ¶ 9.)  Overall, 29 PFD employees were let go in this RIF, 16 men and 13 women.  (Id.)

## C.  Plaintiff Sharpton's Employment with the Infrastructure Group

### 1.  Sharpton's Performance.

Sharpton first worked with the Company in the summer of 1996 as a Summer Analyst in the Housing Group, where she worked with Plaintiff Bartoletti.  (Id. at ¶ 10.)  Following her summer internship, Bartoletti was critical of Sharpton's quantitative skills and did not believe she was qualified for employment with the Housing Group or anywhere else in the Company.

(<u>Id.</u> at ¶ 10.)[3]  Despite Bartoletti's views of Sharpton's shortcomings, Infrastructure Group Head

Tom Green offered Sharpton an Analyst position with his Group.  (<u>Id.</u>)[4]  Sharpton accepted and

began working for the Infrastructure Group in July 2007.  (<u>Id.</u>)

Throughout her short tenure with the Infrastructure Group, Sharpton struggled with her

performance, including her quantitative skills, which Plaintiff Bartoletti had criticized.  For

instance, Director Steve Wood, with whom Sharpton worked extensively, noted that she had a

multitude of performance issues, including her ability to absorb basic business concepts and her

attention to detail.  (<u>Id.</u> at ¶ 11.)  In May 2008, Wood rated Sharpton as inferior to her peer,

second-year Analyst Matthew Chin, whom he rated a "Superior Candidate."  (<u>Id.</u>)  Director Kim

Swain in the Infrastructure Group had similar issues with Sharpton's skills and abilities.  (<u>Id.</u> )

In fact, all of the people Sharpton worked with (including both men and women) noted her

performance deficiencies.  (<u>Id.</u>)  By contrast, Green did not receive <u>any</u> negative feedback

concerning Matthew Chin, who received stellar reviews.  (<u>Id.</u> at ¶ 12.)

Sharpton was well aware of her performance deficiencies.  She had been told that her

analytical modeling skills were limited.  (<u>Id.</u> at ¶ 13.)  She acknowledged she had issues with

"moving too slow and making errors."  (<u>Id.</u>)  In one e-mail, she confided "I don't rank high on

the list and am not as analytically talented as others in my group."  (<u>Id.</u>)  In another candid e-mail

she sent to her close friend, mentor, and confidante at the Company, (<u>Id.</u> at ¶ 14), Sharpton

acknowledged she was unable to effectively perform her job and that Swain and others had valid

complaints about her performance:

---

[3] Ironically, despite her negative views as to Sharpton's qualifications, Bartoletti later recruited Sharpton to join this lawsuit.  (Id. at ¶ 10 n.5.)
[4] The Analyst Program is a two-year entry-level program with an option for a third year, whereby, at the conclusion of the second year, Analysts are either let go or invited to stay for a third year.  (<u>Id.</u> at ¶ 10 n.6.)  At the conclusion of the third year, Analysts are either let go or move on to become Associates.  (<u>Id.</u>)

I cannot do the most simple task and she is furious. . . .  This reflects horribly on me. . . .  I am not a quant person and apparently it takes me 5 years to do a simple task like updating.  I'm sure this would have taken anyone else like an hour MAYBE 90 min, but I think I have a block . . . .  I just don't pick up on the simple thing they tell me to do.  They get mad.  I look like a retarded black girl and the cycle continues.  I just really want to go home and never come back. . . .

This is my fault actually.  If I had better sense then it would not take me so long to do things.  I would not have pushed this back because I would have known how to do it and felt confidently about doing it.  So, my stupid @$$ knowingly put this off, did it wrong, took forever doing it over, and in the end the most value I added was updating some market update pages. . . .

. . . I need a brain Pond.  I really really do. No I am not feeling back [sic] for myself, but I truly do.  This is INSANE.  I KNOW they for SURE know they made a mistake by hiring me.  I didn't want to go down like this, but my miniscule brain cells cannot handle all of this.  They just cannot.

(Id.)  In a succinct self-assessment, Sharpton summed it up best:  ***"This is not the job for me. Period."*** (Id.)

### 2.      Reductions in Force in Infrastructure.

During the first three RIFs in 2007-08, the Infrastructure Group let go three men, including an Analyst.  (No women were let go.)  (Id. at ¶ 15.)  Sharpton expressed concern throughout each of the earlier reductions, aware that her deficiencies could result in her termination.  (Id.)  Nevertheless, despite her struggles, Group Head Green elected to retain Sharpton through each of these RIFs.  (Id.)

In November 2008, Green was asked to conduct another RIF in his Group.  (Id. at ¶ 6.) At that time, the Group had three Analysts—two (Sharpton and Matthew Chin) in their second year, and one (Alan Dockeray) in his first year.  (Id. at ¶ 16.)  Green decided to retain one Analyst at each level going forward.  (Id.)  Green reasoned that, because there is a high turnover rate with Analysts, especially after the second year, it was important to keep a first year to ensure there would be an Analyst in the future both to perform the work and to train any incoming future analysts.  (Id.)  Accordingly, he needed to select one of the second-year Analysts for the

RIF, either Sharpton or Matthew Chin.  (Id.)  By all measures, Matthew Chin was viewed as a

stronger performer.  (Id. at ¶ 17.)  Accordingly, although he had retained her through the first

three reductions, Green selected Sharpton for termination.  (Id.)

By her own admission, Sharpton was not a better performer than Matthew Chin.  In fact,

in one of her e-mails to her confidante, she acknowledges Chin was more skilled:

> I KNOW I'm not competent in this stuff.  I KNOW I work far too slow.  I KNOW
> it takes me 10 years to learn a simple concept.  I KNOW I have not been paying
> close attention to detail as an analyst should.  When will [Kimberly Swain] learn
> just NOT to work with me.  I am no[t] the type of mind she wants.  ***She needs
> [another analyst like] Tanzeer or Matt Chin or You.   Not Brittany freakin
> Amrith Sharpton. . . .   I KNOW they for SURE know they made a mistake by
> hiring me.***

(Id. at ¶ 18 (emphasis added).)  Even after filing her lawsuit, Sharpton was unable to testify at

her deposition that she was the better candidate.

> Q:  Is it your belief that you were better qualified than Matthew Chin?
> A:  At least as qualified.
> Q:  But not better qualified?
> A:  . . . I don't know – at least as qualified.

(Id.)  Sharpton asserted in the Complaint that she performed her job with the "highest degree of

professionalism."  (Id. at ¶ 19.)  Yet, when discovery revealed she engaged in highly

unprofessional and unacceptable conduct—such as repeatedly referring to Caucasians as

"saltines" or "crackers" and to one colleague as "vile" or a "devil"—she modified her assertion

and claimed she performed "at the highest level of competence that Brittany Sharpton can

muster."  (Id.)

**D.      Plaintiff Siu's Employment with the Housing Group**

**1.      Siu's Concerns Regarding the Company's Commitment to Housing.**

Siu was hired in July 2006 as an Analyst for the Housing Group managed by Group Head

Nick Fluehr.  (Id. at ¶ 20.)  The Housing market was, in many respects, at the core of the

financial crisis.  As the market deteriorated, the Group began to shrink.  (Id. at ¶ 21.)  In the first two RIFs, Fluehr selected three employees for reduction.[5]  (Id.)  In the third-round RIF (July 2008), Citigroup terminated Fluehr.  (Id.)  After that RIF, the Housing Group was reduced to seven employees.  (Id.)

Siu was "devastated" and "shocked" by Fluehr's departure and the cutbacks in the Group.  (Id. at ¶ 22.)  She believed the group had already been reduced too much before the third-round RIF and that "it didn't make sense for [the Company] to cut [anyone] from [the Housing Group] when [they] were already short-staffed and [had] lost [] people earlier."  (Id.)  Siu had "a huge concern" that she might be fired following Fluehr's departure, and was unsure as to whether management was committed to keep the Group.  (Id.)  Siu conveyed these concerns and expressed that she might leave the Company.  (Id. at ¶ 23.)   Siu began actively looking for other jobs and sent her resume to numerous other companies.  (Id.)  In addition, although Citigroup had extended Siu an offer to continue in the Analyst program for a third year, Siu declined to sign the offer letter because she did not want to sign anything that might bind her to the Company for a third year.  (Id.)

The Housing Group valued Siu, thought she was a highly talented Analyst, and wanted her to stay.  (Id. at ¶ 24.)  Brownstein—who began overseeing the Housing Group after Fluehr's departure—reached out to the Company's Human Resources Department and inquired as whether a mid-year promotion was possible.  (Id.)  He explained that Siu was a valued and talented employee and he and the others in the Housing Group wanted to do what they could to convince Siu to stay.  (Id.)  As a result of his efforts, he was able to get approval to promote Siu to Associate in December or January, six months ahead of schedule.  (Id. at ¶ 25.)  Siu was

---

[5] Fluehr testified that, during the RIF processes in which he participated, he never saw a decision made that was based on gender.  (Id. at ¶ 21 n.7.)

grateful but, despite the offer, she did not want to commit to the Company.  (Id. ("[W]e never got

a full answer from Chia as to whether she was going to stay. . . .  [S]he never told us that she was

at a point to where she was comfortable staying at the firm.").)

