**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMY BARTOLETTI, CHIA SIU, NADINE MENTOR, LISA CONLEY and BRITTANY SHARPTON, | |
| Plaintiffs, | No. 1:10-cv-7820 (LGS) |
| v. | ***ORAL ARGUMENT REQUESTED*** |
| CITIGROUP INC. and CITIGROUP GLOBAL MARKETS, INC., | |
| Defendants. | |

**DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL**
**FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Citigroup, Inc. and Citigroup Global Markets, Inc. ("Citigroup" or "the

Company") hereby submit this Local Rule 56.1 Statement of Undisputed Material Facts in

Support of their Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of

Civil Procedure, the Local Rules for the United States District Court for the Southern District of

New York, and the individual rules of this Court.

**A.**   **Citigroup Global Markets Inc. and the Public Finance Department**[1]

1.    The Company is an equal opportunity employer that prohibits unlawful discrimination

and is dedicated to providing a work environment free of discrimination and harassment.  (See

---

[1] Citations to the record will be as follows:  (1) Declaration of Leni D. Battaglia, "LDB Decl."; (2) Declaration of Francis Chin, "FC Decl."; (3) expert report of Dr. David E. Bloom, "Bloom Rep.," at LDB Decl. Exhibits ("Exs.") 29 & 30; (4) supplemental expert report of Dr. David E. Bloom, "Bloom Supp.," at LDB Decl. Ex. 31; (5) excerpted RIF population data, "RIF Data," at LDB Decl. Ex. 32; and (6) cited pages from deposition transcripts are attached in alphabetical order to the LDB Decl. as Exs. 1 through 26 and will be cited as follows:  Plaintiff Amy Bartoletti, "AB Dep."; David Brownstein, "DB Dep."; Francis Chin, "FC Dep."; Plaintiff Lisa Conley, "LC Dep."; David Cyganowski, "DC Dep."; Martin Feinstein, "MF Dep."; Nicholas Fluehr, "NF Dep."; Thomas Green, "TG Dep."; Fred Hessler, "FH Dep."; Dr. Mark R. Killingsworth, "MRK Dep."; Michael Koessel, "MK Dep."; Bart Livolsi, "BL Dep."; Plaintiff Nadine Mentor, "NM Dep."; Norman Pellegrini, "NP Dep."; Dr. Louise Roth, "LR Dep."; Plaintiff Brittany Sharpton, "BS Dep."; and Plaintiff Chia Siu, "CS Dep."

LDB Decl. Ex. 27.)  The Company's Equal Employment Opportunity Policy and Sexual

Harassment / Unlawful Discrimination Policy expressly provides that all "[e]mployment

decisions will be made without regard to one's race, color, sex, gender identity or expression,

religion, national origin, age, sexual orientation, disability, veteran status, marital status,

citizenship status or any other basis prohibited by law."  (See id.)

2.      The Public Finance Department ("PFD") is one of several departments within the

Company's Municipal Securities Division, which consists of fifteen Product Groups (including

Healthcare, Housing, and Infrastructure) and Regional Groups (including the Southeast Region).

(FC Decl. ¶¶ 4-5.)  Within these PFD Groups, professional employees could hold positions in a

career that could progress, in order of increasing seniority, from Analyst to Associate to

Assistant Vice President to Vice President to Director to Managing Director.  (Id.)  The PFD

Groups varied widely in terms of required expertise, skills, and networks.  (Id.)  Accordingly,

mobility of professionals across the different PFD Groups is virtually nonexistent.  (Id.)

3.      Since 1993, Francis Chin has been a head of the PFD and, in early 2008, David

Brownstein joined Chin as Co-Head.  (FC Decl. ¶ 2; FC Dep. 44-45.)  Each of the Product and

Regional Groups within PFD is led by its own Head or Co-Heads who are responsible for

running the business of their own Group, evaluating the employees in their Group, and making

personnel decisions concerning those employees.  (FC Decl. ¶ 6; FC Dep. 134.)[2]

**B.      The Financial Crisis of 2007-08 and Resulting Reductions in Force**

4.      Throughout 2007 and 2008, in the face of a severe, unprecedented, and sustained

financial crisis, Citigroup underwent a significant restructuring.  (FC Decl. ¶¶ 7-9; DB Dep. 119,

123.)  In connection with the restructuring, businesses across Citigroup, including the 15 Groups

in PFD, were required to help Citigroup achieve savings through four headcount reductions.  (FC

---

[2] The Regional Group Heads report to the Head of Regional Operations, Bartley Livolsi.  (FC Decl. ¶ 6.)

Decl. ¶ 9.)  In late 2007, this restructuring resulted in the termination of 22 PFD employees, 14

men and eight women.  (See id. at ¶ 10; Bloom Rep. App. pp. 1-4; RIF Data.)  In March 2008,

there was another RIF, which resulted in four terminations in the PFD, three men and one

woman.  (See id.)  In June 2008, there was a third RIF, which resulted in the layoff of another 15

PFD employees, 13 men and two women.  (See id.)[3]

5.      In early October 2008, Citigroup's announced intention to purchase Wachovia failed,

which caused Citigroup's stock price to drop nearly 20%.  (FC Decl. ¶ 11; TG at 163.)  As a

result, Citigroup's leadership came under increasing pressure and, in November 2008, the

Company underwent another RIF.  (FC Decl. ¶¶ 12-13.)  The Groups in PFD were again required

to participate.  (Id.; TG at 163.)

6.      Each time a reduction occurred, the Group Heads each analyzed their Group and

considered a variety of factors, including the reduction's overall effect on the existing business,

when selecting employees for termination.  (TG Dep. 31-33, 210-11, 214-16; FH Dep. 293-99,

300-06, 312-16, 318-25, 335-36, 338; DC Dep. 244, 292, 318, 328 56; NP Dep. 234-35, 274-78,

280-81, 284-85, 289-90, 352-56, 360-61; BL Dep. 26-27, 30-31, 47-48, 52-55, 70 73, 85-95; FC

Decl. ¶ 14.)  Specifically, for the November 2008 RIF, Chin instructed the Group Heads that they

could not demote individuals or otherwise reduce employee salaries – he instructed them to cut

compensation through headcount reductions.  (FC Decl. ¶ 14; FC Dep. 28, 32-33, 38; see also

TG Dep. 143-44, 188-89; FH Dep. 263-64; DC Dep. 101-2; NP Dep. 234 35; BL Dep. 30-31.)

Chin explained to the Group Heads that it was important to consider compensation and the

impact of what was happening in the marketplace on future business prospects.  (Id.)[4]

---

[3] During this period of crisis, some competitors in the marketplace completely closed down their municipal bond departments. (CS Dep. 113-14; FC Decl. ¶ 8.)

