# EXHIBIT 2

153

A. BARTOLETTI

1         A. BARTOLETTI
2     A.  Um-hum.
3     Q.  To Mr. Bynam?
4     MR. WIGDOR:  Yes.
5     A.  Yes.
6     Q.  You say: "Honestly, things suck
7   right now.  We are swamped, bonuses were bad
8   and little motivation."  Do you see that?
9     A.  Yes.
10     Q.  Were bonuses bad for 2007?
11     A.  This brings back memories and my
12   bonus was less than the year before.
13     Q.  Do you know how much less?
14     A.  I don't remember the number, but I
15   remember I was down.
16     Q.  Do you know how bonuses were
17   across the entire bank for 2007?
18     A.  I don't know.
19     Q.  Do you know whether they were down
20   as compared to --
21     A.  Across the entire bank, I have no
22   idea.
23     Q.  How about within your group, do
24   you know whether the bonuses in 2007 were down
25   as compared to the prior year?

155

1         A. BARTOLETTI
2     Q.  Does this e-mail where you say
3   "Things suck right now, we are swamped,
4   bonuses were bad and little motivation," does
5   that refresh your recollection as to whether
6   you were thinking of leaving?
7     A.  No.  I mean, you know, I think
8   this is right after we had to let Corey go,
9   which, if you looked at all public finance,
10   the general mood throughout the department was
11   pretty negative at that time.
12     Q.  Why is that?
13     A.  Because there were layoffs so
14   people were upset.
15     Q.  And you had a similar mood?
16     A.  I had that mood at times.  I'm
17   sure there are other times when I was working
18   so hard I couldn't even think about it.
19     Q.  Who is John Heppolette?
20     A.  John Heppolette.  He is a an
21   employee within municipal securities.  He's
22   also a friend of mine.
23     Q.  And what is his position within
24   municipal securities?
25     A.  I don't know his exact position.

154

1         A. BARTOLETTI
2     A.  I don't know.  I could assume they
3   were down since mine was down.
4     Q.  And why would you assume that?
5     A.  I don't -- I don't know.  I'm sure
6   I'm making that assumption because my bonus
7   was down and I think I was one of the top
8   employees in the top performers in our group.
9   So if my bonus was down, I would assume that
10   the rest of the bonuses in our group were
11   down.
12     Q.  Did you communicate bonuses to
13   anyone else in your group for 2007?
14     A.  I communicated bonuses to analysts
15   and associates.  I don't know if it was 2007.
16   I believe I did.  But that would have been,
17   generally analyst's bonuses are in July so
18   it's different timing.
19     Q.  So you think you communicated
20   bonuses to them in July of 2007?
21     A.  I think so.
22     Q.  After you received a lower bonus
23   for '07 than you had in '06, did you think
24   about leaving?
25     A.  I don't remember.

156

1         A. BARTOLETTI
2   I know he reports to, what's his name, Joe
3   Geraci.
4     Q.  Is Mr. Heppolette a managing
5   director?
6     A.  Yes.
7     Q.  Was he a managing director in
8   2008?
9     A.  Yes, I believe so.
10     Q.  And you say he was a friend of
11   yours?
12     A.  Um-hum.
13     Q.  For how long had Mr. Heppolette
14   been a friend of yours?
15     A.  I've known John a long time.
16   Probably since 1994.
17     Q.  Let me show you an e-mail that is
18   dated -- well, it is May 14th and May 15th,
19   between you and Mr. Heppolette.
20     A.  Okay.
21     MR. TURNBULL:  I will have this
22   marked as Bartoletti Exhibit 7.
23     (Bartoletti Exhibit 7, e-mail
24   dated May 14th and May 15th,
25   between Amy Bartoletti and Mr.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

AMY BARTOLETTI                                         June 14, 2012

157

1        A. BARTOLETTI
2    Heppolette marked for
3    identification, as of this date.)
4    Q.   Do you recall these e-mails, Mrs.
5 Bartoletti?
6    A.   I don't recall the exact e-mails,
7 but I recall the general conversation.
8    Q.   And do you have any reason to
9 believe you didn't send or receive these?
10   A.   No.
11   Q.   If you would turn to the third
12 page.
13   A.   Um-hum.
14   Q.   Again, this is an e-mail chain
15 that starts at the back and works its way up.
16   A.   Yes.
17   Q.   The first e-mail of the chain from
18 you to Mr. Heppolette you say: "Need your
19 opinion. Should I look for another job?  I
20 have one pretty definite option if needed."
21       First of all, why were you asking
22 Mr. Heppolette if you should look for another
23 job?
24   A.   I was very concerned about them
25 cutting the entire housing group.

158

1        A. BARTOLETTI
2    Q.   Even in May 2008?
3    A.   It was before the June layoffs.
4    Q.   So even then you thought they,
5 that Citigroup might get out of the housing
6 business altogether?
7    A.   I was worried which I think is
8 rational and legitimate.
9    Q.   And why were you asking that
10 question of Mr. Heppolette?
11   A.   Because John is fairly high up
12 within municipal securities, so he sometimes
13 hears what's going on.
14   Q.   So you thought he might have some
15 information?
16   A.   Um-hum, yes.
17   Q.   And then you say I have one pretty
18 definite option if needed?
19   A.   I have no idea what that is.  I
20 wish I could tell you, but I really don't
21 know.
22   Q.   Do you recall whether you had
23 received any offers of employment in or around
24 May of 2008?
25   A.   No, I don't remember that at all.

