# EXHIBIT 3

DAVID  BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
89–92

Page 89
1          D. BROWNSTEIN
2     A.   I have seen document that are --
3  generally identical to this, but not specific
4  to Lisa.
5     Q.   Right.
6     A.   Yes, the selling component
7  wouldn't be an estimate, not accurate.
8     Q.   And when is that selling component
9  -- is that selling component ever confirmed or
10  actual?
11     A.   I don't know.
12     Q.   Do you know who inputs the
13  information of these types of documents?
14     A.   I don't.
15     Q.   Do you know where the information
16  contained in these types of documents comes
17  from?
18     A.   I don't.
19     Q.   Were you involved in the decision
20  to lay off Amy Bartoletti?
21     A.   Yes.
22     Q.   How so?
23     A.   I believe I was primarily
24  responsible for that decision.
25     Q.   And why were you primarily

Page 90
1          D. BROWNSTEIN
2  responsible for that decision?
3     A.   Because after we laid off Nick
4  Fluehr who ran the housing group in one of the
5  earlier RIFs, I took responsibility for the
6  housing group directly.
7     Q.   Why?
8     A.   Because we had no one who was
9  prepared at that point to really run every
10  aspect of that business.
11     Q.   Wasn't Amy Bartoletti named the
12  co-head of that group after Nick Fluehr's
13  departure?
14     A.   She was named to be, she and Mike
15  Koessel were named as co-heads of that group,
16  but I was supervising them day to day.
17     Q.   Well, you were supervising
18  everyone?
19     A.   I was managing them as well day to
20  day.
21     Q.   And why did they need managing?
22     A.   They didn't have the experience to
23  take on those responsibilities.
24     Q.   How do you know?
25     A.   I knew both of them and knew what

Page 91
1          D. BROWNSTEIN
2  their capabilities were at the time.
3     Q.   Well, did you ever work with Amy
4  prior to becoming co-head of the public
5  finance department?
6     A.   I had experiences working with
7  Amy, yes, on derivatives transactions an
8  example.
9     Q.   And how about Mr. Koessel, did you
10  ever work on any transactions with him before
11  you became co-head with the public finance
12  department?
13     A.   Again, with respect to derivatives
14  transactions, yes.
15     Q.   So you didn't have any experience
16  with Amy in regards to a management
17  capabilities, did you?
18         MR. TURNBULL:  Objection to the
19     form.
20     A.   I very quickly during the process
21  of the RIF and putting them in their positions
22  learned that neither Amy nor Mike had the
23  capacity or capability to run that business.
24     Q.   Well, when did you start managing
25  the housing group?

Page 92
1          D. BROWNSTEIN
2     A.   As soon as we laid off Nick Fluehr
3  in the first RIF or the second RIF.  I don't
4  know which one he was in.
5     Q.   How long did it take you to find
6  out?
7     A.   A few days.
8     Q.   And what did you base that on?
9     A.   I am a professional, my job is to
10  work closely with people, learn how they work,
11  learn what their capabilities are and learn
12  where they need a guidance and assistance.
13  And I can do that very quickly.
14     Q.   Do you know who managed the group
15  when Nick Fluehr was not in the office?
16         MR. TURNBULL:  Objection to the
17     form.
18     A.   Nick Fluehr managed the group.
19  Whether other people had responsibilities
20  under Nick, I don't know.  But Nick managed
21  the group.
22     Q.   And when you say "manage," what do
23  you mean by that?
24     A.   He was responsible for the
25  decisions on what people would work on day to



DAVID  BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
93–96

Page 93

1              D. BROWNSTEIN
2   day, what each of them would do, how they
3   would get business.  Those are the normal
4   functions of a group head.
5       Q.    Do you consider getting business
6   managing the group?
7           MR. TURNBULL:  Objection to the
8       form.
9       Q.    Let say me it a different way.
10  What does getting business have to do with
11  managing the group?
12      A.    We're in the business of getting
13  hired to help clients do underwritings of bond
14  financings.  The manager of the group has to
15  set strategy on how best to do that.
16      Q.    After Nick Fluehr was laid off, do
17  you know when Nick Fluehr was laid off?
18      A.    I don't.
19      Q.    Do you know if it was in June
20  of 2008?
21      A.    I don't.
22      Q.    Once you started managing the
23  housing group, did you get any business for
24  it?
25      A.    No.

Page 94

1              D. BROWNSTEIN
2       Q.    Why did you believe that Amy -- do
3   you think Amy was capable of assigning
4   personnel to a transaction?
5       A.    Yes.
6       Q.    And do you think Amy was capable
7   of determining people's role on a transaction?
8       A.    Yes.
9       Q.    Do you think Amy was capable of
10  getting business?
11      A.    I don't know.
12      Q.    And so why did you think Amy was
13  not capable of managing the group?
14      A.    What you have asked me if Amy was
15  capable of doing, are not the things I said a
16  manager needs to be able to do.
17      Q.    So what does a manager need to be
18  able to do?
19          MR. TURNBULL:  Objection.  Asked
20      and answered.  He said the manager sets
21      strategy on how to best to get hired by
22      clients.
23      Q.    Did you set strategy when you were
24  a manager of the housing group?
25      A.    I helped them develop a strategy.

Page 95

1              D. BROWNSTEIN
2       Q.    Who did you help?
3       A.    Amy and Mike.
4       Q.    Did you assist them?
5       A.    I was their manager, sir.
6       Q.    Who set the strategy?
7       A.    I did.
8       Q.    Did you help them or did you set
9   it?
10      A.    I never do anything in a vacuum.
11  I work with people jointly to get them
12  comfortable with an approach.
13      Q.    And do you know if they needed
14  your help?
15      A.    They needed my help.  It was my
16  determination, they needed my help.
17      Q.    And did your strategy help them
18  get business?
19      A.    Yes.
20      Q.    When?
21      A.    I am sorry?
22      Q.    When?
23      A.    When?
24      Q.    Yes.
25      A.    How my strategy helped them get

Page 96

1              D. BROWNSTEIN
2   business was to have them focus on a specific
3   account base.  By doing that, they were able
4   to be more focused and therefore, given the
5   shortage of staff, be more effective at what
6   they do.  That's how it helped them.
7       Q.    When did the first transaction
8   come in after Nick Fluehr was laid off as a
9   result of your strategy?
10      A.    You're not fully understanding
11  what I am saying.
12      Q.    Explain it to me then.
13      A.    The challenge is making sure an
14  employee doesn't work on more things at once
15  than they can, so that they can be focused and
16  therefore through that focus, get business.
17  That was the challenge that both Amy and Mike
18  had that I was there to guide them through.
19      Q.    Do you know if that strategy was
20  in place before Nick Fluehr was laid off?
21      A.    I don't.
22      Q.    So what makes you think that they
23  actually needed your help?
24          MR. TURNBULL:  Objection.  Asked
25      and answered.

