# EXHIBIT 6

Case 1:10-cv-07820-LGS   Document 59-6   Filed 06/07/13   Page 2 of 4

FRANCIS Y. CHIN								August 21, 2012
AMY BARTOLETTI vs. CITIGROUP							145–148

Page 145

1  F. Y. CHIN
2  Q. Do you remember when Amy was
3  informed that she was going to be laid off?
4  A. I don't recall what date it was.
5  Q. Was she informed when everyone
6  else was informed that they were being laid
7  off?
8  A. I suspect they were all done
9  within a relatively short period of time.
10 Q. On the same day?
11 A. I don't know.
12 Q. Who notified Amy that she was
13 going to be laid off?
14 A. I met with her along with David
15 Brownstein.
16 Q. And was anyone else in the room?
17 A. I do not believe so.
18 Q. And how long did that meeting
19 last?
20 A. Half an hour, maybe.
21 Q. And what was discussed?
22 A. David and I and Amy, we, I think I
23 advised of Amy that she was being, she was
24 being asked to leave the department, told her
25 that -- I think she was given a contact person

Page 146

1  F. Y. CHIN
2  in HR who had all the papers about her
3  separation and all that stuff.
4  Q. Was anything else discussed?
5  A. Not with the three of us, no.
6  Q. Well, you said that meeting lasted
7  about a half hour, is that correct?
8  A. I would think, 15 to 30 minutes,
9  something like that. It was fairly quick.
10 Q. Did you go into the reasons as to
11 why she was being laid off?
12 A. Nope.
13 Q. So you just gave her the name of
14 someone in HR to contact, and that she was
15 being laid off. Is that all that was said?
16 A. Procedurally on all the RIFs,
17 people were notified of it and then told to
18 speak to the HR professionals as related to
19 any separation packages or any agreements or
20 whatever.
21 Q. Did Amy say anything during this
22 meeting?
23 A. I don't recall what she said.
24 Q. And did you have a meeting with
25 David Brownstein prior to informing Amy?

Page 147

1  F. Y. CHIN
2  A. I don't think so.
3  Q. When did you tell Mike Koessel
4  that Amy was going to be laid off?
5  A. I don't believe I ever told him.
6  Q. Do you know if he knew that Amy
7  was being laid off prior to Amy finding out?
8  A. I don't know.
9  Q. How was the housing group doing in
10 2008?
11 A. I don't recall.
12 Q. You don't know if it was doing
13 well or not?
14 A. No.
15 Q. Would Mr. Brownstein know?
16 A. I don't know.
17 Q. Wasn't he managing that group?
18 A. You asked me what he knew and I
19 couldn't tell you what he knows about what
20 they were doing.
21 Q. Is it his job to know?
22 A. He was responsible for the group
23 and he had to determine what he needed to know
24 to do his job.
25 Q. Do you know if Mike Koessel's

Page 148

1  F. Y. CHIN
2  salary increased after Amy was fired?
3  A. I don't recall.
4  Q. Would you be surprised if his
5  salary increased?
6  A. We have -- we have specific salary
7  levels by title, depending on when someone was
8  promoted, and budgetary constraints they may
9  not be brought up to their full title grade
10 salary level. So if he was below it, and he
11 was brought up to it, it's more
12 administrative. If he was paid more than the
13 salary level, I'd be shocked.
14 Q. Now, when you were trying to
15 arrive at the ask number, were you taking into
16 account total comp for calendar year 2007?
17 A. I'm sorry, could you try that
18 question again.
19 Q. What comp figures were you using
20 when determining whether you could meet the
21 ask number?
22 A. I believe the formula we were
23 given was based on 2007 incentive comp paid in
24 January of 2008.
25 Q. Did you ever think about reducing

Page 149

F. Y. CHIN

1  F. Y. CHIN
2  everyone's discretionary bonus in order to
3  arrive at the number?
4       MR. TURNBULL: Objection to form.
5   A.  That was not what I was told to
6  do.
7   Q.  Wouldn't it have been an
8  alternative in order to save jobs?
9       MR. TURNBULL: Objection to form.
10  A.  It was not an alternative offered
11 to me.
12  Q.  No one suggested it?
13  A.  I don't know if anyone suggested
14 it. I surely did not.
15  Q.  Did you think of it at the time?
16  A.  No.
17  Q.  You didn't think of perhaps we
18 should reduce people's salaries so we can save
19 jobs?
20      MR. TURNBULL: Objection to form.
21  A.  I was instructed what the ground
22 rules to determine the RIF budget was, and I
23 used it.
24  Q.  And no one in the meeting with Mr.
25 Marsh suggested reducing incentive comp?

Page 150

1  F. Y. CHIN
2   A.  I don't recall if that came up.
3   Q.  Do you think that would have been
4  a viable alternative?
5       MR. TURNBULL: Objection.
6   A.  It is not what we were charged to.
7   Q.  But do you think it would have
8  been a viable alternative?
9       MR. TURNBULL: Objection.
10  A.  I don't think it matters what I
11 thought.
12  Q.  But I'm asking you, do you think
13 it would have been a viable alternative?
14  A.  Not the way the instructions were
15 delivered.
16  Q.  Apart from the instructions, I'm
17 asking you do you think it would be a viable
18 alternative?
19      MR. TURNBULL: Objection.
20  A.  I do not believe I had that
21 option, so it was not something I considered.
22  Q.  All right I'm going to ask you the
23 question for the fifth time now. Do you think
24 it would have been a viable alternative?
25  A.  No.

