# EXHIBIT 7

LISA CONLEY  
AMY BARTOLETTI vs. CITIGROUP

August 14, 2012  
21–24

Page 21

```
 1                L. CONLEY
 2   know, I brought in a lot of revenue for Citi
 3   and I shouldn't have been fired I guess is
 4   what he talked about.
 5       Q.   Did you agree with him?
 6            MR. DATOO:  Objection.  You can
 7       answer.
 8       A.   Absolutely, absolutely.  But I
 9   don't know, I don't know what, you know -- I
10   have a tremendous amount of respect for him as
11   a professional and I thought he was very
12   effective in our group.  But I don't know the
13   context of the decision that was made with
14   respect to Dave.
15       Q.   Was Mr. Johnson a high revenue
16   producer in your mind?
17       A.   Yes.
18       Q.   Was he an effective investment
19   banker?
20       A.   Yes.
21       Q.   And I think you just said, correct
22   me if I am wrong, you don't know the reason
23   why he was selected for termination?
24       A.   Correct.
25       Q.   Do you know what law firm he used?
```

Page 22

```
 1                L. CONLEY
 2       A.   No.
 3       Q.   Do you know if it was Liddle &
 4   Robinson?
 5       A.   I don't know.
 6       Q.   And Mr. Johnson was a managing
 7   director, correct?
 8       A.   Yes.
 9       Q.   Did he tell you he thought he was
10   terminated because of his gender?
11       A.   No.
12       Q.   Did you think he was his gender
13   played a role in the decision?
14       A.   No.
15       Q.   Why not?
16       A.   Because he was a man.  I don't
17   think that he was terminated because of his
18   gender, because he was a man.  He is a man.
19       Q.   Do you think only women who were
20   terminated at Citi would have a gender
21   discrimination claim?
22            MR. DATOO:  Objection.
23       A.   There are certainly situations in
24   which you could imagine that, you know, the
25   reverse discrimination claims.  But you know,
```

Page 23

```
 1                L. CONLEY
 2   so I can conceptualize a context in which that
 3   happened.
 4            But what I know is that my firing
 5   as the only woman in the healthcare group with
 6   the kind of revenue generation that I had, the
 7   kind of relationships that I had with the
 8   clients, the kind of new business that I did
 9   as a director leads me to believe that I was
10   illegally fired.
11       Q.   So in the November 2008 reduction
12   in force that Citigroup went through, there
13   were both males and females terminated,
14   correct?
15       A.   Yes.
16       Q.   Do you believe that any of the
17   females who were selected were selected
18   because of their gender?
19       A.   I believe that Citi acted
20   illegally when they fired four out of the five
21   female directors in one fell swoop.  I don't
22   know the context of the specifics of their
23   work performance, but I do believe that that
24   was an illegal act.
25       Q.   So tell me about that.  The four
```

Page 24

```
 1                L. CONLEY
 2   of the five female directors, who are you
 3   talking about?
 4       A.   Nadine, Amy, me, and Kimberly
 5   Swain.
 6       Q.   And when you say four of five
 7   female directors, in what group are you
 8   referring to?
 9       A.   They are across all -- different
10   groups.  I am sorry, this is the public
11   finance group.
12       Q.   I am sorry, I thought you said
13   that four of the five female directors were
14   terminated in one fell swoop I think was how
15   you phrased it, right?
16       A.   Yes.
17       Q.   And four of the five female
18   directors where, in what group?
19       A.   In the public finance group at
20   Citi.
21       Q.   So you gave me four names.  Who is
22   the fifth?
23       A.   I don't recall.
24       Q.   So those four individuals you
25   think were terminated because of their gender?
```



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 3 of 12

LISA CONLEY                                                August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                        25–28

Page 25

```
 1              L. CONLEY
 2        MR. DATOO:  Objection.
 3      A.   I believe that in my case I know
 4   the specifics of my case, that I know the
 5   specifics of my performance versus the other
 6   directors in the healthcare group.  I know the
 7   quality of my reviews, I know the quality of
 8   the revenues I brought in and I know the
 9   amount of work that I did.  I am extending the
10   -- I am extending that situation to the
11   overwhelming statistic of 80 percent of the
12   women being fired on November 21st.
13      Q.   So staying with the four people
14   that you identified, other than yourself, do
15   you believe the other three were terminated
16   because of their gender?
17      A.   I do.
18        MR. DATOO:  Objection.
19      Q.   Why?  What basis do you have for
20   that?
21      A.   What I just explained, I know the
22   specifics of my situation and I know that I
23   feel that I was discriminated against and I am
24   extending that -- I am extending that
25   understanding to the overwhelming statistic of
```

