# EXHIBIT 8

Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 2 of 15

DAVID M. CYGANOWSKI                                             July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                         89–92

Page 89

1     D.M. CYGANOWSKI
2  Q. I think you made your point.
3  A. Okay. That's disgusting.
4  Q. Did there come a time when Lisa
5  Conley was hired by Citigroup?
6  A. Did there what?
7  Q. Did there come a time when Lisa
8  Conley was hired by Citigroup?
9  A. Yes. Yes.
10 Q. And did you recruit Lisa?
11 A. Yes.
12 Q. How did you recruit her?
13 A. I don't recall the specifics,
14 Adam. She was with UBS or the predecessor.
15 It might have been PaineWebber at the time.
16 We were looking to scale up our Chicago
17 office, and either by referral or industry
18 reputation.
19 Q. So did Lisa have a good reputation
20 in the industry?
21 A. Yes. And she still has today a
22 very good reputation.
23 Q. And when did you -- do you
24 remember when you recruited Lisa to Citigroup?
25 A. No. But she was -- she had long

Page 90

1     D.M. CYGANOWSKI
2  tenure with our group. Not quite as long as I
3  did, but she joined --
4  Q. When you recruited her, were you
5  already in your role of managing director?
6  A. I believe so, but I'm not sure.
7  Q. And do you know what position Lisa
8  was hired into?
9  A. I believe she was hired into as an
10 AVP, but she could have also --
11 Q. That's --
12 A. Assistant vice president, although
13 she could have been recruited as an associate
14 but it was a senior associate, either way, it
15 was either a senior associate or assistant
16 vice president, and she was promoted
17 subsequently to that.
18 Q. And were you involved in the
19 decision to hire Lisa?
20 A. Yes.
21 Q. And who else was involved in the
22 decision to hire?
23 A. Principally Fred and me as
24 co-heads, and I'm making the assumption that I
25 was co-head at the time. I'm reasonably

Page 91

1     D.M. CYGANOWSKI
2  certain I was. And we got permission -- you
3  know, it generally worked one of two ways. We
4  either got permission to go out and hire, or
5  we found somebody that we wanted to hire but
6  we had to seek approval. We did not have
7  hiring authorization. We had to get hiring
8  authorization from many people.
9  Q. You said many people. Who were
10 the people you needed authorization from?
11 A. At a minimum it was the head of
12 public finance.
13 Q. Which was Frank Chin at the time?
14 A. Yes. The head of the municipal
15 securities division, Ward Marsh, I believe
16 Ward's boss had to sign off on it and there
17 might have been additional approvals.
18 Q. Who was Ward's boss?
19 A. It changed. I don't know who was
20 his boss at the time that Lisa was hired.
21 Q. So you mean it is just an analyst
22 being hired, it went all the way up the food
23 chain to Ward's boss?
24 A. It depended on the particular
25 period of time and level of position.

Page 92

1     D.M. CYGANOWSKI
2  Q. And Lisa was hired into the
3  healthcare group?
4  A. Yes.
5  Q. And --
6  A. You asked me about hiring. The
7  extent of external -- the extent of external
8  authorizations outside of municipals varied
9  during my tenure as co-head. It changed. But
10 there were always external authorizations
11 required.
12 Q. What about with respect
13 specifically to Lisa's hiring, do you
14 remember --
15 A. I don't remember.
16 Q. Do you remember if Frank Chin
17 signed off at the very least?
18 A. At a minimum, Frank Chin and Ward
19 Marsh signed off.
20 Q. Who communicated the offer of
21 employment to Lisa?
22 A. I don't remember. It was either
23 Fred or me. Or both of us.
24 Q. Did Lisa interview with Citi?
25 A. You mean as part of a recruiting



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 3 of 15

DAVID M. CYGANOWSKI                                          July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                      97–100

Page 97

1          D.M. CYGANOWSKI
2  order to be considered for that role?
3      A.   Generally it was a more senior
4  person with a more junior person.
5      Q.   And could the junior person be a
6  vice president or was it --
7      A.   Yes.
8      Q.   It could be a vice president.
9           And once someone was promoted to
10 vice president, were these delegated people no
11 longer responsible for that?
12     A.   Right.  Then they were direct
13 reports to Fred and me.
14     Q.   So you, aside from consulting with
15 Fred and signing off on it with Fred and then
16 consulting with these delegated people, do you
17 remember talking or consulting with anyone
18 else before promoting Lisa to vice president?
19     A.   Not that I recall.
20     Q.   And would Frank Chin or the head
21 of public finance have to sign off on a
22 promotion?
23     A.   Yes.
24     Q.   So you believe that he did sign
25 off on Lisa's promotion to vice president?

Page 98

1          D.M. CYGANOWSKI
2      A.   Yes, I believe he did.
3      Q.   What about Lisa's promotion to
4  director, who was involved in that decision?
5      A.   Fred and I would look at
6  professional development.  We took it very,
7  very seriously.  So we would meet with our
8  direct reports quite often.  Sometimes
9  informally; sometimes when human resources
10 told us we had to, but we didn't wait until we
11 got instruction because we felt professional
12 development was very, very important to our
13 people, particularly as they became more
14 senior because we wanted them to be successful
15 and we wanted them to be leaders.
16          And generally, for director
17 promotions, it would be an aggregation of
18 factors.  It would be our own observation of
19 them in action.  But we would supplement that
20 by having conference calls with our managing
21 directors.  And we would have all of them on
22 the same line and we would go person by person
23 saying, this year Lisa and Mike are the two
24 people that are up and eligible, what do
25 people think of Mike and Lisa.  And we would

Page 99

1          D.M. CYGANOWSKI
2  seek on a conference call of our managing
3  directors, the pros and cons -- their views.
4           And then after that call, Fred and
5  I would sit down, synthesize what we learned,
6  synthesize what we got from that call, and
7  then come to a joint recommendation that we
8  would make to Frank, and then Frank and David
9  would direct the promotions.
10     Q.   And you in that answer said that
11 you would take it upon yourselves to sit down
12 with all your direct reports to discuss
13 professional development.  Direct reports just
14 to clarify, means directors on up?
15     A.   Yes.  Although we made it clear to
16 aalysts and associates and AVPs, come on into
17 the office, we have an open-door policy, and
18 we would encourage people to come into our
19 office.  We didn't want junior professionals
20 to be reluctant to come into our office and
21 both, I in particular, would spend a lot of
22 time in the bullpen which is our name for
23 where analysts and associates and AVPs would
24 sit, and spend time with them.
25     Q.   And what factors do you consider

