# EXHIBIT 9

Page 289

1          D.M. CYGANOWSKI
2   year-end '07 -- I might be getting my years
3   confused; the year where the performance
4   evaluation does not have a manager summary,
5   that was the year that she stalled.  But the
6   context, I would like the record to show that
7   the context was that Lisa was and is a
8   talented person, and all the RIFs were really
9   because of the firm's financial distress.  It
10  wasn't a termination for cause.
11      Q.   Do you have any documents that
12  reflect what you said I believe the word you
13  used that she stalled in terms of driving
14  business revenue in her development?
15      A.   Yes, the performance evaluation
16  that I hit send to.
17      Q.   So that's the one document that
18  you can identify that would show --
19      A.   Yes.
20      Q.   Are there any other documents that
21  would show that?
22      A.   No.
23      Q.   Did Ryan Freel at this time, and
24  by this time I mean at the time of the
25  November 2008 RIF, did Ryan Freel drive

Page 290

1          D.M. CYGANOWSKI
2   business and revenue?
3       A.   Yes, but he was still -- he was
4   still, along with Mike Brown and the other
5   directors, in a developmental stage, but, yes,
6   he was ahead of, in my view, of Lisa in terms
7   of his development as a director and his
8   ability to drive business and revenue.
9       Q.   And do you have any examples of
10  how he drove business or revenue?
11      A.   Well, one is Catholic Health
12  Initiatives, it's a large client, $20 billion,
13  top line revenue.  He was associated, he was
14  part of the UBS team and he was part of the
15  marketing team or the new business team at
16  Citigroup when he came over and he did a very,
17  very good job there.
18          I would point out that SSM which
19  is Sisters of St. Mary's headquartered in St.
20  Louis, was a UBS account.
21      Q.   When you say he was driving
22  business, was he the lead on any of those
23  accounts in the first chair?
24      A.   No.
25      Q.   Do you know at the time of the

Page 291

1          D.M. CYGANOWSKI
2   November 2008 RIF how long he had been a
3   director for -- I'm sorry, do you know whether
4   he was a director at the time?
5       A.   No, he was a director at the time
6   of the last RIF.
7       Q.   And do you know how long he had
8   been director for at that point?
9       A.   I don't recall, but at least for a
10  couple of years.
11      Q.   At least for a couple of years?
12      A.   Yes.
13      Q.   And what about Michael Brown, do
14  you know how long he had been a director at
15  the time of the November RIF?
16      A.   No.
17      Q.   Was it before, do you remember if
18  he was promoted to director -- was he promoted
19  at Citi to director at some point?
20      A.   Yes.
21      Q.   And do you remember if his
22  promotion to director was before or after
23  Lisa's promotion?
24      A.   I don't recall.
25      Q.   Could it have been before Lisa's

Page 292

1          D.M. CYGANOWSKI
2   promotion?
3       A.   It could have been after, too, I
4   just don't remember.
5       Q.   So you just don't know?
6       A.   I just don't remember.
7       Q.   So you agree that Ryan Freel and
8   Michael Brown were also in that initial stage
9   of development as a director?
10          MR. TURNBULL:  Objection.
11      A.   I would say that all the -- all
12  the directors that remained after the fourth
13  RIF were ahead of Lisa Conley with respect to
14  driving business and revenue.
15      Q.   And do you have any documents that
16  show the comparison between driving business
17  and driving revenue, between Lisa and the
18  other directors?
19          MR. TURNBULL:  Objection.
20      A.   No, it's a judgment call.
21      Q.   So the only document again is what
22  you mentioned, that 2007 --
23      A.   Right.
24          MR. TURNBULL:  Objection.
25      A.   Also driving business, I would



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
297–300

Page 297

1          D.M. CYGANOWSKI
2    Q.   And that's Tom Coomes?
3    A.   Coomes, Tom Coomes.
4    Q.   Do you know whether Michael Brown,
5 Lisa Conley and Ryan Freel, did more work with
6 Tom Coomes and Ray Klaijic than, say, Charles
7 Lee who was based in the New York office?
8    A.   Yes, they didn't do more work.
9 They were not -- we were not divided into
10 regions.
11       So Charles Lee, for example, who
12 is listed in New York, did an awful lot of
13 work in Michigan which was part of the Midwest
14 region.
15    Q.   Sorry --
16       MR. TURNBULL:  -- the answer --
17       MR. GROSS:  He answered the
18    question --
19       MR. TURNBULL:  "They did not" was
20    his answer I believe.
21    A.   They did not.
22    Q.   Did you ever consult with the
23 heads of the Midwest region about Lisa's
24 performance?
25    A.   Yes, we've already established

Page 298

1          D.M. CYGANOWSKI
2 that.
3    Q.   You mentioned Ray Klaijic.  Did
4 you ever talk with Tom Coomes?
5    A.   No.  No, I don't believe we did.
6    Q.   Did Lisa, do you know if Lisa
7 worked with Tom Coomes?
8    A.   I don't think she worked with Tom.
9    Q.   And --
10    A.   But if she did, we would've talk
11 to Tom Coomes.
12    Q.   And how many layoffs affected the
13 healthcare group during 2007 and 2008?
14    A.   A lot.
15       MR. TURNBULL:  Objection to form.
16    A.   A lot.  I can't remember.
17    Q.   Do you remember how many separate
18 layoffs there were?
19    A.   There were four I think in
20 calendar year 2008, and the last one was the
21 weekend before Thanksgiving.
22    Q.   And did healthcare lose people in
23 each of those layoffs?
24    A.   I'm virtually certain they did,
25 but 2008's a blur.

