# EXHIBIT 14

Page 33

1      F. A. HESSLER
2  Q.  And those are all females?
3  A.  Yes. All managing directors.
4  Q.  Why did only women talk to the
5  group?
6      MR. BATTAGLIA: Objection. It
7  calls for speculation.
8  A.  I'm not sure why only women did.
9  Q.  And other than that talk that was
10 given by those three women, were there any
11 other discussions you can remember about this
12 case?
13 A.  No.
14 Q.  What about the claims in this
15 case?
16 A.  No.
17 Q.  About the allegations in this
18 case?
19 A.  No.
20 Q.  You never spoke to Fred Hessler at
21 all about Lisa Conley's --
22     MR. BATTAGLIA: Objection. He's
23 Fred Hessler.
24 Q.  You never spoke to David
25 Cyganowski at all about any of the allegations

Page 34

1      F. A. HESSLER
2  that Lisa has made in this case?
3  A.  I can't remember any specific
4  conversation.
5  Q.  Can you remember any general
6  conversations?
7  A.  No. I'm sure we talked about it,
8  but I don't recall what the substance of those
9  conversations may have been.
10 Q.  What about with Frank Chin?
11 A.  No.
12 Q.  What about with David Brownstein?
13 A.  No.
14 Q.  What about with Ward Marsh?
15 A.  Nope.
16 Q.  Do you remember this case ever
17 receiving any publicity?
18 A.  I'm aware that there was
19 publicity.
20 Q.  Did you ever read any articles
21 about this case?
22 A.  No.
23 Q.  Did you ever watch any TV segments
24 about this case?
25 A.  No.

Page 35

1      F. A. HESSLER
2  Q.  Did you ever discuss any articles
3  with anyone else about this case?
4  A.  No.
5  Q.  Did you ever discuss any TV
6  segments with anybody?
7  A.  No.
8  Q.  Mr. Hessler, there came a time
9  that Lisa Conley was hired by Citigroup, is
10 that right?
11 A.  Yes.
12 Q.  Do you remember when that was?
13 A.  Probably some time in 1997 time
14 frame.
15 Q.  Did you recruit her to the
16 company?
17 A.  I was involved in recruiting her.
18 Q.  Who else was involved?
19 A.  David Cyganowski. And beyond that
20 I don't recall who else was involved.
21 Q.  And how did you recruit her?
22 A.  I don't recall exactly how it is
23 we approached her to recruit her.
24 Q.  You don't recall how he approached
25 her?

Page 36

1      F. A. HESSLER
2  A.  How we approached her.
3  Q.  And what position -- was Lisa
4  eventually hired by the company?
5  A.  Yes.
6  Q.  And what position was she hired
7  into?
8  A.  Best recollection I have is AVP.
9  Q.  And AVP stands for?
10 A.  Assistant vice president.
11 Q.  And she was hired into your group?
12 A.  Yes.
13 Q.  And as an AVP in the healthcare
14 group, what were Lisa's job duties?
15     I'm sorry. As an AVP in the
16 healthcare group, what were Lisa's job duties?
17 A.  To participate in the execution of
18 financing transactions.
19 Q.  And did Lisa do a good job in that
20 role?
21 A.  As an AVP?
22 Q.  Yes.
23 A.  Yes.
24 Q.  And just backing up a second,
25 whose decision was it to hire Lisa Conley?



Page 37

1     F. A. HESSLER
2     A.   It would have been both mine and
3  David Cyganowski's decision.
4     Q.   And did anyone else need to sign
5  off on it?
6     A.   Frank Chin. And I don't know
7  beyond that.
8     Q.   Did David Brownstein sign off on
9  it?
10    A.   No.
11    Q.   Do you remember why you decided to
12 hire Lisa Conley?
13    A.   We needed support at the junior
14 banker level.
15    Q.   She had an impressive background?
16       MR. BATTAGLIA: Objection.
17    A.   She had a solid background.
18    Q.   Do you remember where she came
19 from?
20       MR. BATTAGLIA: Objection.
21       Can you clarify.
22    Q.   Do you remember where she worked
23 previous to Citi?
24    A.   I think it was either PaineWebber
25 or UBS, I don't know at that time what they

Page 38

1     F. A. HESSLER
2  were.
3     Q.   And there came a time that Lisa
4  was eventually promoted out of the AVP role.
5  Is that right?
6     A.   Yes.
7     Q.   And what was the first promotion
8  that she received?
9     A.   That would have been to vice
10 president.
11    Q.   Do you remember when that was?
12    A.   I don't.
13    Q.   Did you recommend her for this
14 promotion?
15    A.   I approved her promotion.
16    Q.   Did you recommend her for the
17 promotion?
18    A.   We would have recommended to Frank
19 Chin to have her promoted.
20    Q.   When you say we, is that you and
21 Cyganowski?
22    A.   David.
23    Q.   So you were fully on board with
24 her promotion?
25    A.   Yes.

Page 39

1     F. A. HESSLER
2     Q.   Do you remember when that was?
3     A.   I don't.
4     Q.   And why were you on board with her
5  promotion?
6     A.   She performed well as an AVP, and
7  demonstrated her ability to continue her
8  career as a junior professional as a vice
9  president.
10    Q.   And what criteria did you analyze
11 in determining that she was ready for the
12 promotion from an AVP to VP?
13       MR. BATTAGLIA: Objection to form.
14       You can answer.
15       THE WITNESS: I'm sorry?
16       MR. BATTAGLIA: You can answer.
17    A.   Well, the criteria would have been
18 in terms of her ability to execute bond deals,
19 financing deals successfully.
20    Q.   And she satisfied that criteria?
21    A.   Yes.
22    Q.   Was anyone else involved in the
23 promotion process of Lisa from AVP to VP?
24    A.   Yes.
25    Q.   Who else was involved?

