# EXHIBIT 15

Page 293

1      F. A. HESSLER
2  discussions relating to any of the healthcare
3  group employees?
4      A.   To my recollection he was not.
5      Q.   What about Tom Green?
6      A.   To my recollection he was not.
7      Q.   David Brownstein?
8      A.   Yes.
9      Q.   And Frank Chin?
10     A.   Yes.
11     Q.   And what about your involvement,
12 was it the same for November 2008 in terms of
13 you didn't participate when talking about
14 employees outside of the healthcare group?
15     A.   Correct.
16     Q.   And of the officers, so the
17 officers who you discussed, what did you talk
18 about for each of the -- what was the criteria
19 that you talked about for each of the people?
20     A.   The criteria was, in addition to
21 having to come up with a comp number, to try
22 to minimize the number of people that would be
23 taken out of healthcare, as well as to salvage
24 what was ultimately going to be remaining in
25 healthcare after this particular RIF.  And the

Page 294

1      F. A. HESSLER
2  best way to salvage that was to identify those
3  folks who, in our judgment, my judgment that
4  would present the least risk associated with
5  taking clients or people.
6      Q.   In conjunction with balancing
7  their salary?
8          MR. BATTAGLIA:  Objection.
9      A.   In conjunction with having to meet
10 the compensation target.
11     Q.   We talked earlier about senior
12 directors versus junior directors, right?  Do
13 you remember when we talked about that?
14     A.   Yes.
15     Q.   And is it fair to say that senior
16 directors are much more likely to bring
17 business with them and people with them than
18 junior directors?
19     A.   Yes.
20     Q.   So wasn't terminating David
21 Johnson much more of a risk of losing people
22 and business, than terminating Ryan Freel?
23     A.   No.
24     Q.   Why is that?
25     A.   Well, because of the fact that so

Page 295

1      F. A. HESSLER
2  many people in the healthcare group really had
3  a hard time relating to David Johnson.  So I
4  concluded that his opportunity to take people
5  was very low.  And, in reality, also that,
6  based on evaluation of his client
7  relationships, his probability of taking
8  clients was pretty low and he was paid a lot
9  of money.
10     Q.   But he was the lead banker on a
11 number of accounts, right?
12     A.   Again, many of the accounts that
13 he was lead on, had long-term relationships
14 that we had long before Dave Johnson was part
15 of our group.
16     Q.   But he certainly had more in-depth
17 client relationships than Ryan Freel at that
18 point, right?
19     A.   He had more responsibilities for
20 client relationships in terms of being the
21 lead person than Ryan Freel, that's correct.
22     Q.   So there was a greater risk of
23 losing clients by terminating David Johnson
24 than there was by terminating a junior
25 director?

Page 296

1      F. A. HESSLER
2      A.   Sure.
3      Q.   Do you remember what David
4  Johnson's salary, compensation was in 2007?
5      A.   I don't recall off the top of my
6  head, but my recollection is it is in the 2 to
7  $2-1/2 million range, something in that zip
8  code.  I can't remember exactly.
9      Q.   Do you remember how Lisa Conley's
10 2007 compensation compared to the other
11 directors in the group?
12     A.   I'd have to go back and take a
13 look at the 2007 listing.  I don't remember
14 the comparison.
15     Q.   And so there came a point in time
16 where you discussed Lisa Conley's name at
17 these meetings?
18     A.   Yes.
19     Q.   Do you remember what was discussed
20 about Lisa?
21     A.   Yes.
22     Q.   What was discussed?
23     A.   Evaluating her probability, if she
24 were to be terminated, as to whether or not
25 she would take any clients with her, or if she



Page 297

1  F. A. HESSLER
2  wound up working for another competitor,
3  whether or not she would be able to recruit
4  people away from our group.
5      Q.  And what was the assessment?
6      A.  Very low risk of her taking
7  business and very low risk of her being able
8  to recruit people who might otherwise still be
9  in our group.
10     Q.  I'm trying to remember now if you
11 said you remember if Michael Brown was
12 discussed or not?
13         MR. BATTAGLIA:  I have a question
14     mark for that one.
15     A.  Yeah, I really don't recall if
16 Michael Brown was on that list or not.
17     Q.  Well, let me ask you this way.
18 Was there a risk in November 2008 that if
19 Michael Brown was terminated, that he would
20 take people and business with him?
21         MR. BATTAGLIA:  Objection.
22     A.  There was a risk because of the
23 fact that he worked a lot with Dave Johnson.
24 So if you eliminated both Dave Johnson and
25 Michael Brown there was a high probability of

Page 298

1  F. A. HESSLER
2  losing clients.
3      Q.  Didn't Lisa Conley work a lot with
4  David Johnson?
5      A.  Only in those clients where they
6  had been long-term clients of our group, and
7  therefore the judgment was there would be low
8  risk of having losing that business because
9  they were essentially institutionalized
10 accounts.
11     Q.  Was there a risk of losing clients
12 or people if Ryan Freel had been terminated?
13     A.  If --
14     Q.  Ryan Freel had been terminated?
15         MR. BATTAGLIA:  Objection.  You
16     can answer.
17     A.  I think there was some risk
18 associated with Ryan Freel's departure since
19 he had a key relationship with SSM, and even
20 though he worked jointly with Charles Lee on
21 that, there was a potential -- there was a
22 chance that we could lose that.
23     Q.  When did -- you said SSM?
24     A.  Um-hum.
25     Q.  When did SSM become a client of

Page 299

1  F. A. HESSLER
2  the healthcare group?
3      A.  I can't tell you exactly.
4  Probably in the 2006, 2007 time frame.
5      Q.  Was Ryan Freel an employee of Citi
6  at that time?
7      A.  Yes.
8      Q.  And you said, who was the other
9  main person on that account?
10     A.  Charles Lee.
11     Q.  And do you know how long Charles
12 Lee's relationship went back with SSM?
13     A.  When we got hired.
14     Q.  So he didn't know them, he had no
15 relationship with them beforehand?
16     A.  Correct, yes.
17     Q.  And who was the primary banker on
18 that account?
19     A.  Charles Lee was.
20     Q.  Were you worried about
21 losing Nebraska Methodist if you had fired
22 Lisa?
23     A.  No.
24     Q.  Why is that?
25     A.  Small.

