# EXHIBIT 16

Page 45

 1      M. KILLINGSWORTH, D.Phil.
 2  certainly had major input into the decision.
 3      Q.   So let me just see if I can ask
 4  that question again.
 5           Is it your understanding that the
 6  group heads of each group made the decision as
 7  to who would be let go in their respective
 8  groups?
 9           MR. GOTTLIEB:  Objection.  It has
10      been asked and answered a couple of
11      times.  It is also outside the scope of
12      his report.  His report was about
13      statistical analysis and you are going
14      far afield of that.
15      A.   My understanding is that they
16  flagged the people who were going, within
17  their group, who were going to be terminated.
18           My understanding also is that they
19  did not necessarily have the absolute final
20  word on the matter.
21      Q.   When you say they flagged people,
22  what do you mean?
23      A.   Well --
24           MR. GOTTLIEB:  Objection.
25      A.   -- they said, in effect,

Page 46

 1      M. KILLINGSWORTH, D.Phil.
 2  identified so-and-so as somebody who should be
 3  terminated, so-and-so is somebody who should
 4  be retained.
 5           MR. GOTTLIEB:  I need to take a
 6      short break.
 7           MR. TURNBULL:  Sure.
 8           (Recess taken.)
 9  BY MR. TURNBULL:
10      Q.   Dr. Killingsworth, with respect to
11  the individuals who were identified for
12  termination by the group heads, you said it is
13  your understanding that they were reviewed by
14  someone.  Is that what your testimony was?
15      A.   Well, my understanding I guess is
16  summarized very, very succinctly by what is in
17  Dr. Bloom's report.  There is a line or two in
18  which he says something like, the group heads
19  made the decisions, or something like that.
20  We could get it out and read it.
21           And I took that to mean that they
22  were reviewed by the group heads.  That's all.
23  I'm not trying to say -- I'm not trying to
24  describe a, quote-unquote, review process.  I
25  just mean that that's what I took what Dr.

Page 47

 1      M. KILLINGSWORTH, D.Phil.
 2  Bloom was saying to mean.  That's all.  And if
 3  I gave you the impression that I somehow was
 4  going beyond that, I'm sorry, because it
 5  wasn't my intention.
 6           We could get Dr. Bloom's report
 7  out and I can show you exactly what I'm
 8  talking about.  That's the sum and substance
 9  of what I was talking about, and other than
10  that I'm just answering questions based on my
11  interpretation of that language.  That's all.
12      Q.   So is your understanding of the
13  RIF process that Citigroup undertook, based
14  upon what you read in Dr. Bloom's report?
15           MR. GOTTLIEB:  Objection.  Can I
16      hear the question again?
17           (Record read.)
18           MR. GOTTLIEB:  I'm going to
19      object.  Are you asking him his
20      understanding as it was with regard to
21      the first report, or his understanding
22      as he sits here today?  I just want to
23      make sure we have a clear record.
24      Q.   If they are different, you can
25  tell me.

Page 48

 1      M. KILLINGSWORTH, D.Phil.
 2      A.   Well, clearly I hadn't seen Dr.
 3  Bloom's report at the time that I did the
 4  first report.  I didn't see it until after I
 5  sent the first report to plaintiffs' counsel
 6  to transmit to you.  So I didn't have that
 7  language of Dr. Bloom's in my head, no.
 8      Q.   Let me ask you, then, when you
 9  prepared your report, did you have any
10  understanding of the RIF process?
11           MR. GOTTLIEB:  Objection.
12      A.   My understanding was that some
13  employees were selected to be RIF'ed and were,
14  and other people were not.  That's it.
15      Q.   Did you have any understanding of
16  how the decisions were made?
17      A.   No.
18      Q.   If you were trying to determine if
19  termination decisions were made in a way that
20  had a disparate impact on females, would you
21  want to understand how the decisions were
22  made?
23           MR. GOTTLIEB:  Objection.
24      A.   Well, number one, as I said
25  before, I'm not a lawyer and disparate impact

