# EXHIBIT 17

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
41–44

Page 41

M.D. KOESSEL
1
2     Q.    And when you started at
3  SalomonSmithBarney, what was your job title?
4     A.    Director.
5     Q.    Were you director for a particular
6  group?
7     A.    Housing group.
8     Q.    And is Salomon Smith Barney now
9  known as Citigroup?
10    A.    Yes.
11    Q.    Do you know when it became
12 Citigroup?
13    A.    I think it became Citigroup again
14 about a month ago because it was Citigroup and
15 then it was Citibank and then it was Citi.
16 It's changed its name a few thousand times.
17    Q.    I'm sorry --
18    A.    In fact, I typically refer to it
19 as simply Citi.  But I think it is now
20 Citigroup again.
21    Q.    And you are still currently
22 employed by Citigroup?
23    A.    Yes.  Yes.
24    Q.    Do you have a Series 53?
25    A.    Yes, I do.

Page 42

M.D. KOESSEL
1
2     Q.    And what is a Series 53?
3     A.    It's a regulatory exam for
4  municipal finance supervisors.
5     Q.    Were you required to take the
6  Series 53?
7     A.    In order to be a group head and
8  supervise people, yes.
9     Q.    Is that a Citigroup requirement?
10    A.    I believe it's an industry-wide
11 requirement.
12    Q.    And when did you receive your
13 Series 53?
14    A.    April 2010 I believe.  I believe.
15    Q.    Did you become head of the housing
16 group in or around November of 2008?
17    A.    I think I became head of the
18 housing group when I completed my Series 53.
19    Q.    Were you co-head of the housing
20 group prior to November of 2008?
21    A.    I think that we oversaw the
22 business, but we were not technically heads
23 until we completed our regulatory exams.
24    Q.    Was there a head of the housing
25 group in --

Page 43

M.D. KOESSEL
1
2     A.    I think technically, no.  I mean,
3  I think it would have been David or Frank, our
4  supervisors.
5     Q.    Weren't David and Frank head of
6  the public finance department?
7     A.    Yes.
8     Q.    And it is your testimony that they
9  were also head of the housing group?
10    A.    I think in the absence of the
11 Series 53 registered rep, they were.
12 But you'd have to check with compliance and
13 see how that works out.  I'm not sure how that
14 plays out.
15    Q.    Did you act as head of the housing
16 group?
17        MR. TURNBULL:  Objection to form.
18    A.    What do you mean, I'm sorry?  Did
19  I pretend to be when I wasn't?
20    Q.    No, were you acting as head?  Did
21 you assume the job duties as head of the
22 housing group from November 2008 going
23 forward?
24        MR. TURNBULL:  Objection to form.
25    You can answer.

Page 44

M.D. KOESSEL
1
2     THE WITNESS:  I can answer.
3     A.    We'd done the same thing we had
4  always done prior to that.
5     Q.    When were you told to take the
6  Series 53 exam?
7     A.    It must have been in the summer of
8  2008.
9     Q.    Do you know why you were told to
10 take the exam in the summer of 2008?
11    A.    Yes, Nick Fluehr had been fired
12 and they needed -- they needed people with
13 those series exam registrations to head up the
14 housing group.
15    Q.    And when did you take the exam?
16    A.    I took the exam when I passed it
17 which was in roughly April of 2010.
18    Q.    So that was the first time you
19 took the exam?
20    A.    Yes, first and only.
21    Q.    You never took it before.
22    Why did you wait for that amount
23 of time after you were told to take it?
24    A.    Business exigencies.
25    Q.    I'm sorry?



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
101–104

Page 101

M.D. KOESSEL
1 that point in time.
2
3     Q.   Now, in 2008 you said Kentucky was
4 a large client?
5     A.   It was brand new, becoming a large
6 client.
7     Q.   Well, do you know how much
8 business you did for Kentucky in 2008?
9     A.   No, but I can say that we just two
10 weeks ago priced the largest taxable
11 single-family transaction, probably done in
12 the last ten years for them.  So they have
13 become a very large client for us.
14     Q.   I'm talking about 2008.
15     A.   But they were brand new.  We
16 hadn't done a transaction yet.
17     Q.   So would you consider them a large
18 client in 2008?
19     A.   I would consider them a brand new
20 client that has traditionally done a lot of
21 issuance and they were a huge prospect for us.
22     Q.   And on this list -- are there any
23 clients in 2008 that do not appear on this
24 list?
25     A.   On my list?

Page 102

M.D. KOESSEL
1
2     Q.   On this list that has been
3 furnished to you.
4     A.   I'd have to go back and look at a
5 map to see and kind of -- I don't recall.
6     Q.   But there are clients on here --
7 you do have clients that do not appear on this
8 list for 2008?
9     A.   You are talking about my list
10 here, my particular list?
11     Q.   I'm talking about the list in
12 front of you.
13     A.   Well, there are two.  There is
14 Amy's list and there's my list.
15     Q.   No, I'm still on the second page.
16     A.   The second page.  So my list?
17     Q.   Yes.
18     A.   Yeah, I mentioned I think Georgia,
19 my name should have had Georgia attached.
20         You know, you want to go
21 through -- I really need to see the whole
22 thing, but Georgia, New York are the two that
23 leap immediately to mind.
24         You know, at that point so much of
25 my activity over and above what I was doing in

Page 103

M.D. KOESSEL
1
2 terms of transaction prospecting and
3 transaction oversight, business prospecting
4 and transaction oversight, had to do with
5 helping clients address the credit crisis, and
6 I was interacting with every one of these
7 states all the time, setting up conferences,
8 going and speaking with treasurer's offices,
9 speaking to boards, meeting with HUD.  We were
10 trying to sort out how HFAs would remain
11 relevant given the fact that the traditional
12 business model was collapsing.  So I spent a
13 lot of my time, I set up a conference with --
14     Q.   Mr. Koessel, I just asked you
15 which clients.
16     A.   On the basis of what I just said,
17 all of them.  Everyone.  I was interacting
18 with every state HFA in the country.
19     Q.   So you are saying that all 50
20 states were your clients in 2008?
21     A.   Okay, let me be less hyperbolic.
22         I would say that there were lots
23 of states well beyond what appear on this list
24 that I was interacting with regularly.
25     Q.   Okay.

