# EXHIBIT 18

Page 13

1  B. F. LIVOLSKI
2  A.  I was probably told by Frank Chin.
3  Q.  Do you know when you were told by
4  Frank Chin?
5      MR. BATTAGLIA: Objection.  You
6  may answer.
7  A.  I don't recall.
8  Q.  Was there a reduction in force in
9  June of 2008?
10  A.  I don't recall.
11  Q.  Do you know if there was a
12  reduction in force in December '07 or
13  January 2008?
14  A.  May have been, but I don't recall
15  for sure.
16  Q.  What was your role in the
17  November 2008 RIF?
18      MR. BATTAGLIA: Objection.  You
19  may answer.
20  A.  I was as a senior person who was
21  manager of the regional operations for Smith
22  Barney public finance.  I was involved in
23  discussions with my direct reports as to their
24  personnel.
25  Q.  And who would be your direct

Page 14

1  B. F. LIVOLSKI
2  reports?
3  A.  There were a number of them in the
4  regional area would have been Wally Nunn, Norm
5  Pellegrini, Ray Noga, Tony Hughes, Ray
6  Kljajic, Tom Coomes.
7      And then with respect to my
8  responsibilities as the head of the northeast
9  region there were a number, including Tim
10  Egan, Tom Egan, Dan Thompson, Kristen
11  Johanson, Jay Bartlett, Bill Mulrow, I believe
12  Ben Cooper, could be Shai Markowitz, I am not
13  sure, Dan Kim, George Lum, John Gavin, John
14  Malpiede.
15  Q.  What was that last name?
16  A.  John Malpiede.  You could find him
17  in the Boston office.
18  Q.  Can you just spell his last name
19  for me, please.
20  A.  M-A-L-P-I-E-D-E.
21  Q.  How about Daniel Cohen?
22  A.  Dan Cohen.
23  Q.  When you spoke to your direct
24  reports, did you speak to them all at the same
25  time?

Page 15

1  B. F. LIVOLSKI
2  A.  No.
3  Q.  Did you speak to them one-on-one?
4  A.  In reference to what?
5  Q.  In reference to the November 2008
6  RIF.
7  A.  One-on-one.
8  Q.  And did you speak to everyone over
9  the phone?
10  A.  To my recollection.
11  Q.  Do you recall speaking to anyone
12  in person?
13  A.  No, I don't recall that.
14  Q.  Why did you need to speak to your
15  direct reports regarding personnel?
16  A.  By definition a RIF means
17  reduction in force, and the objective was to
18  determine who within each person's
19  organization, region, could in fact be a
20  candidate for a RIF.
21  Q.  Were you given any instructions
22  from Frank Chin or David Brownstein about the
23  RIF?
24  A.  I don't recall.
25  Q.  Do you recall being told to lay

Page 16

1  B. F. LIVOLSKI
2  off a certain number of people?
3  A.  I don't recall.  I mean, I recall
4  that there was a certain number of people, but
5  I don't recall what the number was.
6  Q.  And were you told to lay off a
7  certain number of people?
8  A.  I don't remember that.
9  Q.  So how do you recall that there
10  was a certain number of people?
11  A.  Well, it didn't necessarily mean
12  that they were all coming from my areas.
13  Q.  Okay.  Do you recall how many
14  people were supposed to be laid off from your
15  area?
16  A.  I don't recall.
17  Q.  And were you told that you had to
18  reduce a certain number of compensation?
19      MR. BATTAGLIA: Objection.
20  Q.  Let me ask it again.  Let me ask
21  it a different way.  Were you told that you
22  had to reduce your region's budget by a
23  certain amount of money?
24  A.  I don't recall specifically being
25  told that, but having experienced RIFs before,



Page 25

1        B. F. LIVOLSKI
2   you saw?
3        A.   Could I repeat them now, could I
4   tell you what they were, no. I mean, maybe if
5   you reminded me or showed me something, I
6   might be able to remember that.
7        Q.   Were you a sender or recipient of
8   any of these e-mails?
9        A.   Mostly a recipient, occasionally a
10  sender.
11       Q.   I believe you testified that you
12  had at least one discussion with Norm
13  Pellegrini about the November 2008 RIF; is
14  that correct?
15       A.   Yes.
16       Q.   Did you have more than one
17  conversation with Mr. Pellegrini about the
18  RIF?
19       A.   Probably.
20       Q.   Do you know how many?
21       A.   I don't.
22       Q.   Do you know if these conversations
23  were face to face?
24       A.   I don't recall.
25       Q.   Do you recall if it was over the

Page 26

1        B. F. LIVOLSKI
2   phone?
3        A.   Probably.
4        Q.   And do you recall what you
5   discussed with Mr. Pellegrini the first time
6   you spoke?
7        A.   No.
8        Q.   Do you recall what you discussed
9   with Mr. Pellegrini the second time you spoke?
10       A.   Obviously we talked about his
11  personnel.
12       Q.   And what specifically did you talk
13  about?
14       A.   I don't recall.
15       Q.   Did you talk about which people
16  should be laid off?
17       A.   We talked about all of its people.
18       Q.   For what purpose?
19       A.   To discuss and decide on who might
20  be a candidate to be laid off.
21       Q.   Do you recall discussing names of
22  people?
23       A.   I don't recall, but I am sure we
24  discussed each and every individual that works
25  for him.

Page 27

1        B. F. LIVOLSKI
2        Q.   Do you know if he discussed every
3   single person that worked for him?
4        A.   I would believe we did.
5        Q.   So everyone in his group was
6   considered for layoff?
7        A.   Yes.
8        Q.   And how did you know how many
9   people to identify as a candidate for a
10  layoff?
11           MR. BATTAGLIA:  Objection. You
12       can answer.
13       A.   Can you be a little more specific?
14       Q.   Sure. When you were talking to
15  Mr. Pellegrini about candidates for layoff,
16  how did you -- let me back up. How many
17  people were laid off from Mr. Pellegrini's
18  group in connection with the November 2008
19  RIF?
20       A.   Two.
21       Q.   Do you know who they were?
22       A.   Nadine Mentor and Brent Wilder.
23       Q.   Were those two people that you and
24  Mr. Pellegrini identified as candidates?
25       A.   We talked about them, yes. They

Page 28

1        B. F. LIVOLSKI
2   were identified.
3        Q.   Why did you identify only two --
4   did you identify anymore than these two
5   people?
6        A.   Everyone was discussed.
7        Q.   And why did you identify these two
8   as opposed to three or as opposed to one?
9        A.   We identified those that we
10  thought that were weakest candidates and most
11  susceptible to being let go.
12       Q.   I guess what I am trying to get at
13  is, why did you identify two people as opposed
14  to one person?
15       A.   I didn't --
16           MR. BATTAGLIA:  Objection. You
17       may answer.
18       A.   I didn't say we identified -- we
19  identified two people, but that was not the
20  intention or the instruction. We weren't
21  instructed to identify two people, one person,
22  six people.
23       Q.   What was the instruction?
24       A.   When we do a RIF, we -- the way I
25  do a RIF, is we look at the entire department

