# EXHIBIT 20

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 2 of 16

NORMAN PELLEGRINI                                       July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                   53–56

Page 53

1  N. PELLEGRINI
2  Q. Were you familiar with her work
3  performance at all before she joined your
4  group?
5  A. Through discussions with my
6  colleagues at PaineWebber, yes.
7  Q. Who did you have discussions with
8  at PaineWebber about Ms. Mentor's performance?
9  A. I can't remember, but just senior
10 folks within the department.
11 Q. And what did they say about her?
12 A. She was good.
13 Q. Is that all they said?
14 A. She was good, very good. They
15 said she was good.
16 Q. That's it, good, very good?
17 A. Good.
18 Q. Did you ask about what clients she
19 covered?
20 A. No.
21 Q. Did you ask her what clients she
22 had?
23     MR. TURNBULL: Objection to form.
24 A. No.
25 Q. And someone told you she was very

Page 54

1  N. PELLEGRINI
2  good, so that was --
3  A. More than one.
4  Q. How many people said she was good?
5  A. I can't remember, but there was a
6  few.
7  Q. What's a few: four, five?
8  A. Three, four. I can't remember,
9  but it was more than one.
10 Q. And they all said the same thing,
11 that she was good?
12 A. She was good.
13 Q. And based on four, five people
14 telling you that she was good, you agreed to
15 take her on in your group?
16     MR. TURNBULL: Objection to form.
17 A. Including the department head,
18 yes.
19 Q. Did you ever hear anything
20 negative about her from anyone at PaineWebber?
21 A. No.
22 Q. Now, when she joined your group,
23 what was her position?
24 A. To the best of my recollection, it
25 was either associate or AVP, but I think she

Page 55

1  N. PELLEGRINI
2  was an AVP. One of the two.
3  Q. How long did you work with Nadine
4  when she was in your group?
5  A. From the time that she joined. I
6  mean, from the time that she relocated. I
7  mean, she -- yeah, from the time that she
8  relocated.
9  Q. Do you know how long that was?
10 A. What did we establish there in
11 terms of relocation?
12 Q. I'm not sure. You gave a few
13 dates, so.
14 A. Whatever it was. I mean, it's on
15 the record. That's a factual piece of data
16 you can get your hands on.
17 Q. When did you leave UBS?
18 A. June of 2005.
19 Q. What were Nadine's job duties when
20 she worked for your group at UBS?
21 A. Basically providing support to
22 bankers that were covering clients.
23 Q. What kind of support would she
24 provide?
25 A. Assisting them in processing

Page 56

1  N. PELLEGRINI
2  financings.
3  Q. What does that mean?
4  A. That means that you go through,
5  once you are hired you go through a certain
6  process of transacting business and she would
7  assist whoever, you know, she would assist
8  various bankers in transacting business.
9  Q. And is that true for whatever
10 position she held, either associate or AVP at
11 UBS?
12 A. Yes.
13 Q. And what was her work performance
14 like when you worked with her at UBS?
15 A. It was fine.
16 Q. It was just fine?
17     MR. TURNBULL: Objection.
18 A. There were no complaints.
19 Q. Did you have any complaints?
20 A. No.
21 Q. Was she doing an excellent job
22 there?
23 A. In her role she was doing a good
24 job.
25 Q. Did you ever give her, evaluate

Page 57
1        N. PELLEGRINI
2   her performance at UBS?
3       A.   I'm sure I did.
4       Q.   And are the evaluations based on a
5   numerical scale?
6       A.   I can't remember.
7       Q.   When you evaluated her, did you
8   record that she simply met expectations?
9       A.   I can't remember.  I can't
10  remember, but they were not poor evaluations.
11  I can remember that, but I just can't remember
12  what I evaluated her at.
13      Q.   Did she meet your expectations?
14      A.   Yes.
15      Q.   Did she exceed your expectations?
16      A.   We're talking about at UBS?
17      Q.   Yes.
18      A.   I can't remember.
19      Q.   What clients did she provide
20  support on at UBS?
21      A.   Wherever she was needed.
22      Q.   Were there any specific clients
23  she worked on?
24      A.   She worked with bankers who
25  covered specific clients.  We have an office

Page 58
1        N. PELLEGRINI
2   in south Florida and she worked with that
3   banker.
4       Q.   When you say cover, what do you
5   mean by cover?
6       A.   Have responsibility for as a, you
7   know, as a senior banker.
8       Q.   Did she ever cover any clients by
9   herself at UBS?
10      A.   Not to my knowledge, no.  Not that
11  I can remember by herself.
12      Q.   Did she cover the State of
13  Connecticut while at UBS?
14      A.   She may have prior to relocating
15  to Florida, but I can't remember what group
16  she was in, but that may be one of the clients
17  that she covered.
18      Q.   Did she cover Broward County while
19  at UBS?
20      A.   She didn't, she assisted -- she
21  worked on Broward County accounts when she was
22  in my group.
23      Q.   Did she have any clients of her
24  own?
25      A.   At UBS?

Page 59
1        N. PELLEGRINI
2       Q.   Yes.
3       A.   No.
4       Q.   Did you have any clients of your
5   own?
6       A.   Yes.
7       Q.   Who?
8       A.   That I was responsible for,
9   Orlando-Orange County Expressway Authority.
10      Q.   I'm sorry?
11      A.   Orlando-Orange County Expressway
12  Authority.
13      Q.   Is that one client?
14      A.   That's one client.  I was
15  responsible for all clients as manager of the
16  franchise.
17      Q.   Well, what does responsible mean?
18      A.   Wherever I could assist in helping
19  originate business and getting us hired, I
20  would do that.
21      Q.   Now, when you mean originate
22  business, do you mean originate transactions?
23      A.   Correct.  And what I mean by
24  originating transactions is, being engaged by
25  the entity to represent them, the same way

Page 60
1        N. PELLEGRINI
2   that you would as a lawyer.
3       Q.   Now, whose client was the
4   Orlando-Orange County Expressway Authority?
5       A.   Mine.
6       Q.   So when you say -- what do you
7   mean -- you said you were responsible for it?
8       A.   Right.  I was the lead banker in
9   terms of representing PaineWebber as far as
10  transacting their business.  We were hired and
11  I was responsible for that particular client.
12           Now, we had a team of people on
13  there because we just wanted to make sure that
14  the platform and all resources, that the
15  platform was brought to the table on behalf of
16  our client.
17      Q.   Did anyone else at UBS get to
18  claim that the Orlando-Orange County
19  Expressway Authority was their client as well?
20      A.   My other team member who I had who
21  wasn't as senior as me was Jim Calpin.
22      Q.   Could he claim that this entity
23  was his client as well?
24      A.   He could claim that, but in the
25  final analysis, you know, the client moved



