# EXHIBIT 23

Page 5

1        B. A. SHARPTON
2   the record.
3        MR. TURNBULL:  Ken Turnbull with
4   Morgan, Lewis, representing the
5   defendants.
6        MR. DATOO:  Shaffin Datoo and Adam
7   Gross for the plaintiffs.
8        MS. LOEW:  Rachel Loew, Morgan,
9   Lewis.
10       THE VIDEOGRAPHER:  Will the court
11  reporter please swear in the witness.
12  B R I T T A N Y  A.  S H A R P T O N,
13       residing at 4901 Southwest 74 Terrace,
14       Miami, Florida 33143, having been first
15       duly sworn/affirmed by the Notary Public
16       (Anneliese R. Tursi), was examined and
17       testified as follows:
18  EXAMINATION BY MR. TURNBULL:
19       Q.   Good morning, Ms. Sharpton.  As we
20  just met a few moments ago, my name is Ken
21  Turnbull and I'm representing the defendants
22  in the lawsuit that you and others have
23  brought in the Southern District of New York.
24  The defendants are two Citigroup entities and
25  I don't expect that you will know the

Page 6

1        B. A. SHARPTON
2   corporate structure to know why there are two
3   named defendants.
4        Throughout the deposition I may
5   just use shorthand and use the term Citi.  If
6   I use that term, will you understand it to
7   mean the entity where you worked?
8        A.   I will.
9        Q.   During the course of today's
10  deposition, I'll be asking you a series of
11  questions.  My questions and your answers will
12  be taken down by the court reporter.  In order
13  to help her with her job, I'd ask that you let
14  me finish a question before you begin your
15  answer.  And, likewise, I will try to let you
16  finish an answer before I start another
17  question.  Is that fair?
18       A.   Yes.
19       Q.   The deposition today is being
20  videotaped, as you know.  Are you aware that
21  this videotape can be played back to a jury?
22       A.   I am.
23       Q.   And you are aware that your
24  answers today are under oath?
25       A.   I am.

Page 7

1        B. A. SHARPTON
2        Q.   If at any point during today's
3   deposition, you need a break, please let me
4   know.  So long as there is not a question
5   pending, we can take as many breaks as you
6   would like.  Okay?
7        A.   Okay.
8        Q.   If you don't understand something
9   that I ask you, please let me know and I will
10  rephrase it, to help you understand the
11  question.  If you answer the question I asked,
12  I will assume that you understand it.  Is that
13  fair?
14       A.   Okay.
15       Q.   Are you on any medication that
16  would impair your memory or ability to recall
17  events?
18       A.   No.
19       Q.   Is there any reason that you are
20  aware of that would impair your memory?
21       A.   No.
22       Q.   Who are your attorneys?
23       A.   Adam Gross and Shaffin Datoo.
24       Q.   When did you retain their law firm
25  to represent you in this matter?

Page 8

1        B. A. SHARPTON
2        A.   I don't remember exactly, exactly
3   when I retained their law firm.
4        Q.   Do you remember the month?
5        A.   No.
6        Q.   If I can try and place it in some
7   time context for you.  You were informed that
8   your job was being eliminated in November of
9   2008.  Do you recall how long after that you
10  retained a law firm?
11       A.   Maybe a few months later.  I'm not
12  exactly sure exactly when.
13       Q.   How did it come about that you
14  retained the law firm of Thompson Wigdor?
15       A.   Can you clarify your question?
16       Q.   Sure.  Did you interview law firms
17  before choosing one to represent you?
18       A.   I did not.
19       Q.   Did somebody tell you that you
20  should have this firm represent you?
21       A.   Did someone tell me?  Someone
22  suggested a law firm.
23       Q.   Who suggested a law firm?
24       A.   Amy Bartoletti.
25       Q.   Do you know, had Ms. Bartoletti



**Page 9**

1  B. A. SHARPTON
2  spoken to the law firm when she made that
3  suggestion to you?
4      A.  I'm not sure.
5      Q.  What did Ms. Bartoletti say when
6  she suggested that you retain this law firm?
7      A.  I can't recall exactly what she
8  said.
9      Q.  Did Ms. Bartoletti suggest that
10 you and others join together to sue Citigroup
11 collectively as a group?
12     A.  She may have suggested.
13     Q.  She may have?  Do you recall
14 whether she suggested that?
15     A.  Maybe.
16     Q.  You may recall, or you do recall
17 that she suggested that?
18     A.  She probably suggested.  She was
19 the one that probably suggested.
20     Q.  Who else did she suggest be part
21 of that lawsuit?
22     A.  Can you clarify the question?
23     Q.  Who else did she suggest to you
24 would be part of the group or should be part
25 of the group to join together to sue Citi?

**Page 10**

1  B. A. SHARPTON
2      A.  At the time I received word, I
3  wasn't sure besides one other person who would
4  be a part of the suit.
5      Q.  Who was the other person?
6      A.  Nadine Mentor.
7      Q.  Did you know Ms. Bartoletti before
8  she suggested that you retain this law firm?
9      A.  Yes.
10     Q.  In 2008 had you spoken to Ms.
11 Bartoletti before you were informed of your
12 layoff?
13     A.  Yes.
14     Q.  Did Ms. Bartoletti tell you why
15 she thought you should join together with
16 others to sue Citi?
17     A.  I don't remember.  I don't think
18 so.
19     Q.  Did you meet with the Thompson
20 Wigdor firm before deciding whether to retain
21 them as your lawyer?
22     A.  I believe so.
23     Q.  Who did you meet with?
24     A.  Doug Wigdor.
25     Q.  When?

**Page 11**

1  B. A. SHARPTON
2      A.  I can't recall exactly when I met
3  with Doug.
4      Q.  How long did you meet with him?
5      A.  That was so long ago, I don't
6  remember.
7      Q.  At this meeting that you met with
8  Mr. Wigdor, was anyone else present?
9      A.  I believe so.
10     Q.  Who else?
11     A.  I believe Amy, Nadine, Lisa and
12 Chia.
13     Q.  And those are the five plaintiffs
14 who are suing Citigroup, correct?
15     A.  The other four, yes, and myself.
16     Q.  Was there any other person who was
17 not part of this lawsuit who met with them on
18 that day?
19     A.  No.
20     Q.  Did you talk to Nadine Mentor
21 about whether you should retain this law firm?
22     A.  Yes.
23     Q.  When did you talk to her?
24     A.  A little while after I was
25 terminated.

