# Exhibit 18

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case No. 10-CIV-7820
 5   ------------------------------------X
     AMY BARTOLETTI, CHIA SIU,
 6   NADINE MENTOR, LISA CONLEY
     AND BRITTANY SHARPTON,
 7
                         Plaintiffs,
 8
              -against-
 9
     CITIGROUP INC. AND CITIGROUP
10   GLOBAL MARKETS, INC.,
11                       Defendants.
     ------------------------------------X
12
              August 28, 2012
13            9:32 A.M.
14
15            Videotaped deposition of
16   Defendant, by Bartley F. Livolski, taken
17   pursuant to Notice, held at the offices of
18   Thompson Wigdor LLP, 85 Fifth Avenue, New
19   York, New York 10003 before Angela Castoro, a
20   Registered Professional Reporter and Notary
21   Public of the State of New York.
22
23
24
25
```



BARTLEY F. LIVOLSKI
AMY BARTOLETTI vs CITIGROUP INC.
August 28, 2012
45–48

Page 45

1        B. F. LIVOLSKI
2  about her relationships with clients.
3     Q.   Anyone else?
4     A.   Possibly Kristen Johanson, but I
5  am not sure.
6     Q.   Why would you have spoken to
7  Kristen Johanson?
8     A.   Kristen Johanson was a senior
9  banker in the State of Connecticut and, you
10 know, I can't say for sure that Kristen has
11 never come to me and said, I worked with
12 Nadine on this and she was very good or she
13 was very bad.
14    Q.   I believe you also testified that
15 in connection with identifying a candidate for
16 layoff you reviewed banking skills; is that
17 correct?
18        MR. BATTAGLIA:  Objection.  You
19    can answer.
20    A.   Banking skills would have been
21 defined.  I would have been told about banking
22 skills basically from the regional manager.
23    Q.   What was your view of Nadine's
24 banking skills?
25        MR. BATTAGLIA:  Objection.

Page 46

1        B. F. LIVOLSKI
2     A.   My impression was enthusiastic,
3  inexperienced.
4        MR. BATTAGLIA:  Enthusiastic,
5    inexperienced?
6        THE WITNESS:  Enthusiastic as a
7    banker, inexperienced as a banker.
8     Q.   You didn't work with her on any of
9  the transactions, though, did you?
10        MR. BATTAGLIA:  Objection.
11    A.   Not that I recall.
12    Q.   How did you form this opinion of
13 Nadine's banking skills?
14        MR. BATTAGLIA:  Objection.  Asked
15    and answered.
16    A.   I would have picked that up mostly
17 from the regional manager, as well as
18 potentially conversations with her related to
19 just facts within the industry.
20    Q.   What do you mean by "facts within
21 the industry"?
22    A.   Well, techniques, ideas,
23 structures, etc..  I may have, may not have.
24 I have approximately 55 people working in
25 regions.  I can't remember which ones I've had

Page 47

1        B. F. LIVOLSKI
2  these conversations with.
3     Q.   Is that true as of November 2008?
4        MR. BATTAGLIA:  Objection.
5     A.   It would be true, sure.  It would
6  be true that I wouldn't remember those
7  conversations.
8     Q.   Did you and Norm Pellegrini
9  identify Nadine together as a candidate for
10 layoff?
11    A.   I don't recall that.
12    Q.   Who would have identified her for
13 layoff?
14    A.   We could have identified her
15 together.  He may have suggested it.  I would
16 have thought about everybody within the region
17 and decided on, you know, what their skills
18 were, what their client base was and
19 unfortunately picked those that, you know, we
20 would conclude were the most expendable.
21        You have to understand something,
22 every banker looked at during any of these
23 RIFs, these were qualified people.  We were
24 cutting into muscle.  We were not eliminating
25 people that weren't good.  So you had to be,

Page 48

1        B. F. LIVOLSKI
2  you know -- you had to look at exactly, you
3  know, what their value would be versus others
4  within the department and then make a decision
5  accordingly.
6     Q.   You testified earlier that you
7  didn't have to identify anyone for layoff,
8  correct?
9        MR. BATTAGLIA:  Objection.
10    A.   I just finished saying that we
11 identified -- we looked at everyone throughout
12 the department.
13    Q.   But you testified earlier that you
14 didn't have to identify anyone, correct?
15        MR. BATTAGLIA:  Objection.
16    A.   What I testified, to my
17 recollection, was that I didn't have to select
18 anyone from any specific region.
19    Q.   Okay.  Now in connection with your
20 review of identifying candidates for layoff,
21 did you review how much money someone made?
22        MR. BATTAGLIA:  Objection.
23    A.   I would not have specifically
24 looked at revenue sheets because, as I said
25 before, we are an inclusive organization.  So



800.211.DEPO (3376)
EsquireSolutions.com

Page 49

1    B. F. LIVOLSKI
2    if someone happens to be involved in a lot of
3    transactions, they will have a revenue number
4    next to their name for each and every one of
5    those transactions, regardless of the amount
6    of participation they had within the account.
7        Q.   All right. I don't think that --
8    I don't know what you just answered, but my
9    question was: Did you look at anyone's total
10   compensation?
11           MR. BATTAGLIA: Objection. I
12       don't know if that was your question,
13       but --
14           MR. DATOO: Why don't we read back
15       my question.
16       A.   I thought your question was
17   revenues.
18           (Record read.)
19           MR. BATTAGLIA: I think he
20       answered that to the best he understood
21       it.
22       A.   I understood it to mean what they
23   made in terms of generating revenue.
24       Q.   Okay. How about in terms of what
25   they earned?

Page 50

1    B. F. LIVOLSKI
2            MR. BATTAGLIA: Objection.
3        Q.  How much were they paid by
4    Citigroup.
5        A.   Each person's -- each person I am
6    sure was reviewed as to what their
7    compensation package was.
8        Q.   So was this one of the criteria
9    that you employed?
10       A.   It was not a significant factor,
11   but could have very well have been something
12   that factored into the overall decision.
13       Q.   And did you look at any documents
14   regarding how much money people were paid by
15   Citigroup?
16       A.   I don't recall that.
17       Q.   So how would you have known how
18   much money each person made?
19           MR. BATTAGLIA: Objection. You
20       may answer.
21       A.   I said I could have looked at it
22   and I don't recall doing it.
23       Q.   Do you recall if Norm Pellegrini
24   did it?
25       A.   I don't know what Norm Pellegrini

Page 51

1    B. F. LIVOLSKI
2    did.
3        Q.   Did you ask him to do anything on
4    his own with respect to identifying candidates
5    for layoff?
6            MR. BATTAGLIA: Objection. You
7        may answer.
8        A.   I don't recall that.
9        Q.   So as far as you know, everything
10   you did was to together regarding identifying
11   candidates?
12           MR. BATTAGLIA: Objection.
13       A.   I can't answer that. I don't
14   know.
15           MR. BATTAGLIA: Do you want to
16       take a brief break?
17           MR. DATOO: Sure.
18           THE VIDEOGRAPHER: We're off the
19       record at approximately 10:27 A.M..
20           (Recess taken.)
21           THE VIDEOGRAPHER: This is the
22       beginning of disk number two of the
23       deposition. We're now going back on the
24       record at approximately 10:39 A.M..
25       Q.   I believe, and please correct me

Page 52

1    B. F. LIVOLSKI
2    if I am wrong, you testified earlier that you
3    and Mr. Pellegrini discussed everyone in his
4    group when determining who to identify for
5    layoff; is that correct?
6        A.   Yes, I would have been shocked if
7    we didn't.
8            MR. BATTAGLIA: Just to confirm,
9        November 2008?
10           MR. DATOO: Yes.
11       Q.   Everything is about the layoff in
12   November 2008?
13       A.   Yes.
14           MR. BATTAGLIA: Thank you.
15       Q.   Now with respect to Nadine, do you
16   recall what you discussed with Mr. Pellegrini
17   about her?
18           MR. BATTAGLIA: I am sorry, I did
19       not hear that.
20       Q.   With respect to Nadine Mentor, do
21   you recall what you discussed with
22   Mr. Pellegrini about her?
23           MR. BATTAGLIA: Objection. Asked
24       and answered.
25       A.   We would have talked about her



Page 53

