# Exhibit 27

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
AMY BARTOLETTI, CHIA SIU,
NADINE MENTOR, LISA CONLEY
and BRITTANY SHARPTON,

            Plaintiffs,

     -against-                       10CIV7820

CITIGROUP INC. and CITIGROUP
GLOBAL MARKETS, INC.,

            Defendants.
---------------------------------x

              August 21, 2012
              9:31 a.m.
```

Videotaped deposition of FRANCIS Y. CHIN, taken by Plaintiffs at the offices of Thompson Wigdor LLP, 85 Fifth Avenue, New York, New York 10003, before Anneliese R. Tursi, a Registered Professional Reporter and Notary Public within and for the State of New York.



Page 25

1      F. Y. CHIN
2    A.   No.
3    Q.   Have you heard of a similar
4  saying?
5    A.   No.
6    Q.   When did you first become aware
7  that there was going to be a RIF in November
8  of 2008?
9    A.   Probably in late October.
10   Q.   And how did you become aware of
11 that?
12   A.   I was advised by my manager.
13   Q.   And who is your manager?
14   A.   Ward Marsh.
15   Q.   Is that a man or a woman?
16   A.   Man.
17   Q.   And what's Mr. Marsh's job title?
18   A.   He's the head of the municipal
19 securities division.
20   Q.   Do you report directly to Mr.
21 Marsh?
22   A.   Yes, I do.
23   Q.   And did he inform you in person or
24 over the phone or through e-mail?
25   A.   I think we had a meeting.

Page 26

1      F. Y. CHIN
2    Q.   Was anyone else present at that
3  meeting?
4    A.   I'm pretty sure David Brownstein
5  was there.
6    Q.   And how long did this meeting
7  last?
8    A.   You know, I don't recall -- I
9  mean, I don't recall a specific meeting, but,
10 you know, normally, material like that would
11 be done face to face.  Whether Ward did it
12 with his entire management team or just David
13 and myself, or there was a CFO there, I don't
14 recall, but I'm sure I heard it from him.
15   Q.   Okay, my question was how long did
16 that meeting last.
17   A.   I don't know.  Half an hour, 20
18 minutes, I don't.
19   Q.   And I think you said there may
20 have been someone else present at the meeting,
21 in addition to yourself, Mr. Marsh, and Mr.
22 Brownstein?
23   A.   As I said, I don't recall which
24 specific meeting we were told that was going
25 on.  He has regular -- group heads, his

Page 27

1      F. Y. CHIN
2  managers, direct report -- meetings, and so
3  I'm sure it was discussed at one of those
4  meetings.  And whether, you know, and at some
5  times he would have his finance person for the
6  division there, so the same thing, depending
7  upon -- a circumstance like this I would
8  assume he would have been there as well.
9    Q.   And does Mr. Marsh have a
10 management team?
11   A.   Direct reports.
12   Q.   And who would that be?
13   A.   It would be David and myself,
14 Peter Bartlett, Joe Geraci who are co-heads of
15 capital markets.  Andy Ditan and Hal
16 Kuihendahl, K-U-I-H-E-N-D-A-H-L, and Peggy
17 Krieger who manages our compliance area.  And
18 at times Marc Sabino who was the CFO at the
19 time for the division.
20   Q.   Peggy is a man or a woman?
21   A.   Peggy?
22   Q.   Yes.
23   A.   Woman.
24   Q.   And what did Mr. Marsh tell you at
25 this meeting?

Page 28

1      F. Y. CHIN
2         MR. TURNBULL:  Objection.
3    A.   You know, I think we were told
4  there would be another round in '08, that I
5  think we learned at some point around that
6  time, I learned there would be, that kind of
7  we were given a budget to meet regarding RIFs,
8  that the criteria for meeting that budget
9  would include consideration for people's
10 salaries, as well as incentive comp and there
11 was some adjustment for I think benefits.
12   Q.   And was this conversation
13 specifically for the public finance group,
14 public finance department?
15   A.   I think the way Ward would handle
16 it is, he would have a conversation with all
17 the managers so they understood the parameters
18 of the next RIF and then -- then I don't --
19 the conversation what his expectations of
20 public finance did not include anyone other
21 than -- anyone outside of public finance, as I
22 recall.
23   Q.   And were you given a budget by Mr.
24 Marsh for the RIF?
25   A.   I believe so.



Case 1:10-cv-07820-LGS   Document 60-27   Filed 06/26/13   Page 4 of 14

FRANCIS Y. CHIN  
AMY BARTOLETTI vs. CITIGROUP  
August 21, 2012  
29–32

Page 29

1    F. Y. CHIN
2    Q.   Do you know what that budget was?
3    A.   I don't recall the number, but I
4  think it was below 20, but it was a pretty
5  high number in my estimation.
6    Q.   20 million?
7        MR. TURNBULL:  You have to answer
8    verbally.
9    A.   20 million.
10       MR. TURNBULL:  Yes?
11   A.   Yes.
12       MR. DATOO:  Or yes.
13       MR. TURNBULL:  You just nodded
14   your head, that's all.
15       THE WITNESS:  I know, apologies.
16       MR. DATOO:  I'm just going to let
17   the ambulance pass.
18       THE WITNESS:  Good idea.
19   Q.   And did anyone say anything to Mr.
20 Marsh at this meeting?
21   A.   I don't recall any particular
22 conversations, but I am certain people were
23 very upset.
24   Q.   Did you say anything at this
25 meeting?

