# Exhibit 28

## AFFIDAVIT OF NICHOLAS FLUEHR

| | |
|---|---|
| STATE OF NEW YORK | ) |
|  | )ss.: |
| COUNTY OF NEW YORK | ) |

I, Nicholas Fluehr, hereby declare under penalty of perjury:

1.  I am a former employee of Citigroup, Inc. and Citigroup Global Markets, Inc. (together, "Citi" or the "Company").

2.  From approximately 1998 to the end of my employment with Citi in June 2008, I was employed as Managing Director and Head of Citi's Municipal Housing and Student Loan Group ("Housing Group") within the Public Finance Department. In this position, I reported to Frank Chin, Managing Director and Head of the Public Finance Department who in turn reported to Ward Marsh, Managing Director and Head of the Municipal Securities Division. In addition to serving as the Head of the Housing Group, I also served on the Public Finance Operating Committee during this same time period.

3.  My employment at Citi ended in June 2008 when I was notified that my position was being eliminated as part of a reduction in force.

4.  Immediately prior to my termination, the Housing Group consisted of myself as Group Head and the following individuals, all of whom reported directly to me: Amy Bartoletti (Director), Michael Koessel (Director), Ping Hsieh (Vice President), Raymond High (Associate), Michael Murad (Associate), and Chia Siu (Analyst).

5.  In my capacity as Head of the Housing Group, I had the opportunity to observe all of my direct reports' abilities and performance.

6.  In the Fall of 2006, in order to obtain additional feedback regarding the performance of members of the Housing Group, I instituted a 360° review process whereby each

PL 04480

member of the Housing Group would review each other member of the group's work performance based on a number of key performance metrics. The reviews were submitted by each member of the Housing Group directly to Human Resources who consolidated the comments and returned them to me. I then used these reviews to conduct semi-annual performance reviews as well as to determine year-end bonus compensation. The results of these 360° reviews were communicated to each individual member of the Housing Group, however, the source of the comments and ratings remained anonymous. Additionally, the 360° reviews, along with the formal evaluations, were forwarded to Frank Chin for his review as well.

7. Throughout her employment with the Housing Group, Amy Bartoletti always demonstrated a high level of performance. Her 360° reviews bore this out as she was consistently rated the highest among my direct reports (and even, on occasion, me). Ms. Bartoletti was very well regarded by her peers and subordinates and was noted for her business savvy as well as for her great client service.

8. Conversely, Michael Koessel was not well regarded by his peers and subordinates. Mr. Koessel's 360° reviews noted that his work ethic and attention to detail were lacking. Additionally, Mr. Koessel ranked below average in his ability to handle stress and multiple demands at the same time. Indeed, Mr. Koessel was known to take out his frustrations on junior staff members as it was not uncommon to hear Mr. Koessel yelling at these junior staff members. As a result, I often felt that I spent a great deal of my time managing Mr. Koessel as opposed to managing the rest of the Housing Group. Mr. Koessel's below average performance was also noted by others within management as one manager referred to Mr. Koessel as a "lunatic."

9. Ms. Bartoletti's performance exceeded that of Mr. Koessel's in every category.

2

10. As a result of her high level of performance, I often asked Ms. Bartoletti to assume certain managerial responsibilities on my behalf when I was traveling or otherwise unavailable. This included, among other things, conducting reviews of junior staff members and communicating compensation awards to them, notifying a junior staff member of his termination as part of a reduction in force in April 2008, as well as frequently being required to resolve issues that arose between Mr. Koessel and junior staff members.

11. There is no question that Ms. Bartoletti's managerial experience and understanding of the working of the Housing Group far exceeded that of Mr. Koessel's.

12. I received uniformly positive feedback from clients regarding Ms. Bartoletti.

13. Ms. Bartoletti's high level of performance is also borne out by her bonus compensation, which was always significantly higher than that of Mr. Koessel. Bonus compensation awards were determined by both Mr. Chin and myself. In determining each member of the Housing Group's bonus compensation award, Mr. Chin would make a recommendation to me, which I believe was based on his review of each member's performance as demonstrated in their performance reviews, and I then had the authority to reallocate portions of this bonus compensation among members of the Housing Group if I believed such adjustment was warranted. With respect to Ms. Bartoletti, Mr. Chin (and I) consistently recommended significantly higher bonus awards for her in comparison to Mr. Koessel. The higher bonuses for Ms. Bartoletti were in recognition of her superior work performance and commitment to the Housing Group.

14. In light of the foregoing, I was shocked when I learned that Citi decided to terminate Ms. Bartoletti as part of a reduction in force and retain Mr. Koessel. By all relevant

PL 04482

performance metrics, Ms. Bartoletti was better suited to lead the Housing Group than Mr. Koessel.

15. I understand that Citi claims that it retained Mr. Kossel rather than Ms. Bartoletti because it believes that Mr. Koessel was better suited to handle the housing piece of the Housing Group's business, however, having worked closely with both Ms. Bartoletti and Mr. Koessel, I believe that this is not the case as Ms. Bartoletti was equally qualified – if not more qualified – to handle the housing business. Moreover, I do not believe, as I am told Citi claims, that the student loan business "dried up." Even if it had, the decision to retain Mr. Koessel instead of Ms. Bartoletti is completely irrational and cannot be justified.

16. As Directors, Ms. Bartoletti and Mr. Koessel were paid the exact same salary and any bonus compensation that they would receive was discretionary. Thus, the decision whether to retain Ms. Bartoletti or Mr. Koessel was cost neutral. In light of this, and given her demonstrated and well-documented leadership abilities, there is no question whatsoever that Ms. Bartoletti was better qualified than Mr. Koessel to lead the Housing Group.

17. I am aware, however, that David Brownstein, who was appointed as Co-Head of the Public Finance Department (along with Mr. Chin) after my departure from Citi, was a close, personal friend of Mr. Koessel's.

18. During my tenure as Head of the Housing Group, I also had the opportunity to work closely with Chia Siu, who was also let go as part of the same November 2008 reduction in force. Ms. Siu was uniformly regarded by me, as well as her peers and supervisors, as an outstanding employee who consistently demonstrated exceptional work performance and was very smart, very diligent and very hard working. Having had the opportunity to conduct her annual performance review in June 2008, I rated her overall performance as Superior – the

PL 04483

highest rating. While my employment with Citi ended shortly after this rating, I believe that Ms. Siu was a top performer that should have been retained and, based on her work performance, should have been promoted to an Associate position. In fact, I believe that she was more qualified than Raymond High who was retained by Citi. Thus, as with Ms. Bartoletti, I was shocked when Ms. Siu was terminated as part of a reduction in force in November 2008.

19. I can think of no set of circumstances in which Citi could have selected Ms. Bartoletti and Ms. Siu for termination over the male employees that were retained.

20. It has always been my understanding that to be the Head of the Housing Group, you were required to have taken and passed the Series 53 examination.

21. I was also surprised to learn that Ping Hsieh, another female employee in the Housing Group, was terminated while other men in the Housing Group were retained. I was surprised by this because Ms. Hsieh had always done a very effective job and was an asset in the Housing Group.

Dated: 7/30/10                              Signed: _____

Sworn to before me this
30 day of July 2010.

_____
Notary Public

DANIEL J. DONOHUE
NOTARY PUBLIC, State of New York
No. 01DO4731804
Qualified in Westchester County
Commission Expires Feb. 28, 20 11

5

PL 04484