# Exhibit 31

# Expert Report
# Criteria for Layoffs and Gender Disparities in Citigroup's Public Finance Department: The case of Amy Bartoletti, Chia Siu, Nadine Mentor, Lisa Conley, and Brittany Sharpton v. Citigroup Inc. and Citigroup Global Markets Inc.
### By Louise Marie Roth

**On the Instructions of:**       Thompson Wigdor LLP
                                  85 Fifth Avenue
                                  New York, NY  10003

**Report by:**                    Louise Marie Roth
                                  Associate Professor, Sociology
                                  University of Arizona

**Specialist Field:**             Gender inequality in the workplace, especially the securities industry; equal employment opportunity.

**Date:**                         10 December 2012

| | | |
|---|---|---|
| 1. | Assignment, Qualifications, and Materials Reviewed | 2 |
| 2. | Data on Gender Differences in the PFD before and after the 2008 RIFs | 4 |
| 3. | RIF Decision-Making in Citi's PFD | 7 |
| | a. Lack of Formal Criteria for Inclusion in the RIF    8 | |
| | b. The Performance Basis for RIF Decisions    9 | |
| 4. | Discretionary Decision-Making and Gender Inequality | 12 |
| | a. Amy Bartoletti    15 | |
| | b. Lisa Conley    19 | |
| | c. Nadine Mentor    23 | |
| | d. Terminating All Women in the Group    26 | |
| 5. | How Organizational Policies and Practices Can Minimize Bias | 29 |
| | a. Citigroup EEO/AA and Diversity Policies    31 | |
| | b. Monitoring and Oversight for Compliance    34 | |
| 6. | Summary and Conclusions | 36 |
| Appendix 1: | Expert's Declaration | 38 |
| Appendix 2: | References | 39 |
| Exhibit A: | Previous Expert Testimony | 45 |
| Exhibit B: | Curriculum Vitae of Louise Marie Roth | 47 |

I.   **Assignment, Qualifications, and Materials Reviewed**

1.  I have been retained as a consultant and expert by Thompson Wigdor LLP, attorneys for the plaintiffs in a sex discrimination lawsuit against Citigroup Inc. and Citigroup Global Markets Inc. (hereafter "Citi"), to analyze the company's layoff decisions in its reduction in force ("RIF") in November 2008. In particular, I have been asked to assess whether the criteria used to select employees for termination in the Public Finance Department during the November 2008 RIF contributed to gender disparities in layoffs, based on findings from social science research in which I have expertise.

2.  I have consulted as an expert in three cases involving issues of gender discrimination in the financial services industry. A list of cases in which I have been identified as an expert or have given expert testimony is attached as Exhibit A.

3.  I have received a Ph.D. in Sociology from New York University in 2000. I also have a B.A. (Honors) from McGill University and an M.A. in Sociology from New York University. I am currently an Associate Professor of Sociology at the University of Arizona. I teach courses on gender, family, gender and labor markets, medical sociology, and dissertation preparation. I specialize in research on gender and labor markets, equal employment opportunity, and especially gender inequality in the financial securities industry. Much of my research has focused on issues of workplace discrimination and on organizational policies and practices that increase or reduce gender inequality. My Curriculum Vitae is attached as Exhibit B.

4.  My consulting rate is $200 per hour, plus expenses. For time spent in depositions or at trial, I require payment for a minimum of 4 hours.

5.  The views expressed in this report are my own and do not necessarily reflect those of my employer organization.

6.  My analysis is based on deposition testimony of managers in Citi's Public Finance Department (hereafter "PFD") who were involved in the layoff decisions in the November 2008 RIF. In particular, I have reviewed the testimony of: David Brownstein, Francis Y. Chin, David Cyganowski, Thomas Green, Fred A. Hessler, Michael D. Koessel, Bartley F. Livolsi, and Norman Pellegrini.

7.  The documents that I reviewed include: the amended complaint, the defendants' position statements to each plaintiff, performance evaluations for the PFD, a spreadsheet

containing a "compensation chart" that compares compensation of the plaintiffs with others in the same position, and the following company documents: the Diversity Annual Report 2006 and the Citigroup 2007 Employee Handbook. I also referred to the publicly available 1998 "Consolidated Stipulation of Settlement" in the case of Martens, et al. v. Smith Barney Inc.[1] for background on diversity initiatives and legal enforcement of antidiscrimination measures affecting the company during the 10-year period before the November 2008 RIF. My analysis is also based on statistical analyses and tabulations of spreadsheet data on the population of the PFD before and after reductions in force that occurred December 2007-December 2008.