>    **2.      Termination of Siu's Employment in the November 2008 RIF.**

As part of the November 2008 RIF discussions, the Company strongly considered

shutting down the Housing Group altogether.  (Id. at ¶ 26.)  The housing market was under siege

and was seen by many as the root cause of the financial crisis.  (Id.)  Ultimately, it decided  to

retain a skeletal staff to guide clients through the crisis.  (Id.)  To maintain a functional skeletal

group, Brownstein decided to have just a three-person staff remain, including one Analyst.  (Id.)

Siu had believed the Group was short-staffed even before the third-round RIF and questioned the

Company's commitment to Housing when it was reduced to just seven employees.  (Id. at ¶ 27.)

If the Group was again cut and only a skeletal staff of three was retained, Brownstein earnestly

believed Siu would leave.  (Id.)  Siu acknowledged his belief was reasonable.  (Id.)  Although he

had gone out of his way to get approval for an early promotion in an effort to convince Siu not to

quit, Brownstein did not want to risk terminating the only other Analyst who supported the

Group, only to then have Siu quit and leave the group with only two employees—and no

Analyst.  (Id.)  Therefore, Siu was chosen for inclusion in the RIF.  (Id.)

> **E.      Plaintiff Bartoletti's Employment with the Housing Group**

>    **1.      Bartoletti's Performance and Promotions.**

Bartoletti was hired by the Company as an Associate in 1993 in what eventually became

the Housing Group.  (Id. at ¶ 31.)  Throughout her tenure, a significant amount of her work was

on student loans.  (Id.)  She was promoted several times, to Assistant Vice President, Vice

President, and, ultimately, Director.  (Id.)  Bartoletti worked closely with her friend, Group Head

Nick Fluehr, until his departure in July 2008.  (Id. at ¶ 32.)  She was the only Director who did student loan work.  (Id. at ¶ 31 n.8.)

In 2004, Fluehr was recruited by Morgan Stanley and he asked Morgan Stanley to consider hiring Bartoletti as well.  (Id. at ¶ 32.)  Morgan Stanley made offers to both, and Fluehr informed Chin, the Head of Public Finance, of the Morgan Stanley offers.  (Id.)  To convince them to stay, Chin made counter-offers to Fluehr and Bartoletti, which included compensation increases to match the offers from Morgan Stanley.  (Id.)  As a result, Bartoletti's incentive compensation award for 2004 increased approximately 75%, jumping from $380,000 in 2003 to $662,500 in 2004.  (Id.)

When Citigroup terminated Fluehr in the July 2008 RIF (Fluehr had also done student loan work), the Group was without a Head.  (Id. at ¶¶ 31 n.8, 33.)  Bartoletti was one of the two remaining Directors in the group, the other being Mike Koessel.  (Id. at ¶ 33.)  Although neither had significant management experience, Brownstein and Chin initially asked Bartoletti to assume responsibility as Group Head—primarily because she had been employed with the Company longer than Koessel and they were not aware that Koessel would be interested in that position.  (Id.)  Bartoletti did not immediately agree to become Group Head, and, given her close relationship with Fluehr, there was some concern that she would follow Fluehr to whichever company he went to work for after the July RIF.  (Id. at ¶ 34.)  Indeed, Fluehr went to Bank of America and Bartoletti did, in fact, speak to Bank of America about a job.  (Id.)  Brownstein told Bartoletti he wanted her to remain and wanted to help her succeed.  (Id.)  He sought the assistance of Bartoletti's friend and Managing Director, John Heppolette, to convince her to accept the role.  (Id.)

When Koessel heard that Bartoletti had been offered the position to head the Group, he told Brownstein he wanted to be Co-Head and would explore other job opportunities if not also offered the position.  (Id. at ¶ 35.)  Not wanting to lose one of just two Directors, Brownstein and Chin agreed to ask Bartoletti and Koessel to be Co-Heads of the Housing Group, with Bartoletti to lead the student loans unit.  (Id.)[6]

### 2.    Termination of Bartoletti's Employment in the November 2008 RIF.

After July 2008, the Housing market underwent a precipitous downturn.  (See supra pp. 3, 7-9; see also 56.1 Stmt. ¶¶ 4-5, 21, 26, 37.)  By November 2008, the student loan business had become effectively nonexistent and the Company abandoned the business.  (56.1 Stmt. ¶ 37.) Management considered disbanding the Housing Group in its entirety, and Bartoletti herself "thought [] that the entire Housing Group would be let go [in November 2008.]"  (Id.)  As described above, management ultimately decided to keep a skeleton crew.  (See supra p. 9; 56.1 Stmt. ¶ 26.)  As Brownstein described it:  "The conclusion was we would have a very slim housing group with one near term purpose, and that was to have Citi continue to be somewhat of a thought leader in the market when it comes to housing on the municipal side.  [O]ur decision was [] to keep [] a very limited footprint and its goal at that point wouldn't be about generating revenues [], but would be to maintain thought leadership in the market."  (56.1 Stmt. ¶ 38.)

At the Director level, the choice was between Bartoletti and Koessel.  (Id.)  Brownstein noted that through the financial crisis, Koessel had run a Housing Industry conference in Washington, D.C., had arranged and attended several meetings with the federal HUD agency and state Housing Finance Authorities across the country, and had conducted numerous meetings to strategize with and guide clients and others across the industry through an unprecedented crisis.

---

[6] Because neither Bartoletti nor Koessel had significant prior managerial experience, Brownstein retained some of functions Group Head following Fluehr's departure, including selection of employees for fourth-round RIFs.  (Id. at ¶ 36.)

(Id. at ¶ 39.)These activities positioned Koessel as an industry thought leader.  (Id.)  In contrast, Brownstein did not believe Bartoletti was well positioned to navigate clients through the increasingly difficult economic landscape; she had not made efforts to establish herself as a thought leader.  (Id. at ¶ 40.)  By her own admission, Bartoletti had not been engaged in industry conferences, meetings, or speaking events.  (Id. ("Q:  After you were appointed co-head, did you arrange for any industry programs about the housing group or the housing industry as a whole? A:  I did not.").)  Brownstein also noted that several of Bartoletti's clients were in the student loan space that the Company was abandoning and she had fewer relationships than did Koessel with large housing clients.  (Id.)

In short, Brownstein believed Koessel was better positioned than Bartoletti to help important clients through the crisis and thus allow the Company to remain relevant in the Housing space.  (Id. at ¶ 41.)  In addition, given Bartoletti's comparatively higher compensation (as a result of the Morgan Stanley offer), Brownstein determined that it was more cost-effective to have Koessel cover the business while management tried to ascertain whether the group had any future.  (Id.)  Chin agreed with Brownstein's recommendation, and they selected Bartoletti to be let go in the fourth RIF.  (Id.)[7]

**F.   Plaintiff Conley's Employment with the Healthcare Group**

**1.   Conley's Hiring and Promotions.**

Conley was hired in 1997 by Healthcare Group Co-Heads Fred Hessler and David Cyganowski as an Assistant Vice President.  (Id. at ¶ 44.)  Throughout her employment, she worked in the Chicago office.  (Id.)  Hessler and Cyganowski promoted Conley twice, first to

---

[7] After her employment with Citigroup ended, Bartoletti joined Fluehr at Ramirez and Co. due to her "loyalty" to Fluehr.  (Id. at ¶ 43.)  While at Ramirez, Bartoletti and Fluehr shopped themselves as part of a team to other companies, and when Fluehr left Ramirez to join Wells Fargo, Bartoletti also sought out job opportunities at Wells Fargo.  (Id.)

Vice President in January 1999 and then to Director in January 2005.  (Id.)  Conley's promotion

to Director brought with it added responsibilities, including originating and delivering business

and becoming a lead client-relationship manager.  (Id.)  Conley, however, struggled developing

these skills.  (Id. at ¶ 45.)  While she was a strong number two, she was less adept in a lead role.

(Id.)  By November 2008, she had little business that she had developed and few, if any,

significant client relationships that viewed her as their primary trusted advisor.  (Id.)  She had

also shown that, when a client's main point of contact for the account was not available, she was

not helpful in stepping in and trying to deal with the client's issue.  (Id.)  In addition, when

provided with opportunities to lead professional development initiatives, Conley had failed to

follow through.  (Id.)