[4] As of this point in 2008, the PFD had been the number one ranked firm in public finance for approximately 14 of the prior 15 years (based on neogtiated long term municipal issuance).  (FC Decl. ¶ 3).  Further, from at least 1997

7.      The layoff decisions in each Group were made by the respective Group Heads, who compared individuals in the same or similar positions within their own Group.  (TG Dep. 31-33, 210-11, 214-16; FH Dep. 293-99, 300-06, 312-16, 318-25, 335-36, 338; DC Dep. 244, 292, 318, 328-56; NP Dep. 234-35, 274-78, 280-81, 284-85, 289-90, 352-56, 360-61; BL Dep. 26-28, 30-31, 47-48, 52-55, 70-73, 85-95; FC Decl. ¶¶ 14-15; Bloom Rep. p. 2.)  The Group Heads did not compare individuals in fundamentally dissimilar positions within their Groups; nor were they permitted to compare people in their Group with those in other Groups.  (Id.; see also BL Dep. 15, 101-2; NP Dep. 294-97.)

8.      With the exception of the Housing Group, neither Chin nor Brownstein made a single termination decision—those decisions were left to the Group Heads.  (Id.; FC Decl. ¶ 15; FC Dep. 86-87 ("Q:  [D]id you participate in the selection of anybody for [the November 2008] layoff?  A:  No.  Q:  Did you ever recommend any names?  A:  No."), 93-95; DB Dep. 138, 219-20, 223, 229-30; LDB Decl. 28 p. 8; Bloom Rep. p. 2; see also MRK Dep. 46-47.)

9.      The Plaintiffs, each of whom had been selected to remain through the first three RIF rounds, were selected for termination in the November RIF.  (See generally Complaint ("Compl."); see also RIF Data.)  Overall, 29 PFD employees were let go in this RIF, 16 men and 13 women. (See FC Decl. ¶ 15; Bloom Rep. at App. p. 4; RIF Data.) Below is a chart summarizing layoffs in the PFD through the four reductions in force over the period 2007-08. (FC Decl. ¶ 21; see also Bloom Rep. App. pp. 1-4; RIF Data.)

through 2005, Citigroup was the top underwriter of negotiated and competitive long term municipal issuance.  (Id.) Accordingly, one of the objectives of the PFD for the RIF was "how do we at Citi Public Finance try to stay number one in our business with a significantly reduced department and group."  (TG Dep. 163-64, 198; FC Decl. ¶ 14.)

| GROUP | RIF 1 | RIF 2 | RIF 3 | RIF 4 |
|---|---|---|---|---|
| Airports | 2 | 0 | 1 | 0 |
| Credit & Fin Products | 4 | 1 | 3 | 3 |
| Financial Structuring | 0 | 0 | 2 | 0 |
| Health Care | 2 | 0 | 4 | 4 |
| Housing | 2 | 1 | 2 | 4 |
| Infrastructure | 3 | 0 | 0 | 5 |
| Power | 0 | 0 | 1 | 2 |
| PR Transfer | 1 | 0 | 0 | 0 |
| Short Term Group | 0 | 0 | 0 | 0 |
| Central Region | 0 | 0 | 1 | 1 |
| Mid-Atlantic Region | 1 | 0 | 0 | 2 |
| Northeast | 0 | 0 | 0 | 3 |
| South East | 2 | 1 | 0 | 2 |
| South West | 1 | 1 | 0 | 2 |
| West | 4 | 0 | 1 | 1 |

**C.     Plaintiff Sharpton's Employment with the Infrastructure Group**

10.     Sharpton first worked with the Company in the summer of 1996 as a Summer Analyst in the Housing Group, where she worked with Plaintiff Bartoletti.  (BS Dep. 193-94; see also MF Dep. 99, 101.)  Following her summer internship, Bartoletti was critical of Sharpton's quantitative skills and did not believe she was qualified for employment with the Housing Group or anywhere else in the Company.  (AB Dep. 189; NF Dep. 76-77; MF Dep. 103-05; TG Dep. 69-70.)[5]  Yet, Infrastructure Group Head Tom Green offered Sharpton an Analyst position with his Group and she accepted and began working in that Group in July 2007.  (BS Dep. 199; TG Dep. 69-70; MF Dep. 99-101.)[6]

11.     Director Steve Wood, with whom Sharpton worked extensively, noted that she had a multitude of performance issues, including absorbing basic business concepts and attention to

[5] Bartoletti later recruited Sharpton to join this lawsuit.  (BS Dep. 8-10.)
[6] The Analyst Program is a two-year entry-level program with an option for a third year whereby, at the conclusion of the second year, Analysts are either let go or invited to stay for a third year.  (MF Dep. 70, 106; DB Dep. 201; MK Dep. 203.)  At the conclusion of the third year, Analysts are either let go or move on to become Associates.  (Id.)  Very seldom are Analysts promoted to Associate following their second year.  (MF Dep. 125-26; DB Dep. 181, 181; MK Dep. 233.)

detail.  (TG Dep. 105, 114-15, 243-46; LDB Decl. 33 at 1219; BS Dep. 237-38.)  In May 2008, Wood rated Sharpton as inferior to her peer, second-year Analyst Matthew Chin, whom he rated a "Superior Candidate."  (LDB Decl. 34 at 20499 & 20502.)  Director Kim Swain in the Infrastructure Group had similar issues with Sharpton's skills and abilities.  (TG Dep. 115.)  In fact, of all the people Sharpton worked with, (including both men and women), only one individual, Managing Director Paul Creedon, had positive feedback concerning Sharpton, and even he noted her performance deficiencies.  (Id. at 116, 130; see also MF Dep. 114-15.)

12.     By contrast, Green does not remember receiving any negative feedback concerning Matthew Chin, who received stellar reviews from his superiors.  (TG Dep. 109, 245-46; LDB Decl. Ex. 33 at 1216 ("good attention to details"), 1220 ("strong quantitative; drives the modeling," "attention to detail very strong," "good attitude," "very good analyst," "reaches for more.")

13.     Sharpton had been told that her analytical modeling skills were limited.  (BS Dep. 237-41.)  She acknowledged she had issues with "moving too slow and making errors."  (BS Dep. 273, LDB Decl. Ex. 35 at 21329.)  Sharpton acknowledged Swain's frustration, saying, "This is taking me entirely too long and she is not happy at all."  (BS Dep. 276-77; LDB Decl. Ex. 36 at 13611.) In another e-mail, she confided "I don't rank high on the list and am not as analytically talented as others in my group."  (LDB Decl. Ex. 37 at 15012.)