159

1        A. BARTOLETTI
2 That's pretty mind-boggling.
3    Q.   Had you applied to any other
4 employers as of May 2008 --
5    A.   I don't think so.
6    Q.   -- or before then?
7    A.   I don't think so.  Unless someone
8 had approached me, but I don't remember any
9 firm approaching me specifically at that time.
10   Q.   Do you have any reason to believe
11 that you were being dishonest to Mr.
12 Heppolette when you said I have one pretty
13 definite option if needed?
14   A.   I mean, he is a friend of mine.  I
15 don't think so, but.
16   Q.   You can't remember what you are
17 referring to, though?
18   A.   No, I really don't.  I mean, I
19 don't have any e-mails that I can -- that I
20 found that would support this.  Unless there
21 was some sort of residual from when Morgan
22 Stanley had approached me the year prior.
23 It's possible.
24   Q.   Do you recall speaking to Morgan
25 Stanley in 2008?

160

1        A. BARTOLETTI
2    A.   No, I don't.
3    Q.   Do you recall speaking to any
4 other employers in 2008?
5    A.   I don't recall.  Well, in 2008,
6 yes, I mean, I spoke to many employers in
7 2008, sorry.
8    Q.   How about before May 14th of 2008?
9    A.   No, I don't remember speaking to
10 any before May 14th.
11   Q.   If you were conducting a job
12 search or had e-mailed with any prospective
13 employer, would you still have those e-mails?
14   A.   Yes.
15   Q.   Going back to May of 2008?
16   A.   Oh, yes, absolutely.
17   Q.   And did you look for any such
18 e-mails?
19   A.   I did, yeah, I looked for every
20 type of e-mail that would be remotely close to
21 this.
22   Q.   And you don't recall finding any?
23   A.   I don't.
24   Q.   And if you would turn to the prior
25 page, you can see at the bottom Mr.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

161

A. BARTOLETTI

2  Heppolette's response to you?
3    A.   Yes.
4    Q.   Where he says "we're all at risk."
5    A.   Um-hum.
6    Q.   "Let's talk about it."
7    A.   Yup.
8    Q.   Did you have a discussion with Mr.
9  Heppolette about this around May 14th of 2008?
10    A.   I think we had a very brief
11  discussion.
12    Q.   And what was that discussion?
13    A.   I think I asked him if he knew if
14  the housing group was getting cut, and I think
15  he said he didn't know.  And that was really
16  the extent of it, because, I mean, although he
17  may hear things at certain times, he wasn't as
18  involved in the public finance decision-making
19  process.
20    Q.   In May of 2008 there had already
21  been two rounds of reductions, correct?
22    A.   Yes.
23    Q.   And in May of 2008 you expected
24  there to to be more rounds --
25    A.   Yes.

162

A. BARTOLETTI

2    Q.   -- correct?
3         Why did you expect that?
4    A.   Everyone expected it.  I don't
5  know if it was directly communicated to us or
6  not, but it was, I think a pretty widely held
7  belief in public finance that there were going
8  to be more reductions.
9    Q.   Even as of May 2008?
10    A.   I think so.
11    Q.   Did you talk to Mr. Heppolette
12  about the opportunity to be head of the
13  housing group?
14    A.   Yes.
15    Q.   And when was that?
16    A.   I think it was, I could be wrong
17  about the date and time, but I think it was
18  the same day that Mr. Brownstein talked to me.
19  I think he went and got John and asked John to
20  come talk to me which was pretty bad.
21    Q.   Which was pretty bad you said?
22    A.   Well, it's just, I felt like David
23  was using my friendship with John to try to
24  influence me, which, I mean it's fine, but.
25    Q.   So did Mr. Heppolette talk to you?

163

A. BARTOLETTI

2    A.   Yes.
3    Q.   And this was the same day you were
4  offered the position to be head of the housing
5  group?
6    A.   I believe it was, as sole head.
7    Q.   And so you thought Mr. Brownstein
8  was using Mr. Heppolette to try to convince
9  you to accept the position?
10    A.   I don't know what he was trying to
11  do.
12    Q.   But somehow you thought Mr.
13  Brownstein going to Mr. Heppolette was bad?
14    A.   It was just weird.  It was weird.
15    Q.   And --
16    A.   Because I didn't report to John in
17  any fashion, so it was a weird sort of thing.
18    Q.   So what did you and Mr. Heppolette
19  discuss that day?
20    A.   We didn't discuss a lot.
21    Q.   Do you recall anything about that
22  conversation?
23    A.   I don't recall a whole lot.  I
24  think he also thought it was a little strange
25  that Brownstein had asked him to talk to me.

164

A. BARTOLETTI

2    Q.   Do you recall anything else about
3  that conversation?
4    A.   No.
5    Q.   Did you and Mr. Heppolette talk
6  about whether you should accept the position?
7    A.   I don't remember.  Probably.
8    Q.   Did you take notes --
9    A.   No.
10    Q.   -- of that?
11    A.   No.
12    Q.   After the layoff of Mr. Fluehr,
13  did you continue to have concerns that there
14  might be additional layoffs?
15    A.   Yes.
16    Q.   And did you communicate those
17  concerns to others?
18    A.   I'm sure I did at various points
19  in time.
20    Q.   Who is Ward Marsh?
21    A.   The head of municipal securities.
22    Q.   Did you raise your concerns to Mr.
23  Marsh at any point?
24    A.   I don't know if I raised those
25  concerns to him.  I don't think so, but.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

165

A. BARTOLETTI

2  Q.   Before you were informed that you
3  were going to be part of the November
4  reduction in force, were you concerned in
5  November that you might be let go?
6  A.   Again, I was very concerned that
7  they would let the entire housing group go.
8  Q.   And you were aware before you were
9  told that there were going to be additional
10 layoffs?
11 A.   Yes.
12 Q.   When you were informed of your
13 termination, I think you said earlier you were
14 surprised or shocked, is that right?
15 A.   Yes.
16 Q.   You knew in that week in which you
17 were told, that it was a possibility you would
18 be laid off, right?
19 A.   I knew it was a possibility, but,
20 again, I thought the possibility was that the
21 entire housing group would be let go and I
22 know in no circumstance in my realm of
23 possibilities did I think that I would be let
24 go and Mike would be retained.  That never,
25 ever, ever crossed my mind.