DAVID BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
97–100

Page 97

1          D. BROWNSTEIN
2     A.   I already answered that question.
3     Q.   Why don't you answer it again for
4   me.
5     A.   I am a professional.
6     Q.   That's your answer, that just you
7   are professional?
8        MR. TURNBULL:  Objection.  He
9     already answered the question.
10        MR. DATGOO:  Do you want to read
11     back the answer.
12        (Record read.)
13     Q.   So what did you learn quickly
14   about Amy's management ability?
15     A.   What I learned is her inability to
16   make good business decisions.
17     Q.   And you learned this in a few
18   days?
19     A.   Yes.
20     Q.   And did she make any bad business
21   decisions in a few days?
22     A.   I would argue yes.
23     Q.   And in that few day span, what bad
24   business decisions did she make?
25     A.   She had people focusing on more

Page 98

1          D. BROWNSTEIN
2   things than they could legitimately focus on
3   and be effective.
4     Q.   Can you give me an example?
5     A.   Having people respond to requests
6   for proposals from issuers where there would
7   be no economic benefit, yet it would use up
8   significant time of the limited staff she had.
9     Q.   And in that few days what RFP did
10   she have?
11     A.   I don't recall a specific one.  I
12   don't have a name.
13     Q.   And did she make any other bad
14   business decisions in this few day span?
15     A.   I would argue the first one was
16   not embracing taking on the responsibility.
17     Q.   Of what?
18     A.   Of being head of the housing
19   group.
20     Q.   Head or co-head?
21     A.   Well, initially as you know what
22   we talked to her about was being head.
23     Q.   Who is "we"?
24     A.   Me.
25     Q.   Why did you speak to her about

Page 99

1          D. BROWNSTEIN
2   being head?
3     A.   Because that was the thought
4   initially when we let Nick go.
5     Q.   And what do you mean that she
6   didn't embrace it?
7     A.   She said she'd think about it.
8   She was considering whether she should just
9   leave.
10     Q.   You think that was a bad business
11   decision?
12     A.   From my perspective, yes.
13     Q.   Why did you talk to her about
14   becoming head of the group after Nick left?
15     A.   We needed someone to take over
16   responsibility for the group.
17     Q.   And you approached Amy?
18     A.   Yes.
19     Q.   Did Amy tell you that she was
20   thinking about leaving Citi?
21     A.   When?
22     Q.   When you spoke to her about
23   becoming head of the group.
24     A.   Well, I know that she had thought
25   about leaving Citi a couple of times.  So

Page 100

1          D. BROWNSTEIN
2   after we let Nick go, she told us that she was
3   or immediately said she wanted to think about
4   whether she wanted to stay or not, correct.
5     Q.   She said that to you?
6     A.   Yes.
7     Q.   If she testifies differently she
8   would be lying?
9        MR. TURNBULL:  Objection to the
10     form.
11     A.   She would be saying her
12   recollection of the facts and I would be
13   saying mine.
14     Q.   Why did you approach Amy to be
15   head and not Mr. Koessel?
16     A.   Because I didn't think Mike would
17   be interested in that position.
18     Q.   Would you think that would be a
19   bad business decision on his part?
20        MR. TURNBULL:  Objection to the
21     form.
22     A.   No.
23     Q.   Why would it be bad business
24   decision for Amy if she wasn't interested in
25   it?



DAVID BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
101–104

Page 101

D. BROWNSTEIN
1
2    A.    Not what I said, sir.
3    Q.    Then what is it that you said?
4    A.    What I said is she needed to think
5    about whether she wanted to stay at the firm.
6    Mike didn't say I want to leave or not.  What
7    I am saying is Mike was happy with the role at
8    the time that he was playing.  So I didn't
9    think Mike would be interested in a more
10   senior role.
11   Q.    So the bad business decision you
12   believe she made was the fact that she
13   allegedly told you that she was thinking about
14   whether to stay at the firm or not; is that
15   correct?
16         MR. TURNBULL:  Objection to the
17   form.
18   A.    No, I said that was one of
19   several.  Another again as I said is, as the
20   senior person in having people work on things
21   that there was no reason people should be
22   spending their time working on.
23   Q.    But you don't know, you can't give
24   me an example of one thing?
25   A.    There were several proposals that

Page 102

D. BROWNSTEIN
1
2    they sent out and I had several discussions
3    with Amy on it that were unnecessary, and her
4    answer was they were a good training for her
5    team that wasn't a reason to have people
6    working the hours that she was having them
7    work.
8    Q.    You can't name me one of these
9    several proposals?
10   A.    No, I can't.
11   Q.    Did you e-mail, was there any
12   e-mail between communication between you and
13   Amy on this?
14   A.    We sat close enough together that
15   we would talk.
16   Q.    Do you know if Mike Koessel was
17   involved in these RFP decisions?
18   A.    I don't know.
19   Q.    Now why didn't you think that Mike
20   Koessel was capable of managing the group?
21   A.    I didn't say that.  I said that
22   Mike never showed an interest in taking on
23   more responsibility.
24   Q.    Do you think he was capable of
25   managing the group?

Page 103

D. BROWNSTEIN
1
2    A.    Yes.  Looking back now, you have
3    proof of that.
4    Q.    I am saying at the time in that
5    few day period.
6    A.    I understand.  But yes, at the
7    time, yes.  But again, it wasn't something he
8    was asking for.
9    Q.    Well, he did ask for it, didn't
10   he?
11   A.    Ultimately, but not in the
12   beginning, no.
13   Q.    Well, when did he ask to become
14   head of or co-head?
15   A.    When I went and told him that we
16   let Nick go and we were looking at putting Amy
17   in charge.
18   Q.    And what did he say?
19   A.    He said why not me?
20   Q.    Is that the first time you thought
21   he was interested in a leadership position in
22   the group?
23   A.    Correct.
24   Q.    And is there a reason why you
25   didn't make him the sole head of the group?