Page 151

1  F. Y. CHIN
2       MR. TURNBULL: Objection: asked
3  and answered.
4   A.  I do not.
5   Q.  Why not?
6   A.  Because the firm told us what the
7  ground rules were.
8   Q.  Were you thinking about
9  eliminating the housing group altogether?
10  A.  Yes, sir.
11  Q.  Why?
12  A.  I didn't think there was much
13 future in housing at all.
14  Q.  Didn't you just testify that you
15 didn't know how the housing group was doing?
16  A.  It had nothing to do with how the
17 housing group was doing. It is my perception
18 of where the industry is headed.
19  Q.  And what was your perception based
20 upon?
21  A.  Having worked in housing for a
22 while, the single family mortgage business is
23 a structured finance business built around
24 arbitrage between taxable and tax exempt
25 levels, and given the complete collapse of the

Page 152

1  F. Y. CHIN
2  credit markets and the spread between taxable
3  and tax exempt bonds, as well as the collapse
4  of the mortgage business, it seemed to me that
5  the ability to originate new mortgages going
6  forward is very suspect.
7   Q.  Did you know how much revenue the
8  housing group generated in 2008?
9   A.  It didn't matter.
10  Q.  Did you know what deals they had
11 in the pipeline?
12  A.  It also did not matter.
13  Q.  Do you still have the housing
14 group?
15  A.  We still have the housing group.
16  Q.  Is it the same size as post
17 November 2008?
18      MR. TURNBULL: Objection to form.
19  A.  I don't know exactly. It is not
20 bigger.
21  Q.  So it is the same head count?
22  A.  Maybe less. It is definitely not
23 bigger.
24  Q.  Is it still generating revenue as
25 it did in '08?

FRANCIS Y. CHIN  
AMY BARTOLETTI vs. CITIGROUP  
August 21, 2012  
197–200

**Page 197**

F. Y. CHIN
2  A.  Not in the healthcare group. I
3  think as we talked about earlier, David and I
4  made a decision about Amy.
5       Clearly, I was preoccupied with my
6  budget. He clearly looked at other things.
7  And I'm sure the fact that he spent a lot with
8  Amy on student loans, and Mike was purely a
9  housing banker, influenced him.
10  Q.  How do you know what influenced
11  David Brownstein?
12  A.  I don't know. It's possible.
13  Q.  You are guessing, right?
14       MR. TURNBULL: Objection.
15  A.  I think David -- David's been in
16  the business a long time. He weighs a lot of
17  different things, and I think having
18  familiarity with their business which was one
19  of his responsibilities, you know, clearly
20  helped him make some decisions.
21  Q.  So you are guessing as to what he
22  considered?
23       MR. TURNBULL: Objection.
24  A.  I'm not sure of his specific
25  decision-making process.

**Page 198**

F. Y. CHIN
2  Q.  Did you ever present a list of
3  people to David Cyganowski for the November
4  2008 layoff?
5  A.  At what point?
6  Q.  At any point in time.
7  A.  I think after the final
8  determination of the RIF was done, I think all
9  the group heads were made aware who was being
10  asked to leave the department, so he clearly
11  would have found out at that point.
12  Q.  How about Mr. Hessler?
13  A.  I think all the group heads were
14  made aware of who was being asked to leave.
15  Q.  But it was Mr. Hessler that told
16  you about Lisa Conley, not the other way
17  around?
18  A.  I believe so.
19  Q.  Did you select anyone to be
20  included in the November 2008 layoff, other
21  than Amy?
22  A.  Other than Amy, no.
23       And in Amy's case I was part of
24  that process, obviously, with David.
25  Q.  Were you part of the process with

**Page 199**

F. Y. CHIN
2  respect to anybody other than Amy?
3  A.  No.
4  Q.  Did you ever tell Mr. Cyganowski
5  and/or Mr. Hessler as to the criteria they
6  should employ in determining who to select for
7  layoff?
8       MR. TURNBULL: Objection: asked
9       and answered.
10  A.  Other than the original
11  conversation with the group heads about future
12  business opportunities and a number of other
13  factors, not any follow-up as to any specific
14  names.
15  Q.  And the number of other factors
16  you just said you testified to earlier,
17  correct?
18  A.  Right.
19  Q.  Mr. Chin, do you know who Nadine
20  Mentor is?
21  A.  She was a banker in the Southeast.
22  Q.  Do you know if she was a director?
23  A.  I don't recall her title in '08.
24  Q.  And do you know -- I'm sory, she
25  was in the Southeast group, correct?

**Page 200**

F. Y. CHIN
2  A.  Southeast group.
3  Q.  And do you know what clients she
4  covered?
5  A.  I knew she covered Virgin Islands.
6  Other than that, I'm not sure what else.
7  Q.  Why do you know that?
8  A.  Because as part of my e-mail
9  review process, we intercepted her
10  transferring files of the firm related to that
11  transaction, to her home.
12  Q.  Do you know if she had permission
13  to transfer files?
14  A.  She definitely didn't have
15  permission from me.
16  Q.  Do you know if she had permission
17  from anyone else?
18  A.  I do not, but since she was, I
19  believe, I'm not sure she was an employee at
20  the time when she did, but she definitely did
21  not have my permission, so the answer is no.
22  Q.  But you don't know if she had
23  permission from anyone else?
24  A.  No, but it definitely hit our
25  system screen as a questionable e-mail.