Page 26

```
 1              L. CONLEY
 2   80 percent of the directors, female directors
 3   being terminated at once.  It was a time of
 4   crisis at Citi, and I think that mistakes were
 5   made.
 6      Q.   And who do you think made those
 7   mistakes?
 8      A.   I don't know the specifics of who
 9   made the decision to fire me.  I don't know
10   the specifics of who made the decision to fire
11   the other four.  So I don't know who made the
12   mistakes.  All I know is that whatever process
13   they went through, the outcome was
14   discriminatory.
15      Q.   Do you know what factors the
16   decision-makers considered when making their
17   decisions?
18      A.   I understand that there was a
19   consideration of future client relationships,
20   and I understand there was a consideration of
21   just what's the total comp, we need to cut a
22   certain amount of total comp.  So that's
23   another thing that just has me completely
24   flabbergasted, because while I was a very high
25   performer, a very productive member of the
```

Page 27

```
 1              L. CONLEY
 2   healthcare team, I was paid less than almost
 3   every other director, including directors
 4   junior to me.  So if it was a comp situation,
 5   that is puzzling to me.
 6      Q.   Do you know whether the
 7   decision-makers when -- did you say to look at
 8   future revenue or future business?
 9        MR. DATOO:  Objection.
10      A.   I don't know specifically the
11   process that they went through.  I wasn't in
12   the room, I don't know, but what I understand
13   is that they had concern about future client
14   relationships.  And what's ironic is that I
15   just won Heartland from Citi about a month
16   ago.  Memorial South Bend another one of my
17   primary clients went with Wells Fargo rather
18   than Citi.
19        So there was a consideration for
20   would the client stay with Citi if we fired
21   the bankers.  And I am doing my hardest to
22   make sure that doesn't happen.
23      Q.   So I am going to come back to the
24   specifics of your situation.  But for the
25   other three directors that you named,
```

Page 28

```
 1              L. CONLEY
 2   Ms. Bartoletti, Kimberly Swain and Nadine
 3   Mentor, do you know the reasons why Citigroup
 4   terminated their employment?
 5      A.   I do not.
 6      Q.   And do you know how they were
 7   performing?
 8      A.   I do not.
 9      Q.   Do you know how many men in public
10   finance were terminated in November?
11      A.   I do not.
12      Q.   I am talking about November 2008.
13      A.   I have seen the statistics for
14   sure.  I don't recall the statistics.  I don't
15   know how many men.
16      Q.   So I just want to make sure I
17   understand.  So you think first the specifics
18   of your situation as you said is one reason
19   why you think your termination was improper;
20   is that right?
21      A.   Yes.
22      Q.   And then you also said you think
23   it was improper because four out of the five
24   directors who are female in public finance
25   were terminated?
```



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 4 of 12

LISA CONLEY                                                August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                        29–32

Page 29

1         L. CONLEY
2     A.   Yes.
3     Q.   And the fifth one who was not
4  terminated, you can't recall her name?
5     A.   I don't recall.
6     Q.   And among the males who were
7  terminated in November of 2008, do you know
8  how many were directors?
9     A.   I do not know.
10    Q.   Do you know how many females --
11    A.   But I could -- I am sorry, could I
12 answer? But I could state pretty confidently
13 it was a lower percentage than 80 percent.
14    Q.   And how could you be so confident?
15    A.   Because they didn't fire
16 80 percent of the directors, they --
17    Q.   Overall they didn't fire
18 80 percent?
19    A.   Correct.
20    Q.   Do you know how many managing
21 directors were terminated in November of 2008
22 as part of the reduction in force?
23    A.   I do not, no.
24    Q.   Were any female managing directors
25 from the healthcare group terminated?

Page 30

1         L. CONLEY
2     A.   There were no female managing
3  directors from the healthcare group
4  terminated.
5     Q.   In November of 2008, how many
6  female directors, managing directors were
7  there?
8     A.   There were three.
9     Q.   And was Dave Johnson the only
10 managing director terminated in November
11 of 2008?
12    A.   Yes.
13    Q.   Do you know why Citigroup elected
14 to terminate Mr. Johnson, a male, rather the
15 three female managing directors?
16    A.   I do not know.
17    Q.   But you don't think it had to do
18 with his gender?
19    A.   No.
20    Q.   So is there any male among all the
21 terminations that occurred at Citigroup, are
22 there any males who you think were terminated
23 because of their gender?
24         MR. DATOO:  Objection.
25    A.   Would you repeat the question.