Page 100

1          D.M. CYGANOWSKI
2  when deciding on whether someone is ready for
3  a promotion?
4      A.   You have to be more specific.
5      Q.   Well, how did you know that Lisa
6  was ready to be promoted to director?
7      A.   So you are asking me what the
8  criteria was for Fred and me for promotion to
9  director?
10     Q.   Correct.
11     A.   Is that what you are asking me?
12     Q.   That's what I'm asking.
13     A.   Okay.  The criteria in our view
14 was a multiple of factors and it got, you
15 know, it got complicated the more senior you
16 got.
17          Was a person capable of growing
18 into becoming an account manager?  In other
19 words, being responsible for a project team
20 for an existing client, and leading the team
21 to complete a financing.
22          Secondly, did they have the
23 potential to generate new business?  In other
24 words, Mike is No. 2.  He's in the No. 2 chair
25 and you're in the number one chair.  Does a



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 4 of 15

DAVID M. CYGANOWSKI                                              July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                      101–104

Page 101
1         D.M. CYGANOWSKI
2   director have the potential to become a No. 2
3   chair with the potential to become a number
4   one chair.
5         And then, thirdly, leadership
6   capabilities and contributions to not only the
7   healthcare group, but to the division.
8     Q.  And you considered these three
9   criteria when you were deciding, when you
10  decided to promote Lisa to director?
11    A.  Yes.
12    Q.  Did consider Lisa had the ability
13  to generate revenue?  Not just with new
14  business, but just to generate revenue from
15  existing clients?
16        MR. TURNBULL:  Objection to form.
17    A.  I'm not sure what you are asking.
18    Q.  Well, the ability to generate
19  revenue, would that fall under any of these
20  three criteria?
21        MR. TURNBULL:  Objection.
22    A.  Yes.  Yes.  It fell under all of
23  them.
24    Q.  Generating revenue, obviously, is
25  important?

Page 102
1         D.M. CYGANOWSKI
2     A.  Yes.
3     Q.  You can't stay in business without
4   generating revenue?
5     A.  Yes.
6         I would also note that it is not
7   only revenue, it is net income.  It is revenue
8   less expenses.
9     Q.  As a VP was there any revenue
10  generation responsibilities in that role?
11    A.  No.
12    Q.  And as a director there you then
13  become, you become more responsible for
14  generating revenue?
15    A.  Right.  But it's an evolution.
16  It's an evolution.
17    Q.  What do you mean by it's an
18  evolution?
19    A.  I would go back to my analogy that
20  being number two chair versus number one
21  chair.
22    Q.  So the idea is that when you are
23  initially promoted to director you are not
24  expected to generate the same amount of
25  revenue as when you've been a director for

Page 103
1         D.M. CYGANOWSKI
2   five, six years?
3     A.  Correct.
4     Q.  As, you've testified earlier that
5   it is your role as group head, you filled out
6   performance reviews?
7     A.  Um-hum.  I'm sorry, yes, yes, yes.
8         THE WITNESS:  I can laugh.  Can I
9     laugh?  Is that allowed, Kevin?
10    Q.  And is that an important part of
11  your job?
12    A.  I'm sorry?
13    Q.  Filling out reviews, is that an
14  important part of your --
15    A.  I considered it a very important
16  job, but I considered providing, Fred and I,
17  and I know I speak for him on this point as
18  well, that providing constructive feedback
19  regularly, whether there was a form or not,
20  was really important to people, both positive
21  feedback as well as constructive feedback.
22    Q.  So would you agree that it wasn't
23  just the ratings on the reviews that was
24  important, it was also the feedback associated
25  with each rating, or in each category on a

Page 104
1         D.M. CYGANOWSKI
2   review?
3     A.  Yes.
4         MR. TURNBULL:  Objection to form.
5         THE WITNESS:  Sorry.  I keep --
6         MR. TURNBULL:  That's okay.
7     Q.  You can answer.  Yes?
8     A.  Well, it is funny, Ken had one
9   request of me.
10        MR. TURNBULL:  Let's not talk
11    about what we talked about.
12        THE WITNESS:  All right, sorry.
13        MR. GROSS:  The answer was yes.
14    Q.  And are performance reviews and
15  ratings, are they taken into account when
16  making promotion decisions?
17    A.  Can you repeat?
18    Q.  Are the scores that someone got on
19  their performance reviews in previous years,
20  is that considered when deciding whether to
21  promote someone?
22    A.  I would prefer to answer in that
23  that's really the tail wagging the dog, what
24  was on a particular form.  The performance
25  evaluations were a very important part of



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 5 of 15

DAVID M. CYGANOWSKI                                      July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                  105–108

Page 105

1          D.M. CYGANOWSKI
2   professional development because it was an
3   opportunity to formally share, have the
4   employee share a self-assessment of his or her
5   performance, and it would give us an
6   opportunity to comment on it as well as
7   provide, you know, our own opinion. But it --
8   Fred and I considered it to be much more than
9   just the forms. It was a dynamic, living
10  healthcare group, and we saw in action every
11  day and it was an aggregation of many things,
12  not necessarily whether someone got a 1 or 2
13  or a 3.
14      Q.   But the idea is that someone's
15  review would reflect the way that they were
16  performing?
17          MR. TURNBULL: Objection.
18      A.   That was the goal.
19      Q.   In other words, the goal was to
20  fill out the reviews accurately?
21      A.   Yes.
22      Q.   And were performance or when
23  making termination decisions, was performance
24  considered?
25      A.   I'm sorry?