Page 299

1          D.M. CYGANOWSKI
2    Q.   And can you remember -- was there
3 a RIF in March of 2008 to the best of your
4 knowledge?
5    A.   Yeah, I'm sure there was.  There
6 was a RIF every 8 freaking weeks at Citigroup.
7    Q.   Do you remember who was selected
8 as part of that layoff?
9    A.   No.
10    Q.   Do you remember -- I'll show you.
11    A.   But if you have something that
12 tells me, I'll remember it.  I just don't --
13    Q.   Let me show you Plaintiffs' 270.
14       THE WITNESS:  You are right, Ken,
15    the 11 was not a leading indicator.
16       (Plaintiffs' Exhibit 270,
17       e-mail chain bearing Bates No.
18       CGMI_BART 015372 marked for
19       identification, as of this date.)
20       (Discussion off written record.)
21    A.   Yes.
22    Q.   Take a look at that.
23    A.   Okay.  Let me get my ruler out.
24 Yes.
25    Q.   Have you seen this e-mail before?

Page 300

1          D.M. CYGANOWSKI
2    A.   Yes.
3    Q.   Do you remember sending and
4 receiving these e-mails?
5    A.   Yes.
6    Q.   Who is Peter Aherne?
7    A.   Peter Aherne is the -- I don't
8 know what his title is now at Citigroup, but
9 at the time he was head of investment grade
10 securities in taxable fixed income.
11    Q.   And he says in the first e-mail
12 which is the bottom e-mail on this page, he
13 says: "We are getting crushed again in terms
14 of the ask on RIF.  How are you faring?"
15       Was he saying -- do you know what
16 he means by "we're getting crushed again in
17 terms of the ask on," what the ask is?
18    A.   Yes, Peter and I are very good
19 friends.  We're neighbors.
20    Q.   Do you know what he meant by the
21 ask?  Does that mean that he was told to --
22       MR. TURNBULL:  Objection.
23    Q.   Do you know what that means?
24    A.   You are going to have to ask him.
25 I think he is just letting me know that his



DAVID M. CYGANOWSKI                                             July 19, 2012
AMY BARTOLETTI vs. CITIGROUP                                        317–320

Page 317

D.M. CYGANOWSKI

1        D.M. CYGANOWSKI
2       Q.   And if you can read that
3    paragraph, just take a moment to read it to
4    yourself and let me know when you are done.
5       A.   Right.  I'm done.
6       Q.   Is that paragraph accurate?
7       A.   No.
8       Q.   Why is it not accurate?
9       A.   Well, for me I wasn't part of that
10   Veteran's Day meeting.
11       Q.   And that's where Lisa and David
12   Johnson and Pinky Nahata were selected
13   actually for layoff?
14          MR. TURNBULL:  Objection to form.
15       Q.   To the best of your knowledge.
16       A.   To the best of my knowledge.
17       Q.   Do you know whether other
18   directors in the healthcare group were
19   discussed for potential layoff during that
20   meeting?
21       A.   I don't know.
22       Q.   Did you ever ask Fred Hessler
23   that?
24       A.   No.
25       Q.   Did you ever ask Frank Chin that?

Page 318

1        D.M. CYGANOWSKI
2       A.   No.
3       Q.   Or David Brownstein?
4       A.   No.
5       Q.   Or anyone that?
6       A.   No.
7       Q.   Did you agree with the decision to
8    lay off Lisa Conley, Pinky Nahata and David
9    Johnson?
10       A.   Yes.
11       Q.   And do you know if any women were
12   involved in the selection of Lisa Conley for
13   layoff?
14       A.   I don't know.
15       Q.   And at the time following the
16   November 2008 layoff, did there remain any
17   female directors on the healthcare team?
18       A.   I don't, you know, I don't
19   remember.  I know that we had -- we had two
20   managing directors, Lorrie Warner and Jeanette
21   Price that were women who were at our most
22   senior ranks.  I don't recall whether or not
23   there were any women still in the director
24   ranks.  And at the time we had Fred, me, Andy
25   Pines, Jeanette, Lorri.  So two, two out of

Page 319

1        D.M. CYGANOWSKI
2    our five directors, managing directors were
3    women.
4       Q.   Right.  I'm asking at the director
5    level.
6       A.   Yeah, I don't recall.
7       Q.   So as you sit here today you don't
8    remember if there --
9       A.   Yeah, I don't remember.
10       Q.   So is it possible it was all men?
11       A.   I don't remember.  I don't
12   remember.
13       Q.   Do you know, did Fred tell you or
14   did anyone tell you who made the ultimate
15   decision as to who would be laid off?
16          MR. TURNBULL:  Objection.
17       A.   No.  No.  But if you follow lines
18   of authority, it was Frank and David as
19   co-heads of public finance, and then
20   ultimately Ward Marsh who was head of the
21   division.
22       Q.   So you don't know that Frank and
23   David made the call but you assume that they
24   would have?
25       A.   Yes.

Page 320

1        D.M. CYGANOWSKI
2       Q.   And just to clarify again, the
3    November 2008 RIF was a compensation
4    reduction?
5       A.   Yes.
6       Q.   Do you know what the number, how
7    much compensation you had to reduce in
8    healthcare?
9          MR. TURNBULL:  Objection.
10       A.   No.  No.  No, there was not -- it
11   was never discussed with me in the context of
12   healthcare.  I do recall either David or Frank
13   telling me what the total comp hit was for
14   public finance, but I don't remember what that
15   number was, other than remembering it was
16   really big.
17       Q.   So you remember hearing the number
18   for all of public finance?
19       A.   Right.
20       Q.   But not specifically for your
21   group?
22       A.   Right.  It didn't work that way.
23       Q.   Is that your understanding how it
24   worked for the other RIFs, too, for the other
25   compensation RIFs, it was just a compensation



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
325–328

Page 325

1        D.M. CYGANOWSKI
2        So I want the record to show that
3    while it was their decision, they recognized
4    the enormity of the decision and it was a very
5    painful decision for them to make because they
6    had to make such difficult decisions.
7        Q.    Are you really in a position, can
8    you know whether it was a very painful
9    decision for them to make?
10        A.    Yes, I worked with David
11    Brownstein for 17 years and then worked for
12    him the last couple of years.  I worked for
13    Frank Chin for 17 years and I know those
14    people and how they think.  And they are very
15    compassionate people.  And for them to be put
16    through four RIFs was a very painful
17    experience for them.
18        Q.    Did you ever discuss specifically
19    whether it was a painful experience for them
20    on a person-by-person basis?
21        A.    No, but I just, I just know their
22    DNA and they don't take this kind of stuff
23    lightly.  They are not assholes and they are
24    not, you know, they are not -- they are
25    regular old people.