Page 40

1     F. A. HESSLER
2     A.   All the other officers in our
3  healthcare group.
4     Q.   Does that mean all of the
5  directors and managing directors?
6     A.   Yes.
7     Q.   And what was their role in that
8  decision?
9     A.   We provided an opportunity for
10 everyone to provide feedback on potential
11 candidates for promotion.
12    Q.   And do you remember, was everyone
13 on board with Lisa's promotion to vice
14 president?
15    A.   To the best of my recollection,
16 yes.
17    Q.   And during her time as associate
18 vice president, do you recall any clients
19 complaining about Lisa?
20    A.   No.
21    Q.   I might have said associate vice
22 president. AVP.
23       Do you remember any clients
24 complaining about her during that time?
25    A.   No.



Page 41

1    F. A. HESSLER
2    Q.   And do you remember any issues at
3    that time regarding her representation of
4    clients?
5         MR. BATTAGLIA:  Objection to form.
6         I don't think we set a foundation
7         regarding her representation of clients.
8    Q.   Was Lisa involved in covering
9    clients in an AVP role?
10   A.   She was on client assignments as
11   an AVP, yes.
12   Q.   Did she ever have contact with
13   clients as an AVP?
14   A.   Minimal.
15   Q.   During that time do you remember
16   any issues regarding her covering clients?
17   A.   No.
18   Q.   So Lisa was promoted from AVP to,
19   the next promotion was VP.  Is that right?
20   A.   Yes.
21   Q.   And what's the difference in role
22   between an AVP and VP?
23   A.   Very little difference initially.
24   Essentially, still a junior banker processing
25   transactions.

Page 42

1    F. A. HESSLER
2    Q.   Does that change as you become a
3    more experienced VP?
4    A.   Yes.
5    Q.   How does it change?
6    A.   Presumably, one takes on more
7    responsibilities for the execution of the
8    financings.
9    Q.   And did Lisa take on more
10   responsibility for the execution of
11   financings?
12   A.   Yes.
13   Q.   And did there come a time when
14   Lisa was promoted from VP to director?
15   A.   Yes.
16   Q.   Do you remember when that was?
17   A.   I don't.
18   Q.   And who was involved in the
19   decision to promote Lisa to director?
20   A.   Again, all the managing directors
21   and directors in our healthcare group.
22   Q.   And David Cyganowski?
23   A.   And David Cyganowski.
24   Q.   And what about approval from above
25   your pay grade, did any of your superiors have

Page 43

1    F. A. HESSLER
2    to approve it?
3    A.   Yes.
4    Q.   Who?
5    A.   Frank Chin and I would assume
6    Ward Marsh.
7         MR. BATTAGLIA:  Please don't
8         assume.
9         THE WITNESS:  Pardon?
10        MR. BATTAGLIA:  Please don't
11        assume.
12        THE WITNESS:  Okay.
13   A.   Frank Chin.
14        THE WITNESS:  Thank you.
15   Q.   And did you recommend Lisa for the
16   promotion to director?
17   A.   Yes.
18   Q.   Along with Mr. Cyganowski?
19   A.   Yes.
20   Q.   And you supported, obviously, her
21   promotion?
22   A.   Yes.
23   Q.   Why did you support her promotion
24   to director?
25   A.   We believed it was warranted based

Page 44

1    F. A. HESSLER
2    on her performance as a VP.
3    Q.   Were there specific criterion that
4    you analyze when determining whether somebody
5    is ready to move from vice president to
6    director?
7    A.   Yes.
8    Q.   And what are those criteria?
9    A.   A demonstrated ability to manage
10   entire transactions effectively and
11   successfully.
12   Q.   And you felt Lisa had satisfied
13   that criteria?
14   A.   Yes.
15   Q.   And you said you received feedback
16   from all of the other officers in the group?
17   A.   Yes.
18   Q.   Do you remember any negative
19   comments about Lisa at that time?
20   A.   I don't recall any negative.
21   Q.   Do you remember any positive
22   comments at that time?
23   A.   Nothing specific.
24   Q.   Do you generally remember positive
25   comments?



Page 45

1   F. A. HESSLER
2       A.  Yes.
3       Q.  If the feedback had been mainly
4   negative, would Lisa have still been promoted?
5       A.  No.
6           MR. BATTAGLIA:  Objection.  It
7       calls for speculation.
8       Q.  Do you know whether, if the
9   feedback would have been mainly negative if
10  Lisa would have been promoted?
11          MR. BATTAGLIA:  Objection:  it
12      calls for speculation.
13          You may answer.
14      A.  My guess -- I won't assume.
15          MR. BATTAGLIA:  No.
16      A.  I can't tell you.
17      Q.  You wouldn't promote someone with
18  average or negative -- well, you wouldn't
19  promote someone with negative reviews, would
20  you?
21          MR. BATTAGLIA:  Objection.  It
22      calls for speculation.
23      Q.  I'm asking whether you, as the
24  head of the group, would recommend someone for
25  promotion with negative reviews?

Page 46

1   F. A. HESSLER
2           MR. BATTAGLIA:  Objection.  You
3       may ask him if at any point he did, but
4       otherwise you are asking him to
5       speculate and I'm not going to let him
6       sit here and answer hypotheticals.
7           MR. GROSS:  I'm asking him in his
8       practice as the head of the healthcare
9       group over the last 20 years, if you
10      promote people with negative reviews.
11          MR. BATTAGLIA:  Is the question if
12      at any time did he, because that he may
13      answer.
14      Q.  I'm asking you over your 20, or
15  however many years you have been head of the
16  healthcare group, if you have promoted someone
17  to director with negative reviews?
18      A.  No.
19      Q.  And during Lisa's time as a vice
20  president, was she involved in covering
21  clients?
22      A.  I don't understand your question.
23      Q.  Did she have client interaction?
24      A.  Yes.
25      Q.  And would she speak to clients on

Page 47

1   F. A. HESSLER
2   the phone?
3       A.  Yes.
4       Q.  And during her time as a vice
5   president, do you recall any complaints from
6   clients about Lisa?
7       A.  I don't recall any.
8       Q.  Do you remember any issues being
9   raised for your attention regarding her
10  representation of clients?
11      A.  I don't know what you mean.
12      Q.  Were there any issues that you
13  were made aware of regarding Lisa's
14  representation of clients?
15          MR. BATTAGLIA:  To the extent you
16      can recall.
17      A.  Well, right, but Lisa did not
18  represent clients.
19      Q.  Who represents clients?
20      A.  I don't understand your question.
21      Q.  Does one person represent the
22  client?
23      A.  To whom?
24      Q.  Is there a team that's involved in
25  representing the client?