Page 300

1  F. A. HESSLER
2      Q.  Is SSM a big client?
3      A.  Yes.
4      Q.  What big clients did Lisa work on?
5      A.  I'd have to go back to the list
6  there.
7      Q.  Sure.  Let's go back to, I think
8  it is 291?
9      A.  I think these got out of order.
10 What's the number?
11     Q.  291.
12         (Discussion off written record.)
13         MR. BATTAGLIA:  Here you go.
14     A.  291.
15     Q.  You have it in front of you now?
16     A.  Yes.
17     Q.  And, well, first, let's go through
18 the transactions one by one.
19     A.  Sure.
20     Q.  Is McLaren a big client?
21     A.  Yes.
22     Q.  And Lisa worked on that with David
23 Johnson, right?
24     A.  No.
25     Q.  No?



FRED A. HESSLER  
AMY BARTOLETTI vs CITIGROUP INC.  
August 10, 2012  
301–304

Page 301
1  F. A. HESSLER
2  A.  No.
3  Q.  I'm sorry, Fairview. Is Fairview
4  a big client?
5  A.  Very big.
6  Q.  And did Lisa work on that with
7  David Johnson?
8  A.  Yes.
9  Q.  And the first two deals --
10  A.  A client long before David Johnson
11  or Lisa Conley joined our group.
12  Q.  And those first two deals are both
13  Fairview deals?
14  A.  Yes.
15  Q.  Is McLaren a big client?
16  A.  Yes.
17  Q.  Lisa Conley worked on that
18  account?
19  A.  A client of ours since 1988.
20  Q.  Lisa Conley worked on the account?
21  A.  She was a processor on the
22  account.
23  Q.  And how long had she worked on
24  that account?
25  A.  I think maybe a year or two.

Page 302
1  F. A. HESSLER
2  Q.  What about Michigan State
3  Hospital?
4  A.  That's the same as McLaren.
5  Q.  That's McLaren. And the next one
6  down is Nebraska Methodist, right?
7  A.  Yes.
8  Q.  And what about the Indiana Finance
9  Authority, what is that?
10  A.  I believe that is the -- I think
11  that's the Sisters of St. Francis, although I
12  can't be positive on that.
13  Q.  Is that a big client?
14  A.  Not really.
15  Q.  She worked on that with David
16  Johnson, though, right?
17  A.  Pardon me?
18  Q.  She worked on that with David
19  Johnson, though?
20  A.  Yes. Not a big client.
21  Q.  The next one is McLaren again,
22  right?
23  A.  Yes.
24  Q.  And how do you define big client?
25  A.  Those that consistently over

Page 303
1  F. A. HESSLER
2  the -- well, a couple of things. Size of the
3  organization, as well as those that
4  consistently enable us to generate revenue for
5  the group.
6  Q.  And if it is a new client, how do
7  you know they are going to be able to
8  consistently generate revenue for the group?
9  A.  You take a look at the level of
10  activity they've had historically, and you
11  make a judgement as to whether or not they are
12  likely to continue that same level of
13  activity, and a ballpark as to what the
14  estimated revenue might be off that historical
15  set of transactions they may have done.
16  Q.  And SSM was a new client to the
17  group, relatively new client at the time of
18  November 2008?
19  A.  It had been a client of ours in
20  the '90s through 2001, 2002. They had a
21  change in CFOs. It was no longer a client.
22  And then they had another change of CFOs, I
23  think in around the 2007 time period, which is
24  when we got it back.
25  Q.  And --

Page 304
1  F. A. HESSLER
2  A.  And the reason we got it back is
3  that the CFO who came there was a client of
4  ours already, who had a relationship with
5  Charles Lee.
6  Q.  So it was Charles Lee's
7  relationship?
8  A.  No, the other key relationship was
9  they had a long time relationship with their
10  financial advisor Ponder, and Ryan had and has
11  the best relationship with Ponder.
12  Q.  And do you know how many
13  transactions Citi did for SSM in 2007?
14  A.  I don't know.
15  Q.  Do you know about 2008?
16  A.  We have to go through and sort it
17  out.
18  Q.  We will go through that in a
19  second. Let's keep going through here.
20  A.  Sure.
21  Q.  Franklin County of Ohio, is that a
22  big client?
23  A.  Ohio Health is a very large
24  client. We made a lot of money off them over
25  the years.



Page 305

1  F. A. HESSLER
2  Q. And Lisa worked on that account?
3  A. Yes. But we had it long before
4  Lisa started with us. Jim Blake was the
5  principal there.
6  Q. And what about Rush Medical
7  Center, big client?
8  A. Not really. They did basically
9  one deal in two thousand -- I forget what year
10  they did their one deal.
11  Q. What about Richmond Hospital?
12  A. You know, don't hold me to this, I
13  think that is Reid. I think that's Reid.
14  And, again, they basically do one
15  deal every, pick a time frame, 6, 7, 8 years;
16  pretty small.
17  Q. And for Rush that was David
18  Johnson and Lisa Conley?
19  A. Yes.
20  Q. And the same thing for Richmond,
21  Lisa Conley and David Johnson?
22  A. Correct.
23  Q. What about St. Joseph County?
24  A. That's Memorial South Bend.
25  Q. Big client?

Page 306

1  F. A. HESSLER
2  A. Very good sized client. They
3  consistently have done a lot of transactions
4  that we have done very well by.
5  Q. And how long have they been a
6  client of the healthcare group?
7  A. Going back to mid '90s before Lisa
8  joined us.
9  Q. And what about St. Joseph --
10  A. That's the same thing.
11  Q. Indiana Finance is that the same
12  as what we were discussing?
13  A. Yes.
14  Q. And Indiana Health as well?
15  A. Yes.
16  Q. What about the Illinois Finance
17  Authority?
18  A. I don't know -- I don't know which
19  one that is. It's pretty small numbers. I
20  don't know which client that is.
21  Q. But she worked on it with David
22  Johnson it appears, right?
23  A. Sure, um-hum.
24  Q. And Bloomington Hospital, do you
25  know what that is?