MARK R. KILLINGSWORTH, D. PHIL.  Non-Confidential Portions
BARTOLETTI -against- CITIGROUP

April 04, 2013
61–64

Page 61

1       M. KILLINGSWORTH, D.Phil.
2  another, having one decisionmaker rather than
3  another, had something do with your being
4  RIFed.
5       Q.  Your conclusion, your output gives
6  only one result, either yes, there is a
7  statistical disparity, or no there is not a
8  statistical disparity.  Correct?
9            MR. GOTTLIEB:  Referring to which
10     table?
11           MR. TURNBULL:  Table 2.
12      A.  No, that isn't what it shows at
13  all.
14      Q.  Let me see if I can break it down
15  a little bit and walk through it.
16           Who made the RIF decisions for Amy
17  Bartoletti, Nadine Mentor, Lisa Conley, Chia
18  Sui and Brittany Sharpton?
19           MR. GOTTLIEB:  Objection.  Outside
20     the scope of the report.
21      A.  I can't name them.
22      Q.  Do you understand that there were
23  different decisionmakers for each of them?
24           MR. GOTTLIEB:  Objection.  Outside
25     the scope of the report.

Page 62

1       M. KILLINGSWORTH, D.Phil.
2       A.  Well, as I said, based on -- I
3  take Dr. Bloom's language, different people
4  made different decisions about people in
5  different groups.
6       Q.  Is it possible that the
7  decisionmaker who selected Amy Bartoletti for
8  termination, discriminated with respect to
9  gender, but that the person who selected
10  Nadine Mentor did not discriminate with
11  respect to gender?
12           MR. GOTTLIEB:  Objection.
13      A.  How are you defining
14  discrimination?  I'm not sure what you mean.
15      Q.  Made the decision based on gender.
16      A.  I'm still not sure what you mean.
17      Q.  Well, you understand that
18  plaintiffs are alleging the decisions were
19  made based on gender.  Correct?
20      A.  Yes, I do.  And, in particular,
21  that's, I think what I said on paragraph 2.
22           But you were asking a question and
23  I wasn't sure if you meant discrimination in
24  the legal sense, in the sense that economists
25  use the term or what.  I can't offer an

Page 63

1       M. KILLINGSWORTH, D.Phil.
2  opinion about discrimination in the legal
3  sense, obviously.
4       Q.  Let's put aside from a legal sense
5  and let's use your understanding.
6            Is it possible that the person or
7  persons who selected Amy Bartoletti for
8  termination made that decision based on her
9  gender, but that the person who selected
10  Nadine Mentor for termination did not make the
11  decision based on gender?
12           MR. GOTTLIEB:  Objection,
13     that's --
14      A.  Well, anything is possible, I
15  guess.
16      Q.  Does your report and your analysis
17  allow us to make those distinctions?
18      A.  Yes.  And, in fact, let me give
19  you a simple example.
20           Suppose that it is true that the
21  people making the decisions about the
22  individual groups had different standards.
23  One group terminated half the people within
24  the group, while another decisionmaker
25  terminated only 10 percent of the people in

Page 64

1       M. KILLINGSWORTH, D.Phil.
2  the group, et cetera, et cetera.  If each of
3  those decisionmakers did that in a sex neutral
4  fashion, then the sex coefficient that I
5  report here in table 2 would be statistically
6  zero.
7            So, yeah, and likewise --
8       Q.  For each group?
9            MR. GOTTLIEB:  Can you let him
10     finish his answer.
11      A.  No.
12           MR. GOTTLIEB:  Hold on.  You need
13     to let the witness finish his answers
14     before you ask the next question or
15     interrupt him.
16      A.  Let's extend it a little bit, but
17  what I said so far as far as all 16 of the
18  decisionmakers have different RIF rates within
19  their groups, but in every single case the RIF
20  rates don't differ by sex.  I guess I had
21  better add for people who are otherwise the
22  same in terms of seniority and job title.
23           Then in that case my coefficient
24  here in table 2 is going to be statistically
25  zero.