Page 104

M.D. KOESSEL
1
2     A.   And, frankly, well beyond what was
3 even on our map because of the nature of the
4 credit crisis and the service we were trying
5 to provide largely spearheaded by myself.
6     Q.   In 2008 was Florida generating a
7 lot of revenue, your Florida client?
8     A.   Come and go.  We had good years,
9 bad years.  I don't recall in 2008.
10     Q.   Isn't that when the housing crisis
11 hit Florida really hard?
12         MR. TURNBULL:  Objection to form.
13     A.   That's a great question.  I'd love
14 to answer it.
15         MR. TURNBULL:  You can answer it.
16     A.   Yes, it hit Florida very, very
17 hard.
18     Q.   And did that result in --
19     A.   No, they were --
20         MR. TURNBULL:  You've got to let
21 him finish the question.
22     A.   Okay.
23     Q.   Did that result in decreasing
24 revenue?
25     A.   No.  They were very well protected

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
105–108

Page 105

1          M.D. KOESSEL
2  because they had government --
3      Q.   I just asked you if it resulted in
4  decreasing revenue.
5      A.   Okay.  It didn't.  And hence the
6  reference.
7          (Plaintiffs' Exhibit 162,
8          public finance department net
9          revenue report summary bearing
10         Bates No. CGMI_BART 015547 marked
11         for identification, as of this
12         date.)
13     Q.   Mr. Koessel, I'm handing you a
14  document that's been marked as Plaintiffs'
15  Exhibit 162.
16     A.   Okay.
17     Q.   Take a look at the document and
18  let me know if you have seen it before.
19     A.   I may have.  I don't know.
20     Q.   Do you know what this document is?
21     A.   It's a public finance department
22  net revenue report summary.
23     Q.   And what information is reflected
24  on this document?
25     A.   It looks like it is reflecting

Page 106

1          M.D. KOESSEL
2  revenues off a select slate of clients.
3      Q.   And if I can --
4      A.   Is it just one page?
5      Q.   That's all I can show you.
6      A.   Okay.
7      Q.   Does this document contain all of
8  the -- well, let me ask you this way.  Under
9  transaction description, can you tell me what
10  that information is?
11     A.   It's not making a lot of sense to
12  me for the simple reason that something like
13  Missouri who showed up on Amy's list shows up
14  here, but, no, it doesn't look like it
15  reflects the real focus of what I was doing.
16     Q.   Well, do you see in the top
17  right-hand corner it has your name?
18     A.   Yes.
19     Q.   And underneath that there is a row
20  that says period and it says 01/01/07 to
21  12/31/07?
22     A.   Um-hum.
23     Q.   Does this appear to be a partial
24  list of the transactions you worked on in
25  2007?

Page 107

1          M.D. KOESSEL
2      A.   It looks like a very partial list.
3  Very, very partial.
4      Q.   And can you look at the column on
5  the far right-hand side?
6      A.   Um-hum.
7      Q.   Total rev?
8      A.   Um-hum.
9          MR. TURNBULL:  Yes or no.
10  Verbalize your answer.
11         THE WITNESS:  I'm sorry, what was
12     that?
13         MR. TURNBULL:  It was just yes.
14     That's okay.
15     Q.   You were saying um-hum, um-hum.
16  You have to say either yes or no.
17     A.   What's the question?
18     Q.   Do you see the column marked total
19  rev on the far right-hand side?
20     A.   Yes.
21     Q.   Do you know what those numbers
22  represent in that column?
23     A.   I'm assuming it's total revenue.
24     Q.   And do you see the last figure in
25  that row for, in that column total revenue?

Page 108

1          M.D. KOESSEL
2      A.   Yes.
3      Q.   It appears to be 4,535,846?
4      A.   Yes.
5      Q.   Does that sound like an accurate
6  number regarding the total revenue generated
7  from the clients you worked on?
8      A.   It is probably plausible.
9          (Plaintiffs' Exhibit 163,
10         document bearing Bates No.
11         CGMI_BART 016462-63 marked for
12         identification, as of this date.)
13     Q.   Mr. Koessel, I'm handing you a
14  document marked Plaintiffs' 163.  Can you take
15  a look at the document and let me know if you
16  have seen it before.
17     A.   I think it may be a document I've
18  seen before.
19     Q.   Do you know what this document is?
20     A.   It's the same document for a
21  different year.  The same document as the
22  document I saw last time for a different year,
23  but it is complete as opposed to partial.
24     Q.   Can I direct your attention to the
25  top right-hand corner of the document.



MICHAEL D. KOESSEL                                    July 12, 2012
AMY BARTOLETTI vs. CITIGROUP                           109–112

M.D. KOESSEL

1
2    A.   Yes.
3    Q.   It has a period of 01/01/08 to
4  12/31/08, and it appears that it is current as
5  of 12/22/08.  Do you see that in the top
6  right-hand corner?
7    A.   Yeah, there is -- there is a hole.
8    Q.   A hole punch?
9    A.   Yes, a hole punch.
10   Q.   Does this appear to be a complete
11 list of transactions you worked on between
12 January 1st, 2008 and December 22nd, 2008?
13   A.   It's a long list.  I'll have to go
14 through it.
15        It looks like it includes all of
16 the ones that were really significant, like
17 California, Ohio.  Does it have Vermont?  New
18 Jersey.
19        I couldn't tell you that it is
20 comprehensive or exhaustive, but it looks like
21 it is strongly representative.
22   Q.   In connection with your current
23 position as head of the housing group, do you
24 review documents similar to this?
25   A.   I periodically look at them, yes.

M.D. KOESSEL

1
2    Q.   And are these documents supposed
3  to contain a complete list of all the
4  transactions that someone has worked on in
5  your group?
6    A.   At this point our group is very
7  small, so you would hope so, yeah.  In other
8  words, there is one list.  There aren't
9  multiple lists any more.
10   Q.   Do you know who creates the list
11 that you have in front of you?
12   A.   It used to be a guy by the name of
13 Bill Hudnut who would generate it.  I don't
14 know who creates it.  I think Eileen Garvey
15 also is involved.
16   Q.   And do you know how these reports
17 are generated?
18   A.   No.
19   Q.   If you can take a look at the
20 column, third from the left, staffing/product
21 group/regions.
22   A.   Yes.
23   Q.   There are a list of names besides
24 each transaction.
25   A.   Um-hum.

M.D. KOESSEL

1
2    Q.   Is that a list of people who
3  worked on the transaction?
4    A.   It's a list of everybody who
5  touched it.
6    Q.   And do you see next to some of the
7  names there is an asterisk?
8    A.   Um-hum.
9    Q.   You have to say yes.
10   A.   Yes, I'm sorry.
11   Q.   I'm assuming that "um-hum" meant
12 yes?
13   A.   Um-hum means yes, but I'll say
14 yes.
15   Q.   Do you know what that asterisk
16 represents?
17   A.   I don't at all.
18   Q.   Well,  let's take a look at the
19 first one.
20   A.   Um-hum.
21   Q.   There appears to be in the first
22 row --
23   A.   Um-hum.
24   Q.   -- a $300 million transaction for
25 California Housing Finance Agency.