Page 29

1      B. F. LIVOLSKI
2  and you try to get the weakest candidates. It
3  doesn't -- it is not geographic, it is not
4  from within any specific region. You are not
5  assigned that there is one from here and one
6  from there. It is the weakest candidates
7  within the organization.
8      Q.   So was everybody in all the
9  regions fair game?
10     A.   Absolutely.
11     Q.   So you didn't have to pick any
12 people, for example, from the southeast
13 region, right?
14     A.   I didn't have to pick anybody from
15 any region.
16     Q.   Did Frank Chin instruct to you to
17 identify candidates for layoff from any of
18 your regions?
19     A.   I don't recall that.
20     Q.   But Frank Chin did ask you to
21 identify people?
22     A.   When we talk about identifying
23 people, it is throughout the entire public
24 finance department.
25     Q.   By you are responsible for the

Page 30

1      B. F. LIVOLSKI
2  regions, correct?
3      A.   And I would identify people that I
4  was responsible for or knew more about than
5  others.
6      Q.   So everyone in all the regions was
7  considered for layoff?
8      A.   Yes.
9      Q.   So for example, you could have in
10 theory laid off everyone from the western
11 region?
12     A.   Yes.
13         MR. BATTAGLIA:  Objection.
14     Q.   Did Frank Chin give you any
15 criteria to work with regarding who to select
16 for layoff?
17     A.   I don't recall.
18     Q.   Do you recall if anybody gave you
19 any criteria?
20     A.   No, I don't.
21     Q.   What criteria did you utilize in
22 determining the layoff?
23     A.   I did a review, my own review of
24 each and every person within the organization.
25 At least within my regions and made a

Page 31

1      B. F. LIVOLSKI
2  determination based on performance, potential,
3  client base, depth of relationships, banking
4  skills.
5      Q.   Did you conduct this review on
6  your own?
7      A.   I discussed --
8         MR. BATTAGLIA:  Objection. You
9  may answer. You may answer.
10     A.   I discussed that with each of my
11 regional managers.
12     Q.   For the southeast region you would
13 have had this discussion with Mr. Pellegrini,
14 correct?
15     A.   Correct.
16     Q.   And you identified, I guess, five
17 criteria. Were all five criteria discussed
18 with Mr. Pellegrini?
19     A.   I don't recall.
20     Q.   You don't recall if you discussed
21 these five criteria?
22     A.   I don't recall. Possibly.
23     Q.   Is it likely that you discussed it
24 since this was part of your review?
25     A.   Likely.

Page 32

1      B. F. LIVOLSKI
2      Q.   In connection with your review,
3  did you look at any documents?
4      A.   Any documents with Norm
5  Pellegrini?
6      Q.   Yes.
7      A.   Not that I recall.
8      Q.   How about your own?
9      A.   Not that I recall.
10     Q.   When you said you reviewed
11 people's performance, did you look at
12 everyone's performance evaluations?
13     A.   What do you mean by "evaluations"?
14     Q.   Performance appraisals.
15     A.   I don't recall if I did.
16     Q.   Were you familiar with the
17 performance of every individual that works in
18 your region?
19     A.   No.
20     Q.   So then did you use any document
21 to assist you in determining the performance
22 of people in your region?
23     A.   No.
24     Q.   How could you have made a
25 determination as to people's performance?

**Page 33**

1  B. F. LIVOLSKI
2  A. Because I know what everybody
3  does.
4  Q. You just testified that you
5  weren't familiar with the performance of
6  everyone in your region.
7  A. Excuse me?
8  Q. Didn't you just testify that you
9  weren't familiar with the performance of
10  everyone in your region?
11  A. I am familiar with each and
12  person's performance. Not on each and every
13  account, I know basically what their skills
14  are. I know what their potential is. I know,
15  through discussion with regional managers,
16  what he views or they view as their potential,
17  their capabilities. We discuss things like
18  ramifications of losing a person, potential
19  for the future, all of those come into play.
20        I do not specifically recall
21  looking at someone's revenues or total client
22  base or identified relationships. What we do
23  with our organization is we are inclusive in
24  our performance with people. People do not
25  work on their own, they work as a team.

**Page 34**

1  B. F. LIVOLSKI
2  People contribute little bits of pieces, big
3  bits of pieces that all together creates,
4  hopefully, a successful result and successful
5  environment.
6        We would be more inclusive than
7  exclusive.
8  Q. So you had no personal knowledge
9  of people's performance; is that correct?
10       MR. BATTAGLIA: Objection.
11  A. I don't -- personal knowledge, how
12  would you define that?
13  Q. Well, did you ever work on any
14  transactions with Nadine Mentor?
15  A. No, not that I recall.
16  Q. And do you recall the numerical
17  score she got in her 2007 performance
18  evaluation?
19       MR. BATTAGLIA: Objection.
20  A. I don't recall.
21  Q. Do you recall any of the comments
22  on her evaluation?
23  A. I don't recall.
24  Q. Did you comment about her
25  performance on her 2007 evaluation?

**Page 35**

1  B. F. LIVOLSKI
2       MR. BATTAGLIA: Objection.
3  A. I don't recall.
4  Q. Were you in a position to comment
5  on her performance on her 2007 evaluation?
6       MR. BATTAGLIA: Objection.
7  A. I guess I could have.
8  Q. Based on what?
9       MR. BATTAGLIA: Objection.
10 A. As a head of the region, I could
11 review anybody's review.
12 Q. What knowledge would you have
13 about her performance?
14 A. It is --
15      MR. BATTAGLIA: Objection. Asked
16 and answered. You may answer.
17      THE WITNESS: Excuse me?
18      MR. BATTAGLIA: You may answer.
19 A. I would know about her performance
20 because of discussions of observations,
21 discussions with regional manager, discussions
22 with people within my group in the northeast
23 group.
24      And I would not only know about
25 some of the things, not all of the things she

**Page 36**

1  B. F. LIVOLSKI
2  does of her, but of everyone within the
3  regional operation.
4  Q. So you don't have firsthand
5  knowledge of her performance, right?
6       MR. BATTAGLIA: Objection.
7  A. No.
8  Q. Is that true for everyone in the
9  group?
10      MR. BATTAGLIA: Objection.
11 Q. All of the people that work in the
12 northeast region?
13 A. I can't say that for sure. I
14 might have worked on a deal with others in
15 other regions, and then would have firsthand
16 knowledge.
17 Q. So unless you have worked with the
18 person, you wouldn't really have firsthand
19 knowledge of their performance, correct?
20      MR. BATTAGLIA: Objection.
21 A. I would have firsthand knowledge
22 if I worked with them on a transaction in
23 certain areas like technical skills.
24 Q. You also testified that in
25 connection with the review you looked at the