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 4 of 16

NORMAN PELLEGRINI                                         July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                      65–68

Page 65

1  N. PELLEGRINI
2  that's something they have to finance it
3  first, so they hire us to come in and
4  structure a financing to get the funding to
5  build the school project or this airport or
6  this runway or this segment of a toll road.
7     Q.   So the key is to get hired?
8     A.   Yes.
9     Q.   Because you don't do this for
10 free?
11    A.   That's correct.
12    Q.   So it is important to generate
13 business from the client to solve whatever
14 problems they have?
15    A.   That is correct.
16    Q.   That's an important part of your
17 business, correct?
18    A.   It is, yes.
19    Q.   It is the only thing keeping you
20 in business, correct?
21    A.   That's right, yeah.
22         Can I take a break?  Is that
23 possible?
24         MR. DATOO:  Absolutely, yes.
25         THE VIDEOGRAPHER:  It is a good

Page 66

1  N. PELLEGRINI
2  time to change the disk.  We are now
3  going off the record at approximately
4  10:53 and this will be the end of disk
5  No. 1.
6     (Recess taken.)
7         THE VIDEOGRAPHER:  This is the
8  beginning of disk No. 2 in the
9  Pellegrini deposition.  We are now going
10 back on the record approximately 11:06
11 a.m.
12 BY MR. DATOO:
13    Q.   Now, I think I already asked you
14 this question before, but did Nadine cover
15 Broward County while at UBS?
16    A.   She worked on Broward County, a
17 Broward County transaction, I think.
18    Q.   In the same role that she worked
19 on other clients?
20    A.   In a support role.
21    Q.   Now, you testified earlier that
22 Nadine was not in a revenue-generating
23 position at UBS, is that correct?
24    A.   Correct.
25    Q.   Why is that?

Page 67

1  N. PELLEGRINI
2     A.   The way that the department was
3  structured was that it was supported by
4  analysts and associates, and they were not
5  considered officers of the company, and once
6  you became an officer, then there were revenue
7  expectations associated with that.
8     Q.   I believe you also testified
9  earlier that you weren't sure if Nadine was an
10 associate or an assistant vice president, an
11 AVP?
12    A.   Correct.  My recollection at
13 PaineWebber is that, in order to have, to be
14 considered an officer, it was, I think it was
15 vice president and above.  I don't think it
16 was -- yeah, vice president and above.  Right.
17         At that point you could sign
18 documents.  You were authorized to sign
19 documents on behalf of the firm.
20    Q.   And you had revenue generation
21 expectations?
22    A.   I can't remember if it was vice
23 president or first vice president.  If it was
24 vice president, it was -- the expectations
25 weren't that great.

Page 68

1  N. PELLEGRINI
2     Q.   What does the term developed
3  business mean to you?
4     A.   Business that, in the law world, a
5  house account.
6     Q.   I'm sorry?  I just didn't hear
7  you.
8     A.   In your world, it would be an
9  account you have in the law firm.
10    Q.   How about in your world?
11    A.   Business that, clients that we
12 represent, that you are responsible for
13 representing.
14    Q.   How does the term developed fit
15 into that?
16    A.   Similar to your world where you
17 bring in a client, the client becomes -- is a
18 client of the firm, you are responsible for
19 representing the client, you developed that
20 business, you brought that client in, it is
21 the firm's client but it is also your client,
22 so that's what I mean by developed business.
23    Q.   So someone bringing in a client --
24    A.   And representing them.
25    Q.   And representing them.  So it's

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 5 of 16

NORMAN PELLEGRINI                                          July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                      97–100

Page 97

1     N. PELLEGRINI
2  McCarthy is?
3     A.  No.
4     Q.  Have you ever worked with the
5  diversity committee?
6     A.  No.
7     Q.  Do you know what it does?
8     A.  No.
9     Q.  Have you ever heard of a saying at
10 Citigroup that if there is a layoff, it's
11 women and children first?
12    A.  No.
13    Q.  Have you ever heard a similar
14 saying in sum and substance?
15        MR. TURNBULL:  Objection to form.
16    A.  No.
17    Q.  When did Nadine Mentor start
18 working at Citigroup?
19    A.  It was either June or July of
20 2005.
21    Q.  So she came over about a month or
22 two after you started?
23    A.  I don't think it was that long.  I
24 can't remember, but it was probably was in a
25 month or a couple of weeks or three weeks,

Page 98

1     N. PELLEGRINI
2  or -- yeah.
3     Q.  Did you recruit anybody else from
4  UBS --
5     A.  Yes.
6     Q.  -- in addition to Nadine?
7     A.  Yes.
8     Q.  Who?
9     A.  Mark Weinberg.
10    Q.  Anyone else?
11    A.  Michael Baldwin.
12    Q.  Anyone else?
13    A.  Linda Vanderpere.
14    Q.  I'm sorry, what was that name,
15 Linda --
16    A.  Vanderpere, V-A-N-D-E-R-P-E-R-E.
17    Q.  Who was Linda Vanderpere?
18    A.  She was at UBS.  She worked in my
19 group out of New York.
20    Q.  What was her job title at UBS?
21    A.  I think Linda was a director.
22    Q.  And did you recruit Linda to work
23 in your group at Citigroup?
24    A.  Yes.  She -- well, she was going
25 to be in New York assigned to my group, and

Page 99

1     N. PELLEGRINI
2  also do some Northeast work.
3     Q.  And do some what?
4     A.  Work in the Northeast group.
5     Q.  And when did Linda Vanderpere
6  start working at Citigroup?
7     A.  She did not.  She declined to
8  come.
9     Q.  She stayed at UBS?
10    A.  She did.
11    Q.  And when did Mr. Weinberg start
12 working at Citigroup?
13    A.  About the same time that Nadine
14 came over.
15    Q.  And how about Mr. Baldwin?
16    A.  He -- a couple of weeks, three
17 weeks before Nadine.  I can't remember exactly
18 when, but it was mid-June 2005.
19    Q.  And you recruited all three of
20 them?
21    A.  Yes.
22    Q.  And when Nadine started working at
23 Citigroup, what was her position?
24    A.  VP, I think.  I think that was a
25 requirement of bringing -- her coming over,

Page 100

1     N. PELLEGRINI
2  not a requirement but I think she wanted to be
3  vice president in order to come over.  I think
4  that was the case.
5         MR. TURNBULL:  Are you all right?
6         THE WITNESS:  Yeah, I'm okay.  I
7     may want a break in ten minutes or so.
8         MR. DATOO:  Do you want to take a
9     minute?
10        THE WITNESS:  No, I'm fine.
11    Q.  So Nadine wanted to be a VP, that
12 was part of her requirement to work for
13 Citigroup?
14    A.  I think that was the case, if I
15 remember correctly.
16    Q.  Now, I think you testified earlier
17 that you wanted Nadine to work for you at
18 Citigroup because she had great potential as
19 support?
20    A.  She just had great potential
21 period.
22    Q.  So you saw potential in her to
23 develop business?
24    A.  Yes.
25    Q.  To generate transactions?