**Page 12**

1  B. A. SHARPTON
2      Q.  What did you and Ms. Mentor
3  discuss in that regard?
4      A.  Can you clarify?
5      Q.  Sure.  What did you and Ms. Mentor
6  discuss about whether you should retain this
7  law firm?
8          MR. DATOO:  Objection.
9      A.  Me and Nadine did not discuss a
10 law firm to retain.
11     Q.  Did you and Ms. Mentor discuss
12 suing Citi?
13     A.  We discussed possibly, yes.
14     Q.  What did you and she discuss about
15 that possibility?
16     A.  The many factors involved in a
17 lawsuit.
18     Q.  Well, tell me what you remember
19 discussing.
20     A.  Some of the logistics, pros and
21 cons.
22     Q.  And what sort of pros did you
23 discuss with Ms. Mentor?
24     A.  Time, stress, money.
25     Q.  What cons did you discuss with Ms.



Page 190

1     B. A. SHARPTON
2  speak to an attorney?
3     A.   About?
4     Q.   About that -- well, did you speak
5  to an attorney after you received that?
6         MR. DATOO:  At any point in time?
7     Because, in theory, that would run
8     through today.
9     Q.   As a result of receiving that, did
10 you speak to an attorney?
11    A.   No.  No.
12    Q.   And just before we broke, we spoke
13 a little bit about you getting a job as an
14 intern at Citi.  Do you recall that?
15    A.   Yes.
16    Q.   I'm going to go back to that now
17 and pick up from there.
18    A.   Okay.
19    Q.   Did you have to interview?
20    A.   Yes.
21    Q.   Do you recall who you interviewed
22 with?
23    A.   With about maybe five people.
24    Q.   And these, I think you said were
25 not on-campus interviews.  Correct?

Page 191

1     B. A. SHARPTON
2     A.   Right.
3     Q.   So did you interview at
4  Citigroup's offices?
5     A.   Yes.
6     Q.   Did you interview with Marty
7  Feinstein?
8     A.   Yes.
9     Q.   Do you recall any of the others
10 that you interviewed with?
11    A.   I think Dia Martin.  I believe
12 Osee Pierre.  And I can't recall the other
13 people.  Some other senior people, probably.
14    Q.   Do you recall when you received
15 the offer to join the intern program?
16    A.   Maybe a few months before the
17 internship.  I don't recall the exact date.
18    Q.   Some time in early 2006?
19    A.   Yes.
20    Q.   Do you know who made you the
21 offer?
22    A.   Whose name was on the offer
23 letter?  I don't remember.
24    Q.   Did someone call you and tell you
25 you were going to be getting an offer?

Page 192

1     B. A. SHARPTON
2     A.   Yes.
3     Q.   Do you know who that was?
4     A.   Nadine.
5     Q.   Nadine Mentor?
6     A.   Mentor, yes.
7     Q.   Did you interview with Ms. Mentor?
8     A.   No.
9     Q.   Do you know why she called you?
10    A.   Because I knew her before.
11    Q.   Did Ms. Mentor put you in touch
12 with Citigroup --
13    A.   Yes.
14    Q.   -- to interview for that?
15    A.   Yes.
16    Q.   Do you know who made the decision
17 to offer you employment?
18    A.   No.
19    Q.   Tell me about the internship
20 program.  How did it work?
21    A.   Interns were placed into different
22 product groups and had to support their
23 bankers.
24    Q.   How long was the program?
25    A.   For about two to three months.

Page 193

1     B. A. SHARPTON
2  The summer.
3     Q.   Did you rotate through different
4  departments?
5     A.   I didn't.
6     Q.   Do you remember what departments
7  you worked for --
8     A.   Yes.
9     Q.   -- during your internship?
10    A.   Yes.
11    Q.   What departments?
12    A.   I worked in the housing group.
13    Q.   Do you remember who was in the
14 housing group at that time?
15    A.   Yes.
16    Q.   Who was that?
17    A.   Nick Fleuhr, Amy Bartoletti, Chia
18 Siu, Raymond High I believe, and maybe another
19 person or two.  Maybe more.  I forgot.
20    Q.   When you got an offer to join
21 Citigroup as a full-time employee, was it to
22 join a particular group?
23    A.   No.
24    Q.   Do you know how the people in the
25 housing group viewed your work during your



Page 194

1  B. A. SHARPTON
2  internship?
3  A. I never heard anything negative.
4  Q. Do you know whether anybody in the
5  housing group was opposed to you getting an
6  offer?
7  A. I'm not aware of that.
8  Q. Have you heard whether Amy
9  Bartoletti was opposed to you getting an offer
10 from Citigroup?
11 A. I've never heard that.
12 Q. Did Ms. Bartoletti ever
13 communicate to you any criticisms she had of
14 your work while you were an intern?
15 A. Nothing negative. Maybe
16 suggestions like most directors, but nothing
17 stands out.
18 Q. During the internship program, was
19 there one person or a few people within the
20 housing group that you worked mostly with?
21 A. Ray.
22 Q. Ray High?
23 A. Yes.
24 Q. Do you remember what his title was
25 at that time?