```
 1          B. F. LIVOLSKI
 2   client, her potential client base or accounts
 3   that she -- were out there that if she weren't
 4   part of the organization, how would it effect
 5   our southeast operation.  I remember
 6   discussion of having talked about her being a
 7   director first as a vice president, in that
 8   she probably was promoted too quickly.
 9          And we talked about every
10   individual in the region and what their focus
11   was, what their contribution to a specific
12   product or geographic location was.  And at
13   the end of the day, we concluded that Nadine
14   and Brent would have effected, if they were
15   not part of the organization, would effect us
16   the least.
17       Q.   Do you recall looking at how much
18   money she was paid by Citigroup?
19          MR. BATTAGLIA:  Objection.  You
20     can answer.
21       A.   I don't recall.
22       Q.   Do you recall looking at the
23   number of transactions she worked on?
24       A.   I don't recall that.
25       Q.   Do you recall looking at the
```

Page 54

```
 1          B. F. LIVOLSKI
 2   amount of revenue that was generated from the
 3   transactions she worked on?
 4       A.   I don't recall if we did.
 5   Possible.
 6       Q.   Do you recall looking at the
 7   clients she covered?
 8          MR. BATTAGLIA:  Objection.
 9       A.   I don't recall that.  Again, I'd
10   like to indicate that, as I said before, our
11   reporting of bankers working on clients and
12   their contribution was very liberal.  We
13   encouraged team play, and as a result, we put
14   a lot of bankers on a lot of accounts so that
15   all of the resources of public finance could
16   be brought to bear on any transaction.
17       Q.   Did you talk about Nadine's work
18   performance with Mr. Pellegrini?
19          MR. BATTAGLIA:  Objection.
20       A.   I don't recall that.
21       Q.   What did you think about her work
22   performance?
23          MR. BATTAGLIA:  Objection.  You
24     may answer.
25       A.   You know, my limited experience
```

Page 55

```
 1          B. F. LIVOLSKI
 2   with her was that she was doing her job.
 3       Q.   Well, she was promoted early to
 4   director, wasn't she?
 5          MR. BATTAGLIA:  Yes.
 6       A.   Yes.
 7       Q.   So she was doing a pretty good
 8   job, wasn't she?
 9          MR. BATTAGLIA:  Objection.
10       A.   Depending on what you think of
11   being a director versus a vice president.
12       Q.   Well, how about what you think.
13       A.   Well, I think that director is a
14   nice title that is something that a lot of
15   people get and have.  It helps them in their
16   stature within the industry, and generally it
17   is an irrelevant title.  It is a title within
18   our division.  It is a title that you could --
19   we have directors that do vice president's
20   work and we have vice presidents that do
21   directors work.
22          The most meaningful titles within
23   the divisions are the one that are corporate
24   titles, managing director.  So making someone
25   a director -- and I am not suggesting that
```

Page 56

```
 1          B. F. LIVOLSKI
 2   Nadine didn't earn it or didn't deserve it,
 3   all I am saying is that from my perspective
 4   that was a way of satisfying and encouraging
 5   employees to continue to be successful and
 6   work hard.
 7       Q.   If a director title is irrelevant,
 8   why did you just testified that you promoted
 9   her too early?
10       A.   Well, because what happens is
11   sometimes bankers put too much -- they have
12   too much expectation either on themselves or
13   in the group that they are working on.  They
14   are viewed as a director, when in fact they
15   are really doing vice president's work.
16          My feeling was at that point, that
17   although Nadine was maturing and growing and
18   that that title was a nice title, you know, to
19   have her on her business card, that she was
20   doing basically, from what I could ascertain
21   from Norm, vice president's work.
22       Q.   Well, she was a rare talent,
23   wasn't she?
24          MR. BATTAGLIA:  Objection.
25       A.   How do you define that?
```



Page 65

```
 1            B. F. LIVOLSKI
 2   what, you know, clients she was working on.
 3          Now whether it was excellent or
 4   not, that may have been an exaggeration.  I am
 5   not saying it was, it may have been.
 6      Q.   To go on, you used the word
 7   "minder" what do you mean by minder?
 8      A.   You mind accounts, basically you
 9   continue to pay attention to them.
10          MR. BATTAGLIA:  Objection.
11      A.   You provide them with ideas, etc..
12      Q.   What do you mean by "grinder"?
13      A.   Grinder is somebody that spends
14   the time working on transactions, ideas, etc..
15      Q.   What do you mean by "finder"?
16      A.   Finder is a somebody who goes out
17   and is able to get business, sign up business.
18      Q.   And what do you mean by "binder"?
19      A.   Binder is somebody that puts a
20   transaction together, all the way from market
21   -- you hired start to put the transaction
22   together, all the documentation, you turn it
23   over to our syndicate desk who markets the
24   transaction and then we close it within a
25   couple of weeks.  That's what a binder is.
```

Page 66

```
 1            B. F. LIVOLSKI
 2      Q.   And is it rare to find someone
 3   with these four qualities?
 4      A.   No.  No, it is not.
 5      Q.   In your --
 6      A.   Not at Citigroup.  Not at Smith --
 7   let's call it Smith Barney, it's easier for
 8   me.
 9      Q.   Do you mind if we call it
10   Citigroup, because it is probably easier for
11   all of us?
12          MR. BATTAGLIA:  You could use
13      either interchangeably, we all know who
14      you are talking about.
15      A.   It took me a long to get to Citi,
16   okay.
17      Q.   If you just read the next
18   sentence, "it is a rare talent." So it is not
19   a rare talent, is it?
20          MR. BATTAGLIA:  Objection.  Asked
21      and answered.
22      A.   Again, you know, you breaking down
23   every word and the reality is this document
24   was in response to her letter and it was there
25   to encourage her to continue to perform.
```

Page 67