Page 30

1    F. Y. CHIN
2    A.   I doubt it.
3    Q.   Did Mr. Brownstein say anything at
4  this meeting?
5    A.   I don't recall.
6    Q.   And just so I understand, you were
7  supposed to come up with a savings of $20
8  million?  Was that the purpose of the budget?
9    A.   Yes.
10       MR. TURNBULL:  Objection:
11   misstates testimony.
12   A.   We were given an ask of $20
13 million and see -- and ask who would we RIF to
14 meet that budget.
15   Q.   And was that a hard number?
16       MR. TURNBULL:  Objection to form.
17   Q.   Do you know what I mean by hard
18 number?
19   A.   Well, that's what was asked of me,
20 a number.  I'm not sure it was 20, but
21 definitely a number was asked of us.
22   Q.   Is there a document that would
23 reflect the exact figure for the budget?
24   A.   Not that I know of.
25   Q.   Were any of these discussions over

Page 31

1    F. Y. CHIN
2  e-mail?
3    A.   I doubt it.
4    Q.   Do you know if what Mr. Marsh
5  discussed at this meeting was memorialized in
6  e-mail?
7    A.   I don't recall any e-mails on it.
8    Q.   Or also any other type of
9  document?
10   A.   Nope.
11   Q.   Did you write it down, what the
12 figure was?
13   A.   I had the formula.
14   Q.   I'm sorry?
15   A.   I had the formula.  There was a
16 formula how the budget was arrived at.
17   Q.   And do you still have that
18 formula?
19   A.   I don't have it.  It is in the
20 documents I think that were discovered.
21   Q.   Did you turn these documents over
22 to your attorneys?
23   A.   As part of the discovery in the
24 search, I provided anything I had related to
25 the material required.

Page 32

1    F. Y. CHIN
2    Q.   And that would include this
3  formula on how this approximate $20 million
4  figure was arrived at?
5        MR. TURNBULL:  Objection:
6    misstates testimony.
7    A.   I don't know.  I said I didn't
8  think the $20 million was anywhere.
9    Q.   I'm sorry?
10   A.   I don't believe the $20 million
11 was written done anywhere.  That was something
12 we were told to work around.
13   Q.   There was just a formula?
14   A.   The formula was there, there was a
15 targeted number, I believe it was less than
16 20, but I'm not sure what the number was so
17 that's what we worked off of.
18   Q.   Can you explain this formula to
19 me.
20   A.   As I recall, it had a coefficient
21 for, against incentive compensation.  I think
22 it was two-thirds of your incentive
23 compensation.  I think there was a fixed
24 number for related benefits and there was some
25 number related to salary and a combination of



Case 1:10-cv-07820-LGS  Document 60-27  Filed 06/26/13  Page 5 of 14

FRANCIS Y. CHIN
AMY BARTOLETTI vs. CITIGROUP
August 21, 2012
33–36

Page 33

1  F. Y. CHIN
2  those three was the target generated by any
3  person who was RIFed, and the accumulation of
4  those numbers had to reach a budgeted number
5  of some amount.
6  Q. So at the end of the day the
7  savings had to be whatever the resulting
8  number was from that formula?
9  A. The formula yielded a savings
10 number, yes.
11 Q. And when you say incentive comp,
12 is that another term for discretionary bonus?
13 A. Yes.
14 Q. Is there any other type of
15 incentive comp other than a discretionary
16 bonus?
17 A. I don't believe so.
18 Q. And after this meeting, did you
19 have any discussions with anyone about what
20 was just discussed?
21   MR. TURNBULL: Objection to form.
22 A. Well, David was in, I'm pretty
23 sure David was in the meeting so I guess we
24 talked about it. But I'm not sure of any
25 immediate conversations. The question is what

Page 34

1  F. Y. CHIN
2  do the formulas mean and what it would take to
3  get to the budget.
4  Q. Did this meeting take place in New
5  York?
6  A. I'm sure it did.
7  Q. At Citi's offices?
8  A. Yes.
9  Q. Where are those located?
10 A. 390 Greenwich Street.
11 Q. Is that the head office?
12 A. No.
13 Q. Where is the head office?
14 A. I think Citi corporate
15 headquarters is 399 Park I think.
16 Q. And so what were the next steps
17 you took in order to achieve these savings?
18 A. If you, the way the department is
19 organized, it is organized against lines of
20 businesses. The lines are organized on a
21 geographical basis, as well as an industry
22 basis. So each of these elements or each of
23 these silos, have responsibility for major
24 account activities in their immediate places.
25   So the question was, given the

Page 35

1  F. Y. CHIN
2  business environment and the markets
3  environment, a starting point was trying to
4  figure out future business prospects for each
5  of these silos, and then try to make a
6  judgment about head count and cost of doing
7  business related to those activities and try
8  to, if you will, right-size the department in
9  anticipation of a fairly volatile and
10 uncertain market.
11 Q. And who were you working with in
12 order to achieve this $20 million figure?
13 A. Myself.
14 Q. How about Mr. Brownstein?
15 A. My conclusion was, it was easier
16 for one person to start, do at least a first
17 cut at it.
18 Q. The first cut at it. And how did
19 you -- well, describe to me the steps you
20 took, then, in order to achieve these savings?
21 A. Well, the first question was how
22 would the formula work. You know, I think I
23 tried to figure out, based on average comp
24 levels, you know, what type of, what the
25 population of a potential RIF would look like,

Page 36

1  F. Y. CHIN
2  and given the bias toward incentive
3  compensation, it was pretty clear that the
4  large percentage of the budget would be met
5  through highly compensated individuals in the
6  department, at which point then you looked at
7  the different business lines and tried to
8  figure out what business lines were
9  overstaffed.