8. In addition to the materials described above, I have also relied on academic articles, chapters, and books written by social scientists and management scholars, including my own study of gender inequality in the securities industry, and I cite these in this report and provide a complete list of references in Appendix 2. Social science research has generated considerable knowledge over several decades about what generates and sustains workplace inequalities, as well as the kinds of organizational policies and practices that are likely to minimize bias. The body of research that I cite uses multiple methodologies in a variety of contexts, including laboratory experiments; ethnographies, interviews, and case studies in "real world" organizations in a range of industries; statistically representative surveys of workers and employers; and historical studies based on archival materials. Thus, there is a firm scientific foundation, with substantial external validity, that is valuable for understanding bias, discrimination, and the structure and dynamics of gender in organizations.

9. Based on this, I shall consider the decision-making criteria used by management in the PFD to determine which employees to terminate in the November 2008 RIF. My method is to examine distinctive features of the PFD and its policies and practices surrounding the RIF, and to evaluate them against the factors that social science shows to increase or minimize gender bias. I compare the decision-making criteria that PFD managers used with Citi's official policies, and with practices that have been shown to increase or decrease gender diversity in organizations, especially during downsizing. I cite peer-reviewed articles and books from reputable academic sources, as well as industry and media publications.

10. Below, I first summarize the spreadsheet data provided to me, and the results of a descriptive statistical analysis. The analyses described here are restricted to the PFD at Citi in

---

[1] Martens, et al. v. Smith Barney Inc., 96 Civ. 3779.

3

November 2008. Then I describe the policies and practices that the PFD used to implement this RIF. Next I return to a more detailed examination of the disparate impact of the PFD's November 2008 RIF on female employees, including the plaintiffs specifically, with reference to social science research that explains what kinds of policies and practices create and sustain barriers to equal employment opportunity, and what kinds minimize those barriers. Then I discuss Citi's diversity and Equal Employment Opportunity and Affirmative Action (EEO/AA) policies, and monitoring and oversight of EEO/AA in the RIF. In responding to the above-mentioned instruction, I will use social science research to provide a context for understanding gender inequality in the securities industry.

## II.     Data on Gender Differences in the PFD before and after the 2008 RIFs

11.     Citi turned over a spreadsheet of data on the personnel in its Municipal Securities Division before and after its RIF from December 2007 to November 2008. At the beginning of November 2008, immediately prior to the November 2008 RIF, Citi's PFD had 159 employees. I analyze the effects of the November 2008 RIF on these 159 employees who were at-risk for layoffs in the November 2008 RIF.

12.     Some basic statistics reveal statistically significant gender differences in the probability of experiencing a layoff in the PFD's November 2008 RIF. Descriptive statistics report or summarize counts, percentages, or averages. They make no assumptions about the underlying population or how the data were selected. Inferential statistics attempt to measure whether disparities, calculated from descriptive statistics, are within the range that might be expected if variation were simply due to random fluctuation. The small number of cases in Citi's PFD makes it difficult to use advanced multivariate statistical techniques, so I used basic inferential statistics to discern patterns in the data. These statistics address the question, "Is the observed disparity consistent with what would be expected from random fluctuation?" The laws of probability determine which results are expected and which are unlikely. The likelihood that a disparity will occur by random fluctuation is the *significance probability* (hereafter denoted as $p$). If $p$ is very low then one doubts that *random* fluctuation caused the disparity. A very low $p$ suggests *systematic* differences within the data.

4

13. By convention, I use a threshold of $p<.05$ to indicate statistical significance: this signifies that the probability that a disparity is due to chance is less than 5%, allowing at least 95% confidence that the disparity is genuine and not caused by random variation.

14. During the 12-month period from December 2007 to late November 2008, the PFD laid off 70 employees. The layoffs disproportionately targeted female employees. In the November 2008 RIF, in which the PFD laid off the five plaintiffs in this case, there is a clear disparate impact by gender. Among the 159 employees who worked in the PFD at the beginning of November 2008, 32.5% of women and 13.4% of men were laid off in the November RIF. The gender difference in the probability of layoff in November 2008 was statistically significant with $p<.01$.[2] A logistic regression analysis reveals that the odds of experiencing a layoff during the November 2008 RIF were 3.1 times higher for women than for men ($p<.01$). The percentage of women in the PFD declined from 25.2% before November 2008 to 20.8% after, and the proportion of men correspondingly rose from 74.8% to 79.2%.