### 2.  Termination of Conley's Employment in the November 2008 RIF.

By November 2008, the Healthcare Group had already undergone two RIFs, and Conley

had been selected by Hessler and Cyganowski for retention each time.  (Id. at ¶ 46.)  In those two

RIFs, four of Conley's male Director-level colleagues were terminated.  (Id.)  In connection with

the November RIF, Hessler assessed the skills, contributions, and overall performance of the

remaining employees in the group.  (Id.)  Hessler focused his analysis on identifying those

officers that were unlikely to take clients or other employees and thus would have the least

impact on the Group's business going forward.  (Id.)  For example, Hessler readily concluded

that there was little risk of Managing Director Dave Johnson taking clients with him, since many

of the clients he serviced were long-term clients of the Company.  (Id. at ¶ 47.)[8]  Hessler

similarly concluded that there was a "[v]ery low risk of [Conley] taking business and very low

---

[8] In the RIF, Johnson was the only Managing Director selected for termination.  (Id. at ¶ 47.)  Hessler and
Cyganowski elected to retain the three female Managing Directors, using the same assessment.  (Id.)  One of those,
Teri Hartman, had been promoted to Managing Director at a time when no slots were available to add another
Managing Director  (Id. at ¶ 47 n.11.)  Hessler and Cyganowski were able to persuade a male senior Managing
Director to take a step back in order to free up a slot for Hartman.  (Id.)

risk of her being able to recruit people who might otherwise still be in our group." (Id. at ¶ 48.) Similar to—and often in conjunction with—Johnson, Conley worked predominantly on long-term clients of the Group "and therefore the judgment was there would be low risk of [] losing that business because they were essentially institutionalized clients." (Id.)[9] Hessler believed that selecting any other Directors would be more damaging because there would be a greater risk of losing clients or personnel. (See id. at ¶ 49.) Cyganowski concurred, noting that "all of the Directors that remained after the fourth RIF were ahead of Lisa Conley with respect to driving business and revenue." (Id. at ¶ 50.) While the other officers had successfully become the lead or originating contacts for clients who might leave if any of them were terminated, Conley had not done so, aside from one small client (Nebraska Methodist). (Id.) For all these reasons, Hessler and Cygnowski included Conley in the November 2008 RIF. (Id.)

**G.      Plaintiff Mentor's Employment with the Southeast Regional Group**

**1.      Pellegrini Hires and Promotes Mentor.**

Mentor was hired in June 2005 by Southeast Regional Group Head Norm Pellegrini as a Vice President. (Id. at ¶ 54.) Mentor and Pellegrini had worked together at UBS for several years. (Id.) When Pellegrini was recruited by Citigroup to lead the PFD Southeast Regional Group, he did so upon the condition that he be allowed to bring several employees with him, including Mentor. (Id.)

Mentor displayed promise and abilities during her first two years of employment as a Vice President, and after two years, recommended that Mentor be promoted to Director. (Id. at ¶ 55.) Bartley Livolsi, who oversaw the Regional Groups, agreed with Pellegrini's recommendation, and Mentor was promoted to Director in early 2008. (Id.)

---

[9] In fact, the Company did not lose any significant clients or deals because of Conley's termination. (Id. at ¶ 48 2.12.)

2.      **Termination of Mentor's Employment in the November 2008 RIF.**

Pellegrini attempted to avoid having his Southeast Regional team impacted by the November 2008 RIF.  (Id. at ¶ 56.)  Prior to November 2008, three individuals from the Group had already been terminated—including a male Director, a male Associate, and a female Vice President—and Pellegrini had tried to save additional costs by closing the Southeast Group's Atlanta office.  (Id.)  Unfortunately, despite his efforts, Pellegrini could not avoid having his Group participate in the November RIF.  (Id.)

Pellegrini and Livolsi discussed everyone within the Southeast Region and, particularly regarding the Directors, analyzed who would have the least impact on the Group's existing business and moving forward, including what business they were doing and what clients they could take with them.  (Id. at ¶ 57.)  Although Mentor was beginning to build business and had shown potential in this area, the crisis of 2008 reduced the ability to wait on the potential to develop.  (Id. at ¶ 58.)  Pellegrini and Livolsi felt that, by the Fall of 2008, Mentor had less developed business than every other Director in the Group.  (Id. at ¶ 59.)  In fact, Pellegrini felt Mentor had less developed business than Brent Wilder, another Director, and he too was selected for termination in the November RIF.  (Id.)  Thus, with approval of Livolsi, Pellegrini selected Mentor to be included in the RIF because he believed terminating her employment would have the least impact on business of any Director in the Southeast Group.  (Id. at ¶ 60.) [10]

---

[10] Mentor claims that she "played a significant role" in securing deals on the Broward County ($180m) and Virgin Islands ($400m) accounts just before her termination.  (Compl. ¶ 85.)  Yet, the decision to terminate Mentor was made before she was able to help secure business as part of a team on both the Virgin Islands account (which was secured as part of an effort led by the Co-Head of the Infrastructure Group, James Haddon, and senior Director Guy Logan) and the Broward County account (which was a client of Group Head Pellegrini dating back to tenure at UBS).  (Id. at ¶ 61.)

## ARGUMENT

**I.     PLAINTIFFS CANNOT IDENTIFY SPECIFIC FACTS SHOWING THERE IS A GENUINE ISSUE FOR TRIAL.**

Plaintiffs allege that they were selected for termination in the November 2008 RIF based on their gender in violation of Title VII, NYSHRL, and NYCHRL (Compl. ¶¶ 126-142).  In an employment discrimination case, the burden is on plaintiffs to establish discrimination by a preponderance of the evidence.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  In the context of a RIF, a discrimination plaintiff has a higher hurdle to overcome Zito v. Fried, 869 F. Supp. 2d 378 (S.D.N.Y. 2012) (citing Pisana v. Merrill Lynch & Co., No. 93-4541, 1995 WL 438715, at *3-5 (S.D.N.Y. July 24, 1995)).  Where, as here, plaintiffs have not alleged any direct evidence of discrimination, they must proceed under the three-step burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  A plaintiff must first establish a prima facie case by demonstrating that she:  (1) is a member of the protected group; (2) was performing her duties satisfactorily; (3) was terminated; and (4) her termination occurred under circumstances giving rise to an inference of discrimination.  McDonnell Douglas, 411 U.S. at 802; accord Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999).  If a plaintiff establishes a prima facie case, the burden of production shifts to defendant to proffer a legitimate, nondiscriminatory reason for its actions.  Reeves, 530 U.S. at 148.  A plaintiff can only then prevail by proving both that defendant's legitimate, nondiscriminatory reason is false **and** that intentional discrimination is the real reason for the adverse action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  At all times, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendants

intentionally discriminated against the plaintiff.  <u>Texas Dep't of Cmty. Affairs v.</u> <u>Burdine</u>, 450 U.S. 248, 256 (1981).[11]

Assuming for purposes of this motion that Plaintiffs can meet the minimal requirements of a prima facie showing, the Company has easily met its burden of articulating a legitimate, nondiscriminatory reason for each of the five challenged termination decisions.  As explained below, Plaintiffs cannot adduce any evidence, other than their own self-serving and unsubstantiated conjecture, to support their claims of intentional discrimination.  Plaintiffs are unable to show that the rationale of each of the Group Heads is pretextual, i.e., was manufactured to avoid liability.  They are also unable to show that their Group Heads selected them for the fourth-round RIF because of their gender.  Therefore, pursuant to Rule 56, Defendants' motion for summary judgment should be granted.[12]

### A.  <u>Plaintiff Sharpton's Disparate Treatment Claim Should Be Dismissed</u>

In making decisions as to who from the Infrastructure Group would be let go in the fourth-round RIF, Group Head Tom Green decided to retain just one Analyst at each level. Green determined that of the two second-year analysts, Matthew Chin was clearly more qualified than Sharpton.  Therefore, he selected Sharpton to be terminated in that fourth-round RIF. Sharpton cannot demonstrate that Green's rationale is pretextual.  Indeed, Defendants have produced significant and unrefuted evidence that virtually everyone who worked with Sharpton

---

[11] Plaintiffs' NYSHRL and NYCHRL discrimination claims are also analyzed under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u>, <u>e.g.</u>, <u>Farias v. Instructional Sys., Inc.</u>, 259 F.3d 91, 98 (2d Cir. 2001) (citing <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000); <u>Williams v. City of New York</u>, No. 11-3456, 2012 WL 2524726, at *4 n.3 (S.D.N.Y. June 26, 2012) (citing <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010)).

[12] Plaintiffs were only employed by defendant Citigroup Global Markets, Inc., not defendant Citigroup, Inc. Consequently, any claim against Citigroup, Inc. must be dismissed.  <u>Saidin v. NYC Dep't of Educ.</u>, 498 F. Supp. 2d 683, 690 (S.D.N.Y. July 27, 2007) (holding that facts asserted in complaint were insufficient to plead a claim against defendant under, <u>inter alia</u>, Title VII as defendant was not plaintiff's employer and had no direct involvement in any aspect of the unlawful employment discrimination plaintiff alleged).  <u>See also</u> <u>MacSweeney v. ING Life Ins. & Annuity Co.</u>, No. 11-971, 2011 WL 4839086, at *6-7 (S.D.N.Y. Oct. 12, 2011) (dismissing plaintiff's NYSHRL claim where plaintiffs failed to plead facts demonstrating that defendants had immediate control over plaintiffs).