14.     In one candid e-mail she sent to her close friend, mentor, and confidante at the Company, Sherisse Pond, (BS Dep. 283-84), Sharpton acknowledged she was unable to effectively perform her job and that Swain and others had valid complaints about her performance:

> I cannot do the most simple task and she is furious. . . .  This reflects horribly on me. . . .  **I am not a quant person and apparently it takes me 5 years to do a simple task like updating**.  I'm sure this would have taken anyone else like an hour MAYBE 90 min, but I think I have a block . . . .  **I just don't pick up on the**

**simple thing they tell me to do.**  They get mad.  I look like a retarded black girl and the cycle continues.  I just really want to go home and never come back. . . .

**This is my fault actually.**  If I had better sense then it would not take me so long to do things.  I would not have pushed this back because I would have known how to do it and felt confidently about doing it.  So, **my stupid @$$ knowingly put this off, did it wrong, took forever doing it over, and in the end the most value I added was updating some market update pages. . . .**

. . . **I need a brain Pond. I really really do.**  No I am not feeling back [sic] for myself, but I truly do.  This is INSANE. **I KNOW they for SURE know they made a mistake by hiring me.  I didn't want to go down like this, but my miniscule brain cells cannot handle all of this.  They just cannot.**

(LDB Decl. Ex. 38 at 14238 (emphasis added).)  In a succinct self-assessment, Sharpton stated**:**

***"This is not the job for me.  Period."***  (LDB Decl. Ex. 36 at 13611 (emphasis added).)

15.      During the first three RIFs in 2007-08, the Infrastructure group let go three men, including an Analyst.  (No women were let go.)  (TG Dep. 142, 156-57; BS Dep. 242-43, 293; RIF Data.)  Sharpton expressed concern throughout each of these reductions, aware that her deficiencies could result in her termination.  (LDB Decl. Ex. 39 at 14890 ("I'm so scared.  I didn't think they would touch analysts, but they let go of the second year who sits right in from of me :-/ "), 13879 ("I'm about to get fired"), 14975 ("I'm scared now. . . .  I don't want to delay this turn around and have my behind on the chopping board. . . .  FOR SURE, they are doing us next."), 14008 ("I'm def gonna be fired today btw.").)  Nevertheless, despite her struggles, Group Head Green elected to retain Sharpton through each of these RIFs.  (See Compl. ¶ 111; see also RIF Data.)

16.      In November 2008, the Infrastructure Group had three Analysts—two (Sharpton and Matthew Chin) in their second year and one (Alan Dockeray) in his first year.  (Id.)  Green decided to retain one Analyst at each level going forward.  (TG Dep. 210-11, 214-16.)  Green reasoned that, because there is a high turnover rate with analysts, especially after the second year, it was important to keep a first-year analyst to ensure there was an analyst in the future both

to perform the work and to train any future incoming first-year analysts.  (Id.; see also MF Dep.

114; MK Dep. 244.)  This rationale was particularly true in the context of the financial crisis and

the ongoing RIFs as Green believed he would not be able to hire an Analyst to replace any that

left voluntarily.  (TG Dep. 210-11, 214-16.)  Accordingly, he needed to select one of the second-

year Analysts for the RIF, either Sharpton or Matthew Chin.  (Id.)

17.    By all measures, Matthew Chin was viewed as a stronger performer.  (TG Dep. 31-33,

193; LDB Decl. Exs. 34, 40 & 41.)  Accordingly, although he had retained her through the first

three reductions, Green selected Sharpton for termination.  (TG Dep. 31-33; see also id. at 193

(noting that Chin was a stronger performer than Sharpton, as evidenced in LDB Decl. Ex. 34).)

18.    By her own admission, Sharpton was not a better performer than Matthew Chin.  In fact,

in one of her e-mails to her confidante, she acknowledges Chin was more skilled:

> I KNOW I'm not competent in this stuff.  I KNOW I work far too slow.  I KNOW
> it takes me 10 years to learn a simple concept.  I KNOW I have not been paying
> close attention to detail as an analyst should.  When will [Kimberly Swain] learn
> just NOT to work with me.  I am no[t] the type of mind she wants.  ***She needs
> [another analyst like] Tanzeer or Matt Chin or You.   Not Brittany freakin
> Amrith Sharpton. . . .    I KNOW they for SURE know they made a mistake by
> hiring me.***

(LDB Decl. Ex. 38 (emphasis added).)  Even after filing her lawsuit, Sharpton was unable

to testify at her deposition that she was the better candidate:

> Q: Is it your belief that you were better qualified than Matthew Chin?
> A: At least as qualified.
> Q: But not better qualified?
> A: . . . I don't know – at least as qualified.

(BS Dep. 342.)

19.    In this lawsuit, Sharpton has asserted that she performed her job with the "highest degree

of professionalism."  (Compl. ¶ 110.)  Yet, when discovery revealed that she engaged in highly

unprofessional and unacceptable conduct—such as repeatedly referring to Caucasians as

"saltines" or "crackers" or referring to one colleague as "vile" and a "devil"—she modified her assertion and claimed she performed "at the highest level of competence that Brittany Sharpton can muster."  (BS Dep. 256-74.)

**D.      Plaintiff Siu's Employment with the Housing Group**

20.      Siu was hired as an Analyst for the Housing Group in July 2006 managed by Group Head Nick Fluehr.  (CS Dep. 57-58, 76.)  The Housing Group had two primary areas of focus:  State Housing Agencies and certain State Student Loan Issuers.  (FC Dep. 43-44.)  As an Analyst, Siu's duties included preparing financial analyses, preparing presentation books, and assisting with closings.  (DB Dep. 164-65.)

21.      The housing market was in many respects at the core of the financial crisis and, as the market deteriorated, the Group began shrinking.  (CS Dep. at 70-71, 74-75, 79-84, 187-88; AB Dep. 162; FC Dep. 42-44, 87, 106-7, 151-52; DB Dep. 105-6, 119.)  In the first two RIF rounds, Housing Group Head Fluehr selected three employees for reduction.[7]  (See RIF Data.)  In the third-round RIF, Fluehr was terminated.  (FC Dep. 106-07.)  After that third-round RIF, the Housing Group was reduced to seven employees.  (Compl. ¶ 39; RIF Data.)