166

A. BARTOLETTI

2  Q.   If they had, if Citigroup had
3  decided to get out of the housing, the public
4  finance housing business altogether and you
5  were let go as part of that decision, I take
6  it you wouldn't think that was discriminatory?
7  MR. WIGDOR:  Objection.
8  Q.   Correct?
9  MR. WIGDOR:  You can answer.
10 A.   If Citi had let the entire housing
11 group go, Citi would not have had to make a
12 decision between a man or a woman and decide
13 who to keep and who to fire.  But the decision
14 that Citigroup made in letting three women go
15 and retaining less qualified men, is where my
16 basis of discrimination comes from.
17 Q.   So if Citi had decided to let the
18 whole group go, you wouldn't have thought that
19 was discriminatory?
20 MR. WIGDOR:  Objection.  You can
21 answer.  You can answer it if you can.
22 A.   I thought I just answered that.
23 Q.   I know it was the same question.
24 I didn't think you had answered it.
25 MR. WIGDOR:  Objection.

167

A. BARTOLETTI

2  A.   Can you repeat the question.
3  Q.   If Citi had decided to let the
4  whole housing group go, you wouldn't have
5  thought that was discriminatory, correct?
6  A.   Correct, because Citi would not
7  have had to make a choice between a man and a
8  woman and who to hire and who to let go.
9  Q.   If Citi decided to let Mr.
10 Koessel go, as well as, you as part of that
11 reduction, would you think your termination
12 was discriminatory?
13 MR. WIGDOR:  Objection.
14 A.   You're asking me a subjective
15 question now.
16 Q.   I'm just asking for your belief.
17 MR. WIGDOR:  Objection.
18 A.   Can you repeat the question again.
19 Q.   If Citi had decided to let Mr.
20 Koessel go as well as you, would you have felt
21 the decision to let you go was discriminatory?
22 MR. WIGDOR:  Objection.
23 A.   The other circumstances of
24 discrimination still stand when you look at
25 total percentages of women let go, but if that

168

A. BARTOLETTI

2  choice was not made to let me go and retain a
3  lesser qualified male, then that's a different
4  decision.
5  Q.   And if that had been made, you
6  wouldn't have felt the decision to let you go
7  was discriminatory, correct?
8  MR. WIGDOR:  Objection.
9  You can answer, if you can.
10 A.   Again, the other basis of
11 discrimination still stands.
12 Q.   The statistical basis?
13 A.   Yes.
14 Q.   You've said that you were the
15 better qualified of the two between you and
16 Mr. Koessel.
17 A.   Yes.
18 Q.   And I take it that is at least
19 your opinion, correct?
20 MR. WIGDOR:  Objection.
21 A.   That is my opinion.
22 Q.   Do you know what Mr. Brownstein's
23 opinion was as to the relative abilities and
24 merits of you and Mr. Koessel?
25 A.   Well, I know who Mr. Brownstein



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

177

A. BARTOLETTI

1       A. BARTOLETTI
2       Q.    Did you ever go to Citigroup and
3   tell them you had an offer to go to another
4   firm?
5       A.    Yes.
6       Q.    When was that?
7       A.    I believe it was 2006, maybe.
8       Q.    And tell me about that.  What were
9   the circumstances.
10      A.    I was given an offer from I think
11  it was Morgan Stanley at the time to go work
12  in their housing group.
13      Q.    So I take it you had interviewed
14  with Morgan Stanley?
15      A.    Yes.
16      Q.    And that was in 2006?
17      A.    I think it was 2006.  I don't
18  remember the exact year.  Maybe it was before
19  then.  I'm not really a hundred percent sure.
20      Q.    And do you recall what the offer
21  was from Morgan Stanley?
22      A.    No.
23      Q.    Was it an offer in writing?
24      A.    I believe it was an offer in
25  writing.

178

A. BARTOLETTI

1       A. BARTOLETTI
2       Q.    Do you have a copy of that still?
3       A.    Oh, boy, I don't -- I don't know.
4   I could search.  I thought I had turned over
5   all of my e-mails and anything that had to do
6   with my employment offers, over.  Anything
7   that I had, I did turn over, so.
8           ^ MR. TURNBULL:  If you have
9       that, we call for the production of
10      that.
11      Q.    So after receiving the offer from
12  Morgan Stanley, did you come back and tell
13  Citigroup?
14      A.    I personally did not, actually.
15      Q.    Who --
16      A.    Mr. Fluehr, he was also given an
17  offer and I believe he was the one who
18  approached Mr. Chin.
19      Q.    So how did it come about that both
20  you and Mr. Fluehr received offers at the same
21  time?
22      A.    I think Morgan Stanley had
23  contacted both of us.
24      Q.    So was the thought or were you and
25  Mr. Fluehr thinking of going to Morgan Stanley