Page 104

D. BROWNSTEIN
1
2    A.    I think we wanted to give them
3    both an opportunity within the business and if
4    you had at that point made one of them head,
5    the other one would have left.  And we wanted
6    them both to stay.
7    Q.    Why would you offer a position to
8    someone who is not qualified?
9    A.    I am sorry, who are you saying
10   wasn't qualified?
11   Q.    Well, didn't you just testify that
12   you don't believe Amy was qualified to be head
13   of the group?
14   A.    What I was trying to state, if I
15   didn't state it properly for you, is that they
16   weren't in a position, neither of them, to
17   take on the full responsibility of that group
18   at that point.
19   Q.    Did you ever witness Mr. Koessel
20   make any bad business decisions prior to
21   making him co-head?
22   A.    No.
23   Q.    Never once?
24   A.    Not that I recall.
25   Q.    Only Amy?



...

DAVID BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
105–108

Page 105
1      D. BROWNSTEIN
2    A.   Only Amy.
3    Q.   In that few day span?
4    A.   You are saying it was a few days,
5  but I am saying it was probably longer than
6  that. But correct.
7    Q.   Why did you select Amy for a
8  layoff?
9    A.   The fourth RIF was fairly
10  dramatic. We were at a point in our business
11  that we were in survival mode. And the first
12  question was what do we do with the housing
13  group overall. The crisis had a dramatic
14  impact on housing, as you all know.
15      So the questions we asked were
16  should we have a housing group and if so, what
17  should that housing group look like and what
18  would its future be. The conclusion was we
19  would have a very slim housing group with one
20  near term purpose, and that was to have Citi
21  continue to be somewhat of a thought leader in
22  the market when it comes to housing on the
23  municipal side.
24      Clearly Citi was a large player in
25  the housing space overall, not just

Page 106
1      D. BROWNSTEIN
2  municipals. But so our goal in the housing
3  group, our decision was we wanted to keep a
4  footprint, but it would be a very limited
5  footprint and its goal at that point wouldn't
6  be about generating revenues for us, but would
7  be to maintain thought leadership in that
8  market.
9      The decision that I made to have
10  Mike stay and not Amy was because Mike had the
11  capacity and capability and experience to
12  serve in that thought leadership role as
13  opposed to simply a banking role.
14    Q.   What do you mean by thought
15  leadership role?
16    A.   What Mike was spending time on was
17  working with people in Washington on solutions
18  to the crisis. What it means by being a
19  thought leader is being out there in front of
20  people who are in positions to help make
21  change in coming up with solutions that can
22  make those changes.
23    Q.   Did that generate any revenue for
24  the group?
25    A.   As I said, from that point forward

Page 107
1      D. BROWNSTEIN
2  our goal with the housing group was simply to
3  have a footprint that would create the ability
4  to act as a thought leader in the market as
5  opposed to focusing on revenues.
6    Q.   So you weren't focusing on making
7  money for the company?
8    A.   Not in the housing group. The
9  housing group wasn't making a whole lot of
10  money before this, but no. That wasn't our
11  goal.
12    Q.   How much was it making?
13    A.   $7, $8 million total and that's
14  gross, not net.
15    Q.   Now wasn't Amy able to serve in
16  that thought leadership role?
17    A.   Well, first of all, she hadn't
18  been. She hadn't been spending her time doing
19  that. But really didn't have the experience,
20  expertise or knowledge to do that, in my view.
21    Q.   Why not?
22    A.   Just my opinion.
23    Q.   What's it based on?
24    A.   My knowledge of the two
25  individuals and what they did and how they did

Page 108
1      D. BROWNSTEIN
2  things and how they acted.
3    Q.   Well, what's the basis for that?
4  How did Amy act that would lead you to believe
5  that she couldn't function in the stock
6  leadership role?
7      MR. TURNBULL: Objection to the
8    form.
9    A.   Simply my opinion.
10    Q.   When did Mr. Koessel start
11  spending his time speaking to people in
12  Washington to try to form solutions to the
13  housing crisis?
14    A.   I can't give you a specific date.
15  I don't know. You'd have to ask Mike.
16    Q.   How long was it going on for?
17    A.   As I said, I don't know, you have
18  to ask Mike. I don't have dates.
19    Q.   Was it years?
20    A.   Mike was always involved in
21  discussions with people throughout the system,
22  Washington, Fannie, Freddie and otherwise on
23  the housing market, as well as people
24  internally in different components of
25  Citigroup who handled the mortgages.



DAVID BROWNSTEIN                                        August 30, 2012
AMY BARTOLETTI vs CITIGROUP INC.                          109–112

Page 109

1              D. BROWNSTEIN
2      Q.   Well, the crash happened in 2008,
3   correct?
4      A.   Yes.
5      Q.   So you wouldn't have been spending
6   time prior to 2008 trying to figure out
7   solutions to the housing crisis, correct?
8      A.   Solutions to the housing market
9   were issues before the crisis, because they
10  are not just about the crisis, they are about
11  just the housing market, how it functions,
12  what could make it a better functioning
13  market. So Mike was involved in that for
14  sometime, but you'd have to talk to him about
15  his exact experience with that.
16     Q.   Did you ever talk to Nick Fluehr
17  about Amy's work performance?
18     A.   No.
19     Q.   How about Amy's ability to manage
20  the group?
21     A.   No, not that I recall.
22     Q.   Did you ever talk to Nick Fluehr
23  about Mike Koessel's work performance?
24     A.   Not that I recall. Actually, Nick
25  was not a fan of Mike's, he didn't think he

Page 110

1              D. BROWNSTEIN
2   was doing a good job is my recollection.
3      Q.   Do you know why?
4      A.   I don't.
5      Q.   Did you disagree with him?
6      A.   At the point I would have talked
7   to Nick about this, I would have had no direct
8   interaction with Mike or Amy to know to agree
9   or disagree.
10     Q.   So then the only time you would
11  have known directly about Mike's work
12  performance was after Nick Fluehr was laid
13  off?
14     A.   Correct.
15     Q.   And the same thing with Amy?
16     A.   Correct.
17     Q.   And so how do you know Mike was
18  spending his time speaking to people in D.C.
19  about solutions to the housing crisis?
20     A.   I thought you just asked about
21  work performance.
22     Q.   Right.
23     A.   That's not performance, that's
24  what he worked on.
25     Q.   Okay.