Page 31

1         L. CONLEY
2     Q.   Among all of the individuals
3  terminated at Citigroup, are there any males
4  who were terminated who you think were chosen
5  for termination because of their gender?
6         MR. DATOO:  Objection.
7     A.   I have no basis to believe that
8  any of the males terminated were terminated
9  because of their gender.
10    Q.   So it is only the females who you
11 believe were terminated because of gender; is
12 that right?
13        MR. DATOO:  Objection.
14    A.   Yes.
15    Q.   So you said you spoke to Amy
16 Bartoletti in connection with potentially
17 filing a lawsuit.
18        Since the lawsuit has been filed,
19 you were in Forbes, you got some press.  Have
20 you spoken to Amy Bartoletti at any point
21 along the way about the lawsuit?
22    A.   Not about the lawsuit, that I
23 recall.
24    Q.   Not once?
25    A.   We have -- she as part of her --

Page 32

1         L. CONLEY
2  she was looking for a job and so we have
3  exchanged e-mails about different things.  If
4  there was a reference to the lawsuit, perhaps,
5  but I don't recall speaking to her about the
6  lawsuit.
7     Q.   Not once?
8     A.   I don't recall, no.
9     Q.   How about let's talk about Nadine
10 Mentor.
11    A.   Yes.
12    Q.   Did you have any conversations
13 with Ms. Mentor about the lawsuit, either pre
14 or post filing?
15    A.   No one-on-one conversations, no.
16    Q.   I don't want to limit it to
17 one-on-one, did you have any conversations
18 with her at all?
19    A.   No conversations outside of the
20 attorney-client group conversations.
21    Q.   And how about with any of the
22 other plaintiffs?
23    A.   No, no conversations.
24    Q.   So since the lawsuit has been
25 filed, you have never had a single



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 5 of 12

LISA CONLEY                                                      August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                            69–72

Page 69

1  L. CONLEY
2  access system that would allow me to work from
3  home. But even if I wasn't coming to the
4  office, I was still, you know, working very
5  long hours. What I saw remote access was
6  enabling me to do was to work well past
7  midnight on a regular basis.
8     Q.  So was there any part of your
9  career at Citigroup where there was an
10 arrangement that you would work at home one
11 day a week?
12    A.  No. I contemplated it, but it
13 never made sense to me.
14    Q.  Did you ever ask anyone if you
15 could do that?
16    A.  I didn't ask. I did not ask. One
17 of my colleagues Jeanette Price did it and was
18 very unhappy with how it turned out. So I did
19 not try it.
20    Q.  You said I think in an earlier
21 answer that you are the breadwinner or primary
22 breadwinner might have been your response.
23    A.  Yes.
24    Q.  How much does your husband earn?
25    A.  When I was at Citi, he probably

Page 70

1  L. CONLEY
2  earned about 25 to 30 percent of what I
3  earned.
4     Q.  How about now?
5     A.  It is a lot closer to even.
6     Q.  During your tenure at Citi, what
7  offices did you workout of?
8     A.  I worked out of the Chicago
9  office, almost exclusively. I was in New York
10 a lot, and whether that was because clients
11 were there, whether I went to training in New
12 York, whether presentation training, writing
13 skills workshops, diversity events, any number
14 of reasons that I would be in New York, I went
15 to New York a lot.
16         And then in the fall of 2000,
17 right before I had my first child, I spent
18 3 months living in New York. It was very
19 important to Fred and David to be more, I
20 don't know what the word is, they just -- they
21 like people --
22    Q.  Visible?
23    A.  That's a good word. And so I came
24 to New York and was able to do -- extend my,
25 you know, professional development into areas

Page 71

1  L. CONLEY
2  of M&A, for example, that was hard to do from
3  Chicago.
4     Q.  So that three-month period where
5  you worked out of New York, was that at the
6  request of your supervisors or was it
7  something you wanted to do?
8     A.  It was in response to feedback
9  from Fred and David. It was an opportunity
10 that my husband was visiting Yale, so I said
11 to Fred and David, this is something we could
12 do in response to how you want me to grow
13 professionally, what do you think? They loved
14 the idea.
15    Q.  So you worked this in conjunction
16 with your husband's working at Yale?
17    A.  Ahem. Yes.
18    Q.  And you asked Mr. Hessler and
19 Mr. Cyganowski if you could do that; is that
20 right?
21    A.  If I could do it is not
22 necessarily how I would characterize it. It
23 would -- I would characterize it as would this
24 be a constructive thing to do from my
25 professional perspective, from Citi's

Page 72

1  L. CONLEY
2  perspective, from our client's perspective,
3  would this be a constructive helpful thing for
4  me to spend some time in New York. And they
5  were very enthusiastic about all of those.
6     Q.  Do you know whether they had to
7  approve you transferring to New York for that
8  period of time?
9     A.  Yes, they had to sign documents.
10    Q.  And certainly that them approving
11 that was helpful to you and to spend time with
12 your husband, correct?
13    A.  I did not come to New York City to
14 spend time with my husband. I came to New
15 York City to help my career. And it was
16 serendipity that he had the option of spending
17 some time at Yale. It was motivated by Fred
18 and David telling me what I should do to grow
19 professionally, spend more time in the New
20 York office.
21         So I would -- they did not
22 accommodate my husband, my husband had this
23 opportunity and I proposed it to Fred and
24 David as something that would comply with what
25 they were asking me to do.