Page 106

1          D.M. CYGANOWSKI
2       Q.   When making decisions about
3   termination, not just performance reviews, but
4   someone's performance was considered at that
5   time as well?
6       A.   Termination with respect to
7   reduction in force?
8       Q.   Sure. With respect --
9       A.   Well, I'm asking to be specific.
10      Q.   With respect to reductions in
11  force.
12      A.   The reductions in force were not
13  merit-based at all and none of the people that
14  were asked to leave the healthcare group
15  during each of those four RIFs deserved to be
16  terminated. I said that then. I say that
17  today.
18      Q.   What about compensation, did
19  performance reviews and someone's performance
20  play into their discretionary compensation,
21  the amount of their discretionary
22  compensation?
23      A.   It was one factor.
24      Q.   What are the other factors?
25      A.   It was, I would share with you the

Page 107

1          D.M. CYGANOWSKI
2   same observation that I did a few minutes ago
3   in terms of being an aggregation of things.
4       Q.   The same three criteria that --
5       A.   No, no, the aggregation, my
6   comment that Fred and I saw the group in
7   action every day, we saw contributions.
8       Q.   The living, dynamic healthcare?
9       A.   Yes. It's -- if I could offer an
10  analogy, a baseball analogy since you
11  commented on my cufflinks. When you look at a
12  box score, a box score doesn't necessarily
13  reveal the contribution of a player, both
14  positively or negatively, to the outcome of
15  the game.
16      Q.   So it was through your, you and
17  Fred had the experience of working day to day
18  with all of these people, and that's, it was
19  that experience that you used to --
20      A.   Yes.
21      Q.   -- make compensation decisions and
22  promotion decisions?
23      A.   Yes. Well, recommendations.
24      Q.   Recommendations?
25      A.   Recommendations.

Page 108

1          D.M. CYGANOWSKI
2       Q.   And you testified earlier that
3   promotions needed to be signed off on by the
4   head of public finance?
5       A.   At a minimum.
6       Q.   At a minimum. How would
7   compensation be set? Did you provide
8   suggestions?
9       A.   No. But -- yes. No -- excuse me
10  for a minute. Let me pause.
11          When Frank Chin was public finance
12  head, he would, sometime during the incentive
13  compensation process, share with Fred and me,
14  a spreadsheet that proposed incentive
15  compensation for our bankers from vice
16  president, I believe vice president on up.
17  Because AVPs and associates were considered --
18  that was a different track, a different set.
19  There was more firm-wide driven.
20          So he would share with us the
21  spreadsheet and ask for our comments so there
22  was a little bit of collaboration. But it was
23  a process driven by Frank Chin.
24      Q.   And David Brownstein once he
25  became co-head?



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 6 of 15

DAVID M. CYGANOWSKI                                         July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                    117-120

Page 117
1           D.M. CYGANOWSKI
2     A.   We would try to separate -- Fred
3  and I tried very hard to separate performance
4  appraisal from compensation discussions
5  because if you sat -- it was our experience
6  that if you sat down a professional and said
7  you're incentive compensation was X, whatever
8  you said after that would not have -- would
9  not resonate.  So we tried to put as much time
10 between the year-end and when we informed them
11 of their incentive compensation.  Because
12 while they are clearly linked, they, the
13 purpose of a performance evaluation is much --
14 is different than sitting down and telling
15 somebody their incentive compensation number.
16    Q.   And if you look on the second page
17 of this document, the page that is marked 342
18 in the bottom right-hand corner.
19    A.   Um-hum.
20    Q.   One of those signatures, is that
21 your signature on the manager line?
22    A.   Yes, sir.
23    Q.   And do you know if that is Fred
24 Hessler's signature as well?
25    A.   Yes.

Page 118
1           D.M. CYGANOWSKI
2     Q.   So this was both you and Fred
3  reviewing Lisa's performance for this year?
4     A.   Yes.
5     Q.   And would you --
6     A.   I don't -- let me rephrase that
7  since this is a deposition and it is based on
8  fact.
9         I don't recall Fred -- I don't
10 recall specifically that he signed this, but
11 it looks like his signature, and we certainly
12 sat down with her together and it was a joint
13 review.
14    Q.   And you already said that this was
15 Lisa's first year as a director, right?
16    A.   Yes.
17    Q.   And in her first year as a
18 director, would you agree that she had very
19 strong performance?
20    A.   She had a strong year.  Yes.  Yes.
21 Yes.
22    Q.   Would you say that she had an
23 excellent year?
24    A.   No, I would say that she had a
25 strong year.

Page 119
1           D.M. CYGANOWSKI
2     Q.   So do you disagree if you look at
3  the second page with the manager overall
4  comment?
5     A.   No, I'm looking --
6     Q.   If you look at part 3, overall
7  performance summary and rating.
8     A.   Oh, I see what your point is.
9     Q.   It says "Lisa's performance in
10 2005 has been excellent."
11    A.   Yes.
12    Q.   Do you disagree with that?
13    A.   No, I don't disagree with that.  I
14 guess -- no, I don't disagree with that.  I
15 was just looking at the summary comments on
16 the top where it was a strong year.
17        So, yes, she had a strong year and
18 her performance in '05 was excellent in my
19 opinion and in Fred's opinion, yes.
20    Q.   So would it be fair to say that
21 she flourished from the transition from vice
22 president to director?
23    A.   No.
24        MR. TURNBULL:  Objection to form.
25        THE WITNESS:  Oh, I'm sorry.

Page 120
1           D.M. CYGANOWSKI
2        MR. TURNBULL:  Go ahead.
3     Q.   In 2005 did she struggle in the
4  transition from vice president to director?
5     A.   In her first year as a director,
6  she had a very strong year.  Her performance
7  was excellent.
8     Q.   And if you look -- I just want to
9  take you through the comments on the top of
10 that second page, the page marked 342.  It
11 says in the second line there, in the middle
12 of the second line, it says:
13        "Lisa has led our efforts to
14 structure and launch the CDO rural health
15 financing program?"
16        Do you see that?
17    A.   Yes.
18    Q.   What is that program?
19    A.   As best as I recall, I believe she
20 was working with others, including Dave
21 Johnson, to set up some type of program, a
22 pooled financing structure for small rural
23 hospitals where you would aggregate the needs
24 of small hospitals which generally had modest
25 borrowing needs, and package them in a way



Page 121

1  D.M. CYGANOWSKI
2  into a larger program. But I don't recall
3  many specifics because the financing program
4  was not successful. The initiative was not
5  successful.
6      Q. So it did not lead to any
7  business?
8      A. It may have led to one piece of
9  business, but it did not lead to a sustainable
10 flow of revenue.
11     Q. And if you look above that on the
12 first line, the second sentence:
13         "She successfully managed a series
14 of transactions for clients such as Reid,
15 Greenville and Jefferson."
16         Do you see that?
17     A. Yes.
18     Q. What do you mean by she
19 successfully managed a series of transactions?
20     A. A responsibility of a director is
21 to manage the project team of Citi to execute
22 financings, and the analogy, again, was, in a
23 number two chair to make sure that the trains
24 are running on time and that you have all the
25 information that you need to do to