Page 326

1        D.M. CYGANOWSKI
2        Q.    They never discussed the specific
3    people?
4        A.    No.
5        Q.    And once again, you never knew
6    any -- you never knew that any of the names
7    were being considered until Fred told you who
8    those people were?
9        A.    He called me after the meeting.
10        MR. TURNBULL:  Objection: asked
11        and answered.
12        THE WITNESS:  Sorry.  Another
13        three hours, I'll get this down so I
14        won't be stepping over you.
15        Q.    Did you inform Lisa that she was
16    being terminated?
17        A.    Fred and I flew out on the Friday
18    before Thanksgiving to Chicago, and we met
19    with both Lisa Conley and David Johnson
20    individually.
21        Q.    And they were both in the Chicago
22    office, based in the Chicago office?
23        A.    Yes.
24        Q.    So both you and Fred did it
25    jointly?

Page 327

1        D.M. CYGANOWSKI
2        A.    Yes.
3        Q.    I show you now Plaintiffs' Exhibit
4    269.
5        (Plaintiffs' Exhibit 269,
6        e-mail chain bearing Bates Nos.
7        CGMI_BART 015118-119 marked for
8        identification, as of this date.)
9        A.    I remember this one.
10        Q.    Good.
11        A.    Okay.
12        Q.    So this is an e-mail you remember
13    sending these e-mails, or you remember seeing
14    the top e-mail?
15        A.    Yes.  I remember this string.  It
16    was a very difficult day for me.
17        Q.    And the chain, flip to the second
18    page, that's the first e-mail in the chain,
19    right?
20        A.    Yes.
21        Q.    And Frank Chin says please let,
22    now this is an e-mail to you and to Fred?
23        A.    Yes.
24        Q.    "Please let David and I know after
25    you've had those communications."

Page 328

1        D.M. CYGANOWSKI
2        A.    Yes.
3        Q.    Do you know what communications he
4    is referring to?
5        A.    Yes, our informing Lisa and
6    Johnson, I'm sorry, Lisa and Dave that they
7    were part of the RIF.
8        Q.    And when Fred sends that e-mail
9    that says "DJ is done" -- I'm sorry, I'm
10    skipping ahead, the bottom e-mail on the first
11    page where you say "Conley's been told" that
12    means she's been told she's been terminated?
13        A.    Yes.
14        Q.    "Johnson is out of the office but
15    is expected shortly."  And then Fred about 20
16    minutes later says "DJ is done."  That means
17    Johnson has been told?
18        A.    Yes.
19        Q.    And then Frank Chin asked "Ugly"
20    with a question mark?
21        A.    Yes.
22        Q.    Is he asking about how they took
23    the news?
24        A.    He was specifically talking about
25    Johnson.



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
329–332

Page 329

1          D.M. CYGANOWSKI
2     Q.   How do you know he was
3 specifically talking about Johnson?
4     A.   Well, actually that's how I
5 interpreted it.
6     Q.   Why did you interpret it that way?
7     A.   Because David Johnson had a
8 personality where we expected him not to take
9 it well.  Plus it also followed the "DJ is
10 done" e-mail.
11     Q.   And then you responded "yupe" or
12 Y-U-P-E?
13     A.   Yup.
14     Q.   Get ready for the lawsuit?
15     A.   That's correct.
16     Q.   And why did you write that?
17     A.   Because the conversation with
18 David Johnson did not go very well.
19     Q.   What did David Johnson say during
20 that conversation?
21     A.   He just got angry, and we were
22 instructed not to share many details with him,
23 that's standard procedure.  And when we did
24 not share the details he wanted to hear which
25 is why he was picked, he got really angry.

Page 330

1          D.M. CYGANOWSKI
2     Q.   And the "get ready for the
3 lawsuit" did not refer at all to Lisa?
4     A.   No.
5     Q.   How did Lisa take the news when
6 you told her?
7     A.   She was emotionally devastated as
8 Fred and I was.
9          I actually was supposed to tell
10 Lisa.  The way that Fred and I had rehearsed
11 it, I was going to handle Lisa, although we
12 were all in the same room, and Fred was going
13 to handle Dave.  And when I walked in and I
14 saw her, she knew exactly why we were there,
15 she started to cry, I teared up and Fred
16 jumped in and gave Lisa the news, and, you
17 know, she was as emotionally devastated as
18 Fred and I were.
19     Q.   Fred was emotional as well?
20     A.   Yes.  Well, he wasn't as -- he's
21 not as demonstrative as I am or was Lisa, but,
22 yeah, he was very....
23     Q.   Did David Johnson end up to your
24 knowledge suing the company?
25     A.   He went to arbitration.

Page 331

1          D.M. CYGANOWSKI
2     Q.   Do you remember what his claims
3 were based on?
4     A.   No.
5     Q.   Do you know what the outcome of
6 the arbitration was?
7     A.   I know, I believe it was settled,
8 but I don't know.
9     Q.   Did you give any sworn statements
10 in connection with the --
11     A.   No.
12     Q.   -- arbitration?
13     A.   No.
14     Q.   Didn't sign an affidavit?
15     A.   No.
16     Q.   And who told Johnson?  Was it
17 you --
18     A.   Fred.
19     Q.   Fred.  And this was done in a
20 conference room?
21     A.   In his office.
22     Q.   David Johnson's office?
23     A.   Yes.
24     Q.   And what about with Lisa?
25     A.   In her office.