Page 48

1   F. A. HESSLER
2       A.  We have people assigned to clients
3   who work with clients to execute financing
4   transactions.
5       Q.  So is your issue with my use of
6   the term "represent"?
7       A.  I don't know what that term means.
8       Q.  Were there ever any issues brought
9   to your attention regarding Lisa's covering of
10  clients during her time as a vice president?
11      A.  Nothing was brought to my
12  attention.
13      Q.  And does the vice president have
14  any responsibilities with respect to
15  generating revenue?
16      A.  There is no real expectation for a
17  VP to generate revenue.
18      Q.  Do you evaluate whether a vice
19  president has the potential to generate
20  revenue upon promotion to director?
21      A.  Yes.
22      Q.  And how do you evaluate that?
23      A.  Based on their performance in
24  terms of working with clients and
25  understanding of the business, understanding



Page 49

1    F. A. HESSLER
2    of the investment banking business, healthcare
3    business, and I guess financing transactions.
4        Q.   And at the time that Lisa was
5    promoted to director, did you believe that she
6    had potential to generate revenue for the
7    healthcare group?
8        A.   Yes.
9        Q.   And was that one of the factors
10   you considered when promoting Lisa to
11   director?
12       A.   Yes.
13       Q.   And, again, you don't remember
14   when that promotion was to director?
15       A.   I don't.
16       Q.   And do you consider when someone's
17   promoted to director, whether they would be
18   successful or successful interacting with
19   clients?  Strike that.
20            Do you consider whether people
21   would be good at interacting with clients?
22            MR. BATTAGLIA:  Objection.  You
23       may answer.
24       A.   Their ability to interact with
25   clients, either was or was not demonstrated in

Page 50

1    F. A. HESSLER
2    their time as a vice president.
3        Q.   And so Lisa was good at
4    interacting with clients?
5        A.   She interacted with clients
6    effectively.
7        Q.   Do you fill out performance
8    reviews in connection with your role as head
9    of the healthcare group?
10       A.   Yes, sir.
11       Q.   And that's part of the manager's
12   job?
13       A.   Yes.
14       Q.   Is it an important part of their
15   job?
16            MR. BATTAGLIA:  Objection.
17       A.   Yes.
18       Q.   During Lisa's time as an AVP, did
19   you ever express or did you ever have any
20   reservations that she wasn't interested in her
21   professional development?
22       A.   I don't recall.
23       Q.   Do you recall whether you were
24   worried about whether she was interested in
25   her professional development during her time

Page 51

1    F. A. HESSLER
2    as a vice president?
3        A.   I don't recall.
4        Q.   Did Lisa ever express to you that
5    she was interested in being promoted?
6            MR. BATTAGLIA:  At which point?
7            MR. GROSS:  As a vice president,
8        do you remember whether she was
9        interested in being promoted to a
10       director.
11       A.   I don't recall her ever expressing
12   that to me.
13       Q.   Do you ever recall her expressing
14   that she was not interested in being promoted
15   to director?
16       A.   I don't recall her expressing any
17   interest in not being promoted.
18       Q.   When you fill out performance
19   reviews, are those reviews considered when
20   making promotion decisions?
21           MR. BATTAGLIA:  Objection.
22       A.   Could you repeat it.  There is a
23   lot of traffic out there.
24       Q.   Sure.  Are performance reviews,
25   the scores that people receive on performance

Page 52

1    F. A. HESSLER
2    reviews, is that taken into account when
3    deciding whether to promote someone?
4            MR. BATTAGLIA:  Objection.  You
5        may answer.
6        A.   Yes.
7        Q.   Yes?
8        A.   Yes.
9            MR. BATTAGLIA:  Objection.  You
10       said I guess?
11           THE WITNESS:  I said "yes."
12           MR. BATTAGLIA:  I'm also having a
13       hard time hearing.
14       Q.   Are those performance ratings
15   considered when determining the amount of
16   discretionary bonus that someone receives?
17           MR. BATTAGLIA:  Objection.  You
18       can answer.
19       A.   Yes.
20       Q.   Are they considered when making
21   termination decisions?
22           MR. BATTAGLIA:  Objection.  You
23       may answer.
24       A.   Yes.
25       Q.   Would you agree that reviews are

Page 69

1    F. A. HESSLER
2    A.   Yes.
3    Q.   Do you remember having any
4    disagreements with Mr. Cyganowski regarding
5    this review?
6    A.   Not to my recollection.
7    Q.   If you look on that same first
8    page under the Responsibility to Our Clients
9    heading, and that first box says Builds Client
10   Relationships. Do you see where I'm looking?
11   A.   Yes.
12   Q.   And it says: "Anticipates,
13   understand and exceeds client expectations and
14   needs." And Lisa received a 2 in that
15   category, correct?
16   A.   Yes.
17   Q.   And that means that she was highly
18   effective?
19   A.   Yes.
20   Q.   And you agree with that rating?
21   A.   Yes.
22   Q.   And that Lisa, the last bullet
23   point in that box says "Solicits, listens and
24   responds to client feedback." Do you agree
25   that Lisa was highly effective in that area in