Page 307

1  F. A. HESSLER
2  A. Yes. That's the one where Kent
3  Jackman was taking the lead on it.
4  Q. And is that a big client?
5  A. No, small.
6  Q. What about the Pennsylvania
7  Economic Development?
8  A. That's Jefferson Health big client
9  and that's Mike Irwin.
10  Q. That's Mike Irwin?
11  A. Yes.
12  Q. And Lisa Conley worked on that as
13  well?
14  A. Yes.
15  Q. And when did you obtain that
16  client?
17  A. Oh, Jefferson goes back, we first
18  got that one around '93, '94 maybe, in that
19  time frame.
20  Q. Now let's go back to 304.
21  MR. BATTAGLIA: It's in there. I
22  saw it.
23  A. 304. What's the document so --
24  Q. It is Ryan Freel's revenue report
25  for 2007.

Page 308

1  F. A. HESSLER
2  A. Okay. Just the one page, right?
3  Q. It's a two-page document.
4  A. Yes.
5  Q. I'm just looking at the first
6  page.
7  A. Okay.
8  Q. Are any of these deals, this is
9  Ryan Freel's for 2007. Are any of them SSM?
10  A. No.
11  Q. And now let's look at 305.
12  A. Okay.
13  Q. How many times does SSM appear on
14  this list?
15  A. Missouri Health and Ed.
16  Q. Where are you looking just so I
17  can --
18  A. About halfway down.
19  Q. Okay.
20  A. Missouri Health and Ed, a little
21  further down for 76 million. Missouri Health
22  and Ed for 60 million. Missouri Health and Ed
23  for 54 million. Missouri Health and Ed for 48
24  million. Missouri Health and Ed for 42
25  million. Missouri Health and Ed on the next



Page 309

```
 1              F. A. HESSLER
 2   page for 135. Missouri Health and Ed, next
 3   one down, 64 million. Missouri Health and Ed
 4   86 million, and the last one. Those are all
 5   SSM.
 6      Q.   And do you know how much revenue
 7   Citi generated on each of these deals?
 8           MR. BATTAGLIA: Objection.
 9      A.   If you wanted to, you could go
10   down and add these things up, for 2008. I
11   couldn't tell you off the top of my head what
12   the revenue was.
13      Q.   So is the number all the way to
14   the right, the total revenue --
15           MR. BATTAGLIA: Objection.
16      A.   That's the revenue on here, I'm
17   not sure what the total revenue would be that
18   the firm generated as I already established
19   that we don't think these relate to a total
20   revenue of the firm.
21      Q.   What I'm trying to get is, does
22   the fact that the number all the way to the
23   right on the first Missouri Health deal that
24   you mentioned is 66,609 --
25      A.   On the first one? I think it is
```

Page 310

```
 1              F. A. HESSLER
 2   292,662 if I'm reading it right.
 3      Q.   Yes, you are, I'm sorry. 292,662.
 4      A.   Right.
 5      Q.   You don't know what that number
 6   is, though, do you, that 292 number?
 7           MR. BATTAGLIA: Objection: asked
 8       and answered.
 9      A.   Other than it's a number appearing
10   on this piece of paper I don't know what --
11      Q.   So looking at this document we
12   can't tell from this document what revenue
13   Citi derived from these deals?
14      A.   Correct.
15      Q.   Or what revenue the healthcare
16   group derived from these deals?
17      A.   Correct.
18           MR. BATTAGLIA: And just to
19       clarify, we are also talking about
20       revenue, not income?
21           MR. GROSS: Revenue.
22           MR. BATTAGLIA: Okay.
23      Q.   Which accounts, I think you said
24   earlier that Michael Brown worked a lot with
25   David Johnson?
```

Page 311

```
 1              F. A. HESSLER
 2      A.   Quite a bit, yeah.
 3      Q.   And that was one of the reasons
 4   that you were worried about if Michael Brown
 5   left, that some of David, his and David
 6   Johnson's clients would be vulnerable?
 7      A.   Dave Johnson and Michael Brown
 8   came to our group at the same time, both from
 9   Merrill Lynch.
10      Q.   And which clients specifically
11   were you worried about losing if Michael Brown
12   was terminated?
13      A.   I'd have to go back to the list to
14   see which of those, where he had a
15   relationship. I can't remember off the top of
16   my head.
17      Q.   Which list? Do you need to go
18   back to Michael Brown's list?
19      A.   Whatever one -- do you have a list
20   for David Johnson?
21      Q.   I don't think we have gone over
22   those, no. We have a list for Michael Brown.
23   Would that help?
24      A.   That would be partially helpful.
25           MR. BATTAGLIA: Do we know what
```

Page 312

```
 1              F. A. HESSLER
 2   number it is?
 3           MR. GROSS: Yes. It's 514.
 4      A.   Okay.
 5      Q.   So why don't you look at that list
 6   and tell me which ones, if any, you were
 7   worried about losing if both David Johnson and
 8   Michael Brown were terminated, if any.
 9      A.   Yes. Going down here, the Jackson
10   one, third one down.
11      Q.   Is that a big client?
12      A.   Not a huge client, but the fact
13   that it generates, you know, presumably in the
14   neighborhood of $3-1/2 million makes it a good
15   size account.
16      Q.   Where did you get that $3-1/2
17   million number?
18      A.   I said a million and a half.
19      Q.   A million and a half. So do those
20   numbers --
21      A.   1.390, ballpark. It is in that
22   zip code somewhere.
23      Q.   I'm confused about that. I
24   thought we have been saying all day we
25   couldn't use those numbers all the way on the
```



Page 313
1              F. A. HESSLER
2   right?
3       A.   As a -- well, in contrast to a
4   $50,000 revenue item, this is a significant
5   revenue item, without saying how precise that
6   is.
7            Let's see. The Sisters of Mercy,
8   Mercy Health and Education facility, see that,
9   about 310 million. And that's a good size
10  organization, very good size organization in
11  six different states.
12           University Hospitals and Health
13  System.
14           MR. BATTAGLIA:  Which one was
15      Sisters of Mercy?
16      A.   That would be the one that says
17  310,000 -- 310 million.
18           MR. BATTAGLIA:  Missouri Health
19      and Education.
20      A.   Yes, that's Missouri Health and
21  Ed.
22      Q.   That's not SSM?
23      A.   No.
24      Q.   So not all Missouri Health and Ed
25  is --

Page 314
1              F. A. HESSLER
2       A.   No, there is one issuing authority
3   and every health system issues through that
4   authority.
5       Q.   Okay.
6       A.   University Hospitals and Health
7   system, a dominant provider in Cleveland.
8            Parkview in Indiana.
9            Again, on the top of page 2, this
10  is the $75 million item for that's University
11  Hospitals and Health System.
12           MR. BATTAGLIA:  I'm sorry, the
13      first one?
14      A.   Yes.
15           MR. BATTAGLIA:  Ohio State.
16      A.   Yes, State of Ohio new money and
17  revenue, yes, refunding bonds.
18           So all of those are the ones that
19  Mike Brown and Dave Johnson brought over
20  together, in contrast to the ones that Lisa
21  and Dave Johnson worked on together which were
22  our clients already before any of them got
23  there.
24      Q.   And so Dave Johnson and Mike Brown
25  brought them over together from where?