Page 65

1        M. KILLINGSWORTH, D.Phil.
2        Now let's take it one step
3   further.  Suppose that there is one bad apple,
4   one guy or person in one group who makes the
5   decisions for one group and does it in a
6   non-sex-neutral fashion and all the other
7   people do so in a sex-neutral fashion.  They
8   may have different RIF rates across groups,
9   but within each group they are all sex
10  neutral.  Then in that case it is likely, we
11  would have to do some simulations to maybe be
12  more specific, but it is certainly not
13  unconceivable that, again, the coefficient
14  here would be statistically zero.
15       So at any rate, the group
16  indicators, the group variables take full
17  account of presence in the group, and
18  simultaneously, take full account of the
19  difference in the decisionmakers concerning
20  those different groups.
21       Q.  So then let me just pick up on
22  your example.  How can we tell which, if any
23  of the groups, the 16 different groups in
24  public finance from your analysis, how can we
25  tell which, if any, made decisions in a

Page 66

1        M. KILLINGSWORTH, D.Phil.
2   sex-neutral fashion?
3        A.  This doesn't address that
4   question.  This addresses what the overall
5   impact is taking account of differences in
6   group membership.
7        Q.  So in your analysis we cannot tell
8   whether a particular group head made decisions
9   in a sex-neutral fashion?
10       MR. GOTTLIEB:  Objection.
11       A.  We can't speak with respect to a
12  specific group.
13       We can, however, speak with
14  respect to the overall process taking account
15  of differences in group RIF rates.
16       Q.  And let me just explore that a
17  little bit.
18       So is it possible that if one
19  group, if one group head made decisions in a
20  non-sex-neutral fashion, that that one group
21  head's decision-making could influence your
22  conclusion?
23       MR. GOTTLIEB:  Objection.
24       A.  Well, it is impossible to say by
25  how much.  It is impossible to say empirically

Page 67

1        M. KILLINGSWORTH, D.Phil.
2   the actual magnitude of the effect.  So I just
3   don't know.
4        I mean, you would have to
5   construct some experimental data I guess or
6   something, simulate something like that.  But
7   I don't think you can say for sure.  There
8   aren't enough specifics to enable you to say
9   anything for sure.
10       Q.  Do you know which, if any, groups
11  from your analysis the data indicate that
12  decisions were made in a sex-neutral fashion?
13       MR. GOTTLIEB:  Objection.
14       A.  The analysis doesn't tell you.  It
15  doesn't investigate that.  I didn't
16  investigate that.  I'm looking at the overall
17  process taking account of group differences.
18       Q.  And so, Dr. Killingsworth, is it
19  correct to say that, for example, if there
20  were 12 group heads who made decisions in a
21  sex neutral fashion but four group heads made
22  decisions in a non-sex-neutral fashion, that
23  those four decisionmakers could influence the
24  result as to your entire analysis?
25       MR. GOTTLIEB:  Objection.

Page 68

1        M. KILLINGSWORTH, D.Phil.
2        A.  Well, the outcomes for any
3   individual person, regardless of what group
4   they are in, whether they are in a group with
5   a sex-neutral decisionmaker or a sex-biased
6   decisionmaker, all of those outcomes are going
7   to influence the result.  Every single one.
8        Q.  But your conclusion is that, as a
9   whole, you conclude that decisions were not
10  made in a sex-neutral fashion.  Correct?
11       MR. GOTTLIEB:  Objection.
12       A.  As a whole, yes, taking account of
13  differences by group for people of the same
14  sex, by job title of the people for the same
15  sex and by seniority.
16       Q.  And I'm going to come to those
17  control factors in a bit.
18       But my question is can you tell
19  from your analysis, how many groups made
20  decisions in a non-sex-neutral fashion?
21       MR. GOTTLIEB:  Objection.
22       A.  Well, I haven't attempted to study
23  that, no.
24       Q.  Can we tell from your analysis
25  whether the decisions, the RIF decisions in