M.D. KOESSEL

1
2    A.   Right.
3    Q.   I think you testified earlier you
4  consider California your client in 2008?
5    A.   I considered it as much my client
6  as anybody's in 2008.  Absolutely.
7    Q.   What do you mean by as anybody?
8    A.   I had primary relationship
9  responsibility with them and I oversaw the
10 transactions.
11   Q.   Was that Nick's client prior to
12 his departure?
13   A.   It had been Nick's client in prior
14 years.  At the point of his departure, his
15 grip on the client I think significantly
16 weakened.
17   Q.   Was he still handling transactions
18 for the client when he was still there?
19   A.   No.  He wasn't really very
20 involved in transactions at all, no.
21   Q.   And who was handling the
22 transactions for the California housing?
23   A.   I think that it was probably me
24 working with Ping Hsieh.  And probably Chia
25 Siu worked on the numbers.

Page 141

```
1            M.D. KOESSEL
2    impression.
3        Q.   Do you know if Amy was capable of
4    conducting housing transactions when you first
5    started?
6        A.   Oh, absolutely.  Yeah, absolutely.
7        Q.   Are you aware of any performance
8    issues with Amy?
9        A.   No, none.
10       Q.   Any performance deficiencies?
11       A.   Not that I'm aware of.
12       Q.   How would you characterize her
13   work performance throughout the years at Citi?
14       A.   She was a strong banker.  She was
15   a good banker.
16       Q.   Did you ever evaluate her
17   performance?
18       A.   I mentioned before 360s.  So my
19   guess is in that context I evaluated her once.
20       Q.   Do you know what her relationships
21   were like with her clients?
22       A.   I think they were strong.  I think
23   her clients liked her.
24       Q.   Did she generate a lot of revenue
25   from her clients?
```

Page 142

```
1            M.D. KOESSEL
2        A.   We went through her revenue
3    sheets.  North Dakota was a very lucrative
4    account I think.
5        Q.   Other than North Dakota?
6        A.   North Dakota is probably the most
7    lucrative of her housing clients, yes.
8        Q.   But other than North Dakota did
9    she generate a lot of revenue with her
10   clients?
11           MR. TURNBULL:  Objection to form.
12       A.   Other than North Dakota did she
13   generate a lot of housing revenue with her
14   clients?
15           There were selected clients that
16   did better and worse.  I think Alaska, for
17   example, was a reasonably good client,
18   especially the last few years.
19       Q.   How would you compare the amount
20   of revenue you generated from your clients to
21   the amount of revenue Amy generated from her
22   clients?
23       A.   My guess is it went back and
24   forth, up and down.  Student loans aside,
25   student loan is very separate, but in the
```

Page 143

```
1            M.D. KOESSEL
2    housing world I had some good years and she
3    probably had some good years.
4        Q.   Ebbs and flows?
5        A.   Yes.
6        Q.   Do you know how much work in
7    general of Amy's was in student loans?
8        A.   I don't.  It always seemed to me
9    to be a lot, but I wasn't, I never knew
10   exactly how much it was.  It seemed to me it
11   was, like I indicated previously, they were
12   very focused on bringing in more business
13   which can be very time-consuming.  So I got
14   the sense because of that focus, that a lot of
15   her energy was focused on student loans.
16           MR. DATOO:  We're going to take a
17   five-minute break.
18           THE VIDEOGRAPHER:  We are now
19   going off the record at approximately
20   12:23 p.m.
21           (Recess taken.)
22           (Plaintiffs' Exhibit 147,
23   document bearing Bates No.
24   CGMI_BART 016971-73, 015432 marked
25   for identification, as of this
```

Page 144

```
1            M.D. KOESSEL
2    date.)
3        THE VIDEOGRAPHER:  We are now
4    going back on the record approximately
5    12:27 p.m.
6    BY MR. DATOO:
7        Q.   Mr. Koessel, you have in front of
8    you a document that's been marked Plaintiffs'
9    147.  I just want to draw your attention to
10   the last two pages to start.
11       A.   Um-hum.  Including the one with
12   the handwriting?
13       Q.   Correct.  There are three pages
14   that are in sequential Bates stamp number.
15       A.   Um-hum.
16       Q.   And then there is a another page
17   that bears a Bates stamp number a little bit
18   different from the rest.  So I'm not
19   purporting this to be one document.
20       A.   Um-hum.
21       Q.   Mr. Koessel, do you know what this
22   document is?
23       A.   It looks by the title like a net
24   revenue report summary.
25       Q.   Do you know for who?
```



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
165–168

<table>
<tr><td>

Page 165

M.D. KOESSEL

1
2    Q.   Now, you testified earlier that
3  these evaluations fluctuate a lot, don't they?
4    A.   Yes.  I said they can fluctuate a
5  lot.
6    Q.   In Amy's case it didn't fluctuate
7  a lot?
8    A.   It didn't, over two -- it is a
9  very small sample space.
10   Q.   And if you look at the comments.
11   A.   Um-hum.
12   Q.   "Amy has fantastic client skills."
13  Do you agree with that?
14   A.   I think she was very good with her
15  clients.
16   Q.   And it goes on to read:  "Amy has
17  been a critical element in Citigroup's housing
18  success story."
19        Do you agree with that?
20   A.   I think that's very strong.
21   Q.   Do you know who wrote these
22  comments?
23   A.   No, I'm assuming participants in
24  the 360.
25   Q.   Did there come a time when Amy

</td><td>

Page 167

M.D. KOESSEL

1
2    A.   Me and Amy.
3    Q.   He spoke to you at the same time?
4    A.   Yes.
5    Q.   Did you ever threaten to quit if
6  you weren't made head or co-head of the
7  housing group?
8    A.   I said that I don't want to be a
9  part of this effort if I can't be in
10  leadership position, yes.
11   Q.   And did you say that in the
12  meeting with Amy and David Brownstein?
13   A.   No, not at all.
14   Q.   When did you say that?
15   A.   I said it later on.
16   Q.   Why would you say it later on if
17  Mr. Brownstein asked both of you to lead the
18  effort?
19   A.   Because he came to me later on and
20  said that, because of the experience that they
21  had had with Mike and Nick as co-heads, that
22  Frank Chin felt strongly that there should
23  only be one head of the group.
24   Q.   And did he tell you who the head
25  of the group should be?

</td></tr>
<tr><td>

Page 166

M.D. KOESSEL

1
2  became co-head of the housing group?
3    A.   There was a time when we were
4  asked to, at Nick's departure, to lead the
5  effort going forward, the housing effort.
6    Q.   As co-heads?
7    A.   Yes.
8    Q.   And did Amy ever become co-head?
9    A.   We ran together the business
10  efforts of the housing group from the time
11  that Nick left until Amy left.
12   Q.   Were you ever bestowed with the
13  title co-head?
14   A.   Not formally.  We were told to
15  lead the charge and to maintain our clients
16  and to run the business.
17   Q.   And who approached you to be
18  co-head?
19   A.   You know, I remember a couple of
20  people saying things.  David Brownstein told
21  us -- it was a difficult day when Nick was
22  fired, and David sat us down, talked to us and
23  said you guys are going to be in charge now.
24   Q.   When you say us, do you mean you
25  and Amy?