Page 37

1  B. F. LIVOLSKI
2  potential of a person.
3      MR. BATTAGLIA: Objection.
4   Q. Is that correct?
5   A. Yes.
6   Q. And how did you gauge someone's
7  potential?
8   A. How they carried themselves, what
9  people perceive of them, what clients might
10 think of them, what bankers, senior bankers
11 would think of them, what I know to be their
12 client base or potential client base, their
13 market territory. It is not an exact science.
14  Q. And did you use any documents in
15 connection with your review of someone's
16 potential?
17  A. No.
18  Q. Did you speak to any clients about
19 someone's potential?
20  A. Not that I recall.
21  Q. And did you --
22  A. Let me rephrase that. Are you
23 saying Nadine's or are you saying any banker's
24 potential?
25  Q. Let's say Nadine's.

Page 38

1  B. F. LIVOLSKI
2   A. I don't recall that.
3   Q. How about other bankers?
4   A. Likely, but I can't say for sure.
5   Q. So you called up a client and
6  asked them how they perceive?
7   A. I may know the client.
8   Q. And is that what you did?
9      MR. BATTAGLIA: Objection.
10  Q. You called the client to ask them
11 how they perceived people that work for you?
12     MR. BATTAGLIA: Objection.
13  A. I can't say for sure that I called
14 the client. I see clients and I may have had
15 a face-to-face conversation. I may have
16 called them, it may have been in passing. It
17 would not have been intentional.
18  Q. Do you know any of Nadine Mentor's
19 clients?
20     MR. BATTAGLIA: Objection.
21  A. I have met the -- let me rephrase
22 that.
23     They weren't her clients. If you
24 are asking did I know any of the clients where
25 she may have worked on deals, I know that I

Page 39

1  B. F. LIVOLSKI
2  have met the State Treasurer of Connecticut.
3   Q. And did you speak with the State
4  Treasurer of Connecticut about Nadine's
5  performance?
6   A. Not that I recall.
7   Q. Did you speak to the State
8  Treasurer of Connecticut about Nadine's
9  potential?
10  A. No.
11  Q. Did you speak to the State
12 Treasurer of Connecticut about how they, he,
13 she, perceived Nadine?
14  A. Not likely.
15  Q. I believe you testified that
16 Nadine worked on a client who was the State
17 Treasurer of Connecticut?
18  A. Worked as part of a transaction
19 team.
20  Q. And whose client was that?
21  A. I would identify that client as
22 Kristen Johanson, who is the senior person in
23 the overall relationship manager for the State
24 of Connecticut.
25  Q. Do you know if Nadine had any

Page 40

1  B. F. LIVOLSKI
2  relationships with the State Treasurer of
3  Connecticut?
4   A. My understanding through Kristen
5  is that Nadine knew the state treasurer.
6   Q. Knew the state treasurer?
7   A. Yes.
8   Q. And what makes the state treasurer
9  Kristen Johanson's client?
10  A. She has worked in that state for
11 many, many years long before anyone else in
12 our organization. She has had in-depth
13 knowledge of the accounts. She has worked
14 with deputy state treasurers. She has worked
15 with legislatures. She has an extensive
16 background and knowledge of the account.
17  Q. Did you speak to Kristen Johanson
18 about Nadine's performance?
19  A. I don't recall.
20  Q. Did you speak to Kristen Johanson
21 about Nadine's potential?
22  A. I don't recall.
23  Q. How about how she perceived
24 Nadine?
25  A. I don't recall.

Page 41

1  B. F. LIVOLSKI
2  Q. Is Kristen Johanson considered a
3  senior banker?
4  A. Yes.
5  Q. Did you speak to any senior
6  bankers about Nadine's performance?
7      MR. BATTAGLIA: Objection.
8  A. Norm Pellegrini.
9  Q. Anyone else?
10 A. No.
11 Q. Did you speak to any senior
12 bankers about Nadine's potential?
13 A. No, except for Norm Pellegrini,
14 not that I recall.
15 Q. Did Nadine have any clients at
16 Citigroup?
17     MR. BATTAGLIA: Objection.
18 A. Most people at Citigroup don't
19 have clients. Citigroup has clients. She
20 along with others works on client transactions
21 and for clients.
22 Q. Now do you know any of the clients
23 that Nadine worked on other than the State
24 Treasurer of Connecticut?
25 A. She worked on Virgin Islands. And

Page 42

1  B. F. LIVOLSKI
2  I am not even sure that we ever did a deal
3  there. Just I know she was working on the
4  Virgin Islands.
5  Q. And did she bring the Virgin
6  Islands to Citigroup?
7  A. I don't recall that.
8      MR. BATTAGLIA: Objection.
9  Q. Do you know if Citigroup has ever
10 done a transaction with the Virgin Islands?
11 A. Yes.
12 Q. How many deals have they done with
13 the Virgin Islands?
14 A. Possibly two.
15 Q. And when were those deals?
16 A. They would have been done at the
17 last three year time frame.
18 Q. Is that before or after Nadine was
19 laid off?
20 A. I can't say for sure, probably
21 after.
22 Q. And who would have worked on those
23 deals?
24 A. Guy Logan would have been the
25 senior banker.

Page 43

1  B. F. LIVOLSKI
2  Q. Why guy Logan?
3  A. Guy Logan was a senior banker who
4  knew a lot of folks. He may have been
5  involved in the Virgin Islands transaction
6  early on. I don't know exactly how he ended
7  up there.
8  Q. You testified earlier that in
9  connection with identifying candidates for
10 layoff you reviewed a candidate's client base;
11 is that correct?
12     MR. BATTAGLIA: Objection.
13 A. I don't recall saying I reviewed a
14 candidate's client base, but I had discussions
15 with each manager as to their bankers and
16 their client base that they might in fact work
17 on.
18 Q. So clients that they worked on?
19 A. Yes.
20 Q. And who did you speak to about
21 Nadine's client base?
22 A. Norm Pellegrini.
23 Q. Anyone else?
24 A. Not that I recall.
25 Q. And you also testified that in