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 6 of 16

NORMAN PELLEGRINI                                           July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                     105–108

Page 105

```
 1              N. PELLEGRINI
 2     A.   I made the decision and
 3  recommended to Frank, so I don't know.
 4     Q.   Did you tell Frank that you were
 5  hiring her?
 6     A.   No. I asked Frank to hire her.
 7          Let me clarify that just quickly.
 8  A condition of me coming over was that certain
 9  people within my group at UBS would have the
10  opportunity to come with me. Nadine was one
11  of those people. Linda Vanderpere was one of
12  those people. Mike Baldwin was one of those
13  people. Mark Weinberg was one of those
14  people.
15          If they decided they didn't want
16  to come, that was their decision, but I made
17  it a requirement that they have the
18  opportunity. Period. End of statement.
19     Q.   Do you recall what Nadine's
20  compensation was in her first year at
21  Citigroup?
22     A.   I think it was north of 400,000
23  total.
24     Q.   Do you know what her base salary
25  was?
```

Page 106

```
 1              N. PELLEGRINI
 2     A.   I can't remember.
 3          MR. TURNBULL: Why don't we take a
 4     5-minute break?
 5          MR. DATOO: Sure.
 6          THE WITNESS: Thank you.
 7          THE VIDEOGRAPHER: We are now off
 8     the record approximately 11:56 a.m.
 9          (Recess taken.)
10          (Plaintiffs' Exhibit 379,
11          CGMI_BART 013427 and 013444 marked
12          for identification, as of this
13          date.)
14          THE VIDEOGRAPHER: We are now
15     going back on the record approximately
16     12:08 p.m.
17  BY MR. DATOO:
18     Q.   Mr. Pellegrini, you have in front
19  of you a document, a two-page document that's
20  been marked as Plaintiffs' Exhibit 379. It
21  contains the first page which is Bates stamped
22  CGMI_BART 013427 and the second page is marked
23  013444.
24          MR. TURNBULL: I just want to note
25     for the record that, although you said
```

Page 107

```
 1              N. PELLEGRINI
 2     it is a two-page document, it is two
 3     pages, I don't think it's from the same
 4     document.
 5     Q.   Mr. Pellegrini, have you seen this
 6  document or these two pages before?
 7     A.   I can't remember.
 8     Q.   Can you take a look at the first
 9  page.
10     A.   Yes.
11     Q.   Are these accounts that Nadine
12  covered while at Citigroup?
13     A.   Based upon my recollection, yes,
14  these were accounts that she was -- she
15  covered along with other team members.
16     Q.   She was part of a team?
17     A.   Correct.
18     Q.   Did the team vary for each client?
19     A.   Yes.
20     Q.   If you can take a look at the
21  second page.
22     A.   Yes.
23     Q.   Is this a list of clients that
24  Nadine covered while at Citigroup?
25     A.   Along with others, as a team
```

Page 108

```
 1              N. PELLEGRINI
 2  member.
 3     Q.   Now, do you know if there are any
 4  clients that she covered that are not on
 5  either of these two pages?
 6     A.   I can't remember.
 7     Q.   Now, does a team have a set
 8  compensation?
 9     A.   No.
10     Q.   And how do you determine who works
11  on a team to cover a client?
12     A.   Whoever has a relationship or
13  technical skill that can contribute.
14     Q.   So a team could consist of one
15  person or more?
16     A.   More.
17     Q.   Did Nadine cover any of these
18  clients by herself?
19     A.   I can't remember. I don't think
20  so.
21     Q.   How about Broward County, did she
22  cover that by herself?
23     A.   No.
24     Q.   How about Miami-Dade County, did
25  she cover that by herself?
```

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 7 of 16

NORMAN PELLEGRINI                                            July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                    109–112

Page 109

1    N. PELLEGRINI
2    A.    Miami-Dade County is a rotational
3    account.
4    Q.    A what account?
5    A.    Rotational account. Which means
6    that pretty much every firm on Wall Street is
7    in their rotation. So they just go through
8    the rotation, and that particular account she
9    may have covered it by herself. But I can't
10   remember specifically. I don't think so. I
11   think it was Todd Holder covered that with
12   her.
13   Q.    How about Miami-Dade schools, did
14   Nadine cover that account by herself?
15   A.    Definitely not.
16   Q.    Who else covered that with her?
17   A.    Mike Baldwin.
18   Q.    Is that because Mike Baldwin
19   primarily covered schools?
20   A.    Pretty much our school practice,
21   yes.
22   Q.    So why would Nadine team with Mike
23   to cover Miami-Dade schools?
24   A.    Because it was in South Florida.
25   Q.    Solely by geography?

Page 110

1    N. PELLEGRINI
2    A.    Yes.
3    Q.    Did she have any relationships at
4    Miami-Dade schools?
5    A.    Not that I'm aware of.
6    Q.    Did she cover it for technical
7    skills?
8    A.    It was strategic as much as
9    anything else.
10   Q.    What do you mean by that?
11   A.    We were at some point hoping to
12   open a South Florida office and relocate
13   Nadine. She had, you know, she had the south
14   Florida area.
15   Q.    So you wanted her to build a
16   relationship with the schools?
17   A.    We were hoping to, for that to
18   happen.
19   Q.    Did she build a relationship with
20   the schools before she was laid off?
21   A.    I don't -- I don't know.
22   Q.    Did Nadine cover Miami-Dade
23   Expressway Authority by herself?
24   A.    No.
25   Q.    Did she cover any of the Virgin