Page 195

1  B. A. SHARPTON
2  A. Associate I believe or maybe --
3  analyst or associate.
4  Q. Was there anyone else that you
5  worked closely with during your internship?
6  A. I worked very briefly with Chia
7  when her program rotated her in, but primarily
8  with Ray.
9  Q. Did you get any feedback from
10 anybody during your internship about your
11 performance?
12 A. Nothing formal. I would get
13 suggestions, if I asked, or regular helping
14 the intern sort of dialogue.
15 Q. After you completed the
16 internship, did anyone ever tell you that Ms.
17 Bartoletti didn't want you to join the housing
18 group?
19 A. No.
20 Q. When you were offered a position
21 as a full-time employee, what position were
22 you offered?
23 A. An analyst.
24 Q. And this will probably help put it
25 in time, but let me have marked as Sharpton

Page 196

1  B. A. SHARPTON
2  Exhibit 12, what I believe to be your offer
3  letter from Citigroup.
4     (Sharpton Exhibit 12, offer
5     letter from Citigroup marked for
6     identification, as of this date.)
7  Q. Ms. Sharpton, do you recognize
8  Exhibit 12?
9  A. Yes.
10 Q. Is that your offer letter to join
11 Citigroup?
12 A. Yes.
13    MR. DATOO: I'm sorry, Ken, just
14 for the record, I would like the
15 document itself, I don't know if I'm
16 supposed to do this, to be marked
17 Confidential, just because it has Mr.
18 Sharpton's Social Security number
19 unredacted on it.
20    THE WITNESS: I also have seen my
21 Social Security number.
22    MR. TURNBULL: On your
23 application?
24    THE WITNESS: On my application I
25 believe, yes.

Page 197

1  B. A. SHARPTON
2     MR. DATOO: And the same thing for
3  Sharpton Exhibit 11 as well.
4     MR. TURNBULL: Okay.
5  Q. So, Ms. Sharpton, this was the
6  offer letter to have you join Citigroup
7  following your graduation. Is that right?
8  A. Yes.
9  Q. What position were you offered?
10 A. Financial analyst.
11 Q. In which group?
12 A. We weren't assigned groups in the
13 offer letter.
14 Q. You were assigned just as part of
15 public finance?
16 A. Correct.
17 Q. When you joined Citigroup, were
18 you assigned to a particular group?
19 A. Afterwards, yes. After we joined.
20 Q. So tell me when you joined what
21 happened. Was there a training program?
22 A. There was a training program.
23 Q. How long did that last?
24 A. Two months, I think.
25 Q. After that training program were

Page 198

1                B. A. SHARPTON
2   you assigned to a particular group within
3   public finance?
4       A.   Yes.
5       Q.   How were those assignments made?
6       A.   I expressed my interest wanting to
7   be in the infrastructure group during the
8   summer and I don't know how that feedback
9   reflected into what actually happened.
10      Q.   So while you were an intern, you
11  expressed an interest in the infrastructure
12  group?
13      A.   Yes.
14      Q.   Were you interested in the housing
15  group?
16      A.   No.
17      Q.   Why not?
18      A.   I didn't find it interesting at
19  all.
20      Q.   You didn't find the work
21  interesting?
22      A.   Not the subject, not the housing,
23  what housing did, no.
24      Q.   Is the type of work an analyst
25  does, different depending on the subgroup they

Page 199

1                B. A. SHARPTON
2   are in?
3       A.   Slightly, but for the most part
4   it's similar.
5       Q.   Was the work in the housing group
6   more analytical and more technical than the
7   other groups?
8       A.   In the summer I wouldn't have a
9   point of reference to compare.
10      Q.   Do you know who decided to make
11  you an offer to join as a full-time employee?
12      A.   No.
13      Q.   Do you know whether Martin
14  Feinstein was involved in that decision?
15      A.   I am not sure.
16      Q.   When did you begin working for
17  Citigroup as an analyst?
18      A.   In the summer of 2007.
19      Q.   July, does that sound right?
20      A.   Yes.
21      Q.   How did you become interested in
22  the infrastructure group?
23      A.   I heard of people working in the
24  infrastructure group before, and I am a big
25  sports fan, enjoy stadiums, roads. I like the

Page 200

1                B. A. SHARPTON
2   subject matter.
3       Q.   When you started your employment,
4   who did you report to?  The full time
5   employment.
6       A.   At the time I believe Hadden was
7   still the head of our group, and Tom Green. I
8   think they co-headed in the beginning.
9       Q.   So you reported to the head or
10  heads of infrastructure?
11      A.   At the very, very beginning, they
12  were the two heads of infrastructure.
13      Q.   Do you know whether they approved
14  you joining their group?
15      A.   I don't know what the decision
16  process was.
17      Q.   When you started as a full-time
18  employee at Citi, did you have any reporting
19  relationship to Mr. Feinstein?
20      A.   Besides series exams, not that I
21  can recall.
22      Q.   Your starting salary at Citi was
23  $60,000. Is that right?
24      A.   Yes.
25      Q.   And then you also received a

Page 201

1                B. A. SHARPTON
2   relocation payment?
3       A.   Yes.
4       Q.   Where were you relocating from?
5       A.   From -- I moved from Philly
6   to Miami. Miami was the last place.
7       Q.   Do you know whether all the
8   analysts received a relocation package?
9       A.   I'm not sure.
10      Q.   Did you hold the analyst position
11  throughout your tenure at Citi?
12      A.   Yes.
13      Q.   Did you get any raises at Citi?
14      A.   Yes.
15      Q.   When?
16      A.   The following summer, after I
17  started.
18      Q.   So July of 2008?
19      A.   Yes.
20      Q.   You got a salary increase?
21      A.   Yes.
22      Q.   What did it increase to?
23      A.   To 70,000.
24      Q.   So a $10,000 salary increase?
25      A.   Yes, yes.

Case 1:10-cv-07820-LGS   Document 59-23   Filed 06/07/13   Page 7 of 15

BRITTANY A. SHARPTON  Non-Confidential
BARTOLETTI VS. CITIGROUP, et al.
October 04, 2012
202–205

Page 202

B. A. SHARPTON

1  Q. Did you also receive a bonus in the summer of 2008?
2  A. I did.
3  Q. Did you receive that bonus at the same time all analysts received bonuses?
4  MR. DATOO: Objection.
5  A. I know when I received my bonus.
6  Q. Let me see if I can just clarify it a little bit.
7  Was the analyst pay cycle from July to July?
8  A. Yes.
9  Q. And is it your understanding, if you know, were the bonus determinations for analysts made and then paid in the July time period?
10 A. July, August, yeah. That's my understanding.
11 Q. What was your bonus for, that was paid in July of 2008, in or around July of 2008?
12 A. I believe about 40-ish thousand.
13 Q. Public finance is part of municipal securities at Citigroup. Is that

Page 203

B. A. SHARPTON

right?
A. That's correct.
Q. Do you know what other groups are part of the municipal securities?
A. Sales and trading. Sales and trading.
Q. So public finance is one group, sales and trading is a second group?
A. Yes.
Q. Were there any other groups who were part of municipal?
A. Not that I am aware of.
Q. Do you recall when the co-head structure of the infrastructure group changed?
A. Not exactly when Jim Hadden left.
Q. Was Jim Hadden still at Citigroup at the beginning of 2008?
A. I know he switched groups. I'm not -- maybe. Perhaps.
Q. And let me ask that same question, but rather than asking if he was still at Citigroup, ask if he was still in the infrastructure group. Was he still in the infrastructure group in the beginning of 2008?