```
 1            B. F. LIVOLSKI
 2          I want nothing more than to see
 3   Nadine become a senior person within our
 4   department.  I think she had skills.  I think
 5   she still has skills and there was no reason
 6   for me to say congratulations and leave it at
 7   that.  My job is to encourage people to
 8   continue to move forward and perform.
 9      Q.   Did you ever review any of
10   Nadine's performance evaluations?
11      A.   I don't recall.
12      Q.   Do you use the term "develop
13   business"?
14          MR. BATTAGLIA:  Objection.
15      A.   I may have over the course of my
16   career.  I have been doing this 40 years.
17      Q.   When you use the word "develop
18   business," what do you mean by that?
19      A.   To me it would be -- I would
20   define that as going out and working with a
21   client to either get that client to either get
22   that client to hire our organization or
23   develop a concept or an idea that client could
24   look at and then hire us for.
25          Develop business is to me a person
```

Page 68

```
 1            B. F. LIVOLSKI
 2   who is responsible for in effect getting that
 3   client in the door.
 4      Q.   With your understanding with it or
 5   your use of the term develop business, can
 6   someone's develop business be documented?
 7          MR. BATTAGLIA:  Objection.
 8      A.   I don't -- I really -- I don't
 9   know how you can -- I don't know.  I don't
10   know.  I guess people have different styles,
11   they could do whatever they want to do.  I
12   don't know how you can document developing
13   business.
14      Q.   Can you measure it in any way?
15          MR. BATTAGLIA:  Objection.
16      A.   I think the way you measure
17   develop business is typically the senior
18   banker continues to have a relationship with
19   that account.
20      Q.   Did you ever hear Mr. Pellegrini
21   use the term "develop business"?
22      A.   I don't recall that.
23      Q.   Did you ever recall Mr. Pellegrini
24   using the term in connection with your
25   discussions regarding the November 2008
```



Page 69

```
 1            B. F. LIVOLSKI
 2   layoff?
 3        MR. BATTAGLIA:  Objection.
 4     A.   I don't recall that.
 5     Q.   Is it fair to say that you and
 6   Mr. Pellegrini made the decision to select
 7   Nadine for layoff?
 8     A.   That's fair.
 9     Q.   And once you identified Nadine for
10   layoff, what did you do?
11     A.   I don't recall.
12     Q.   Did you speak to Frank Chin?
13     A.   Likely.
14     Q.   Did you let him know?
15     A.   Likely.
16     Q.   Did you do anything else?
17     A.   It was what five, six years ago.
18     Q.   Four years ago.
19     A.   Four years ago.  I can't remember.
20     Q.   Do you know if Mr. Pellegrini did
21   anything else after Nadine was identified for
22   layoff?
23     A.   I don't recall.
24     Q.   Did you agree with the decision to
25   select Nadine for layoff?
```

Page 70

```
 1            B. F. LIVOLSKI
 2     A.   Yes.
 3        MR. BATTAGLIA:  Objection.
 4     Q.   How about Mr. Wilder?
 5     A.   Yes.
 6     Q.   Were there any other people you
 7   discussed with Mr. Pellegrini that you
 8   identified for layoff?
 9        MR. BATTAGLIA:  Objection.
10     A.   Well, I could tell you that we
11   probably discussed every person.  As I said
12   before, the objective was to come to the
13   proper conclusions.  I would have thought that
14   we would have touched on each person.  That
15   they may not have been lengthy conversations,
16   but we would have touched on each person.
17        As an example, we would have
18   talked about Michael Ho.  Michael Ho has, you
19   know, dominated business in the south of
20   Florida, Louisiana, Tennessee.  A significant
21   producer and someone who has worked on many of
22   the accounts that I had established over the
23   years.
24        Mike Baldwin would have been
25   somebody who has dominated the school business
```



FILED UNDER SEAL

Page 72