10 Q. And did you form some sort of
11 committee to help you out with this task?
12 A. Nope.
13 Q. You handled it by yourself?
14 A. Pretty much, yes.
15 Q. What do you mean by pretty much?
16 A. You know, I kind of charged
17 different group heads with kind of
18 expectations about needing to reduce their
19 head count after we made some judgments and
20 they were asked to go provide some feedback on
21 who those individuals would be. So I tried to
22 figure out what that generated in terms of
23 towards the budget.
24 Q. So who did you, which group heads
25 did you charge with the task?



Case 1:10-cv-07820-LGS   Document 60-27   Filed 06/26/13   Page 6 of 14

FRANCIS Y. CHIN
AMY BARTOLETTI vs. CITIGROUP
August 21, 2012
37–40

Page 37

1    F. Y. CHIN
2    A. I think everyone was advised that
3 we would be undergoing head count reduction.
4    Q. When you say everyone, you mean
5 the group heads?
6    A. All my direct reports, yes.
7    Q. And those are all the group heads?
8    A. Group heads.
9    Q. Of the industry groups and the
10 geographic groups?
11   A. Yes.
12   Q. And when did you advise them of
13 this?
14   A. Either end of October, early
15 November, something like that.
16   Q. And how did you advise them of
17 this?
18   A. Probably sent everybody an e-mail.
19   Q. Do you recall having a meeting
20 with them in person?
21   A. I doubt if we did a personal
22 meeting. We're too scattered geographically.
23 Probably did a call, conference call.
24   Q. Conference call. And what exactly
25 did you tell them?

Page 38

1    F. Y. CHIN
2    A. I told them we were doing another
3 RIF. That this one would have, important to
4 consider compensation, incentive compensation
5 in particular, and that people had to start
6 thinking about the impact of what was
7 happening in the marketplace on their future
8 business prospects, and in particular their
9 revenue generating capabilities, and that we
10 were going to have to, I'm pretty sure I told
11 everybody that was going to be a factor in
12 determining what we do from a staffing
13 perspective going forward.
14   Q. And did you give each group a
15 certain dollar figure to cut?
16   A. I don't believe so.
17   Q. So how would the group head have
18 known how many people they would have had to
19 select?
20        MR. TURNBULL: Objection to form.
21   A. I believe I told everybody I
22 expected, as a general matter, that I wanted
23 to find out who their weakest performers were,
24 see what that happened and I think there was
25 specific instructions to the healthcare group

Page 39

1    F. Y. CHIN
2 that their staffing was just too high going
3 forward.
4    Q. Why the healthcare group?
5    A. There were products they were
6 involved in doing in the past, that given the
7 financial conditions of Citigroup that were
8 not going to be done in the future because
9 they required balance sheet and high levels of
10 credit and the like. So you could see a
11 fairly dramatic reduction in their
12 revenue-generating capabilities. And their
13 department or their head count was driven by
14 that profitability, so with clearly a
15 significant drop in that revenue capability,
16 they were just overstaffed.
17   Q. Did you have one-on-one or
18 one-on-two conversations with the group heads
19 of each group?
20   A. I doubt it.
21   Q. And so did you say anything else
22 on this call about what the group heads needed
23 to think about?
24        MR. TURNBULL: Objection.
25   A. I don't recall anything else

Page 40

1    F. Y. CHIN
2 beyond that.
3    Q. And what happened after that?
4    A. I think -- I'm sure at some point
5 they were told to come back with or call me up
6 with their suggestions. I'm sure I gathered
7 them and tried to figure out what it meant for
8 the budget.
9    Q. And by suggestions, what do you
10 mean?
11   A. People; people they would RIF.
12   Q. And do you know if any of this was
13 done by e-mail?
14   A. I'd be surprised.
15   Q. Why would you be surprised?
16   A. In my view things like this are
17 too sensitive for e-mail and I just want to
18 talk to the individuals to get a sense of
19 their tone of voice and how they are feeling
20 about it, and e-mails tend to be very
21 answer-specific line questions. And I can't
22 delve into the decision-making process on
23 e-mails.
24   Q. And did you give the group heads
25 some sort of deadline by when they had to get



Page 61

1  F. Y. CHIN
2  Q. The names that appear in the rows,
3  are those people that worked on the
4  transaction?
5  A. Those are people that if Lisa was
6  the coordinating banker, she submitted as part
7  of the deal team. I don't know if for certain
8  they all worked on it, how much they worked on
9  it, nor what they did on it.
10  Q. But the representation is people
11  who worked on the team?
12  A. Were involved in the transaction
13  in some form.
14  Q. And do you have any reason to
15  doubt the accuracy of the information
16  submitted to Eileen?
17      MR. TURNBULL: Objection to form.
18  A. I wouldn't think people -- I don't
19  believe they would put in false information.
20  Q. And is there any significance as
21  to the revenue generated by a particular
22  transaction?
23  A. Well, since we are a revenue
24  business, or net income business, you need to
25  know where revenues are being generated by

Page 62

1  F. Y. CHIN
2  what clients and on what basis. So revenues
3  are important what we do as a department.
4  Q. And if someone is working on a
5  particular transaction that is generating
6  revenue, is that considered a good thing?