15. Table 1 illustrates the gender effects of the November 2008 layoffs, and that this RIF did disproportionately impact women in the PFD. The defendants' position statements in the cases of all 5 plaintiffs in this case explicitly argue in footnote 2 that female employees were not disproportionately impacted by the November 2008 RIF. The statistical significance of these data, which reveals a systematic gender difference with 99% confidence, clearly contradicts the defendants' position statements in this case.

**Table 1: Gender Differences in Layoffs, Nov. 2008**

|  | Male | Female | Total |
|---|---|---|---|
| Remained after November 2008 | 103 (86.6%) | 27 (67.5%) | 130 (81.8%) |
| Laid off in 2008 RIF | 16 (13.4%) | 13 (32.5%) | 29 (18.2%) |
| Total | 119 | 40 | 159 |
| Pearson Chi-Square | 7.30** | | |

Note: Percentages are of men and of women in the PFD.
** $p<.01$

---

[2] A chi-square probability and a t-test both indicate that the probability that this gender difference was due to random chance is less than 1%, suggesting that there is a 99% probability that there was a systematic gender difference in the likelihood of layoff in the November 2008 RIF.

5

16. At the beginning of November 2008, women were also disproportionately at lower ranks within the PFD. Forty percent (40.0%) of all women in the PFD were analysts, 12.5% each were at the Associate, AVP, VP, and Director levels, and 10% were Managing Directors. Yet managers disproportionately targeted women at higher ranks for layoff in the November 2008 RIF. After the November 2008 RIF, the percent of women at the Director level dropped from 12.5% of female employees in the PFD to only 3.7% of remaining women. Despite the small numbers to compare at the Director level, this effect was statistically significant ($p<.01$). Citi's PFD laid off 80.0% of its female Directors (4 of 5) but only 18.4% of its male Directors (9 of 49). Binary logistic regression analysis reveals that female Directors had 17.78 times higher odds of inclusion in the November 2008 RIF than male Directors ($p<.05$).

17. While the number of cases in each subgroup prohibited meaningful statistical analysis by subgroup for all subgroups within the PFD, there were exceptions: Housing, Infrastructure, and the West region. Two of these groups involved three of the plaintiffs in this case (Housing and Infrastructure).[3]

18. At the beginning of November 2008, the Infrastructure group had 18 employees, of whom 15 were men and 3 were women. In the November 2008 RIF, this group laid off all 3 women and 2 men (100% vs. 13.3% respectively). This gender difference is statistically significant with $p<.01$. In the November 2008 RIF, the Housing group also laid off *all* of its female employees and only 25% of its male employees, with a statistically significant disparate impact by gender ($p<.05$). Figure 2 illustrates the gender differences in inclusion in the November 2008 RIF across the four subgroups that the plaintiffs worked in, revealing a higher probability of layoff for female employees in each of these subgroups of the PFD.

---

[3] Some subgroups (e.g. Financial Structuring, Power, Southwest) were all-male before the RIF, so that RIFs had no impact on their gender composition.

6



Figure 1: Gender Differences in Layoffs by Subgroup, Nov 2008

19. The basic statistical results all clearly point in the same direction: Citi's PFD was significantly more likely to lay off women than men during the reductions in force that took place in November 2008. Moreover, even before the November 2008 RIF, women in the PFD were concentrated at lower levels and yet the few women with senior positions were especially likely to be part of the RIF. Some groups also eliminated all of their female employees during the November RIF. The question that remains is how this disparate impact by gender occurred, and the answers appear to lie in a lack of formal criteria for making layoff decisions and an apparent lack of oversight of the RIF's compliance with EEO/AA guidelines and Firm-wide diversity initiatives from the legal department or Human Resources.

### III. RIF Decision-Making in Citi's PFD

20. The depositions in this case suggest that there were no formal criteria for making decisions about which employees to terminate from the PFD in the November 2008 RIF. The senior managers involved in the RIF process, Francis Chin and David Brownstein, received instructions from Citi's senior management to come up with savings of approximately $20

million in employee compensation,[4] with no specific criteria for how to make decisions and no apparent oversight concerning Equal Employment Opportunity and Affirmative Action (EEO/AA) compliance.