(both women and men) found her qualifications, especially her financial analysis skills, to be

lacking.  Even her co-Plaintiff, Bartoletti, had previously denied her a position in the Housing

Group based on these deficiencies.  Sharpton herself freely and candidly admitted that she was

far <u>less</u> qualified than Matthew Chin:

- "[Swain] needs [] Matt Chin [].  Not Brittany [] Sharpton ….  I KNOW they for SURE know they made a mistake by hiring me."  (56.1 Stmt. ¶ 18.)

- "I don't rank high on the list and an [sic] not as analytically talented as others in my group."  (<u>Id.</u> at 13.)

In the face of this evidence, including her own admissions, Sharpton cannot demonstrate that

Green's reason for retaining Matthew Chin (based on his superior qualifications) was pretextual,

let alone that it was discriminatory.

While Sharpton now tries to distance herself from her candid self-assessments of her

deficiencies and shortcomings and conveniently argues that she was a strong performer, her

newfound positive self-assessment is insufficient to demonstrate pretext.  As an initial matter, at

her deposition, Sharpton would not assert she was more qualified than Matthew Chin, only

venturing so far as to say she thought she was "as qualified" as him.  (56.1 Stmt. ¶ 18.)  This is

fatal to her claim.  <u>See</u>, <u>e.g.</u>, <u>King v. Interstate Brands Corp.</u>, No. 02-6470, 2009 WL 1162206, at

*10 (E.D.N.Y. Apr. 29, 2009) (collecting cases).

Moreover, it is well settled that an employee's self-assessment of her skills and

disagreement with her employer's assessment is insufficient to avoid summary judgment.  <u>See</u>,

<u>e.g.</u>, <u>Lester v. M&M Knopf Auto Parts</u>, No. 04-850S, 2006 WL 2806465, at *13 (W.D.N.Y.

Sept. 28, 2006) ("although plaintiff may disagree with defendants' characterization of [her] job

performance, [her] disagreement is inconsequential"); <u>Evans v. New York Botanical Garden</u>, 253

F. Supp. 2d 650, 660 (S.D.N.Y. 2003), <u>aff'd</u>, 88 F. App'x 464 (2d Cir. 2004) (same); <u>Gupta v.</u>

<u>NYC Sch. Constr. Auth.</u>, 305 F. App'x 687, 689 (2d Cir. 2001) (granting summary judgment

where, as here, plaintiff offered nothing more than "mere speculation" supporting his claim that

he was more qualified than other employees selected for retention in a RIF); Payami v. City of

New York, No. 03-2785, 2007 WL 945529, at *1 n.5 (S.D.N.Y. Mar. 28, 2007) (employee's

disagreement with employer's perception of job performance does not show proffered

justification for termination was a pretext); Brown v. Time, Inc., No. 95-10081, 1997 WL

231143, at *12 (S.D.N.Y. May 7, 1997) (finding insufficient plaintiff's claim that his evaluations

were unfair and inaccurate; an employer is permitted to make bad business judgments as long as

its evaluations and decisions are nondiscriminatory); Shabat v. Blue Cross Blue Shield of

Rochester Area, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) (employee's dissatisfaction with a

business decision based on her own subjective assessment of her performance is not enough to

escape summary judgment), aff'd sub nom. Shabat v. Billoti, 108 F.3d 1370 (2d Cir. 1997).  This

is particularly true in the context of a reduction in force.  See, e.g., Seltzer v. Dresdner Kleinwort

Wasserstein, Inc., 356 F. Supp. 2d 288, 297 (S.D.N.Y. 2005); Vuona v. Merrill Lynch & Co., ---

F. Supp. 2d ---, 2013 WL 271745, at *24 (S.D.N.Y. Jan. 24, 2013).[13]

 Sharpton bases her claim in large part on the fact that she is a woman, and that the two

other women from the Infrastructure Group were terminated.  But beyond this, Sharpton has no

evidence to even suggest gender played a role in Green's decision.  Sharpton acknowledges that

her gender was never discussed by Green or by anyone in the context of her termination, and no

one made any disparaging comments about her gender.  (BS Dep. 204.)  Cf. Rozenfeld v. Dep't

of Design & Constr. of the City of N.Y., 875 F. Supp. 2d 189, 205-06 (E.D.N.Y. 2012) (finding

no credible evidence of discrimination where, inter alia, "Plaintiff explicitly states nobody made

---

[13] Similarly, while Sharpton may disagree with Green's decision to retain one analyst at each class year, her disagreement with his well-reasoned business rationale is irrelevant and falls short of showing pretext.  Moreover, her assertion that she would have been more qualified than the first-year analyst,is unavailing since he was not similarly situated to her.  See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

disparaging comments about his [protected category]"), aff'd, --- F. App'x ---, 2013 WL 2321600 (2d Cir. May 29, 2013); Rodriguez v. Pierre N.Y., 299 F. Supp. 2d 214, 218 (S.D.N.Y. 2004) (same); Corcoran v. Gab Bus. Servs., Inc., 723 F. Supp. 966, 968-69 (S.D.N.Y. 1989) (granting summary judgment where "plaintiff offers nothing more than the single fact that he was terminated at the age of sixty-one as evidence of any age discrimination").

Moreover, the notion that Green made the decision to terminate Sharpton based on her gender is belied by the fact Green hired her into the Infrastructure Group just fifteen months earlier, and selected her for retention in the earlier RIF rounds.  Indeed, in the earlier rounds, three men—and not a single woman—were terminated, including an Analyst.  (56.1 Stmt. ¶ 15.) The courts have recognized that, where the same person hires a member of the protected class and is then responsible for the challenged employment decision, "there is a 'powerful inference' that the [challenged decision] was not motivated by discriminatory animus."  Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).  See also Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) (finding that, when the individuals who made the termination decision were also the ones who made the hiring decision, "it is difficult to impute to [them] an invidious motivation"), cert. denied, 525 U.S. 936 (1998); Strohmeyer v. Int'l Bd. of Painters & Allied Trades, 989 F. Supp. 455, 460 (W.D.N.Y. 1997) (granting summary judgment and holding that "employers who knowingly hire workers within a protected group seldom will be credible targets of [discriminatory] firing"), aff'd, 164 F.3d 619 (2d Cir. 1998); Figueroa v. New York Health & Hosps. Corp., No. 03-9589, 2007 WL 943537, at *8 (S.D.N.Y. Mar. 27, 2007) (supervisor's positive actions towards plaintiff undercut any inference of discrimination); Crawford-Mulley v. Corning Inc., 194 F. Supp. 2d 212, 221 (W.D.N.Y. 2002) (same); Pasha v. William M. Mercer Consulting, Inc., No. 00-8362, 2004 WL 188077, at *6-7 (S.D.N.Y. Feb. 2,

2004) (granting summary judgment and noting that "evidence of an employer's non-discrimination should be considered as well"), <u>aff'd</u>, 135 F. App'x 489 (2d Cir. 2005).

Sharpton has adduced no evidence to support her claim of gender discrimination. Accordingly, her claims should be dismissed.  <u>See</u>, <u>e.g.</u>, <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 152-53 (2d. Cir. 2000) (holding where, as here, defendants have put forth substantial evidence that company "was engaged in a bona fide reduction in force, motivated by the need to save large amounts of operating costs" and that "the actor who made the adverse employment decision against plaintiff also made a recent favorable employment decision regarding plaintiff," plaintiff cannot establish gender-based animus and summary judgment is appropriate); <u>Nicholls v. Phillips Semiconductor Mfg.</u>, 760 F. Supp. 2d 407, 420-21 (S.D.N.Y. 2011) (granting summary judgment for employer where, as here, employer's proffered reasons for RIF were legitimate, nondiscriminatory, and not shown to be pretextual).

### B.      Plaintiff Siu's Disparate Treatment Claim Should Be Dismissed

In November 2008, at the height of the financial crisis, the Company contemplated shutting down its Housing Group in full.  Ultimately, it decided to maintain a skeletal staff of just three employees, including one Analyst.  As described above, Siu was selected to be included in the November RIF not based on any concerns about her performance or her qualifications, but rather because there was a well-founded belief that she would leave.  After the previous RIF in July 2008 had reduced the Housing Group to seven employees, Siu expressed frustration that they were short-staffed and believed that by cutting the Group to seven employees, the Company had demonstrated it was not committed to the Housing business. Indeed, she thought the Group was short-staffed even before the July RIF, and was "devastated" and "shocked" when the Group was reduced.  She told many colleagues she was contemplating leaving, she pursued other employment opportunities, and she declined to sign the Company's

offer for her to continue as a third-year Analyst because she did not want to bind herself to another year with the Group, whose future was uncertain.  In light of these concerns, which Siu had made well known, Brownstein believed Siu would leave if the Group was cut down to a skeletal staff of just three employees, and he did not want to risk terminating the only other Housing Analyst, only to have Siu then quit.