22.      Siu was "devastated" and "shocked" by Fluehr's departure and the cutbacks in the Group. (CS Dep. 70-71, 74-75, 170-75, 177.)  She believed the Group had already been reduced too much before the third-round RIF and that "it didn't make sense for [the Company] to cut [anyone] from [the Housing Group] when [they] were already short-staffed and [had] lost [] people earlier."  (Id.)  Siu had "a huge concern" that she might be fired following Fluehr's departure and, given that the Housing Group had been reduced to just seven employees, was

---

[7] Fluehr testified that, during the RIF processes in which he participated, he never saw a decision made that was based on gender.  (NF Dep. 102, 111.)

concerned about the Company's commitment to the Housing Group and was unsure as to "whether management wanted to keep the group." (Id. at 84, 116.)

23.     Siu conveyed these concerns to her supervisors and Company management and expressed that she might leave the Company. (DB Dep. 176-78 ("[Siu] said she wasn't sure that she was going to stay [with the Company], that she still wasn't very comfortable and would think about it."), 175-76 ("Amy [Bartoletti] and Mike [Koessel] were very concerned that Chia would leave[.]"); MK Dep. 304; CS Dep. 120-21, 133-40; AB Dep. 65-67, 198-99.) Siu began actively looking for other jobs at the time, sending her resume to numerous other companies. (CS Dep. 132-33; LDB Decl. Ex. 42; see also CS Dep. 85-86, 93-100.) In addition, although Citigroup had extended Siu an offer to continue the Analyst program as a Third-Year Financial Analyst, Siu declined to sign the offer letter agreement because of her concerns with the Company's commitment to the Housing Group. (DB Dep. 176-80, 186; AB Dep. 207; CS Dep. 120-21, 129-32, 151-52, 191-93.) She did not want to sign anything that might bind her to the Company for a third year. (CS Dep. 152, 156-57; LDB Decl. Ex. 43 at 12478; see also id.)

24.     The Housing Group valued Siu, thought she was a highly talented Analyst, and wanted her to stay. (DB Dep. 175-77; MK Dep. 299-300; AB Dep. 204-05; see also CS Dep. 120-21, 129-30, 164-65; LDB Decl. Ex. 44.) Brownstein—who began overseeing the Housing Group after Fluehr's departure—reached out to the Company's Human Resources Department, hopeful that he could provide assurances to Siu that she would be promoted to Associate after completing her third year of the Analyst program. (Id.; FC Dep. 42-43; CS Dep. 165; Compl. ¶ 61.) He went further, and inquired as whether a mid-year promotion was possible. (DB Dep. 175-77, 179-81; MF Dep. 125-26; CS Dep. 120-21, 157-60; Compl. ¶ 61.) Although Brownstein was informed that it was uncommon to promote anyone outside of the annual review process, he

explained that Siu was a valued and talented employee, and he and the others in the Housing Group wanted to do what they could to convince Siu to stay.  (Id.)

25.    As a result of his efforts, Brownstein was able to get approval to promote Siu to Associate in December or January, six months ahead of schedule.  (DB Dep. 180-81; CS Dep. 157-58; Compl. ¶ 61.)  Siu was grateful but, despite the offer, she did not want to commit to the Company.  (DB Dep. 183-84, 177-80.  In fact, Brownstein recalls Siu telling him "I am not sure if I am going to stay." (DB Dep. 183-84, 177-80 ("[W]e never got a full answer from Chia as to whether she was going to stay. . . .  [S]he never told us that she was at a point to where she was comfortable staying at the firm.").

26.    As part of the November 2008 RIF discussions, the Company strongly considered shutting down the Housing Group altogether.  (FC Dep. 42-44, 87, 106-7, 121, 151-52; FC Decl. ¶ 18.)  The student loan market had disappeared, and the housing market was under siege and was seen by many as the root cause of the financial crisis.  (Id.; see also NF Dep. 38-42.)  Ultimately, it decided not to fully exit the market, but instead to retain a skeletal staff to guide clients through the crisis.  (FC Dep. 42-44, 87, 106-7, 141-42; FC Decl. ¶ 18; DB Dep. 119.)  To maintain a functional skeletal group, Brownstein decided to have just a three person staff remain, including one Analyst.  (DB Dep. 197-98.)

27.    Although Siu was a skilled and valued Analyst, Brownstein earnestly believed that Siu would quit following another RIF.  (Id. at 183, 197-98, 201-3; MK Dep. 307-11.)  Siu had believed the Group was short-staffed even before the third-round RIF and questioned the Company's commitment to Housing when it was reduced to just seven employees.  (CS Dep. 120-21, 129-32, 151-52, 156-57, 191-93.)  If the Group was again cut and only a skeletal staff of three were retained, Brownstein believed Siu would leave.  (DB Dep. 197-98.)  Although he had

gone out of his way to get approval for an early promotion in an effort to convince Siu not to quit, Brownstein did not want to risk terminating the only other Analyst who supported the Group, only to then have Siu quit and leave the group with only two employees—and no Analyst and, therefore, Siu was chosen for inclusion in the RIF.  (Id. at 197-200; FC Decl. ¶ 20.)  Siu acknowledged Brownstein's decision based on his concern she would leave was reasonable.  (CS Dep. 196 ("Q:  Do you think that would be a reasonable concern that someone might given your prior expressions and concerns about the size of the group [] That it would be reasonable for someone to think that if the group shrunk to three, from seven to three, and you were one of the three, that you might leave? . . . A:  [T]hat could be a reason."), 210.)

28.     Siu was asked about other employees who were selected for termination in the multiple RIF rounds and, for each male who was selected for termination, including the Group Head Fluehr, Siu believed the decision was based on performance, but for each woman selected, it was based on gender.  (CS Dep. 207-210.)  Siu based her opinion primarily on articles she read that mass layoffs can be used to mask gender discrimination.  (Id. at 189-191.)

29.     Siu admitted that:  her prior expressed dissatisfaction with the future and direction of the Group may have factored into the decision to include her in the November RIF (Id. at 210); that she did not speak with any of the decision makers regarding the termination decision and, thus, has no knowledge concerning the decision (Id. at 210-12); and that, up until the day of her termination, nothing had ever occurred during her employment at Citigroup that ever made her feel she was treated differently because of her gender.  (Id. at 213.)

30.     Siu admits that the basis of her discrimination claim is an article she read before her termination that suggests "that people sometimes use a mass layoff to mask gender discrimination."  (Id. at 190.)  Other than that article, she confirmed she has no basis for her

belief that she was discriminated against.  (Id. ("Q: Any other basis for your belief that one reason you might be terminated was because of your gender?  A:  No.").)

**E.**     **Plaintiff Bartoletti's Employment with the Housing Group**

31.     Bartoletti was hired by the Company as an Associate in 1993 into what eventually became the Housing Group.  (AB Dep. 34, 37.)  Throughout her tenure, a significant amount of her work was on student loans.  (Id. at 36, 39-40; MK Dep. 44.)[8]  She was promoted several times to Assistant Vice President, Vice President and, ultimately, Director.  (AB Dep. 33-34; NF Dep. 88-90.)