179

A. BARTOLETTI

1   as a team?
2       A.    Yes.
3       Q.    And prior to 2006 had you and Mr.
4   Fluehr sought other opportunities as a team?
5       A.    I don't remember.  I don't think
6   so.
7       Q.    So you said Mr. Fluehr informed
8   Citigroup that you and he had offers.  Is that
9   right?
10      A.    Yes.
11      Q.    Do you know who he informed?
12      A.    I don't.
13      Q.    And what happened as a result of
14  Citigroup being informed that you had an
15  offer?
16      A.    Citigroup countered -- they
17  counteroffered.
18      Q.    Meaning what?
19      A.    Meaning they offered the same or
20  higher level of pay that Morgan Stanley was
21  offering because they wanted to retain us.
22      Q.    And do you recall who was involved
23  in that decision?
24      A.    I don't -- I don't remember.  I

180

A. BARTOLETTI

1   think it was probably Frank Chin, but I'm not
2   a hundred percent sure.
3       Q.    And so as a result of that, did
4   you get a guarantee for compensation?
5       A.    I did not have anything in writing
6   from what I recall, but I think I was given a
7   verbal guarantee or assurance that I would get
8   paid a certain amount.
9       Q.    That verbal assurance, was that
10  from Mr. Chin?
11      A.    I believe it was.
12      Q.    And what was the amount?
13      A.    I don't remember.
14      Q.    Did you get the amount that you
15  were verbally promised?
16      A.    I believe so.
17      Q.    Was it --
18      A.    I don't remember being unhappy,
19  so.
20      Q.    Was it just a one-year?
21      A.    I think it was just a one-year
22  from what I recall.
23           MR. TURNBULL:  This is probably a
24      good time for a lunch break.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

AMY BARTOLETTI                                    June 14, 2012

189

A. BARTOLETTI
1
2      Q.    And you don't recall what year she
3   was a summer intern?
4      A.    I don't know what year that was.
5      Q.    Do you recall that after her
6   summer internship she received an offer to
7   join?
8      A.    Yes.
9      Q.    And do you recall you had an
10  opinion as to whether she should get an offer?
11     A.    I was asked if she should be given
12  an offer into the housing group, and I did not
13  think that she should be given an offer in the
14  housing group.
15     Q.    And why not?
16     A.    Difficult to say, I don't remember
17  the exact circumstances.  We have a lot of
18  summer interns.  If I had to formulate a guess
19  as to why, it is housing is one of the most
20  quantitative groups in public finance at
21  Citigroup and perhaps her quantitative skills
22  weren't appropriate for the housing group.
23     Q.    And do you recall in fact
24  expressing that view?
25     A.    I must have expressed it to

190

A. BARTOLETTI
1
2   somebody.  I don't remember to whom.
3      Q.    And do you recall whether others
4   in the group had the same opinion as you about
5   whether Ms. Sharpton should get an offer?
6      A.    I don't remember.  I don't know.
7      Q.    Do you recall whether Ping shared
8   the same opinion as you?
9      A.    I don't remember honestly.
10     Q.    Do you recall whether Mr. Koessel
11  shared the same opinion as you?
12     A.    No, I don't remember.
13     Q.    Did you have an opinion that --
14  did you express an opinion that you thought if
15  she got an offer, it would be because of her
16  dad and her uncle?
17     A.    Did I express that to people at
18  the time?  I don't think so.
19       I mean, at the time I don't think
20  I knew who her uncle was.  I know now, but I
21  don't think I knew at the time.
22     Q.    So you don't recall expressing it?
23     A.    I don't recall.
24     Q.    Do you recall whether Ms. Sharpton
25  had developed any sort of reputation during

191

A. BARTOLETTI
1
2   her summer internship?
3       MR. WIGDOR:  Objection.
4      A.    I don't recall.
5      Q.    You don't recall one way or the
6   other?
7      A.    I mean, I don't even know what you
8   mean, honestly.
9      Q.    Well, you have mentioned that you
10  didn't think or that Ms. Sharpton might not
11  have the quantitative skills for the housing
12  group, correct?
13     A.    Yes.
14     Q.    Tell me what you mean by that.
15  What sort of quantitative skills are required
16  for the group?
17     A.    I mean, housing is one of -- is
18  probably one, if not the most quantitative
19  groups in public finance.  There are a couple
20  of others that are very quantitative as well.
21     Q.    And when you say quantitative, you
22  mean you have to do a lot of mathematical
23  calculations?
24     A.    It is mathematical.  It's also the
25  ability to do complex formulas in Excel and

192

A. BARTOLETTI
1
2   learn DBC housing and understand very complex
3   mathematical relationships.
4      Q.    And it was your opinion that Ms.
5   Sharpton didn't have those skills?
6      A.    I don't remember that, like I
7   said.  I said if there was a reason, that
8   probably would have been it.  I don't remember
9   specifically.
10       We had interns every year.  I
11  don't remember specifically much about
12  Brittany, so.
13     Q.    If somebody from Citigroup
14  testified that you expressed that concern
15  about Ms. Sharpton and your belief that she
16  shouldn't be allowed to join the housing
17  group, would you think that they were being
18  dishonest?
19       MR. WIGDOR:  Objection.
20     A.    You are asking me a subjective
21  question.
22     Q.    No, I don't think it is
23  subjective.  I'm just asking you a question.
24  Do you want me to have it reread?
25       MR. WIGDOR:  Objection.  You can



ESQUIRE
DEPOSITION SOLUTIONS

197

A. BARTOLETTI

1

2     Q.   And you said that it's because of
3   the statistics?
4     A.   Yes.
5     Q.   And I'm asking is there any other
6   basis for your belief that gender played a
7   role in her termination?
8     A.   I can go back and try to think of
9   the mediation and remember what was said, but
10  I wasn't paying particular attention to the
11  specifics of Ms. Sharpton's case.
12    Q.   So is --
13    A.   And I did not work with her.
14    Q.   So as we sit here today, you can't
15  think of any other basis for your belief that
16  gender played a role in her termination?
17        MR. WIGDOR:  Objection.
18    A.   Oh, no, that's incorrect,
19  actually.
20    Q.   Okay, tell me what other basis.
21    A.   Because I believe that less
22  qualified men in her group were retained, come
23  to think of it.
24    Q.   So do you know how Ms. Sharpton's
25  performance was in her group?