Page 111

1              D. BROWNSTEIN
2      Do you know what Amy worked on
3   prior to Nick's termination?
4      A.   Sure. Both student loan and
5   housing bond finances.
6      Q.   Do you know what she specifically
7   did?
8      A.   She ran the deals because Nick
9   basically handed them off to her.
10     Q.   Do you know what Mr. Koessel did?
11     A.   He went and got business and
12  managed and ran deals as well. They both did.
13     Q.   And Amy never got business?
14     A.   I said she did.
15     Q.   She did?
16     A.   Yes.
17     Q.   She went out and got business?
18     A.   Yes. Mostly with Nick as opposed
19  to Mike, because she and Nick worked very,
20  very closely together.
21     Q.   You know what both of them did --
22  I am sorry, Amy and Mike?
23     A.   Yes.
24     Q.   You just don't know how well they
25  did?

Page 112

1              D. BROWNSTEIN
2      A.   You asked me if I asked Nick about
3   what he thought of their performance. And I
4   never spoke to Nick about their performance.
5      Q.   Did you speak to anyone about
6   their work performance?
7      A.   No.
8      Q.   Were you in a position to evaluate
9   Amy's work performance?
10     A.   I worked with both Amy and Mike on
11  derivatives transactions. So I had
12  interaction with them.
13     Q.   How many times did you work with
14  Amy on derivative transactions?
15     A.   Over many, many years, I can't --
16  I can't give you an amount.
17     Q.   More than ten?
18     A.   Probably not even close to ten.
19     Q.   More than five?
20     A.   I don't know.
21     Q.   And how about Mike, how many
22  derivative transactions on with him?
23     A.   The same, a couple.
24     Q.   And is the last time you recall
25  working on a derivatives transaction with

ESQUIRE
S O L U T I O N S

DAVID  BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
113–116

Page 113
```
1           D. BROWNSTEIN
2   Mike?
3       A.    It would have been before '08, I
4   believe.
5       Q.    Do you know how far before '08?
6       A.    I don't.  The same with Amy, it
7   would have been before '08.
8       Q.    So the extent of your ability to
9   judge their performance was based solely on
10  the transactions you worked on them with?
11      A.    And interacting with them
12  generally.
13      Q.    How could you judge their work
14  performance based on interacting with them?
15      A.    Because how they interact with
16  other people gives you a feel for how -- what
17  their capable of doing.
18      Q.    And you would see them interact
19  with their coworkers?
20      A.    Their coworkers, other people
21  within the department, yes.  And sometimes
22  clients.
23      Q.    And what was your opinion about
24  Amy's interactions?
25      A.    I thought Amy was very capable as
```

Page 114
```
1           D. BROWNSTEIN
2   a banker.
3       Q.    How about Mike?
4       A.    I thought Mike was very capable as
5   a banker as well.
6       Q.    Do you know if people complained
7   about Mike yelling in the office?
8       A.    I never heard that.
9       Q.    Do you know if he was well liked
10  by the group?
11      A.    I don't know.
12      Q.    Do you know if anyone complained
13  about his ability to manage people?
14      A.    I don't.
15      Q.    Did you take Amy's compensation
16  into account when determining who to lay off,
17  either her or Mike?
18      A.    My primary decision factor was as
19  I explained to you.  It was driven by our --
20  what our objective would be at that point for
21  what our housing group would do if we were to
22  keep one.  And clearly other factors went into
23  account as well, but that was the primary
24  factor.
25      Q.    What other factors did you take
```

Page 115
```
1           D. BROWNSTEIN
2   into account?
3       A.    Total compensation people had and
4   what impact would have on total requirements
5   for the RIF.
6       Q.    And Amy was making more than
7   Mr. Koessel?
8       A.    Correct.
9       Q.    Do you know how much more?
10      A.    I don't.
11      Q.    Reducing her compensation was not
12  an option though, correct?
13      A.    As I said, that wasn't a choice we
14  were given by senior management.
15      Q.    If someone makes more money than
16  someone else, what does that mean?
17          MR. TURNBULL:  Objection to the
18      form.
19      Q.    Let me just ask that based on
20  incentive comp.  If someone receives more
21  incentive comp than someone else, what does
22  that mean?
23          MR. TURNBULL:  Objection to the
24      form.
25      A.    Well, as I understand it --
```

Page 116
```
1           D. BROWNSTEIN
2          THE WITNESS:  Do I not answer when
3      you say that?
4          MR. TURNBULL:  No, I just objected
5      to the form of the question.  You can go
6      ahead and answer.
7          THE WITNESS:  Thanks.
8      A.    I understand that Amy's
9   compensation was at the level it was at
10  because a year or two before she and Nick went
11  in and told Frank they were going to leave
12  unless he matched what they were offered at
13  Morgan Stanley.  So that's the reason her
14  compensation was at the level it was at.
15      Q.    And do you know when this offer
16  from Morgan Stanley came?
17      A.    I don't.  I wasn't in public
18  finance at the time.
19      Q.    Do you know if it was a year or
20  two before?
21      A.    I don't.
22      Q.    So you are guessing?
23      A.    That's what someone told me at the
24  time.  I don't have exact dates, no.
25      Q.    Who told you?
```



DAVID  BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
117–120

Page 117

1          D. BROWNSTEIN
2     A.   It would have been Frank.
3     Q.   Okay.  Did you take any other
4  factors into account?
5     A.   No.
6     Q.   So it was comp and this thought
7  leadership role?
8     A.   It was the thought leadership role
9  and then comp.
10         MR. TURNBULL:  Objection to the
11     form.
12     A.   But it was primarily what we were
13  going to have this very small housing group do
14  if we were to keep the housing group at all.
15     Q.   With respect to Amy receiving an
16  offer from Morgan Stanley, did that happen
17  before you became co-head of the public
18  finance department?
19         MR. TURNBULL:  Objection.
20     A.   I believe so.
21     Q.   And why would Frank Chin, do you
22  know why Frank Chin would have spoken to you
23  about that before you were co-head of the
24  public finance department?
25         MR. TURNBULL:  Objection.