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 6 of 12

LISA CONLEY                                                    August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                         81–84

Page 81

1   L. CONLEY
2   And then I entered the -- then I started
3   working for PaineWebber in Chicago in July
4   of 1993, right before I got married.
5         After PaineWebber I started with
6   Smith Barney in June of 1998. -- 1997.
7       Q.   Just going back to the Bankers
8   Trust job. When did you start that?
9       A.   January of 2000 -- January
10  of 1991.
11      Q.   Starting with Bankers Trust, what
12  was your job there?
13      A.   I worked in the economics group at
14  Bankers Trust. I was an assistant vice
15  president, I think was my title.
16      Q.   In the economics group you said?
17      A.   Yes.
18      Q.   What were your responsibilities?
19      A.   Fundamentally economic analysis.
20  We did industry research. We did Bankers
21  Trust portfolio analysis. Those are the two
22  primary things we did.
23      Q.   And were you in that economics
24  group throughout your tenure at Bankers Trust?
25      A.   Yes.

Page 82

1   L. CONLEY
2       Q.   Do you recall what your
3   compensation was at the time you left?
4       A.   I do not.
5       Q.   Did you have any disciplinary
6   record while at Bankers Trust?
7       A.   No.
8       Q.   Did you raise any complaints while
9   at Bankers Trust?
10      A.   No.
11      Q.   And then you said you -- when you
12  took the PaineWebber job you went to Chicago;
13  is that right?
14      A.   Yes.
15      Q.   When you moved from Bankers Trust
16  to PaineWebber, were you looking to get into
17  the Chicago market?
18      A.   Yes.
19      Q.   Did Bankers Trust have an office
20  in Chicago?
21      A.   No. Well, no economics
22  department. They did have an office, I spoke
23  to people in the office.
24      Q.   So there was no opportunity at
25  Bankers Trust in their Chicago office for you?

Page 83

1   L. CONLEY
2       A.   Correct.
3       Q.   Did you resign voluntarily from
4   Bankers Trust?
5       A.   Yes.
6       Q.   Did you receive any severance?
7       A.   No.
8       Q.   What was your job at PaineWebber?
9       A.   I was an associate in the
10  healthcare group as part of the municipal
11  securities group.
12      Q.   Was that a change in job for you?
13  Obviously you changed from one employer to
14  another, but in terms of the job you were
15  doing, was it a different job?
16      A.   Yes, I went from being an economic
17  analyst to a junior investment banker.
18      Q.   Did Bankers Trust have an
19  investment banking group in Chicago?
20      A.   Repeat the question.
21      Q.   Did Bankers Trust have an
22  investment banking group in Chicago?
23      A.   Not that I know of.
24      Q.   Did you explore any opportunity
25  like that with Bankers Trust?

Page 84

1   L. CONLEY
2       A.   I don't recall what Bankers Trust
3   had in Chicago. I did speak to people in
4   Chicago about working there, but I don't
5   recall even what the context was.
6       Q.   So when you went to PaineWebber
7   your title was associate?
8       A.   Yes.
9       Q.   And what were your
10  responsibilities?
11      A.   Doing bond structuring, running
12  refunding analyses, writing summaries of
13  analyses, preparing memos for clients,
14  preparing presentation books for clients.
15      Q.   And you were at PaineWebber for
16  about four years?
17      A.   Yes.
18      Q.   Were you an associate throughout
19  that time?
20      A.   No, I was promoted to AVP.
21      Q.   And when did you get promoted?
22      A.   I don't recall.
23      Q.   Do you recall what your
24  compensation was your last year at
25  PaineWebber?

Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 7 of 12

LISA CONLEY											August 14, 2012
AMY BARTOLETTI vs. CITIGROUP										85–88

Page 85

		L. CONLEY
2	A.	No, I don't.
3	Q.	Were you ever disciplined at
4	PaineWebber?
5	A.	No.
6	Q.	Did anyone ever make any
7	complaints about you to your knowledge, while
8	you were at PaineWebber?
9	A.	No.
10	Q.	Did you ever complain about your
11	treatment?
12	A.	No.
13	Q.	Why did you leave PaineWebber?
14	A.	I left PaineWebber because of
15	dynamics -- the bankers I worked for in
16	Chicago all decided to do different things.
17	So I had a choice between not doing
18	healthcare, which is what I wanted to do and
19	going into more government oriented or going
20	into a different firm.
21	Q.	You resigned from PaineWebber?
22	A.	Yes.
23	Q.	Did you receive any severance?
24	A.	No.
25	Q.	From PaineWebber you went to

Page 86

		L. CONLEY
2	Citigroup?
3	A.	Yes, I went to Smith Barney.
4	Q.	Just so we're clear and you are
5	comfortable, if I refer to Citigroup are you
6	comfortable that also would refer to Smith
7	Barney and then Citigroup Smith Barney and any
8	iterations of Citigroup?
9	A.	Yes.
10	Q.	So when you joined Citigroup, what
11	was your title?
12	A.	AVP.
13	Q.	And in what group were you
14	working?
15	A.	The healthcare group.
16	Q.	And the title structure at
17	Citigroup goes how?  So from associate vice
18	president to what?
19	A.	Assistant vice president to vice
20	president to director to managing director.
21	Q.	So as an assistant vice president
22	in the healthcare group, what were your
23	duties?
24	A.	They were comparable to the duties
25	I described earlier with respect to