Page 122

1  D.M. CYGANOWSKI
2  successfully manage the deposition, Lisa in
3  that way was a very -- was a very effective
4  No. 2 person managing transaction execution,
5  and in this particular year it was Reid which
6  is in Indiana, Greenville which is in South
7  Carolina and Jefferson which is in
8  Philadelphia.
9      Q. And does this constitute leading
10 business?
11         MR. TURNBULL: Objection to form.
12     A. I'd have to ask you to rephrase
13 that.
14     Q. Were these new clients, Reid,
15 Greenville and Jefferson? Or were any of them
16 new clients?
17     A. I don't recall, but the context of
18 this, the context of this sentence was
19 directed to her managing the team for the
20 transaction execution, not for securing the
21 client, this particular sentence.
22     Q. And so when you used your analogy
23 before with the number one chair and the
24 number two chair, are you saying that Lisa was
25 in the number two chair with respect to these

Page 123

1  D.M. CYGANOWSKI
2  transactions, with Reid, Greenville and
3  Jefferson?
4      A. Yes.
5      Q. Who was in the number one chair?
6      A. I can't recall with Reid, but with
7  Greenville and Jefferson it was Mike Irwin who
8  was a managing director.
9      Q. And at this time in the healthcare
10 group, do you remember how many managing
11 directors you had, aside from you and Fred?
12     A. In '05? No, I can tell you with
13 complete accuracy the number of managing
14 directors we had when, you know, when I left
15 Citi, but I can't tell you who was a managing
16 director in '05.
17     Q. Was it more than two?
18     A. Oh, yes, yes.
19     Q. More than five?
20     A. I can just tell you who the
21 managing directors were during the course of
22 my tenure. Is that satisfactory? Or -- I
23 don't remember who the managing directors were
24 at the end of, in November of '05.
25     Q. Well, let me ask you this. Do you

Page 124

1  D.M. CYGANOWSKI
2  remember if at this time or whether really
3  throughout your tenure at Citi, whether most
4  deals were staffed with a managing director on
5  a deal or on a client?
6         MR. TURNBULL: Objection to form.
7      A. No, not every one was. But we
8  believed, our philosophy was to have two
9  senior people on an account, and those two
10 senior people could either be an MD or a
11 director, two directors or even two managing
12 directors, and it was really a function of the
13 complexity of the client, the level of
14 importance, the magnitude of the contribution
15 of the client to our overall business flow,
16 the reputation of that client within the
17 industry.
18     Q. So there was always two management
19 level employees on an account?
20     A. I don't want to say always, but
21 our --
22     Q. General practice?
23     A. -- policy, that was what we
24 encouraged the group to do. For seamless --
25 and we did that for a number of reasons. We



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 8 of 15

DAVID M. CYGANOWSKI                                         July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                   145–148

Page 145
1              D.M. CYGANOWSKI
2       So does playing a key leadership
3   role still equate to a second chair?
4       A.   Yes.
5       Q.   And did you talk this year with
6   people who were, so to speak, the first chairs
7   about what Lisa's role was, with respect to
8   acquiring these new clients?
9       A.   I don't know.  All I could tell
10  you is we had the call with managing
11  directors.
12           I would think that on HAC, since
13  it involved Ray Klaijic who was a managing
14  director not in the group, that we reached out
15  to him, but I don't recall anything specific.
16           What I will tell you is that we
17  were very deliberate and took these things
18  very, very seriously to get as much feedback
19  as we could.
20      Q.   And so how did Lisa's role differ
21  from those in the number one chair?  What does
22  the person in the first chair do?
23           MR. TURNBULL:  Objection to form.
24      A.   The person in the first chair is
25  the one who leads the team, is the one that is

Page 146
1              D.M. CYGANOWSKI
2   the senior ranking person who is generally a
3   managing director who has years of experience,
4   or a senior director that has got years of
5   experience that's capable of leading a new
6   business effort, and that means internally as
7   well as externally.
8            Externally it means when you are
9   presenting the team in front of the client,
10  trying to generate opportunities to get in
11  front of the new business target and
12  orchestrating and maximizing as many, as many
13  touch points into that organization as you
14  can.
15           Internally it means organizing the
16  team and making sure that the team is being
17  very disciplined in having and following the
18  road map to secure the client.
19      Q.   And were you involved at all in
20  the, in pitching or acquiring the Kansas,
21  Wellmont or HAC account?
22      A.   No, they were very modest
23  accounts.
24      Q.   Was Fred Hessler involved?
25      A.   I can't -- I don't remember.

Page 147
1              D.M. CYGANOWSKI
2       Q.   So you don't really, you don't
3   know what Lisa did on a day-to-day basis with
4   respect to these accounts?
5       A.   That's correct.
6            MR. GROSS:  Do you want to break
7       for lunch?
8            MR. TURNBULL:  If this is a good
9       time.
10           MR. GROSS:  We can go for another
11      15, 20 minutes, or we can break for
12      lunch.
13           THE WITNESS:  Let's go.  No, let's
14      keep going.
15           MR. TURNBULL:  You want to keep
16      going?
17           THE WITNESS:  Let's go a little
18      more.
19           (Discussion off written record.)
20      Q.   As you look through this review,
21  Mr. Cyganowski, are there any comments in here
22  or ratings in this review reflecting a failure
23  on Lisa's part to develop new business?
24      A.   You keep focusing on new business.
25  All your questions are on new business.