Page 332

1          D.M. CYGANOWSKI
2     Q.   Do you know what Lisa's or anyone
3 in the Chicago office, what their regular
4 business hours were?
5          MR. TURNBULL:  Objection.
6     A.   You mean how long they -- you mean
7 how hard they worked?
8     Q.   Yes.
9     A.   They had pretty good, pretty good
10 sense, I don't know how many hours anybody
11 spent in the office but I have a pretty good
12 sense on how hard people worked because of
13 e-mail traffic and that sort of thing.
14     Q.   And that's what you are basing it
15 off of is e-mail traffic?
16     A.   Yes.
17     Q.   Did you ever talk to upper level
18 people, like managing directors in the Chicago
19 office, asking about the work ethic of people
20 who worked for them?
21     A.   I'm sure -- I don't recall, but
22 I'm sure we did, and as part of the year-end
23 conference calls that would be a normal
24 question to ask about work ethic.
25     Q.   And do you remember how Lisa's

Page 333

1              D.M. CYGANOWSKI
2   work ethic was?
3       A.   Yeah, I mean, it was excellent.
4       Q.   What about Ryan Freel's?
5       A.   Excellent.
6       Q.   Michael Brown's?
7       A.   Excellent.  They were three hard
8   working individuals.
9       Q.   Are there directors in the
10  healthcare group who you would qualify as less
11  hard working than those three?
12      A.   No, the group we had was
13  outstanding in terms of work ethic.
14      Q.   So everyone worked equally as
15  hard?
16      A.   Really hard.  Really hard.
17          MR. TURNBULL:  Objection.
18      Q.   Do you know whether Fred consulted
19  with any other people in the healthcare group
20  before the decisions on the November 2008
21  layoffs were made?
22      A.   I don't know.
23      Q.   Do you know whether the heads of
24  the region groups were considered before --
25      A.   Considered or consulted?

Page 334

1              D.M. CYGANOWSKI
2       Q.   Consulted, I'm sorry.
3       A.   Don't know.
4       Q.   Were you aware that Jim Blake told
5   Lisa that he did not agree with the decision
6   to terminate her?
7       A.   No.
8       Q.   Does that surprise you?
9       A.   Jim Blake is a very independent
10  person and these decisions, you know, were
11  difficult, and it doesn't surprise me that Jim
12  Blake said that.
13      Q.   I ask you now to turn back to
14  Exhibit 11.
15      A.   Ah-hah.
16      Q.   In the second paragraph on that
17  first page --
18      A.   Yes.
19      Q.   Have you had a chance to read that
20  paragraph?
21      A.   Yes.
22      Q.   You see four lines from the
23  bottom.
24      A.   Yes.
25      Q.   "Conley did not appear to be

Page 335

1              D.M. CYGANOWSKI
2   interested in professional development."
3       A.   Yes.
4       Q.   I believe you testified earlier
5   that you didn't believe that to be the case,
6   is that correct?
7          MR. TURNBULL:  Objection:
8          misstates testimony.
9       A.   What I would say is that the --
10  her decision not to follow through with this
11  leadership initiative or leadership
12  opportunity we gave her, at least with respect
13  to, in my view, was pretty significant because
14  it was an established fact in the group that
15  that was a big deal to get a leadership
16  opportunity, and she didn't run with it.
17  So --
18      Q.   Do you agree with -- I'm sorry,
19  are you finished?
20      A.   I'm sorry.  So this statement, you
21  know, I agree with in terms of her decision on
22  the women's forum that had a big impact with
23  me.
24      Q.   And is that the only thing you can
25  think of that would suggest that Lisa was not

Page 336

1              D.M. CYGANOWSKI
2   interested in her professional development?
3       A.   That's the first thing -- that's
4   the most important thing in my mind.
5       Q.   Are there any other things that
6   are less important in your mind?
7       A.   None that come to mind right now,
8   but that was a big deal for me.
9       Q.   And was this failure to, was this
10  lack of, or perceived lack of interest in
11  professional development, is there ever any
12  document that you gave, that would illustrate
13  that --
14      A.   No.
15          MR. TURNBULL:  Objection.
16      Q.   Did you discuss this with Lisa?
17      A.   No, but we did.
18      Q.   There is no document that would
19  show it?
20      A.   No other document.
21      Q.   Did you ever in your recollection
22  in her reviews note that she did not appear
23  interested in professional development?
24      A.   Yes -- well, no, but we made it
25  clear that we were disappointed in her not



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
337–340

Page 337

1        D.M. CYGANOWSKI
2  following up on this leadership opportunity we
3  gave her.
4      Q.    Do you remember exactly what year
5  that leadership opportunity was?
6      A.    No, but it was toward, it was
7  certainly in the last, certainly in the last
8  year.  It might have been the last two years,
9  but we were very patient with her and kept
10  reminding her that this was an opportunity for
11  her.
12      Q.    So it could have been 2006?
13      A.    No.
14          MR. TURNBULL:  Objection.
15      A.    No, it doesn't go back that far.
16      Q.    So it could have been 2007?
17      A.    '7, yeah, I don't -- I'm just
18  unclear on the dates, but it was made
19  eminently clear to her that this was a
20  leadership opportunity for her that we
21  discussed with her several times.
22      Q.    And in any of these discussions,
23  did Lisa ever say why she didn't do it?
24      A.    No.
25      Q.    Did you ever ask her?

Page 338

1        D.M. CYGANOWSKI
2      A.    She just said she'd do it.
3      Q.    So you remember her saying that
4  she would do it?
5      A.    Um-hum, yes.
6      Q.    And she never did it?
7      A.    And she never did it.
8      Q.    Did she ever tell you why she
9  didn't do it?
10      A.    No, she just said she'd do it.
11      Q.    At any point in time when Lisa was
12  on  you team, did she take time off for
13  maternity leave?
14      A.    I'm sure she did.  She had three
15  children, three girls.
16      Q.    Did she take maternity leave each
17  time?
18      A.    I'm sure she did.  I don't recall.
19  I mean, we certainly encouraged it.
20      Q.    Do you remember when her children
21  were born?
22      A.    No.
23      Q.    Is it possible --
24      A.    I know they are -- well, actually
25  I don't know their ages right now.  It's been