Page 70

1    F. A. HESSLER
2    2006?
3    A.   Yes.
4    Q.   And if you look at the next box
5    down, it says "Delivers client solutions."
6    And the first bullet point says:
7         "Continuously delivers superior
8    advise, product and services, leverages
9    internal expertise."
10        Again, Lisa got a 2 for highly
11   effective. Do you agree with that rating for
12   2006?
13   A.   Yes.
14   Q.   If you turn the page to the page
15   marked on the bottom, 683, the second page of
16   this document. At the top of the page there
17   is what appear to be Lisa's, Lisa Conley's
18   comments, right?
19   A.   Yes.
20   Q.   Do you have access, do you see
21   these comments when you are filling out the
22   review?
23   A.   Yes.
24   Q.   So the employee puts in her own,
25   his or her own comments before the managers

Page 71

1    F. A. HESSLER
2    actually put in their comments and put in the
3    ratings?
4    A.   I believe that's what took place
5    in two thousand -- this is 2006, right. I
6    believe that was the system in 2006, yes.
7    Q.   So if we look at Lisa's comments
8    in that top of page 683, starting with the
9    second sentence where she says:
10        "My time was spent being much more
11   client focused and the transaction processing
12   was delegated much more effectually. For the
13   Rush and Sisters of St. Francis relationships,
14   I was front and center for all significant
15   discussions."
16        Would you agree with those
17   comments?
18   A.   Yes.
19   Q.   Was Lisa the lead banker on the
20   Rush and Sisters of St. Francis accounts?
21   A.   No.
22   Q.   Do you know who was the lead
23   banker on those accounts?
24   A.   Yes.
25   Q.   Who was the lead banker on Rush?

Page 72

1    F. A. HESSLER
2    A.   I believe it was Dave Johnson.
3    Q.   And who was the lead banker on
4    Sisters of St. Francis?
5    A.   Dave Johnson.
6    Q.   Was Lisa taking, to your knowledge
7    did Lisa take an active role in covering those
8    clients?
9         MR. BATTAGLIA: Objection. You
10        can answer, if you understand.
11   A.   She was taking an active role in
12   processing the transactions for Rush and
13   Sisters of St. Francis.
14   Q.   But she wasn't the lead banker?
15   A.   Yes, sir, correct.
16   Q.   What does the lead banker do?
17   A.   He has primary responsibility for
18   the client relationship.
19   Q.   And are directors ever lead
20   bankers?
21   A.   Yes.
22   Q.   Yes?
23   A.   Yes.
24   Q.   Are directors -- when someone is
25   just promoted to director, are they expected



Page 169

1      F. A. HESSLER
2  pertain solely to Lisa.  Correct?
3      A.   Yes.
4      Q.   And are there documents that
5  pertained to the healthcare group as a whole?
6      A.   Yes.
7      Q.   And did you receive those
8  documents as well from Bill Hudnut?
9      A.   Yes.
10     Q.   So you would receive not just the
11 healthcare group information as a whole, but
12 you also received the individual reports?
13         MR. BATTAGLIA:  Objection:  asked
14     and answered.
15     A.   Yes, we got these from Bill Hudnut
16 as well.
17     Q.   Do you know why you received the
18 individual reports?
19         MR. BATTAGLIA:  Objection.  To the
20     extent you know, please don't speculate.
21         MR. GROSS:  He can answer the
22     question however he sees fit to answer
23     the question.
24         MR. BATTAGLIA:  Right, but I'm not
25     going to have him sit here and guess why

Page 170

1      F. A. HESSLER
2     other people sent --
3         MR. GROSS:  He can answer the
4     question however -- you can object if
5     you have a problem with the question,
6     but you can't instruct him how to answer
7     the question.
8         MR. BATTAGLIA:  I'm not.  I'm
9     telling him not to speculate, to answer
10    to the extent that he knows.
11        MR. GROSS:  There is no rules --
12    he can answer however he would like to
13    answer it.
14     A.   We got these type of reports
15 annually.
16     Q.   My question is do you know why you
17 got these, why these reports were sent to you?
18        MR. BATTAGLIA:  Objection.  To the
19    extent you know.
20     A.   I've lost track over here.
21 Please?
22     Q.   You can answer the question to the
23 extent you can answer the question, which is,
24 do you know why these individual reports were
25 sent you in your role as a group head?

Page 171

1      F. A. HESSLER
2      A.   I don't know why.
3      Q.   Now, if you look at the document,
4  I think, if you look at the two pages, it
5  appears that the second page is the same as
6  the first page, just that it lists the top ten
7  transactions on the second page, but since
8  there is only nine transactions it appears the
9  two pages are actually identical.  Is that --
10        MR. BATTAGLIA:  Take your time and
11    review --
12        MR. GROSS:  Take your time and
13    review it.
14     A.   Okay.
15     Q.   It's fair that these two pages are
16 the same?
17     A.   They appear that way, yes.
18     Q.   And so if we look at just the top
19 ten transactions which is the page marked
20 15688 on the bottom right.
21     A.   Yes.
22     Q.   The total revenue number, do you
23 know, can you tell from this sheet what the
24 total revenue that is attributed to Lisa is
25 for this year?

Page 172

1      F. A. HESSLER
2         MR. BATTAGLIA:  Objection.  Which
3     document are you looking at?
4         MR. GROSS:  The one Bates marked
5     15688.  I'm just trying to understand
6     how to read this sheet.
7         Let me rephrase the question.
8      A.   I'm totally unfamiliar with this
9  sheet, so.
10     Q.   Does it appear that the total
11 revenue column is the furthest one to the
12 right on this sheet, the revenue column, the
13 net revenue?
14        MR. BATTAGLIA:  Objection.  Again,
15    please just answer to the extent you
16    know or can infer from this document.
17     A.   I don't know on this document, on
18 this page.
19     Q.   Do you know on the first page?
20     A.   The first page is the typical
21 report that we would get.  I'm not at all
22 familiar with this other page at all.  I don't
23 know what --
24     Q.   So let's look at the first page.
25 Is the column all the way to the right on the



Page 201

1  F. A. HESSLER
2  A.  Um-hum.
3  Q.  -- for Ryan Freel. It says --
4  this is another Fairview deal, right?
5  A.  Yes. I'm sorry, yes.
6  Q.  And you will notice that neither
7  David Johnson nor Lisa Conley's name is
8  listed?
9  A.  Correct.
10  Q.  David Johnson and Lisa Conley were
11  involved in covering that account before their
12  terminations, right?
13  A.  Correct.
14  Q.  So was this, do you know why their
15  names don't appear here?
16  A.  I don't know.
17  Q.  If you flip back to the previous
18  exhibit which was, I believe 291. You will
19  notice --
20  A.  Sure.
21  Q.  -- that the first deal on Lisa
22  Conley's 2008 revenue report, is also a
23  Fairview deal, right?
24      MR. BATTAGLIA: You mean the
25      second one?