Page 315
1              F. A. HESSLER
2       A.   Merrill Lynch.
3       Q.   They came over to Citi at the same
4   time you said?
5       A.   Yes.
6       Q.   And when was that?
7       A.   I think it was around 2000,
8   sometime in maybe 2000, 2001.
9       Q.   And what position was Mike Brown
10  in when he came to Citi originally?
11      A.   I'm not certain. Either a vice
12  president or a director, I can't recall, if he
13  was a vice president when he would have gotten
14  promoted to director. I just can't recall.
15      Q.   Would it surprise you if he wasn't
16  promoted to director until 2006?
17           MR. BATTAGLIA:  Objection.
18      A.   Would it surprise me? No.
19      Q.   So if he was a vice president --
20  as a vice president would he have had
21  consistent client interaction with all of the
22  clients that they brought over from Merrill?
23      A.   Yes. Because, unlike our group,
24  the Merrill Lynch team worked very
25  differently, and so they had an approach with

Page 316
1              F. A. HESSLER
2   client service that it was a tag team,
3   managing director, VP, and that's what they
4   brought over, as opposed to our group which we
5   then added other people to the group to have a
6   bigger team. So not uncommon to be, as a VP
7   to work hand in hand with an MD on clients.
8       Q.   At Merrill Lynch?
9       A.   At Merrill Lynch. And that
10  continued here for a number of years until we
11  started adding people to those accounts.
12      Q.   Getting back to the meetings with
13  respect to the November 2008 --
14      A.   Yes.
15      Q.   -- reductions in force. Was that
16  all the reasons that you can remember that
17  Lisa was selected for layoff?
18      A.   Yes.
19      Q.   That was the only criteria
20  analyzed?
21      A.   Yes.
22      Q.   Simply the risk of losing people
23  and the risk of losing clients?
24      A.   Yes.
25      Q.   And what risk, what clients --



Page 317

1       F. A. HESSLER
2       MR. GROSS: Let's take two
3   minutes.
4       THE VIDEOGRAPHER: We're now going
5   off the record approximately 4:04 p.m.
6   This is the end of disk No. 4.
7       (Recess taken.)
8       THE VIDEOGRAPHER: Now going back
9   on the record approximately 4:09 p.m.
10  This is the beginning of disk 5 in the
11  Hessler deposition.
12  BY MR. GROSS:
13      Q.  Going back to the layoff meeting,
14  Mr. Hessler, or the meetings, were you worried
15  about if David Kasdin was terminated that you
16  would lose people, that you would lose people
17  in the group?
18      A.  No.
19      Q.  Were you worried that you would
20  lose clients?
21      A.  Not particularly, no.
22      Q.  What about Victor Radina?
23      A.  Yes.
24      Q.  Were you worried that you would
25  lose people?

Page 318

1       F. A. HESSLER
2       A.  People.
3       Q.  Who were you worried that you
4   would lose?
5       A.  Victor, if he were terminated and
6   if he were to go to another firm, he could be
7   very influential in hiring VPs and star
8   associates.
9       Q.  And why were you worried about
10  that for him?
11      A.  Because of so many people at that
12  level looked up to him as a mentor and as a
13  person that they really thought could help
14  them a lot in their careers.
15      Q.  And what about losing clients,
16  were you worried about losing clients with
17  Victor Radina?
18      A.  No.
19      Q.  What about Charles Plimpton, were
20  you worried about losing people?
21      A.  People and clients.
22      Q.  He was a senior director at that
23  point?
24      A.  Yes.
25      Q.  So he was a revenue generator?

Page 319

1       F. A. HESSLER
2       A.  Yes.
3       Q.  What about Charles Lee, worried
4   about losing people?
5       A.  People. And not so much clients.
6   The difference is that Charles worked on
7   multiple complex client situations that, with
8   the downsizing of our group so dramatically,
9   we just needed to be able to retain some of
10  that competency. And so we were concerned
11  that if we terminated him, that we would lose
12  that ability to have someone come in and work
13  in complicated, complicated clients.
14      Q.  Mike Irwin was a revenue generator
15  at this point in time, right?
16      A.  Yeah, senior banker, revenue
17  generator, and did and still does a lot to
18  establish our brand in the industry.
19      Q.  So given that, what the criteria
20  was when discussing all these names, why was
21  he on the list?
22      MR. BATTAGLIA: Objection.
23      A.  Again, Frank Chin put him on the
24  list, and I think to initiate conversation to
25  make sure we were thoroughly thinking it

Page 320

1       F. A. HESSLER
2   through as to what, what the real criteria was
3   and why we wanted to be able to do certain
4   things with certain people.
5       The fact is also, he didn't make a
6   huge amount of money.
7       Q.  He made less money than David
8   Johnson? Did he make less money than David
9   Johnson?
10      A.  Substantially.
11      Q.  Why is that?
12      A.  David Johnson came over at a
13  fairly healthy compensation arrangement and
14  stayed at that for a few years, but then
15  gradually that compensation level was coming
16  down. But even so, having said that, he was
17  at a level that was nowhere near Mike Irwin's
18  level.
19      David generated a lot of revenue
20  that his name was next to, more so than
21  Michael.
22      Q.  And because he generated more
23  revenue, his compensation was higher?
24      A.  Yes.
25      Q.  And did you ever review those