Page 157

1     M. KILLINGSWORTH, D.Phil.
2     A.   Well, it is not an analysis of any
3  individual group, correct.
4     Q.   And so can one determine from your
5  analysis whether the decisions made in a
6  particular group were gender-neutral or not?
7     MR. GOTTLIEB:  Objection.
8     A.   Well, I give the previous answer.
9  It is not an analysis of individual groups.
10    Q.   So is the answer no, one could not
11 make that determination?
12    MR. GOTTLIEB:  Objection.
13    A.   No.  No, that's right.  You can't
14 make a determination about an individual group
15 because this is not an analysis of gender
16 differences in any particular individual
17 group.
18    Q.   Could one determine from your
19 analysis whether any particular decisionmaker
20 made decisions that were not gender-neutral?
21    MR. GOTTLIEB:  Objection.  I don't
22 think -- objection.
23    A.   I would answer just the same way.
24    Q.   So is the answer no?
25    A.   The answer --

Page 158

1     M. KILLINGSWORTH, D.Phil.
2     MR. GOTTLIEB:  Objection.
3     A.   The answer is right, it is not an
4  analysis of individual decisionmakers or of
5  individual groups.
6     Q.   As part of your expert analysis,
7  do you reach any conclusions as to the
8  decision, the specific decision to let Amy
9  Bartoletti go?
10    A.   No, I don't have an analysis of
11 that decision, about her individually.
12    Q.   And do you make any conclusion
13 with respect to that decision?
14    MR. GOTTLIEB:  Objection.
15    A.   Well, not explicitly.  The fact
16 that she was terminated is in the data and if
17 she hadn't been terminated, the results would
18 have looked different.
19    I didn't try to rerun the study
20 somehow classifying her as having been
21 retained, so I can't pull out the Amy
22 Bartoletti effect, if that's what you mean.
23    Q.   I apologize, maybe my question is
24 not clear.
25    Do you have any opinion as to

Page 159

1     M. KILLINGSWORTH, D.Phil.
2  whether the decision to terminate Amy
3  Bartoletti was influenced by gender?
4     MR. GOTTLIEB:  Objection.
5     A.   I haven't studied that, no.
6     Q.   Do you have any opinion as to
7  whether the decision to terminate Ms. Conley
8  was influenced by her gender?
9     MR. GOTTLIEB:  Objection.
10    A.   I haven't studied that specific
11 decision either, no.
12    Q.   Do you have any opinion as to
13 whether the decision to terminate Ms. Mentor
14 was influenced by her gender?
15    MR. GOTTLIEB:  Objection.
16    A.   I haven't analyzed that particular
17 decision, either.
18    Q.   Do you have any opinion as to
19 whether the decision to terminate Ms. Sharpton
20 was influenced by her gender?
21    MR. GOTTLIEB:  Objection.
22    A.   I haven't studied that decision,
23 individual decision either.
24    Q.   Do you have any opinion as to
25 whether the decision to terminate Ms. Sui was

Page 160

1     M. KILLINGSWORTH, D.Phil.
2  influenced by her gender?
3     MR. GOTTLIEB:  Objection.
4     A.   I haven't studied that individual
5  decision, either.
6     Q.   Do you have any opinion as to the
7  rationale for the termination decisions --
8     MR. GOTTLIEB:  Objection.
9     Q.   -- as to each of the five
10 plaintiffs?
11    A.   Say that again, I'm sorry.
12    Q.   Do you have any opinion regarding
13 the rationale for the selection of each of the
14 five plaintiffs for termination?
15    MR. GOTTLIEB:  Objection.
16    A.   I don't believe I have seen any
17 written rationale for the actions taken with
18 respect to any one of those individuals, so I
19 haven't studied that.
20    Q.   So is the answer no, you don't
21 have?
22    A.   I haven't studied it.  If I
23 haven't studied it, I certainly don't have an
24 opinion.
25    MR. TURNBULL:  Let me turn to,