</td><td>

Page 168

M.D. KOESSEL

1
2    A.   He said that because I had never
3  been interested in being a managing director,
4  it was his sense that I just wanted to keep
5  doing the things I'd been doing, and based on
6  that they felt that Amy was the, you know, the
7  logical choice.
8    Q.   And is that when you threatened to
9  quit if you weren't made co-head?
10   A.   Well, actually what I said was:
11  What do you mean Nick hasn't put me up for
12  managing director?
13       And that's when he marched me down
14  to his office and showed me the managing
15  director nominations for prior years.
16   Q.   Right, but my question is is that
17  when you threatened you would quit if you
18  weren't made co-head?
19   A.   No, not at that point.
20   Q.   At what point --
21   A.   At a later point after
22  conversation with him.
23   Q.   How long afterwards?
24   A.   Maybe an hour.
25   Q.   Were you qualified to be a

</td></tr>
</table>

ESQUIRE

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
169–172

Page 169

M.D. KOESSEL
1 co-head?
2
3     A.   I was certainly qualified to run
4 the business since Nick was an absentee boss
5 for years, and before I was certainly
6 qualified as well as anybody to run the
7 business adequately.
8     Q.   Well, you didn't have your Series
9 53, did you?
10     A.   That's a, you know, regulatory
11 thing.  That's something that Amy didn't have
12 at the time either.
13     Q.   Well, Amy received her Series 53
14 didn't she?
15     A.   Subsequently, yes.
16     Q.   Do you know when?
17         MR. TURNBULL:  Objection: asked
18     and answered.
19     A.   Yeah, you asked me that.
20     Q.   Do you know when?
21     A.   I think -- no, I don't.  I think
22 before she was let go.
23     Q.   So she was qualified to head the
24 group?
25         MR. TURNBULL:  Objection to form.

Page 170

M.D. KOESSEL
1
2     A.   Based on those regulatory
3 considerations, yes.
4     Q.   Now, between the time Nick left
5 and the time Amy left, was it busy?
6     A.   Yes.
7     Q.   Yet, Amy still managed to take and
8 pass her Series 53, correct?
9     A.   Yes.
10     Q.   And were you busier than Amy?
11     A.   I was on the road a lot.
12     Q.   And was Amy on the road a lot?
13     A.   Not nearly as much.
14     Q.   Do you know if Amy was offered the
15 position as head of the housing group?
16     A.   I don't know that she was offered
17 the position, but I know that based on what I
18 just said a few minutes ago, after having been
19 told by David and by Bart Livolsi in a less
20 formal way, that we would be leading the
21 charge going forward, it was communicated
22 probably to Amy -- I'm not sure about this --
23 that Frank only wanted one, one group head,
24 and she was the first choice.
25     Q.   And then you were the second

Page 171

M.D. KOESSEL
1
2 choice?
3     A.   That, I have no idea.  I explained
4 previously that the reason they didn't
5 naturally offer it to me is because of this
6 managing director nomination process that
7 they'd been exposed to me.  That was
8 communicated explicitly to me.
9     Q.   Then do you know why they
10 proceeded with Amy as the co-head?
11     A.   Yes, for the specific reason that
12 I mentioned before because she had been
13 nominated by Nick many, many times before for
14 managing director.
15     Q.   I was referring to as co-head, not
16 managing director.
17         MR. TURNBULL:  Objection to form.
18     A.   You are losing me.  Start again.
19     Q.   Once you expressed your interest
20 in being head of the group after you
21 threatened to quit, why didn't they just make
22 you sole head of the group?
23     A.   I didn't want it.
24     Q.   You did not want to be head of the
25 group?

Page 172

M.D. KOESSEL
1
2     A.   I did not want to be sole head of
3 the group.
4     Q.   You wanted to be co-head of the
5 group?
6     A.   I wanted to be co-head of the
7 group.
8     Q.   Why was that?
9     A.   Because I found the situation
10 slightly overwhelming, significant reduction
11 in employees, and I respected Amy's managerial
12 responsibility, you know, abilities.  I wanted
13 to co-run the group with her.  I communicated
14 that very clearly.
15         (Plaintiffs' Exhibit 1,
16         Amended Complaint marked for
17         identification, as of this date.)
18     Q.   I hand you a document that's
19 marked Plaintiffs' Exhibit 1.  If I can direct
20 your attention to paragraph 45.
21     A.   Um-hum.
22     Q.   Now, paragraph 45 reads -- I'm
23 sorry, 44.
24         "Shortly after they were named as
25 co-heads of the housing group, both Ms.



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
177–180

Page 177

M.D. KOESSEL
1
2  group and what might be used here.
3     Q.   Well, were you officially named
4  head of the housing group?
5        MR. TURNBULL:  Objection to form.
6     A.   That's my point.  That's exactly
7  my point.  I did not have on my business card
8  head of the housing group until I passed
9  Series 53 and I was told I could not use that
10  title until I passed Series 53.
11     Q.   So you could not be head of the
12  housing group or co-head of the housing group
13  until you had your Series 53?
14        MR. TURNBULL:  Objection to form.
15     A.   At least in the sense I just
16  indicated.
17     Q.   Do you see in paragraph 45 where
18  Citigroup admitted that Amy received her
19  Series 53 on or about October 20, 2008?
20     A.   Yes.
21     Q.   At that point was Amy qualified to
22  be head of the housing group?
23        MR. TURNBULL:  Objection to from.
24     A.   From that regulatory perspective,
25  yes.  I assume.  You'd have to ask somebody,

Page 178

M.D. KOESSEL
1
2  but I assume.
3     Q.   So at that point she was qualified
4  to be head of the housing group and you
5  weren't?
6        MR. TURNBULL:  Objection to form.
7     A.   You would have to speak to
8  somebody who understands the regulatory
9  matters.
10     Q.   Well, wasn't it a Citigroup
11  requirement as well?
12     A.   I think it is industry regulation.
13  It is a regulatory requirement.
14     Q.   So at the time of her termination,
15  from a regulatory standpoint, you were not
16  qualified to be head of the housing group?
17        MR. TURNBULL:  Objection to form.
18     A.   You would have to speak to
19  somebody who is knowledgeable about that
20  stuff.
21     Q.   You were told you couldn't be head
22  of the housing group until you passed your
23  Series 53, correct?
24     A.   I was told I couldn't technically
25  be head of the housing group, technically, in

Page 179

M.D. KOESSEL
1
2  that technical sense.
3     Q.   Would it be a violation of any
4  rule or regulation if you were head of the
5  housing group?
6        MR. TURNBULL:  Objection to form.
7     A.   You'd have to ask somebody other
8  than me.
9     Q.   Now, after Nick Fluehr left, you
10  testified that you and Amy were leading the
11  group.  What duties did you handle in leading
12  the group and what duties did Amy handle in
13  leading the group?
14     A.   She principally managed the people
15  back in the office and I managed the clients
16  in the business model.
17        It wasn't quite as clear-cut as
18  that.  We tried to do it through consensus on
19  both sides.  She would consult me about
20  employees that were disgruntled or
21  demoralized, and I would consult her about
22  should I be spending my time in Ohio or
23  Florida, should I be organizing a conference
24  in D.C. or going to see the governor of
25  California.