Page 44

1  B. F. LIVOLSKI
2  connection with identifying candidates for
3  layoff, you reviewed depth of relationships;
4  is that correct?
5      MR. BATTAGLIA: Objection.
6  A. Yes, through discussion with
7  regional managers.
8  Q. And did you discuss the depth of
9  relationships that Nadine had with clients?
10 A. With clients?
11 Q. With anyone.
12 A. Can you rephrase?
13 Q. Let me ask that again.
14    Did you discuss the depth of
15 relationships Nadine had with clients?
16     MR. BATTAGLIA: Objection.
17 A. I don't -- I am not following the
18 question.
19     MR. BATTAGLIA: Did you ask it
20    with the clients or did he ask depth of
21    relationship with clients with someone
22    else?
23     MR. DATOO: With someone else.
24 A. I don't recall specifically, but
25 probably had discussions with Norm Pellegrini

Page 45

```
 1        B. F. LIVOLSKI
 2   about her relationships with clients.
 3      Q.   Anyone else?
 4      A.   Possibly Kristen Johanson, but I
 5   am not sure.
 6      Q.   Why would you have spoken to
 7   Kristen Johanson?
 8      A.   Kristen Johanson was a senior
 9   banker in the State of Connecticut and, you
10   know, I can't say for sure that Kristen has
11   never come to me and said, I worked with
12   Nadine on this and she was very good or she
13   was very bad.
14      Q.   I believe you also testified that
15   in connection with identifying a candidate for
16   layoff you reviewed banking skills; is that
17   correct?
18           MR. BATTAGLIA: Objection. You
19      can answer.
20      A.   Banking skills would have been
21   defined. I would have been told about banking
22   skills basically from the regional manager.
23      Q.   What was your view of Nadine's
24   banking skills?
25           MR. BATTAGLIA: Objection.
```

Page 46

```
 1        B. F. LIVOLSKI
 2      A.   My impression was enthusiastic,
 3   inexperienced.
 4           MR. BATTAGLIA: Enthusiastic,
 5      inexperienced?
 6           THE WITNESS: Enthusiastic as a
 7      banker, inexperienced as a banker.
 8      Q.   You didn't work with her on any of
 9   the transactions, though, did you?
10           MR. BATTAGLIA: Objection.
11      A.   Not that I recall.
12      Q.   How did you form this opinion of
13   Nadine's banking skills?
14           MR. BATTAGLIA: Objection. Asked
15      and answered.
16      A.   I would have picked that up mostly
17   from the regional manager, as well as
18   potentially conversations with her related to
19   just facts within the industry.
20      Q.   What do you mean by "facts within
21   the industry"?
22      A.   Well, techniques, ideas,
23   structures, etc.. I may have, may not have.
24   I have approximately 55 people working in
25   regions. I can't remember which ones I've had
```

Page 47

```
 1        B. F. LIVOLSKI
 2   these conversations with.
 3      Q.   Is that true as of November 2008?
 4           MR. BATTAGLIA: Objection.
 5      A.   It would be true, sure. It would
 6   be true that I wouldn't remember those
 7   conversations.
 8      Q.   Did you and Norm Pellegrini
 9   identify Nadine together as a candidate for
10   layoff?
11      A.   I don't recall that.
12      Q.   Who would have identified her for
13   layoff?
14      A.   We could have identified her
15   together. He may have suggested it. I would
16   have thought about everybody within the region
17   and decided on, you know, what their skills
18   were, what their client base was and
19   unfortunately picked those that, you know, we
20   would conclude were the most expendable.
21           You have to understand something,
22   every banker looked at during any of these
23   RIFs, these were qualified people. We were
24   cutting into muscle. We were not eliminating
25   people that weren't good. So you had to be,
```

Page 48

```
 1        B. F. LIVOLSKI
 2   you know -- you had to look at exactly, you
 3   know, what their value would be versus others
 4   within the department and then make a decision
 5   accordingly.
 6      Q.   You testified earlier that you
 7   didn't have to identify anyone for layoff,
 8   correct?
 9           MR. BATTAGLIA: Objection.
10      A.   I just finished saying that we
11   identified -- we looked at everyone throughout
12   the department.
13      Q.   But you testified earlier that you
14   didn't have to identify anyone, correct?
15           MR. BATTAGLIA: Objection.
16      A.   What I testified, to my
17   recollection, was that I didn't have to select
18   anyone from any specific region.
19      Q.   Okay. Now in connection with your
20   review of identifying candidates for layoff,
21   did you review how much money someone made?
22           MR. BATTAGLIA: Objection.
23      A.   I would not have specifically
24   looked at revenue sheets because, as I said
25   before, we are an inclusive organization. So
```

Page 53

1  B. F. LIVOLSKI
2  client, her potential client base or accounts
3  that she -- were out there that if she weren't
4  part of the organization, how would it effect
5  our southeast operation. I remember
6  discussion of having talked about her being a
7  director first as a vice president, in that
8  she probably was promoted too quickly.
9     And we talked about every
10 individual in the region and what their focus
11 was, what their contribution to a specific
12 product or geographic location was. And at
13 the end of the day, we concluded that Nadine
14 and Brent would have effected, if they were
15 not part of the organization, would effect us
16 the least.
17    Q.  Do you recall looking at how much
18 money she was paid by Citigroup?
19       MR. BATTAGLIA:  Objection.  You
20    can answer.
21    A.  I don't recall.
22    Q.  Do you recall looking at the
23 number of transactions she worked on?
24    A.  I don't recall that.
25    Q.  Do you recall looking at the

Page 54

1  B. F. LIVOLSKI
2  amount of revenue that was generated from the
3  transactions she worked on?
4     A.  I don't recall if we did.
5  Possible.
6     Q.  Do you recall looking at the
7  clients she covered?
8       MR. BATTAGLIA:  Objection.
9     A.  I don't recall that.  Again, I'd
10 like to indicate that, as I said before, our
11 reporting of bankers working on clients and
12 their contribution was very liberal.  We
13 encouraged team play, and as a result, we put
14 a lot of bankers on a lot of accounts so that
15 all of the resources of public finance could
16 be brought to bear on any transaction.
17    Q.  Did you talk about Nadine's work
18 performance with Mr. Pellegrini?
19       MR. BATTAGLIA:  Objection.
20    A.  I don't recall that.
21    Q.  What did you think about her work
22 performance?
23       MR. BATTAGLIA:  Objection.  You
24    may answer.
25    A.  You know, my limited experience

Page 55

1  B. F. LIVOLSKI
2  with her was that she was doing her job.
3     Q.  Well, she was promoted early to
4  director, wasn't she?
5       MR. BATTAGLIA:  Yes.
6     A.  Yes.
7     Q.  So she was doing a pretty good
8  job, wasn't she?
9       MR. BATTAGLIA:  Objection.
10    A.  Depending on what you think of
11 being a director versus a vice president.
12    Q.  Well, how about what you think.
13    A.  Well, I think that director is a
14 nice title that is something that a lot of
15 people get and have.  It helps them in their
16 stature within the industry, and generally it
17 is an irrelevant title.  It is a title within
18 our division.  It is a title that you could --
19 we have directors that do vice president's
20 work and we have vice presidents that do
21 directors work.
22       The most meaningful titles within
23 the divisions are the one that are corporate
24 titles, managing director.  So making someone
25 a director -- and I am not suggesting that