Page 111

1    N. PELLEGRINI
2    Islands accounts by herself?
3    That would be on the second page.
4    A.    She covered them with Jim Haddon.
5    I can't remember whether or not Jim was still
6    with us or not.
7    Q.    Who was Jim Haddon?
8    A.    He was a managing director at
9    Citi.
10   And I can't remember; she may have
11   covered it with Guy Logan who was a director.
12   Q.    Do you know when Jim Haddon left?
13   A.    I don't. I can't remember.
14   Q.    Was Jim Haddon a part of your
15   group?
16   A.    No.
17   Q.    What group was he a part of?
18   A.    He ran the infrastructure group --
19   co-headed the infrastructure group.
20   Q.    So if Jim left before Nadine,
21   would Nadine have covered the Virgin Islands
22   accounts by herself?
23   MR. TURNBULL: Objection to form.
24   A.    Unless guy covered it with her.
25   Q.    Why would guy -- Guy Logan are you

Page 112

1    N. PELLEGRINI
2    referring to?
3    A.    Yes.
4    Q.    Why would Guy --
5    A.    I think he had some relationships
6    there. I think. I'm having a hard time
7    remembering whether he was -- I know he had
8    some relationships there. I can't remember
9    whether he was covering with her or with Jim
10   or whether Jim left. It's the time frame.
11   Q.    Now, with respect to, going back
12   to the first page, Miami-Dade County?
13   A.    Yes.
14   Q.    Whose client was that?
15   A.    That was, I think I just explained
16   that to you. That was a rotational account.
17   So Nadine was on the team and Todd Holder from
18   what I can remember.
19   Q.    Well, who brought in the client?
20   A.    They submitted an RFP, we got
21   selected and that was it.
22   Q.    And so Miami-Dade County is
23   developed business for Nadine?
24   A.    Miami-Dade County is a rotational
25   account. She was assigned to it, to help

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 8 of 16

NORMAN PELLEGRINI
AMY BARTOLETTI vs. CITIGROUP
July 10, 2012
121–124

Page 121

1     N. PELLEGRINI
2     A.   And the reason I considered --
3     Q.   Mr. Pellegrini, let me finish.
4     A.   Um-hum.
5     Q.   You just testified that you
6  considered it developed business for you.  And
7  then you testified that it wasn't because you
8  didn't do a transaction.
9         So my question to you is, why
10 wasn't it considered developed business for
11 Nadine but it was considered developed
12 business for you?
13        MR. TURNBULL:  Objection to form.
14    A.   Because I did a transaction.
15    Q.   How about prior to 2008?
16    A.   There were no transactions to do.
17    Q.   But did you still consider it
18 developed business to you between '05 and '08?
19    A.   Yes.
20    Q.   But you didn't do any transactions
21 for it, correct?
22    A.   But I felt if they did a
23 transaction, I would do it.
24    Q.   And would Nadine have done it?
25    A.   I don't know.

Page 122

1     N. PELLEGRINI
2     Q.   Was she on the team?
3     A.   Yes.
4     Q.   So she would have done the
5  transaction with you, correct?
6         MR. TURNBULL:  Objection to form.
7     A.   Maybe; maybe not.
8     Q.   Well, she was on the team,
9  correct?
10    A.   Yes.
11        MR. TURNBULL:  Objection:  asked
12    and answered.
13    Q.   She was on the team, correct?
14    A.   Yes.
15    Q.   Why wouldn't she have done it?
16        MR. TURNBULL:  Objection to form.
17    A.   Who knows if she would have been
18 there.
19    Q.   Well, she was there from '05 to
20 '08, correct?
21    A.   We also had another member on that
22 team.
23    Q.   So Nadine may not have been on,
24 you would have taken her off the team?
25    A.   I didn't say that.

Page 123

1     N. PELLEGRINI
2     Q.   So why wouldn't she have worked on
3  the transaction?
4         MR. TURNBULL:  Objection.
5     A.   She may not have wanted to.
6     Q.   She may not have wanted to.
7     A.   I don't know.
8     Q.   Okay, thank you.  Mr.
9  Pellegrini --
10    A.   Right.
11    Q.   -- City of North Miami was that
12 considered developed business for Nadine?
13    A.   We didn't do any business for the
14 City of North Miami, end of story.
15    Q.   Was it considered developed
16 business for anybody?
17    A.   We didn't do any business.  How
18 can it be considered --
19    Q.   Mr. Pellegrini, you have got to
20 answer my question.  You have to answer my
21 question, otherwise you are going to miss your
22 dinner appointment --
23    A.   I'm sorry.
24    Q.   -- which I want to get you to.
25    A.   Okay, okay.

Page 124

1     N. PELLEGRINI
2     Q.   But you've got to answer my
3  question.
4     A.   I'm just a little frustrated,
5  that's all.  Sorry.
6     Q.   So am I.
7         City of North Miami, was that
8  considered developed business for Nadine?
9     A.   No.
10    Q.   Why not?
11    A.   Because we didn't do any business.
12    Q.   Was it considered developed
13 business for anybody?
14    A.   No.
15    Q.   City of North Miami CRA was that
16 considered developed business for Nadine?
17    A.   No.
18    Q.   Why not?
19    A.   Because we never did any business.
20    Q.   Was that considered developed
21 business for anybody?
22    A.   No.
23    Q.   Broward --
24        (Discussion off written record.)
25    Q.   Broward County, was that



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 9 of 16

NORMAN PELLEGRINI                                         July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                   125–128

Page 125

N. PELLEGRINI

1  considered developed business for Nadine?
2  A. I'm sorry, which one?
3  Q. Broward County.
4  A. Nadine -- I would say yes.
5  Q. And why is that?
6  A. Because she covered Broward County.
7  Q. Did she cover it as part of the team?
8  A. Yes.
9  Q. Why was that considered developed business to her, though?
10 A. It was also considered developed business for other members of the team.
11 Q. Why was it considered developed business to her, though?
12 A. Because she spent time there, did a good job and there was business to do. That's the reason why.
13 Q. And did Citigroup do any transactions for Broward County while Nadine was employed?
14 A. Did we do any transactions while she was employed? Technically, no.