Page 204

B. A. SHARPTON

A. I don't believe so.
Q. In this lawsuit you are contending that you were discriminated against. Correct?
A. Yes.
Q. Who is it that you believe discriminated against you?
A. Tom Green and others.
Q. Who else?
A. The heads of public finance.
Q. Mr. Chin and Mr. Brownstein?
A. Yes.
Q. Anybody else?
A. Those were the decision makers, so I hold them accountable.
Q. On what basis do you believe you were discriminated against?
A. During the layoffs, all of the women, every single one was terminated. The two men that they left, the two analysts, I was more experienced and had more qualifications than Alan Dockery. I have more experience at Citi, and, at the bare minimal, was at least as qualified as Matthew Chin.

Page 205

B. A. SHARPTON

The work that they gave me was the less, quote-unquote sexy of the jobs, mostly pitch books, RFQs, admin-related tasks, while he got all of the modeling work, or at least most of the modeling work, and they also gave most of the modeling work to Alan Dockery who was a year my junior.

When I was laid off, Marty Feinstein tapped me on the shoulder, gave me this look of, oh, I'm sorry, and said it's not performance-based. And kind of shrugged his shoulder and waived me off to the HR lady.

And Tom Green did not even once reach out to say anything, like he treated the other males that were laid off prior to me.
Q. And I think this is clear, but I just want to make sure. You believe you were discriminated against because of your gender?
A. That's correct.
Q. Any other basis that you believe you were discriminated against?
A. I can say for gender.
Q. Do you believe you were discriminated against on any other basis?



Page 206

```
                B. A. SHARPTON
 1
 2      A.   I can't say that for certain.
 3      Q.   I understand that. I'm not asking
 4  you what you can say for certain. I'm just
 5  asking you what you believe?
 6      A.   I believe I was discriminated
 7  against because I am a woman.
 8      Q.   And no other reason?
 9      A.   No.
10           MR. TURNBULL: Okay. Why don't we
11  change the tape.
12           THE VIDEOGRAPHER: The time is
13  2:36 p.m. and this completes tape 3.
14           (Recess taken.)
15           THE VIDEOGRAPHER: The time is
16  2:41 p.m. and this is tape No. 4 of the
17  videotaped deposition of Ms. Brittany
18  Sharpton.
19  BY MR. TURNBULL:
20      Q.   Ms. Sharpton, in this lawsuit you
21  are claiming that your termination was on the
22  basis of your gender. Correct?
23      A.   Yes.
24      Q.   And that you believe that was
25  discriminatory?
```

Page 207

```
 1              B. A. SHARPTON
 2      A.   Yes.
 3      Q.   Is there anything else that
 4  occurred during your employment that you
 5  believe was discriminatory?
 6      A.   Perhaps.
 7      Q.   As you sit here today, is there
 8  anything that you can recall that you believe
 9  was discriminatory?
10      A.   Not as I sit here today.
11      Q.   And other than your termination,
12  you are not challenging any other acts in the
13  workplace as being discriminatory. Is that
14  correct?
15      A.   Conversations amongst men in my
16  presence about other women were a little
17  uncomfortable. Things like that.
18      Q.   What do you mean when you say
19  conversations amongst men. What are you
20  referring to?
21      A.   Matthew Chin and Jason Baran would
22  frequently talk about how hot women's butts
23  were as they walked to the bathroom. We sat
24  right in front of the rest rooms. And Matthew
25  would lean over to me and say, oh, look how
```

Page 208

```
 1              B. A. SHARPTON
 2  great such-and-such looks today. This
 3  happened frequently.
 4      Q.   Did you ever make similar comments
 5  about men in the workplace?
 6      A.   How sexy their butts looked as
 7  they walked to the bathroom, no.
 8      Q.   Did you ever comment on how a man
 9  looked in their appearance --
10      A.   Sure.
11      Q.   -- in the workplace?
12      A.   Sure.
13      Q.   And have you ever commented on
14  whether they were attractive or not
15  attractive?
16      A.   Yes.
17      Q.   Other than those comments that you
18  referred to that Mr. Chin made, is there
19  anything else that you believe was
20  discriminatory that occurred in the workplace?
21      A.   An instance with Mathilde McLean,
22  sexual harassment between her and Wally
23  Kulakowski.
24      Q.   Tell me about that.
25      A.   Well, Mathilde confided in me
```

Page 209

```
 1              B. A. SHARPTON
 2  sometimes and she told me that she was being
 3  sexually harassed. I was wondering what
 4  happened with Wally when they fired him.
 5      Q.   And what did Ms. McLean tell you
 6  in that regard?
 7      A.   She didn't really go into detail.
 8  She got very emotional, but she did tell me
 9  that she was sexually harassed.
10      Q.   You didn't observe any of that
11  harassment, did you?
12      A.   Thank goodness, no.
13      Q.   Is there anything that happened to
14  you or that you observed in the workplace
15  other than the termination that you believe
16  was discriminatory?
17      A.   Giving me the less desirable work
18  only after I've clawed and literally begged to
19  be put on more quant-heavy and technical
20  assignments and not the stereotypical womanly
21  admin-related tasks that are necessary, but I
22  wanted to work on Wall Street for more than
23  responding to RFQs and pitch books and such.
24      Q.   Do you know why you were assigned
25  that work that you believe was less desirable?
```



Page 234

1      B. A. SHARPTON
2  in a row this happened." Correct?
3     A.  Yes.
4     Q.  What are you referring to?
5     A.  Probably being screamed at by
6  Kimberly Swain. I don't know for sure.
7     Q.  Was Ms. Swain unhappy with the
8  work product you were giving her?
9     A.  She never gave me a negative
10 feedback.
11    Q.  Well, you just said you think it
12 is probably because she screamed at you?
13    A.  People scream for various reasons.
14 That was her -- she was known to be a very,
15 just neurotic, screaming type of manager.
16    Q.  Do you recall Ms. Swain ever
17 communicating to you any issues she had with
18 your work performance?
19    A.  If there was something she needed
20 or some suggestion she would make, or if I
21 asked, you know, for a suggestion, a
22 recommendation, she would give it to me.
23    Q.  Do you recall Ms. Swain ever
24 telling you, in words or substance, that she
25 was unhappy with your work performance?