```
 1            B. F. LIVOLSKI
 2   given the problems that the industry was
 3   having with derivatives, it made sense that he
 4   would be part of our organization going
 5   forward.
 6     Q.   How about Robert Szostak?
 7     A.   Robert Szostak, I don't recall
 8   talking about him.  He is a public power guy,
 9   good experience, did some work in the western
10   part of the state, probably focused more on
11   power and possibly renewals, renewal of merge.
12     Q.   Did you talk about Nadine?
13        MR. BATTAGLIA:  Objection.
14     A.   Of course we talked about Nadine.
15   I remember discussing Connecticut because I
16   knew secondhand from Kristen that she had been
17   involved in Connecticut.  We talked about what
18   other areas did she have a significant role or
19   a major influence.  And quite frankly, there
20   weren't.
21     Q.   How about Broward County?
22     A.   We may have -- she may have been
23   asked to work in Broward County, help us
24   there.
25     Q.   Did you discuss the Virgin
```



Page 73

1        B. F. LIVOLSKI
2  Islands?
3     A.   With Norm Pellegrini?
4     Q.   Yes.
5     A.   I don't recall that.
6     Q.   With respect to Michael Baldwin
7  you said he was involved in the school
8  business?
9     A.   School districts, that's one part
10 of his responsibility.
11    Q.   What was the other part?
12    A.   He would do general regional
13 business, county business, etc..
14    Q.   Did anyone else do school district
15 transactions in the southeast?
16         MR. BATTAGLIA:  Objection.
17    A.   Prior to Mike Baldwin joining the
18 firm, Rick Paterson had spent time in that
19 area.  He probably -- he might have very well
20 had one or two accounts that he continued to
21 work on, even when he was a derivative banker.
22 Michael Ho may have worked on a school
23 district.
24         Years ago I probably worked on
25 school districts myself.  I couldn't be

Page 74

1        B. F. LIVOLSKI
2  specific.
3     Q.   How was the school district
4  business doing in 2008?
5     A.   It was a, my recollection, it was
6  a fairly good business.
7     Q.   What does that mean?
8     A.   Is that it was consistent.  There
9  were, you know, transactions that were out
10 there that were either, you know, potentially
11 getting done or would be done for the future.
12 There would be needs, construction needs for
13 schools.  Florida was a growing community in
14 those days.  And there would have been -- it
15 was likely that there would be expansion in
16 the school district space.
17         School districts, just so we're
18 clear, is defined as K through 12 in Florida.
19    Q.   Do you know how much revenue
20 Citigroup generated from school district
21 transactions?
22    A.   Since when?
23    Q.   In '08.
24    A.   No, I don't have any idea.
25    Q.   Do you know if it was a long

Page 75

1        B. F. LIVOLSKI
2  running?
3     A.   I couldn't say for sure.
4     Q.   Do you know how much revenue
5  Michael Baldwin generated for Citigroup in
6  2008?
7     A.   Who?
8     Q.   Michael Baldwin.
9          MR. BATTAGLIA:  Objection.
10    A.   I don't recall that.
11    Q.   Do you know if it was more than a
12 million dollars?
13         MR. BATTAGLIA:  Objection.
14    A.   I didn't hear that.
15    Q.   Do you know if it was more than a
16 million dollars?
17         MR. BATTAGLIA:  Objection.
18    A.   I don't recall that.  I don't
19 know.
20    Q.   If it was less than a million
21 dollars, would you be surprised?
22         MR. BATTAGLIA:  Objection.
23    A.   This is a roller coaster, revenues
24 are up and down.  Very few bankers grow their
25 revenues this way.  It is a question of what

Page 76

1        B. F. LIVOLSKI
2  your focus is, what your client base is, what
3  your clients base is doing.  Are they in the
4  market, will they be in the market.
5          So if you tell me that Michael
6  Baldwin generated less than a million dollars,
7  it would probably surprise me, but it wouldn't
8  shock me.  And you know, that's the business.
9          I mean, if you looked at the
10 revenue sheets that I -- from myself over the
11 years, I guarantee you that they didn't go