7  A. It's good to be associated with
8  transactions and revenues. The problem with a
9  system like this is because there is no
10  recognition of the role they play, people
11  could construe a report like this to give them
12  a reason to put their name on every
13  transaction which would clearly inflate their
14  revenue report number for their name.
15  Q. Have you seen any instances of
16  that?
17  A. None in particular, but I'm sure
18  people, given the fact that they think the
19  revenue report is the only thing we look at on
20  compensation, I'm sure they view it's in their
21  self-interest to inflate the number.
22  Q. But this sheet is only distributed
23  to the group heads, correct?
24  A. If the group heads ask for it and
25  their bankers ask for it, I'm sure they give

Page 63

1  F. Y. CHIN
2  it to their bankers.
3  Q. Do you have any reason to believe
4  that Lisa Conley in this case inflated her
5  numbers?
6  A. As I said, I'm sure people do it.
7  In some ways it's actually not that important
8  in the grand scheme of things.
9  Q. So when you say I'm sure, are you
10  guessing?
11  A. Yes.
12  Q. Yes?
13  A. I'm guessing.
14  Q. And do you consider the
15  information on this sheet when making
16  compensation decisions?
17  A. Not for individuals, no.
18  Q. Is there any other type of comp,
19  other than individual comp?
20      MR. TURNBULL: Objection.
21  A. If you are asking whether a
22  person's incentive compensation is determined
23  solely on the basis of this, the answer is no.
24  Q. Okay.
25  A. The determination of incentive

Page 64

1  F. Y. CHIN
2  comp for an individual includes a number of
3  factors. Revenues are a small part of it. I
4  leave the determination of the value of an
5  individual within a group to the group heads.
6      We clearly look at the group
7  revenues. We look at the nature of the
8  business, their market share. We look at
9  contributions. We look at the value to the
10  culture of the department. We look at the
11  quality of the enterprise. We look at the
12  long-term prospects for our business.
13      But my focus is primarily
14  initially on group performances, and then
15  within that I have recommendations as to what
16  people may or may not get paid. But the
17  ultimate determination is made by the group
18  heads themselves.
19  Q. So do you recommend a number to
20  the group head?
21  A. For incentive compensation, yes.
22  Q. And is that after you receive
23  feedback from the group head?
24  A. No, I give them my -- I'll give
25  them a view initially, and they respond to it.



Page 85

1        F. Y. CHIN
2    Q.    And so what happened after you
3  were given this initial list of names?
4    A.    Because of the formulation, you
5  basically get a benefit, if you will, from the
6  people who were RIFed, and you try to -- you
7  look at the total generated and compare it to
8  the ask, and it suggests that you would have
9  to go back and find more candidates for a RIF.
10   Q.    So with respect to the November
11 2008 RIF, how many names were on the initial
12 list?
13   A.    I don't recall.
14   Q.    Was it more than 20?
15   A.    I just don't recall, but I'm sure
16 it is a pretty high number.
17   Q.    Do you recall what the total
18 savings was?
19   A.    No.
20   Q.    Was it close to the ask?
21   A.    I don't know the exact number, no.
22   Q.    So what happened after that?
23   A.    I'm pretty sure we were short and
24 I think we had to go back and figure out how
25 to basically get to that number, to get to a

Page 86

1        F. Y. CHIN
2  final list.
3        We went back, same thing, same
4  process, trying to determine who we thought
5  was overstaffed, what we thought were the
6  future prospects in any particular area, you
7  know, and I don't remember how short we were,
8  if we were short, to try to get down to a
9  final list.
10   Q.    And did you participate in the
11 selection of any people for the RIF, for the
12 November 2008 RIF?
13   A.    I was involved in determination of
14 what we do with the housing, the senior
15 housing bankers.
16   Q.    And who would that be?
17   A.    It would be Amy Bartoletti and
18 Mike Koessel.
19   Q.    How about Chia Siu?
20   A.    I don't think she was an officer
21 at that point, so I really didn't get involved
22 with that one.
23   Q.    How about Ping?
24   A.    Same thing: I didn't get involved
25 with that one.

Page 87

1        F. Y. CHIN
2    Q.    Do you recall if Ping was a vice
3  president at that point?
4    A.    I don't recall her title.
5    Q.    If she was a vice president, would
6  you have been involved?
7    A.    Possibly, but I think the big
8  issue with the housing group was really the
9  two directors.
10   Q.    Why were you involved in that if
11 Brownstein, Mr. Brownstein was managing the
12 housing group?
13   A.    I think the issue on the table was
14 do we even keep the housing group.
15   Q.    So leaving the housing group
16 aside, did you participate in the selection of
17 anybody for layoff?
18   A.    No.
19   Q.    Did you ever recommend any names?
20   A.    No.
21   Q.    So going back a bit, after you had
22 this, I guess this second conversation or this
23 next conversation with the group heads about
24 being short, was that over the phone, was that
25 in person?

Page 88

1        F. Y. CHIN
2    MR. TURNBULL:  Objection:
3  misstates the testimony.
4    A.    Yeah, I don't recall, but I know
5  we collected the information through some
6  means and created a new list.
7        At that point I assume it was
8  close enough to our ask to submit it.  So I'm
9  sure we sent it in.
10   Q.    So were there two rounds of the
11 group heads giving you names?
12   A.    I don't think so.
13   Q.    Were there more than two rounds?
14   A.    I just think we did the initial
15 round, developed the next submission and I
16 think they were out of the loop at that point.
17   Q.    I'm sorry, I'm just having a
18 little trouble following.
19   A.    So you had the first round.
20   Q.    Yes, where you asked them for
21 names and they gave you names?