Lack of Formal Criteria for Inclusion in the RIF

21.     When asked if he had given group heads criteria for determining candidates for the November 2008 RIF, David Brownstein said, "We had several requirements for economics, and so we would have shared downstream how the economics needed to work in order for us to fulfill our requirement to the firm" (Brownstein depo., pp. 57-58). According Francis Chin's deposition, the strategy for achieving this goal was to charge the group heads with giving them feedback on whom to lay off by giving him names of their "weakest performers" (Chin depo., p. 37). Brownstein confirmed this strategy, saying, "My expectation was that they provided us with the names of people who could have the least impact on their ability to run their business properly" (Brownstein depo., p. 67). However, by asking the group heads to select people that they could live without, and giving them no details about how to evaluate the value of their employees or how many people they would need to cut, Brownstein and Chin left it up to the group heads to select people for termination without *any formal criteria* (Chin depo, p. 89, p. 159). Francis Chin said, "I told them I wanted them to find out who they felt they could live without. I told them compensation is an important consideration" (Chin depo., p. 159). David Brownstein also said explicitly, "I had no expectation on what they would take into account to accomplish the goal they needed to for us" (Brownstein depo, p. 68). Thus, the main criterion that concerned the senior managers was meeting their budget target, which they could have met in a variety of ways. Their method for meeting this target involved giving vague directives to group heads to select names for inclusion in the RIF based on subjective determinations of who constituted their "weakest performers" or whom they could "live without."

22.     To achieve this objective, Chin and Brownstein did not give most group heads a dollar figure to cut or a specific number of names to offer for layoff (Chin depo., pp. 38-39, pp.

---

[4] When asked what the budget was, Francis Chin said, "I don't recall the number, but I think it was below 20, but it was a pretty high number in my estimation" (Chin depo., p. 29). See also Chin depo., p. 30: "We were given an ask of $20 million and see – and ask who would we RIF to meet that budget."

8

157-160).[5] One would then expect group heads to offer only 1 name each, and to offer the name of a relatively junior employee. Chin and Brownstein did, however, tell group heads that compensation was a consideration, which then pointed to senior personnel: "I think they were told that compensation was a consideration in the list, and analysts don't get paid a lot" (Chin depo., p. 159). Bartley Livolsi indicated that Frank Chin had directed group heads to offer Managing Directors for the RIF if it was possible to do so, since they have the highest salaries (Livolsi depo., pp. 103-104). However, only one Managing Director was included in the November 2008 RIF and the RIF disproportionately laid off employees at the Director level (13 of the 29 people included in the RIF, or 44.8%, were Directors). Among Directors, the available compensation data suggest that group heads selected women like Nadine Mentor and Lisa Conley who cost the firm less than men in the same positions – and both of whom were the only female Directors in their groups. The RIF also included a significant number of analysts (7 out of 34, or 24.1%), despite the fact that these employees are very inexpensive compared to senior personnel. This suggests that actual RIF decisions were sometimes loosely coupled with compensation considerations.

The Performance Basis for RIF Decisions

23. Moreover, decision-makers did not use or even scrutinize formal performance evaluations when making termination decisions, despite the enormous effort that Citi engages in producing these evaluations and the significant documentation that they create. Thomas Green, the head of the Infrastructure Group, was the only group head who indicated that he accounted for formal performance evaluation scores in making decisions about the RIF.[6] In their depositions, all other group heads indicated that they relied on no documents and did not scrutinize performance evaluations in choosing names of employees for inclusion in the November 2008 RIF. For example, Norman Pellegrini, the head of the Southeast Group, said that

---

[5] When asked how the group heads would know how many people to select, Francis Chin said, "I believe I told everybody I expected, as a general matter, that I wanted to find out who their weakest performers were, see what that happened and I think there was specific instructions to the healthcare group that their staffing was just too high going forward" (Chin depo., pp. 38-39). Depositions from group heads confirmed that most of them had no specific directions for how many names to offer for the RIF or how much money they needed to recover in compensation (e.g. Pellegrini depo., p. 233, pp. 273-274; Livolsi depo., p. 28). The exception was the Health Care group: Fred Hessler recalled a compensation reduction target of around $3 million (Hessler depo., p. 279).

[6] Specifically with reference to comparing Brittany Sharpton, one of the plaintiffs in this case, with Matthew Chin, another analyst with the same level of experience. He said, "on a comparative basis Matt seemed to be the analyst to keep within that class" (Green depo., p. 32).