Siu cannot offer any admissible evidence even remotely suggesting that the Company's stated reason for its decision to terminate her employment was false.  Uncontroverted documentary evidence and testimony demonstrate that Brownstein made the decision on the basis of her expressed, vocal dissatisfaction with the Company's commitment to the Housing Group and the significant likelihood that she would leave the skeletal group of three if she had been retained.  Siu now claims that the Company should have taken the chance that she would have stayed, but this is patently insufficient to demonstrate pretext.  In fact, Siu admitted at her deposition that her prior expressed dissatisfaction with the future and direction of the Group may have factored into the decision to include her in the November RIF.  (56.1 Stmt. ¶¶ 27, 29.) This admission alone defeats any suggestion of pretext and warrants summary judgment.  See, e.g., Sklar v. New York Life Ins. Co., No. 00-2254, 2001 WL 984724, at *7 (S.D.N.Y. Aug. 27, 2001) (granting summary judgment for employer where, as here, "[n]othing in the record indicates that a material issue of disputed fact as to [employer's] justification or that the proffered justification is merely pretextual, as [plaintiff] himself conceded the point at his deposition.") aff'd, 34 F. App'x 403 (2d Cir. 2002), cert. denied, 537 U.S. 1126 (2003). [14]

Even if she could establish pretext—which she cannot—Siu cannot point to any evidence to suggest gender discrimination was the true reason for her termination.  Siu acknowledges that

---

[14] Siu's assertion that she was more qualified than the Analyst (and the Associate) who was retained is a red herring. (See Compl. ¶¶ 63-66.)  Her relative skills were not the basis for the decision.  In fact, Siu was highly regarded.

she did not speak with any of the decision makers regarding the termination decision and, thus, has no knowledge concerning why she was selected.  (56.1 Stmt. ¶ 29.)  Siu also testified that, up until the day of her termination, nothing had ever occurred during her employment at Citigroup that ever made her feel she was treated differently because of her gender.  (Id.)  Indeed, she admits that the principal basis of her discrimination claim is an article she read that suggested "that people sometimes use a mass layoff to mask gender discrimination."  (Id. at ¶ 30.)  Other than that article, she confirmed she has no basis for her belief that she was discriminated against.

> "Q:  Any other basis for your belief that one reason you might be terminated was because of your gender?  A:  No."  (Id.)

The notion that the decision to terminate Siu was based on her gender is further belied by the fact that just months earlier after the July RIF, Brownstein went out of his way to get approval for her early promotion to Associate in advance of the normal cycle in an effort to convince her not to leave.  This refutes any inference Brownstein harbored a discriminatory animus towards Siu because of her gender.  See supra pp. 20-21; see also Ali v. Tribune Entm't Co., No. 93-1398, 1996, WL 384913, *8 (S.D.N.Y. July 10, 1996) (finding strong inference that discrimination did not motivate the termination decision when the same individuals both promoted and fired plaintiff).  Moreover, Siu was selected for retention in each of the three prior RIFs while other men in the Housing Group were selected for termination, including the former Group Head Fluehr and other male Analysts.[15]

In sum, Siu has "done little more than cite to [her alleged] mistreatment and ask the court to conclude that it must have been related to [her gender].  This is not sufficient."  Lizardo v.

---

[15] Siu's deposition testimony demonstrated that she is willing to conjure up a claim of discrimination without regard to actual facts.  She admitted she does not know who made the RIF decisions or what they were based on, but, nevertheless, conclusorily claims that decisions to terminate men throughout the RIF process were based on performance, while decisions to terminate women must have been gender-based.  (56.1 Stmt. at ¶¶ 28-29.)

Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) (citing Norton v. Sam's Club, 145 F.3d 114, 120

(2d Cir. 1998), cert. denied, 525 U.S. 1001 (1998)).

     **C.**    **Plaintiff Bartoletti's Disparate Treatment Claim Should Be Dismissed**

In reducing the Housing Group down to a skeletal staff of just three employees,

Brownstein and Chin needed to choose a Director between Koessel and Bartoletti.  Brownstein

believed Koessel was better qualified to lead the Housing Group and its clients through difficult

and uncertain economic times of the financial crisis.  Koessel was a demonstrated thought leader

and had arranged and participated in several industry conferences and meetings with state and

federal regulators concerning the financial crisis and its impact on the Housing market.  By her

own admission, Bartoletti did none of this.  In addition, Brownstein believed Koessel had greater

skills and more important client relationships to maintain the Group's relevance through the

crisis than did Bartoletti.  A significant portion of Bartoletti's clients were in the student loan

area (56.1 Stmt. ¶¶ 31, 31 n.8, 41), a market the Company was abandoning.  Based on this

legitimate assessment, Brownstein believed Koessel should be retained and Bartoletti should be

let go in the November RIF.  Chin, who had advocated in favor of shutting down the entire

Housing group, concurred with Brownstein's decision.

Bartoletti cannot prove that these legitimate, nondiscriminatory reasons for selecting her

for inclusion in the RIF are a pretext.  Indeed, the Company has consistently and uniformly

explained the rationale without deviation, and the evidence supporting its legitimate,

nondiscriminatory reason for electing to retain Koessel over Bartoletti is uncontroverted.  In fact,

Bartoletti conceded that, while she was managing deals and studying for her Series 53 licensing

exam, Koessel was organizing and chairing conferences and meeting with clients.  (Id. at ¶ 40.)

Bartoletti also concedes that she was devoting a significant portion of her time to student loans, a

market and client base the Company was abandoning.  (Id. at ¶ 41.)  Thus, by her own

admissions, Bartoletti affirms the basis for Brownstein's business judgment that Koessel was better positioned to lead the group in the direction the Company decided to move and, thus, she is unable to demonstrate pretext.

Bartoletti claims that the Company made the wrong decision; she believes Brownstein and Chin should have concluded that she was more qualified.  This argument, however, fails for several reasons.  First, although Bartoletti may not agree with the Company's strategic vision for the Group during the crisis, or with Brownstein or Chin's perceptions of her relative qualifications, it is well settled that it is the decision maker's perception, not the plaintiff's, that is relevant.  See supra pp. 18-19; see also Moylan v. Nat'l Westminster Bank USA, 687 F. Supp. 54, 59 (E.D.N.Y. 1998) ("It is not the function of the judiciary to second-guess ordinary business decisions . . . .  It is the employer's perception of the plaintiff, not the plaintiff's perception of himself that is relevant…"); Weinstock v. Columbia Univ., 224 F.3d 33, 47 (2d Cir. 2000) ("[The employer] alone has the right to set its own criteria . . . and then to evaluate a candidate's fitness . . . under them."), cert. denied, 540 U.S. 811 (2003).

Second, Bartoletti's perception that her past performance would have made her better suited for the role the Company needed during the financial crisis reflects a fundamental misunderstanding of what the decision makers were seeking from the skeletal group that would remain in November 2008.  For example, Bartoletti asserts that she should have been retained because she was better than Koessel at managing the Housing Group staff and had, in the past, performed some administrative managerial tasks.  This wholly ignores the fact that, after the November RIF, only two other employees would be in the skeletal Group, and, thus, her purported managerial skills were not part of the assessment.  Similarly, Bartoletti points to her friend Fluehr's earlier evaluations of her performance (part of which was work she had done in

the student loan area), including nominating her for Managing Director.  (See 56.1 Stmt. ¶¶ 31, 31 n.8, 32.)  However, Fluehr's prior assessments of her qualifications are completely irrelevant to strategic decisions that were made after his departure, particularly given the economic landscape and financial crisis confronting the Group in November 2008.  Indeed, Fluehr himself acknowledged the Housing business suffered the most severe downturn between June and December of 2008.[16]  For the same reasons, the fact that Bartoletti had been asked in July 2008 to become the sole head of the Group—based on the fact she had been employed at Citigroup longer than Koessel—misses the point.  By November, the crisis had worsened substantially and the Company was deciding which of the two Directors could best help guide clients through the unprecedented market turmoil and maintain relevancy with key clients.  Based on Koessel's industry activities during the crisis, and the fact that Bartoletti had engaged in no similar activities, Brownstein believed Koessel was plainly better suited for that role than Bartoletti.  Cf. Tutko v. James River Paper Co., No. 98-9663, 1999 WL 1024627, at *1 (2d Cir. Oct. 29, 1999) (employer is entitled to decide which employee will be most useful to the business going forward; "Neither the Court, nor a jury, sits as a 'super-personnel department' to reexamine an entity's decisions on the usefulness to the enterprise of an at-will employee.").