32.     Bartoletti worked closely with her friend, Group Head Nick Fluehr, until his departure in July 2008.  (AB Dep. 44, 85, 247; NF Dep. 77-78, 87-90; LDB Decl. Ex. 45.)  In 2004, Fluehr was recruited by Morgan Stanley and he asked Morgan Stanley to consider hiring Bartoletti as well.  (AB Dep. 177-79; NF Dep. 91-93.)  Morgan Stanley made offers to both, and Fluehr informed Chin, the Head of Public Finance, of the Morgan Stanley offers.  (Id.)  To convince them to stay, Chin made counter-offers to Fluehr and Bartoletti, which included compensation increases to match the offers from Morgan Stanley.  (AB Dep. 177-79; NF Dep. 94-95; FC Dep. 137-38.)  As a result, Bartoletti's incentive compensation award for 2004 increased approximately 75%, jumping from $380,000 in 2003 to $662,500 in 2004.  (See id.; LDB Decl. Ex. 46.)  Fluehr also nominated Bartoletti for Managing Director.  (AB Dep. 81.)

33.     Citigroup terminated Fluehr's employment in July 2008, leaving the Housing Group without a Head.  (DB Dep. 90.)  Bartoletti was one of the two remaining Directors in the group, the other being Mike Koessel.  (FC. Dep. 147; DB Dep. 90-91, 104.)  Although neither had

---

[8] One of the reasons she was placed in the Group was because of her experience with student loans.  (AB Dep. 36.) Bartoletti focused on both student loan and housing clients, while Koessel exclusively covered housing clients.  (FC Dep. 115, 197; MK Dep. 143; AB Dep. 39-40.)  While Fluehr also did student loan work, Bartoletti was the only Director who did student loan work.  (See id.)  In 2008, a significant portion of Bartoletti's clients were in the student loan area.  (AB Dep. 40-41; NF Dep. 48-49).)

significant management experience, Brownstein and Chin initially asked Bartoletti to assume responsibility as Group Head—primarily because she had been employed with the Company longer than Koessel and they were not aware that Koessel would be interested in that position. (FC. Dep. 123-24, 126; DB Dep. 91-96, 99-100, 104; FC Decl. ¶ 16; MK Dep. 167-68, 171, 208-9.)

34.    Bartoletti did not immediately agree to become Group Head.  (DB Dep. 98-100; AB Dep. 45-46, 115, 164; FC Decl. ¶ 16.)  Given Bartoletti's close relationship with Fluehr, there was some concern Bartoletti would follow Fluehr to whichever company he went to work for after the July RIF.  (DB Dep. 98-100; AB Dep. 86-88; LDB Decl. Ex. 45 at 1709.)  Indeed, Fluehr went to Bank of America and Bartoletti did, in fact, speak to Bank of America about a job.  (AB Dep. 86, 115-120; see also id.)  Brownstein told Bartoletti he wanted her to remain at Citigroup and wanted to help her succeed.  (LDB Decl. Ex. 45; AB Dep. 89-91; DB Dep. 104, 135-36; FC Decl. ¶ 16.)  Brownstein also sought the assistance of Bartoletti's friend and Managing Director, John Heppolette, to convince her to accept the role.  (AB Dep. 162-63, 155-58.)

35.    When Koessel heard that Bartoletti had been offered the position to head the Group, he told Brownstein he wanted to be Co-Head and would explore other job opportunities if not also offered the position.  (MK Dep. 167-68, 171, 207-8; DB Dep. 136.)  Having reduced the Housing Group to just seven members, and not wanting to lose one of just two Directors, Brownstein and Chin agreed to ask Bartoletti and Koessel to be Co-Heads of the Housing Group, with Bartoletti to lead the student loans unit.  (FC Dep. 122, 130; DB Dep. 104 ("[I]f you [] made one of them head, the other one would have left.  And we wanted them both to stay."), 135-36 ("The reason that we named them co-heads [] was because we wanted to create as little turmoil as we could in trying to keep that group together."); FC Decl. ¶ 16; AB Dep. 46-47.)

36.     Because neither Bartoletti nor Koessel had significant prior managerial experience, Brownstein retained some of the functions of Group Head following Fluehr's departure, including selection of employees for fourth-round RIFs.  (FC Dep. 43-44, 113-14, 123, 126 ("I didn't think either one was really qualified to run a group. . . .  They had never done it before, no experience."), 147; DB Dep. 90-91, 94-95, 104; FC Decl. ¶¶ 16-17.)

37.     By November 2008, the student loan business had become effectively nonexistent as problems in the credit markets essentially eliminated the viability of auction-rate securities, which were the primary funding vehicles for those clients, and the Company abandoned the business.  (Id.; FC Decl. ¶ 18; FC Dep. 43-44 ("there was nothing I thought public finance could do to basically resurrect [the student loan] business."), 121.)  After July 2008, the housing market underwent a precipitous downturn.  (See supra ¶¶ 4-5, 21, 26.)  Management considered disbanding the Housing Group in its entirety (id.; DB Dep. 105-6, 119, 131-32), and Bartoletti herself "thought [] that the entire Housing Group would be let go [in November 2008.]"  (AB Dep. 165.)

38.     As Brownstein described it:  "The conclusion was we would have a very slim housing group with one near term purpose, and that was to have Citi continue to be somewhat of a thought leader in the market when it comes to housing on the municipal side.  Clearly Citi was a large player in the housing space overall . . . [but] our decision was [] to keep [] a very limited footprint and its goal at that point wouldn't be about generating revenues [], but would be to maintain thought leadership in the market."  (DB Dep. 105-6; FC Decl. ¶ 18.)  At the Director level, the choice was between Bartoletti and Koessel.  (Id.)

39.     Brownstein noted that through the financial crisis, Koessel had run a Housing Industry conference in Washington, D.C., had arranged and attended several meetings with the federal

HUD agency and state Housing Finance Authorities across the country, and had conducted numerous meetings to strategize with and guide clients and others across the industry through an unprecedented crisis.  (DB Dep. 104-9, 131-32, 146-55, 158; MK Dep. 102-110.)  These activities positioned Koessel as an industry thought leader.  (DB Dep. 104-9, 131-32, 146-55, 158.)  Brownstein also believed Koessel had greater client relationships to maintain relevance in the housing space.  (DB Dep. 104-9, 128-29, 146-55, 158; see also MK Dep. 179-83.)