198

A. BARTOLETTI

1

2     A.   I don't know.
3     Q.   So how do you come to the
4   conclusion that less qualified men were
5   retained if you don't know?
6     A.   Because that allegation has been
7   made.
8     Q.   Other than the allegation being
9   made, do you have any other basis for that
10  statement?
11    A.   Not having worked in her group, I
12  can't say that.
13    Q.   Chia Siu, we talked about earlier,
14  where she expressed some concerns about the
15  group after the June 2008 RIF, correct?
16    A.   Yes.
17    Q.   And did you talk to her about her
18  concerns?
19    A.   Yes.
20    Q.   And tell me what she said her
21  concerns were in your discussion?
22    A.   From what I remember, this is
23  quite a while ago, but from what I remember
24  she was concerned about Citi's commitment to
25  housing.  She was concerned how we were going

199

A. BARTOLETTI

1

2   to retain clients and how we were going to
3   continue serving our clients the way we had
4   prior.
5     Q.   Were those concerns because the
6   group was shrinking?
7     A.   That was part of it, yes.
8     Q.   And what did you say to Ms. Siu to
9   address those concerns?
10    A.   I don't remember exactly what I
11  said to her, but I tried to give her every
12  assurance that I could and I also asked Mr.
13  Brownstein to speak to her.
14    Q.   And did Mr. Brownstein speak to
15  her?
16    A.   He did.
17    Q.   Why did you ask Mr. Brownstein to
18  speak to her?
19    A.   Because I couldn't personally
20  comment on Citi's commitment to the housing
21  group.  That wasn't in my realm to do so
22  because I had no control over that.  So I
23  thought it would make sense for David who does
24  have some control over those factors, to speak
25  to her.

200

A. BARTOLETTI

1

2     Q.   And did you tell Mr. Brownstein
3   that his discussion with Ping had been
4   helpful?
5     A.   Sorry?
6     Q.   Let me just show you a document.
7   It's an e-mail dated June 27, 2008.  The top
8   one is an e-mail from you to David Brownstein
9   and others.
10    A.   Okay.
11        MR. TURNBULL:  We will mark this
12  as Bartoletti Exhibit 10.
13        (Bartoletti Exhibit 10, e-mail
14        dated June 27, 2008 marked for
15        identification, as of this date.)
16    A.   Okay.
17    Q.   Do you recall this e-mail?
18    A.   I have --
19    Q.   Or this chain of e-mails?
20    A.   -- vague recollection of this,
21  yes.
22    Q.   And you see the bottom e-mail, the
23  first e-mail in the chain is from Marty
24  Feinstein to you and others?
25    A.   Yes.



ESQUIRE
DEPOSITION SOLUTIONS

201

A. BARTOLETTI

2    Q.   And it is about a discussion he
3  had with Chia?
4    A.   Yes.
5    Q.   And then he lists the concerns
6  that he said Chia raised with him.  Do you see
7  that?
8    A.   Um-hum.
9    Q.   Is that a yes?
10   A.   Yes, sorry.
11   Q.   In the list of concerns that Mr.
12 Feinstein raised identifies, are those similar
13 to the concerns that Ms. Siu had raised with
14 you?
15   A.   Similar, but not exact.
16   Q.   Did you have the same concerns
17 that Ms. Siu had about the group?
18   A.   I did not have the same concerns.
19 I had concerns, but not the same concerns.
20   Q.   Did you have concerns about the
21 group shrinking?
22   A.   I had concerns about the number of
23 people because it just meant more work for all
24 of us and there is so many hours in a day.
25   Q.   And then you see Mr. Brownstein,

202

A. BARTOLETTI

2  in response to Mr. Feinstein's e-mail says,
3  "Do you think I should also chat with her?"
4    A.   Yes.
5    Q.   And then up above you say to Mr.
6  Brownstein:  "I think that would be very
7  helpful, David."  And you gave one reason
8  earlier why you thought it would be helpful.
9    Any other reasons why you thought
10 that would be helpful?
11   A.   The main reason, again, was that
12 Mr. Brownstein was in control of a lot of the
13 decisions that were being made, therefore, he
14 was really one of the few people that could
15 give her the assurances she was looking for
16 that Citi was committed to housing.
17   Q.   And you say Mr. Brownstein was in
18 control.  Was that because he was a co-head of
19 public finance?
20   A.   Yes.  Yes.
21   Q.   And do you think Mr. Chin was also
22 in control, to use your words?
23   A.   I believe that they both had some
24 say.  I personally, and it is a personal
25 opinion, think David had a little more control