Page 118

1          D. BROWNSTEIN
2     Misstates testimony.
3     A.   I didn't say he spoke to me before
4  then, before I became co-head.
5     Q.   Okay.  So you found out after you
6  became co-head?
7     A.   Correct.
8     Q.   Did you discuss your criteria in
9  determining who to select off between Amy and
10  Mike with Frank Chin?
11     A.   Perhaps.
12     Q.   Do you recall telling him your
13  thought process?
14     A.   I don't recall.
15     Q.   Was Frank Chin involved in the
16  decision to terminate Amy?
17     A.   At some point in the process, yes.
18     Q.   At what point in the process?
19     A.   I don't know.
20     Q.   Did you initially identify her?
21     A.   Yes.
22     Q.   And so she was on this initial
23  list of people who were selected for layoff in
24  connection with the fourth RIF?
25         MR. TURNBULL:  Objection to the

Page 119

1          D. BROWNSTEIN
2     form.
3     A.   The housing group in total was
4  considered for this first RIF -- fourth RIF.
5     Q.   In terms of the my question has to
6  do in terms of the names that were identified.
7     A.   That would be the housing group in
8  total.
9         MR. TURNBULL:  I think you guys
10     are missing each other.  Go ahead, start
11     over again.
12     Q.   Let me try it this way:  When you
13  spoke to the group heads about identifying
14  candidates for the fourth RIF, did you
15  identify anybody at all?
16         MR. TURNBULL:  Objection to the
17     form.
18     A.   I considered the entire housing
19  group as part of that RIF.
20     Q.   Okay.  Did you also consider
21  people from the derivatives group as well?
22     A.   Almost everyone in the derivatives
23  group was laid off in one of the four RIFs, 23
24  of the 25 people or so.
25     Q.   So now my question is, did you

Page 120

1          D. BROWNSTEIN
2  select anyone for inclusion in the fourth RIF
3  from the housing group?
4         MR. TURNBULL:  Objection.  Asked
5     and answered.
6         MR. DATOO:  I think he said he
7     considered everyone.  I want to know if
8     he identified everyone.
9     A.   I identified everyone.
10         MR. TURNBULL:  He selected, he
11     told you he selected Amy.
12         MR. DATOO:  I am getting confused
13     over the group and specific individuals.
14     Q.   I want to know which individuals.
15         MR. TURNBULL:  Just let him finish
16     the question because it is sort of
17     mid-question and you are jumping in.
18     Q.   I want to know what individuals
19  you identified for layoff from the housing
20  group.
21     A.   No individuals specifically
22  identified initialing the entire group, which
23  would include all the individuals.
24     Q.   So let me make sure I am clear.
25  When names were identified for inclusion in

800.211.DEPO (3376)
EsquireSolutions.com

Page 121

1             D. BROWNSTEIN
2   the fourth RIF, everyone in the housing
3   group's name were on this list?
4             MR. TURNBULL:  Objection to the
5         form.  It misstates the testimony.
6             MR. DATOO:  I don't know what the
7         testimony is.
8             MR. TURNBULL:  I understand there
9         is a misunderstanding, but you are --
10        your question incorporates your
11        misunderstanding.
12        A.   I am sorry.  I am not quite sure
13   at this point what you are asking.
14        Q.   Let me keep trying this, because I
15   don't know why there is a disconnect.  I don't
16   know if it is you or me, I don't know.
17             I believe you testified earlier
18   this morning that either you or Frank Chin
19   reached out to the group heads and told them
20   that there was going to be a fourth RIF,
21   correct?
22        A.   Yes.
23        Q.   And I believe you testified this
24   morning that you weren't quite sure of the
25   timing, but at some point the group heads got

Page 122

1             D. BROWNSTEIN
2   back to you with names?
3        A.   Correct.
4        Q.   And that was the initial list of
5   names, I am referring to that as the initial
6   list of names.
7             MR. TURNBULL:  Objection.  There
8         has been no testimony other than one
9         list.
10             MR. DATOO:  Can you let me finish?
11             MR. TURNBULL:  I am objecting to
12         the term "initial list."
13             MR. DATOO:  Object, but let me
14         finish asking the question.
15        Q.   Once the group heads identified a
16   list of names, were there any names of people
17   from the housing group on that list of names?
18        A.   Again, at that point all we were
19   considering was whether to close the housing
20   group.  So that would have meant every name
21   would have been in consideration as a total.
22        Q.   Maybe it is the word that you are
23   using "consideration."
24             MR. TURNBULL:  Or your word
25         "list."

Page 123

1             D. BROWNSTEIN
2             MR. DATOO:  I don't think "list"
3         is throwing anybody off.
4        Q.   I am not concerned with who you
5   considered.  I want to know who was identified
6   from the housing group for layoff when all the
7   group heads gave you names?
8        A.   At that point we hadn't gotten
9   that far when it comes to the housing group,
10   so that's why there was no one on a list,
11   there was an entire group under consideration.
12        Q.   Okay.  Were there people from the
13   derivatives group identified?
14        A.   Yes.  That would have been on the
15   list.
16        Q.   And that would have come from
17   decisions you made?
18        A.   Correct.
19        Q.   Okay.  At what point in time were
20   people from the housing group added to this
21   list?
22        A.   I can't give you exact timing
23   because I don't remember when along the way
24   that was a decision that was made to add them
25   to the list.  I don't know.

Page 124

1             D. BROWNSTEIN
2        Q.   And was it you that selected the
3   people from the housing group?
4        A.   Correct.  Yes.
5        Q.   And did Frank Chin have to approve
6   your selections from the housing group?
7        A.   Yes.
8        Q.   Why did he have to approve?
9        A.   Because we were co-heads of the
10   business, neither of us made decisions alone.
11        Q.   So even you had to approve, you
12   and Frank had to approve everyone whose name
13   is on the list?
14        A.   Correct.
15        Q.   And did Frank Chin say anything
16   about the inclusion of Amy on this list?
17        A.   I don't recall.
18        Q.   And do you recall discussing Amy's
19   inclusion on this list with Frank Chin?
20             MR. TURNBULL:  Objection.  Asked
21         and answered.
22        A.   I don't.
23        Q.   Did you ever see any of Amy's
24   performance reviews?
25        A.   No.  You asked me that earlier.