Page 87

		L. CONLEY
2	preparation of numerical analysis, customer --
3	client presentations, summaries of analyses
4	and memos, and those kinds of things.  Only as
5	an AVP you work with analysts associates below
6	you and have more of a responsibility for the
7	final work-product.
8	Q.	As a VP, did you interact with
9	clients?
10	A.	Yes.
11	Q.	And in what capacity, in what
12	context?
13	A.	This is with Citi, correct?
14	Q.	With Citi.
15	A.	Working group meetings, talking to
16	clients on the phone, clarifying the
17	information that we needed.  When I started at
18	Citi, I very quickly was presenting analyses
19	to clients on the phone.  So I took
20	responsibility very -- as much
21	responsibilities as I could take with respect
22	to client interaction as I could.
23	Q.	I take it your work was on
24	specific transactions, correct?  In other
25	words, you would do these analyses and

Page 88

		L. CONLEY
2	presentations and the other things in
3	connection with the transactions?
4	A.	There was work done in association
5	with transactions and work done in association
6	with trying to obtain business.
7	Q.	At Citigroup, let's take
8	transactions first, how does Citigroup staff
9	their transactions?
10		MR. DATOO:  Objection.
11	Q.	How did they when you were there?
12		MR. DATOO:  Objection.
13	A.	In general, they put a lot of
14	professionals on particular deal teams, and so
15	there was usually a director and/or a managing
16	director or two, somebody in the middle VP,
17	AVP level, somebody in the junior banker
18	level.  It depended on the size of the client
19	as to how many professionals were assigned.
20	Q.	Was it the same type of staffing
21	model that was used when you were trying to go
22	out and get new business?
23	A.	You're differentiating between
24	transaction, execution and new business
25	development?  Yes, yes.  The client teams were

Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 8 of 12

LISA CONLEY                                                                                    August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                                                         89–92

Page 89

 1      L. CONLEY
 2  staffed similarly.
 3      Q.  And how long did you remain an
 4  AVP?
 5      A.  I think it was a year and a half.
 6      Q.  And so again, you said you joined
 7  in '96, correct?
 8      A.  '97.
 9      Q.  June of '97?
10      A.  Yes.
11      Q.  And when you joined, did you
12  interview?
13      A.  Yes.
14      Q.  Who did you interview with?
15      A.  I am sure I spoke with Fred.  I am
16  sure I had lunch with Frank Chin.  Outside of
17  that, I can't recall who I spoke with.
18      Q.  Did you speak with David
19  Cyganowski?
20      A.  I don't recall.
21      Q.  Who extended you the offer?
22      A.  I don't recall.
23      Q.  Do you know who approved your
24  hiring?
25      A.  No, I do not.

Page 90

 1      L. CONLEY
 2      Q.  So you went from AVP to vice
 3  president?
 4      A.  Yes.
 5      Q.  And when was that, what year?
 6      A.  I believe that was 1999.
 7      Q.  And the promotions at Citigroup,
 8  were they effective in January of each year?
 9      A.  I think so.  Junior bankers are on
10  a different cycle than senior bankers.  I
11  don't recall specifically.
12      Q.  Do you know who approved your
13  promotion?
14      A.  I do not know who approved my
15  promotion.
16      Q.  Do you know whether Fred Hessler
17  was involved in the decision to promote you?
18      A.  Based on my conversations with
19  Fred, yes, I would think that he was involved
20  in the decision.
21      Q.  Why do you think that?
22      A.  Because I had annual reviews with
23  him in which he was very enthusiastic of my
24  performance, and made some statement like
25  we're going to recommend you for promotion.

Page 91

 1      L. CONLEY
 2      Q.  How about Dave Cyganowski, do you
 3  know whether he was involved in the decision
 4  to promote you?
 5      A.  I don't know whether he was
 6  involved.  My reviews were always with both of
 7  them.
 8      Q.  And do you know whether Frank Chin
 9  had any involvement in your promotion?
10      A.  I don't know.
11      Q.  How long did you remain a vice
12  president?
13      A.  I don't recall.
14      Q.  As a vice president, what were
15  your duties?
16      A.  They were very similar to what I
17  described earlier.  Less -- less of the number
18  crunching and more of the presenting and
19  preparation of memos, more of the management
20  of the junior bankers, but the same general
21  tasks of executing existing transactions and
22  trying to get new business.
23      Q.  And when you say "presentations,"
24  do vice presidents make presentations to
25  clients?