Page 148
1              D.M. CYGANOWSKI
2       Q.   I'm just asking you to answer --
3       A.   No, but all your questions are on
4   new business, and Fred's and my definition of
5   director and the, and their relative
6   contribution, was new business was just one
7   element.
8            And as a young director, we viewed
9   Lisa a reasonably inexperienced director, we
10  would view her in a different light than we
11  would a more experienced director.
12      Q.   I understand that, but again I'm
13  asking -- I don't think you answered my
14  question which was are there any manager
15  comments or ratings in this review that
16  reflect a failure on Lisa's part to develop
17  new business?
18      A.   No.
19      Q.   And if you look at the next line
20  after we stopped reading previously, where it
21  says "Lisa also successfully elevated her
22  role."  Do you see where I'm reading from?
23      A.   Yes.
24      Q.   "Lisa also successfully elevated
25  her role on important accounts such as Rush,



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 9 of 15

DAVID M. CYGANOWSKI                                        July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                   153–156

**Page 153**

D.M. CYGANOWSKI

York. And I would see Lisa more often.
    So it wasn't -- it wasn't location at all. It was more travel schedules. But with today's communication of both cell phone and e-mail, you were never out of touch with anybody, but we always encouraged people to come to headquarters whenever they could. And, for example, every banker had reason to come to New York because the rating agencies, for example, are headquartered here. So you would have a client meeting and they would be at Standard & Poors, you know, downtown. And we would tell Lisa check in, or a David Kasdin or Andy Pines, look, don't just come in, go to the rating agency meeting and get on an airplane, try, within the context of your work/family balance, because they were all parents, try to stay, try to work out of the New York office for a day just so that you can get, you know, just to be around.
    But no one was disadvantaged from a promotion or compensation standpoint because of their location.
    Q.  And would you say that because of

**Page 154**

D.M. CYGANOWSKI

everyone's hectic travel schedules, it made it all the more important for you to solicit feedback from the people they were working with on a day-by-day basis in order to be able to effectively review and evaluate their performance?
    A.  Yes.
        MR. TURNBULL: Objection to form.
    A.  Oh, sorry. Sorry.
        Yes, and that's why we tried as best we can -- Fred and I put a lot of emphasis on soliciting feedback from people and -- yes.
    Q.  And then again, looking throughout this review, are there any comments, manager comments in here or ratings in this review that reflect a failure to progress toward leading her own business, leading or managing her own business?
    A.  Well, she didn't have a business to manage. She had a very strong year, highly effective year as a second-year director. And as I said in the beginning of the deposition, Lisa, along with the seven or eight or ten

**Page 155**

D.M. CYGANOWSKI

other people let go in the four RIFs in this particular year, were not terminated because of cause.
    Q.  But you said that she was progressing on that, the comments in the review do indicate that she was progressing on the role towards developing on her own?
    A.  Yes. And I would add that everybody else that we RIFed that year had similar comments, perhaps different ratings or overall summary comments, but no one was let go because of talent. And if Citi had not melted down, my presumption is that we would still be working at 390 and Lisa would still be in the Chicago office.
    Q.  Now, are there any manager comments or ratings in the review that suggest that Lisa was not interested in her own professional development?
    A.  No. She was -- Lisa is a wonderful person who took a lot of pride in what she did and she loved what she did and was always interested in --
    Q.  So she was interested in moving up

**Page 156**

D.M. CYGANOWSKI

through the ranks at Citi?
    A.  Yes.
        MR. TURNBULL: Objection to form.
        THE WITNESS: I'm sorry, I keep interrupting you.
    A.  Yes, she was interested in moving up and I would say that all of our directors and -- I mean, they all wanted to move up.
    Q.  And are there any comments in this review or ratings in this review that would suggest that she was struggling at all in her role during 2006?
    A.  No, she had, as I'm sure Fred will tell you when he's here, we stand by these comments. She had a strong year as a second-year director.
    Q.  So you agree that Lisa was interested in her professional development?
    A.  From every indication, yes.
    Q.  And you mentioned that you spoke to the managing directors when filling out this review -- before filling out the review?
    A.  Yeah, prior to, prior to the form, but also if we weren't required by HR, and HR



DAVID M. CYGANOWSKI  
AMY BARTOLETTI vs. CITIGROUP  
July 19, 2012  
173–176

Page 173

1  D.M. CYGANOWSKI
2  Mike Brown --
3  A. No.
4  Q. -- to join the Nebraska Methodist
5  team?
6  A. No. There is no reason for me to
7  believe that this is either true or false.
8  Q. Well, is it the fact that Lisa
9  wrote it, a reason to believe that it might be
10  true?
11       MR. TURNBULL: Objection to form.
12  A. Sure.
13      Are we done with this?
14       MR. GROSS: For now, yeah.
15          (Plaintiffs' Exhibit 296, Ryan
16          Freel's 2007 review bearing Bates
17          Nos. CGMI_BART 001186-1192 marked
18          for identification, as of this
19          date.)
20  Q. Mr. Cyganowski, I'm now handing
21  you what's been marked as Plaintiffs' Exhibit
22  296. Take a second to look it over.
23  A. Okay.
24  Q. Before we move onto this which is
25  the review, I should ask about Lisa's 2007

Page 174

1  D.M. CYGANOWSKI
2  review which is the document you were just
3  previously looking at. You said you believe
4  that you did fill out manager ratings and
5  reviews.
6     Do you remember as you sit here
7  today what you gave Lisa for her overall
8  rating in 2007?
9  A. No. But I do recall summary
10  comments.
11  Q. You recall the comments that you
12  wrote after the overall rating in the overall
13  comments section?
14  A. Yes.
15  Q. And what do you recall from those
16  comments?
17  A. The recollection I had was that
18  she had a good year, but her progress was
19  stalling --
20  Q. What do you --
21  A. -- in three areas. Number one, we
22  asked her specifically to take a leadership
23  role in forming a women's focus group for
24  women in leadership positions in the
25  healthcare delivery system industry. And she

Page 175

1  D.M. CYGANOWSKI
2  failed to do that.
3        Secondly, we had started to
4  receive, have concerns expressed on client
5  management on follow-through.
6        And thirdly, from a new business
7  development perspective, we felt that she was
8  running in place over the past year. In other
9  words, she wasn't taking a step back, but she
10  wasn't advancing.
11  Q. And so you mentioned three things,
12  the first thing was a women's leadership
13  group. You had asked her to put together a
14  committee or a group?
15  A. No, we asked her to put together
16  a -- we asked her to put together some type of
17  forum where women leaders in healthcare could
18  come together as an opportunity for her to
19  exercise leadership within our group. And we
20  specifically mentioned that one way to do that
21  was to leverage, to leverage off the Citi
22  investor conference that we host every year
23  with the AHA which is a situation where 30
24  healthcare systems and their leadership come
25  in to talk with investors once a year in May.