Page 339

1        D.M. CYGANOWSKI
2  some time since I talked to her.
3      Q.    Is it possible that her children
4  were born around the same time or she was on
5  maternity leave during the planning and/or
6  event of this leadership opportunity you have
7  been referring to?
8          MR. TURNBULL:  Objection to form.
9      A.    It's possible but....
10      Q.    If you could, do you know whether
11  this perceived lack of interest in
12  professional development was considered in the
13  decision to select Lisa for layoff?
14      A.    If you are asking me what happened
15  in that meeting on Veteran's Day, I don't
16  know.  But you asked me whether I agreed with
17  the decision --
18      Q.    That's not what I'm asking you.
19      A.    Okay.
20      Q.    I'm asking do you know whether
21  that was considered --
22      A.    Oh, I don't know.
23      Q.    Did you ever discuss these
24  concerns of professional development with
25  anyone else other than Lisa?  Did you discuss

Page 340

1        D.M. CYGANOWSKI
2  it with Fred Hessler?
3      A.    Oh, yes.
4      Q.    Did you discuss it with Frank
5  Chin?
6      A.    I don't remember.  I don't
7  remember.  It wasn't -- it wasn't -- we did
8  not talk regularly with Frank about, you know,
9  people.
10      Q.    What about with David Brownstein?
11      A.    I don't recall.
12      Q.    And what about these conversations
13  with Fred Hessler, would they have been, do
14  you remember sending any e-mails to him, to
15  Fred Hessler about this?
16      A.    No, no, he was in the office right
17  next to me, and we did everything
18  collaboratively.  So the idea of Lisa doing
19  this was our joint idea.  We presented it to
20  her jointly.  We would update her jointly.
21          It is no different than we asked
22  Andy Pines when he was a director to relocate
23  to San Francisco to build our West Coast
24  business.  We didn't put it in writing.  We
25  told him that we would like him to consider



Page 341
1          D.M. CYGANOWSKI
2  relocating, and it was a leadership
3  opportunity for him and he decided yes, he
4  went out there and built the business and he
5  was promoted.  But there was nothing -- if you
6  asked me today if I had a document that showed
7  that, there is no document.  You reach a stage
8  in your career where you don't document
9  things.  You suggest and you present
10  leadership opportunities, and if people don't
11  seize them, it is not like being an analyst
12  where they are task-oriented.  Either people
13  seize leadership opportunities or they don't.
14      Q.    Were you ever told by anyone not
15  to document things?
16      A.    Never, no.
17      Q.    On page 2 of this document, if you
18  turn to the next page, Mr. Cyganowski, the
19  second-to-last sentence of the page.
20          MR. TURNBULL:  Go ahead and read
21      that paragraph.
22      A.    So she was hired as an AVP --
23  okay.  Yes.
24      Q.    Do you see the second-to-last
25  sentence?

Page 342
1          D.M. CYGANOWSKI
2      A.    Yes.  Oh, "in particular?"
3      Q.    The second to last line, I'm
4  sorry.
5      A.    Yes, "moreover."
6      Q.    "Moreover, when provided with
7  opportunities to spearhead professional
8  development initiatives focused on networking
9  efforts, Conley did not follow through."
10      A.    Yes.
11      Q.    Is that a reference to the same --
12      A.    Yes.
13      Q.    So is that different than
14  professional development, what we discussed on
15  the previous page, or are they both one in the
16  same?
17          MR. TURNBULL:  Objection to form.
18      A.    Well, I didn't write this, nor was
19  I consulted.  But I would infer that they are
20  linked.  To me it is intuitive.
21      Q.    So again, as you sit here today,
22  you can't think of any other examples for what
23  this recites here in the last line which is
24  "when given the opportunity to spearhead
25  professional development initiatives, Conley

Page 343
1          D.M. CYGANOWSKI
2  did not follow through."  Other than the one
3  we discussed, you cannot think of any other
4  examples of that?
5      A.    No.  But that was a big one.
6  That's what I want the record to show.  It's a
7  big deal.
8      Q.    And if you look at the same page,
9  the second-to-last sentence:  In particular,
10  when a client's main point of contact for the
11  account was not available, Conley was not
12  helpful in stepping in and trying to deal with
13  the client's issue."
14      A.    Right.
15      Q.    Do you agree with that?
16      A.    Yes.  My view, and you can ask
17  Fred when he's here, our view changed on Lisa
18  because we started hearing these concerns.
19  I'm unable, as I mentioned before, to give you
20  specific names, although I did offer up the
21  Fairview one because I was directly involved
22  with it, but that's what, I'm assuming that's
23  what that refers to.
24      Q.    So you said your opinion on Lisa
25  changed when you started hearing some of these

Page 344
1          D.M. CYGANOWSKI
2  things.  The one you talked about earlier was
3  the Fairview, unless I'm mistaken I believe
4  you testified it was a number of months after
5  Lisa had been terminated, is that correct?
6      A.    Right.  But we had been hearing
7  these concerns while she was employed.  I just
8  can't remember who said what, and then you
9  asked me, well, can you name one, and Fairview
10  was etched in my mind for some reason.
11      Q.    So you still can't think of any
12  specific examples?
13      A.    No, but certain things in your
14  life are etched in your mind, like the
15  conversation with Fred on Veteran's Day, I
16  took it right outside of Columbia Restaurant
17  in Sarasota Florida on a cell phone.
18      Q.    And what about, did you discuss
19  this perceived problem with anyone else,
20  Lisa's alleged failure to --
21      A.    Well, we discussed -- I'm sorry, I
22  interrupted you.
23      Q.    Lisa's alleged failure to step in
24  and try to deal with a client's issue when the
25  main client contact was unavailable?



Page 345
1          D.M. CYGANOWSKI
2     A.   We were, while I cannot remember
3  specifically, I'm sure that we were made aware
4  of it during the calls that we would have with
5  our managing directors.  And I know that we
6  made Lisa aware of it in the year-end
7  performance evaluation.
8     Q.   So the only time you remember
9  making Lisa aware of it was in that review?
10     A.   I believe so.
11     Q.   And, again, you are referring to
12  the 2007 year-end evaluation?
13     A.   Yes, because she was the -- the
14  last RIF was in '08, right?  Yes.  Yes.
15     Q.   And there is no other documents
16  that would show her alleged failure to step in
17  and deal with client issues other than that
18  performance review that we just discussed?
19     A.   That's correct.
20     Q.   If you turn to page 3.  We looked
21  at this I believe earlier, but I want to focus
22  on a different aspect of it.  You can reread
23  the paragraph if you like, but it is the
24  second paragraph in subheading C?
25     A.   Right.