Page 202

1  F. A. HESSLER
2  A.  The first one and the second one,
3  both.
4  Q.  The first one.
5  A.  Yes.
6  Q.  So do you know why -- and Ryan
7  Freel's name does not appear there, correct?
8  A.  Correct.
9  Q.  Nor does Pat -- John Sheehan,
10  right?
11  A.  Correct.
12  Q.  And then if we go back to Ryan
13  Freel's list, Jim Blake, Ryan Freel and Pat
14  Sheehan all appear, correct?
15  A.  Correct.
16  Q.  Is this because the staffing
17  changed after the termination of Lisa and
18  David Johnson?
19      MR. BATTAGLIA: Objection. I
20      don't believe we confirmed that it's the
21      same deal, but he can certainly testify
22      to that.
23  A.  Yeah, I can't tell you why these
24  are different names.
25  Q.  I'm not trying to suggest -- I

Page 203

1  F. A. HESSLER
2  don't think it is the same deal. What I'm
3  trying to get a sense of is whether these
4  people listed here, Jim Blake, John Sheehan
5  and Ryan Freel on the first deal on Ryan
6  Freel's sheet, would have been covering that
7  deal had Lisa and David Johnson not been
8  terminated?
9  A.  No, because that's not the team
10  that took over.
11  Q.  So who took over?
12  A.  Cyganowski and Freel and -- I
13  don't recall who else.
14  Q.  So after Lisa and David Johnson
15  were terminated, Cyganowski and Freel took
16  over?
17  A.  Yes.
18  Q.  And Cyganowski and Freel were not
19  involved previously?
20  A.  Again, this account goes back to
21  1995, and in that time period, Jim Blake and
22  David Cyganowski and Fred Hessler were all
23  involved in Fairview. And so Cyganowski would
24  have had prior lead responsibilities with
25  Fairview prior to the Johnson/Conley team.

Page 204

1  F. A. HESSLER
2  Q.  And then at some point Johnson and
3  Conley -- Johnson became the lead on that
4  account with Conley as well?
5  A.  Yes.
6  Q.  And so if you look, going back to
7  Lisa's 2008 revenue report.
8  A.  Um-hum.
9  Q.  If you see the second deal, that's
10  another Fairview deal, right?
11  A.  Yes.
12  Q.  And the date in the transaction
13  details, what does that date represent?
14      MR. BATTAGLIA: Objection. You
15      may answer.
16  A.  It is probably -- let's see, this
17  is a derivative -- it is probably the date
18  when this particular derivative transaction
19  was executed.
20  Q.  Executed. And if we look at Ryan
21  Freel's sheet --
22  A.  Um-hum.
23  Q.  -- does that deal appear on his
24  sheet anywhere?
25  A.  Quickly scanning down here, I



Page 241

1    F. A. HESSLER
2 inexperienced director never could.
3    Q.   So on a day-to-day basis, how does
4 that make a senior director's job different
5 than a junior director's job?
6    A.   He isn't supposed to be working on
7 a day-to-day execution of transactions. We
8 leave that processing for junior directors.
9    Q.   Is he, as a senior director, more
10 focused on bringing in new business than a
11 junior director would be?
12    A.   Again, junior director's career
13 path is to become a revenue generator, and
14 someone who has been in the business 30 plus
15 years is already at that point.
16    Q.   So you would call Kent Jackman a
17 revenue generator at this point?
18    A.   Yes.
19    Q.   Would you call Ryan Freel a
20 revenue generator in 2008?
21    A.   In 2008, no.
22    Q.   Would you call David Kasdin a
23 revenue generator in 2008?
24    A.   No.
25    Q.   Would you call Michael Brown a

Page 242

1    F. A. HESSLER
2 revenue generator in 2008?
3    A.   No.
4    Q.   Lisa Conley: a revenue generator
5 in 2008?
6    A.   No.
7    Q.   Were there expectations for Ryan
8 Freel to be a revenue generator in 2008?
9    A.   No.
10    Q.   Michael Brown?
11    A.   No.
12    Q.   Lisa Conley?
13    A.   No.
14    Q.   David Kasdin?
15    A.   No.
16       MR. GROSS:  Let's take a break.
17       THE VIDEOGRAPHER:  We're now going
18    off the record approximately 2:20 p.m.
19    This is the end of disk No. 3.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  This is the
22    beginning of disk 4 in the Hessler
23    deposition.  We're now going back on the
24    record approximately 2:32 p.m.
25 BY MR. GROSS:

Page 243

1    F. A. HESSLER
2    Q.   Mr. Hessler, if you take a look at
3 Exhibit 517.
4    A.   Okay.
5       (Plaintiffs' Exhibit 517, Mike
6       Irwin's Net Revenue Report for 2008
7       marked for identification, as of
8       this date.)
9    Q.   Which is Mike Irwin's revenue
10 report for 2008.
11    A.   Okay.
12    Q.   And so at the top of the document
13 if you look at the top next to Mike Irwin's
14 name.
15    A.   Yes.
16    Q.   It says director.  Does that
17 refresh your recollection at all as to when
18 his role was changed from a managing director
19 to a director?
20    A.   Well, it clearly happened some
21 time before December 22, 2008.  I can't
22 remember the exact time.  It may have been
23 2007.
24    Q.   And how long had Michael Irwin
25 been a director or managing director?