Page 321
1        F. A. HESSLER
2  revenue sheets when determining compensation?
3     A.   Pardon me?
4     Q.   Did you review the revenue sheets
5  when determining compensation?
6     A.   That was only part of it.
7     Q.   But it was part of it?
8     A.   Part of it, yeah.
9     Q.   And Kent Jackman, he was a senior
10 banker, right?
11    A.   Yes.
12    Q.   He was, had a lot of primary
13 relationships with accounts, right?
14    A.   Yes.
15    Q.   So why was he on the list?
16    A.   Again, I think Frank wanted to
17 make sure that we were looking at all
18 potential candidates.
19    Q.   And Mike Irwin, even though he
20 didn't make as much as David Johnson, he made
21 a lot more than Lisa Conley, right?
22    A.   Define a lot.
23    Q.   He made more than Lisa Conley?
24    A.   He made more than Lisa Conley.
25    Q.   Do you remember what Mike Irwin

Page 322
1        F. A. HESSLER
2  made in 2007?
3     A.   I don't remember.
4     Q.   Do you think it was more than a
5  million dollars in total compensation?
6     A.   No.
7     Q.   Why was Kent Jackman retained?
8     A.   Because of his lead relationships
9  with some of our important critical clients.
10    Q.   Do you remember how much money
11 Kent Jackman made in 2007?
12    A.   I don't.
13    Q.   Pat Sheehan, do you remember
14 whether he was on the list?
15    A.   I think for the very same reason,
16 wanting to make sure that we were looking at
17 everyone, which is why I think he was on,
18 initially, the list.
19    Q.   Well, he was on the list in the
20 previous -- I don't want to put words in your
21 mouth, I don't know whether you said he was on
22 the list for --
23       MR. BATTAGLIA:  He said maybe.
24    A.   I can't remember if he was.
25    Q.   He was on the list though you

Page 323
1        F. A. HESSLER
2  testified for the June layoff of 2008?
3     A.   Yeah.
4     Q.   Right?
5     A.   I, again, regardless of what I
6  said earlier, I can't recall with certainty
7  that he was on the June list or the November
8  list.
9     Q.   Do you remember as you sit here
10 today, anything changing substantially with
11 Pat Sheehan between June and November that
12 would have him come off, that he wouldn't have
13 been considered in November where he was
14 considered in June?
15       MR. BATTAGLIA:  Objection.  You
16    may answer.
17    A.   Nothing materially changed.
18    Q.   So if he was discussed in June,
19 would you expect that he was also discussed in
20 November?
21       MR. BATTAGLIA:  Objection.  You
22    may answer.
23    A.   That's reasonable.
24    Q.   And so were you worried about
25 losing people with Pat Sheehan?

Page 324
1        F. A. HESSLER
2        MR. BATTAGLIA:  Objection.  You
3    may answer.
4     A.   To a degree, yes.
5     Q.   Who were you worried about losing?
6     A.   I'm sorry?
7     Q.   Who were you worried about losing?
8     A.   Again, he, I think, had
9  established a number of relationships with
10 people that potentially could be a flight
11 risk, although not a significant flight risk.
12    Q.   And what about clients, were you
13 worried about losing clients?
14    A.   Yes.
15    Q.   Which clients?
16    A.   Scott and White in particular.
17    Q.   Is that a big client?
18    A.   Good-sized client, yes.  But he
19 had been -- when Pat joined us, he essentially
20 brought that relationship over with him to our
21 group, and so he had the ongoing relationship
22 with them.
23    Q.   Did, had Scott and White generated
24 a lot of revenue up until that point for the
25 company?



Page 325

1        F. A. HESSLER
2      A.   Not a significant amount, but it
3  is a major player in the geographic area
4  between Dallas and Houston, and the belief is
5  which is true, that it continues to grow like
6  crazy. So it had huge upside potential.
7      Q.   Do you know whether Citi or that
8  the healthcare group has done any deals with
9  Nebraska Methodist since Lisa was terminated?
10     A.   I don't know.
11     Q.   Is it possible they have not done
12  any deals with --
13     A.   It is certainly possible. I
14  haven't tracked that.
15     Q.   Do you remember whether Citi,
16  whether the healthcare group was involved
17  recently in pitching business for Heartland
18  Health?
19     A.   Recently?
20     Q.   Within the last year.
21     A.   Well, it had been a client going
22  back, and I can't remember what time frame it
23  was, principally a Kent Jackman relationship
24  and then they are the type of client that I
25  think periodically goes out and just send out

Page 326

1        F. A. HESSLER
2  RFPs. And so it's certainly possible that we
3  had gone through another of those RFPs in the
4  last year or two, I just don't recall.
5      Q.   And is that a big client?
6      A.   No.
7      Q.   Do you remember if Lisa Conley
8  worked on that account?
9      A.   She did in the earlier
10  relationship that we had with them.
11     Q.   And was the healthcare group
12  successful in winning that RFP, the most
13  recent one?
14     A.   You know, I don't know.
15     Q.   Do you know if it is a current
16  client?
17     A.   You know, I'm not sure that -- I'm
18  not sure I know the results of that.
19     Q.   Do you know who was staffed on
20  that after Lisa?
21     A.   It continued to be Kent Jackman
22  who had been the lead person prior to, you
23  know, the first time around.
24     Q.   Was Ryan Freel also put on that
25  account?

Page 327

1        F. A. HESSLER
2      A.   I think he was. I can't tell you
3  when, though.
4      Q.   Is it possible that -- strike
5  that.
6      A.   Heartland is not a significant
7  player and they do deals every so often and
8  they send out RFPs for deals so, again, it's
9  not a key client.
10     Q.   Is it possible that Bank of
11  Montreal won the business, this most recent?
12         MR. BATTAGLIA: Objection.
13     A.   Don't know.
14     Q.   Is it possible that Ryan Freel
15  pitched the business for Citi?
16         MR. BATTAGLIA: Objection.
17     A.   I don't know if -- I don't know
18  who actually was involved. I know Kent
19  Jackman was. I don't know beyond that.
20     Q.   So in these meetings you
21  eventually decided on David Johnson and Lisa
22  Conley and maybe Pinky Nahata?
23         MR. BATTAGLIA: Objection.
24     Q.   How many meetings did it take --
25         MR. BATTAGLIA: Were you asking