Page 161

1   M. KILLINGSWORTH, D.Phil.
2   what I'm calling the damages report, and
3   I will have the court reporter mark as
4   Exhibit 5, your December 17, 2012
5   report.
6        (Killingsworth Exhibit 5,
7        December 17, 2012 report marked for
8        identification, as of this date.)
9        MR. TURNBULL: Dr. Killingsworth,
10  I'm going to have marked as
11  Killingsworth Exhibit 6, your addendum
12  to the first report.
13       (Killingsworth Exhibit 6,
14       addendum to Dr. Killingsworth's
15       first report marked for
16       identification, as of this date.)
17       MR. TURNBULL: And while we are
18  marking, I will have marked as Exhibit
19  7, your report in rebuttal to the report
20  of Dr. Becker.
21       (Killingsworth Exhibit 7, Dr.
22       Killingsworth's report in rebuttal
23       to Dr. Becker's report marked for
24       identification, as of this date.)
25  Q.   Dr. Killingsworth, earlier we

Page 162

1   M. KILLINGSWORTH, D.Phil.
2   looked at the list of documents that you
3   consulted to prepare the expert report dated
4   December 17 which is the report that's marked
5   as Exhibit 5. And that list that you gave us
6   was previously marked as Exhibit 3.
7   A.   Yes.
8   Q.   So this list of documents on
9   Exhibit 3 is the list identified as the
10  documents that you consulted to prepare your
11  economic loss report?
12  A.   Right. And that's Exhibit 5 I
13  think.
14  Q.   Yes.
15  A.   Yeah.
16  Q.   And for this report, who chose,
17  who decided what documents you would review?
18  A.   Well, I, just in general terms, I
19  asked for information on the pay of
20  comparables, so-called comparables. I was
21  informed that there were so-called comparables
22  that isn't always the case. But in this
23  instance there were, and there were, I guess I
24  would call them screen shots of information,
25  containing information about pay of these, pay

Page 163

1   M. KILLINGSWORTH, D.Phil.
2   bonuses, variable compensation, that sort of
3   thing. And at least some of those, most of
4   those are the documents we see here with these
5   Bates numbers on them. So I said, in effect,
6   give me information about the comparables and
7   their pay and that's what I got.
8   Q.   Did you do anything to determine
9   who the comparables were?
10  A.   No. I take that as given.
11  Q.   As given by whom?
12  A.   As given by counsel. They told
13  me, I asked who are the so-called comparables,
14  if there were. At some point I learned that
15  there are so-called comparables and I asked
16  who are they. So that's what I was told.
17  Q.   Do you know that the plaintiffs
18  themselves identified comparables, who they
19  considered to be their comparables?
20  A.   I think Dr. Becker's report has
21  statements to that effect. That's what I
22  recall.
23  Q.   Other than Dr. Becker's report,
24  did you undertake anything to determine who
25  the comparables were?

Page 164

1   M. KILLINGSWORTH, D.Phil.
2   A.   Well, other than Dr. Becker's
3   report and hearing statements from plaintiffs'
4   counsel. Those were, in fact, I got the
5   information from plaintiff's counsel because I
6   didn't see Dr. Becker's report until after I
7   prepared mine. So I wasn't -- I didn't rely
8   on Dr. Becker's report for any other
9   comparables. I got it from plaintiff's
10  counsel.
11  Q.   In your list of documents that you
12  reviewed there are a few depositions that were
13  reviewed. Are you aware of that?
14  A.   Yes.
15  Q.   Do you recall what depositions you
16  reviewed?
17  A.   Well, I think they are the ones
18  listed here on Exhibit 3, not the entire
19  deposition by the way. Just extracts.
20  Q.   So first it looks like you
21  reviewed extracts you said?
22  A.   Yes.
23  Q.   Of three depositions?
24  A.   Right.
25  Q.   First, with respect to that, who