Page 180

M.D. KOESSEL
1
2     Q.   Wasn't Amy traveling trying to
3  keep business for the housing group?
4     A.   Not so much.
5     Q.   Not so much?
6     A.   By my recollection, not so much.
7     Q.   Do you recall if Amy flew to
8  Alaska back and forth within 36 hours to keep
9  the business?
10     A.   Alaska was one account, so I don't
11  recall but I could imagine that's true.
12     Q.   Do you know if she was out trying
13  to obtain new clients between the time Nick
14  left and the time she was terminated?
15     A.   We worked together on that so I'm
16  sure she helped with that, yes.
17     Q.   Was she responsible for having the
18  housing group appointed to senior manage
19  Tennessee housing?
20     A.   We were appointed to be senior
21  manager in Tennessee housing about a month or
22  two ago, and I was fully responsible.
23     Q.   A month or two ago?
24     A.   Yes, that's when it happened.
25     Q.   How about in 2008?

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
181–184

Page 181

M.D. KOESSEL

1
2    A.   We were not appointed to senior
3    manager.  That's a mistake.
4    Q.   I'm sorry.  Were you appointed to
5    senior manage Kentucky?
6    A.   Yes.
7    Q.   Was that due to Amy's efforts?
8    A.   Not any more than mine.
9    Q.   Did you visit Kentucky?
10   A.   Yes.
11   Q.   Did Amy go and visit Kentucky?
12   A.   I don't recall.
13   Q.   Were you also appointed to senior
14   manage a team of New York City HDC between the
15   time Nick left and the time Amy was
16   terminated?
17   A.   We're working on our first senior
18   managed transaction for HDC right now.
19   Q.   So you weren't?
20   A.   No.
21   Q.   And during that time were you
22   hosting, were you participating in conferences
23   for clients?
24   A.   I was spearheading with a group of
25   kind of like a little kitchen cabinet, a group

Page 182

M.D. KOESSEL

1
2    of state HFA heads, in particular Ohio,
3    Massachusetts and California, who were working
4    together trying to figure out the various
5    forms of government legislation that was
6    coming out, HERA, Housing Economic Recovery
7    Act for 2008.  We were trying to figure out
8    how that might apply to the state HFAs, and we
9    were spending enormous amounts of time trying
10   to figure out how to redesign the HFA business
11   to solve the housing crisis.
12        I spent a lot of time in
13   California, a lot of time with Ohio, a lot of
14   time with Florida and a lot of time
15   criss-crossing the country working on those
16   topics.
17   Q.   At conferences?
18   A.   The conferences that I did were
19   conferences I organized.
20   Q.   You organized?
21   A.   Yes, they were my conferences.
22   Q.   And Amy was out getting new
23   business?
24   A.   Amy was managing people back at
25   home, back in the office.

Page 183

M.D. KOESSEL

1
2    Q.   She wasn't out getting new
3    business?
4    A.   I don't recall her being
5    particularly focused on new business.  We were
6    at that point in time, because we had lost so
7    many employees and because the industry was in
8    such a transition, our focus wasn't bringing
9    in new clients so much as holding on to the
10   ones we had, and executing the business we
11   had.
12   Q.   Didn't two deals close with North
13   Dakota and South Dakota during that period of
14   time?
15   A.   Yes.
16   Q.   And that was due to Amy's effort?
17   A.   I'm sure she participated,
18   especially in North Dakota.
19   Q.   So she just wasn't managing
20   employees; she was out getting business?
21   A.   That's just not getting business.
22        MR. TURNBULL:  Objection to form.
23   A.   That's executing transactions.  I
24   just disagree with your terminology.
25   Q.   She was getting revenue for the

Page 184

M.D. KOESSEL

1
2    group?
3    A.   She was, as was I.
4        I did a Vermont and an Ohio and
5    several other transactions during that period
6    of time, in addition to my efforts.
7        Just to understand management
8    of -- managing clients is doing work.  It's
9    executing transactions.
10   Q.   That's important?
11   A.   Absolutely, you do a bad job
12   executing a transaction, you lose the
13   business.
14   Q.   But executing transactions is the
15   whole point of the business, correct?
16        MR. TURNBULL:  Objection to form.
17   A.   Yes, we were both doing that.
18   Q.   But that's the most important
19   thing, correct?
20        MR. TURNBULL:  Objection to form.
21   A.   I don't know.  I don't know,
22   that's a tough one to say.  We could have a
23   long conversation about that.
24   Q.   Well, making money for Citigroup
25   is very important?



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

Page 205

M.D. KOESSEL

1
2  thoughts.
3          MR. TURNBULL:  Objection to the
4      form.
5      A.   Yeah, I felt lousy about them
6  being fired.  It definitely contains my
7  thoughts.
8      Q.   Do you regularly write e-mails to
9  yourself?
10     A.   No, I said I only do it by mistake
11 or infrequent circumstances where I'm trying
12 to preserve something.
13     Q.   Do you ever write your thoughts on
14 paper?
15     A.   I write my thoughts in e-mails a
16 lot.  I don't really use -- I type, I don't --
17 I can't write.  I don't write.
18     Q.   Do you keep a journal?
19     A.   No.
20     Q.   Diary?
21     A.   No.
22     Q.   Notebooks?
23     A.   No.  Drawings.  I keep drawings.
24     Q.   Drawings?
25     A.   Those are my notebooks.