Page 56

1  B. F. LIVOLSKI
2  Nadine didn't earn it or didn't deserve it,
3  all I am saying is that from my perspective
4  that was a way of satisfying and encouraging
5  employees to continue to be successful and
6  work hard.
7     Q.  If a director title is irrelevant,
8  why did you just testified that you promoted
9  her too early?
10    A.  Well, because what happens is
11 sometimes bankers put too much -- they have
12 too much expectation either on themselves or
13 in the group that they are working on.  They
14 are viewed as a director, when in fact they
15 are really doing vice president's work.
16       My feeling was at that point, that
17 although Nadine was maturing and growing and
18 that that title was a nice title, you know, to
19 have her on her business card, that she was
20 doing basically, from what I could ascertain
21 from Norm, vice president's work.
22    Q.  Well, she was a rare talent,
23 wasn't she?
24       MR. BATTAGLIA:  Objection.
25    A.  How do you define that?

Page 69

1  B. F. LIVOLSKI
2  layoff?
3      MR. BATTAGLIA: Objection.
4  A.  I don't recall that.
5  Q.  Is it fair to say that you and
6  Mr. Pellegrini made the decision to select
7  Nadine for layoff?
8  A.  That's fair.
9  Q.  And once you identified Nadine for
10 layoff, what did you do?
11 A.  I don't recall.
12 Q.  Did you speak to Frank Chin?
13 A.  Likely.
14 Q.  Did you let him know?
15 A.  Likely.
16 Q.  Did you do anything else?
17 A.  It was what five, six years ago.
18 Q.  Four years ago.
19 A.  Four years ago. I can't remember.
20 Q.  Do you know if Mr. Pellegrini did
21 anything else after Nadine was identified for
22 layoff?
23 A.  I don't recall.
24 Q.  Did you agree with the decision to
25 select Nadine for layoff?

Page 70

1  B. F. LIVOLSKI
2  A.  Yes.
3      MR. BATTAGLIA: Objection.
4  Q.  How about Mr. Wilder?
5  A.  Yes.
6  Q.  Were there any other people you
7  discussed with Mr. Pellegrini that you
8  identified for layoff?
9      MR. BATTAGLIA: Objection.
10 A.  Well, I could tell you that we
11 probably discussed every person. As I said
12 before, the objective was to come to the
13 proper conclusions. I would have thought that
14 we would have touched on each person. That
15 they may not have been lengthy conversations,
16 but we would have touched on each person.
17     As an example, we would have
18 talked about Michael Ho. Michael Ho has, you
19 know, dominated business in the south of
20 Florida, Louisiana, Tennessee. A significant
21 producer and someone who has worked on many of
22 the accounts that I had established over the
23 years.
24     Mike Baldwin would have been
25 somebody who has dominated the school business

Page 71

1  B. F. LIVOLSKI
2  in Florida for many years and one of the
3  reasons why we would have wanted to hire the
4  folks from the UBS office.
5      Marc Weinberg had strong family
6  connections, knew a lot of people throughout
7  the state and he was someone who understood
8  the business very well and was very competent.
9  I could -- I could go on.
10     MR. BATTAGLIA: That's okay.
11 Q.  Did you discuss --
12 A.  I could tell you each one, but --
13 Q.  Please continue then.
14     MR. BATTAGLIA: What's the pending
15     question, people he considered with Norm
16     Pellegrini?
17 Q.  What did you discuss with
18 Mr. Pellegrini about Rick Paterson?
19 A.  Rick Paterson was an interesting
20 discussion. From what I could recall in that
21 Rick may have been a managing director at that
22 time, I think so. Was a derivative expert who
23 had had school business, as well as Tampa Bay
24 business for many years. And given his
25 capabilities in the derivatives space and

Page 72

1  B. F. LIVOLSKI
2  given the problems that the industry was
3  having with derivatives, it made sense that he
4  would be part of our organization going
5  forward.
6  Q.  How about Robert Szostak?
7  A.  Robert Szostak, I don't recall
8  talking about him. He is a public power guy,
9  good experience, did some work in the western
10 part of the state, probably focused more on
11 power and possibly renewals, renewal of merge.
12 Q.  Did you talk about Nadine?
13     MR. BATTAGLIA: Objection.
14 A.  Of course we talked about Nadine.
15 I remember discussing Connecticut because I
16 knew secondhand from Kristen that she had been
17 involved in Connecticut. We talked about what
18 other areas did she have a significant role or
19 a major influence. And quite frankly, there
20 weren't.
21 Q.  How about Broward County?
22 A.  We may have -- she may have been
23 asked to work in Broward County, help us
24 there.
25 Q.  Did you discuss the Virgin



Page 77

1          B. F. LIVOLSKI  
2     Q.   Are you referring to a specific  
3  document?  
4          MR. BATTAGLIA:  Objection.  
5     A.   When you say "revenue sheets,"  
6  there is a revenue sheet that is generated for  
7  each region.  And that revenue sheet lists  
8  every transaction that's been done in that  
9  region or product group -- could be a product  
10 group as well as a region -- and who are all  
11 the bankers associated with that transaction  
12 and all the product or regional groups  
13 associated with that transaction.  
14    Q.   Is there a document that reflects  
15 how many transactions were conducted with  
16 school districts in 2008?  
17    A.   A document that just isolates  
18 school districts?  
19    Q.   Yes.  
20    A.   Probably not.  Probably doesn't --  
21 just isolate school districts.  Probably is  
22 included within the revenue sheets of the  
23 entire region.  
24    Q.   So for example, if I wanted to  
25 find out how many school transactions were  

Page 78

1          B. F. LIVOLSKI  
2  conducted in the southeast group for 2008, I  
3  would have to look at the document that lists  
4  all the transactions for that group for that  
5  year?  
6     A.   There may be a way to put  
7  something into a program that would split out  
8  all of the school districts.  I don't know.  
9  There could very well be.  My tool would be  
10 what the region is doing, what the accounts  
11 are that they have done and what the, you  
12 know, what are the revenues for that region.  
13    Q.   Is that a document, is that  
14 information contained on that document?  
15         MR. BATTAGLIA:  Is that what?  
16    Q.   Is the information that you just  
17 said --  
18    A.   That I utilized?  
19    Q.   Yes.  
20    A.   Whenever I request a revenue sheet  
21 for the region, they will produce it for me.  
22 And it is typically I will give them a time  
23 frame.  
24    Q.   Okay.  How were derivatives doing  
25 in 2008?  