Page 126

N. PELLEGRINI

1  Q. So there were no transactions done for Broward County?
2  A. There were.
3  Q. While Nadine was employed?
4  A. Technically, no.
5  Q. What do you mean "technically, no"?
6  A. I think Nadine wasn't employed when we did the transaction.
7  Q. So why was it considered developed business for Nadine?
8  A. Because we were appointed, recommended -- we were being recommended on a transaction that she was involved in covering.
9  Q. And was this the deal worth approximately $180 million?
10 A. What type?
11 MR. TURNBULL: Objection to the form.
12 Q. The summer of --
13 A. But what kind of deal was it?
14 Q. What deal did you do for Broward County?
15 A. Then? It was a water and

Page 127

N. PELLEGRINI

1  wastewater.
2  Q. And when was that?
3  A. It was in late 2008 as I recall.
4  Q. And was that deal a result of --
5  A. No, it was 2009 I apologize. I can't remember, but it was within the time frame.
6  Q. Was that while Nadine was still working there?
7      MR. TURNBULL: Objection: asked and answered.
8  A. We were being -- she was -- we were being recommended by the staff, but it hadn't been approved by the board, but when the recommendation was made, I think Nadine was still working with us, yes.
9  Q. And was it considered developed business for her because of her efforts?
10 A. Yes.
11 Q. Would Broward County -- did Broward County follow her out the door when she left?
12 A. No.
13 Q. So under one of your definitions

Page 128

N. PELLEGRINI

1  of developed business, why did you consider it developed business for Nadine if it didn't follow her out the door?
2  A. Because she was -- she had a role in originating that business.
3  Q. So now does developed business also mean having a role in generating business?
4      MR. TURNBULL: Objection to form.
5  A. No. I think there are two definitions, if I may.
6  Q. Please.
7  A. One is if they follow you out the door, and what impact it would have if you left and -- you know, on your business in general.
8      In the final analysis, it didn't have that big an impact on us because we were able to do the business.
9  Q. And what was the second definition of developed business?
10 A. The impact it would have on our whole, on our business if someone left.
11 Q. But all of this is tied to someone

Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 10 of 16

NORMAN PELLEGRINI                                          July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                    165–168

Page 165

1        N. PELLEGRINI
2  Holder he was a director and senior person
3  with us, who they both covered Miami-Dade
4  together. So I would say given that
5  rotational thing, I would say, you know,
6  that -- I mean, that would be it.
7     Q.   How about Broward County?
8     A.   Which one?
9     Q.   Both of them.
10    A.   Broward County School District,
11 School Board?
12    Q.   Yes.
13    A.   No.
14    Q.   Didn't you testify earlier that
15 Broward County was considered developed
16 business for Nadine?
17         MR. TURNBULL: No, that misstates
18     testimony. Objection.
19    A.   Broward County and Broward County
20 School Board are two separate entities.
21    Q.   Okay. Was Nadine involved in a
22 transaction with the Virgin Islands in 2008?
23    A.   I don't know if she was involved
24 in -- I don't know if it was that time frame.
25 I know she covered the Virgin Islands, and we

Page 166

1        N. PELLEGRINI
2  talked about that.
3     Q.   Did your group, was your group
4  involved in a $400 million transaction
5  involving the Virgin Islands in 2008?
6     A.   My group?
7     Q.   Yes.
8     A.   Not my group, no.
9     Q.   Was any group involved with a
10 transaction with the Virgin Islands in 2008?
11    A.   Citi may have done a deal in, you
12 know, that's possible we did a deal in 2008.
13    Q.   Do you know if Nadine was involved
14 in that deal before she left?
15         MR. TURNBULL: Objection to form.
16    A.   I don't know. I don't know. I
17 don't know if we did one or not. I can't
18 remember.
19         (Discussion off the record.)
20    Q.   Just looking at the document, the
21 third transaction from the top?
22    A.   Yes. Which one, now, which
23 document, 397?
24    Q.   397.
25    A.   Okay.

Page 167

1        N. PELLEGRINI
2     Q.   Where it says Connecticut, State
3  of General Obligation Bond 308, do you see
4  that under the transaction column?
5     A.   Yes.
6     Q.   The figure associated with that
7  transaction, is that 2 billion 276 million
8  578 -- what number is that?
9     A.   $2,276,578,269?
10    Q.   Is that --
11    A.   That was the size of the
12 transaction.
13    Q.   Is that considered -- was that one
14 of the largest transactions for the group in
15 2008?
16    A.   Well, this was the Northeast group
17 that did this -- yeah, I would say it was one
18 of the largest ones, yeah, absolutely. And we
19 were co-manager on that as you see. You can
20 see the revenue generated from it was actually
21 less than where we acted as senior manager on
22 some of the other ones.
23         THE WITNESS: Do you want to
24    change that now?
25         MR. DATOO: Sorry. Let's go off

Page 168

1        N. PELLEGRINI
2     the record.
3         THE VIDEOGRAPHER: Off the record
4     at approximately 2:08 p.m. This is the
5     end of disk No. 3.
6         (Recess taken.)
7         THE VIDEOGRAPHER: This is the
8     beginning of disk No. 4. We're going
9     back on the record approximately 2:18
10    p.m.
11 BY MR. DATOO:
12    Q.   Mr. Pellegrini, if I can direct
13 your attention to Plaintiffs' Exhibit 397.
14    A.   Yes.
15    Q.   In the column marked Staffing,
16 Product Groups and Regions, do you see that?
17    A.   Yes.
18    Q.   There are a list of names of
19 people who are involved in the transaction,
20 correct?
21    A.   Yes.
22    Q.   There appears to be an asterisk or
23 a star next to some of the names. Do you know
24 what that designates?
25    A.   My understanding is that



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 11 of 16

NORMAN PELLEGRINI  July 10, 2012
AMY BARTOLETTI vs. CITIGROUP  209–212

Page 209

1  N. PELLEGRINI
2  Q. She was vice president, Nadine was
3  a vice president for the calendar year 2007,
4  correct?
5  A. I think so.
6  Q. Now, if you can turn to the second
7  page.
8  A. Yes.
9  Q. In the box entitled Manager
10 Comments.
11 A. Yes.
12 Q. Do you see that?
13 A. Yes.
14 Q. And do you, if I can direct your
15 attention to the second sentence:
16      "We are very pleased with this
17 progression and Nadine is on course to
18 becoming one of the top public finance
19 professionals at the firm."
20      Did you write that?
21 A. Yes.
22 Q. Was that true when you wrote it?
23 A. Yup.
24 Q. Is every statement in this
25 evaluation true?