Page 235

1      B. A. SHARPTON
2     A.  No.
3     Q.  Do you recall her ever telling you
4  that she was not happy with something you had
5  done for her?
6     A.  Not in those words, but by her
7  screaming.
8     Q.  Maybe not using the words, I'm not
9  happy, but the substance, you certainly
10 understood she was not happy. Do you recall
11 any situations like that?
12    A.  When she started yelling, she was
13 screaming at me, crazily.
14    Q.  How many occasions do you recall
15 where she was unhappy with the work that you
16 had given her?
17    A.  I can't say that she was screaming
18 as a result my work product, but she screamed
19 at me many times.
20        Maybe she had issues at home. I
21 don't know what was up with Kimberly.
22    Q.  Do you recall her ever being
23 unhappy, whether or not she used that word,
24 with your performance at Citigroup?
25    A.  I don't.

Page 236

1      B. A. SHARPTON
2     Q.  Do you know whether Ms. Swain ever
3  communicated to any of her superiors, her
4  views on your performance?
5     A.  I'm not sure.
6     Q.  Did Ms. McLean ever express any
7  unhappiness with your work performance?
8     A.  Not to me.
9     Q.  When you say in your e-mail here
10 "two times in a row this happened," what is it
11 that happened two times in a row?
12    A.  I can't recall exactly what I'm
13 referring to.
14    Q.  Do you recall whether it referred
15 to something you were working on with Ms.
16 Swain?
17    A.  I'm just assuming since she
18 screamed at me, or screamed in general, the
19 most, but I'm not sure.
20    Q.  Do you know whether Ms. Swain had
21 a view of your performance based on your
22 gender?
23    A.  I do appreciate the fact that
24 Kimberly was the only senior banker who would
25 give me technical and modeling work and she

Page 237

1      B. A. SHARPTON
2  gave me and Margaret -- she tried to include
3  us where the men excluded us in that aspect of
4  the job. So in that regards, yes.
5     Q.  So do you think she favored you
6  because of your gender?
7     A.  That's not what I said. I said
8  that she was the, really the only banker until
9  I begged to get work in the other subgroups
10 that would make it a point to try to include
11 the women in our group in technical
12 assignments.
13    Q.  Didn't Tom Green try to help you
14 with your modeling skills?
15    A.  I don't recall.
16    Q.  Is it possible that he did and you
17 just don't remember?
18    A.  It's a possibility.
19    Q.  And didn't you have people tell
20 you that your modeling skills were weak?
21    A.  It's a possibility.
22    Q.  Didn't you work with Stephen Wood?
23    A.  I worked with Steve.
24    Q.  And you really liked Steve Wood,
25 right?



Page 238

1           B. A. SHARPTON
2      A.   I do.
3      Q.   You thought he gave you
4  opportunities, correct?
5      A.   What sort of opportunities?
6      Q.   Work opportunities, such as
7  modeling.
8      A.   In that group the modeling wasn't
9  as heavy as, say, transportation, but it was
10 an opening to hopefully get some of the work
11 that I was seeking.
12     Q.   And so Mr. Wood did give you
13 opportunities to develop your skills, didn't
14 he?
15     A.   He gave me a crack.  That does not
16 mean I got those assignments.
17     Q.   Wasn't Mr. Wood your favorite
18 banker at Citigroup?
19     A.   He was one of them.
20     Q.   Who else were your favorites?
21     A.   Nadine.
22     Q.   Did you work with Ms. Mentor?
23     A.   I did.
24     Q.   Who else?
25     A.   I worked with many different

Page 239

1           B. A. SHARPTON
2  bankers.
3      Q.   Who else were your favorites?
4      A.   At this point in time at the top
5  of my head, I enjoyed working with Steve and
6  Nadine.
7      Q.   Did Ms. McLean ever offer
8  suggestions to you about your modeling skills?
9      A.   Mathilde, she was open to helping.
10 She was a helpful woman.
11     Q.   And did Ms. McLean tell you you
12 had some weaknesses that you needed would work
13 on with your modeling skills?
14     A.   I don't recall, but I did ask
15 Mathilde as an AVP for help which is usual
16 with a junior person.
17     Q.   But you don't recall whether she
18 told you that you needed to work on your
19 modeling skills because they were weak?
20     A.   I don't recall her saying those
21 words.
22     Q.   How about the substance?  Put
23 aside the words.
24     A.   I can't recall.
25     Q.   Did Ms. Swain work with any of the

Page 240

1           B. A. SHARPTON
2  other analysts in the infrastructure group?
3      A.   She did.
4      Q.   Do you know how she viewed their
5  skills as compared to yours?
6      A.   No idea.
7      Q.   Did you ever work directly with
8  Tom Green on any assignments?
9      A.   Directly?  Not directly.
10     Q.   Do you know whether Mr. Green
11 worked with any of the analysts in the group?
12     A.   Perhaps.
13     Q.   You don't know one way or the
14 other?
15     A.   I'm not sure what he was doing all
16 the time.
17     Q.   Did Ms. McLean work with other
18 analysts in the group?
19     A.   She did until she was forbidden,
20 or Matt was forbidden from working with her
21 because of outbursts and unprofessional
22 behavior.
23     Q.   Do you know what her views were on
24 the skills of the other analysts in the group?
25     A.   I do not.