12 straight up.  So it is just not -- you are not
13 subjected to just the work you do.  You are
14 not subjected to just the -- you know, if the
15 hearty work, the more revenues generated.
16         Your clients have to be in the
17 marketplace.  And part of our business is not
18 just writing tickets in any given year, it is
19 about continuing to grow a business, create a
20 stable of clients and position yourself to do
21 financing so in fact they are in the
22 marketplace.
23    Q.   Now you just mentioned revenue
24 sheets.  What are you referring to?
25    A.   Well, that's just a general term.



BARTLEY F. LIVOLSKI  
AMY BARTOLETTI vs CITIGROUP INC.  
August 28, 2012  
85–88

Page 85

1      B. F. LIVOLSKI
2      I will wait and see if you lay a
3   foundation for his knowledge of them.
4      Q.   Did you have an opportunity to
5   review the document?
6      A.   Thank you.
7      Q.   Have you had an opportunity to
8   review it?
9      A.   I have, yes.
10     Q.   Have you seen any of these
11  documents before?
12     A.   I don't recall them.
13     Q.   Do you recall if Nadine Mentor
14  covered Miami Dade County?
15          MR. BATTAGLIA:  Objection.
16     A.   She may have been one of the
17  bankers assigned to it.
18     Q.   Do you know who had the primary
19  relationship with Miami Dade County?
20     A.   Yeah.  I mean, as far as I have
21  known historically it would have been Norm
22  Pellegrini.
23     Q.   Do you know who is the lead banker
24  for Miami Dade County?
25          MR. BATTAGLIA:  Objection.

Page 86

1      B. F. LIVOLSKI
2      A.   I would have to say it would be
3   Norm Pellegrini.
4      Q.   Do you know that or are you
5   guessing?
6      A.   Well, logical conclusion would be
7   that if you are the responsible -- if you are
8   the senior banker for the account and you have
9   the relationship, you are technically the lead
10  banker.  That doesn't necessarily mean you are
11  working on that account day to day, but are
12  technically the lead banker.
13     Q.   Do you know if Nadine covered the
14  City of Miami?
15          MR. BATTAGLIA:  Objection.
16     A.   Possibly.
17     Q.   Do you know who was the lead
18  banker for that client?
19     A.   No.
20     Q.   Do you know who was the person
21  with primary responsibility for the
22  relationship?
23     A.   I can't -- I have no idea.
24     Q.   Do you know if Nadine covered
25  Miami Dade schools?

Page 87

1      B. F. LIVOLSKI
2      A.   I couldn't say that she was the
3   primary banker.  It was probably Mike Baldwin,
4   but I -- but she very well could have been
5   part of the team.
6      Q.   Do you know if Nadine covered
7   Miami Dade Expressway Authority?
8      A.   She may have.
9      Q.   Do you know who was the lead
10  banker?
11     A.   I would envision that it was Norm
12  Pellegrini.
13     Q.   Do you know, are you guessing?
14     A.   I am guessing.
15     Q.   Do you know who the primary
16  relationship with Miami Dade Expressway
17  Authority was?
18     A.   Excuse me?
19     Q.   Do you know who had the primary
20  relationship with Miami Dade Expressway?
21     A.   I would make the assumption it was
22  Norm Pellegrini because he handled those
23  accounts for many years.
24     Q.   Do you know if Nadine covered the
25  City of North Miami?

Page 88

1      B. F. LIVOLSKI
2      A.   Can you are you repeat, please?
3      Q.   Do you know if Nadine covered the
4   City of North Miami?
5      A.   I don't know.
6          MR. BATTAGLIA:  Objection.
7      Q.   Do you know who had the primary
8   relationship of that client?
9      A.   I don't know.
10     Q.   Do you know if Nadine covered City
11  of North Miami CRA?
12     A.   I don't know.
13     Q.   Do you know who was the lead
14  banker for that client?
15     A.   I don't know.
16     Q.   Do you know who had the primary
17  relationship with that client?
18     A.   I don't know.
19     Q.   Do you know if Nadine covered
20  Broward County?
21     A.   She probably was involved in
22  Broward County, yes.
23     Q.   Do you know who was the lead
24  banker for Broward County?
25     A.   There I think it was Norm



800.211.DEPO (3376)  
EsquireSolutions.com

Page 89