22   A.    Right.  The second was they would,
23 then we would have to go back and decide
24 whether we needed more, right.  And then we
25 created that list.  And then I'm sure that



Case 1:10-cv-07820-LGS   Document 60-27   Filed 06/26/13   Page 9 of 14

FRANCIS Y. CHIN	August 21, 2012
AMY BARTOLETTI vs. CITIGROUP	93–96

Page 93

1    F. Y. CHIN
2    Q.   I'm sorry?
3    A.   I said other than David, I don't
4  think so.
5    Q.   What did you discuss with David
6  about people on the initial list?
7    A.   Go back to the basic goal was to
8  hit a budget target.  So the question is how
9  far off were we from the original, from the
10 budget.  So I'm sure we had an estimate of
11 what the benefit from the original group was
12 and to try to figure out how we meet our
13 budget.
14   Q.   Did you ever discuss specific
15 people with David?
16   A.   Other than the question about the
17 housing group, no.
18   Q.   How about with the group heads,
19 did you have any specific discussions about
20 people on the list?
21   A.   Only with the people on the list
22 from their group.
23   Q.   And what were the nature of these
24 discussions?
25   A.   Excuse me?

Page 94

1    F. Y. CHIN
2    Q.   With the group heads, I believe
3  you just testified that you discussed the
4  specific people in their group with them.  Is
5  that correct?
6    A.   I might have with some of them.
7    Q.   And what was the nature of those
8  discussions?
9    A.   I don't recall.  It was probably
10 more of, are you comfortable with the list you
11 are submitting.
12   Q.   And why would you have those
13 discussions with the group heads?
14   A.   Just to make sure.
15   Q.   Make sure of what?
16   A.   Make sure they are comfortable
17 with what they submitted.
18   Q.   Why wouldn't they be comfortable
19 with the list of names they submitted?
20   A.   Regret is an interesting human
21 nature, and after they thought about it
22 overnight, they said I should have done
23 somebody else.  They have the right to kind of
24 change their mind.
25   Q.   Do you recall any group heads

Page 95

1    F. Y. CHIN
2  changing their minds?
3    A.   No.
4    Q.   Do you recall if any group heads
5  fought to keep people off the list?
6         MR. TURNBULL:  Objection to form.
7    A.   Everyone complained.  It's human
8  nature.
9    Q.   What did they complain about?
10   A.   They thought they shouldn't let
11 anyone go.
12   Q.   So did any group head not nominate
13 a person or people for layoff?
14   A.   I don't think anyone -- I think
15 everyone lost at least somebody, I believe,
16 but I don't recall offhand.
17   Q.   Did any group heads attempt to not
18 have anyone laid off?
19        MR. TURNBULL:  Objection to form.
20   A.   Everyone didn't want to lose -- no
21 one wanted to lose anyone.
22   Q.   Did you have a discussion with any
23 group heads?
24   A.   It was never about any specific
25 name.  It was always:  Do I really have to do

Page 96

1    F. Y. CHIN
2  this?  And I said, yes, you have to do this.
3    Q.   Do you recall having an e-mail
4  exchange with Ray Noga about people in his
5  group being selected for the RIF?
6    A.   Yeah.
7    Q.   And what was the substance of that
8  e-mail exchange?
9    A.   He was like every other group
10 head.  He thought it was unfair that anyone in
11 his group should be RIFed.
12   Q.   Did he ask for certain people to
13 be removed from the list?
14   A.   He definitely complained about his
15 folks.  You know, whether -- I don't recall if
16 he wanted somebody off or other people on or
17 whatever.
18   Q.   You asked the group heads to
19 select people who they could live without,
20 correct?
21   A.   Who?
22   Q.   They could live without in their
23 group?
24   A.   Within their group, yes.
25   Q.   And Mr. Noga gave you a name or



Page 97

1         F. Y. CHIN
2  names, didn't he?
3      A.   I don't remember what his comments
4  were, but I know we reduced -- we RIFed
5  someone out of the Southwest.
6      Q.   And was he trying to get someone
7  else RIFed out of another group in order to
8  save his people?
9      A.   I don't recall, but that wasn't
10 something I'd entertain.
11     Q.   Why not?
12     A.   I just didn't believe any group
13 head knew enough about what was going on in
14 another group to be in a position to make that
15 determination for another group.
16     Q.   And were you in a position to make
17 any determinations as to who should be
18 selected for layoff, other than the housing
19 group?
20     A.   Indirectly involved?
21     Q.   Yes.
22     A.   I left that determination to the
23 group heads.
24     Q.   How about indirectly?
25     A.   I submitted the lists, so since

Page 98

1         F. Y. CHIN
2  the list had to go from me to somebody, you
3  could say that, but I didn't get to
4  participate actively in that determination.
5      Q.   Do you think you were qualified to
6  directly select people for layoff?
7          MR. TURNBULL:  Objection to form.
8      A.   I didn't do that.  I think I'm
9  qualified to direct my management team to
10 select group -- individuals within their own
11 groups for a RIF.
12     Q.   So you wouldn't consider yourself
13 in a position to select people from specific
14 groups, correct?
15         MR. TURNBULL:  Objection to form.
16     A.   I didn't believe I needed to do
17 that.
18     Q.   Is that because you didn't know
19 what they did on a day-to-day basis?
20     A.   You know, each -- the answer is
21 yes.  I mean, each group head managed their
22 business with the resources they had which are
23 people, and they had to make those
24 determinations.