9

he had discussed the employees in the group and what they did with Bartley Livolsi, who oversaw all of the regional groups in the PFD (Pellegrini depo., pp. 277-288). In response to questions about how he determined which employees would be included in the RIF, he clearly referred to subjective judgment, saying, "I guess *I knew innately*, you know, based upon running this group for six years, who had business, who didn't, based upon, you know, running the group" (Pellegrini depo., p. 287; *emphasis added*). In making this determination, he and Bartley Livolsi had not examined any documents enumerating the business that employees were involved in or their performance evaluations. Norman Pellegrini also said that he had not considered all of the Directors in the group for inclusion in the RIF because of their "impact on our business going forward" (Pellegrini depo., p. 278). More specifically, he did not recall discussing three men at the Director level for potential layoff in November 2008 (Michael Baldwin, Michael Hoe, and Kent Lawrence).

24. Fred Hessler and David Cyganowski, the heads of the Healthcare Group, indicated that Frank Chin and David Brownstein had given them the initial list of names of employees targeted for layoff, based on a judgment of which employees would be most likely to take business or other employees with them after termination (Cyganowski depo., p. 308; Hessler depo., pp. 263-264). David Cyganowski said, "Frank Chin and David Brownstein would come with a list and would ask for our comments. But it was their list" (Cyganowski depo., p. 308). They were consulted in the decision-making process only after Frank Chin had compiled the initial list, and David Cyganowski was not consulted in the November 2008 RIF decisions. However, they did not review any documents, or discuss the revenue generation or performance reviews of the employees targeted for the RIF in their consulting role (Hessler depo., pp. 264-265). In general, decision-makers in Citi's PFD appear to have consulted no documents and taken no notes in making decisions about which employees to terminate: "I don't recall any documents being discussed that were part of the discussion" (Livolsi depo., p. 137).

25. Francis Chin and David Brownstein, the more senior managers who directed the RIF process, also did not encourage the inspection of performance evaluations or define performance criteria for the group heads. When asked whether he had ever discussed anyone's performance during the RIF selection process, Francis Chin said, "I don't think I discussed individuals with the group heads. I think, as I noted earlier, they were asked to come up with initial recommendations. They were given the opportunity to modify those initial

recommendations. And so I don't recall having gone into specific names with the group heads" (p. 107). David Brownstein simply commented that everyone was a superb performer and therefore there were no relevant performance distinctions among individuals, even though formal evaluations do make such distinctions (Brownstein depo., pp. 62-65). In fact, distinctions among employees at the same rank are a requirement of the performance review process at Citi (Brownstein depo., pp. 69-70). They thus create documentation that could have informed group heads and their more senior managers in making distinctions among workers at the same rank. My analysis of the available performance data strongly suggest that those distinctions would have made it less likely that the PFD would have made RIF decisions with such a clear disparate impact on women. If managers had reviewed performance data in detail, they would have recognized that the women whom they terminated had performance reviews that were equal to or better than many of the men who remained in the PFD after November 2008.

26. In fact, the managers with the most authority (Frank Chin and David Brownstein) claimed that the RIF selected to terminate the employees with the weakest performance and least business value to the PFD. For example, Francis Chin said that "Everyone was a potential candidate based on performance, future value added..." (Chin depo., p. 206). Bartley Livolsi also said, "We were the senior managers within the organization and, you know, when you are trying to effect a RIF, you are trying to make sure that, you know, you put a list together that's the best possible list in terms of performance, etc..." (Livolsi depo., pp. 17-18). Thus, while managers did not use the extensive written performance evaluations that were available to determine whom to lay off, they still claimed that performance judgments were an important basis for the RIF decisions.

27. At the same time, the criteria for performance that Chin and Brownstein expected managers to take into account seemed deliberately ambiguous. When pressed about what he meant by "performance," Chin replied, "since I didn't prescribe it, *they clearly could have decided whatever was important in their decision-making*. So I didn't go through criteria with them" (Chin depo., p. 207; *emphasis added*). As a result, some testimony acknowledges, explicitly or implicitly, that criteria for defining the "weakest performers" were subjective and open to the interpretation of individual managers. For example, when asked about his process for selecting employees for the RIF, Norman Pellegrini said that Chin and Brownstein had asked him to determine which employees in his group would have the least impact on the business:

11

> A. Based upon relationships, what they are doing, what clients they will be able to take with them.
> Q. And how do you come up with that determination?
> A. *Subjectives.*
> Q. Do you look at any documents?
> A. You *just know* as a manager (Pellegrini depo., p. 235; *emphasis added*).