Bartoletti testified she has no idea how the termination decision was made, who made it, or what factors they considered.  (56.1 Stmt. ¶ 42.)  She also has not alleged, because she cannot, that her gender was ever discussed by Brownstein and Chin, in the context of her termination in any way, or that anyone ever made derogatory comments about her gender.  When asked why

---

[16] Bartoletti's attempted reliance on peer evaluations (360 evaluations) from earlier years is similarly flawed. Bartoletti's alternate claim that she was better qualified to lead the Housing Group because she had obtained her Series 53 licensure is simply wrong.  (Compl. ¶ 45.)  Contrary to her self-serving statements, Chin, who was responsible for establishing the regulatory requirements for the PFD, confirmed that neither he nor any regulatory body required Group Heads to hold a Series 53.  (56.1 Stmt. ¶ 40 n.9.)  Regardless, Bartoletti has failed to allege how this licensure made her more qualified to lead the Group, particularly given the dire economic realities why the Housing Group faced in November 2008.

she believes Koessel was retained, Bartoletti claimed it was because Koessel had a "personal friendship" with Brownstein.  This assertion is fatal to her gender discrimination claim.  The law is well settled that favoritism based on friendship does not equate to discrimination.  See, e.g., Rivera v. Nat'l Westminster Bank USA, 801 F. Supp. 1123, 1133 n.13 (S.D.N.Y. 1992) (favoritism based on friendship does not suggest discriminatory animus against a plaintiff).

Further undermining her claim of discrimination, Bartoletti received numerous promotions, bonuses, and raises throughout her 15 year tenure—all of which were ultimately approved by one of the decision makers (Chin).  In fact, the same individuals who terminated her employment are the same individuals who promoted her to Co-Head of the Housing Group mere months before her termination.  Even more, Brownstein urged Bartoletti to remain at the Company and not follow her friend Fluehr to Bank of America after Fluehr had been terminated in the July RIF, telling Bartoletti he wanted to help her succeed.  He even solicited the help of another senior executive to help him convince Bartoletti to stay.  Had Brownstein been intent on reducing the number of women in the Group—as Bartoletti now claims—he obviously would not have taken such steps.  Similarly, Bartoletti was selected for retention in each of the prior RIFs (including by Brownstein and Chin in the third-round RIF), while male coworkers were terminated, including the male Group Head Fluehr.  It simply makes no sense that, in November 2008 Brownstein and Chin all of a sudden developed a gender-based bias against Bartoletti when they had exhibited no such animus toward her in the prior 15 years, and in fact had given her raises, promotions, and bonuses, including a significant compensation increase to retain her when Bartoletti had an offer to join Morgan Stanley.[17]  Because there is no evidence to show that

---

[17] Bartoletti has asserted that she must have been more qualified than Koessel because she was more highly compensated.  (Compl. ¶ 47.)  This argument seeks to prove too much.  After he was confronted with the Morgan Stanley offer, Chin agreed to match that offer to retain Bartoletti.  This resulted in a significant increase, and her total compensation jumped approximately 75% from $380,000 to $662,500.  (56.1 Stmt. ¶ 32.)  This higher pay did

Brownstein's rationale for selecting Koessel is pretextual, or that he based the decision on a discriminatory animus against Bartoletti because she is female, summary judgment is warranted.

### D.   **Plaintiff Conley's Disparate Treatment Claim Should Be Dismissed**

Defendants established their legitimate, nondiscriminatory reason for selecting Conley for the November RIF.  Specifically, Healthcare Group Heads Hessler and Cyganowski explained without contradiction that Conley was selected because, compared to the other Directors, she did not lead or originate business and had not demonstrated as much proficiency in developing new business.  They also believed there was little risk that clients or employees would be lost if she were let go.  It was the legitimate business rationale to minimize the negative effects on the business that led Hessler and Cyganowski to select Conley for the November RIF.

Conley admits she has no idea how the termination decision was made, who made it, or what factors they considered.  (56.1 Stmt. ¶ 51.)  Indeed, it was her lack of understanding that led her to jump to the conclusion that she was "illegally fired."  (Id.)  Her lack of understanding, however, cannot be used as a basis to ask the Court to question the unequivocal and unrebutted evidence demonstrating that the decision was based on Hessler and Cyganowski's assessment of the relative qualifications and established business and clients of individuals in the Healthcare Group, and not on gender.  See Pearson v. Merrill Lynch, No. 10-5119, 2012 WL 983546, at *5 (S.D.N.Y. Mar. 22, 2012) ("'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'") (quoting DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170-71 (2d Cir.1993)).

---

not mean she would be more qualified to lead through the crisis in 2008.  In fact, because the RIFs were cost-cutting exercises, Chin acknowledged that, from a purely economic point of view, the Company would recognize more savings letting Bartoletti go rather than Koessel.  (Id. at ¶ 41.)

Conley claims Hessler and Cyganowski made a bad decision; she disagrees with their assessment as to the strength of her client relationships and believes she was more qualified than allegedly similarly situated men who were retained.  The Second Circuit has instructed that "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude that the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment could have chosen the candidate selected over the plaintiff for the job in question."  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93 103 (2d Cir. 2001); accord Gupta, 305 F. App'x at 689 (granting summary judgment where "[t]he employees who were [] retained during the RIF were eminently qualified, even in direct comparison to [plaintiffs], and we must respect the employer's unfettered discretion to choose among qualified candidates").  Conley cannot meet these requirements.

To establish her purportedly superior qualifications, Conley relies on her "knowledge of the situation."  (56.1 Stmt. ¶ 52.)  She also claims that she was told "over the years [] that I was terrific and manage processes better than other [] midlevel bankers they had worked with. [T]hat's my answer.").  (Id.)  Yet, her self-professed "knowledge of the situation" and her contention that other colleagues thought she was "terrific" are patently insufficient to demonstrate she was "so superior" that no reasonable person could have terminated her over the individuals retained.  Indeed, Hessler and Cyganowski provided detailed explanations as their assessment of the business and client relationships of every other banker in the Group and why they believed each of those individuals should be retained over Conley.  As Cyganowski

summarized it after reviewing Conley and all of the others, "all of the Directors that remained after the fourth RIF were ahead of Lisa Conley with respect to driving business and revenue." (Id. at ¶ 50.)  Cyganowski also noted that Conley had failed to follow through on professional development opportunities.  (Id.)

Conley attempts to buttress her perception of how valuable she was by relying on "revenue sheets" (that she saw for the first time in discovery and after filing her lawsuit), claiming these demonstrate she had more business and client relationships than other Directors. (Id. at ¶ 53.)  Her reliance on these documents is entirely misplaced.  Both Hessler and Cyganowski testified that these documents merely indicate everyone who "touched" a deal in any capacity and tell nothing about the relative contribution of any individual or who maintained the key relationships with each client.  (Id.)  As a result, Hessler and Cyganowski testified that these sheets are of little to no value, and they certainly did not consider these "revenue sheets," when assessing the client relationships and selecting individuals for termination.  (Id.)  Cf. Baker v. Randstad N. Am. L.P., 151 F. App'x 314, 319 (5th Cir. 2005) (holding that, in RIF cases, plaintiff's reliance on information that was not relied on by decision makers carried no weight).

Moreover, the notion that the decision to terminate Conley's employment was based on her gender is belied by the fact that the same individuals who selected her for termination are the same individuals who hired her, promoted her, and gave her bonuses and raises throughout her nine-year tenure with the Company.  These same individuals (Hessler and Cyganowski) also selected Conley for retention in each of the prior RIFs in which four male Directors from the Healthcare Group were selected for termination.[18]  Conley's attempt to conjure up a sense of

---

[18] In the earlier RIFs, five men and only one woman had been terminated from the Healthcare Group.  Like Siu, Conley conclusorily stated that, when Cyganowski and Hessler's assessments resulted in men being terminated, the decisions were performance-based; but when those same assessments resulted in women being terminated, the decisions were due to intentional gender discrimination.

discrimination by claiming that she was the only female Director in the Healthcare Group

(Compl. ¶ 99.) is both unavailing and disingenuous.  Three of the ***Managing Directors*** in the

Group were women, and each of them was retained through the RIFs, including the November

RIF in which male Managing Director Dave Johnson was terminated.  (56.1 Stmt. ¶ 47.)

Moreover, the last two promotions made in the Healthcare Group were of women.  (Id.)  In fact,

in early 2008, when no new Managing Director slots were available, Hessler and Cyganowski

convinced a senior male Managing Director with over thirty years' experience to step down so

that they could promote a woman (Teri Hartman) to that title.  (Id. at n.11.)  These facts refute

Conley's speculative accusation that Hessler and Cyganowski discriminated based on gender.

### E.   Plaintiff Mentor's Disparate Treatment Claim Should Be Dismissed

Defendants established their legitimate, nondiscriminatory reason for including Mentor in

the November RIF.  Norm Pellegrini, the Head of the Southeast Regional Group, testified

without contradiction that, while he did not want to terminate anyone from his Group, he

selected Mentor for termination because he believed terminating her employment would have a

lesser impact on the Southeast Group than would terminating other officers.  (See 56.1 Stmt. ¶¶

57-60.)  Although he believed Mentor had the potential to grow to become a solid business

developer, in November of 2008, she had the least amount of developed business in the Group.

Livolsi agreed with and approved Pellegrini's decision.  There is not a shred of evidence to

suggest that Pellegrini and Livolsi "manufactured" this rationale to avoid liability.  In fact,

Mentor testified she has no idea how the termination decision was made, who made the decision,

or what factors were considered, let alone any evidence to establish pretext.  (56.1 Stmt. ¶ 62.)