40.     In contrast, Brownstein did not believe Bartoletti was well positioned to navigate clients through the increasingly difficult economic landscape; she had not made efforts to establish herself as a thought leader.  (DB Dep. 105-09, 154, 158.)  By her own admission, she had not been engaged in industry conferences, meetings, or speaking events.  (AB Dep. 127 ("Q:  After you were appointed co-head, did you arrange for any industry programs about the housing group or the housing industry as a whole?  A:  I did not."), 127-31.)  Rather, Bartoletti was managing deals and studying for her Series 53 licensing exam,[9] while Koessel was organizing and chairing conferences and meeting with clients.   (See id. at 127-31; MK Dep. 179-183 (indicating that Koessel was spearheading initiatives and meeting with State housing agencies and organizing conferences while Bartoletti was managing people and whatever deals remained in the office).)

41.     Brownstein also noted that several of Bartoletti's clients were in the student loan space that the Company was abandoning and she had fewer relationships than did Koessel with large housing clients.  (DB Dep. 93-94, 97, 98, 101-2, 105-8, 114-15, 125-30, 146-55, 158; see also FC Dep. 197 ("Amy [spent a lot of time] on student loans, and Mike was purely a housing banker.").)  In short, Brownstein believed Koessel was the better positioned than Bartoletti to help important clients through the crisis and thus allow the Company to remain relevant in the

---

[9] Chin, who was responsible for establishing the regulatory requirements for the PFD, confirmed that neither he nor any regulatory body required Group Heads to hold a Series 53.  (FC Dep. 19-20, 113.)

Housing space.  (Id.; FC Decl. ¶ 19)  In addition, given Bartoletti's comparatively higher

compensation (as a result of having matched the Morgan Stanley offer), Brownstein determined

that it was more cost-effective to have Koessel cover the business while management tried to

ascertain whether the group had any future.  (DB Dep. 105-8, 114-15, 118; FC Decl. ¶ 19.)  Chin

agreed with Brownstein's recommendation, and they selected Bartoletti to be let go in the fourth

RIF.  (FC Dep. 133, 137-38, 141-43, 197; FC Decl. ¶ 19.)

42.     Bartoletti testified she has no idea how the termination decision was made, who made it,

or what factors they considered.  (AB Dep. 53, 56.)

43.     After her employment with Citigroup ended, Bartoletti joined Fluehr at Ramirez and Co.

due to her "loyalty" to Fluehr.  (AB Dep. 105-6, 235-36. 261-63.)  While at Ramirez, they

shopped themselves as part of a team to other companies, and when Fluehr left Ramirez to go to

Wells Fargo, Bartoletti also sought out job opportunities at Wells Fargo.  (Id.)

**F.     Plaintiff Conley's Employment with the Healthcare Group**

44.     Conley was originally hired in 1997 by Fred Hessler and Dave Cyganowski as an

Assistant Vice President in the Healthcare Group.  (LC Dep. 81, 85-86; FH Dep. 35-37).

Throughout her employment, she worked in the Chicago office.  (LC Dep. 70.)  Hessler and

Cyganowski promoted Conley twice, first to Vice President in January 1999, and then to

Director in January 2005.  (LC Dep. 90, 92-93; FH Dep. 38, 42-43; DB Dep. 11.)  Conley's

promotion to Director brought with it added responsibilities, including originating and delivering

business and becoming a primary or lead relationship manager.  (DC Dep. 100-103; FH Dep. 48-

49, 339.)

45.     Conley, however, struggled in developing these skills.  (FH Dep. 335-36, 338-39.)  While

she was a strong number two, working closely with Managing Director Dave Johnson, she was

less adept in a lead role.  (DC Dep. 120-23, 145-46; FH Dep. 72, 203, 294-98, 335-36, 338-39.)

She had little business that she had developed and few, if any, significant client relationships that

viewed her as their primary trusted advisor.  (FH Dep. 335-36, 338-39; DC Dep. 120-21, 154-55,

174-75.)  She had also shown that, when a client's main point of contact for the account was not

available, she was not helpful in stepping in and trying to deal with the client's issue.  (DC Dep.

174-76, 349, 359-61.)  In addition, when provided with opportunities to lead professional

development initiatives, Conley did not follow through.  (DC Dep. 174-76, 335, 342-343; FH

Dep. 341-42, 345-46.)

46.     By November 2008, the Healthcare Group had already undergone two RIFs, and Conley

had been selected by Hessler and Cyganowski for retention each time.  (FH Dep. 254; see also

RIF Data)  In those two RIFs, four of Conley's male Director-level colleagues were terminated.

(Id.)[10]  In connection with the November RIF, Hessler assessed the skills, contributions and

overall performance of the remaining employees in the Group.  (Id. at 293-95.)  Hessler focused

his analysis on an assessment of what moves could be made within the Group that would have

the least impact on existing business while allowing the Group to successfully bring in new

business going forward.  (Id.)  Hessler also sought to identify those officers who would present

the least risk associated with taking clients or other employees.  (Id. at 293-95.)

47.     Hessler readily concluded there was little risk of Johnson taking client with him, as many

of the clients her serviced were long-term clients of the Company.  (Id.)  In the RIF, Johnson was

the only Managing Director terminated, while three female Managing Directors were retained.

(LC Dep. 30.)  Hessler and Cyganowski elected to retain the three female Managing Directors,

using the same assessment.  (See FH Dep. 293-94, 328-29; DC Dep. 318-19.)  One of those, Teri

---

[10] Conley believes all men were selected for termination for performance reasons, but all women were selected
because of their gender.  (LC Dep. 22-23, 30-31, 95, 116-17.)

Hartman, had been promoted to Managing Director upon Hessler and Cyganowski persuading a

male senior Managing Director to take a step back in order to free up a slot for Hartman.  (FH

Dep. at 243-47.)

48.     Hessler concluded that there was a "[v]ery low risk of [Conley] taking business and very

low risk of her being able to recruit people who might otherwise still be in our group."  (FH Dep.