203

A. BARTOLETTI

2  over some of these decisions.
3    Q.   And what's that belief based on?
4    A.   Based on some of the decisions
5  that were made.
6    Q.   And --
7    A.   Again, I can tell you
8  specifically, given the fact of who was
9  retained and who was let go in our group.  I
10 think David had a very big hand in that and I
11 think it has his fingerprints on it.  I mean,
12 I don't think it is something Mr. Chin would
13 have made in a vacuum.
14   Q.   So your belief that Mr. Brownstein
15 had more say in the decisions is based on who
16 was kept and who was let go?
17   A.   That, as well as who communicated
18 to me that I was going to be sole head of the
19 group initially, and then Mr. Brownstein was
20 also the person that subsequently communicated
21 to me that I would be then co-head after
22 speaking to Mr. Koessel.  You know, David was
23 taking a prominent role in these decisions and
24 in communicating these decisions.
25   Q.   And then you continue:  "We have

204

A. BARTOLETTI

2  all talked to her but I think it will be
3  meaningful coming from you.  It certainly
4  helped Ping."
5    What do you mean when you say it
6  certainly helped Ping?
7    A.   I think Ping had a lot of similar
8  concerns about the commitment of Citi to
9  housing, and David assured her that Citigroup
10 was committed to housing and committed to our
11 business and committed to each of us.
12   Q.   And is this based upon what Ping
13 told you?
14   A.   Yes.
15   Q.   Had Ping expressed similar
16 concerns to you about the housing group?
17   A.   Ping had expressed some concerns
18 to me, not the same concerns that Chia had but
19 she was also concerned about Citi's commitment
20 to housing.
21   Q.   Do you recall that Ms. Siu was
22 ultimately offered a promotion at the end of
23 the year?
24   A.   I do recall that, yes.
25   Q.   And do you know who made that

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

205

1          A. BARTOLETTI
2    decision?
3          A.   I believe -- I don't know exactly
4    who makes these decisions.  I believe it was
5    in part Mr. Brownstein.
6          Q.   And who else had a part in it?
7          A.   I'm not sure.  Maybe Marty
8    Feinstein.
9          Q.   Anyone else?
10         A.   That's all I know of.
11         And do you recall that Ping told
12   you that Chia, that there is a chance Chia
13   might leave?
14         A.   I remember Ping saying that, yes.
15         Q.   And did you talk to Chia about
16   whether she was thinking of leaving?
17         A.   I talked to Chia.  All that Chia
18   expressed to me was concern over what was
19   going on in the group.  Chia never said to me
20   that she was going to leave, that she was
21   thinking about leaving, that this is, she is
22   done with this business, as far as I remember,
23   but she did express concerns over what was
24   happening.  She was very worried.
25         Q.   Did Ms. Siu ever tell you she was

206

1          A. BARTOLETTI
2    looking for other jobs?
3          A.   I don't believe so.
4          Q.   Did Ms. Siu ever tell you that she
5    had other job options?
6          A.   I don't believe so.  I don't
7    remember her ever having any other options
8    that I'm aware of -- that I was aware of.
9          Q.   So she never told you that?
10              MR. WIGDOR:  Objection.
11         Q.   Right?
12              MR. WIGDOR:  I think she's already
13         answered the question.
14         A.   I mean, yeah, she did not tell me
15   that.  In fact, she, after speaking to David
16   and getting these commitments that she felt --
17   after she felt that Citi really was committed,
18   she went out and got an apartment.  Prior to
19   that she lived with her parents.  So I think
20   once she felt comfortable that Citi was
21   committed to housing, she took the step and --
22   because she thought she was there for the
23   long-term.
24         Q.   Did you talk to Ms. Siu about the
25   contract she was offered to remain with

207

1          A. BARTOLETTI
2    Citigroup as a third-year analyst?
3          A.   I don't know if I talked to her
4    about the specifics of the contract.  I know
5    at the same time she was having some of these
6    questions, she was concerned about signing the
7    contract.
8          Q.   And did you talk to her about
9    whether she should or should not sign that?
10         A.   I don't think I gave her advice
11   either which way from what I remember.  I
12   mean, I wouldn't.
13         Q.   Did she tell you why she was
14   hesitant to sign the contract?
15         A.   I believe it was for the same
16   reason.  She just wasn't sure of Citi's
17   commitment to housing and the other reasons
18   that are expressed here.
19         Q.   Do you know whether she ever
20   signed that contract?
21         A.   I do not know.
22         Q.   Let me ask you about your jobs
23   after Citigroup.
24         A.   Um-hum.
25         Q.   When did you begin with Ramirez?

208

1          A. BARTOLETTI
2          A.   June of 2009.
3          Q.   And in what position?
4          A.   Managing director.
5          Q.   And do you recall what the terms
6    of the offer were?
7          A.   I do actually, yeah.  From what I
8    recall, I think it was 150,000 base salary, a
9    bonus of 50,000 for the end of that year and
10   then an all-in guarantee of 400,000 for the
11   following year.
12         Q.   And those were minimum guarantees?
13         A.   Yes.
14         Q.   And did you get more than the
15   minimum?
16         A.   I got more than the minimum in the
17   second year.
18         Q.   In 2010?
19         A.   Yes.
20         Q.   And then you also participated in
21   Ramirez's benefits programs, correct?
22         A.   Yes.
23         Q.   Was the Ramirez offer the only
24   offer you had after leaving Citi?
25         A.   No, it was not.