DAVID  BROWNSTEIN                                    August 30, 2012
AMY BARTOLETTI vs CITIGROUP INC.                              125–128

Page 125

1            D. BROWNSTEIN
2       Q.   Did you ever see any of
3   Mr. Koessel's performance reviews?
4       A.   No, I did not.  You asked me that
5   earlier.
6       Q.   Amy did housing transactions,
7   didn't she?
8       A.   And student loan.
9       Q.   My question was, did Amy do
10  housing transactions?
11      A.   Yes.
12      Q.   She also did student loans?
13      A.   Yes.
14      Q.   In 2008 were student loans a big
15  part of her practice?
16      A.   20 percent I suspect.
17      Q.   And did anyone else in the -- was
18  anyone else in the housing group able to do
19  student loan transactions in '08?
20      A.   No.
21      Q.   Is this just like an extra skill
22  that Amy had?
23      A.   Well, prior to Nick being
24  terminated, Nick of course could do student
25  loan transactions as well.  We had a separate

Page 126

1            D. BROWNSTEIN
2   student loan group in corporate finance that
3   did student loan transactions.  Our business
4   retained 10, 15 percent of the client base in
5   student loans after they split off from
6   corporate finance.  So that's why Nick and Amy
7   continued to do a small portion of that work.
8       Q.   Why did that 10 to 15 percent get
9   split off into the corporate finance group?
10      A.   I don't know.
11      Q.   But Amy could do housing
12  transactions, right?
13      A.   Sure.
14      Q.   So the inclusion or selection of
15  Amy for layoff had nothing to do with the fact
16  that she was doing student loans, did it?
17          MR. TURNBULL:  Objection.
18      A.   I would argue it had something to
19  do with it, yes.
20      Q.   Why did student loans play a
21  factor?
22      A.   Again, you'd have to look at each
23  of their client bases that they had and
24  conclude who had a client base that would
25  better fit what our business was going

Page 127

1            D. BROWNSTEIN
2   forward.  That's item 1.
3          And I'd 2 is again as I said, the
4   primary goal for the future was to be a
5   thought leader in the market.
6          So while the business that each of
7   them had was great and I am sorry we lost Amy
8   and her business, but it wasn't the driver for
9   why we were going to retain a portion of that
10  business going forward.
11      Q.   So you lost business when Amy was
12  laid off?
13      A.   Some business, yes.
14      Q.   Do you know who?
15      A.   Yes, I know we lost South Dakota
16  and perhaps North Dakota.  North Dakota I
17  think was student loan primarily, but I am not
18  sure.
19      Q.   Were you familiar with Amy's
20  clients?
21      A.   Some of them, yes.
22      Q.   Who else, other than South
23  Dakota -- was South Dakota Amy's client?
24      A.   Well, it was Nick's client that
25  Amy was involved in is how I would respond to

Page 128

1            D. BROWNSTEIN
2   that.
3       Q.   How about North Dakota?
4       A.   Yes, same thing Nick's client.
5       Q.   In addition to those two, who else
6   was Amy's client?
7       A.   Montana student loan and Nick's
8   client as well.  Amy worked on a couple of the
9   other housing accounts around the country.  In
10  many respects the smaller accounts, how you
11  have to break up our businesses, the large
12  states have the large populations, issue the
13  most data, the South Dakota simply doesn't fit
14  as an example into that category.
15      Q.   Well, can you name me, other than
16  the ones you just specifically named me?
17      A.   I can't recall.
18      Q.   Were you familiar with Mike
19  Koessel's clients in '08?
20      A.   Some of them.
21      Q.   Which ones were his clients?
22      A.   Cal housing as an example.  We did
23  derivatives for them, that's how I was
24  involved in that one.  Mike was involved in
25  Florida housing, Texas housing, New York as

DAVID  BROWNSTEIN                                            August 30, 2012
AMY BARTOLETTI vs CITIGROUP INC.                                  129–132

Page 129
1              D. BROWNSTEIN
2  was Amy, but really a banker client, regional
3  banker client that they both worked on.
4  Massachusetts and Connecticut housing.
5      Q.   I just want to make sure that
6  we're talking about the same thing.  I am not
7  asking about clients that they did work on.  I
8  am asking about whether certain clients
9  belonged to Amy or Mike, if you could answer
10  that question.
11          MR. TURNBULL:  Objection to the
12      form.
13      Q.   Let me ask it again.  Which
14  clients were Mike's?
15      A.   Ahem.  I would tell you the ones I
16  just said, plus Ohio housing.  One of the
17  things you are saying that I'd like to correct
18  a little is, "your clients," an individual's.
19  I don't believe that any client of the firm's
20  belongs to an individual.  They are -- they
21  are hiring the firm and its capabilities.
22          And while the lead banker on the
23  account plays an integral role and the most
24  important role in our being hired by that
25  client, it is the skill set of the

Page 130
1              D. BROWNSTEIN
2  organization overall and capabilities of that
3  organization that the clients is also hiring.
4  So there is no client that belongs to one
5  individual within our business.
6      Q.   Just so I am clear and maybe so
7  the record is clear, do you know which clients
8  Amy acted as a lead banker for, other than the
9  ones, unless they are different than the ones
10  you just mentioned?
11      A.   The ones I mentioned about Amy,
12  which again -- Amy worked very closely with
13  Nick, so they worked primarily on the same
14  accounts together.
15      Q.   Was Cal housing Nick's client?
16      A.   Yes.
17      Q.   Do you know how Mike Koessel
18  started --
19      A.   Mike was involved in Cal housing
20  day to day.  He was always involved in the
21  transactions I did out there on the derivative
22  side.  He was the one I interacted with.
23  While I know Nick was involved, I don't think
24  I ever interacted with Nick on that account.
25      Q.   Was the amount of revenue