Page 92

 1      L. CONLEY
 2      A.  Yes.
 3      Q.  And you did that while you were
 4  vice president?
 5      A.  Yes.
 6      Q.  Do they also make presentations
 7  internally to the rest of the deal team?
 8      A.  No.
 9      Q.  Are vice presidents, when you were
10  at Citigroup, are vice presidents in the
11  healthcare group expected to generate revenue?
12      A.  No.
13      Q.  Were they given responsibility for
14  any accounts?
15      A.  No.
16      Q.  Does it refresh your memory if I
17  tell you were promoted to director in January
18  of 2005?
19      A.  Yes.
20      Q.  Do you know who was involved in
21  that decision?
22      A.  I know that I had a review with
23  Fred and David in which they told me that I
24  would be promoted, but I don't know the
25  specifics of how that decision was made and



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 9 of 12

LISA CONLEY                                                August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                         93–96

Page 93

1   L. CONLEY
2   who approved it.
3       Q.   In your conversations with Fred
4   and David about the promotion, did they both
5   indicate they supported your promotion?
6       A.   Fred and David were always very
7   enthusiastic about my performance, and I don't
8   recall the specifics of whether they made that
9   statement about being in support.
10      Q.   And you don't know whether Frank
11  Chin was involved?
12      A.   I don't.
13      Q.   And we have talked about Fred and
14  David, Fred Hessler and David Cyganowski, they
15  were the co-heads of the healthcare group when
16  you joined; is that right?
17      A.   Yes.
18      Q.   Do you know how your compensation
19  was determined?
20      A.   I don't know.
21      Q.   What were your responsibilities as
22  a director in the healthcare group?
23      A.   They were very similar, except
24  there was almost no number crunching.  As a
25  director the basic tasks of transaction

Page 94

1   L. CONLEY
2   execution and new business development were --
3   remained as the primary tasks, but the client
4   interaction component of it increased the
5   responsibility for attainment of an account
6   increased.  And the expectation of one of the
7   things that I was exceedingly good at was
8   minding existing clients for additional
9   revenue.
10          And so my focus was on both the
11  maintenance of existing client relationships
12  as well as in 2006, you know, winning
13  transactions like University of Kansas and
14  other such that my first review as a director,
15  that was what they said I was exceptional at
16  because I brought three new accounts there.
17  There was Wellmont, KU and one other that I
18  brought in that really impressed Fred and
19  David.
20      Q.   In this lawsuit you are alleging
21  that you were discriminated against, correct?
22  You were treated differently; is that right?
23      A.   I am alleged -- my position is
24  that I was treated differently in that I was
25  fired.

Page 95

1   L. CONLEY
2       Q.   And your position is you were
3   selected for termination because of your
4   gender?
5       A.   Correct.
6       Q.   And who are you alleging made that
7   decision?
8       A.   I don't know how the decision was
9   made and I don't know who the -- I don't know
10  who made the decision.
11      Q.   So as a director, let me ask it a
12  little differently.  When you were at
13  Citigroup, were directors expected to generate
14  revenue?
15      A.   Directors were expected to
16  generate revenue in the context of being part
17  of client teams.  There was a culture of
18  teamwork at Citi, such that you were expected
19  to have other senior bankers on the team with
20  you.
21          I was not expected to necessarily
22  go out and identify and attain new clients,
23  although I did that.  What we were expected to
24  do is kind of work in the context of the team,
25  and because there was a belief that the best

Page 96

1   L. CONLEY
2   client service, the best client understanding
3   comes from cooperation.
4       Q.   From 2005 to 2008, do you recall
5   how many directors there were in the
6   healthcare group?
7       A.   I don't recall if the number
8   changed at all.  I know that there were ten
9   when I left.
10      Q.   Do you recall who those ten were?
11      A.   I know and worked with all of
12  them, so if you gave me enough time I would
13  come up with a list.
14      Q.   Let me ask you this and maybe we
15  can help structure that list:  Were there
16  senior directors?
17      A.   Yes.
18      Q.   And who were the senior directors?
19      A.   There were a number of people that
20  had been directors for a very long time, a
21  very long time.  Kent Jackman comes to mind,
22  Mike Irwin comes to mind who was a managing
23  director and then was demoted.  Charlie
24  Plimpton out in the West Coast.  Those are the
25  senior directors I am coming up with right



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 10 of 12

LISA CONLEY                                                                August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                                       113–116

Page 113

1  L. CONLEY
2  the healthcare group?
3      A.  In this list that you just led me
4  through she is the only woman of this six and
5  I can't think of anybody else.
6      Q.  And we have just gone through five
7  males who were let go before you, correct?
8      A.  Correct.
9      Q.  And then in November of 2008 there
10 were a total of how many people let go?
11         MR. DATOO:  Objection.
12     Q.  In the healthcare group.
13     A.  In the healthcare group, there
14 were two -- three, I guess, three.
15     Q.  Who do you recall being let go in
16 November of 2008 from the healthcare group?
17     A.  I believe it was Dave Johnson and
18 Pinky Nahata and I.
19     Q.  And focusing on the November 2008
20 reduction in force, do you know who made the
21 decision as to who would be let go?
22     A.  I don't know who made the
23 decision.
24         MR. DATOO:  You have to let him
25     finish the question.