Page 176

1  D.M. CYGANOWSKI
2  And we specifically suggested that she use
3  that as a vehicle or venue to launch this
4  women's initiative. For example, perhaps
5  having a cocktail party the night before an
6  event, immediately after.
7  Q. And was this an internal forum?
8  A. No, no, this was a forum meant to
9  attract CFOs, women, women in C-Suite
10  positions in nonprofit healthcare systems
11  which were our base.
12  Q. So the idea was -- what was the
13  purpose of, why did you ask her to organize
14  the forum?
15  A. Two reasons. One was, as we did
16  with all our directors at the appropriate time
17  of professional development, we try to give,
18  we tried to create opportunities for them to
19  have an impact on the entire group, i.e. a
20  leadership position they can call their own
21  beyond their existing accounts.
22        And secondly, we thought it would
23  be good for business for our group because it
24  would raise our visibility within the industry
25  and result in new business. So it had dual



800.211.DEPO (3376)  
EsquireSolutions.com

Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 11 of 15

DAVID M. CYGANOWSKI                                    July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                              197–200

Page 197

1       D.M. CYGANOWSKI
2  Freel?
3       MR. TURNBULL:  Objection.
4     A.  No.
5     Q.  Would you have given him a 1?
6     A.  I would have given everybody a 1.
7     Q.  If Lisa had not been terminated in
8  November, do you think you would have given
9  her a 1 as well?
10    A.  Absolutely.  If you were a direct
11 report of mine, I would have given you a 1.  I
12 think the only exception to that would have
13 been Mike.
14    Q.  So the reason you gave everyone
15 all 1s, and if you went through this review,
16 it is a perfect review.
17    A.  I don't have to look at it.  I
18 know exactly what I did.
19    Q.  So that was a statement to the
20 company?
21    A.  That was an act of rebellion just
22 like my 16-year-old does at home.  It was an
23 act of rebellion.
24    Q.  An act of rebellion at the company
25 having nothing do to do with the actual

Page 198

1       D.M. CYGANOWSKI
2  performance of the employee?
3     A.  Nothing.
4       MR. GROSS:  Can we take
5  two-minutes.
6       THE VIDEOGRAPHER:  We are now
7  going off the record approximately 3:05
8  p.m.
9       (Recess taken.)
10      THE VIDEOGRAPHER:  We are now
11 going back on the record approximately
12 3:11 p.m.
13 BY MR. GROSS:
14    Q.  Mr. Cyganowski, you said that you
15 remember previously filling out Ryan Freel's
16 2007 review.  Is that right?
17    A.  Yes.
18    Q.  As you sit here now, do you
19 remember what the overall rating Ryan Freel
20 received in 2007?
21    A.  Not the rating.
22    Q.  Do you know whether there is a
23 limit to the number of 1s people in your group
24 can receive?  Let me rephrase that.
25      Do you know whether there is a

Page 199

1       D.M. CYGANOWSKI
2  maximum number of people who can receive
3  overall ratings of 1 in a given year?
4     A.  Yes.  In the -- I believe in the
5  last year there was a bell curve that was
6  instituted.
7     Q.  When you say the last year, is
8  that your last year of the company?
9     A.  I believe it is the last year or
10 maybe the last two years, I don't recall.
11    Q.  But it was not in place to your
12 knowledge in 2007?
13    A.  I don't know.  I just know that
14 when I left the firm, when I left the company,
15 a bell curve was instituted, was a mandate.
16    Q.  How did you become aware that the
17 bell curve was instituted?
18    A.  I don't remember, but I'm sure
19 Frank Chin or David Brownstein told us about
20 it.
21    Q.  Was it a conversation with Frank
22 Chin or David Brownstein?
23    A.  I don't remember whether there was
24 an e-mail or a conversation.
25    Q.  Do you recall any conversations

Page 200

1       D.M. CYGANOWSKI
2  with Frank Chin or David Brownstein about this
3  bell curve prior to the November of 2008
4  reductions in force?
5     A.  No.
6     Q.  What about prior to any of the
7  reductions in force in 2007 or 2008?
8     A.  No.
9     Q.  So as you sit here today you don't
10 understand why you weren't able to give Ryan
11 Freel a 1 on his 2008 review?
12    A.  No.
13    Q.  And he got a 3, that was the final
14 ranking, right, as you looked at that review?
15    A.  Yes.
16    Q.  And we've reviewed earlier today
17 all of the reviews as a director that Lisa
18 Conley had.  Is that correct?
19    A.  Yes.
20    Q.  And did you see any of the final
21 rating lines, anything other than a 2 on those
22 reviews?
23    A.  Can you -- I'm not clear what you
24 are asking me.
25    Q.  Did Lisa Conley ever do worse than



Case 1:10-cv-07820-LGS   Document 59-8   Filed 06/07/13   Page 12 of 15

DAVID M. CYGANOWSKI                                    July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                              213–216

Page 213

1              D.M. CYGANOWSKI
2    called Charlie.
3        Q.   Charlie Plimpton?
4        A.   Yes.
5        Q.   And again you don't know what
6    "mass submitted" means?
7        A.   No.
8        Q.   Were you also a direct manager of
9    Charlie Plimpton?
10       A.   Yes.
11       Q.   And does the same comment apply,
12   that you don't remember whether you were
13   allowed to click submit for his review in
14   2008? It lists Fred Hessler as his manager.
15       A.   Right. Charlie Plimpton was a
16   direct report of mine, as he was of Fred, and
17   these were the same comments, and we, the
18   collective we, Fred and I tried to give him a
19   1 and couldn't, the system overruled us.
20       Q.   And it had nothing to do with his
21   performance?
22       A.   Nothing.
23            Next direct report.
24       Q.   Do you remember having a
25   conversation with Charlie Plimpton in 2007

Page 214

1              D.M. CYGANOWSKI
2    regarding his performance?
3        A.   Yes. I recall having a year-end
4    assessment with every direct report at the end
5    of 2008. I just don't know when they took
6    place, whether it was October, November,
7    December or January.
8            (Plaintiffs' Exhibit 339, 2007
9            combined assessment for Michael
10           Irwin document bearing Bates Nos.
11           CGMI_BART 021943-1949 marked for
12           identification, as of this date.)
13       Q.   This is a combined assessment for
14   Michael Irwin in 2007, correct?
15       A.   Correct.
16       Q.   And he was a director at the time
17   in the group?
18       A.   No, he was a managing director.
19       Q.   He was a managing director at the
20   time?
21       A.   He was managing director.
22       Q.   Was there a time when Michael
23   Irwin was demoted from managing director to
24   director?
25       A.   Oh, I'm sorry, you are absolutely