Page 346
1          D.M. CYGANOWSKI
2     Q.   Do you --
3     A.   I'm good.  No, I'm good.
4     Q.   Dead in the middle of that
5  paragraph, it says: "In making the
6  determination, they readily concluded that
7  unlike other directors in the group, Conley
8  did not derive business or revenue."
9          Did you readily come to that
10  conclusion?
11     A.   What this -- this paragraph
12  implies that Cyganowski and Hessler made the
13  determination to terminate, to include Lisa in
14  the RIF, and my testimony today contradicts
15  that.  It wasn't a collaborative process.
16  There was this key meeting on Veteran's Day
17  and we were not, Fred and I were not
18  approached by David and Frank as co-heads, and
19  said this is, your total compensation goal you
20  have to cut, who are you going to cut.
21     Q.   So in that way it was different
22  than the way the previous RIFs happened?
23     A.   No, no, what I'm saying is this --
24          MR. TURNBULL:  Asked and answered.
25     A.   Yeah, we have gone over this, the

Page 347
1          D.M. CYGANOWSKI
2  RIFs were always driven by Brownstein and
3  Chin.
4     Q.   But your involvement --
5     A.   And we were consulted.  I was
6  consulted.
7     Q.   On the previous RIFs?
8     A.   Right.
9     Q.   Whereas, you had not --
10     A.   I was not consulted on this one.
11     Q.   So this entire paragraph is, in
12  your opinion is not entirely accurate?
13          MR. TURNBULL:  Objection.
14     A.   It's, I want the record to show
15  that it wasn't my decision, but I agree with
16  the decision.
17     Q.   If we stay on page 3 and we look
18  at the second paragraph in the third sentence:
19          Cyganowski and Hessler focused
20  their analysis on an assessment of what moves
21  could be made within the group that would have
22  the least impact on the existing business
23  while allowing the group to successfully bring
24  in new business going forward."
25          Do you believe that terminating

Page 348
1          D.M. CYGANOWSKI
2  Lisa would have less of an impact on business
3  going forward than anyone else?
4     A.   Yes, and that was the basis, when
5  you asked me did I agree with the decision
6  that's the calculus that's involved in a
7  total compensation RIF.  It's selecting those
8  people that are paid a lot of money and trying
9  to calculate, if they left, what business
10  would you lose.  That's the calculus behind
11  the total compensation reduction.
12     Q.   And did Lisa --
13     A.   And I agree with, that's why I
14  agree wholeheartedly with Dave Johnson of Lisa
15  Conley being RIF'ed.
16     Q.   And as you sit here today, do you
17  remember how Lisa's compensation compared to
18  that of other directors in the group at that
19  time?
20     A.   Gees, it was so long that I don't
21  know.
22     Q.   If I told you that Lisa was making
23  hundreds of thousands of dollars less than
24  some of the other directors in the group,
25  would that surprise you?



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
349–352

Page 349

1            D.M. CYGANOWSKI
2        MR. TURNBULL:  Objection to form.
3      A.   No, it wouldn't surprise me
4   because we had a lot of variation.  We had a
5   lot of variation within the director ranks.
6   We had a lot of variation in the managing
7   director ranks on total compensation so the
8   bandwidth was very wide.
9      Q.   So selecting for layoffs someone
10  who made more money could have potentially
11  saved other people's jobs?
12        MR. TURNBULL:  Objection.
13     A.   You hit the very definition of
14  total compensation, yes.  If Ward Marsh had
15  gotten, had been RIF'ed, that would have saved
16  a lot of jobs.
17     Q.   And why, what's your basis for
18  believing that Lisa's termination would have
19  the least impact on business going forward?
20     A.   Because she was not in the number
21  one chair, she was running in place and we
22  were hearing complaints from her existing
23  accounts on follow through.  So when you hear
24  concerns like that being expressed about
25  someone, it is easy to come to the conclusion

Page 350

1            D.M. CYGANOWSKI
2   that there would be no business loss.
3      Q.   And --
4      A.   But it is a calculation.  It is a
5   judgment call.
6      Q.   As you sit here today can you
7   think of any -- was Ryan Freel in first
8   position on more accounts than Lisa?
9        MR. TURNBULL:  Objection to form.
10     A.   We've asked and answered, I mean.
11  Whether he was or not, it was my judgment
12  today and it was then, that Ryan was making
13  more progress as a director than Lisa.  And I
14  would say the same thing about David Kasdin
15  and Mike Brown and Chad Kenan and every other
16  director, Charlie Plimpton and Kent Jackman,
17  every other director that was not included in
18  the RIFs were ahead of Lisa.
19     Q.   I'm asking if you know whether
20  Lisa was in first position on accounts, on
21  more or fewer, was she first position on more
22  or fewer accounts --
23     A.   Yeah, and we've been --
24        MR. TURNBULL:  Objection.
25     A.   -- you've probed this before and I

Page 351

1            D.M. CYGANOWSKI
2   don't know.  I don't know.
3        As a general view, I would say
4   that Lisa was not in the number one chair on
5   any accounts, but then you rightfully pointed
6   out there were some accounts that I was not
7   specifically intimately familiar with and I
8   acknowledged that on the record.
9      Q.   Are you familiar with the deals
10  that Lisa had in the pipeline for 2009?
11     A.   No one had any deals in the
12  pipeline.  There were teams that had deals in
13  the pipeline.
14     Q.   Did you consider -- when you say
15  that you agree with the statement that Lisa's
16  departure would have the least impact on
17  business moving forward, are you considering
18  the deals that she had that were going, the
19  deals that she was going to be working on in
20  2009?
21        MR. TURNBULL:  Objection to form.
22     A.   No, it's -- you don't, at least
23  Fred and I don't think that way.  We think
24  about the long-term.  So it's not what they
25  had in the pipeline for the next six months.