Page 244

1    F. A. HESSLER
2    A.   Mike Irwin began, let's see, 1985,
3 he would have been a director and/or managing
4 director from about 1992, '3, time period,
5 roughly.
6    Q.   And why was he, why did he get
7 demoted from a managing director to a director
8 position?
9       MR. BATTAGLIA:  Objection.  You
10    can answer.
11    A.   He's a well established, well
12 recognized senior banker on the Street and
13 recognized by his clients.  We wanted to
14 create an opportunity for some of our younger
15 directors to get promoted, and so we asked
16 Michael if he would mind no longer being a
17 managing director in order for us to promote
18 Teri Hartman to managing director.
19    Q.   And why was it that Michael Irwin,
20 his role needed to be changed from managing
21 director to director in order for you to be
22 able to promote Teri Hartman?
23    A.   We had a limit in terms of the
24 number of managing director positions we had
25 available within MSD, PFD and healthcare



Page 245

1           F. A. HESSLER
2  group.
3      Q.   And who sets those limits?
4      A.   I don't know.
5      Q.   Who communicated those limits to
6  you?
7      A.   The limits in terms of the number
8  of spots?
9      Q.   Well, how did you know that you
10 needed to have a managing director be moved to
11 director in order to promote one up?
12     A.   Because when we recommended to
13 promote Teri Hartman they said you've got too
14 many managing directors.
15     Q.   And did the decision -- how did
16 you decide on Mike Irwin?
17         MR. BATTAGLIA: Objection. But
18     you may answer.
19         THE WITNESS: Sure.
20     A.   Quite honestly, he, like others,
21 like Charlie Plimpton and Kent Jackman, had
22 been in the business 30-plus years, well
23 established, well recognized, well respected
24 in the industry, and we concluded that he
25 didn't need a title to be effective as a

Page 246

1           F. A. HESSLER
2  senior banker to healthcare organizations
3  around the country.
4      Q.   Did it have anything to do with
5  his performance?
6      A.   No.
7      Q.   When you made the decision as to
8  who to approach about stepping down a level,
9  did you compare the performance of Kent
10 Jackman, Mike Irwin and Charles Plimpton?
11         MR. BATTAGLIA: Objection. You
12     may answer.
13     A.   No, Kent and Charlie were already
14 directors.
15     Q.   Did it have anything to do with
16 his age that you asked him to be the one to
17 step down?
18         MR. BATTAGLIA: Objection.
19     A.   Not his age, his experience in the
20 industry.
21     Q.   And during the course of your
22 tenure as head of the healthcare group, have
23 you ever approached anyone else about taking a
24 step-down in title?
25     A.   No.

Page 247

1           F. A. HESSLER
2      Q.   That's the only time it's ever
3  happened?
4          MR. BATTAGLIA: Objection.
5      A.   Yes.
6      Q.   And would you say that Michael
7  Irwin in 2008, his job duties were similar to
8  that of Kent Jackman as a senior director?
9      A.   Yes.
10     Q.   So if you just take a look at
11 Exhibit 517, take a look at it and let me know
12 which one of the clients Michael Irwin was the
13 lead banker for in 2008?
14         MR. BATTAGLIA: To the extent that
15     you can remember.
16         MR. GROSS: To the extent that you
17     can remember.
18     A.   Okay, I'll give you the names that
19 are here. New Jersey Health, Vermont Health,
20 Greenville, New York City Health and
21 Hospitals, Fletcher Allen, Grandview, New York
22 State Dormitory, Greenville again, New York
23 Health and Hospitals again, Greenville again,
24 Vermont again. I'm not sure what the Albany
25 Industrial Development is. And again, I don't

Page 248

1           F. A. HESSLER
2  know what the Albany Industrial Development
3  is.
4          MR. BATTAGLIA: There is one more
5      on the next page.
6      A.   Oh, I'm sorry. And Jefferson
7  Health, yes.
8      Q.   And is Mike Irwin, he's still
9  employed at the company?
10     A.   Yes.
11     Q.   Do you know how old Mike Irwin is?
12     A.   Michael is 62.
13     Q.   When Mike Irwin was moved to the
14 director from the managing director role, do
15 you know whether there was a change in his
16 compensation at that time?
17         MR. BATTAGLIA: Objection. You
18     may answer.
19     A.   There was no change in -- I don't
20 know whether or not -- I'm not certain --
21 well, put it this way. I am reasonably
22 certain there was no change in his base
23 compensation. There would have been no change
24 in his ultimate total compensation.
25     Q.   There would not have been a



Page 253

1     F. A. HESSLER
2  she had occasion to do very little but -- very
3  little with Ray Kljajic.
4     Q.   And what about Tom Coomes?
5     A.   That, I don't know.
6     Q.   Did you ever consult with Ray
7  Kljajic regarding Lisa's performance?
8     A.   No.
9     Q.   What about before making
10 compensation decisions?
11    A.   No.
12    Q.   Termination decisions?
13    A.   No.
14    Q.   Do you remember how many separate
15 lay-offs affected your group, the healthcare
16 group in 2007 and 2008?
17        MR. BATTAGLIA: I'm sorry, can you
18    restate, that how many --
19    Q.   How many separate layoffs affected
20 the healthcare group in 2007, 2008.
21        MR. BATTAGLIA: So just to
22    clarify, we are talking about mass
23    layoffs or individuals leaving?
24    Q.   Part of company-wide reductions in
25 force.

Page 254

1     F. A. HESSLER
2     A.   The ones that come to mind, there
3  were three.
4     Q.   And what's the one furthest back
5  in time?
6     A.   From roughly 2007.
7     Q.   And do you know when in 2007?
8     A.   Late. I don't know exact date.
9     Q.   Towards the end of 2007?
10    A.   End of 2007.
11    Q.   And when's the next one?
12    A.   That would have been mid 2008.
13    Q.   And the last one?
14    A.   Late 2008.
15    Q.   And do you remember who, if
16 anyone, was included from the healthcare group
17 in the end of 2007 layoff?
18    A.   A memory test. The two that come
19 to mind are Efraim Zamora.
20    Q.   Efraim?
21    A.   I'm sorry?
22    Q.   Efraim?
23    A.   Efraim. And Amy Reding.
24        MR. BATTAGLIA: Amy?
25    A.   Reding.