Page 328

1        F. A. HESSLER
2  him that question?
3      Q.   Those were the people, definitely
4  David Johnson and Lisa Conley, right?
5      A.   Yes.
6      Q.   And possibly Pinky Nahata?
7      A.   Yes.
8      Q.   And how many meetings did it take
9  to get down to, to finalize that those were
10  the names that were going to be terminated?
11     A.   You know, it is hard because
12  everything sort of blends together from
13  four-plus years ago. At least one, maybe two.
14     Q.   Do you remember there being any
15  disagreement over Lisa Conley's inclusion in
16  the layoff?
17     A.   No.
18     Q.   Do you remember there being any
19  disagreement over David Johnson's inclusion in
20  the layoff?
21     A.   Disagreement amongst?
22     Q.   The people at the meeting.
23     A.   No.
24     Q.   Do you remember whether there was
25  any disagreement over people who were retained



Page 329

1   F. A. HESSLER
2   that others at the meeting felt that they
3   should have been included in the layoff?
4       MR. BATTAGLIA: Objection.
5   A.  No.
6   Q.  You don't remember, or there was
7   no such disagreement?
8   A.  No recollection of any
9   disagreement.
10  Q.  When did David Cyganowski find out
11  to your knowledge that David Johnson and Lisa
12  Conley were going to be terminated?
13  A.  He was involved in the discussion
14  with me during the development of the list.
15  Q.  And do you remember what his
16  reaction was to those two names?
17  A.  Fully supportive.
18  Q.  I'm sorry?
19  A.  Fully supportive.
20  Q.  Did he say why?
21  A.  He agreed with the assessment of
22  the flight risk of clients and the flight risk
23  of people.
24  Q.  Did you talk to managing directors
25  in the group during this layoff process?

Page 330

1   F. A. HESSLER
2   A.  We did not.
3   Q.  The directors work with the
4   managing directors on a daily basis, right?
5   A.  Correct.
6   Q.  So they are the one who have the
7   most knowledge about the day to day?
8       MR. BATTAGLIA: Objection.
9   A.  I don't think so.  Dave and I have
10  responsibility for managing the entire group.
11  Q.  But did Lisa spend more time
12  working with you or Jim Blake?
13  A.  Jim Blake.
14  Q.  And are you aware that Jim Blake
15  told Lisa he didn't agree with the decision to
16  terminate her?
17      MR. BATTAGLIA: Objection.
18  A.  I'm totally unaware of that.
19  Q.  Does that surprise you?
20      MR. BATTAGLIA: Objection.
21  A.  I have no idea what the
22  relationship was between Jim and Lisa as to
23  why he would say something like that.
24  Q.  But they worked together a lot,
25  right?

Page 331

1   F. A. HESSLER
2   A.  To some degree.  They were office
3   mates.
4   Q.  Which managing directors would you
5   say Lisa worked with the most?
6   A.  I'd have to go back and take a
7   look as to who she worked the most with.  I
8   mean, she worked with a lot of different
9   people.
10      MR. GROSS: Exhibit 11.
11          (Plaintiffs' Exhibit 11,
12          letter on the letterhead of Morgan,
13          Lewis & Bockius marked for
14          identification, as of this date.)
15  Q.  Mr. Hessler, you have just been
16  handed Plaintiffs' Exhibit 11.  Take a minute
17  to flip through it and then if you could let
18  me know if you have ever seen this document
19  before.
20  A.  I mean, do you want me to read the
21  entire thing or --
22  Q.  If you need to read it to let me
23  know if you have ever seen it before?
24  A.  Well, you tell me if I need to
25  read it.

Page 332

1   F. A. HESSLER
2   Q.  Well, I want to know if you have
3   ever seen this document before, so do whatever
4   you need to to tell me --
5   A.  It's the first time I have ever
6   seen this document.
7   Q.  Do you know what this document is?
8   A.  I do not.
9   Q.  When did you become aware that
10  Lisa Conley was suing Citigroup?
11  A.  I'm sorry, the question was when?
12  You know, some time in early 2009.  I can't
13  tell you when I found out.
14  Q.  How did you become aware?
15  A.  To the best of my recollection,
16  either and/or David Brownstein or Frank Chin
17  informed me.
18  Q.  And do you remember what else they
19  said in connection with that?
20  A.  No.  That she had decided to sue
21  and that she was part of a group of people who
22  were doing that.
23  Q.  Why don't you take a second to --
24  let's turn to, if you look on the first page
25  of this document?



Page 333

1  F. A. HESSLER
2  A.  Um-hum.
3  Q.  In the second paragraph.
4  A.  Okay.
5  Q.  Let me just ask you before, was
6  Lisa's performance ever discussed at these
7  layoff meetings?
8  A.  No.
9  Q.  And what about the other directors
10 who were considered, was their performance
11 ever discussed at these performance meetings?
12     MR. BATTAGLIA:  Objection.  And I
13     meant to object before the last answer.
14 A.  No.
15 Q.  And the only criterion was the
16 risk of losing people and business?
17     MR. BATTAGLIA:  Objection.
18 Q.  That's the only criteria
19 considered?
20     MR. BATTAGLIA:  I believe he
21     testified there were other criteria
22     including total compensation.
23 Q.  And total compensation.
24 A.  Yes.
25 Q.  Those are the criteria?

Page 334

1  F. A. HESSLER
2  A.  Yes.
3  Q.  If you can look at the second
4  paragraph now of this document, I'm looking at
5  the second line.
6     "Rather, Conley was selected for
7  the reduction in force, RIF, because she did
8  not lead or originate business for the
9  healthcare group, nor did she demonstrate a
10 proficiency in developing new business.
11 Moreover, Conley did not appear to be
12 interested in professional development."
13    Let's break that down, the last
14 line, "Moreover, Conley did not appear to be
15 interested in professional development."  Do
16 you believe that to be true?
17 A.  I have no idea what that means.
18 Q.  So you weren't consulted before
19 this was?
20 A.  No.
21     MR. BATTAGLIA:  Objection.
22 Q.  Would you turn to the last page of
23 this document, the signature page, not -- the
24 second-to-last page of the document, the
25 signature.  Do you see that?