Page 206

M.D. KOESSEL

1
2      Q.   Do you write in those drawings?
3      A.   No.  Except for things about
4  paints and pencils and things like that,
5  supplies or ideas.
6      Q.   If I can direct your attention to
7  the top e-mail, the fifth sentence.  It reads:
8  "I feel like Chrchill being asked to dismantle
9  the British empire (well, a little bit
10 maybe)."
11         What did you mean by that
12 sentence?
13     A.   Well, I saw -- I'm assuming that
14 what I meant by this, I'm assuming that this
15 was meant to go to Brett Whysel who was
16 terminated alongside Amy, that with everybody
17 being fired, I was being retained just to
18 clean up the mess and bow out gracefully, and
19 I think the reference to Chrchill basically
20 being, it is a silly reference, granted, but
21 he was asked to dismantle the British empire.
22         We had a thriving housing
23 business.  I was winding it down.
24     Q.   Just to go back to some testimony,
25 you gave before our lunch break.  I believe

Page 207

M.D. KOESSEL

1
2  you testified that both you and Amy met with I
3  think it was Mr. Brownstein in which he told
4  you he wanted both of you to proceed as
5  co-heads.  Is that correct?
6      A.   He said he wanted us to run the
7  group, yeah, we were going to be running the
8  housing effort on behalf Citigroup, yes.
9      Q.   And then I believe you testified
10 that, and please forgive me if I'm incorrect
11 about the timing, but was it an hour after
12 that meeting you went to Mr. Brownstein and
13 threatened to quit if you weren't made a
14 co-head or head?
15     A.   No, you got the timing all wrong.
16     Q.   When did you go to Mr.
17 Brownstein -- was it before the meeting you
18 had with Mr. Brownstein before you and Amy?
19     A.   No, no, no.  When Nick was let go,
20 David called us together and we met and that's
21 when he said, you know, Nick's gone, you guys
22 are going to run the group.
23         It was an informal conversation,
24 it was more morale boosting conversation.  As
25 you can tell from Chia's response, morale was

Page 208

M.D. KOESSEL

1
2  very low, we had just been cut again and we
3  proceeded down that path.
4          At a later point in time David
5  came back to me and said, well, you know,
6  since you never really wanted to be promoted
7  as based on the evidence provided by Nick, you
8  know, in his assertion of promotions, and
9  since we've had a bad experience in the past
10 with co-heads, we need one co-head.  And
11 that's when he said that Amy was the obvious
12 choice at that point.  And I said, your
13 decision is based on erroneous information.  I
14 very, very much wanted to be promoted to
15 managing director.
16         It was at that point I said if you
17 want to make her sole head over me, based on
18 this new information, you let me know and I'll
19 go find something somewhere else.
20         And he said I'll carry that back
21 to Frank.
22     Q.   Do you have to be -- you keep
23 using the term managing director when I'm
24 referencing co-head.  What's the correlation?
25     A.   I will tell you.  Here, the people

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
209–212

Page 209

M.D. KOESSEL

1
2  who want to be managing director are people
3  who want to rise in the managerial ranks, and
4  it has become the case, by and large, that you
5  are not a managing director unless you are the
6  head of the group.  It used to be the case
7  that there were more managing directors than
8  just group heads, but for the most part you
9  are not a managing director any more unless
10  you are a group head.
11        The fact that I hadn't, according
12  to David based on the information, the false
13  information from Nick, wanted to be managing
14  director, meant that I didn't want to rise to
15  a higher managerial level, that I was happy
16  doing the sort of work I was doing.  And he
17  actually said to me at the time, we made the
18  assumption, and he referenced a few people
19  that you like so-and-so, so-and-so, so-and-so
20  we're very happy doing the business work
21  you've been doing.  And I said that's just
22  false, I've been pushed very hard to be
23  managing director and I talked to Nick about
24  it.
25        Q.   You also testified before lunch

Page 210

M.D. KOESSEL

1
2  that you went out to dinners with Mr.
3  Brownstein and I think you may have stayed at
4  his house on the beach?
5        A.   It wasn't on a beach, it was --
6  no, it wasn't on the beach but it was a
7  country house.
8        Q.   And on those occasions did you
9  ever express any sentiment about you wanting
10  to be managing director, to David Brownstein?
11        A.   I don't recall us talking -- those
12  were very social occasions.  We didn't talk
13  about that sort of thing, no.
14        Q.   Was anyone else involved in these
15  social occasions?
16        A.   Remember, during that period of
17  time he wasn't my boss.
18        Q.   But was there anyone else involved
19  in these social occasions or was it just you
20  and him?
21        MR. TURNBULL:  Objection:  asked
22  and answered.
23        THE WITNESS:  Do I answer?
24        MR. TURNBULL:  Yes.
25        A.   Yes, friends of mine, business

Page 211

M.D. KOESSEL

1
2  associates of his.
3        Q.   And were there any female
4  employees from Citigroup present at these
5  social engagements?
6        A.   I don't recall.
7        Q.   Did you ever go out with Amy and
8  David Brownstein?
9        A.   No.
10        Q.   Did you ever go with Frank and
11  Amy?
12        A.   I never went out with Frank
13  period.
14        Q.   Do you get along with Frank?
15        A.   Yes.
16        (Plaintiffs' Exhibit 9, letter
17        dated June 23, 2009 from Morgan
18        Lewis to the USEEOC marked for
19        identification, as of this date.)
20        Q.   Mr. Koessel, handing you a
21  document that's been marked as Plaintiffs'
22  Exhibit 9.  Flip through the document and let
23  me know if you have seen it before.
24        A.   No, I've never seen this.
25        Q.   Have you seen a document similar

Page 212

M.D. KOESSEL

1
2  to this before?
3        A.   Since I don't really know what it
4  is, it would be hard to say if I have seen
5  anything similar, but I don't think I have.
6  But what is it?
7        Q.   Well, take your time to
8  familiarize yourself with it, please.
9        A.   No, I've never seen a similar
10  document.
11        Q.   Now, if you could turn to page 2
12  of this document.  Under the heading 1(b).  Do
13  you see that?
14        A.   Yep.  Yes.
15        Q.   The fifth, sixth sentence reads:
16  "By 2008 the student loan business
17  had become effectively nonexistent because of
18  problems in their credit markets" and it goes
19  on.
20        Is that a true statement that the
21  student loan business had become effectively
22  nonexistent in 2008?
23        A.   Absolutely, to the best of my
24  knowledge it had become effectively
25  nonexistent.

Page 241

M.D. KOESSEL

1
2 worked with Lee on different accounts, but I
3 worked with Lee Chen.
4       I just don't remember when some of
5 these people left. That's the unfortunate
6 thing. I don't know whether they left in
7 early '07, mid '07 and late '07. There was a
8 fair amount of turnover on the bottom.
9       Q.    Did you work at all with Raymond
10 High?
11       A.    Not very much at all.
12       Q.    How about Henry Chen?
13       A.    Henry was brand new. I barely
14 knew him.
15       Q.    What clients did you work on with
16 Lee Chen?
17       A.    I think she, I know I worked with
18 her on California.
19       Q.    Did you ever take her to
20 California?
21       A.    I don't know.
22       Q.    What clients did you work on with
23 Chia?
24       A.    The only one I can recall is
25 California.