Page 79

1          B. F. LIVOLSKI  
2     A.   The derivative business was  
3  probably in significant danger.  A lot of it  
4  revolved around variable rate axis, as well as  
5  insurance.  Both areas were having their  
6  problems.  So I would suspect that there  
7  wasn't a lot of new derivative business, but  
8  there were significant monitoring and unwinds  
9  that would be part of the business.  
10    Q.   What do you mean by "unwinds"?  
11    A.   In other words, trying to get  
12 clients out of the derivative trades that they  
13 were in.  
14    Q.   Who was working on derivatives in  
15 the southeast group?  
16    A.   The major focus would have been  
17 Rick Paterson as the derivative person within  
18 the region.  
19         MR. BATTAGLIA:  Just to clarify,  
20    we're talking about 2008?  
21         MR. DATOO:  Yes.  
22    Q.   How about 2007?  
23    A.   It would have been Rick Paterson.  
24    Q.   Why wasn't Rick Paterson  
25 identified for layoff?  

Page 80

1          B. F. LIVOLSKI  
2     A.   Why was he?  
3     Q.   Why wasn't he?  
4          MR. BATTAGLIA:  Objection.  
5     A.   I don't -- when you say  
6  identified, can you be a little more specific?  
7  Why wasn't he picked, why wasn't he  
8  selected --  
9     Q.   Yes.  
10    A.   -- as one of the people?  
11    Q.   Yes.  
12    A.   Well, because not only did he have  
13 a history of being a leader with clients, but  
14 he also was a derivatives expert which would  
15 have come in significance and handy because of  
16 the unwinds and etc., going forward.  
17    Q.   Has the derivatives business  
18 picked up since '08?  
19    A.   No.  But it has -- but unwinds  
20 continue.  
21    Q.   Is there anyone else --  
22    A.   Innovations continue.  
23    Q.   Could anyone else have handled  
24 derivatives in the southeast group?  
25    A.   No.  Well, I mean, you could have

Page 81

1   B. F. LIVOLSKI
2   -- any banker could have probably tried, that
3   doesn't mean it would be done in an expert
4   way. That's not to say -- if a senior
5   manager -- if Palm Beach county did a
6   derivative and Michael Ho for the sake of
7   argument was the senior banker on that
8   account, he would -- and a derivative trade
9   took place, Rick Paterson would be involved in
10  that, Michael Ho would at least be involved in
11  that from a client-relationship perspective.
12      Q.  Rick Paterson was a managing
13  director, right?
14      A.  I believe so.
15      Q.  Is he still with Citi?
16      A.  He is not.
17      Q.  When did he leave?
18      A.  He left in 2011.
19      Q.  Do you know why?
20      A.  He was RIFed.
21      Q.  I am sorry?
22      A.  I think he was part of a RIF.
23      Q.  Who is handling derivatives now?
24      A.  Unwinds are basically being
25  handled in addition to the relationship

Page 82

1   B. F. LIVOLSKI
2   managers the -- our financial products group
3   would in New York would assist in putting
4   those novations together. There are not many,
5   to my knowledge, new derivative transactions,
6   but there are a lot of outstanding
7   transactions that are client based that would
8   like to see unwound.
9       Q.  Could the financial products group
10  in New York have handled derivatives if Rick
11  Paterson was laid off in November of 2008?
12      A.  Difficult because we -- part of
13  the business plan was to put a derivatives
14  person in geographic locations around the
15  country to provide more focus.
16      Q.  Do you know how much money Rick
17  Paterson was making in 2008?
18      A.  I haven't any idea.
19      Q.  Managing directors generally make
20  more than directors?
21      A.  In most cases, but not in all
22  cases.
23      Q.  Do you know if Rick Paterson was
24  making more money than Nadine Mentor?
25      A.  I couldn't say that as a fact, but

Page 83

1   B. F. LIVOLSKI
2   the probability is yes.
3       Q.  Do you know how much more?
4       A.  I have no idea.
5       Q.  Do you know what the base salary
6   of a managing director was in '08?
7       A.  It could be $250,000.
8       Q.  Do you know what the base salary
9   for managing director was in '08 -- for
10  director in '08?
11          MR. BATTAGLIA: Objection.
12      A.  Maybe 150'ish, range. I am not
13  quite sure.
14      Q.  Does the incentive comp differ
15  from managing directors to directors?
16          MR. BATTAGLIA: Objection.
17      A.  In most cases it would, but not in
18  all cases.
19      Q.  Do you know if Rick Paterson's
20  incentive comp was greater than Nadine's
21  incentive comp in 2007?
22          MR. BATTAGLIA: Objection.
23      A.  I don't know.
24      Q.  Is it likely?
25      A.  Likely, but I don't know.

Page 84

1   B. F. LIVOLSKI
2       Q.  Did you ever know which clients
3   Nadine covered?
4           MR. BATTAGLIA: Objection.
5       A.  I knew she had spent time working
6   on Connecticut. I knew that she was part of
7   the Virgin Islands team. There was discussion
8   early on about having her work in south
9   Florida. But specifically, no, except for
10  those two.
11      Q.  I am handing you a document that's
12  been marked as Plaintiff's Exhibit 379.
13          MR. DATOO: For the record, I just
14      want to make it clear that this is not
15      one document, it is two documents just
16      stapled together.
17          MR. BATTAGLIA: I would ask, were
18      there e-mails attached to these
19      documents or were they standalone
20      documents?
21          MR. DATOO: I know it has your
22      Bates stamp on it.
23          MR. BATTAGLIA: I know. If you
24      are going to ask him questions about
25      these documents, it is sort of assume --

Page 85

1  B. F. LIVOLSKI
2  I will wait and see if you lay a
3  foundation for his knowledge of them.
4  Q.  Did you have an opportunity to
5  review the document?
6  A.  Thank you.
7  Q.  Have you had an opportunity to
8  review it?
9  A.  I have, yes.
10  Q.  Have you seen any of these
11  documents before?
12  A.  I don't recall them.
13  Q.  Do you recall if Nadine Mentor
14  covered Miami Dade County?
15  MR. BATTAGLIA:  Objection.
16  A.  She may have been one of the
17  bankers assigned to it.
18  Q.  Do you know who had the primary
19  relationship with Miami Dade County?
20  A.  Yeah.  I mean, as far as I have
21  known historically it would have been Norm
22  Pellegrini.
23  Q.  Do you know who is the lead banker
24  for Miami Dade County?
25  MR. BATTAGLIA:  Objection.