Page 210

1  N. PELLEGRINI
2  A. Yeah.
3     MR. TURNBULL: By him?
4  A. By me.
5     MR. TURNBULL: Is that what you
6  meant?
7     MR. DATOO: Yes.
8  A. By me.
9  Q. Is there anyone else who commented
10 in this evaluation?
11 A. On this one?
12    MR. TURNBULL: Nadine.
13 A. Nadine.
14 Q. Sorry, just under --
15    MR. DATOO: Anything he knows.
16 Q. Was there anyone other than Nadine
17 and you that wrote on this evaluation?
18 A. No, this was me.
19 Q. Now, when you said in that
20 sentence "we," who did you mean by we?
21 A. I, you know, I refer to my group
22 in the plural, you know, we. We as a group,
23 we as -- yeah.
24 Q. Now you said Nadine, you also said
25 Nadine is on course for becoming one of the

Page 211

1  N. PELLEGRINI
2  top public finance professionals at the firm.
3     Were you referring to all of the
4  professionals in the PFD?
5  A. I'm trying to think back.
6     Yeah, I think so.
7  Q. And you go on to write:
8     "This is demonstrated by the
9  respect she has earned by her client base."
10    Nadine had a client base?
11 A. Well, the clients that she, you
12 know, we went through where she had the
13 asterisks and who she was responsible for, and
14 they liked her.
15 Q. So based on her client base, you
16 came to the determination that she was on
17 course to becoming one of the top public
18 finance professionals at Citigroup?
19 A. That's one of the aspects.
20 Q. Okay.
21 A. Her attitude, her energy, her
22 interpersonal skills.
23 Q. If you can turn to the page marked
24 719.
25 A. Yes.

Page 212

1  N. PELLEGRINI
2  Q. If you look at the box marked
3  Manager Comments. Do you see that?
4  A. Yes.
5  Q. You wrote in the second sentence:
6     "She has had several successes
7  such as the City of Hollywood CRA financing,
8  Miami-Dade County SRE financing, Miami-Dade
9  school financing --
10 A. Um-hum.
11 Q. -- as well as taking the
12 leadership role of the Virgin Islands WAPA
13 financing when asked to do so."
14 A. Um-hum.
15 Q. What did you mean when you wrote
16 Nadine had several successes with respect to
17 these clients?
18 A. Well, she was an integral part of
19 the team and she deserved credit for the
20 success that we had in representing those
21 clients.
22 Q. Turn to the last page of the
23 document.
24 A. Yup.
25 Q. You rated Nadine a 1 which is



Case 1:10-cv-07820-LGS  Document 59-20  Filed 06/07/13  Page 12 of 16

NORMAN PELLEGRINI
AMY BARTOLETTI vs. CITIGROUP
July 10, 2012
213–216

Page 213

N. PELLEGRINI
1
2  exceptional, correct?
3     A.  Correct.
4     Q.  That's the highest rating you can
5  give someone, correct?
6     A.  Correct.
7     Q.  Under part 3 in the box marked
8  Manager Overall Comments, you wrote:
9         Nadine has made great progress
10 this year. In recognition of this Nadine will
11 be assuming a much higher level of
12 responsibility in the new year."
13        What did you mean by Nadine will
14 be assuming a much higher level of
15 responsibility in the new year?
16    A.  Just what it says, she was going
17 to go to the next level as far as professional
18 development so.
19    Q.  And what was the next level?
20    A.  I recommended her for promotion to
21 director.
22    Q.  Why?
23    A.  For a couple -- well, one was
24 because of her past performance, but because
25 of additional responsibility she was willing

Page 214

N. PELLEGRINI
1
2  to assume.
3     Q.  What were those additional
4  responsibilities?
5     A.  She was going to become a member
6  of, for lack of a better term, this new team
7  that was going to be developed to cover big
8  cities through the country, she was going to
9  be traveling more. And in recognition of that
10 and her willingness to take on that
11 responsibility with a very good attitude I
12 just made up my mind, you know, that she was
13 to be promoted because she was going to be,
14 you know, dealing with some high level public
15 officials, and she had -- in retrospect, it
16 may have been a mistake, maybe one year early,
17 but I felt that it was deserving based upon
18 her willingness to do that. And, you know,
19 just a good attitude in the past in terms of
20 being -- you know, and she developed very
21 nicely. And as a vice president she was
22 coming along.
23        You know, I have always kind of
24 questioned whether or not I should have done
25 that, but only because she may have been able

Page 215

N. PELLEGRINI
1
2  to use one more year development as a vice
3  president, but given that new responsibility,
4  I thought it would be a positive -- something
5  positive that she would grab ahold of and
6  that's why I recommended her.
7     Q.  Was there a concern at the time
8  you promoted her about the amount of developed
9  business she had?
10    A.  I mean, she could have had more.
11    Q.  Is there a reason why you didn't
12 note that in her 2007 evaluation?
13    A.  No.
14    Q.  You just didn't put it in?
15    A.  It could have been viewed as a
16 negative.
17    Q.  Do you only put positive things in
18 people's evaluations?
19    A.  In this case I did because of what
20 she was being asked to do.
21    Q.  So the exceptional rating you gave
22 her wasn't truthful, was it?
23    A.  It was truthful. Remember, this
24 was as a vice president and it was truthful.
25    Q.  Right. As a vice president, was

Page 216

N. PELLEGRINI
1
2  there any concern with the amount of developed
3  business she had?
4     A.  Not as a vice president, no.
5     Q.  And you recommended her for
6  promotion early, didn't you?
7     A.  I did.
8     Q.  Is it rare for someone to be
9  promoted early to a director?
10        MR. TURNBULL: Objection.
11    A.  I don't know. I really don't.
12    Q.  Well, how long does it usually
13 take for someone to get promoted from VP to
14 director?
15    A.  It depends.
16    Q.  What does it depend on?
17    A.  How well the person develops.
18    Q.  So if they develop well, they get
19 promoted earlier?
20    A.  On schedule, usually.
21    Q.  What's the schedule?
22    A.  Three, four years.
23    Q.  And she was promoted after 2-1/2
24 years, correct?
25    A.  She also came in, yeah, she also

Page 217

1  N. PELLEGRINI
2  came -- and she wasn't even an AVP at UBS for
3  two years. I mean, I think, if I remember
4  correctly, it was shorter than that.
5  Q. So that's a good thing for her,
6  isn't it, being promoted that early?
7  A. That was a condition of her coming
8  over to Citi that she wanted to be a VP.
9  Q. But being promoted to director was
10  not a condition of her coming over, was it?
11  A. Oh, no.
12  Q. Now, as a director, what were her
13  job duties?
14  A. At that point, you know, you have
15  more responsibility in terms of bringing in
16  business. You are out there more alone. You
17  are out there in a leadership role.
18  Q. Did you ever have a conversation
19  with Nadine prior to promotion about the
20  amount of developed business she had?
21  A. In my recollection I had a
22  conversation with her. I'm not sure it was
23  like, specifically about the amount of
24  developed business she had.
25  Q. What was the conversation about?