Page 241

1           B. A. SHARPTON
2      Q.   Do you know whether Ms. McLean
3  communicated her views on the skills of the
4  analysts, to any of her supervisors?
5      A.   I don't know.
6      Q.   Do you know whether Ms. Swain
7  communicated her views on the skills of the
8  analysts, to any of her supervisors?
9      A.   I don't know.
10     Q.   Do you know how many individuals
11 in the public finance group were laid off in
12 the January reduction in force?
13     A.   I'm not for certain, no.
14     Q.   Do you recall that there was a
15 reduction in force in March of 2008?
16     A.   I don't remember the dates.
17     Q.   Let me bring it down from the
18 public finance level to your group level.
19     A.   Okay.
20     Q.   Do you know how many people were
21 let go in the first round reduction in force
22 in the January time period that we were
23 looking at earlier?
24     A.   I can guess, but I'm not sure.
25     Q.   What's your recollection how many



Page 242

         B. A. SHARPTON
 1
 2  people were let go in that round?
 3       A.   As a guess -- I mean, I'm not
 4  sure.  I don't know.
 5       Q.   Do you recall Brian Cloonan being
 6  let go in that group, in that RIF?
 7       A.   I know he was let go.  In which
 8  part of the year, I'm not sure.
 9       Q.   And that was a person that we
10  talked about earlier who was an analyst at the
11  time, correct?
12       A.   We did mention that Brian Cloonan
13  is an analyst, yes.
14       Q.   What analyst class was he in 2008?
15       A.   I know he was older than I was.
16       Q.   Do you recall whether he was one
17  year senior or more than one year senior?
18       A.   Maybe one.  I don't -- I think --
19  I don't know.  I can't -- I don't know.
20       Q.   Do you know whether Walter
21  Kulakowski was let go in the January RIF?
22       A.   He was fired for sexual
23  harassment.
24       Q.   Was he let go in the January RIF?
25       A.   I don't know.  I just -- I don't

Page 243

         B. A. SHARPTON
 1
 2  know.
 3       Q.   How about Thomas Boast, was he
 4  also let go in the January RIF?
 5       A.   I don't remember when Tom, I don't
 6  remember the time frames.
 7       Q.   Tom Boast was a director?
 8       A.   He was.
 9       Q.   And Mr. Kulakowski was a director?
10       A.   Yes.
11       Q.   Do you recall any women being let
12  go from your group in the January reduction in
13  force?
14       A.   Well, all the women were let go in
15  my round, so there were no other women in the
16  group, so, no.
17       Q.   No, no, I'm not sure my question
18  was clear.
19            The January RIF preceded your
20  reduction, correct?
21       A.   Right.
22       Q.   So in the January RIF do you
23  recall whether any women were let go from your
24  group?
25       A.   I do not recall.

Page 244

         B. A. SHARPTON
 1
 2       Q.   Do you recall any women being let
 3  go from your group at any point before the
 4  November RIF?
 5       A.   No.
 6       Q.   How many people were let go in the
 7  November RIF from your group?
 8       A.   From my group?  I believe four.
 9       Q.   Who do you believe?
10       A.   All three of the women.
11       Q.   Can you give me the names of the
12  people you recall.
13       A.   Brittany Sharpton, Mathilde
14  McLean, Kimberly Swain and Stephen Wood.
15       Q.   Was there someone in your group
16  named Tom Bradshaw?
17       A.   There is -- was, yes.
18       Q.   Was he let go in that November
19  RIF?
20       A.   I don't think -- I mean, I don't
21  know.  I don't recall.
22       Q.   Is it possible he was let go in
23  that November RIF?
24       A.   It's a possibility.  I don't
25  remember.

Page 245

         B. A. SHARPTON
 1
 2       Q.   Do you know why Ms. Swain was
 3  selected for termination in November?
 4       A.   I only know about myself.  I don't
 5  know her situation.
 6       Q.   Do you know why Mr. Wood was let
 7  go in November?
 8       A.   I don't know.
 9       Q.   Do you know why Ms. McClean was
10  selected for termination?
11       A.   I don't know.
12       Q.   Do you know why you were selected
13  for termination?
14       A.   Based on what happened to me,
15  because I'm a woman.
16       Q.   Why do you believe you were let go
17  because you are a woman?
18            MR. DATOO:  Objection: asked and
19       answered.
20       A.   Each and every woman in my group
21  was terminated.  The analysts that they kept,
22  Alan Dockery, I was more experienced than he
23  was, more qualified than he was, I had more
24  experience at Citi than Matt Chin and at best,
25  at the minimum, as qualified as Matt.  I was



Page 254

1           B. A. SHARPTON
2      A.   I didn't compare myself. I just
3  know about me.
4      Q.   You also mentioned that the
5  analysts had to interface with clients. Is
6  that right?
7      A.   Sometimes.
8      Q.   Did you interface with clients?
9      A.   Via telephone.
10     Q.   Did the other analysts in your
11 group interface with clients?
12     A.   I don't know.
13     Q.   Did the other analysts in your
14 group do financial analysis?
15     A.   Yes.
16     Q.   Did Matthew Chin do financial
17 analysis?
18     A.   They would primarily give Matthew
19 and Alan Dockery the financial modeling work.
20     Q.   When you say they would give the
21 work, who is they?
22     A.   The decisionmakers in our group,
23 Tom Green would -- is the decisionmaker in our
24 group.
25     Q.   Tom Green would decide who would

Page 255

1           B. A. SHARPTON
2  do what work on a particular deal or a pitch
3  or a transaction?
4      A.   Well, I know I went to Tom Green
5  when I wanted to be put on these deals, so I'm
6  under the assumption that he has the authority
7  to make those decisions.
8      Q.   Before you went to Tom Green, did
9  anybody ask you to do financial analysis?
10     A.   Kimberly Swain was the only other
11 that gave me real financial modeling work.
12     Q.   Do you know why Matthew Chin got
13 more financial modeling work than you?
14     A.   I don't know what the decision
15 process entailed.
16     Q.   Do you know whether the persons
17 making those decisions thought Matthew Chin
18 had better financial modeling skills than you
19 did?
20     A.   No.
21     Q.   Do you know why Alan Dockery was
22 given financial analysis work more than you?
23     A.   No.
24     Q.   Do you know whether the decision
25 makers thought that Alan Dockery's financial