```
 1         B. F. LIVOLSKI
 2   Pellegrini.
 3       Q.   Do you know who had the primary
 4   relationship with Broward County?
 5       A.   It would have been Norm
 6   Pellegrini.
 7       Q.   Do you know if Nadine covered the
 8   City of Hollywood, Florida?
 9       A.   I don't know.
10       Q.   Do you know who was the lead
11   banker for that client?
12       A.   I don't know.
13       Q.   Do you know who had the primary
14   relationship with that client?
15       A.   I don't know.
16       Q.   Do you know if Nadine covered the
17   City of Hollywood Beach CRA?
18       A.   I have no idea.
19       Q.   Do you know who was the lead
20   banker?
21       A.   I have no idea.
22       Q.   Do you know who had the primary
23   relationship with that client?
24       A.   No.
25       Q.   Do you know if Nadine covered
```

Page 90

```
 1         B. F. LIVOLSKI
 2   Orange County Expressway Authority?
 3       A.   No.
 4       Q.   Do you know who was the lead
 5   banker for that?
 6       A.   Norm Pellegrini.
 7       Q.   Do you know who had the primary
 8   relationship with that client?
 9       A.   Norm Pellegrini.
10       Q.   Do you know if she covered
11   Pennbrook Pines, Florida?
12       A.   I don't know.
13       Q.   Do you know who was the lead
14   banker for that client?
15       A.   I don't know.
16       Q.   Do you know who had the primary
17   relationship with that client?
18       A.   I wouldn't know.  Most of these
19   clients, because they are irrelevant.
20       Q.   They are what?
21       A.   Irrelevant.
22       Q.   Why is that?
23       A.   Because they are small and
24   typically don't do a lot and, you know,
25   wouldn't be something that would hit my radar
```

Page 91