25     Q.   So is it because you were not in a

Page 99

1         F. Y. CHIN
2  position to make those determinations?
3          MR. TURNBULL:  Objection to form.
4      A.   I try to empower my managers.
5      Q.   Well, could you have determined
6  who was the least valuable in each group?
7      A.   My view is, the high level
8  determination I had to make was what
9  businesses I thought would be viable going
10 forward.  That's my primary focus.
11     Q.   Mr. Chin, I don't think you are
12 answering the question.  The question is, were
13 you qualified to make the selection for each
14 group?
15         MR. TURNBULL:  Objection to form.
16         That was not the prior question, but I
17         object to the form of this question.
18     A.   Since I wasn't doing that, I don't
19 know.  I mean, if someone asked me to do it, I
20 think I would have been able to do it.  But
21 since it wasn't the way the process went, the
22 same thing, I'm not sure that's relevant.
23     Q.   Well, you testified earlier that
24 you didn't know what some of your senior
25 officers did on a day-to-day basis, correct?

Page 100

1         F. Y. CHIN
2      A.   I didn't say that.  I said that --
3  you asked me how the senior group heads
4  managed their groups, and I really don't know
5  on a day-to-day basis how they manage their
6  groups.
7      Q.   You testified earlier that you did
8  not know which people were primarily
9  responsible for certain clients, correct?
10     A.   Yes.
11     Q.   And you also testified earlier, I
12 believe, that you were not familiar with what
13 your senior officers did on a day-to-day
14 basis, correct?
15     A.   In many cases, correct.
16     Q.   And how would you know which
17 people in certain groups would then be less
18 valuable than others?
19         MR. TURNBULL:  Objection to form.
20     A.   But I didn't make that
21 determination.  I let the group heads make
22 that determination.
23     Q.   I understand that.  But would you
24 have been able -- how would you have been in a
25 position to determine who was less valuable in



Page 121

1       F. Y. CHIN
2    A.  Nope.
3    Q.  Did you ever know?
4    A.  Did I ever know?
5        MR. TURNBULL: Objection.
6    Q.  I'm sorry, let me make that a
7  little bit more clear.
8        Did you ever know which clients
9  Amy brought in?
10   A.  No.
11   Q.  Did you ever know which clients
12 Amy had the primary relationship with?
13   A.  Nope.
14   Q.  Do you know how the student loan
15 business was doing in 2008?
16   A.  As I recall it, there really
17 wasn't anything left of the student loan
18 business by the time we got to 2008.
19   Q.  Do you know how much revenue was
20 generated by student loan transactions in
21 2008?
22   A.  Not offhand.
23   Q.  Was it --
24   A.  I doubt if it was much, if you
25 want orders of magnitude.

Page 122

1       F. Y. CHIN
2    Q.  I'm sorry?
3    A.  I doubt if it was very much
4  because I don't think we were doing any
5  transactions.
6    Q.  Would a million dollars be
7  considered a lot?
8        MR. TURNBULL: Objection.
9    A.  For a year?
10   Q.  Yes.
11   A.  I don't think so.
12   Q.  And do you know what percentage of
13 revenue that Amy generated came from her
14 student loan clients?
15   A.  No.
16   Q.  And I believe you testified
17 earlier that Amy became co-head of the housing
18 department some time after Nick Fluehr left?
19   A.  Correct.
20   Q.  And why did Amy become a co-head?
21   A.  It was David's recommendation.
22   Q.  It wasn't yours?
23   A.  Nope.
24   Q.  Did you originally want Amy to be
25 the head of the housing department?

Page 123

1       F. Y. CHIN
2    A.  In 2008 after Nick left, I think
3  as I noted earlier, I basically asked David to
4  kind of take responsibility for that. You
5  know, I think he was trying to decide how he
6  manages the business. I think there was a
7  suggestion at some point in making her --
8  making co-heads or heads.
9        I think I suggested David should
10 consider a sole head, not a co-head, just for
11 managing purposes. And as a practical matter,
12 it seemed having two bankers, and they're both
13 co-heads of a group, didn't really make a lot
14 of sense, but at the end of the day it was up
15 to him to decide how he wanted to organize the
16 group.
17   Q.  And did you suggest that Amy
18 should manage the group?
19   A.  I started with that.
20   Q.  Why?
21   A.  She had been there the longest.
22   Q.  Was that the sole criteria?
23   A.  At that point, yes.
24   Q.  What do you mean at that point?
25   A.  Based on what I knew, that was the

Page 124

1       F. Y. CHIN
2  only thing I could go by. I really didn't
3  know her business mix. I think I dealt mostly
4  with Nick. I think Nick was the primary
5  driver of the housing and the student loan,
6  definitely the student loan effort. So I
7  thought that since she had been there the
8  longest, I would let her run the group.
9    Q.  Were you concerned that she would
10 leave?
11   A.  Not particularly.
12   Q.  And what was the significance of
13 Amy being there the longest?
14       MR. TURNBULL: Objection to form.
15   A.  You know, I think since it was
16 hard to, you know, there were really no
17 criteria to decide whether either one of them
18 was qualified, I figured her time in the
19 department was, you know, would help her.
20       MR. DATOO: Mr. Chin, you are
21     about to be handed a document that's
22     been previously marked as Plaintiffs'
23     Exhibit 100.
24       (Plaintiffs' Exhibit 100,
25     three-page e-mail chain dated June



FRANCIS Y. CHIN  
AMY BARTOLETTI vs. CITIGROUP  
August 21, 2012  
125–128

Page 125
1  F. Y. CHIN
2  23, 2008 marked for
3  identification.)