Bartley Livolsi, when asked how he gauged an employee's potential, also described subjective criteria rather than reliance on formal evaluations:

> *How they carried themselves, what people perceive of them, what clients might think of them, what bankers, senior bankers, would think of them,* what I know to be their client base or potential client base, their market territory. *It's not an exact science* (Livolsi depo., p. 37; *emphasis added*).

When asked how he knew the individual contributions of the employees working in each public finance subgroup, Francis Chin also said, "I look at, having done this for 20 – for quite a while, almost 20 years, *I have a sense of people's contributions over time*" (Chin depo., p. 65; *emphasis added*). From top to bottom, PFD managers used subjective impressions to assess workers' performance, rather than the extensive performance evaluations that Citi conducts annually to determine incentive compensation.

## IV.     Discretionary Decision-Making and Gender Inequality

28.     The use of subjective criteria to select candidates for layoff is remarkable given decades of research on how inconsistent procedures and a lack of accountability for non-discriminatory outcomes lead to biases against women and racial-ethnic minorities in the workplace.[7] Human resource literature shows that open and formal procedures are necessary to produce a level playing field for under-represented groups in the workplace. Affirmative action policies attempt to promote equal opportunity by counteracting managers' tendency to prefer members of traditionally dominant groups, such as white males, when faced with similarly qualified applicants from different demographic groups. Thus, one of the primary purposes of affirmative action policies is to ensure that employers scrutinize qualified candidates of all genders and racial-ethnic groups, and encourage them to make personnel decisions that favor members of under-represented groups when they are similarly qualified.

---

[7] Since this case involves allegations of gender discrimination, and I have no evidence that any of the plaintiffs or the comparable individuals who remained at Citi after the November 2008 RIF are African-American, Native American, or Hispanic, the focus of this discussion will be gender.

29. The rationale for EEO/AA initiatives receives substantial support from research in social psychology, which has demonstrated the underlying cognitive processes that encourage most decision-makers to favor white men (especially if they are white men themselves). Research in both experimental and organizational settings has demonstrated that men have advantages and women have disadvantages in evaluations of competence, especially in male-dominated settings (Foschi 1996; 2000; Foschi, Lai and Sigerson 1994; Krieger 1995; Purdue et al. 1990; Reskin 2000; 2003; Ridgeway 1997; Ridgeway and Correll 2004; Roth 2004; Salancik and Pfeffer 1978; Trentham and Larwood 1998). Men's advantages and women's disadvantages are outgrowths of the fact that people automatically categorize others into in-groups (like me, or "us") and out-groups (not like me, or "them") (Krieger 1995; Martin 2001; Purdue et al. 1990; Reskin 2000). Categorization is accompanied by biased beliefs about people's skills and motivations, and biases in evaluations of performance based on a person's group category (Fiske 1998; Fiske, Lin, and Neuberg 1999; Foschi 1996; 2000; Reskin 2000; Smith et al. 2001). Experimental research suggests that people are "cognitive misers," in the sense that it is easier to rely on unconscious assumptions about people's strengths and weaknesses than to fully assess the evidence in every situation (Brewer and Brown 1998; Fiske 1998; Reskin 2000; 2003; Ridgeway 1997). This leads to a reliance on stereotypes, even among people who consciously reject these stereotypes (Bodenhausen, Macrae, and Garst 1998; Krieger 1995; Reskin 2000). As a result, decision-makers make biased decisions, even when they believe that their decisions are gender-neutral.

30. Stereotypes are over-simplified assumptions about people's skills, interests, and motivations that provide individuals with shortcuts to interpret others and their behavior, regardless of their feelings toward other groups and often without conscious intention or recognition (Fiske 1998). People use stereotypes as shortcuts to help them cope with complex and demanding environments (Fiske 1998). For example, people tend to assume that men are better at male-dominated tasks (e.g. fixing a car) and that women are better at female-dominated tasks (e.g. typing). When observers see both a man and a woman performing a male-dominated task, they assume that the man is better at it and hold him to a *lower* standard for performance. In other words, if both perform equally, his performance is rated as better.