Mentor's purported "evidence" of gender discrimination consists of her disagreement

with Pellegrini's assessment and unsupported allegations that she believes she was more

qualified than allegedly similarly situated men who were retained.  This so-called "evidence,"

however, consists of nothing more than rank speculation and is insufficient to avoid summary judgment.  Specifically, she testified that she has absolutely no information concerning what developed business or clients other male Directors had, which or how many transactions they worked on, or their prior relevant work experience.  (Id.)  Curiously, although Mentor alleged that she was "bringing in more revenues in 2008 and [] had more revenues coming down the pipeline than Mike Baldwin," she conceded that she not only had no idea whatsoever concerning Baldwin's business, but was also unsure of her own.  (Id. at n.13.)  In fact, she admitted she had no information for any other officers in the Southeast Group.  (Id.)

It is not unusual for a terminated individual to believe their manager made the wrong decision and that he or she is better qualified than other employees who were retained.  As noted above, however, to prevent summary judgment based on an alleged discrepancy in qualifications, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Byrnie, 243 F.3d at 103; accord Gupta, 305 F. App'x 689.  The law is clear that the relevant opinion is that of the decision maker and that the Court "does not sit as a super-personnel department that reexamines an entity's business decisions."  Vuona, 2013 WL 271745,  at *13 (citing Martin v. MTA Bridges & Tunnels, 610 F. Supp. 2d 238, 251 (S.D.N.Y. 2009); see also Lee v. Healthfirst, Inc., No. 04-8787, 2007 WL 634445, at *11 (S.D.N.Y. March 1, 2007) ("Plaintiff's personal opinion of [alleged comparator's] purported lesser qualifications is of no weight."); Matos v. City of New York Dep't of Homeless Servs., No. 01-756, 2003 WL 169779, at *3 (S.D.N.Y. Jan. 23, 2003) (same).  Far from being "so superior," Mentor admits that she did not even know the credentials or qualifications of the other men in her Group.

32

Furthermore, while she attempts to take credit for "bring[ing] in new business" with the State of Connecticut and Virgin Islands accounts (Compl. ¶ 85), Mentor admitted at deposition she was assigned to those established accounts and primarily assisted senior bankers (Kristin Johnson and James Haddon, respectively).  (56.1 Stmt. ¶ 61.)  Likewise, Broward County was a long-time account relationship of Pellegrini dating back to his days at UBS, and it was Pellegrini who assigned Mentor to this account.  (Id.)  While she argues that Pellegrini's assessment of her was wrong because she "played a significant role in" securing deals on the Virgin Islands and Broward County accounts, she admits that those accounts were merely "in her pipeline" and closed around the time of or after her termination.  (Id.)  Indeed, Pellegrini and Livolsi had made the decision to terminate Mentor <u>before</u> deals had been secured on either of those accounts.  (Id.) <u>Vuona</u>, 2013 WL 271745,  at *13 (holding that employer's decision to credit certain employees with closed business while not crediting plaintiff with other closed or future business "was a permissible business judgment" and that, "while a reasonable jury could find that, in the hurried RIF process, [plaintiff] was not accorded the credit she perhaps deserved, there is no basis for finding that [her] gender was a factor in any such calculative oversight"), *25 (same).  Thus, Mentor has not established any basis with which to challenge Defendants' legitimate decision, let alone proffered evidence to demonstrate that the decision was discriminatory.

Further, Pellegrini had hired her at UBS, brought her with him to the Company, and, with another decision maker (Livolsi), approved her promotion to Director mere months before her termination.  Similarly, the same decision makers selected Mentor for retention in each of the prior RIFs while male coworkers were terminated.  It strains credulity to conclude that Pellegrini

(and Livolsi) suddenly developed a gender-based bias against Mentor in November 2008 when no such animus had previously been exhibited toward her.[19]

### F. Plaintiffs' Purported "Statistical Analysis" Cannot Save Their Disparate Treatment Claims

Lacking evidence to establish that the decision makers selected them for inclusion in the November RIF because they are women, each of the Plaintiffs resorts to "statistics."  For example, Conley claims that Hessler and Cyganowski must have acted with a discriminatory motive because they selected her for termination and she was the only woman Director in the Healthcare Group (ignoring the fact that a male Director was also terminated, that a male Managing Director was terminated while three woman Managing Directors were retained, and that she herself was retained through the earlier RIF rounds in which three male Directors were terminated).  Plaintiffs rely on an analysis conducted by Dr. Mark Killingsworth.  As explained below, however, the Killingsworth "analysis" the Plaintiffs rely on treats the layoffs of the five Plaintiffs as if they were the result of a simple decision making process across all of PFD.  This analysis does not focus on the actual decision making processes that occurred within each Group.  As such, the analysis is fundamentally flawed and provides no support to the Plaintiffs' individual clams of discrimination.

---

[19] Mentor attempts to argue that Pellegrini's occasional use of the nickname "princess" is evidence of gender bias. This argument is baseless given Mentor and Pellegrini's professional relationship (including that he hired her at UBS, brought her to Citi, and promoted her to Director).  (56.1 Stmt. ¶¶ 54-55.)  See, e.g., Lichwick v. Verizon, No. 08-3892, 2011 WL 4000991, at *10-11 (S.D.N.Y. Aug. 30, 2011) (holding that comments did not raise an inference of discrimination after considering the maker, timing, content, and context of the alleged remarks) (citing Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010), cert. denied, 131 S. Ct. 1602 (2011)); James v. New York Racing Ass'n, 233 F.3d 149, 153 (2d Cir. 2000) (noting that, while plaintiff "cited jokes referring to [plaintiff's age], none of them ridiculed or disparaged [him] or in any way showed discriminatory animus against older workers."). Moreover, Mentor does not allege that these comments were related to the termination process in any way.  Cf. Del Franco v. N.Y.C. Off-Track Betting Corp., 429 F. Supp. 2d 529, 536 (E.D.N.Y. 2006) ("statements made by decisionmakers unrelated to the decisional process itself do not constitute sufficient evidence to support a claim of . . . discrimination"), aff'd, 245 F. App'x 42 (2d Cir. 2007).

It is axiomatic that proper statistical analysis must group each Plaintiff with the coworkers with whom she was compared for selection purposes.  Aggregated analyses, such as that conducted by Killingsworth, provide no probative evidence.  See, e.g., Chin v. Port Auth. of NY & NJ, 685 F.3d 135 (2d Cir. 2012) (plaintiffs must identify the correct, eligible population for analysis), cert. denied sub nom. Eng v. Port Auth. of NY & NJ, 133 S. Ct. 1724 (2013); Sanders v. Sw. Bell Tel., LP, 544 F.3d 1101, 1110 (10th Cir. 2008) (holding that alleged statistical disparity in RIF did not constitute evidence of discrimination where analysis failed to account for how determinations were made).  Here, the layoff decisions were made by the Group Heads, who only considered individuals in their own group, and who only compared individuals in the same or similar positions.  (56.1 Stmt. ¶¶ 6-8.)

Killingsworth admittedly ignores that the decision making process occurred at the Group level.  Instead he aggregates data from all 15 Public Finance groups—including 11 in which none of the Plaintiffs worked.  Killingsworth acknowledged in his deposition that his analysis did not take into account who made the termination decisions that Plaintiffs challenge, and he admitted that he had no understanding of how the different RIF decisions were made.  (56.1 Stmt. ¶ 63 ("Q:  Did you have any understanding of how the decisions were made.  A:  No.").) He was not even provided, and thus did not review, any of the deposition testimony of the decision makers in which they explain how their decisions were made.  (Id. at ¶ 65.) Remarkably, he only became aware after rendering his report and reviewing Defendants' report that "different people made different decisions about people in different groups."  (Id. ¶ 66.)

While Killingsworth concluded that women in PFD were more likely to be laid off than men, he has absolutely no idea as to which of the 15 Groups drove that conclusion, and has no opinion as to whether women in any particular Group—including the Groups in which the

Plaintiffs worked—were more likely to be laid off than men in that Group.  (Id. at ¶¶ 64, 67.)

Killingsworth further admitted that, although he is aware that each Plaintiff is claiming that a

male in her Group should have been laid off instead of her, he has not studied, and has no

opinion as to whether, the termination decisions of any of the five individual plaintiffs were

influenced by gender.  (Id. at ¶ 68 ("Q:  Do you have any opinion as to whether the decision to

terminate Amy Bartoletti was influenced by gender?  A:  I haven't studied that, no."), (answering

the same for each Plaintiff).)[20]   Killingsworth's analysis admittedly does not take account of

how decisions were made.  (Id. at ¶ 64 ("[I]t is not an analysis of individual decisionmakers or of

individual groups.").)  Rather, he aggregates data across the entire PFD and treats the layoffs of

the five plaintiffs as if they resulted from a single process involving all the employees in the

PFD.  (Id.)  Killingsworth's statistical analysis did not test the challenged termination decisions

and did not separately focus on each Group.  Therefore, his analysis is entirely irrelevant to each

Plaintiffs' disparate treatment claim.