296-97; see also DC Dep. 347-51.)  Similar to, and often in conjunction with, Johnson, Conley

worked predominantly on long-term clients of the Group "and therefore the judgment was there

would be low risk of [] losing that business because they were essentially institutionalized

clients."  (FH Dep. 298; accord id. at 300-302, 305-7, 312, 314, 335-36, 338-39.)[11]

49.     Hessler believed that selecting any other Directors would be more damaging because

there would be a greater risk of losing clients or personnel.  (FH Dep. 297 ("if you eliminated []

Michael Brown there was a high probability of losing clients"), 312-316 (identifying those

clients), 298 & 300 (whereas Conley had a relationship with Nebraska Methodist, a small client,

"Ryan Freel[] had a key relationship with SSM[,] there was a risk that we could lose that [big

client]."), 303-4 ("Ryan had the best relationship with [SSM]), 318 ("Victor [Radina], if he were

terminated and [were] to go to another firm, he could be very influential in hiring VPs and star

associates."), 318-19 ("Charles Plimpton, [could take both] [p]eople and clients.  [H]e was a

revenue generator[.]"), 319 ("Charles Lee, [he could take] [p]eople. . . .  And [] we were

concerned that if we terminated him, that we would lose that ability to have someone come in

and work on complicated, complicated clients."), 319-20 ("Mike Irwin was [a] senior banker,

revenue generator, and did and still does a lot to establish our brand in the industry."), 321-22

("Kent Jackman, he was a senior banker . . . [and] had a lot of primary relationships with . . .

_____

[11] In fact, the Company did not lose any significant clients or deals because of terminating Conley.  (FH Dep.
327-28; DC Dep. 354; see also id.).)

some of our important critical clients."), 324-25 (Pat Sheehan "had established a number of relationships with [clients that had huge upside potential] that potentially could be a flight risk").

50.     Cyganowski concurred, noting that "all of the Directors that remained after the fourth RIF were ahead of Lisa Conley with respect to driving business and revenue."  (DC Dep. 292, 352-53.)  Cyganowski also noted that Conley had failed to follow through on professional development opportunities.  (Id. at 244, 292.)  Thus, while the other officers had successfully become the lead or originating contacts for clients who might leave if any of them were terminated, Conley had not done so, aside from one small client (Nebraska Methodist).  (FH Dep. 299, 335-36, 339; DC Dep. 244, 349-51, 298-300.)  For all these reasons, Hessler and Cygnowski included Conley in the November 2008 RIF.  (FH Dep. 329.)

51.     Conley admits she has no idea how the termination decision was made, who made it, or what factors they considered (LC Dep. 26-27, 95) and that, in fact, it was her lack of understanding that lead her to jump to the conclusion that she was "illegally fired."  (Id. at 23.)

52.     To establish her purportedly superior qualifications, Conley relies on her "knowledge of the situation" (Conley Dep. 202) and that she was told "over the years [] that I was terrific and manage processes better than other kind[s] of midlevel bankers they had worked with. [T]hat's my answer.").  (Id. at 204.)

53.     Conley also attempts to rely on "revenue sheets" (that she saw for the first time in discovery and after filing her lawsuit), claiming these demonstrate she was more valuable and had more business and client relationships than other Directors.  (LC Dep. 202-3.)  Her reliance on these documents is entirely misplaced.  Both Hessler and Cyganowski testified that these documents merely indicate everyone who "touched" a deal in any capacity and tell nothing about the relative contribution of any individual or who maintained the key relationships with each

client.  As a result, Hessler and Cyganowski testified that these sheets are of little to no value, and they certainly did not consider these "revenue sheets," when selecting individuals for termination.  (FH Dep. 170-71, 288-89, 310; DC Dep. 104-7, 246 ("I wouldn't review [these] at all. . . .  Frank [Chin] would have it sent to Fred and me [and] I ignored it, yes."), 247 ("Q:  So you and Fred [Hessler] never discussed this document?  A:  No."), 259 ("I'm telling you this is a report that is meaningless and is inaccurate.  So I'm not going to say that this is a listing of Lisa's revenue contribution for the year. . . .  I don't know whether these numbers are right or not.  And this report is meaningless to me as co-head.").)

**G.**  **Plaintiff Mentor's Employment with the Southeast Regional Group**

54.  Mentor and Pellegrini had worked together at UBS for several years.  (NP Dep. 55.) When Pellegrini was recruited to join PFD and lead its Southeast Regional Group, he did so upon the condition that he be allowed to bring several employees with him, including Mentor. (Id. at 55, 97-98, 105.)  Chin approved Pellegrini's request and Mentor was hired in June 2005 as a Vice President in the Southeast Regional Group, headed by Norm Pellegrini.  (Id. at 105.)

55.  Mentor displayed promise and abilities during her first two years of employment as a Vice President.  (Id. at 213-17.)  Although she had not yet developed many clients, Pellegrini believed she had the ability to do so in the future and he recommended an out-of-cycle promotion of Mentor from Vice President to Director in early 2008.  (Id. at 213-17, 222, 254-55; BL Dep. 55-56.)  Livolsi, who oversaw the different regional Groups, approved Pellegrini's decision as "a way of [] encouraging [Mentor] to continue to be successful and work hard."  (BL Dep. 55-56.)  Mentor was promoted to Director in early 2008.  (NP Dep. 223-24.)

56.  When it became clear that the Company would undergo a RIF in November 2008, Pellegrini attempted to avoid having his Southeast Regional team impacted.  (Id. at 270, 272-73,

294.)  Prior to November 2008, three individuals from the group had already been terminated—including a male Director, a male Associate, and a female Vice President—and Pellegrini had tried to save additional costs by closing the Group's Atlanta office.  (Id. at 227; see also RIF Data.)  Unfortunately, Pellegrini could not avoid having his Group participate in the November RIF.  (NP Dep. 270, 272-73.)

57.      Pellegrini and Livolsi discussed everyone within the group and, particularly regarding the Directors, analyzed who would have the least impact on the Group's business moving forward, including what business they were doing and what clients they could take with them.  (Id. at 234-35, 274-78, 284-85, 287-88; BL Dep. 26-27, 30-31, 32-39; 43-49, 53-54, 69-73, 79-82.)

58.      Although Mentor was beginning to build business, and had shown potential in this area, the crisis of 2008 reduced the ability to wait on the potential.  (NP Dep. 220, 285, 289-90; BL Dep. 56 ("[s]he was doing basically, from what I could ascertain, [] vice president [] [level] work.").)  Pellegrini and Livolsi determined that eliminating Mentor would have the least impact on the Southeast Group's existing developed business.  (NP Dep. 274-75, 284-85; BL Dep. 47-48, 53-55, 70-73, 85-95; DB Dep. 229-30.)

59.      In particular, Pellegrini and Livolsi felt that, by Fall of 2008, Mentor had less developed business than every other Director in the Group.  (NM Dep. 220, 274-75, 285, 289-90; BL Dep. 47-48, 52-55, 70-73, 85-95.)  In fact, Pellegrini felt Mentor had less developed business than Brent Wilder, another Director, and Wilder too was selected for termination in the November RIF.  (NM Dep. 285, 289-90.)