ESQUIRE
DEPOSITION SOLUTIONS

AMY BARTOLETTI                                          June 14, 2012

233

A. BARTOLETTI
1    A. BARTOLETTI
2    I'm not going to deny that.  But, really, from
3    my perspective, it was for, mostly for
4    business reasons.  I knew we had worked
5    together in the past, we had worked together
6    for 15 years.  We knew we could work together
7    well.  We knew that clients liked us as a
8    team.  We knew it would be easy for clients to
9    transfer business from somebody else to us
10   together as a team, as opposed to transferring
11   it, you know, trying to figure out who to
12   transfer business to, if I was at JP and he
13   was at Ramirez or whatever it was.
14      Q.   Do you recall at one point
15   deciding that you would go to JP and then Mr.
16   Fluehr talked you out of it?
17      A.   I remember one night I was
18   thinking I was going to go to JP.  I thought I
19   had made my decision, and I had spoken to Mr.
20   Fluehr and, yes, he might have had some
21   influence, but that wasn't the sole -- that
22   wasn't the sole reason I changed my decision.
23           Part of that reason was absolutely
24   because I felt we could work together better
25   as a team and it would have been, I think, an

234

A. BARTOLETTI
1    easier way for me to build business going
2    forward.  But part of it was all the other
3    reasons I talked about, and I really felt like
4    being at a big firm would have been -- it
5    would have been a little tough emotionally for
6    me, given what had just happened.
7       Q.   And despite that, you had, you
8    thought you had decided to go to JP and he
9    talked you out of it?
10      A.   I was changing my mind back and
11   forth every five minutes, to be honest with
12   you.
13           MR. TURNBULL:  Let me have mark as
14   Bartoletti Exhibit 14, an e-mail
15   exchange, Bates No. PL 15873 through
16   15877.
17           (Bartoletti Exhibit 14, e-mail
18   exchange, Bates No. PL 15873-877
19   marked for identification, as of
20   this date.)
21      Q.   Do you see the e-mail, the two
22   e-mails on the first page, one actually
23   carries over to the second page?
24      A.   Yes.  With Pat Nagel.

235

A. BARTOLETTI
1    Q.   Right.
2    A.   He was a client at North Dakota
3    Housing.
4       Q.   And on the bottom e-mail which is
5    May 28th, 2009 you wrote:  "I thought I made a
6    decision for JP but when I spoke to Nick, he
7    spent about an hour trying to convince me it
8    was the wrong decision."
9            Do you see that?
10      A.   Yes.
11      Q.   And then you go on to say:  "Truth
12   is that my loyalty toward him is a big factor
13   in this process, but it is difficult to
14   differentiate what is right for him versus
15   what is right for me."
16      A.   Sure.
17      Q.   Do you see that?
18      A.   Yes.
19      Q.   Ultimately, were you able to make
20   that differentiation between what is right for
21   him and what is right for you?
22      A.   I think I was.  I mean, I put
23   together a spreadsheet to show what revenues I
24   would have to generate in years ensuing after

236

A. BARTOLETTI
1    2010 to make more money at Ramirez, and I was
2    pretty convinced I would be able to do that,
3    particularly in a team environment with
4    someone whom I had worked with for 15 years.
5       Q.   Do you remember telling Mr. Fluehr
6    that you decided to go to Ramirez based on
7    your loyalty to him?
8       A.   That, again, it could have been
9    one factor, but it wasn't the sole factor and
10   I never would have taken a job that I thought
11   was of lesser quality if I had -- for Nick.  I
12   mean, that's silly.
13      Q.   In the e-mail above what was the
14   one we just looked at.
15      A.   Um-hum.
16      Q.   You say:  "I think you will be
17   surprised by this but I am leaning towards
18   Ramirez."
19      A.   Sure.
20      Q.   Why do you say that --
21      A.   To Mr. Nagel.
22      Q.   -- he will be surprised?
23      A.   Because Pat Nagel had not really
24   heard of Ramirez, and Pat Nagel works for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

245

A. BARTOLETTI

1
2    A.   Yes, that's how I was feeling at
3  that moment.  As I said, my mind switched back
4  and forth literally every five minutes.  It
5  was a very, very hard decision for me to make,
6  and I think ultimately I was deciding between
7  two very good firms.
8    Q.   Did you decide, as you say here,
9  to go to Ramirez out of loyalty to Nick?
10   A.   Loyal -- that might have been one
11 reason, one part of the reason.  Because after
12 what I had experienced at Citigroup, loyalty
13 was actually something at that time I was
14 valuing probably more than I would have
15 otherwise.  But I also felt very strongly
16 that, from an economic perspective I was
17 taking what I considered equal jobs and I
18 truly believed at that time that I actually
19 had more upside potential at Ramirez than I
20 did at JPMorgan.
21   Q.   And why wasn't Ramirez your first
22 choice?
23   A.   Because, as I said before, you
24 talk to the clients in the Midwest, they know
25 who JPMorgan is.  It sounds easy.

246

A. BARTOLETTI

1
2    But, then, again, I wouldn't have
3  I don't think as much job security because
4  it's another big firm.  I don't know who is
5  making the decisions whether to let the
6  housing group go, whether to let me go,
7  whether to let all the women in the department
8  go.
9    Q.   So you went with your second
10 choice out of loyalty to Nick?
11   A.   It was no longer my second choice
12 when I changed my mind.  This is how I felt at
13 that moment, but then it -- I would not have
14 chosen it if it wasn't my choice, ultimately.
15   Q.   But you say you are choosing it
16 even though it is not your first choice,
17 right?
18   A.   I might have said that, but that's
19 not what I meant.  I mean, I wouldn't have
20 gone there had I not thought it was the right
21 choice for me.
22   Q.   Well, you say in here I'll go
23 there if you really need me, otherwise I will
24 go to JP, right?
25   A.   Again.  I was torn.  I was on the