Page 131
1              D. BROWNSTEIN
2  generated from client transactions important?
3      A.   Absolutely.
4      Q.   Why?
5      A.   Because we're in the business of
6  making money.
7      Q.   But the housing group shifted away
8  from that, didn't it?
9      A.   The decision with respect to the
10  housing group, although I should correct one
11  thing you said, Mike actually has done a
12  tremendous amount making money for the housing
13  group since it got pared down to just him and
14  two people.
15          But having said that, the answer
16  is that the decision process for us was to
17  either stay in that business with a slimmed
18  down staff and focus on how to become a
19  participant in the market on the thought
20  leadership side or to be out of the market
21  totally.  And that market was a very -- the
22  key was that market was shrinking very
23  quickly.  Housing bonds weren't being done, we
24  were in a crisis.
25          And so to keep people in that

Page 132
1              D. BROWNSTEIN
2  space, you had to decide some time in the
3  future there might be a business model that
4  would work.  And to keep yourself prepared for
5  that some time in the future, you wanted
6  someone who could be in communication with the
7  major participants in the market about what
8  the market could do, how it could do it better
9  and who could take a thought leadership role
10  in doing that.  That's where Mike came in.
11      Q.   You testified earlier that you
12  spoke to I believe you testified earlier that
13  you spoke to Nick Fluehr about Mike Koessel?
14      A.   I did not say that.
15      Q.   How did you know that Nick Fluehr
16  was not a fan of Mike Koessel?
17      A.   It was known.
18      Q.   How was it known?
19      A.   Everybody knew that.
20      Q.   How did you know it?
21      A.   Nick was pretty vocal with
22  everybody, he wasn't a fan of Mike Koessel.
23      Q.   Did you overhear Nick?
24      A.   No, but everybody told me that.
25  It was fairly you -- it was a pretty common



DAVID BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
133–136

Page 133
1          D. BROWNSTEIN
2    statement.
3        Q.    Was it well known -- was Nick's
4    thoughts about Amy well known?
5        A.    Oh sure.  Nick loved Amy.
6        Q.    Do you know why that was?
7        A.    I would suggest it was because Amy
8    did all of Nick's work for Nick.
9        Q.    Do you know why Nick didn't like
10   Mike?
11       A.    I don't.
12       Q.    Did Mike do any work for Nick?
13       A.    I don't know.
14       Q.    Did he work on Cal housing for
15   Nick?
16       A.    I don't know if they worked
17   together on Cal housing or not.  You have to
18   ask Mike.
19       Q.    But it was Nick's client, right?
20       A.    Originally.
21       Q.    And when it was Nick's client or
22   when Nick was the lead banker with Cal
23   housing, did he have Mike do any work on it?
24       A.    I don't know.  Mike could tell you
25   that if you want to ask him.

Page 134
1          D. BROWNSTEIN
2        Q.    Was Amy ever nominated to become
3    managing director?
4        A.    I don't know.
5        Q.    Do you know if Mr. Koessel was
6    ever nominated to become managing director?
7        A.    I don't believe he was.
8        Q.    Do you know why not?
9        A.    The nomination would have come
10   from Nick, and Nick never put him up.  So I
11   don't.
12       Q.    Could any managing director have
13   nominated a director for a MD position?
14       A.    In theory, yes.  In practice in
15   our business it was the group heads who had to
16   do the nominating.
17       Q.    What's Mr. Koessel's current
18   position?
19       A.    He is director in the housing
20   group.
21       Q.    Are you still managing the housing
22   group?
23       A.    Yes.
24       Q.    Have you nominated him for an MD
25   position?

Page 135
1          D. BROWNSTEIN
2        A.    No.
3        Q.    If you knew Mr. Koessel was
4    interested in becoming head of the housing
5    group, would you have approached him over Amy?
6        A.    No.
7        Q.    Do you know who Frank Chin
8    preferred as head of the group?
9            MR. TURNBULL:  Objection.
10       A.    I don't.
11       Q.    Did you ever talk to Frank Chin
12   about having a sole head or a group head of
13   the housing group?
14       A.    Yes.
15       Q.    Do you know what Frank's opinion
16   was?
17       A.    Well, again, there were loads of
18   stages along the way.  Ultimately, Frank
19   agreed that we should have them co-head the
20   group so that we can try to retain the staff
21   we have.
22       Q.    Is the only reason you named Mike
23   co-head is because he threatened to leave?
24       A.    I don't believe Mike threatened to
25   leave.

Page 136
1          D. BROWNSTEIN
2        Q.    Is the only reason you named him
3    co-head was because he was interested in
4    becoming co-head?
5        A.    The reason that we named them
6    co-heads were, from my perspective, was
7    because we wanted to create as little turmoil
8    as we could in trying to keep that group
9    together.
10       Q.    So once you found out Mr. Koessel
11   was interested in a leadership position you
12   approached him to avoid any internal politics
13   in the group?
14           MR. TURNBULL:  Objection.
15       A.    No, it wasn't about politics.  It
16   was about trying to retain your staff and have
17   them work as hard as possible.
18       Q.    Do you think Mr. Koessel would
19   have left?
20       A.    I don't know.  But I didn't want
21   to run that risk at that point.  If you cut
22   people, what you don't want to do is have the
23   people that you didn't cut leave because then
24   clearly you reduced your staff even further.
25       Q.    Now after you selected Amy for



DAVID  BROWNSTEIN                                             August 30, 2012
AMY BARTOLETTI vs CITIGROUP INC.                                      137–140

Page 137

1           D. BROWNSTEIN
2  layoff and Frank Chin approved it, did
3  Mr. Marsh have to approve the names on the
4  list?
5          MR. TURNBULL:  Objection to the
6      form.
7      A.   No.
8      Q.   Were the names just submitted to
9  Mr. Marsh?
10          MR. TURNBULL:  Objection to the
11      form.
12      A.   I believe they would have been
13  submitted to human resources.
14      Q.   And did the list that was
15  submitted that you believe was submitted to
16  HR, was it ever changed?
17      A.   I don't know.
18      Q.   At what point did you decide not
19  to eliminate the entire housing group?
20      A.   I don't have an exact timing.
21      Q.   But eliminating the housing group
22  was initially considered; is that correct?
23      A.   Yes.
24      Q.   And did you take the comp of
25  everyone in the housing group into

Page 138

1           D. BROWNSTEIN
2  consideration when determining whether you
3  could hit your number?
4      A.   Correct.
5      Q.   And then after you decided or
6  after it was decided that the housing group
7  would not be eliminated, was there a shortfall
8  on meeting your number?
9          MR. TURNBULL:  Objection to the
10      form.
11      A.   You are asking me to remember
12  things, it's been too much time for me to
13  remember.  I really don't know.
14      Q.   Do you recall ever having to go
15  back to any of the group heads and asking them
16  to give additional names or different names?
17          MR. TURNBULL:  Objection.
18      A.   No.
19      Q.   Are you aware just one round of
20  names being given to you by group heads?
21      A.   I am not.
22      Q.   Could there have been more?
23      A.   Yes.
24      Q.   You only remember --
25      A.   I don't remember.