Page 114

1  L. CONLEY
2      Q.  Do you know who made the decision
3  as to who would be let go?
4      A.  I don't know who made the
5  decision.
6      Q.  Do you know what criteria the
7  decision-makers relied on in making their
8  decision?
9      A.  I understand there was criteria
10 that there were two primary criteria of client
11 retention and salary and bonus reduction.  But
12 that's not something that I had knowledge of
13 at the time.
14     Q.  And do you have that understanding
15 now?
16         MR. DATOO:  I am going to instruct
17     the witness not to answer that question
18     if it involves you conveying something
19     that was discussed with your counsel.
20     A.  I am not going to answer that
21 question.
22     Q.  In the earlier reductions in
23 force, the other rounds of reductions in 2008
24 we identified a few other directors who were
25 let go, correct?

Page 115

1  L. CONLEY
2      A.  Yes.
3      Q.  When those directors were let go
4  did Citigroup lose any clients?
5      A.  Yes.  Iowa Health Systems is now a
6  client of J.P. Morgan where Peter Reilly is
7  currently at.  And there may be other names on
8  the list, I don't -- Peter Reilly tends to be
9  a West Coast banker, so he had relationships
10 that I am not privy to.
11     Q.  Do you believe Peter Reilly took
12 other clients away from Citigroup, other than
13 Iowa Health Systems?
14     A.  I don't have any basis to say yes
15 or no, because I just don't know.
16     Q.  Do you know whether Mark Chiang
17 took any clients away from Citigroup?
18     A.  Mark was an M&A banker that
19 focused on things that was even outside of not
20 for profit healthcare, so I have no basis to
21 know whether he took any or not.
22     Q.  And as you saw the reductions that
23 Citigroup was going through in 2008, did you
24 have any discussions with your supervisors
25 about your status?

Page 116

1  L. CONLEY
2      A.  I did not specifically -- what
3  specifically do you mean with respect to
4  status?
5      Q.  Well, did you discuss with them
6  whether you were possibly going to be laid
7  off?
8      A.  I did not.
9      Q.  Did you discuss with them job
10 security?
11     A.  I did not.
12     Q.  Did you discuss with them how many
13 people overall were going to be let go?
14     A.  I did not.
15     Q.  When you learned about some of the
16 males that we have gone through that had been
17 let go from the healthcare group, did you
18 think their gender played a role in those
19 decisions?
20         MR. DATOO:  Objection.
21     A.  I did not think their gender
22 played a role.
23     Q.  How about for any of -- the one
24 woman that you recall who was let go before
25 your round of reductions, did you believe her



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 11 of 12

LISA CONLEY                                        August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                              117–120

Page 117

1       L. CONLEY
2  gender played a role?
3       A.   I did not think her gender played
4  a role.
5       Q.   Do you know how the healthcare
6  group was doing in 2008?
7       A.   I don't think that I could
8  contemplate -- I don't think that I can
9  comment from the perspective of revenue
10 generation. I know that we were very busy.
11      Q.   Do you have knowledge as to
12 whether the group was profitable in 2008?
13      A.   Define "profitable."
14      Q.   Well, do you know what it means to
15 make a profit?
16      A.   There are different ways to define
17 profit.
18      Q.   Within the healthcare group were
19 transactions profitable?
20      A.   In general, they were profitable,
21 yes.
22      Q.   I take it some were not
23 profitable?
24      A.   There were a handful that were not
25 profitable.

Page 118

1       L. CONLEY
2       Q.   And how was profit determined in
3  the healthcare group?
4       A.   Generally revenues. The revenues
5  of the transaction were probably the primary,
6  the primary area of focus when evaluating a
7  transaction. There were higher revenue
8  transactions and lower revenue transactions,
9  and so I don't know that we ever talked about
10 transactions in the context of being
11 profitable business or unprofitable business.
12 It was either high revenue business or not so
13 high revenue business.
14      Q.   So do you know how Citigroup
15 measured whether its transactions were
16 profitable or not?
17      A.   I don't have direct knowledge of
18 how they evaluated transactions. But from my
19 perspective and the direction given to me by
20 Fred and David is, focuses on revenues.
21      Q.   You used the term in your answer
22 how they evaluated transactions. I just want
23 to make sure that we're talking about the same
24 thing. I am trying to ask whether you know
25 how they determined whether a transaction was

Page 119

1       L. CONLEY
2  profitable for Citibank.
3       A.   I don't know how -- I don't know
4  how they technically determined that, no.
5       Q.   Were you aware that the healthcare
6  group was not profitable in 2008?
7       A.   I did not know that.
8       Q.   Are you aware that they had
9  significant losses in 2008?
10      A.   I did not know that.
11      Q.   Do you know what "mark to market"
12 means?
13      A.   Yes.
14      Q.   And were the transactions that you
15 were involved in mark to market a component of
16 those?
17      A.   There were a number of my clients
18 who swap positions with Citigroup that had
19 negative marks is the terminology that we
20 used. There was never any indication to me
21 from anybody at Citigroup that a negative
22 swap, mark to market, meant that my client was
23 not profitable. It is a --
24      Q.   You said that negative mark was
25 the terminology you used; is that right?