Page 215

1              D.M. CYGANOWSKI
2    correct, you are correct. I apologize.
3        Q.   So he was a managing director at
4    one point and then he went back to --
5        A.   Yes, I don't recall what year that
6    happened, but, yes, he was demoted to
7    director. You are absolutely correct. I
8    apologize.
9        Q.   Do you recall whether at the time
10   at the end of 2007 he was a director?
11       A.   I don't remember. I just remember
12   he was demoted.
13       Q.   Why was he demoted?
14       A.   There was a limit placed on
15   managing directors in public finance. I don't
16   recall who placed that limit, whether it was
17   external to the division, but we were faced
18   with a zero sum situation where, in order to
19   promote a director to managing director in
20   public finance, someone had to be demoted.
21           And in our group Terry Hartmann, a
22   woman, who we thought extraordinarily highly
23   of, deserved to be promoted to managing
24   director. And we went to Michael who is
25   nearing the end of his career and asked him to

Page 216

1              D.M. CYGANOWSKI
2    be, to be utterly selfless and step back in
3    title so that we could have Terry promoted.
4    And he did. And -- and he did. And that was
5    an action that was absolutely reflective of
6    the culture of, in healthcare.
7        Q.   So this was a voluntary decision
8    by Mike Irwin?
9        A.   We asked him to do it and he did
10   it.
11       Q.   So it was not voluntary?
12           MR. TURNBULL: Objection.
13       A.   We asked him if he would volunteer
14   and he said yes.
15       Q.   As you sit here today, do you know
16   what would have happened if he had said no?
17       A.   No. It is a hypothetical answer,
18   not a question I can't answer. All I know is
19   that he was selfless.
20       Q.   And why did you approach Michael
21   Irwin as opposed to any of the other managing
22   directors at the time?
23       A.   He was at the later stages of his
24   career. We thought that he would accept it
25   and not view it as a demotion, and someone



Page 241

1  D.M. CYGANOWSKI
2  Q. If you look at page 15375.
3  A. Yes.
4  Q. Towards the bottom.
5  A. Yes.
6  Q. Do you see Wake Med?
7  A. Yes.
8  Q. Do you see any other seniors next
9  to Conley's name there?
10 A. No.
11 Q. Does that mean she was the only
12 senior on the account?
13 A. That's what this would imply, but
14 that's not the case.
15 Q. Do you know who else was on the
16 account with her?
17 A. Yes.
18 Q. Who else?
19 A. Amy Yang was and Kent Lawrence.
20 Q. I'm sorry, was Amy Yang in
21 healthcare?
22 A. Yes.
23 Q. What level?
24 A. Director.
25 Q. And was there a point in time

Page 242

1  D.M. CYGANOWSKI
2  where she was terminated?
3  A. No.
4  Q. So she was in healthcare as a
5  director at the end of 2008?
6  A. Yes. She was a woman.
7  Q. And what about for Wellmont
8  underneath Wake Med, could Lisa have been in
9  the first chair on that account?
10 A. In my view she was not in the
11 first chair on any account, regardless of this
12 staffing matrix. And the purpose of this
13 staffing matrix was more to focus on the
14 balance of activities and responsibilities for
15 the people that reported to Yang and to Kasdin
16 which would be AVP, associate, analyst.
17 Q. And who put this document
18 together?
19 A. I did not.
20 Q. Do you know who did?
21 A. No.
22 Q. Did you ever review the document
23 for its accuracy?
24 A. No.
25 Q. Do you know on the Wellmont

Page 243

1  D.M. CYGANOWSKI
2  account that it appears Lisa covered with Pat
3  Sheehan?
4  A. Yes.
5  Q. Do you know how they divided up
6  the work on that account?
7  MR. TURNBULL: Objection to form.
8  A. No.
9  Q. Do you know who was the primary
10 contact on that account?
11 A. No.
12 Q. Could it have been Lisa?
13 MR. TURNBULL: Objection.
14 A. It could have been.
15 Q. And the same question with respect
16 to Wake Med, could it have been Lisa who was
17 the primary contact on that account?
18 MR. TURNBULL: Objection.
19 A. Lisa was -- no, that's an account
20 I'm familiar with, unlike the questions you
21 are asking about these other accounts. She
22 was not the primary contact. Kent Lawrence
23 was.
24 Q. Ken Lawrence?
25 A. Kent Lawrence, K-E-N-T.

Page 244

1  D.M. CYGANOWSKI
2  Q. And what about Wishard Health
3  Services?
4  A. Wishard was the account that, as I
5  mentioned before, Ray Klaijic was the managing
6  director of the Central region.
7  Q. And if you look further up on that
8  same page, in the middle of the page, you see
9  Nebraska Methodist?
10 A. Yes.
11 Q. And you see that it is Lisa, and
12 is that Michael Brown?
13 A. Yes.
14 Q. And do you know whether Lisa was
15 the lead on that account?
16 A. No. Although, again, I would like
17 the record to show that, in my view she wasn't
18 the number one chair on any of the accounts,
19 but some of these I'm simply not familiar
20 with.
21 Q. So you really have no basis to say
22 whether she was the lead or not the lead on
23 the Nebraska Methodist account?
24 MR. TURNBULL: Objection to form.
25 A. That's correct. That's a fair



DAVID M. CYGANOWSKI  
AMY BARTOLETTI vs. CITIGROUP  
July 19, 2012  
245–248

Page 245

1          D.M. CYGANOWSKI
2   statement.
3       Q.   In your role as co-head of the
4   group, did you keep tabs on revenue that was
5   being brought in, on how much revenue was
6   being brought on?
7       A.   On an aggregate basis, yes.
8       Q.   Did you keep tabs on what an
9   individual's role was in bringing in that
10  revenue?
11      A.   No.
12      Q.   Did you ever look at any documents
13  that would indicate how much revenue someone
14  was bringing in?
15      A.   Frank Chin asked Bill Hudnut to
16  produce a revenue report at the end of the
17  year, so the answer would be yes.
18      Q.   I'm going to hand you now
19  Plaintiffs' Exhibit 290.
20           (Plaintiffs' Exhibit 290, PFD
21           Net Revenue Report Summary for Lisa
22           Conley in 2007 bearing Bates Nos.
23           CGMI_BART 15462, 15688 marked for
24           identification, as of this date.)
25      Q.   You referred to Bill Hudnut

Page 246

1          D.M. CYGANOWSKI
2   before.  Who is he?
3       A.   H-U-D-N-U-T.  He was the, I think
4   he was the CFO for public finance.  He kept
5   records like this.
6       Q.   Like this one.  And this is what's
7   called the PFD Net Revenue Report Summary for
8   Lisa Conley in 2007.  Do you see that?
9       A.   Yes, that's what it says.
10      Q.   Have you ever looked at this
11  document before?
12      A.   I've seen it before, yes.
13      Q.   When did you see it?
14      A.   Frank would have Bill send this
15  out generally in January, February.
16      Q.   So you would review this type of
17  document on a yearly basis?
18      A.   I wouldn't review this at all.
19      Q.   So who was it sent to?  Frank
20  would have it sent to who?
21      A.   Frank would have it sent to Fred
22  and me.
23      Q.   And you would just ignore it?
24      A.   I ignored it, yes.
25      Q.   Do you know if Fred ignored it?