Page 352

1            D.M. CYGANOWSKI
2   It's what was best for the group over the next
3   three to five years.
4      Q.   Is there a forward calendar or
5   other document that shows likely transactions
6   for the upcoming year?
7      A.   There are several forms.  There is
8   actually a formal, formal calendar kept by the
9   department as a compliance document that
10  would, that showed transaction, you know,
11  pending transactions, and then within the
12  healthcare group we would go through business
13  planning initiatives and have our own
14  pipeline.  So there were different forms of
15  forward calendars.
16     Q.   Do you know whether the healthcare
17  group at Citi did any deals with Nebraska
18  Methodist after Lisa was terminated?
19     A.   I have no idea.
20     Q.   Do you believe that if Ryan Freel
21  had been terminated, Citi would have done
22  fewer deals the following year?  Let me
23  rephrase that.
24        Do you believe Citi would have
25  lost any business if Ryan Freel had been



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
353–356

Page 353
1          D.M. CYGANOWSKI
2   terminated?
3      A.   I believe that we would have had
4   greater business loss if anybody other than
5   Lisa was chosen.
6      Q.   What I'm asking, do you think you
7   would have lost any specific clients, can you
8   point to any clients, can you point to any
9   specific clients --
10     A.   I think it's a judgment call, and
11  Ryan as well as Mike Brown and David Kasdin
12  and Ken Jackman and others had stronger,
13  deeper client relationships that we felt if
14  they were included in the RIF we would have
15  been at risk with those.
16     Q.   Lisa had been in the healthcare
17  group at Citi a lot longer than Ryan Freel had
18  been, is that right?
19     A.   I'm sorry?
20     Q.   Lisa had been in the healthcare
21  group at Citigroup a lot longer than Ryan
22  Freel had been?
23     A.   You know, I don't -- let's see.
24  Conley was hired in 1997 and Ryan was hired
25  after that. I'm not sure when he was hired,

Page 354
1          D.M. CYGANOWSKI
2   actually, but after -- Ryan was hired after
3   Lisa.
4      Q.   So Lisa had more time than Ryan to
5   cultivate relationships with healthcare group
6   clients?
7      A.   Yes.
8      Q.   Do you know whether Heartland
9   Health is still a client Citigroup?
10     A.   No, I don't know who's a client
11  Citigroup since I left. I'm in a different
12  world.
13     Q.   Was Heartland Health still a
14  client when you left Citigroup?
15     A.   I don't know. In fact, I would
16  have told you -- if you had asked me when I
17  was at Citigroup whether Heartland Health was
18  a client, I wouldn't have known.
19     Q.   That's what I just asked you. Oh,
20  you are talking about --
21     A.   Yes, when I was still there, I
22  don't think I could have told you whether
23  Heartland Health was a client or not.
24     Q.   So you don't know whether Lisa was
25  first chair on Heartland Health --

Page 355
1          D.M. CYGANOWSKI
2      MR. TURNBULL:  Objection:  asked
3   and answered.
4      A.   Yes, that's been asked and
5   answered.
6      Q.   And the answer is no?
7      MR. TURNBULL:  Objection:  asked
8   and answered.
9      A.   Yeah, no.
10     Q.   Do you know where Lisa works now?
11     A.   Yes.
12     Q.   Where does she work?
13     A.   She works at BMO Capital Markets.
14     Q.   And do you still deal with her
15  professionally at all?
16     A.   No, but I see her. I saw her at a
17  forum for CFOs about six months ago.
18     Q.   And are you aware that Lisa at
19  BMO, Lisa pitched and won business from
20  Heartland Health in direct competition with
21  Citi, that was business pitched by Ryan Freel?
22     MR. TURNBULL:  Objection.
23     A.   No, I wasn't aware of that.
24     Q.   Does that surprise you?
25     MR. TURNBULL:  Objection.

Page 356
1          D.M. CYGANOWSKI
2      A.   I've been in the business 30
3   years. Nothing surprises me. I don't mean to
4   be flippant. Nothing surprises me.
5      Q.   So each of the remaining directors
6   following the November RIF, the November 2008
7   RIF, there are documents that would show the
8   clients that they covered?
9      MR. TURNBULL:  Objection.
10     A.   I can't. Now, I don't know now,
11  but presumably -- we were not big on, Fred and
12  I were not big on lists with people's names
13  next to it, because it helped to inspire and
14  carry through on our culture. So we were not
15  big on lists whose clients were whose, because
16  in our view they were clients of the firm and
17  clients of the group.
18        So notwithstanding Amy Yang's
19  matrix that she sent, you showed me one of the
20  documents before, Fred and I didn't keep lists
21  on who, you know, who was covering what
22  clients.
23     Q.   So is the answer you don't know if
24  there is documents that would show that?
25     A.   Either I don't know, or no, the



800.211.DEPO (3376)
EsquireSolutions.com

DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
357–360

Page 357

1           D.M. CYGANOWSKI
2   documents don't exist.
3       Q.   What about are there documents
4   that would show who was lead on certain
5   accounts --
6       A.   No.
7       Q.   Who would be first position?
8       A.   I apologize.
9       Q.   No problem.  Are there documents
10  that would show after November 2008 which
11  accounts they were the lead or in first
12  position for?
13      A.   No, there were no documents before
14  or after.  That was contrary to how Fred and I
15  ran the group.
16      Q.   What about documents for that same
17  group of directors that would show clients
18  that they were involved in originating the
19  business for Citi?
20      A.   I'm not quite sure I understand.
21      Q.   Are there documents that would
22  show which clients they were involved in
23  originating?
24      A.   You mean --
25      Q.   New clients?