Page 255

1     F. A. HESSLER
2     Q.   And what position -- is Efraim
3  Zamora, is that a man or a woman?
4     A.   It's a man.
5     Q.   And what position was Efraim?
6     A.   I think they were both vice
7  presidents.
8     Q.   Were you involved in selecting
9  those two individuals for termination?
10    A.   I was involved.
11    Q.   Was David Cyganowski involved?
12    A.   He would have been involved.
13    Q.   Who else was involved?
14    A.   Frank Chin and I don't recall
15 whether or not David Brownstein was involved
16 in 2007 or not.
17    Q.   Was Bart Livolsi involved?
18    A.   Relative to?
19    Q.   These two names in 2007.
20    A.   No.
21    Q.   Was Tom Green involved?
22    A.   No.
23    Q.   And do you remember what the
24 criteria was that you analyzed in terms of
25 coming up with these two people's names?

Page 256

1     F. A. HESSLER
2        MR. BATTAGLIA: Objection. You
3    may answer.
4     A.   The criteria had to do with their
5  performance as vice presidents and -- it was
6  the principal criteria.
7     Q.   And who recommended these two
8  individuals for layoff?
9        MR. BATTAGLIA: Objection. You
10   may answer.
11    A.   I don't understand your question.
12    Q.   Did Frank Chin have to sign-off on
13 all the layoff decisions?
14    A.   Yes.
15    Q.   Who initially proposed Efraim and
16 Amy's names for layoff?
17    A.   You know, for 2007 I really can't
18 remember who proposed those two. I don't
19 remember.
20    Q.   Could it have been you?
21    A.   It could have been.
22    Q.   Could it have been Cyganowski?
23    A.   It could have been.
24    Q.   Could it have been Frank Chin?
25    A.   Yes.



Page 261

1      F. A. HESSLER
2  Frank Chin decision.
3      Q.   Did you have an opinion?
4      A.   I did.
5      Q.   And what was your opinion?
6      A.   He should be off the list.
7      Q.   Why was that?
8      A.   He is a very talented banker who,
9  if he left our group and went to another
10 group, would take a multitude of clients with
11 him and a bunch of people with him.  So it is
12 a high risk strategy to remove him.
13     Q.   And so this initial list that
14 Frank Chin put together, did he send that to
15 you in an e-mail?
16     A.   I don't believe so.
17     Q.   So how would he have given it to
18 you?
19     A.   Verbally.
20     Q.   Verbally?
21     A.   Yes.
22     Q.   There was a meeting?
23     A.   Yes.
24     Q.   With just you and Frank Chin?
25     A.   As I recall, it was Chin, Livolsi,

Page 262

1      F. A. HESSLER
2  Brownstein and myself.  I don't recall whether
3  or not Tom Green was there or not.
4      Q.   So why was it those four
5  individuals, why were those four individuals
6  invited to the meeting?
7      A.   Because we had the most number of
8  people in the whole department.
9      Q.   Were you part of a committee?
10     A.   No formal committee.
11     Q.   An informal committee?
12     A.   I'm not sure it was even an
13 informal committee.
14     Q.   Do you remember when you met?
15     A.   I don't.  I don't.
16     Q.   Do you know how many times you
17 met?
18     A.   I would just be guessing, two,
19 three.
20     Q.   Did you take notes at any of these
21 meetings?
22     A.   The only notes I took was the
23 initial list.
24     Q.   Did you keep that list?
25     A.   No.

Page 263

1      F. A. HESSLER
2      Q.   Do you remember whether anyone
3  else at the meeting was taking notes?
4      A.   That, I don't remember.
5      Q.   And was there an order on the list
6  in terms of who Frank Chin was suggesting
7  should be the first to go?
8      A.   No.
9      Q.   So the names you listed were all
10 on equal footing, originally?
11     A.   I don't know if it was equal
12 footing.  There was no order to the list.
13     Q.   So how did you get from that
14 original list to these four names?
15     A.   The hard reality is that we may
16 have had to make a judgment in each of these
17 cases as to whether or not any particular
18 individual, if they were terminated, would
19 take business with them or people with them.
20          And the judgment that was
21 exercised in June was that those four
22 individuals, particularly the directors, in
23 fact, it was the directors Mark Chiang and
24 Peter Reilly that we had most focused in on,
25 and we concluded that we would have a low

Page 264

1      F. A. HESSLER
2  probability of losing business or having
3  people being recruited by them, if they were
4  terminated.
5      Q.   So that was what the criteria was?
6      A.   Yes.
7      Q.   And you said that Peter Reilly and
8  Mark Chiang were directors?
9      A.   Yes.
10     Q.   And what was Jeffrey Cepler's
11 position?
12     A.   I think he was a vice president I
13 believe.
14     Q.   And what about Matthew Fong?
15     A.   I can't remember if he was an
16 associate on AVP.
17     Q.   He wasn't a senior level employee,
18 right?
19     A.   No.
20     Q.   Did you review any documents at
21 these meetings?
22     A.   No.
23     Q.   Did you discuss performance
24 reviews during these meetings?
25     A.   Not to my recollection.



Page 285

1	F. A. HESSLER
2	Q.	Victor Radina?
3	A.	No.
4	Q.	Charles Plimpton?
5	A.	Again, he could have been. I
6	can't tell you with certainty.
7	Q.	Charles Lee?
8	A.	I don't believe so.
9	Q.	Mike Irwin?
10	A.	Yes.
11	Q.	He was on the list?
12	A.	Yes.
13	Q.	Kent Jackman?
14	A.	I believe he was, but, again, I
15	can't be certain.
16	Q.	Pat Sheehan?
17	A.	Again, I put him in that category,
18	could have been, but I can't be for certain.
19	Q.	So other than, I believe you said
20	Victor Radina was not on the list?
21	A.	Yes.
22	Q.	And Charles Lee was not on the
23	list?
24	A.	I think that's right.
25	Q.	And Mike Irwin was on the list?