Page 335

1  F. A. HESSLER
2  A.  This page here?
3  Q.  The page with the signature.
4  A.  Yes.
5  Q.  Do you know who Kenneth Turnbull
6  is?
7  A.  No.  Never met him.
8  Q.  Okay.  And so this line here, it
9  says Conley did not appear to be interested in
10 a professional development, that had nothing
11 to do with the reason why she was terminated?
12     MR. BATTAGLIA:  Objection.
13 A.  I have no idea what that means,
14 and that did not enter into any discussions
15 about her termination.
16 Q.  What about because she did not
17 lead or originate business, did that play into
18 it, did that have anything to do --
19 A.  As we just discussed, and all of
20 this, yes.
21 Q.  That did play a role?
22 A.  Sure.
23 Q.  But that doesn't have to do
24 with -- so how does that play into the
25 criteria that we discussed?

Page 336

1  F. A. HESSLER
2  A.  That's exactly what the criteria
3  is all about, generating business going
4  forward, and risk is whether it stays here or
5  goes somewhere else.
6  Q.  So leading or originating business
7  has to do with the risk of whether that
8  business, whether you will lose that business
9  if that person leaves?
10 A.  Correct.
11 Q.  And are junior bankers supposed to
12 be leading or originating business, was there
13 an expectation that they --
14     MR. BATTAGLIA:  Objection.
15 Q.  -- would be leading or originating
16 business?
17 A.  I don't know what you mean by
18 junior banker.
19 Q.  I believe you testified earlier
20 about the difference in roles between a junior
21 banker and senior banker and that senior
22 bankers were revenue generators, I believe was
23 the term you used, and junior bankers were
24 not.  So does leading or originating business
25 constitute revenue generation?



Page 337

1         F. A. HESSLER
2     A.   Junior bankers are associates,
3  analysts and vice presidents.
4     Q.   I'm sorry, junior directors, and
5  senior directors, and you said that senior
6  directors were revenue generators but junior
7  directors were not.
8         MR. BATTAGLIA: Objection.
9     Q.   Is leading or originating
10 business, is that revenue generation?
11        MR. BATTAGLIA: Objection. You
12    can answer to the extent you can, but I
13    think we already demonstrated that this
14    was prepared by someone else and you are
15    asking him whether or not.
16    Q.   I'm just asking about the words.
17 I'm not asking what the author meant when he
18 wrote this.
19        MR. BATTAGLIA: Well, you can ask
20    him to the extent he can understand, is
21    that how he interprets that.
22        MR. GROSS: That's fine.
23    Q.   I'm asking whether to you, the
24 terms did not lead or originate business, is
25 that, is there an expectation of a junior

Page 338

1         F. A. HESSLER
2  director to lead or originate business?
3     A.   Implicit in my response on all the
4  other questions that you had relative to the
5  risk of flight on losing clients, inherent in
6  that is an issue about whether or not that
7  person will take revenue with them. And so
8  can you -- I don't know whose words these are,
9  but my criteria is all about the risk of
10 revenue walking out the door. If you want to
11 call that these words here, fine. But, so,
12 again, I had nothing to do with this, so I
13 can't tell you what these words that were
14 chosen really mean.
15    Q.   Do you have any specific examples
16 of Lisa not leading or originating business?
17        MR. BATTAGLIA: Objection.
18    A.   There were multiple discussions.
19 We went through her list several hours ago.
20    Q.   Do you ever remember addressing
21 these concerns with Lisa?
22    A.   It's not a concern if you are not
23 leading.
24    Q.   Was it a concern that she was not
25 leading business, though, at the time of her

Page 339

1         F. A. HESSLER
2  termination?
3         MR. BATTAGLIA: Objection.
4     A.   That wasn't -- the discussion
5  earlier was what was her, what was her
6  responsibilities on all of these accounts, and
7  we went through all of her lists and there
8  weren't any, save for perhaps for Nebraska
9  Methodist, where she was the lead person in
10 terms of the client relationship lead as we've
11 defined it.
12    Q.   And what I'm asking you now is, at
13 the time of her termination was there an
14 expectation that she should have been the lead
15 on more than that one account?
16    A.   At that point in time, no.
17    Q.   Did you ever discuss Lisa's
18 promotional track with her?
19    A.   We would have discussed it as she
20 was promoted from AVP to VP to director.
21    Q.   Let's turn to page 2 of this
22 document and I'm looking at the subheading B.
23    A.   Okay.
24    Q.   And I'm looking four lines from
25 the bottom, the sentence that begins "in

Page 340

1         F. A. HESSLER
2  particular."
3     A.   Yes.
4     Q.   It says: "In particular when a
5  client's main point of contact for the account
6  was not available, Conley was not helpful in
7  stepping in and trying to deal with the
8  client's issue."
9         Do you agree with that?
10    A.   I wouldn't say that that was an
11 issue. At the time we were making the
12 decision to terminate her. Having said that,
13 after the termination when we reached out to
14 her clients, both Rush, Sisters of St. Francis
15 in particular, both had complaints about
16 Lisa's lack of responsiveness and service.
17    Q.   And that was --
18    A.   But we were unaware of that at the
19 time of the termination.
20    Q.   So that they were never concerns
21 that you discussed with Lisa?
22    A.   I didn't --
23        MR. BATTAGLIA: Objection.
24    A.   I didn't become aware of that
25 until after the termination when we were



Page 341

1       F. A. HESSLER
2  talking to her clients.
3      Q.   When you say we, is that you and
4  David Cyganowski?
5          MR. BATTAGLIA:  Objection.
6      A.   Yes.
7      Q.   And also on page 2, the last two
8  lines:
9          "Moreover, when provided with
10  opportunities to spearhead professional
11  development issues focused on networking
12  efforts, Conley did not follow through."
13         Do you agree with that?
14     A.   Yes.
15     Q.   And do you have specific examples
16  of that?
17     A.   Yes, you know, every director, we
18  try to find an opportunity to demonstrate
19  leadership and do an initiative.  We talked
20  earlier about her work for the CDO, rural
21  health CDO program.
22         We had also asked her to, in
23  conjunction with our annual investor
24  conference, to lead a women's initiative that
25  would attract all of the senior finance

Page 342

1       F. A. HESSLER
2  professionals in healthcare organizations and
3  in a collaborative fashion, in and around our
4  healthcare conference which is held every May,
5  and we had asked Lisa to do that somewhat in
6  connection with the fact that the role of
7  women in healthcare organizations continues to
8  be important and is growing in importance, and
9  we thought it would be a wonderful opportunity
10  for Lisa to lead such an initiative.  And sad
11  to say, nothing ever happened on that.
12     Q.   And do you remember when you asked
13  Lisa to do this?
14     A.   I can't tell you exactly.  I would
15  just have to guess.  Probably within the first
16  12, 18 months of getting promoted to director.
17  But, again, I can't be certain about that.
18     Q.   Do you in the performance reviews
19  that we reviewed today, do you remember seeing
20  any comments that reflected Lisa's failure to
21  put together this conference?
22         MR. BATTAGLIA:  Objection.
23     A.   Off the top of my head, I don't
24  recall seeing that.  It could be there, but I
25  don't recall.