Page 242

M.D. KOESSEL

1
2       Q.    Did you ever take her to
3 California?
4       A.    I don't recall. I'm pretty sure
5 either Lee or Chia went to California for one
6 of the transactions. It wasn't typical for a
7 first, second year analyst to go on a trip,
8 and we were very sensitive to the analyst's
9 desire to travel. And some liked travel and
10 some didn't.
11       Q.    Do you know if Chia liked
12 traveling?
13       A.    I don't know that at all. I know
14 that Joe did like traveling.
15       Q.    Now, did you first meet Chia when
16 she interned at Citigroup?
17       A.    I must have, yes.
18       Q.    And did she intern in your group?
19       A.    I assume so, yeah. I think it was
20 part of a program. We had a program with --
21 how did you pronounce it? SONYMA.
22       Q.    And what did you think about her
23 work performance when she interned?
24       A.    Again, I don't remember very well.
25 I don't remember very well.

Page 243

M.D. KOESSEL

1
2       The thing I remember about Chia is
3 she did a very good job on the California
4 numbers. That's what I remember. And I know
5 I was getting feedback from Ping and Amy who
6 worked closer with Chia that she was very
7 good.
8       Q.    And did there come a time when
9 Chia was hired by Citigroup to work full time?
10       A.    Obviously, yes.
11       Q.    Do you know when that was?
12       A.    I don't know whether it was at the
13 end of her internship. I mean, these
14 internships I think were shared with SONYMA.
15 So I don't know that she went back and
16 interned with SONYMA and then came and worked
17 with us, I don't know.
18       Q.    Do you know if it was sometime in
19 the summer of '06?
20       A.    No, I don't know.
21       Q.    And do you recall what Chia's job
22 title was when she started working at
23 Citigroup full time?
24       A.    I think she was an analyst, right?
25 I'm assuming she was an analyst. That's where

Page 244

M.D. KOESSEL

1
2 everybody starts.
3       Q.    Did she come in as a first year
4 analyst?
5       A.    I do not know.
6       Q.    How long is the analyst program?
7       A.    It's typically I think about three
8 years. It can be prolonged as evidenced by
9 our prior discussion, it is seldom, only under
10 certain circumstances, shortened.
11       Q.    And what happens after the three
12 year mark?
13       A.    Lots of things can happen. Lots
14 of people go to business school. Lots of
15 people make life decisions for themselves and
16 move onto something else. Some people get
17 retained for another year and told they are
18 not going to be kept beyond that. Lots of
19 people are encouraged to leave. Some people
20 who are recognized as having a future and you
21 promote them on up.
22       Q.    And what's the next level above
23 analyst?
24       A.    Associate.
25       Q.    And is there a general period of



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
297–300

M.D. KOESSEL

1
2    Q.    And she specifically told you she
3 was thinking about leaving?
4    A.    She was weighing her life choices,
5 yes.  And she was very concerned about what
6 Nick's being laid off meant for the group, for
7 her lifestyle, for her workload.  Everything.
8 It was a very, a very pleasant conversation in
9 a lot of ways.  It ws a very heartfelt
10 conversation.
11    Q.    You said she was weighing her life
12 choices.  My question was did you she
13 specifically tell you that she was thinking
14 about leaving?
15    A.    She told me that she felt that
16 investment banking wasn't the right business
17 for her, yes.  Yes.
18    Q.    And what else did she say?
19    A.    I don't remember the details, but
20 I remember talking about that.  It frequently
21 comes up with analysts and associates at some
22 point or another.
23    Q.    You had that discussion how long
24 after Nick left?
25    A.    When it became clear that her

M.D. KOESSEL

1
2 morale was very much -- had deteriorated
3 because of Nick's departure.
4    Q.    And when was that?
5    A.    You know, you keep asking me the
6 exact timing and I just don't know.
7    Q.    Was that a week after Nick left,
8 was that a day after Nick left, in that time
9 frame?
10        MR. TURNBULL:  Objection.
11    A.    I don't know.
12    Q.    Was it a month after Nick left?
13        MR. TURNBULL:  Objection.
14    A.    It could have been.  Probably not
15 much more than a month, though.  My guess is
16 it was more like, it's more like a couple of
17 weeks.
18    Q.    And what did you say to Chia in
19 this conversation?
20    A.    I think I listened for the most
21 part.
22    Q.    Did you say anything?
23    A.    I think I wanted her to stay as
24 evidenced by that letter and all the efforts
25 you see I did on her behalf.  I wanted her to

M.D. KOESSEL

1
2 stay.  But I didn't want her to stay if she
3 didn't want to stay.  But if she wanted to
4 stay, I really wanted her to stay.
5    Q.    Did you make any efforts to get
6 her to stay?
7    A.    I don't recall.
8    Q.    Did you try and get her promoted?
9    A.    You saw the letter.  I obviously,
10 in concert with Ping and Amy, probably, yes,
11 we tried to get her promoted thinking that
12 that might be the way to get her to stay.
13    Q.    So you do remember making efforts
14 to get her to stay?
15    A.    Exactly the effort that was
16 refreshed in my memory today by the e-mail.
17    Q.    So you tried to get her a
18 promotion?
19    A.    Yes.
20    Q.    And why did you think that would
21 make her stay?
22    A.    Good question.  I think that was
23 Amy's ploy.  I don't know.  I think that was
24 Amy's idea.
25    Q.    And you went along with it?

M.D. KOESSEL

1
2    A.    Yeah.
3    Q.    In fact, you advocated for it?
4    A.    Yes, I did.
5    Q.    Because you believed it would make
6 her stay?
7    A.    I was supportive of it.
8    Q.    You didn't want her to leave,
9 correct?
10    A.    I really didn't want to lose any
11 more people in the group, no.
12    Q.    Because you would be sunk if Chia
13 left?
14    A.    Because we were already
15 shorthanded.
16    Q.    And was Chia's promotion approved?
17    A.    I have no idea.  None.
18    Q.    No one ever got back to you?
19    A.    I just don't remember.  I don't
20 remember.  By "no idea," I don't know now.  I
21 might have known then, but I don't know now.
22 So I don't know.
23    Q.    And did you ever tell Chia that,
24 talk to her about her promotion?
25        MR. TURNBULL:  Objection.

MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
301–304

Page 301

1           M.D. KOESSEL
2      A.   Like I said, I don't even
3  remember, I don't think she was promoted.  I
4  don't know.  I just don't know.
5      Q.   Do you know if her promotion was
6  to take effect in January of 2009?
7           MR. TURNBULL:  Objection.
8      A.   I don't know.  I don't know.
9      Q.   Did you ever have any
10  conversations with Amy about promoting Chia?
11      A.   I think we were trying to boost
12  her morale by getting her promoted early and
13  I'm sure that Amy, Ping and I all talked at
14  length about it.
15      Q.   Do you recall what you discussed?
16      A.   I think we, exactly what I just
17  said.  That maybe her morale would be improved
18  if she were promoted.  And then she might stay
19  as a result of that.
20      Q.   And you just don't remember if she
21  was promoted or not?
22      A.   You know, I vaguely recall -- I'm
23  trying to remember.  I'm trying to remember.
24  I just don't remember offhand now.  I don't
25  remember the details now.