Page 86

1  B. F. LIVOLSKI
2  A.  I would have to say it would be
3  Norm Pellegrini.
4  Q.  Do you know that or are you
5  guessing?
6  A.  Well, logical conclusion would be
7  that if you are the responsible -- if you are
8  the senior banker for the account and you have
9  the relationship, you are technically the lead
10  banker.  That doesn't necessarily mean you are
11  working on that account day to day, but are
12  technically the lead banker.
13  Q.  Do you know if Nadine covered the
14  City of Miami?
15  MR. BATTAGLIA:  Objection.
16  A.  Possibly.
17  Q.  Do you know who was the lead
18  banker for that client?
19  A.  No.
20  Q.  Do you know who was the person
21  with primary responsibility for the
22  relationship?
23  A.  I can't -- I have no idea.
24  Q.  Do you know if Nadine covered
25  Miami Dade schools?

Page 87

1  B. F. LIVOLSKI
2  A.  I couldn't say that she was the
3  primary banker.  It was probably Mike Baldwin,
4  but I -- but she very well could have been
5  part of the team.
6  Q.  Do you know if Nadine covered
7  Miami Dade Expressway Authority?
8  A.  She may have.
9  Q.  Do you know who was the lead
10  banker?
11  A.  I would envision that it was Norm
12  Pellegrini.
13  Q.  Do you know, are you guessing?
14  A.  I am guessing.
15  Q.  Do you know who the primary
16  relationship with Miami Dade Expressway
17  Authority was?
18  A.  Excuse me?
19  Q.  Do you know who had the primary
20  relationship with Miami Dade Expressway?
21  A.  I would make the assumption it was
22  Norm Pellegrini because he handled those
23  accounts for many years.
24  Q.  Do you know if Nadine covered the
25  City of North Miami?

Page 88

1  B. F. LIVOLSKI
2  A.  Can you are you repeat, please?
3  Q.  Do you know if Nadine covered the
4  City of North Miami?
5  A.  I don't know.
6  MR. BATTAGLIA:  Objection.
7  Q.  Do you know who had the primary
8  relationship of that client?
9  A.  I don't know.
10  Q.  Do you know if Nadine covered City
11  of North Miami CRA?
12  A.  I don't know.
13  Q.  Do you know who was the lead
14  banker for that client?
15  A.  I don't know.
16  Q.  Do you know who had the primary
17  relationship with that client?
18  A.  I don't know.
19  Q.  Do you know if Nadine covered
20  Broward County?
21  A.  She probably was involved in
22  Broward County, yes.
23  Q.  Do you know who was the lead
24  banker for Broward County?
25  A.  There I think it was Norm

Page 89

1   B. F. LIVOLSKI
2   Pellegrini.
3   Q.   Do you know who had the primary
4   relationship with Broward County?
5   A.   It would have been Norm
6   Pellegrini.
7   Q.   Do you know if Nadine covered the
8   City of Hollywood, Florida?
9   A.   I don't know.
10   Q.   Do you know who was the lead
11   banker for that client?
12   A.   I don't know.
13   Q.   Do you know who had the primary
14   relationship with that client?
15   A.   I don't know.
16   Q.   Do you know if Nadine covered the
17   City of Hollywood Beach CRA?
18   A.   I have no idea.
19   Q.   Do you know who was the lead
20   banker?
21   A.   I have no idea.
22   Q.   Do you know who had the primary
23   relationship with that client?
24   A.   No.
25   Q.   Do you know if Nadine covered

Page 90

1   B. F. LIVOLSKI
2   Orange County Expressway Authority?
3   A.   No.
4   Q.   Do you know who was the lead
5   banker for that?
6   A.   Norm Pellegrini.
7   Q.   Do you know who had the primary
8   relationship with that client?
9   A.   Norm Pellegrini.
10   Q.   Do you know if she covered
11   Pennbrook Pines, Florida?
12   A.   I don't know.
13   Q.   Do you know who was the lead
14   banker for that client?
15   A.   I don't know.
16   Q.   Do you know who had the primary
17   relationship with that client?
18   A.   I wouldn't know.  Most of these
19   clients, because they are irrelevant.
20   Q.   They are what?
21   A.   Irrelevant.
22   Q.   Why is that?
23   A.   Because they are small and
24   typically don't do a lot and, you know,
25   wouldn't be something that would hit my radar

Page 91

1   B. F. LIVOLSKI
2   screen.
3   Q.   What do you consider a lot?
4   A.   I would consider a client that was
5   in the market on at least an annual basis with
6   sizable transactions.  Miami Dade schools, MDX
7   may have been, Orange Orlando Expressway,
8   Broward County.  Miami Beach wouldn't be
9   considered that, Miami wouldn't be considered
10   that.
11   Q.   What do you mean by "sizable
12   transaction"?
13   A.   It could be a couple of hundred to
14   $500 million transactions.
15   Q.   The value of the transaction?
16   A.   The principal amount of the
17   transaction.
18   Q.   And is the principal amount of the
19   transaction tied to the revenue that Citi
20   generates from the transaction?
21   A.   It would be likely we get paid a
22   percentage of the principal amount.
23   Q.   Do you know if Nadine covered the
24   City of Atlanta?
25   A.   I am not sure.  Possibly.

Page 92

1   B. F. LIVOLSKI
2   Q.   Do you know who was the lead
3   banker for that client?
4   A.   Again, it would have been Guy
5   Logan.
6   Q.   Do you know who had the primary
7   relationship with that client?
8   A.   It would have been Guy Logan.
9   Q.   Do you know if Nadine covered Cobb
10   County Georgia?
11   A.   Possibly.
12   Q.   Do you know who the lead banker
13   was for that client?
14   A.   It would have been either Noga,
15   Ray Noga, Rick Paterson or Guy Logan.
16   Q.   Do you know who had the primary
17   relationship with that client?
18   A.   It would have been either one of
19   those three probably, Ray Noga.
20   Q.   Do you know if Nadine covered
21   Fulton County Georgia?
22   A.   I have no idea.
23   Q.   Do you know who was the lead
24   banker for that client?
25   A.   Ray Noga.

Page 93

1      B. F. LIVOLSKI
2    Q.   Do you know who had the primary
3  relationship with that client?
4    A.   Ray Noga.
5    Q.   Do you know if Nadine covered
6  Fulton County Recreational Development?
7    A.   I have no idea.
8    Q.   Do you know who was the lead
9  banker for that client?
10   A.   I would make an assumption it was
11 Guy Logan because he was responsible for
12 Atlanta.
13   Q.   Do you know who had the primary
14 relationship of that client?
15   A.   I think it would have been Guy
16 Logan for the same reason I just stated.
17   Q.   Do you know if Nadine covered
18 Virgin Islands Public Finance Authority?
19   A.   She has spent time there.
20   Q.   Do you know if she covered that
21 client?
22        MR. BATTAGLIA:  Objection.
23   A.   I would assume she did, yes.
24   Q.   Do you know what I mean when I say
25 "covered"?