Page 218

1  N. PELLEGRINI
2  A. That, look, this was to be a new
3  role, that there were going to be new things
4  that, you know, their expectations were going
5  to be higher, and that, you know, she's going
6  to be -- you know, with this new title comes
7  accountability, accountability as far as being
8  able to generate the business and do the
9  business and keep the business. It is
10  basically another level -- it is another
11  level. It is a leadership level.
12  Q. And at the time she was promoted,
13  how much developed business did she have?
14  A. Just what we went over.
15  Q. When we say developed business,
16  are we talking dollar value, are we talking
17  number of clients, number of transactions,
18  what do we mean?
19  MR. TURNBULL: Objection to form.
20  A. It wasn't -- just what we went
21  over.
22  Q. And what was that?
23  A. What we went over on the previous
24  sheet.
25  Q. Okay. Why don't you just tell me

Page 219

1  N. PELLEGRINI
2  again because I couldn't follow you. So I'm
3  asking you again.
4  A. The developed business was, you
5  know, was limited, but she had tremendous
6  potential. Again, she was taking on a new
7  responsibility.
8  Q. Mr. Pellegrini, my question was
9  how much developed business did she have at
10  the point you promoted her, when you
11  recommended her for promotion?
12  A. Unless I look at that sheet again,
13  I can't tell you.
14  Q. But when you talk about developed
15  business, are you talking in terms of number
16  of clients, are you talking in terms of number
17  of transactions, are you talking about in
18  terms of size of transactions, what do you
19  mean?
20  MR. TURNBULL: Objection to form.
21  A. The ability to originate the
22  business, keep the business and have the
23  clients just stay with you, that simple.
24  MR. TURNBULL: Are you all right?
25  Do you need a break?

Page 220

1  N. PELLEGRINI
2  THE WITNESS: Yeah, could I have
3  one more break?
4  MR. DATOO: Sure.
5  THE VIDEOGRAPHER: We are now
6  going off the record at approximately
7  3:16 p.m. This is the end of disk 4.
8  (Recess taken.)
9  THE VIDEOGRAPHER: This is the
10  beginning of disk 5. We're going back
11  on the record approximately 3:22 p.m.
12  BY MR. DATOO:
13  Q. Mr. Pellegrini, you mentioned a
14  moment ago that you regretted promoting Nadine
15  to director early. Is that correct?
16  MR. TURNBULL: Objection.
17  A. If that's what I said.
18  Q. Did you regret promoting her early
19  to director?
20  A. I may have made a mistake. It may
21  have been that it may have been premature.
22  Q. Do you feel that she would not
23  have been terminated had she remained vice
24  president?
25  A. I don't know.



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 14 of 16

NORMAN PELLEGRINI                                          July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                     221–224

Page 221

```
 1              N. PELLEGRINI
 2       (Plaintiffs' Exhibit 361,
 3       document bearing CGMI_BART
 4       015387-89 marked for
 5       identification, as of this date.)
 6    Q.   You have in front of you a
 7  document marked Plaintiffs' Exhibit 361.  If
 8  you can turn to the last page.
 9    A.   361, yes.
10    Q.   Or even the bottom of the
11  second-to-last page.  It appears to be an
12  e-mail from you to Frank Chin copying Bart
13  Livolsi, dated November 8th, 2007.
14    A.   Okay.
15    Q.   Do you recall sending this e-mail?
16    A.   I don't recall it, but I'm sure I
17  did.
18    Q.   Now, on the last page, the fourth
19  paragraph, starting Nadine.
20    A.   Yes.
21    Q.   You wrote: "Nadine is ready to
22  assume the role and responsibilities of a
23  director --
24    A.   Um-hum.
25    Q.   -- and this promotion fits into
```

Page 222

```
 1              N. PELLEGRINI
 2  the strategic goals, our business and her
 3  professional development."
 4       Do you see that?
 5    A.   Yes.
 6    Q.   So why didn't you express any
 7  reservations you may have had to Frank
 8  regarding Nadine's, amount of Nadine's
 9  developed business?
10       MR. TURNBULL:  Objection to form.
11    A.   I assumed she just had the time to
12  grow into her role as a director.
13    Q.   Well, you said she was ready,
14  didn't you?
15    A.   As a first-year director, but I
16  think she would have been, you know, she would
17  have had time.
18    Q.   Now, you wrote that her promotion
19  fits into the strategic goals our business.  I
20  assume that means of our business?
21    A.   Right.
22    Q.   What strategic goals were you
23  referring to?
24    A.   We had always contemplated opening
25  a South Florida office and Nadine had always
```

Page 223

```
 1              N. PELLEGRINI
 2  expressed an interest of being on the ground
 3  down there, and that was kind of the strategic
 4  vision we had.
 5    Q.   And was she, was it your vision to
 6  have her head the office?
 7    A.   I'm sorry?
 8    Q.   Was it your vision to have her
 9  head the office?
10    A.   No, it would have been a satellite
11  office of our Orlando office.
12    Q.   And would she have been running
13  that satellite office?
14    A.   She would have been the only
15  person in the office.
16    Q.   I'm sorry?
17    A.   She would have been the only
18  person initially in the office, and then
19  potentially an analyst.
20    Q.   Now, you also wrote you spoke to
21  Bart and KJ, and they are aware that I'm
22  recommending her for this promotion?
23    A.   Correct.
24    Q.   Who is KJ?
25    A.   Kristen Johanson.
```

Page 224

```
 1              N. PELLEGRINI
 2    Q.   And why did you speak to Kristen
 3  Johanson?
 4    A.   Because she was coordinating the
 5  promotion process within PFD, as I remember
 6  it.
 7    Q.   Now, who approved Nadine's
 8  promotion to director?
 9    A.   I think it was signed off -- it
10  was signed off on by Frank and then ultimately
11  HR had to approve it I think.
12    Q.   Do you know who the person was who
13  made the decision to promote her?
14    A.   Me.
15    Q.   You made the decision, or you
16  recommended her?
17    A.   It was me who made the decision to
18  recommend her, and then it was Frank who had
19  to sign off on it.
20    Q.   So Frank had to approve the
21  promotion?
22    A.   He had to approve it, right.  And
23  then ultimately I think HR had to approve it.
24    Q.   Was David Brownstein involved?
25    A.   Not to my knowledge.
```



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 15 of 16

NORMAN PELLEGRINI                                          July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                    225–228

Page 225

1  N. PELLEGRINI
2  Q. Did you ever tell Nadine that she
3  was on track to becoming a managing director?
4  A. Not to my knowledge. One step at
5  a time.
6  Q. Now, at the time Nadine, just
7  before Nadine was promoted in the beginning of
8  2008, were there any other vice presidents in
9  your group?
10  A. I'm trying to go through the
11  names. Mark was either an AVP or a VP. He
12  may have been a VP. Weinberg.
13     Could you give me the names?
14  Q. I'll do my best. Mark Weinberg?
15  A. He may have been. And I can't
16  remember in 2008. He was either an AVP or a
17  VP.
18  Q. And did you recommend him for
19  promotion at the end of 2007?
20  A. No.
21  Q. Why not?
22  A. I didn't think he was ready.
23  Q. And what about --
24  A. He was doing -- I didn't think he
25  was ready.