Page 256

1           B. A. SHARPTON
2  analysis and modeling skills were stronger
3  than yours?
4      A.   I don't know.
5      Q.   In your complaint in the section
6  that deals with your performance -- this is
7  Exhibit 8 if you want to look at it.
8      A.   Yes.
9      Q.   I'm going to read you a paragraph,
10 or part of it.
11     A.   Okay.
12     Q.   I'm going to look at paragraph
13 110. Paragraph 110 states: "Throughout her
14 career with Citigroup, Ms. Sharpton performed
15 her job with the highest degree of
16 professionalism and competence."
17          Do you see that?
18     A.   Yes.
19     Q.   Do you believe that to be true?
20     A.   Yes.
21     Q.   Was there any time during your
22 employment at Citigroup where you did not
23 perform with the highest degree of
24 professionalism?
25     A.   I strive to always perform at the

Page 257

1           B. A. SHARPTON
2  highest degree of professionalism and
3  competence.
4      Q.   I understand that you strive to do
5  that. Do you believe that there were any
6  times where you did not perform with the
7  highest degree of professionalism?
8      A.   If I was -- the train was late --
9  I mean, I strived to perform at the highest
10 degree of professionalism and competence.
11     Q.   Do you think referring to people
12 as, the people you worked with with nicknames
13 such as Chronic, is the highest degree of
14 professionalism?
15     A.   I did not say this to their face,
16 but it could be interpreted either way.
17     Q.   What do you mean it could be
18 interpreted either way?
19     A.   That didn't interfere in the least
20 with my performance and my work product.
21     Q.   Do you think it could be viewed as
22 less than the highest degree of
23 professionalism?
24     A.   I can't see what people can view
25 things as.



Page 258

1         B. A. SHARPTON
2     Q.   What about referring to people as,
3  white people as saltines, do you think that is
4  the highest degree of professionalism?
5     A.   It doesn't interfere with my work
6  product.
7     Q.   But do you think that is
8  performing your job with the highest degree of
9  professionalism?
10    A.   It doesn't interfere with me
11 performing my job.
12    Q.   I understand.
13    A.   The highest degree of
14 professionalism, it doesn't interfere.
15    Q.   So you think that calling someone
16 a saltine or a cracker reflects the highest
17 degree of professionalism?
18         MR. DATOO:  Objection.
19    A.   I never called somebody a cracker
20 or a saltine.
21    Q.   But you referred to them as that
22 in your e-mails, right?
23         MR. DATOO:  Objection.
24    A.   In the e-mail, that's what was
25 written down.

Page 259

1         B. A. SHARPTON
2     Q.   In more than one e-mail you reused
3  that term to refer to white people, right?
4          MR. DATOO:  Objection.
5     A.   Probably, perhaps.
6     Q.   And do you think, and you did that
7  on the Citigroup system, right?
8     A.   Yes.
9     Q.   And, in fact, you referred to some
10 of the people at Citigroup with those terms,
11 correct?
12         MR. DATOO:  Objection.
13    A.   Yes.
14    Q.   Do you think that reflects the
15 highest degree of professionalism?
16    A.   It could be interpreted.  It
17 depends who is interpreting.
18    Q.   Earlier -- we will look at some of
19 those in a little while.
20         Do you think that throughout your
21 employment at Citigroup you performed with the
22 highest degree of competence?
23    A.   Yes.
24    Q.   At all times?
25    A.   No one is perfect at all times,

Page 260

1         B. A. SHARPTON
2  but I did perform at the highest degree of
3  competence.
4     Q.   What do you define as the highest
5  degree of competence?
6     A.   The highest degree that Brittany
7  Sharpton is competent.
8     Q.   You referenced earlier your 2008
9  performance review.  Do you remember what your
10 ratings were on that?
11    A.   2, 3.
12    Q.   Do those ratings reflect the
13 highest degree of competence?
14    A.   It depends on what your basis is.
15    Q.   Well, do you know what the rating
16 system was on those reviews, what the scale
17 was?
18    A.   The scale, I believe 1 through 5.
19    Q.   With one being the highest?
20    A.   Yes.
21    Q.   And you recall getting 2s and 3s?
22    A.   Yes.
23    Q.   Would you agree that a 1 rating
24 would reflect a higher degree of competence
25 than a 2 or a 3?

Page 261

1         B. A. SHARPTON
2     A.   I don't equate those numbers to
3  competence.
4     Q.   Let's look at your review for
5  2008.  We will have this marked as Sharpton
6  Exhibit 18.
7           (Sharpton Exhibit 18, Brittany
8           Sharpton's 2008 financial analyst
9           year-end performance review marked
10          for identification, as of this
11          date.)
12    Q.   Ms. Sharpton, do you recognize
13 Exhibit 18?
14    A.   Yes.
15    Q.   What is this?
16    A.   This is my 2008 financial analyst
17 year-end performance review.
18    Q.   Do you know who completed this
19 review?
20    A.   I don't know who completed this
21 form.
22    Q.   Were you given this form while you
23 were employed at Citigroup?
24    A.   Yes.
25    Q.   Who gave it to you?



BRITTANY A. SHARPTON  Non-Confidential
BARTOLETTI VS. CITIGROUP, et al.
October 04, 2012
262–265

Page 262

1        B. A. SHARPTON
2    A.   This was discussed with Tom Green.
3    Q.   Do you know if Tom Green is the
4  one who gave you the ratings on this form?
5    A.   No, I don't know.
6    Q.   Do you know whether -- well, do
7  you know who had input into the ratings that
8  are reflected on this form?
9    A.   I don't know.
10   Q.   And I'm looking at the first page
11 of the document which has a number of
12 categories, and there is one category where
13 you got rated a 1.  Do you see that?
14   A.   Yes.
15   Q.   Do you think that 1 rating would
16 reflect the highest degree of competence in
17 that area?
18   A.   I don't equate any of these
19 ratings to competence.
20   Q.   In the quantitative skills
21 section, do you see the first category you are
22 ranked a 3?
23   A.   Yes.
24   Q.   And that is, "possesses strong
25 quantitative skills and expert knowledge of