```
 1         B. F. LIVOLSKI
 2   screen.
 3       Q.   What do you consider a lot?
 4       A.   I would consider a client that was
 5   in the market on at least an annual basis with
 6   sizable transactions.  Miami Dade schools, MDX
 7   may have been, Orange Orlando Expressway,
 8   Broward County.  Miami Beach wouldn't be
 9   considered that, Miami wouldn't be considered
10   that.
11       Q.   What do you mean by "sizable
12   transaction"?
13       A.   It could be a couple of hundred to
14   $500 million transactions.
15       Q.   The value of the transaction?
16       A.   The principal amount of the
17   transaction.
18       Q.   And is the principal amount of the
19   transaction tied to the revenue that Citi
20   generates from the transaction?
21       A.   It would be likely we get paid a
22   percentage of the principal amount.
23       Q.   Do you know if Nadine covered the
24   City of Atlanta?
25       A.   I am not sure.  Possibly.
```

Page 92

```
 1         B. F. LIVOLSKI
 2       Q.   Do you know who was the lead
 3   banker for that client?
 4       A.   Again, it would have been Guy
 5   Logan.
 6       Q.   Do you know who had the primary
 7   relationship with that client?
 8       A.   It would have been Guy Logan.
 9       Q.   Do you know if Nadine covered Cobb
10   County Georgia?
11       A.   Possibly.
12       Q.   Do you know who the lead banker
13   was for that client?
14       A.   It would have been either Noga,
15   Ray Noga, Rick Paterson or Guy Logan.
16       Q.   Do you know who had the primary
17   relationship with that client?
18       A.   It would have been either one of
19   those three probably, Ray Noga.
20       Q.   Do you know if Nadine covered
21   Fulton County Georgia?
22       A.   I have no idea.
23       Q.   Do you know who was the lead
24   banker for that client?
25       A.   Ray Noga.
```

Page 93

1	B. F. LIVOLSKI
2	Q.	Do you know who had the primary
3	relationship with that client?
4	A.	Ray Noga.
5	Q.	Do you know if Nadine covered
6	Fulton County Recreational Development?
7	A.	I have no idea.
8	Q.	Do you know who was the lead
9	banker for that client?
10	A.	I would make an assumption it was
11	Guy Logan because he was responsible for
12	Atlanta.
13	Q.	Do you know who had the primary
14	relationship of that client?
15	A.	I think it would have been Guy
16	Logan for the same reason I just stated.
17	Q.	Do you know if Nadine covered
18	Virgin Islands Public Finance Authority?
19	A.	She has spent time there.
20	Q.	Do you know if she covered that
21	client?
22		MR. BATTAGLIA:  Objection.
23	A.	I would assume she did, yes.
24	Q.	Do you know what I mean when I say
25	"covered"?

Page 94

1	B. F. LIVOLSKI
2	A.	Well, you could define for me if
3	you like.
4	Q.	You have been answering the
5	questions, so in your mind what does that word
6	mean?
7	A.	Covered means being involved in an
8	account.
9	Q.	Okay.  Do you know who was the
10	lead banker for Virgin Islands Government
11	Public Finance Authority?
12	A.	I don't know for sure, but it
13	could very well have been James Haddon.  He
14	was the original relationship and I don't know
15	if he was still in public finance in '08.
16	Q.	If he was not in public finance in
17	'08, do you know who would be the lead banker
18	for that client?
19	A.	Nadine probably.
20	Q.	Do you know if Nadine covered
21	Virgin Islands Water and Power Authority?
22	A.	I would assume she covered
23	everything in the Virgin Islands.
24	Q.	Do you know if she was the lead
25	banker for anything in the Virgin Islands?

Page 95

1	B. F. LIVOLSKI
2	A.	I would assume she was the lead
3	banker if James Haddon wasn't in public
4	finance at that time.
5	Q.	And would she have been the
6	primary relationship with the Virgin Islands
7	if James Haddon wasn't there at the time?
8	A.	She probably would have been the
9	primary relationship.
10	Q.	Do you know if Nadine covered the
11	City of Detroit?
12	A.	She may have been part of a team
13	that covered Detroit.
14	Q.	Do you know who was the lead
15	banker for that client?
16	A.	If it wasn't Haddon, it was Guy
17	Logan.
18	Q.	And do you know who had the
19	primary relationship with that client?
20	A.	If it wasn't Haddon it was Guy
21	Logan.
22	Q.	Did you discuss any of these
23	clients when you spoke to Mr. Pellegrini?
24	A.	I don't recall.
25	Q.	Let me just finish asking the

Page 96

1	B. F. LIVOLSKI
2	question.
3	A.	I thought you had finished.