4  Q.  You can review the e-mail starting
5  from the back.  I'm mainly concerned with an
6  e-mail on the first page, but if you want
7  context, please, feel free to read the
8  document.  Just let me know when you are done.
9  A.  Okay.
10  Q.  If I can direct your attention to
11  the first page and it is the second e-mail
12  from the top.  It is from you to David
13  Brownstein dated Monday, June 23rd at 10:11:55
14  2008.  Do you see that e-mail?
15  A.  Um-hum.  Yes.
16  Q.  Do you see where I am?
17  A.  Yes.
18  Q.  You wrote: "Nick leaving."  I
19  assume you are referring to Nick Fluehr?
20  A.  Yes.
21  Q.  "And working for Mike."  I assume
22  you are referring to Mike Koessel?
23  A.  Correct.
24  Q.  "Why would she stay at that
25  point?"  She, meaning Amy Bartoletti?

Page 126
1  F. Y. CHIN
2  A.  Correct.
3  Q.  So does that refresh your
4  recollection as to whether you were concerned
5  about Amy leaving?
6  A.  I think it was a reaction to
7  having Mike be a head versus Amy.
8  Q.  Why do you believe that Amy would
9  not work for Mike?
10  A.  I mean, our view is she had been
11  here longer, she was both senior to him in
12  terms of time and grade and service.  I think
13  people tend to equate that with being more
14  qualified.
15  Q.  Did you believe Amy was more
16  qualified?
17  A.  I didn't think either one was
18  really qualified to run a group.
19  Q.  Why not?
20  A.  They had never done it before, no
21  experience.
22  Q.  Do all your group heads have prior
23  experience running a group?
24  MR. TURNBULL:  Objection to form.
25  A.  The facts would tell you that all

Page 127
1  F. Y. CHIN
2  the group heads who are currently in public
3  finance have been group heads for over ten
4  years.  They have all been senior bankers
5  before they got to that position and some of
6  them came from other firms where they were
7  managers.  So the bulk of them actually have
8  experience.
9  Q.  Well, in this case Amy was a
10  director, correct?
11  A.  Correct.
12  Q.  And wouldn't you consider her a
13  senior banker?
14  A.  I look at my MDs as my senior
15  level.  Directors, I think, you know, they're
16  experienced, but my most senior folks are my
17  MDs.
18  Q.  Norman Pelligrini isn't an MD, is
19  he?
20  A.  Yes, he is.
21  Q.  Are all your group heads MDs?
22  A.  All of my regional group heads and
23  all of my industry group heads, other than
24  housing, are MDs.  Marty Feinstein is a
25  director.

Page 128
1  F. Y. CHIN
2  Q.  I'm talking about, if we can go
3  back to 2008.
4  A.  Um-hum.
5  Q.  Were all your group heads MDs at
6  that point?
7  MR. TURNBULL:  Before Nick Fluehr
8  left?
9  MR. DATOO:  Yes.
10  A.  Nick was an MD.  He ran that
11  group.  The only non, quote, group head would
12  be Marty Feinstein who ran the technical group
13  and he's a director.  Otherwise, all the
14  industry people and all the regional heads
15  were MDs.
16  Q.  Now, with respect to becoming an
17  MD, is there any management experience
18  guideline involved with that?
19  A.  No.  I think, as we earlier
20  discussed, the criteria includes, you know,
21  culture, revenue contribution to the business,
22  franchise development, just a number of
23  factors like that.
24  Q.  So why couldn't a director manage
25  a group?



800.211.DEPO (3376)  
EsquireSolutions.com

FRANCIS Y. CHIN　　　　　　　　　　　　　　　　　　　　　　　August 21, 2012
AMY BARTOLETTI vs. CITIGROUP　　　　　　　　　　　　　　　　129–132

Page 129
```
 1           F. Y. CHIN
 2       MR. TURNBULL:  Objection to form.
 3       A.   I didn't say they couldn't.  I
 4  just said she had no prior experience managing
 5  because you asked me whether she was more
 6  qualified than Mike, and I said, look, I
 7  didn't think either was qualified for lack of
 8  having prior experience.
 9       Q.   Do you know if Amy managed the
10  group in Nick's absence?
11       MR. TURNBULL:  Objection to form.
12       A.   I don't know what she did in
13  Nick's absence.
14       Q.   Do you know if Amy had any
15  management experience?
16       A.   Not that I'm aware of.
17       Q.   So then why would you think she's
18  not qualified?
19       MR. TURNBULL:  Objection.  Asked
20       and answered.
21       A.   I didn't say she wasn't qualified.
22  I said I'm not sure she was any more qualified
23  than either one of them.
24       Q.   You also wrote in that e-mail, the
25  second sentence, "give her a chance to prove
```

Page 130
```
 1           F. Y. CHIN
 2  herself and become a managing director."
 3       A.   Um-hum.
 4       Q.   What did you mean by that?
 5       A.   Well, if she was running the
 6  business and the business proved to be
 7  successful, that would give her a basis for
 8  becoming promoted to managing director.
 9       Q.   Now, did David Brownstein take a
10  different view about having co-heads?
11       A.   I think he thought it would be
12  worth considering.
13       Q.   And why was that?
14       A.   Why did he believe it was worth
15  considering?
16       Q.   Yes.
17       A.   I don't know.
18       Q.   Why did you end up going with
19  co-heads?