31. Stereotypes predispose people to interpret behavior as confirming their stereotype, especially when multiple interpretations are possible, and they blind them to behavior that

13

disconfirms it (Fiske 1998). Unconsciously, individuals seek and remember information that supports their stereotypes, and may rationalize incongruent behavior in ways that allow them to maintain those stereotypes (Fiske 1998; Reskin 2000). So while incongruent events may draw individuals' attention more than those that are consistent with their beliefs, they tend to make attributions of causality that are consistent with their stereotyped expectancies (Roese and Sherman 2007). Thus, when a woman demonstrates competence at a stereotypically masculine task, observers will tend to attribute it to luck or to view her as an exceptional woman. In contrast, observers will view poor performance at the same task by a woman as emblematic of her lesser abilities as well as women's inferior abilities more generally (Bodenhausen et al. 1998; Fiske 1998; Nelson et al. 1996; Reskin 2000; 2003).

32. Stereotypes are linked to relative status, and research has demonstrated that people believe that individuals with higher status are more competent than those with lower status. In a male-dominated society, men have more status than women do, which means that people generally assume that men are more competent in tasks that are gender-neutral as well as those that are male-dominated (Foschi 1996; 2000; Ridgeway and Walker 1995; Ridgeway 1997; Ridgeway and Correll 2004; Webster and Foschi 1988). This generates double standards: women are held to higher standards more often than men are, and observers tend to evaluate women's performance more harshly than men's performance, even when it is equal or superior (Foschi et al. 1994; Foschi 1996; 2000). Experimental research has consistently found that observers view men as more competent, give them more opportunities to demonstrate their competence, and give them the benefit of the doubt more often than women (Berger et al. 1977; Ridgeway and Walker 1995; Ridgeway 1997; Ridgeway and Correll 2004; Webster and Foschi 1988). In the workplace, this means that a woman will receive more negative evaluations than a man whose performance is the same, and will receive fewer opportunities to demonstrate her competence. This is one of the rationales for supporting affirmative action policies: giving greater benefit of the doubt to women may counteract some of these status effects.

33. In contrast, using subjective evaluation criteria amplifies these effects. Experimental research demonstrates that stereotyping and double standards operate under extremely controlled circumstances, in which the experimenter controls all outside influences, varying only one condition within an interaction that is usually of very short duration. I rely in part on findings from laboratory experiments because they reveal how gender affects interaction,

and they show gender effects *despite* experimental controls. This attests to the importance of gender as an axis of categorization, status, and stratification. However, research also finds that status cues arise in interaction and affect behavior, intensifying gender-related status differences when participants can exhibit more cues about status and dominance (Berger et al. 1977; Ridgeway and Walker 1995). This means that gender effects are stronger in settings with multiple behavioral indicators, more intense interactions, and more opportunities for contact over time (Walker et al. 1996). Thus, one expects gender to have larger effects in contexts like workplaces, since gender is easy to categorize, people hold pre-existing assumptions about gender differences, and on-going interactional cues about status and dominance reinforce stereotypes. In these settings, the effects of stereotyping and status differences are cumulative. As a result, the effects of stereotyping are likely to be much larger in the workplace than in laboratory experiments unless the organization creates an environment that mitigates these effects.

34.   How is this relevant in the case of Citi's PFD and the November 2008 RIF? Given the clear indications from all deposed managers that there were no clear criteria for determining which employees had the least value to their subgroups, and that they did not scrutinize the formal performance evaluations that were available, the RIF process was highly vulnerable to stereotyped assessments of employees. A combined assessment of the deposition testimony and the performance evaluations suggests that gender biases in evaluations and gender stereotypes may have informed decisions to lay off the three plaintiffs with Director positions in this case.

Amy Bartoletti: Subjective Evaluations and Inclusion in the RIF

35.   In the case of Amy Bartoletti, David Brownstein was the primary decision-maker for the Housing Group in the November 2008 RIF. David Brownstein claimed that Ms. Bartoletti was less competent to head the Housing Group than her co-head, Mike Koessel, who remained as head of the group. Objectively, however, Amy Bartoletti had more seniority than Mike Koessel, has superb performance evaluations, and had completed her Series 53 requirement to be a group head within 90 days of taking the position. (Mike Koessel had not completed this requirement by the time of the November 2008 RIF.) Francis Chin had preferred a single group head and Amy Bartoletti had been his first choice. He said, "our view is she had been here longer, she was both senior to him in terms of time in grade and service. I think people tend to