In stark contrast to Killingsworth's aggregated analysis across all of the PFD, the

Company's statistical expert, Dr. David Bloom, analyzed the decision at the appropriate Group

levels and appropriate comparator levels.  This analysis, which mirrors the decision making

process undertaken in each of the Groups and pays careful attention to appropriate comparators,

reveals there are no statistically significant gender disparities in selection for layoff among

individuals who were similarly situated to each Plaintiff.  (Id. at ¶¶ 69-70.)[21]

---

[20] Plaintiffs have also offered the report of Dr. Louise Roth who, while conducting some statistical analyses, including analyses that contradict Killingsworth's, she admits that she is not an expert on statistics or quantitative methodologies and defers, instead, to recognized experts such as Defendants' expert, Dr. David Bloom.  (56.1 Stmt. ¶ 68 n.14.)  Yet even she recognizes that decisions were made at the Group level:  "Brownstein and Chin left it up to the group heads to select people for termination. . . ."  (Id.)

[21] These statistical findings hold true not only for the November RIF, but also for the three other RIF rounds that occurred in 2007-08.  (See id. at ¶ 70.)

Even assuming, arguendo, that the statistics did not favor Defendants, which they do, "[s]tatistical analysis is rarely sufficient to defeat summary judgment [and,] [a]lthough a generalized statistical analysis of selections in a RIF can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that Defendant's legitimate business rationale for eliminating Plaintiff[] is false or that her . . . gender was the real reason for her termination." Vuona, 2013 WL 271745, at *11 (citing Robinson v. Metro-North Commuter R.R., No. 94-7374, 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998) (holding that "while statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case . . . the Court is aware of no case where generalized statistical evidence has been held sufficient to refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a non-discriminatory explanation for a particular act complained of"), aff'd, 191 F.3d 283 (2d Cir. 1999)); accord Zito v. Fried, Frank, Harris, Shriver & Jacobson, 869 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2012); see also Hudson v. IBM Corp., 620 F.2d 351, 355 (2d Cir. 1980) ("the particular employee [in an individual disparate treatment action] must establish that [s]he has been discriminated against because of [her protected category and] ha[ving] failed to establish [her] case the statistics standing alone do not create it"); Drake v. Delta AirLines, Inc., No. 94-5944, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005), aff'd, 216 F. App'x 95 (2d Cir. 2007) (same); Grant Roche Diagnostics Corp., No. 09-1540, 2011 WL 3040913, at *9 (E.D.N.Y. July 20, 2011) (same); Braunstein v Napolitano, No. 07-1015, 2011 WL 867247, at *1 (E.D.N.Y. Mar. 11, 2011) (same). The Company has made a "particularized evidentiary showing of a nondiscriminatory explanation" for each determination decision being challenged. Plaintiffs are unable to show the rationale was a pretext for discrimination. Therefore, summary judgment is warranted.

## II.    TO THE EXTENT PLAINTIFFS ATTEMPT TO ASSERT A DISPARATE IMPACT CLAIM, THAT CLAIM ALSO FAILS.

Plaintiffs make passing reference to "disparate impact" several times in their Complaint, alleging in conclusory fashion, that "the Company-wide layoffs that Citigroup underwent on November 21, 2008, had a disparate impact on the Company's woman employees."  (Compl. ¶¶ 2, 32, 53, 73, 91, 104, 102.)  Plaintiffs' specific factual allegations, however, as well as their deposition testimony, indicate that they are really alleging individualized disparate treatment claims.  In the Complaint, Plaintiffs allege they were terminated on account of their gender because of Brownstein's animus toward women, and because he "was given unfettered discretion in whom to select for layoff."  (Id. ¶¶ 49, 51, 52, 64-67, 89, 98, 113, 120.)[22]  The law is clear: these allegations simply amount to individual claims of disparate treatment, not disparate impact. See, e.g., Kourofsky v. Genencor Int'l, Inc., 459 F. Supp. 2d 206, 215 (W.D.N.Y. 2006) (dismissing plaintiffs' disparate impact claim and finding plaintiffs claim was a disparate treatment claim where, as here, plaintiffs merely "allege …they were singled out for termination [in a RIF] because of [decision maker]'s animus toward older workers, and because 'defendant used different criteria for each group so that they [sic] would be able to target the older workers of each such group'"); Wado v. Xerox Corp., 991 F. Supp. 174, 186 (W.D.N.Y. 1998) ("[T]he gist of plaintiffs' factual allegations is that this disparity was the result of Xerox's conscious decision to terminate older employees.  This is therefore not comparable to a case in which a company decides which employees to terminate based on a facially neutral criterion that, when actually applied as intended, tends to favor one group of persons over another."), aff'd, 196 F.3d 358 (2d Cir. 1999); accord Renaldi v. Manufacturers & Traders Trust Co., 954 F. Supp. 614 (W.D.N.Y. 1997) and Hunt v. Tektronix, Inc., 952 F. Supp. 998 (W.D.N.Y. 1997).

---

[22] When asked at deposition, Plaintiffs did not know who caused or made respective termination decisions or what factors were relied on.  (56.1 Stmt. ¶¶ 29, 30, 42, 51, 62.)

Even if their claims were analyzed under a disparate impact theory, they would still fail. Plaintiffs cannot establish that Defendants "use[d] a particular employment practice that cause[d] a disparate impact on the basis" of gender.  Robinson, 267 F.3d 147, 160 (2d Cir. 2001), cert. denied, 535 U.S. 951 (2002).  Indeed, it is not enough to simply allege that there is a disparate impact on women.  Rather, "the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." Smith v. City of Jackson, Miss. 544 U.S. 228, 242 (2005); accord Byrnie, 243 F.3d at 111.  The U.S. Supreme Court has cautioned that "[Plaintiffs'] failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances."  Smith, 544 U.S. at 242.  See also Chin, 685 F.3d at 154 (citing Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2555-56, (2011) ("[R]espondents have identified no specific employment practice.  Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice.")). Here, Plaintiffs have merely alleged a discriminatory animus by Defendants and pointed to an alleged disparate impact on women across all of PFD without identifying any isolated employment practice that caused such an impact.  Although each of the Group Heads used their own criteria for selecting which employees from their Group would be let go, Killingsworth has conceded that he has not studied or identified which Group Heads' selection practices caused the alleged disparate impact.  (56.1 Stmt. ¶ 68.)  This sweeping conclusory allegation is insufficient. See, e.g., Kourofsky, 459 F. Supp. 2d at 215 (alleging that "involuntary reduction in force that had a disparate impact against those employees over the age of forty" is insufficient); Byrnie, 243 F.3d at 111 (same).  Because Plaintiffs cannot identify the specific employment practice they are challenging, Plaintiffs cannot establish even a prima facie disparate impact case.

Furthermore, even if the employer's decision-making process is not capable of separation for analysis, reliance on aggregated results across the entire PFD also dooms any disparate impact claim.  Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999) (affirming summary judgment for employer where, as here, plaintiffs failed to identify the correct RIF population for analysis), overruled on other grounds, Meachem v. Knolls Atomic Pwr. Lab., 461 F.3d 134, 141 (2d Cir. 2006.)  For data relied upon to be competent and sufficient, a plaintiff to "identify the correct population for analysis."  Murphy v. GE Co., 245 F. Supp. 2d 459, 477-78 (N.D.N.Y. 2003) (citing Ottaviani v. SUNY New Paltz, 875 F.2d 365, 373 (2d Cir. 1989); see also supra p. 35.  Here, the challenged decisions were made by different Group Heads who evaluated a different population of employees from which to select RIF candidates.  Plaintiffs' expert failed to identify the correct population for analysis, and thus can establish no causal connection between a challenged employment practice and the aggregated statistical conclusion.  (See 56.1 Stmt. ¶¶ 63-68.)  Murphy, 245 F. Supp. 2d at 477; Malave v. Potter, 320 F.3d 321, 326 (2d Cir. 2003); Kourofsky, 459 F. Supp. 2d at 210.  By contrast, the Bloom Report offers the only statistical evidence that takes account of the appropriate populations for analysis (both the decision makers and comparators associated with each of the five individual Plaintiffs) and, as noted therein, there is no statistical support for each of Plaintiffs' claims of discrimination.  (56.1 Stmt. ¶¶ 69-70.)  Therefore, a disparate impact claim would also fail for this reason.  See Gupta, 305 F. App'x at 689.

## CONCLUSION

Because Plaintiffs have adduced no evidence to show that the Company's rationale for selecting each of them for termination was pretextual, or that the Group Heads who selected them did so because of their gender, summary judgment is warranted as to each of their claims.

Dated:  June 7, 2013

By:    /s/ Kenneth J. Turnbull
    Kenneth J. Turnbull
    Leni D. Battaglia
    MORGAN, LEWIS & BOCKIUS LLP
    101 Park Avenue
    New York, New York  10178
    212-309-6000
    Attorneys for Defendants