60.      Thus, Pellegrini, with approval of Livolsi, selected Mentor for termination because, as compared to any Director in the Southeast Group, he believed terminating her employment would have the least impact on business of any Director in the Southeast Group.  (NP Dep. 274-

80, 284-85; BL Dep. 69-73, 79-82, 85-95.)  In fact, the Company did not lose any business

because of terminating Mentor.  (NP Dep. 127, 284 ("Q:  Did you lose any business?  A:  I don't

think we did.").)

61.    The decision to terminate Mentor was made <u>before</u> she was able to help secure business

<u>as part of a team</u> on both the Virgin Islands account (which was secured as part of an effort lead

by the Co-Head of the Infrastructure Group, James Haddon, and senior Director Guy Logan),

and the Broward County account (which was a client of Group Head Pellegrini dating back to

tenure at UBS).  (BL Dep. 42-43, 88-89, 94; NP Dep. 58, 66, 108,110-12, 124-26, 165-66, 212,

284; NM Dep. 51-52, 54-55, 60-61, 63; <u>cf.</u> Compl. ¶ 85.)  Further, Mentor admitted at deposition

she was assigned to the Company's established State of Connecticut account and merely assisted

a Managing Director (Kristin Johnson).  (NM Dep. 51-52.)

62.    Mentor testified she has no idea how the termination decision was made, who made the

decision, or what factors were considered.  (NM Dep. 101-2, 264.)  She further testified that she

has absolutely no information concerning the other Directors in her group, other than the fact that

everyone else had more experience than she.  (NM Dep. 74-76, 108-12.)  Specifically, she

testified that she has absolutely no information concerning what developed business or clients

they had, which or how many transactions they worked on, or their prior relevant work

experience.  (<u>Id.</u> 74-76, 108-12.)[12]

**H.    Proper Statistical Analysis Reveals That No Discrimination Occurred**

63.    Killingsworth admittedly ignores that the decision making process occurred at the Group

level.  For instance, he acknowledged in his deposition that his analysis did not take into account

---

[12] Curiously, although Mentor alleged that she was "bringing in more revenues in 2008 and [] had more revenues coming down the pipeline than Mike Baldwin," she conceded that she not only had no idea whatsoever concerning Baldwin's business, but was also unsure of her own.  (<u>Id.</u> at 108-10.)  In fact, she conceded she had absolutely no information for any of the other officers in the Southeast Group.  (<u>Id.</u> at 74-76, 108-12.)

who made the termination decisions that Plaintiffs challenge, and he admitted that he had no understanding of how the different RIF decisions were made.  (MRK Dep. 48 ("Q:  Did you have any understanding of how the decisions were made.  A:  No."), 61 ("Q:  Who made the RIF decisions for [each of the Plaintiffs.]  A:  I can't name them."); see also Bloom Supp. pp. 1-2.)

64.     Instead, he aggregates data from all 15 Public Finance Groups—including 11 in which none of the Plaintiffs worked.  (Id.)  In so doing, Killingsworth aggregates data across the entire PFD and treats the layoffs of the five plaintiffs as if they resulted from a single process involving all the employees in the PFD.  (Id.; Bloom Supp. 1-2.)  Killingsworth admitted his analysis does not take account of how decisions were made.  (MRK Dep. 158 ("[I]t is not an analysis of individual decisionmakers or of individual groups."); see also supra ¶¶ 6-8.)  Thus, Killingsworth failed to identify the correct population for analysis.  (Bloom Supp. pp. 1-4; supra ¶¶ 6-8.)

65.     Killingsworth was not even provided, and thus did not review, any of the deposition testimony of the decision makers in which they explain how their decisions were made.  (MRK Dep. 164; see also LDB Decl. Ex. 47.)

66.     Remarkably, Killingsworth only became aware after rendering his report and reviewing Defendants' report (Bloom Rep. & Bloom Supp.) that "different people made different decisions about people in different groups." (MRK Dep. 61-62.)

67.     While Killingsworth concluded that women in PFD were more likely to be laid off than men, he has absolutely no idea as to which of the 15 Groups drove that conclusion, and has no opinion as to whether women in any particular Group—including the Groups in which the Plaintiffs worked—were more likely to be laid off than men in the Group.  (Id. at 65-66 ("Q: How can we tell which, [of the 15] different groups in [the PFD], if any, made decisions in a sex-

neutral fashion?  A:  [My analysis] doesn't address that question.  This addresses what the overall impact is. . . ."), 59-60.)

68.     Killingsworth further admitted that, although he is aware that each Plaintiff is claiming that a male in her Group should have been laid off instead of her, he has not studied, and has no opinion as to whether, the termination decisions of any of the five individual plaintiffs were influenced by gender.  (Id. at 46-47, 158-59 ("Q:  Do you have any opinion as to whether the decision to terminate Amy Bartoletti was influenced by gender?  A:  I haven't studied that, no."), 159-60 (answering the same for each Plaintiff).)[13]

69.     In stark contrast to Killingsworth's aggregated analysis across all of the PFD, the Company's expert analyzed the decision at the appropriate Group and appropriate comparator levels.  (See generally Bloom Rep. & Bloom Supp; see also supra ¶¶ 6-8.)

70.     Defendants' report offers the only statistical evidence that takes account of the appropriate populations for analysis (both the decision makers and comparators associated with each of the five individual Plaintiffs).  (Id.; see also Bloom Supp. pp. 6-10.)  The analysis reveals there are no statistically significant gender disparities in selection for layoff among individuals who were similarly situated to each Plaintiff with respect to their position and Group.  (Bloom Rep. pp. 7-13; Bloom Supp. p. 2.)  These statistical findings hold true not only for the November RIF, but also for the three other RIF rounds that occurred in 2007-08.  (See id.; see also Bloom Supp. pp. 2-5.)

---

[13] Plaintiffs have also offered the report of Dr. Louise Roth who, while conducting some statistical analyses, including analyses that contradict Killingsworth's, admits that she is not an expert on statistics or quantitative methodologies and defers, instead, to recognized experts such as Defendants' expert, Dr. David Bloom.  (LR Dep. 229-230.)  Yet even she recognizes that decisions were made at the Group level:  "Brownstein and Chin left it up to the group heads to select people for termination. . . ."  (LDB Decl. Ex. 28 at p. 8).

Dated:  New York, New York

      June 7, 2013

                                   By:  ___/s/ Kenneth J. Turnbull_____
                                       Kenneth Turnbull
                                       Leni D. Battaglia
                                       MORGAN, LEWIS & BOCKIUS LLP
                                       101 Park Avenue
                                       New York, New York  10178
                                       212-309-6000

                                     Attorneys for Defendants