247

A. BARTOLETTI

1
2  fence about this decision and literally from
3  moment to moment, it was a toss-up for me and
4  there were many positive things at Ramirez and
5  there are many positive things at JP, but
6  ultimately I felt like I was making the right
7  decision for me from an economic and business
8  perspective going to Ramirez.
9    Q.   Why did you feel loyalty to Nick
10 Fluehr?
11   A.   I felt loyalty to him because I
12 worked with him for 15 years and we worked
13 very well together and I think he treated me
14 fairly while I was working with him.  And it
15 was an unknown working for -- with anyone else
16 because you don't know until you get there
17 what it's going to really be like.
18   Q.   I take it when you are sending
19 this e-mail to your significant other, that
20 you are being candid with him, right?
21   A.   At that moment I was probably
22 telling him how I felt at that moment very
23 explicitly.
24      MR. TURNBULL:  Let me have marked
25 as Bartoletti Exhibit 17, an e-mail

248

A. BARTOLETTI

1
2  exchange between you and Julie Burger.
3    A.   Okay.
4      (Bartoletti Exhibit 17, e-mail
5       exchange between Amy Bartoletti and
6       Julie Burger marked for
7       identification, as of this date.)
8    Q.   Do you see this e-mail exchange is
9  from October 31 and November 1st of 2009?
10   A.   Yes.
11   Q.   And at the time, where was Julie
12 Burger working?
13   A.   She was at Ramirez.
14   Q.   And she was considering another
15 opportunity, correct?
16   A.   Yes.  I'm just trying to remember
17 which one it was because she had a couple of
18 opportunities.
19   Q.   Well, maybe I can help.  If you
20 turn to page 2.
21   A.   Okay.
22   Q.   Your e-mail to her which is in the
23 middle of the page, you talk about Citi?
24   A.   Sure.  Okay.
25   Q.   Was Ms. Burger considering a job



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

AMY BARTOLETTI                                    June 14, 2012

261
1        A. BARTOLETTI
2    with --
3        A.   Absolutely.  I would be a fool to
4    think if they wouldn't.  But I think I built
5    that into my analysis as well.
6        MR. TURNBULL:  Why don't we take a
7    break here.
8        MR. WIGDOR:  Okay.  How much more
9    time do you think you have, Ken?
10       MR. TURNBULL:  An hour.
11       MR. WIGDOR:  Okay.
12       THE VIDEOGRAPHER:  The time now is
13   2:59 p.m.  This marks the end of tape
14   No. 4.  Going off the record.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  The time now is
17   3:11 p.m.  This marks the beginning of
18   tape No. 5.  We're back on the record.
19   BY MR. TURNBULL:
20       Q.   Ms. Bartoletti, after Mr. Fluehr
21   left Ramirez, did he get another job?
22       A.   Yes, he did.
23       Q.   Where is that?
24       A.   At Wells Fargo.
25       Q.   So he went to another big

262
1        A. BARTOLETTI
2    institution?
3        A.   He did.
4        Q.   Were you surprised that he went to
5    a big institution?
6        A.   I was not surprised that he went
7    to Wells.
8        Q.   After he went to Wells, did you
9    apply for a position at Wells?
10       A.   I did speak to folks at Wells,
11   yes.
12       Q.   Did you still feel loyalty to Mr.
13   Fluehr after he left Ramirez?
14       A.   Somewhat.
15       Q.   Did you, did you feel that you and
16   Mr. Fluehr, or do you feel that you and Mr.
17   Fluehr are friends?
18       A.   Friends -- I don't know, that's a
19   tough question, actually.
20       Q.   You certainly --
21       A.   We're friendly, I mean, you know.
22       Q.   But you certainly weighed the
23   advice he was giving you about what job to
24   accept, correct?
25       A.   I did, yes.

263
1        A. BARTOLETTI
2        Q.   And part of the reason you went to
3    Ramirez was your relationship with Mr. Fluehr?
4        A.   Yes.  But a big part of it was the
5    fact that, you know, from a business
6    standpoint we would be able to bring in
7    clients together.
8        Q.   And other than you looking for a
9    job at Wells Fargo, where else have you looked
10   for a job?
11       A.   I have looked at a lot of places,
12   actually.
13       Q.   Did you look at any places before
14   Mr. Fluehr left Ramirez?
15       A.   Yes.
16       Q.   And some of them were looking to
17   go as a team?
18       A.   Yeah.  The one place was at Wells,
19   yes.
20       Q.   And other than Wells, did you look
21   at any other positions before Mr. Fluehr left?
22       A.   I don't remember.
23       Q.   Do you remember looking at any
24   places on your own, in other words, not going
25   with Mr. Fluehr while he was still employed at

264
1        A. BARTOLETTI
2    Ramirez?
3        A.   I'm not sure actually.  I'm not,
4    you know, I'm a little confused on the timing
5    of things because I did reach out to other
6    places; I just don't know if it was before or
7    after he was there.  I don't want to give you
8    the wrong info.
9        Q.   So who else have you reached out
10   to, other than Wells Fargo, who else have you
11   reached out to for jobs?
12       A.   I reached out to Loop, to Siebert,
13   to First Southwest Securities, to Morgan
14   Stanley, to JPMorgan.
15       I mean, I reached out to every
16   place that I thought would be a possibility of
17   hiring me pretty much that I could think of.
18       Q.   And why have you started looking
19   to leave Ramirez?
20       A.   Because of compensation.
21       Q.   Any other reasons?
22       A.   That's the primary reason.
23       Q.   Any other reasons?
24       A.   Sure, there are some reasons.
25   Let's see.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com