Page 139

1           D. BROWNSTEIN
2      Q.   You don't remember whether there
3  was one or more --
4      A.   I don't.
5      Q.   You don't remember going back to
6  the group heads and asking them for additional
7  or different names?
8          MR. TURNBULL:  Objection.  Asked
9      and answered.
10      A.   No.
11      Q.   When did you tell Mike that Amy
12  was going to be laid off?
13      A.   I don't know.
14      Q.   Was it before she was notified?
15      A.   I don't know.
16      Q.   Did you consult with Mike
17  regarding who should be laid off in the
18  housing group?
19      A.   No.
20      Q.   Are you and Mike friends?
21      A.   I wouldn't call us friends, I
22  would call us friendly.
23      Q.   Are you friendly outside the
24  workplace?
25      A.   We have done things together a

Page 140

1           D. BROWNSTEIN
2  couple of times, not that often.
3      Q.   What have you guys done together?
4      A.   We've had dinner maybe five times.
5  Once in my house with some other employees,
6  and he came out and visited me on Long Island
7  one weekend.
8      Q.   Do you know if Mike's salary
9  increased after Amy was fired?
10      A.   It did not.
11      Q.   Do you know if his base salary
12  increased after Amy was fired?
13          MR. TURNBULL:  At any point after
14      she was fired.
15      Q.   Starting in 2009.
16      A.   The only time -- I don't know.
17      Q.   Would you have been surprised if
18  his base salary increased after Amy was laid
19  off in 2009?
20          MR. TURNBULL:  Objection.
21      A.   If his base salary increased it
22  wasn't his alone that increased, it was a
23  firmwide change in salaries, not individuals.
24      Q.   So after the fourth RIF, which was
25  a compensation reduction, Citigroup decided to

DAVID  BROWNSTEIN
AMY BARTOLETTI vs CITIGROUP INC.

August 30, 2012
145–148

Page 145
1          D. BROWNSTEIN
2  people.  I just remember the two of them.  It
3  may have just been the two of them.  It might
4  have been.
5      Q.    Did you work with Nadine?
6      A.    Nadine worked in the southeast
7  group.  I knew Nadine, yes.
8      Q.    Why did you invite her to your
9  house for dinner?
10     A.    I tried to socialize as best I
11  could with everyone who I work with.  It is
12  about building relationships, right?
13     Q.    I am handing you a document that's
14  been marked previously marked as Plaintiff's
15  Exhibit 9.  Take a look at this document and
16  let me know if you have seen it before.
17     A.    I saw it yesterday, yes.
18     Q.    Did you see it before yesterday?
19     A.    I don't believe so.
20     Q.    Do you recall seeing a document in
21  a similar format before yesterday?
22     A.    I don't know.
23     Q.    If I could direct your attention
24  to page 3.
25     A.    Yes.

Page 146
1          D. BROWNSTEIN
2      Q.    Third paragraph.  The second
3  sentence.
4      A.    Ahem.
5      Q.    It reads:
6          "In assessing whose selection" --
7      A.    I am sorry, I am in the wrong
8  place.
9          MR. TURNBULL:  I think you are
10     right.
11     A.    Oh, the second sentence.
12     Q.    The second sentence.  It reads:
13          "In assessing whose selection
14     would have the least impact on the
15     business, Brownstein noted that Koessel
16     had stronger relationships with larger
17     clients, had been making forward
18     thinking efforts to try to creatively in
19     vigor the group's business during the
20     financial crisis and had more experience
21     in the housing piece of the housing
22     group's business."
23          Do you see that?
24     A.    Ahem.
25     Q.    Is that all true?

Page 147
1          D. BROWNSTEIN
2      A.    Yes.
3      Q.    Now why were Mike's relationships
4  with larger clients stronger than Amy's
5  relationships?
6      A.    Again, it is not a function of --
7  it is a function of who each client was
8  focused on or who each banker was focused on.
9  And so when we say "larger clients," what we
10  mean is clients whose expectation over time,
11  like Texas, because of the population in
12  Texas.  I believe Texas is the third most
13  populus state in the U.S., would potentially
14  be the larger issuer of debt.
15          So if you compare Texas to South
16  Dakota with a very small population, the
17  issuance will be driven by the needs of the
18  public in that location.  So that's why what
19  we're saying, when you look at the locations
20  that Mike does business in, those locations
21  over time, my expectation would be larger
22  issuers in the municipal market.
23     Q.    But that has to do with revenue
24  generation, correct?
25     A.    Absolutely.

Page 148
1          D. BROWNSTEIN
2      Q.    I thought at that point in time
3  you weren't focused on generating revenue?
4      A.    Well, what I said is I told Mike
5  your first and foremost responsibility is to
6  be a thought leader in the market.  And what
7  that will do is lead to other things like
8  revenues, because clients will come to you
9  because they will want to talk to you about
10  what to do.  The driver won't be you going out
11  there and soliciting business, because you
12  won't have to the time to and you won't have
13  the staff to.  But clients often come to those
14  who have the knowledge, who can give them
15  solutions, they otherwise couldn't come up
16  with on their own.
17          So ultimately while near term the
18  driver wasn't revenues, ultimately if we were
19  going to remain in this business at all, long
20  term, it had to be about revenues.
21     Q.    Now South Dakota was one of the
22  housing groups biggest clients, wasn't it?
23          MR. TURNBULL:  Objection.
24     A.    They were a -- the banker to South
25  Dakota, but when you say biggest clients, if