Page 120

1       L. CONLEY
2       A.   Yes.
3       Q.   Does that terminology mean it was
4  a loss for Citigroup?
5       A.   No, it did not mean it was a loss.
6  It meant that our client had a position in
7  which it owed Citi money.
8       Q.   And were there some positions when
9  you took into account the mark to market --
10 and I take it effectively represents the
11 market value at a current point in time; is
12 that right?
13      A.   Of a particular swap position.
14      Q.   So that when a swap is put on,
15 that position might have a certain value, but
16 as the market changes, the value of that
17 position changes, correct?
18      A.   Correct.
19      Q.   And that if the market changes in
20 one direction, it could result in a loss to
21 Citigroup, correct?
22      A.   Not correct.
23      Q.   Why is that not correct?
24      A.   Because even though the value of
25 the position changes, it is not a revenue



Case 1:10-cv-07820-LGS   Document 59-7   Filed 06/07/13   Page 12 of 12

LISA CONLEY                                                            August 14, 2012
AMY BARTOLETTI vs. CITIGROUP                                               201–204

Page 201

1        L. CONLEY
2  terminated illegally.
3     Q.   And what is the basis for that
4  belief?
5     A.   Because I was the only woman that
6  was a director in the healthcare group and my
7  performance was better from the perspective of
8  executing on revenues, on leading client
9  accounts, on generating new business.  And on
10 top of that, I had lower comp than a lot of my
11 comparators and so it -- when you have those
12 kinds of facts, it leads me to believe that it
13 was because I was a woman.
14    Q.   So let me just walk true this.
15 One, you said you were the only female
16 director in the healthcare group, right?
17    A.   Yes.
18    Q.   If there had been another female
19 director in the group, would you still feel
20 that your termination was discriminatory?
21       MR. DATOO:  Objection.
22    A.   There wasn't another female
23 director in the healthcare group, so it is
24 impossible for me to say -- it is impossible
25 for me to say what if.

Page 202

1        L. CONLEY
2     Q.   So one reason is, one reason you
3  think your termination was wrong is because
4  you were the only woman in the group?
5     A.   Yes.
6     Q.   And did you feel it was wrong when
7  males were terminated before you in earlier
8  rounds of the RIF?
9     A.   I don't know what contributed to
10 the decision to terminate them, so I can't say
11 whether it was right or wrong.  It is not, you
12 know -- it wasn't my decision and it wasn't
13 anything that I have any knowledge of.
14    Q.   The second reason you said was
15 that your performance was better.
16    A.   Yes.
17    Q.   According to who?
18    A.   My knowledge of the situation, the
19 revenue reports that I have seen the --
20    Q.   I am sorry, you didn't see the
21 revenue reports until two days ago, and this
22 lawsuit was filed years ago.
23    A.   Right.
24    Q.   So clearly you said you believe
25 that it was accurate at the time it was filed.

Page 203

1        L. CONLEY
2     A.   Right.
3     Q.   You didn't have those revenue
4  reports at the time it was filed.
5     A.   Right.
6     Q.   So when you say your performance
7  was better, did you believe your performance
8  was better at the time the lawsuit was filed?
9     A.   I believed that I was more
10 effective than many of the other directors in
11 the group.  And I guess I am just reciting the
12 revenue reports because I think that that
13 bears out the general feeling that I had at
14 the time.
15    Q.   And when you say you believe you
16 were more effective or that you were a better
17 performer, did anyone tell you that?
18    A.   I did not have the specific
19 conversation with anybody about that, no.
20    Q.   So this is just your perception of
21 your performance that you are basing it on,
22 correct?
23    A.   I am certain that I was told over
24 the years by other managing directors that I
25 worked with that I was terrific and that I can

Page 204

1        L. CONLEY
2  manage processes better than other kind of
3  midlevel bankers that they had worked with.
4  But as far as -- that's my answer.
5     Q.   But as far as assessing, your
6  belief that your performance was better and
7  that you were more effective, is that belief
8  based on your own perception of how you
9  performed compared to others?
10    A.   My perception is based upon
11 knowledge of what's going on in the healthcare
12 group and knowledge of work hours and
13 knowledge of leading transaction teams.
14       I know that I led a number of
15 accounts, whereas other similar situated males
16 did not lead accounts.  So there are -- there
17 is my opinion, but then there is also some
18 facts to back that up.
19    Q.   You said that managing directors
20 told you were terrific.
21    A.   Ahem.
22    Q.   Who told you that?
23    A.   I had great working relationships
24 with a number of managing directors, Jim
25 Blake, Jim Johnson.