Page 247

1          D.M. CYGANOWSKI
2       A.   You are going to have to ask him.
3   I think he's up.
4       Q.   So you and Fred never discussed
5   this document?
6       A.   No.
7       Q.   Why do you think Frank Chin sent
8   you this document?
9           MR. TURNBULL:  Objection.
10      A.   I have no idea.
11      Q.   You think it was because he felt
12  that there was some utility to it?
13          MR. TURNBULL:  Objection.
14      A.   You can ask him when you depose
15  him.  I don't mean to be curt, but.
16      Q.   And if you look at this
17  document -- let me just state for the record
18  that this appears to be two separate documents
19  that are grouped together as one exhibit.  As
20  you can see the first page says 15462, while
21  the second page says 15688.  And if you look
22  at the two pages side by side, Mr. Cyganowski,
23  it appears that the deals listed on both pages
24  are identical.  Is that fair?
25      A.   It looks like it, yes.

Page 248

1          D.M. CYGANOWSKI
2       Q.   And the second page, 15688 is a
3   transaction summary for top ten for 2007?
4       A.   Yes.
5           MR. TURNBULL:  Objection to form.
6       Q.   In other words, this appears to be
7   Lisa's highest, or top ten transactions for
8   2007?
9       A.   That, I don't know.
10      Q.   Do you know how the top ten is
11  measured?
12      A.   No.
13      Q.   If you -- do you know if it is by
14  total revenue generated?
15      A.   I have no idea.
16      Q.   If you look to the column all the
17  way to the right, that says net.
18      A.   Right.
19      Q.   Do you see that?
20      A.   Yes.
21      Q.   Is it your understanding that that
22  refers to net revenue for each deal listed?
23      A.   Probably, but I can't say that
24  with certainty.  That's what the column would
25  imply, yes.



Page 257

1          D.M. CYGANOWSKI
2 generally try to have the people who are
3 entertaining clients be the people who are
4 working on those accounts?
5     A.   By and large, yes, but not always
6 the case.
7     Q.   What about Bloomington Hospital?
8     A.   I didn't even know Bloomington was
9 a client. I just forgotten.
10     Q.   And I guess we talked about
11 earlier, it looks like it is Indiana?
12     A.   Right.
13     Q.   So you don't know whether Lisa was
14 the point person on this account?
15     A.   No.
16     Q.   It's possible that she was?
17     A.   Yes, it is possible.
18     Q.   What about your knowledge of
19 Pennsylvania, the last two deals on this?
20     A.   Jefferson Health, actually I am
21 familiar with that. Mike Irwin is the lead.
22     Q.   And Lisa is involved?
23     A.   I'm not quite sure, actually.
24     Q.   Do you have any --
25     A.   I'm not quite sure. You'll have

Page 258

1          D.M. CYGANOWSKI
2 to ask Mike.
3     Q.   You have no reason to believe she
4 wasn't?
5     A.   I have no reason to believe she
6 wasn't.
7     Q.   And I think we skipped one in the
8 middle there, Saint Joseph County Hospital?
9     A.   That's Memorial South Bend.
10     Q.   That's the same one?
11     A.   Yes.
12         That points out, by the way, the
13 inaccuracy of this list because it is the same
14 client, yet there are two people listed for
15 Memorial, and then we do a deal the same year
16 and there is more people listed. So it just
17 shows you that this report is, whoever
18 prepared it, did not do it accurately.
19     Q.   You keep referring to the
20 inaccuracies on the list. You are talking
21 about the inaccuracies on the banking team,
22 correct?
23     A.   That's correct.
24     Q.   You have no reason to believe that
25 the revenue numbers aren't accurate?

Page 259

1          D.M. CYGANOWSKI
2     A.   I have no reason to believe that.
3     Q.   Including Lisa's total revenue for
4 the year?
5         MR. TURNBULL: Objection to form.
6     Q.   That 6-1/2 million number?
7     A.   I wouldn't call it Lisa's revenue
8 for the year.
9         What I will say for the record is
10 that the deals that you have listed here, add
11 up to net revenue of 6.577 million.
12     Q.   And this is Lisa's sheet, this is
13 a report run for Lisa Conley, correct?
14     A.   I don't know.
15     Q.   If you look at the first page --
16     A.   Right, I don't know. I'm telling
17 you this is a report that is meaningless and
18 is inaccurate. So I'm not going to say that
19 this is a listing of Lisa's revenue
20 contribution for the year.
21     Q.   But this is a report that Frank
22 Chin --
23     A.   I don't know if this was sent to
24 me or not.
25     Q.   This is the type of document that

Page 260

1          D.M. CYGANOWSKI
2 Frank Chin would send to you?
3     A.   Actually, I don't remember this
4 one at all. I remember in this form.
5     Q.   When you say in this form, what
6 page are you referring to?
7     A.   I'm sorry, this form I remember
8 getting on a yearly basis.
9     Q.   Which page number?
10     A.   I'm sorry, 462 is something I
11 remember.
12     Q.   So if you compare the two
13 documents, 15462 and 15688, are the revenue
14 numbers, total revenue, the same on both
15 sheets?
16     A.   Yeah, there is a consistency of
17 numbers, yes.
18     Q.   So again my question is do you
19 have any reason to believe that that number
20 isn't accurate with respect to Lisa's --
21     A.   No, but I don't have any reason to
22 believe -- I don't know whether these numbers
23 are right or not. And this report is
24 meaningless to me as co-head.
25     Q.   I'm going to hand you Plaintiffs'