Page 358

1           D.M. CYGANOWSKI
2       A.   You mean who actually did deals?
3       Q.   New clients that they acquired and
4   then did deals with, yeah?
5       A.   No, I mean, there was the revenue
6   list that you shared with me before, that was
7   a Frank Chin list that when Fred and I would
8   get the group together, we would talk about
9   new client adds, but there would not be names
10  of people next to it.
11      Q.   What about documents that would
12  show the last transaction that was done with
13  each client of the healthcare group other than
14  the --
15      A.   No.  Other than the revenue list
16  you showed me, no.
17      Q.   The ones that Bill Hudnut --
18      A.   Right.
19      Q.   Following Lisa's termination did
20  you receive any feedback from any of her
21  clients about her termination?
22          MR. TURNBULL:  Objection.  Other
23      than what he's testified to?
24      Q.   Other that what you testified to,
25  and what I'm referring to is other than the

Page 359

1           D.M. CYGANOWSKI
2   conversation with the people from Fairview.
3       I'm just asking --
4       A.   No, I want to make sure I answer
5   your question correctly, now that we are in
6   the home stretch here, but I want to be
7   thoughtful.
8       Yes, there was.  I remember one
9   specific, it was Parkview which she covered, I
10  believe.  It was either Parkview or SSF.  It
11  was a client in, it was a client in Indiana
12  that was covered by Dave Johnson, Lisa Conley
13  and Mike Brown and Terry Hartman, an MD and
14  director were asked by Fred and me to assume
15  coverage.  And it was a very difficult meeting
16  where there were numerous complaints about
17  Lisa.  So it was either, it was either
18  Parkview or SSF.
19      Q.   Complaints?
20      A.   Complaints.
21      Q.   This is after Lisa's termination?
22      A.   Yes, you were asking whether or
23  not there were client reactions and the only
24  client reaction that I can think of other than
25  Fairview, was either Parkview or SSF.

Page 360

1           D.M. CYGANOWSKI
2       Q.   You said there was complaints.
3   What do you mean by that?
4       A.   The same actually sort of
5   complaints that Fairview had which was lack of
6   follow-up.
7       Q.   And they specifically, you had,
8   this was an in-person meeting in which these
9   complaints were related to you?
10      A.   Yes, Terry Hartman and Mike Brown
11  went to visit them.
12      Q.   So you weren't there?
13      A.   Oh, no, I wasn't there.
14      Q.   And this is what they related to
15  you?
16      A.   Yes.
17      Q.   Terry and Mike related to you?
18      A.   Yes.
19      Q.   And had Terry and Mike been on the
20  account previously before?
21      A.   No.
22      Q.   They were new to the account?
23      A.   Brand new.
24      Q.   And it was Dave Johnson and Lisa
25  previously?



DAVID M. CYGANOWSKI
AMY BARTOLETTI vs. CITIGROUP

July 19, 2012
361–364

Page 361

1          D.M. CYGANOWSKI
2     A.    Right.  And I can't remember
3  whether it was Parkview or SSF.
4     Q.    And do you know whether the client
5  was complaining specifically about Lisa or
6  were they complaining about David Johnson?
7     A.    I think they were complaining
8  about both.
9     Q.    But David Johnson was the lead on
10  the account?
11     A.    Right.  The report was that they
12  were very upset with the coverage provided by
13  both Dave and Lisa.
14     Q.    And you know that's what they said
15  or you think --
16     A.    No, no, I don't know that that's
17  what they said, but that's what Terry Hartmann
18  and Mike Brown reported to Fred and me at the
19  follow-up.
20     Q.    Did any of Lisa's clients express
21  frustration that it was the wrong decision to
22  terminate Lisa?
23     A.    Not with me and not that I know
24  of.
25          (Plaintiffs' Exhibit 257,

Page 362

1          D.M. CYGANOWSKI
2          e-mail bearing Bates No. CGMI_BART
3          15353 marked for identification, as
4          of this date.)
5     Q.    I'm going to hand you now
6  Plaintiffs' Exhibit 257.  Take a second just
7  to look it over.
8     A.    I'm ready.
9     Q.    Who is Michael Hammond?
10     A.    Michael Hammond at the time was
11  CEO of Shattuck Hammond Partners.
12  S-H-A-T-T-U-C-K, Hammond Partners.  He is a
13  professional and personal friend of mine.
14          He e-mailed me on I think, is that
15  Thanksgiving?  It must be Thanksgiving, right,
16  two days after the RIF happened, and asked me
17  whether Dave Johnson was fired.  And I replied
18  that he was part of last week's reduction in
19  force, Lisa Conley too, and I encouraged
20  Michael to speak with both of them because I
21  thought, and still think today, that Dave
22  Johnson and Lisa Conley are very talented
23  bankers.
24     Q.    So despite the feedback that you
25  said you received from, you have mentioned two

Page 363

1          D.M. CYGANOWSKI
2  clients that Lisa covered, doesn't change your
3  opinion of her as a --
4     A.    No, not at all.  She wasn't fired
5  for cause.  People are on different tracks and
6  these were not terminations for cause.  Lisa
7  today is a very solid banker who I think very
8  highly of.
9     Q.    So Mike Hammond was not a client,
10  he was just a --
11     A.    Oh, he was a competitor.
12     Q.    He was a competitor?
13     A.    A competitor, I told him --
14     Q.    You were trying to help Lisa --
15     A.    Oh, yes.
16     Q.    -- and David Johnson find new
17  work?
18     A.    Sorry.  I'm just tired.  Yes.
19     Q.    Yes.
20          MR. GROSS:  I think I'm done.
21  Let's just take two minutes to confirm.
22          MR. TURNBULL:  Okay.
23          THE VIDEOGRAPHER:  We're now going
24  off the record approximately 6:28 p.m.
25          (Recess taken.)

Page 364

1          D.M. CYGANOWSKI
2          THE VIDEOGRAPHER:  We're now back
3  on the record approximately 6:30 p.m.
4          MR. GROSS:  Thank you, Mr.
5  Cyganowski, I've got no further
6  questions.
7          THE WITNESS:  You're most welcome.
8          THE VIDEOGRAPHER:  We're now going
9  off the record approximately 6:30 p.m.
10          (Time noted:  6:30 p.m.)
11
12          _____
12          DAVID M. CYGANOWSKI
13
14  Subscribed and sworn to before me
15  this _____ day of _____, 2012.
16
17  _____
18
19
20
21
22
23
24
25