Page 286

1	F. A. HESSLER
2	A.	Yes.
3	Q.	And you believe Kent Jackman was
4	on the list?
5	A.	I believe so.
6	Q.	And all the other names, it could
7	be one way or the other?
8	A.	Yes.
9		MR. BATTAGLIA: And Cyganowski I
10	  believe you said.
11	Q.	And Cyganowski you said no?
12	A.	Yes.
13	Q.	And do you know why these people
14	were on, the people that were on the list were
15	on the list?
16	A.	I don't know what criteria was
17	used to be able to put people on that list in
18	the first place.
19	Q.	So you don't know what criteria
20	Frank Chin and maybe David Brownstein
21	evaluated in coming up with that initial list
22	of names?
23	A.	No.
24	Q.	And was the list organized in any
25	fashion that you can remember?

Page 287

1	F. A. HESSLER
2		MR. BATTAGLIA: Objection.
3	A.	Again, it was a verbal
4	communication and I don't -- there was no
5	order to it.
6	Q.	When Frank -- was it Frank Chin
7	who gave you the verbal list of names?
8	A.	Yes.
9	Q.	And it was at this meeting?
10	A.	As I recall best, yes.
11	Q.	And do you remember what he said
12	about the people, each of the people on the
13	list?
14	A.	I don't recall if he had comments
15	about the individuals on the list or not.
16	Q.	Do you remember, was it a
17	collaborative discussion in terms of
18	ultimately determining who would be part of
19	the reduction in force?
20	A.	It was a discussion about getting
21	towards a list of people who would in
22	healthcare's case would have come up to about
23	a $3 million compensation number.
24	Q.	So it was that he initially
25	proposed which people would go and then you

Page 288

1	F. A. HESSLER
2	got to provide input?
3	A.	Oh, by the very fact they were on
4	the list said that they were candidates.
5	Q.	But whittling it down from the
6	people on this list to the ultimate handful of
7	people who were terminated, that was a
8	collaborative process?
9	A.	Yes.
10	Q.	It wasn't Frank Chin suggesting
11	unilaterally, or David Brownstein suggesting
12	unilaterally, who they felt those names should
13	be?
14	A.	No, there was exchange and back
15	and forth.
16	Q.	And did you have any documents at
17	these meetings that you reviewed?
18	A.	No.
19	Q.	When you were at these meetings
20	did you know what people's -- how did you know
21	what people's 2007 salaries were?
22		MR. BATTAGLIA: Objection.
23	A.	Yeah, we did and I don't recall
24	how we knew that sitting in these meetings. I
25	don't recall.



Page 289

1        F. A. HESSLER
2    Q.   But you did know --
3    A.   Yes.
4    Q.   -- the comp numbers?
5    A.   Yes.
6    Q.   What about revenue documents?
7    A.   No.
8        MR. BATTAGLIA:  Objection.
9        THE WITNESS:  Sorry.
10   Q.   What about performance
11 evaluations?
12       MR. BATTAGLIA:  Objection.
13   Q.   Did you look at those at any of
14 these meetings?
15   A.   No.
16   Q.   Do you remember discussing
17 performance evaluations at any of these
18 meetings?
19   A.   No.
20   Q.   Do you remember discussing
21 feedback, performance evaluation feedback
22 regarding any of these people at these
23 meetings?
24       MR. BATTAGLIA:  Objection.
25   A.   No.

Page 290

1        F. A. HESSLER
2    Q.   Can you remember, roughly, can you
3 remember how many people were on the original
4 list, how many people's names appeared on the
5 initial list?
6    A.   For?
7    Q.   The November 2008 reduction in
8 force?
9    A.   For?
10   Q.   Healthcare.
11   A.   Whatever the names we just went
12 over would be as best I remember the names on
13 the list and the total number.
14   Q.   So I only listed directors and I
15 believe Cyganowski is a managing director.
16 Was anyone else considered for layoff?
17       MR. BATTAGLIA:  To the extent you
18    can recall.
19   A.   Yeah, again, there were likely
20 associates and analysts, but I don't recall if
21 they were on there.
22   Q.   I also didn't mention other
23 people's names such as David Johnson. Was he
24 on the list?
25   A.   Yes.

Page 291

1        F. A. HESSLER
2    Q.   Lisa Conley, she was on the list?
3    A.   Yes.
4    Q.   Jim Blake?
5    A.   No.
6    Q.   Do you know why he wasn't on the
7 list?
8    A.   No.
9    Q.   Andy Pines?
10   A.   No.
11   Q.   Do you know why he wasn't on the
12 list?
13   A.   No.
14   Q.   Did you agree that his name
15 shouldn't be on the list?
16       MR. BATTAGLIA:  Objection.
17   A.   Yes.
18   Q.   Was there anyone who was not on
19 the list who you thought should have been on
20 the list?
21       MR. BATTAGLIA:  Objection. You
22    may answer.
23   A.   No. It was a pretty long list.
24   Q.   And what was the criteria, how did
25 you, when you were discussing everyone -- did

Page 292

1        F. A. HESSLER
2 you discuss everyone's name on the list?
3    A.   Definitely the officers, yes.
4    Q.   And you are defining officers as
5 what?
6    A.   Managing directors, directors and
7 I don't recall whether or not there were any
8 VPs on the list and if there were, we may have
9 touched upon their names.
10   Q.   But you discussed all the
11 officers?
12   A.   Yes.
13   Q.   And who was part of those
14 discussions?
15   A.   As I said earlier, in those
16 meetings was Chin, Brownstein, Livolsi, myself
17 and maybe Tom Green.
18   Q.   And you testified earlier that
19 with respect to when there was conversations
20 about employees from other groups that you
21 didn't know, that you were in the room but you
22 weren't an active participant, right?
23   A.   Correct.
24   Q.   Do you remember whether Bart
25 Livolsi was an active participant in the