Page 343

1       F. A. HESSLER
2      Q.   Would you have expected that
3  criticism to appear in her performance review?
4      A.   It could have been in the 2007.
5      Q.   Do you remember if it was in the
6  2007?
7      A.   I know we talked to her about
8  this.
9      Q.   Do you remember when you talked to
10  her about it?
11     A.   I don't remember exactly when we
12  talked to her about it.
13     Q.   And when you say we again, you are
14  talking about --
15     A.   David and me.
16     Q.   And has that women's focus group,
17  has that taken place ever in subsequent years
18  to that?
19     A.   Not yet, no.
20     Q.   Have you ever asked anyone else to
21  spearhead this?
22     A.   No.
23     Q.   And what's the purpose of --
24     A.   Oh, I'm sorry, up until this year
25  when we are doing it.

Page 344

1       F. A. HESSLER
2      Q.   And who is putting it
3  together this year?
4      A.   Amy Yang.
5      Q.   And what's the purpose of, why is
6  this -- is it to obtain, hopefully, new
7  business?
8      A.   No, again, I think as I
9  articulated already, that the number of women
10  in senior leadership positions in healthcare
11  organizations is growing, and as a leading
12  banking firm within the industry, it's
13  important that people recognize our efforts,
14  what we do in the industry, as well as the
15  importance, important role that women play in
16  our industry, in the healthcare industry, and
17  our commitment to that in our industry.
18         MR. BATTAGLIA:  Can we take a
19     break?
20         MR. GROSS:  Yes.
21         THE VIDEOGRAPHER:  Now going off
22     the record approximately 4:38 p.m.
23         (Recess taken.)
24         THE VIDEOGRAPHER:  Now going back
25     on the record approximately 4:44 p.m.



Page 345

1  F. A. HESSLER
2  BY MR. GROSS:
3  Q. Before we took the break we were
4  talking about a women's focus group, so to
5  speak, that you had asked, you and David had
6  asked Lisa to spearhead. That was, you don't
7  remember the exact time but it was obviously
8  before Lisa was terminated in 2008, right?
9  A. Yes.
10  Q. And it hasn't been done in any of
11  the years in between then and now, right?
12  A. Correct.
13  Q. So how important really was this
14  initiative?
15  A. Well, you asked me what that last
16  sentence means on the bottom of page 2, and
17  I'm telling you what it means.
18       In the grand scheme of things, it
19  is important to demonstrate leadership. Is it
20  the reason why, the sole reason why she was
21  terminated in the RIF? No.
22  Q. Was it at all part of the reason
23  why she was terminated in the RIF?
24  A. It's like everything. I mean,
25  there's nothing that is necessarily black and

Page 346

1  F. A. HESSLER
2  white, cut and dry. Is it in there somewhere?
3  It's in there somewhere, but not the principal
4  reasons for the termination.
5  Q. Did you talk about that reason in
6  the meetings with Frank Chin, David
7  Brownstein, Bart Livolsi?
8  A. I don't recall having that
9  conversation.
10  Q. Do you even know whether Frank
11  Chin is aware that Lisa didn't follow through
12  with this initiative?
13       MR. BATTAGLIA: Objection.
14  A. I don't know.
15  Q. Did you ever tell Frank Chin?
16  A. I don't recall telling him that.
17  Q. Did you ever tell David
18  Brownstein?
19  A. I don't recall telling him that
20  either.
21  Q. And is the reason that this
22  hasn't, this -- why has it taken at least four
23  years to put this initiative together again?
24       MR. BATTAGLIA: Objection. You
25  may answer.

Page 347

1  F. A. HESSLER
2  A. Well, when you think about our
3  firm and what's happened to it since 2008 with
4  federal subsidies and all the other things
5  that we all read about, a decision was made
6  post-2008 to low profile those kinds of
7  things. So we consciously decided not to do
8  that for those kinds of reasons.
9  Q. And did it need to be a woman who
10  put this thing, who put this initiative
11  together?
12  A. Did it need to be a woman? It
13  didn't need to be a woman but our assessment
14  was after talking to Lorrie Warner, Teri
15  Hartman and Jeannette Price they thought it
16  should be a woman leading that. If we are
17  going to be asking women to attend a women's
18  forum, it would be important to have a woman
19  lead the forum.
20  Q. And is the ultimate goal of the
21  forum to, that it might eventually lead to new
22  business and new contacts?
23       MR. BATTAGLIA: Objection. I
24  believe he answered this.
25  A. It clearly is networking

Page 348

1  F. A. HESSLER
2  opportunity. And any time you have networking
3  opportunities, you have the opportunity to
4  establish relationships. And if you establish
5  relationships with senior people from
6  healthcare organizations, there might be an
7  expectation that you can generate business
8  from that at some point in time. And if you
9  can generate business, you have some
10  opportunity to generate revenue. But there is
11  no quid pro quo on it.
12  Q. Turn now to page 3 of this
13  document. And if you look in the second
14  paragraph of subheading C.
15  A. Okay.
16  Q. In the middle of that paragraph it
17  says: "In making this determination they
18  readily" --
19  A. Hang on. Okay.
20  Q. Are you with me?
21  A. Yup.
22  Q. "In making this determination
23  they," which if you look up a little bit
24  refers to Cyganowski and Hessler, "in making
25  this determination they readily concluded that