Page 302

1           M.D. KOESSEL
2           I think that we kind of agreed
3  that she would be promoted under normal time
4  frame, three years.  The real issue here was
5  not is she worthy of promotion.  That
6  obviously was not the issue.  The issue was
7  accelerating her promotion.  And my sense is
8  that we just kind of reassured her that within
9  the time frame she would be promoted.  But
10  that's my vague recollection.  We did not
11  convince Frank, I don't think, to promote her
12  at that time.
13      Q.   Do you know if Amy was told that
14  Chia was going to be promoted effective
15  January 2009?
16      A.   I don't know what people -- no, I
17  don't know that.  I don't know.
18      Q.   Do you know if Amy had a
19  conversation with Chia about promotion?
20      A.   I know that, something happened
21  that convinced Chia to stay, although, I know
22  that one of the things we did was at a time
23  when everyone was in overdrive, we gave her a
24  week's vacation thinking that that would kind
25  of chill her out a little bit and get her more

Page 303

1           M.D. KOESSEL
2  enthusiastic and she went off on a vacation.
3  I don't recall whether that was the proximate
4  cause of her staying, or whether some kind
5  promise, you know, it's not that long to your
6  third year, but something happened.
7      Q.   And how do you know that caused
8  her to stay?
9      A.   Just like I said, I don't --
10           MR. TURNBULL:  Objection.
11      A.   I don't know.
12      Q.   But you knew she wanted to stay?
13      A.   I knew she stayed.
14      Q.   She stayed?
15      A.   She stayed.
16      Q.   Do you know where Chia was living
17  when she was working at Citi.  I knew at the
18  time.  I don't know now.  I think maybe with
19  her family, but I don't remember for sure.
20      Q.   Do you know if she signed a lease
21  for a new apartment?
22      A.   That, I don't know.
23      Q.   Do you know if she signed a new
24  lease for an apartment in the summer of 2008?
25      A.   That, I don't know.

Page 304

1           M.D. KOESSEL
2      Q.   Who would have made the decision
3  to promote Chia?
4      A.   I'm assuming the same people who
5  make the decisions regarding all promotions at
6  Citigroup or within the municipal division.
7  I'm assuming it is, you know, I'm assuming it
8  is Frank and David.  You know, I don't know.
9  I don't make those decisions.  I advocate, as
10  evidenced by that e-mail, but I don't make the
11  decision.
12      Q.   Did she ever tell you that she was
13  interviewing?
14      A.   Now that you mention it, it sounds
15  familiar but I don't recall with any
16  certainty.
17      Q.   Did she ever tell you she was
18  looking for another job?
19      A.   I don't recall with any certainty
20  at all.
21      Q.   Did she ever specifically tell you
22  that she was unhappy?
23      A.   Well, she was certainly
24  demoralized.  I don't know if that's unhappy.
25      Q.   Is that based on your impression?



MICHAEL D. KOESSEL
AMY BARTOLETTI vs. CITIGROUP

July 12, 2012
309–312

Page 309

1         M.D. KOESSEL
2     A.   No, no, no.  I'm saying that if
3 she hadn't been laid off, given the magnitude
4 of the layoffs in the housing group and given
5 that she almost left when Nick had been laid
6 off, what would she have done when Amy, Ping
7 and Mike Murad were laid off.  The chances of
8 retaining her after that would have been zero.
9     Q.   And that's what Brownstein
10 conveyed to you?
11     A.   In some way, in some way he
12 conveyed that, yeah.
13     Q.   What do you mean in some way?
14     A.   Well, I mean I don't know if those
15 were the exact words, but that was the gist of
16 what he said.
17     Q.   And did you convey that to him?
18     A.   I think I agreed with him.  I
19 think after what we had been through all
20 summer with her, that made sense to me.  But
21 it certainly wasn't something I objected to.
22     Q.   Did you ever tell him that you
23 thought she was unlikely to stay?
24     A.   Like I said, I think I agreed with
25 him.  I don't know if I told him or not.

Page 310

1         M.D. KOESSEL
2     Q.   Well, then why did you advocate to
3 promote her early if you didn't think she was
4 going to stay?
5         MR. TURNBULL:  Objection.  It's a
6     different time frame.
7     A.   I don't understand your question
8 at all.
9     Q.   Well, I'm trying to figure out
10 when you had this conversation with David
11 Brownstein because --
12     A.   Well, which conversation are you
13 talking about?
14     Q.   The one where he told you that
15 Chia was unlikely to stay?
16     A.   That was when he laid off, or
17 Citigroup laid off Amy Bartoletti and Ping
18 Hsieh and Michael Murad.  I thought, and I
19 think he thought, I think everybody thought,
20 it's highly unlikely that Chia will stay being
21 that she strongly threatened to leave when we
22 simply laid off Nick Fluehr.
23     Q.   You say everybody thought.  Who is
24 everybody?
25     A.   I'm mistaking it.  I don't know

Page 311

1         M.D. KOESSEL
2 who everybody is.  I thought that, and I think
3 David thought that.  Everybody is me and
4 David.  That's all.  That's the only people
5 who's sense of what Chia might do, I -- you
6 know, I know; I have a sense of.
7     Q.   Well, you testified earlier that
8 giving her the week off and advocating for an
9 early promotion, that caused her to stay,
10 correct?
11     A.   Right.
12     Q.   And so at what point did you
13 change your mind?
14         MR. TURNBULL:  Objection.
15     A.   If she was going to leave when one
16 person was laid off and we did what we could
17 to retain her and she was close with three
18 more people who were going to be laid off, how
19 could we have kept her.
20     Q.   Well, you say that if she was
21 going to leave when one person left.  Did she
22 tell you she was going to leave?
23         MR. TURNBULL:  Objection:  asked
24     and answered.  Could we go back and read
25     back that answer.

Page 312

1         M.D. KOESSEL
2         MR. DATOO:  I withdraw the
3 question.  Let's take a break.
4         THE VIDEOGRAPHER:  We're now going
5 off the record approximately 4:16 p.m.
6         (Recess taken.)
7         THE VIDEOGRAPHER:  We're now going
8 back on the record approximately 4:24
9 p.m.
10 BY MR. DATOO:
11     Q.   Mr. Koessel, I believe you
12 testified before we broke that you had a
13 conversation with David Brownstein in which
14 he, please correct me if I am wrong, in which
15 he relayed to you that if Amy and Ping were
16 laid off, Chia would leave, too.  Is that
17 correct?
18     A.   Yes.
19     Q.   And when exactly did you have this
20 conversation with him?
21     A.   It was around the time when I was
22 trying to make sense out of what had happened,
23 and I wondered why Tim wasn't laid off rather
24 than Chia.  Chia was a known commodity; Tim
25 was not.  And that's what was explained to me.