Page 94

1      B. F. LIVOLSKI
2    A.   Well, you could define for me if
3  you like.
4    Q.   You have been answering the
5  questions, so in your mind what does that word
6  mean?
7    A.   Covered means being involved in an
8  account.
9    Q.   Okay.  Do you know who was the
10 lead banker for Virgin Islands Government
11 Public Finance Authority?
12   A.   I don't know for sure, but it
13 could very well have been James Haddon.  He
14 was the original relationship and I don't know
15 if he was still in public finance in '08.
16   Q.   If he was not in public finance in
17 '08, do you know who would be the lead banker
18 for that client?
19   A.   Nadine probably.
20   Q.   Do you know if Nadine covered
21 Virgin Islands Water and Power Authority?
22   A.   I would assume she covered
23 everything in the Virgin Islands.
24   Q.   Do you know if she was the lead
25 banker for anything in the Virgin Islands?

Page 95

1      B. F. LIVOLSKI
2    A.   I would assume she was the lead
3  banker if James Haddon wasn't in public
4  finance at that time.
5    Q.   And would she have been the
6  primary relationship with the Virgin Islands
7  if James Haddon wasn't there at the time?
8    A.   She probably would have been the
9  primary relationship.
10   Q.   Do you know if Nadine covered the
11 City of Detroit?
12   A.   She may have been part of a team
13 that covered Detroit.
14   Q.   Do you know who was the lead
15 banker for that client?
16   A.   If it wasn't Haddon, it was Guy
17 Logan.
18   Q.   And do you know who had the
19 primary relationship with that client?
20   A.   If it wasn't Haddon it was Guy
21 Logan.
22   Q.   Did you discuss any of these
23 clients when you spoke to Mr. Pellegrini?
24   A.   I don't recall.
25   Q.   Let me just finish asking the

Page 96

1      B. F. LIVOLSKI
2  question.
3    A.   I thought you had finished.
4    Q.   It is okay.  My voice makes me
5  stop sometimes.
6         Do you recall discussing any of
7  these clients with Mr. Pellegrini when you
8  were identifying Nadine for layoff?
9    A.   I don't recall discussing
10 individual clients like that.  I don't recall.
11   Q.   If you can flip over to the second
12 page.
13   A.   Okay.
14   Q.   Do you see the section entitled
15 "State of Connecticut"?
16   A.   Yes.
17   Q.   Do you know if Nadine covered any
18 clients for the State of Connecticut?
19   A.   Nadine --
20        MR. BATTAGLIA:  Objection.  You
21   may answer.
22   A.   Nadine was part of the team that
23 covered the State of Connecticut.
24   Q.   And so would she have covered GO?
25   A.   She would have been part of the



BARTLEY F. LIVOLSKI  
AMY BARTOLETTI vs CITIGROUP INC.

August 28, 2012  
101–104

Page 101

1          B. F. LIVOLSKI  
2 review the document?  
3    A.   I have, thank you.  
4    Q.   And have you seen this document  
5 before?  
6    A.   My lawyer showed it to me.  
7    Q.   And do you recall engaging in this  
8 e-mail exchange with Mr. Noga?  
9    A.   I don't recall.  
10    Q.   Do you have any reason to doubt  
11 that you did not?  
12    A.   That I did not?  
13    Q.   Engage in this e-mail exchange.  
14    A.   I have no reason to doubt that we  
15 did.  
16    Q.   Now Mr. Noga suggested closing the  
17 southeast group, correct, eliminating the  
18 southeast group?  
19    A.   According to this e-mail, yes.  
20    Q.   If I could direct your attention  
21 to your e-mail on the bottom of the first  
22 page, it is from you to Mr. Noga, Frank Chin  
23 to yourself, do you see it is right on the  
24 bottom of the page?  
25    A.   Yes, I see it.

Page 102

1          B. F. LIVOLSKI  
2    Q.   And you wrote:  
3        "Ray," because there is a word  
4 chopped off it says "I don't know what to say.  
5 Your suggestion is not a solution. Why don't  
6 you make a reasonable proposal."  
7        Why was Ray Noga's proposal  
8 unreasonable?  
9    A.   Well, first of all, you know Ray  
10 could express his opinion any way he wants.  
11 It really wasn't his job to, you know, offer  
12 up his idea of what should be done in the  
13 southeast region.  
14        And secondly, the reason that Norm  
15 and his team was hired initially wasn't  
16 because we wanted to take some of the burden  
17 off Ray Noga, it is that we wanted to perform  
18 in areas that historically in the southeast  
19 and in Florida we had not. Furthermore, it  
20 was to get Ray Noga to develop and work and  
21 grow the southwest region.  
22        So this -- to me this whole e-mail  
23 was the result of moving or trying to operate  
24 in a place like Texas, finding out it was  
25 harder than he thought it would be and trying

Page 103

1          B. F. LIVOLSKI  
2 to move back into an area that he had some  
3 comfort with. It was a preposterous proposal.  
4    Q.   What group was Rick Paterson in?  
5    A.   He was in the derivative group  
6 until -- my dates may be incorrect, but he  
7 moved back into the southeast group when we in  
8 effect unwound, you know, specific derivative  
9 people around the country. And it may have  
10 been '07, '08, I don't remember when that took  
11 place. So he moved back into the southeast  
12 group.  
13    Q.   Is there a document that would  
14 reflect when he was a member of the southeast  
15 group?  
16    A.   I am sure there is some employment  
17 record that would indicate when he became a  
18 direct report of Norm Pellegrini.  
19    Q.   Now the next sentence reads:  
20       "Rick's name surfaced because we  
21    need MD's."  
22        What did you mean by that?  
23    A.   Well, obviously thanks for  
24 pointing that out, it was obvious that, you  
25 know, when we were putting together a list,

Page 104

1          B. F. LIVOLSKI  
2 Frank was given a directive that if we  
3 could -- you know, if there are some MD's that  
4 could be offered up, put up we should try to  
5 do that. So that's what I meant by it.  
6    Q.   Is that the only directive you  
7 remember Frank Chin giving you?  
8        MR. BATTAGLIA: Objection.  
9    A.   I didn't remember that one.  
10    Q.   Does this refresh your  
11 recollection?  
12    A.   It does.  
13    Q.   And do you know why Frank Chin  
14 wanted MD's on the list?  
15        MR. BATTAGLIA: Objection. You  
16    may answer.  
17    A.   An assumption would be that it was  
18 the benefit of MD title reductions and salary  
19 income.  
20    Q.   What's the significance of the  
21 title reductions?  
22        MR. BATTAGLIA: Objection.  
23    A.   Well, the more -- the less MD's  
24 you have in a division, the assumption would  
25 be that there would be less of a pay package