Page 226

1  N. PELLEGRINI
2  Q. How about Robert --
3  A. Szostak?
4  Q. Yes.
5  A. No, he was an associate. No.
6  Q. He was an associate?
7  A. He may have been an AVP, but, no,
8  I did not recommend him. He wasn't ready.
9  Q. So I guess out of those three,
10  Nadine, Robert and Mark --
11  A. Was Robert a VP on there?
12  Q. I don't know.
13  A. I think he was an AVP. I think
14  Mark was VP.
15  Q. So what would be the next
16  promotion for Robert. Would it be from AVP to
17  VP?
18  A. Correct.
19  Q. And he wasn't ready for that
20  promotion?
21  A. He may have gotten promoted to VP
22  that year. I can't remember. He's very good.
23  Q. What's the difference between the
24  job duties of an AVP and a VP?
25  A. AVP is in the office doing a lot

Page 227

1  N. PELLEGRINI
2  of processing, very similar to what your
3  associates would do in the law work.
4  Q. Is there a big difference between
5  an AVP and a VP?
6     MR. TURNBULL: Objection to form.
7  A. Slight.
8  Q. In terms of what?
9  A. Client interaction.
10  Q. So VP has more client interaction
11  than an AVP?
12  A. A little more, yes.
13  Q. Now, did Citigroup conduct layoffs
14  in December 2007 or January 2008?
15  A. I don't know the specific dates,
16  but I went through a lot of RIFs.
17  Q. But around that time, do you
18  recall there being a layoff, either end of
19  2007, early 2008, January?
20  A. There may have been. I mean, I
21  don't -- I can't remember, but if you could
22  give me something to jog my memory. I mean, I
23  know that we had to shut down the Georgia
24  office, but I don't know what time frame that
25  was. I can kind of tell you I went through --

Page 228

1  N. PELLEGRINI
2  anyway.
3  Q. I'm going to do my best.
4  A. Okay.
5     (Plaintiffs' Exhibit 56,
6     document bearing Bates Nos.
7     CGMI_BART 15400-15404 marked for
8     identification, as of this date.)
9  Q. Here is a document that's marked
10  Plaintiffs' Exhibit 56.
11  A. Susan Castro.
12  Q. If you can turn to the
13  second-to-last page. Or the third page,
14  whatever is easier for you.
15  A. Second-to-the-last page?
16  Q. Yes. You know what, turn to the
17  third page. Probably the third page is
18  easier.
19  A. I got the third page. Let's see,
20  one -- cover, two, three, okay.
21  Q. It is marked 15402.
22  A. 15402, correct.
23  Q. If I could just direct your
24  attention to I guess the hierarchy beneath
25  you.



Case 1:10-cv-07820-LGS   Document 59-20   Filed 06/07/13   Page 16 of 16

NORMAN PELLEGRINI                                          July 10, 2012
AMY BARTOLETTI vs. CITIGROUP                                    233–236

Page 233
1         N. PELLEGRINI
2  could go forward with. I mean, we had -- it
3  was mandated we had to let certain people go,
4  so who would have the least impact on our
5  business.
6      Q.  Were you told to lay off a certain
7  number of people?
8      A.  I don't remember.
9      Q.  Do you recall if you were told to
10 reduce your -- reduce the salaries or total
11 comp by a certain amount?
12     A.  I'm not sure, but I don't think
13 so.
14     Q.  So why is it that three people
15 were selected for layoff, and not more or
16 less?
17         MR. TURNBULL: Objection to form.
18     A.  In my region, I don't know the
19 answer to that question.
20     Q.  Why was Lori Smith selected for
21 layoff?
22     A.  Least amount of impact on our
23 business going forward.
24     Q.  What does that mean?
25     A.  How much business are we going to

Page 234
1         N. PELLEGRINI
2  lose.
3      Q.  And how did you determine that?
4      A.  She was relatively new to the
5  group.
6      Q.  How new was she?
7      A.  A year or two. I don't remember
8  exactly.
9      Q.  Anyone else at that point in time
10 that was, that had similar seniority?
11     A.  I'm sorry, I don't understand.
12     Q.  Was there anyone else in your
13 group at that time that was only there for one
14 or two years?
15     A.  No, not that I know of.
16     Q.  She was the newest member of the
17 group?
18     A.  Pretty much.
19     Q.  Who else did you consider for
20 layoff?
21     A.  I don't remember.
22     Q.  Did you consider everybody?
23     A.  Yeah, when that comes down,
24 everybody's name is up, so.
25     Q.  And then what's your process in

Page 235
1         N. PELLEGRINI
2  deciding who to select?
3         MR. TURNBULL: Objection to form.
4      A.  Basically determine who is going
5  to have the least amount of impact on
6  business.
7      Q.  How do you determine that?
8      A.  Based upon relationships, what
9  business they are doing, what clients they
10 will be able to take with them.
11     Q.  And how do you come to that
12 determination?
13     A.  Subjectives.
14     Q.  Do you look at any documents?
15     A.  You just know as a manager.
16     Q.  So you don't look at any
17 documents?
18     A.  You looked at the forward
19 calendar, who was working on what.
20     Q.  And is that what you --
21     A.  No. Subjectives.
22     Q.  So you look at the forward
23 calendar?
24     A.  I didn't say that.
25     Q.  You just said you look at the

Page 236
1         N. PELLEGRINI
2  forward calendar?
3      A.  I said you can look at the forward
4  calendar.
5      Q.  You can. And did you look at the
6  forward calendar?
7      A.  No.
8      Q.  And did you talk to anybody else?
9      A.  Yes.
10     Q.  Who do you speak to?
11         MR. TURNBULL: Objection to form.
12     A.  Who I report in to. I spoke to
13 people that I, that I report in to, to Bart.
14 I can't remember if I spoke to Frank. Maybe.
15     Q.  And what did you speak to them
16 about?
17     A.  Do I have to do this. I mean, I
18 really was an advocate of trying to keep all
19 my people, but it was spread throughout my
20 department.
21     Q.  Well, I mean in terms of your
22 selection criteria, do you speak to anyone
23 about who to select?
24     A.  We talked about it.
25     Q.  Who?