Page 263

1        B. A. SHARPTON
2  products and institutional features of
3  relevant markets."
4    A.   Yes.
5    Q.   Did Mr. Green tell you during your
6  review that your quantitative skills were
7  rated a 3?
8    A.   He probably in conversation went
9  over that line item.
10   Q.   Did he tell you he thought you
11 needed to improve in that area?
12   A.   I can't recall our conversation.
13   Q.   And the next one down you also got
14 rated a 3.  Do you see that?
15   A.   Yes.
16   Q.   Did you talk about that with Mr.
17 Green?
18   A.   We may have.
19   Q.   Do you remember him telling you
20 you need to improve in this area?
21   A.   I don't remember our conversation.
22   Q.   And I'm not going to go through
23 every one of these, but down on the bottom,
24 the overall quantitative skills rating is 3.
25 When you saw that rating, did you think you

Page 264

1        B. A. SHARPTON
2  needed to improve your quantitative skills?
3    A.   I'm always striving to improve.
4    Q.   So when you saw that rating, did
5  you think you needed to improve your
6  quantitative skills?
7    A.   That further prompted me to insist
8  on being on more quant-heavy jobs.  My skills
9  were fine.  My experience on jobs that
10 required those skills is a completely
11 different issue.
12   Q.   Do you know whether people were
13 reluctant to give you quantitative assignments
14 because they didn't have confidence in your
15 ability?
16   A.   I don't know.
17   Q.   And do you see in the next
18 category your overall rating in the quality of
19 work produced is a 3?
20   A.   Yes.
21   Q.   Did you talk about that with Mr.
22 Green?
23   A.   I don't remember our conversation.
24   Q.   Do you remember getting any
25 criticisms about the quality of the work that

Page 265

1        B. A. SHARPTON
2  you were turning in?
3    A.   In which regard?
4    Q.   In any regard.
5    A.   Suggestions may have been made, or
6  recommendations.
7    Q.   Constructive suggestions as to how
8  to improve?
9    A.   Suggestions.
10   Q.   As to how to improve?
11   A.   When I asked, yes.
12   Q.   When you saw this rating of 3 in
13 this overall quality of work produced rating,
14 did you think you needed to improve?
15   A.   I thought the ratings should be
16 higher, but I'm always striving to improve.
17   Q.   Did you tell Mr. Green you thought
18 the rating should be higher?
19   A.   I don't remember our conversation.
20   Q.   Do you remember ever being told
21 you need to improve your attention to detail?
22   A.   I do recall.
23   Q.   And do you recall that that was a
24 big part of this review?
25       MR. DATOO:  Objection.



Case 1:10-cv-07820-LGS   Document 59-23   Filed 06/07/13   Page 15 of 15

BRITTANY A. SHARPTON  Non-Confidential
BARTOLETTI VS. CITIGROUP, et al.
October 04, 2012
266–269

Page 266

1         B. A. SHARPTON
2     A.   I don't recall that being a big
3  part of this review.
4     Q.   Do you recall it being any part of
5  the review?
6     A.   I don't recall the conversation.
7     Q.   How about as you read the review
8  itself?
9     A.   I remember the review. The
10 conversation I cannot recall.
11    Q.   Well, the review itself notes that
12 you should continue to improve your attention
13 to detail. When you read this in the review,
14 did that come as a surprise to you?
15    A.   No, improvement is standard for
16 any junior employee, anyone in general,
17 actually.
18    Q.   Did any of the senior bankers that
19 you worked with, tell you you needed to
20 improve your attention to detail?
21    A.   Not -- I can't -- I don't
22 remember.
23    Q.   Do you remember giving work
24 product in to people that you worked with that
25 contained just cut and pastes from earlier

Page 267

1         B. A. SHARPTON
2  presentations?
3     A.   Sure.
4     Q.   And do you recall that in those
5  instances there were times where you didn't
6  even change the details to reflect that it was
7  a different deal and you couldn't just cut and
8  paste from an earlier deal?
9     A.   I've made mistakes.
10    Q.   And do you recall being told you
11 need to improve upon those, that we rely upon
12 you as an analyst, to improve on those?
13    A.   I don't recall someone saying
14 that.
15    Q.   What was your overall rating?
16    A.   3 trending 2.
17    Q.   And 3 stands for meets
18 expectations?
19    A.   Correct.
20    Q.   Did Mr. Green help you find more
21 complex assignments?
22    A.   After I asked to be put on more
23 complex assignments, I'm assuming he had -- I
24 don't know what he did afterwards, but I was
25 eventually staffed to more quant-heavy

Page 268

1         B. A. SHARPTON
2  assignments.
3     Q.   Was that after you got this
4  midyear review?
5     A.   I don't remember --
6     Q.   I'm sorry, this July review. June
7  review.
8     A.   -- when exactly I asked.
9     Q.   After you were put on those, what
10 you described as more quant-heavy assignments,
11 do you recall that you had problems actually
12 doing that quant-heavy work?
13    A.   Problems? Problems. It is more
14 challenging than a pitch book, so it's a
15 challenge.
16    Q.   Did you ever refer to Kim Swain as
17 MB?
18    A.   No.
19    Q.   Do you know what those initials
20 are, MB; do you know what they stand for?
21    A.   I'm not exactly sure.
22    Q.   Do you recall referring to anybody
23 in your group as something with those
24 initials?
25    A.   It could be Margaret Barry.

Page 269

1         B. A. SHARPTON
2     Q.   Did you have problems with
3  Margaret Barry?
4     A.   Not problems. Personality
5  differences.
6     Q.   Did Margaret Barry ever express to
7  you frustration with your work product?
8     A.   Margaret was my equal. She took
9  on the characteristics of Kimberly and tried
10 to impose herself as someone with more
11 authority than she did have.
12         MR. TURNBULL: Let me mark this
13    e-mail, the top e-mail is dated December
14    3, 2007 and it is a string of e-mails.
15    We will have it marked as Sharpton
16    Exhibit 19.
17         (Sharpton Exhibit 19, e-mail
18    string, top e-mail dated December
19    3, 2007 marked for identification,
20    as of this date.)
21    Q.   Do you recognize this document,
22 Ms. Sharpton?
23    A.   Yes.
24    Q.   The top e-mail is an e-mail to
25 your friend Sherrise Pond, right?