4	Q.	It is okay.  My voice makes me
5	stop sometimes.
6		Do you recall discussing any of
7	these clients with Mr. Pellegrini when you
8	were identifying Nadine for layoff?
9	A.	I don't recall discussing
10	individual clients like that.  I don't recall.
11	Q.	If you can flip over to the second
12	page.
13	A.	Okay.
14	Q.	Do you see the section entitled
15	"State of Connecticut"?
16	A.	Yes.
17	Q.	Do you know if Nadine covered any
18	clients for the State of Connecticut?
19	A.	Nadine --
20		MR. BATTAGLIA:  Objection.  You
21		may answer.
22	A.	Nadine was part of the team that
23	covered the State of Connecticut.
24	Q.	And so would she have covered GO?
25	A.	She would have been part of the

Page 125

1  B. F. LIVOLSKI
2  Q. But they all report in to you,
3  don't they?
4  A. No, associates and analysts report
5  to Marty Feinstein.
6  Q. Even if they work in your region?
7  A. Correct.
8  Q. So you have no supervisory
9  authority over analysts and associates?
10     MR. BATTAGLIA: Objection.
11  A. That seems to be the way it works,
12  yes. I don't do a review for them. Their
13  compensation is usually decided by human
14  resources. And that's it.
15  Q. Do the heads of your regions have
16  supervisory authority over the analysts and
17  associates?
18     MR. BATTAGLIA: Objection. You
19  may answer.
20     THE WITNESS: I can answer, right?
21     MR. BATTAGLIA: Yes.
22  A. I would say I have day-to-day
23  responsibility for them, but the actual
24  reporting, they probably report to Marty
25  Feinstein.

Page 126

1  B. F. LIVOLSKI
2  Q. So with respect to the analysts
3  and associates in your regions -- with respect
4  to the analysts and associates in your
5  regions, who would have considered them for
6  layoff?
7     MR. BATTAGLIA: Objection.
8  A. I really don't know what the
9  procedure would have been. Probably some
10  combination of Marty Feinstein, Frank Chin,
11  and the regional manager. I really wasn't
12  involved at that level typically that I can
13  recall.
14  Q. Do you know if Marty Feinstein was
15  familiar with the performance of the analysts
16  and associates in your regions?
17     MR. BATTAGLIA: Objection.
18  A. Well, I would -- his knowledge
19  probably would come from reports that are
20  submitted, evaluations that are submitted by
21  various bankers in the regions and in product
22  groups.
23  Q. Is there a difference in job
24  duties between an associate and a vice
25  president?

Page 127

1  B. F. LIVOLSKI
2     MR. BATTAGLIA: Objection.
3  A. There should be, but I think our
4  biggest problem in the industry is that a lot
5  of associates and a lot of -- a lot of vice
6  presidents do associate work. And I think
7  that's inefficient but that's just the way it
8  is structured.
9  Q. Is that true in November of 2008
10  for the southeast group?
11  A. Always been true. That's not to
12  say that there aren't exceptions and that's
13  not to say that it is a consistent approach.
14  But -- and let me rephrase that.
15     In the regions we're little bit
16  more disciplined, in that I have always
17  encouraged people at various levels to work
18  and achieve at a higher level.
19     Whereas in New York, where it is a
20  little more structured, associates and
21  analysts, even AVP's to a degree tend to end
22  up doing the same work. AVP's and vice
23  presidents are a lot -- typically a lot more
24  experienced, but it is the same work.
25  Q. Other than people selected for

Page 128

1  B. F. LIVOLSKI
2  your regions that you are responsible for,
3  were you involved in decisions to select
4  anyone else for layoff?
5     MR. BATTAGLIA: Objection. You
6  may answer.
7  A. I was in discussions about
8  everyone, but whether I was -- I mean, how do
9  you define involvement? Did I decide who it
10  was, did I isolate, did I select a person, no.
11  Q. So other than your group, you
12  didn't select anyone else?
13     MR. BATTAGLIA: Objection.
14  A. I didn't select anyone. It was a
15  group of people making selections. It was the
16  regional manager, it was me, it was Frank
17  Chin, it would have been David Brownstein.
18     I would not have had input on the
19  selection of a healthcare person. I don't
20  know them. I didn't know what any of those
21  folks did.
22  Q. So the only people who you
23  selected for layoff were those within the
24  regions you were responsible for?
25     MR. BATTAGLIA: Objection. You