20       A.   It was his recommendation.
21       Q.   Whose recommendation?
22       A.   David's.
23       Q.   David's recommendation.  And did
24  you question his recommendation?
25       A.   No.
```

Page 131
```
 1           F. Y. CHIN
 2       Q.   When did David Brownstein become a
 3  managing director?
 4       A.   I don't know, but he's been a
 5  managing director for a long time.
 6       Q.   Before he became co-head, did he
 7  have any direct reports?
 8       A.   I actually don't recall whether
 9  David actually was a direct report to me
10  before he became co-head.  He actually might
11  have been a direct report to Ward at that
12  point.
13       Q.   Do you know when Amy and Mike
14  became co-heads?
15       A.   Some time after Nick left.
16       Q.   And did they become co-heads
17  together, at the same time?
18       MR. TURNBULL:  Objection:  asked
19       and answered.
20       A.   Yes, they did.
21       Q.   And did they officially become
22  co-heads?
23       MR. TURNBULL:  Objection.
24       A.   Officially meaning?
25       Q.   Were they announced as being
```

Page 132
```
 1           F. Y. CHIN
 2  co-heads of the group?
 3       A.   I don't recall, but I would -- I
 4  left that to David.
 5       Q.   And did they become co-heads in
 6  2008?
 7       A.   I think that's after Nick left,
 8  yes.
 9       Q.   Did you have a conversation with
10  Amy about being the sole head of the group?
11       A.   I really never spoke to her about
12  it.  I left it to David to handle.
13       Q.   Do you know if David had a
14  conversation with her about being the sole
15  head of the group?
16       A.   I don't know what he spoke to her
17  about.
18       Q.   Was there anyone else involved in
19  the decision about promoting Mike Koessel and
20  Amy to co-heads of the group?
21       MR. TURNBULL:  Objection to form.
22       A.   Not that I was aware.
23       Q.   So you don't know if Mr.
24  Brownstein consulted with anyone else?
25       A.   I do not know.
```



Case 1:10-cv-07820-LGS   Document 60-27   Filed 06/26/13   Page 14 of 14

FRANCIS Y. CHIN  
AMY BARTOLETTI vs. CITIGROUP  
August 21, 2012  
141–144

Page 141

1   F. Y. CHIN
2   Q.   And you wrote: "Do we want to
3   make a public announcement?"
4       What was that in reference to?
5   A.   I think it was related to
6   announcing Amy and Mike as co-heads of housing
7   and I assume sole head of student loans.
8   Q.   And did you make a public
9   announcement?
10  A.   I don't recall if a public
11  announcement was made.
12  Q.   By anyone?
13  A.   By David for sure.
14  Q.   Do you know why not?
15  A.   I said I don't know if it was
16  made. So I don't know what happened.
17  Q.   Were you involved at all in the
18  decision to lay off Amy?
19      MR. TURNBULL: Objection: asked
20      and answered. Go ahead.
21  A.   David and I talked about the
22  housing practice overall. We talked about
23  closing down the entire housing practice. I
24  believe David felt that the capital markets
25  folks thought we should at least keep toehold

Page 142

1   F. Y. CHIN
2   in the housing arena, and based on what we
3   were trying to do on our budget side, since
4   Amy was the most highly compensated between
5   herself and Mike, I think in keeping one, it
6   made sense, based on that formulation, to keep
7   Mike and put Amy in the RIF.
8   Q.   And that was based on her
9   compensation?
10  A.   Because of the way the formulas
11  were driven, yes.
12  Q.   Was that the sole criteria for
13  laying off Amy?
14  A.   Yes.
15  Q.   How many discussions did you have
16  with Mr. Brownstein about laying Amy off?
17  A.   I recall having one. I'm not sure
18  we actually had any others after that.
19  Q.   And did he make the decision or
20  was it a joint decision?
21      MR. TURNBULL: Objection to form.
22  A.   I actually don't recall who,
23  quote, made the decision. But clearly that is
24  something we both agreed to do going forward.
25  Q.   Was Mike Koessel's name mentioned?

Page 143

1   F. Y. CHIN
2   A.   The, I think the decision at that
3   point was to keep one person at that banking
4   level in housing, and because of the formula,
5   between the two, Amy's RIF would help us meet
6   our budget target more than Mike would.
7       THE VIDEOGRAPHER: Is this a
8   logical point to change the tape?
9       MR. DATOO: Sure. You want to
10  break for lunch, Ken?
11      MR. TURNBULL: Yes, this is fine.
12      THE VIDEOGRAPHER: We are now
13  going off the record at approximately
14  12:39 p.m. This is the end of disk No.
15  2.
16  (Lunch recess: 12:39 p.m.)

Page 144

1   F. Y. CHIN
2   AFTERNOON  SESSION
3       1:32 p.m.
4   FRANCIS Y. CHIN,
5   having been previously duly sworn, was
6   examined and testified further as
7   follows:
8       THE VIDEOGRAPHER: We are now
9   going on the record approximately 1:32
10  p.m. This is the beginning of disk 3 in
11  the Chin deposition.
12  CONTINUED EXAMINATION
13  BY MR. DATOO:
14  Q.   Mr. Chin, do you remember when it
15  was decided that Amy was going to be laid off?
16  A.   When Amy was --
17  Q.   When it was decided that Amy was
18  going to be laid off.
19  A.   I'm not sure what date, but
20  definitely it was in November of 2008 I would
21  think.
22  Q.   Was it close to the day everyone
23  was told they were being laid off?
24  A.   I don't recall the exact timing of
25  the final determination and the notifications.

