# Exhibit 32

equate that with being more qualified" (Chin depo., p. 126). However, he left the decision up to David Brownstein (Chin depo., p. 132). Mr. Koessel demanded an opportunity to share that position rather than work under Amy Bartoletti, thus negotiating an opportunity with David Brownstein. As a result, prior to the November RIF, Amy Bartoletti and Mike Koessel were co-heads of the Housing Group, and both held the title of Director.

36. David Brownstein claimed that Ms. Bartoletti and Mr. Koessel needed managing as co-heads of the group because neither of them had the experience to take on the responsibilities of running a group. He determined that they needed his help to set the group's strategy. He said, "I very quickly during the process of the RIF and putting them in their positions learned that *neither Amy nor Mike had the capacity or capability* to run that business" (Brownstein depo., p. 91; *emphasis added*). When asked how he made that determination, he responded with the vague statement, "I am a professional" (Brownstein depo., p. 97).

37. The performance evaluations that I reviewed suggested that both Ms. Bartoletti and Mr. Koessel were high performers, although Amy Bartoletti's reviews were higher than Mike Koessel's both quantitatively and qualitatively. In annual performance reviews from 2003 to 2007, and a 360 review from July 2005, Amy Bartoletti received grades of 1 (Exceptional) and 2 (Highly effective), with overall manager ratings of 1 (Exceptional). Mike Koessel, her peer, received rankings of 2 (Highly Effective) and 3 (Effective) in his 2006 and 2008 reviews. Manager comments in these reviews and in Amy Bartoletti's nomination to Managing Director in 2008 were overwhelmingly positive. Some examples of these comments include:

> "Amy has a great balance between maximizing revenues while being sensitive to long term client trust." "Great job with existing clients. Next step is growing our business." "Outstanding team player – networks well in PFD and firm-wide. Great product knowledge." "Strong client support, great revenue sense, very competent." Areas for improvement: "Grow our client list!" (2004 Year End Performance Review)

> "Amy is a very good banker with great client relations. She is also very caring and maintains composure under stress. Amy is probably *the best banker in the group*. She is great with clients and great to work for. Knows her stuff and is willing to teach. Has a lot on her plate. Very direct in what she wants but allows the freedom to structure as you see fit. Great presentation skills. Good mentor for staff. Could be more aggressive pursuing new business." (360 Feedback Summary, July 2005; *emphasis added*)

16

> "Excellent rapport with clients. Great attention to detail." "It is always hard to balance transaction processing, client service, and new business development. Amy does a great job balancing these competing demands." "Great rapport and respect from junior staff." "Amy is very accomplished, has a great attitude, great attention to detail, and is a vital part of the group." (2006 Year End Performance Review)

> "*Amy is one of the most respected individuals in the housing business.* She is extremely smart and articulate. Her math and philosophy backgrounds have proved to be a very worthwhile combination in dealing with challenging analytical problems and our diverse client base. Clients admire and respect Amy and are very loyal to the exceptional job she does. She is effective in getting and maintaining business.

> Amy pursues excellence in all that she does. She <u>never</u> drops the ball and is a strong mentor for the junior staff. Many firms have tried to hire Amy given her strong skill set. She would be an asset to the firm as a MD." (<u>emphasis in original</u>; *emphasis added*) (2008 MD Promotion Process, Nomination Form)

It is worth noting that most of the criticisms of Amy Bartoletti's performance or areas for improvement suggest that she should be more aggressive at pursuing more business. These criticisms align with gender stereotypes that portray women as passive and, at the same time, punish women who act aggressively for defying cultural ideals of appropriate femininity (Babcock and Laschever 2003; Foschi 1996; Roth 2006).

38. The manager comments about Mike Koessel's performance were sparser and less uniformly glowing that Amy Bartoletti's:

> "Mike has been very effective in Ohio and hopefully his work in Vermont will also pay dividends." "Mike is very talented and develops longstanding client relationships." (Combined Assessment Year End: 2006)

> "2008 was a challenging year. 2009 will be even more challenging. Maintaining client relationships and generating revenues in an uncertain environment will be a difficult task." (Combined Assessment Year End: 2008)

Notably, his manager overall ranking from Francis Chin in 2008 was 3 (Effective), which was lower than any overall ranking that Amy Bartoletti received in the years that I reviewed.

39. Given the documentation in these reviews, a requirement to eliminate a senior banker from the Housing Group would seem to point to Mike Koessel as the obvious candidate. At very least, it should have raised questions about the legitimacy of eliminating Amy Bartoletti on the basis of performance, especially at the same time as eliminating *all* other women from the

17

group and retaining a small all-male Housing Group. However, David Brownstein decided to lay off all three women who remained in the Housing Group at the beginning of November 2008, including Amy Bartoletti (Brownstein depo., p. 89).

40. Brownstein claimed that the decision to terminate Amy Bartoletti was performance-based, but his subjective evaluations of her motivation and commitment to the group, as well as her abilities as a leader, ignore the available data on performance and conform closely to gender stereotypes. As a result, it is difficult to disentangle them from the expectations that gender stereotypes would produce. When asked what he had learned within a few days of overseeing the group about Amy Bartoletti's management ability, David Brownstein said, "What I learned is her inability to make good business decisions" (Brownstein depo., pp. 97-98). One of the reasons that he viewed her business sense as deficient was that she did not immediately embrace the responsibility of being group head when she was first approached about it because she wanted time to think about it. This appears to indicate that Ms. Bartoletti had a deliberative decision-making style that is sometimes viewed as stereotypically feminine and "timid" (Babcock and Laschever 2003; Roth 2006).[8]

41. In contrast, Brownstein did not think that Mike Koessel was *interested* in taking on more responsibility, but did not question his *ability* to do so or hold his lack of interest against him (Brownstein depo., pp. 102-103). When asked why he did not think that Mike Koessel was capable of managing the group, David Brownstein said, "I didn't say that. I said that Mike never showed an interest in taking on more responsibility" (Brownstein depo., p. 102). However, he did not view his apparent lack of interest in running the group or seeking promotion to Managing Director as a sign of poor judgment or lack of ability to lead the group. When asked if he thought that Koessel was capable, he said, "Yes. Looking back now, you have proof of that" (Brownstein depo., p. 103) This assessment of the two Directors' abilities, motivations, and decision-making styles aligns perfectly with status processes and gender stereotypes, whereby observers evaluate men as more competent and hold them to lower standards for performance, while subjecting women to greater scrutiny and higher standards. These gender status effects lead managers like

---

[8] In my research on women in Wall Street securities firms, I found that women were sometimes described as "timid" or viewed as weak because they did not shoot from the hip and wanted to think things through before making judgments. Men were typically rewarded for a more rapid-fire decision-making style, even if it often led them to make judgments that were incorrect and cost time and money.

Brownstein to offer men more opportunities to perform, to assess their performance as better, and to view their performance as due to their abilities.

42. Stereotypes were also evidence in Brownstein's ideas about Mike Koessel and Amy Bartoletti's relative talents. The senior managers, Francis Chin and David Brownstein, had debated eliminating the whole Housing Group but decided to keep a very slim group in which Citi could be "a thought leader in the market side" (Brownstein depo., p. 105). His view of Mike Koessel as more of a "thought leader" than Amy Bartoletti again conforms to gender stereotypes of leadership as male and of women as good drudge workers (Eagly and Johnson 1990). When asked if Amy Bartoletti could have served in a thought leadership role, Brownstein replied:

> A. Well, first of all, she hadn't been. She hadn't been spending her time doing that. But really didn't have the experience, expertise or knowledge to do that, in my view.
> Q. Why not?
> A. *Just my opinion.*
> Q. What's it based on?
> A. My knowledge of the two individuals and what they did and how they did things and how they acted (Brownstein depo., pp. 107-108; *emphasis added*).

43. At the same time that he held this opinion, he never spoke to anyone else about Bartoletti and Koessel's performance or looked at their performance reviews (Brownstein depo., pp. 124-125). He also expressed no awareness of the EEO/AA implications of his decision to terminate *all* of the remaining women from the Housing Group. Instead, he based his judgment of their performance on his personal interactions with them, "Because how they interact with other people gives you *a feel* for how -- what they're capable of doing" (Brownstein depo., p. 113; *emphasis added*). Thus, despite the large amounts of data that the performance review process generates every year, he based his judgments about whom to lay off on personal feelings that are highly subject to stereotype bias.

Lisa Conley: Gender Stereotypes and Inclusion in the RIF

44. Lisa Conley was one of ten Directors in the Health Care Group within the PFD at the beginning of November 2008. She was the only female Director in the group before the November 2008 RIF, and one of two Directors included in the RIF.[9] I reviewed Lisa Conley's

---

[9] David Cyganowski indicated that Amy Yang was also a Director (Cyganowski depo., pp. 241-242). However, the data that Citi provided indicates that she was a Vice President in 2008.

performance evaluations from 2000 to 2007, and the available performance evaluations for her peer group in the Health Care Group.

45.     During this seven-year period, Lisa Conley received consistent rankings as Highly Effective/Exceeds Expectations (2) in most areas of her annual performance reviews, and her reviews suggested that she was "on track." They also suggested that she had acted as a lead banker on some transactions as early as 2000. She had held the title of Director since January 2005, so her reviews for 2005-2007 reflected comparisons with others at the Director level.

46.     Manager comments in these reviews were overwhelmingly positive. Some examples of comments from her more recent reviews include:

> "Lisa does a very good job of processing transactions, meeting the needs of clients and completing multiple assignments in a diligent manner with little or no fanfare – a very good attribute. She is dedicated to her profession and proactively strives for self-improvement. She was largely responsible for completing a number of complicated transactions with other members of the health care group. She works well with colleagues and other professionals." "Lisa should try to increase her visibility in the group by working with more senior bankers and increasing her role in new business initiatives. Simultaneously, *she should strive to maintain a work/personal life balance given her growing family*." "Lisa is a valuable member of the Health Care Group who we believe should be promoted to Director in January 2005" (2003 Year End Manager Review; *emphasis added*).

> "Lisa made a meaningful revenue contribution in 2004, including identifying an advisory opportunity with a long-standing client. We encourage her to be more proactive in new business development, especially in 'prospecting' existing client accounts." "Lisa is gradually building her network of business contacts and has built solid client relationships." "Lisa is demonstrating leadership in designing and executing the Rural Health CDO Funding Program. She has also been an active and enthusiastic supporter of diversity efforts." "Lisa is a valuable member of the Health Care Group who we believe should be promoted to Director in January 2005." (2004 Year End Performance Review)

> "2005 has been a strong year of performance for Lisa, who grew into her new role as a Director in the Health Care Group. She successfully managed a series of transactions for clients such as Reid, Greenville and Jefferson. In addition, Lisa has led our efforts to structure and launch the CDO Rural Health Financing Program. She has also been an active and enthusiastic supporter of diversity efforts. Most importantly, throughout an active and hectic year, Lisa has kept *a clean and well-organized office*, which is reflective of her seriousness, professionalism and focus" (Performance Appraisal - Year End 2005).

> "Lisa had a strong year, showed market improvement and has evolved into a very capable and skilled Director. She played a key leadership role in securing several

new accounts in 2006, including Kansas University Hospital, Wellmont and HHC. Lisa also successfully elevated her role on important accounts such as Rush, SSF and OhioHealth, which leveraged Managing Directors and effectively managed the client relationships and deal teams. She has worked in partnership with the Central Region in their new business efforts to secure public and mid-market hospital clients. Lisa has enthusiastically supported diversity efforts and participated in division-wide recruiting. Looking towards 2007, we encourage Lisa to continue her efforts to be the "go to" senior professional on client accounts, partner with fellow account officers on new business, improve her knowledge of the health care industry and increase her New York Office whenever possible *while maintaining a work/family balance*" (Combined Assessment Year End: 2006; *emphasis added*).

47. It is difficult to draw strong comparisons between these reviews and the performance reviews of her male peers, since the reviews of male directors for 2006, 2007, and 2008 were very incomplete. All of the 2007 reviews had no manager comments, although Fred Hessler and David Cyganowski both claimed that they had completed full reviews for all Directors in 2007 and had submitted them electronically (Cyganowski depo., pp. 163-192; Hessler depo., pp. 94-128). For 2008, however, all reviews were deliberately identical, with scores of all 1s (Exceptional). David Cyganowski described this as a protest against giving valid performance evaluations to employees in a highly problematic year: "That was an act of rebellion just like my 16-year old does at home" (Cyganowski depo., p. 197). Unfortunately, the lack of useful data for 2007 and 2008 makes it difficult to compare Lisa Conley's performance with that of her peers at the Director level in the Health Care Group.

48. The valid performance reviews for David Kasdin, Ming C. Lee, Charles Plimpton, Pat Sheehan, and Victor Radina for 2006 suggest that all of these Directors had solid performance. Only one stood out above the rest: Ming C. Lee had an overall manager rating of 1 for 2006, and his 2006 performance was described as "stellar." On the other hand, Michael Irwin had weaker scores than the others, with a couple of 4s ("Partially Effective/Needs Improvement"). David Cyganowski also expressed some reservations about his performance in 2008, after the RIFs, saying that he may have been the only exception to his belief that all of his direct reports deserved all 1s on their 2008 reviews (and that Lisa Conley would have deserved all 1s if she had remained in the group): "If you were a direct report of mine, I would have given you a 1. *I think the only exception to that would have been Mike*" (p. 197; *emphasis added*). Yet he did not select Michael Irwin for a RIF. All other Directors in the Health Care Group had

21

similar performance scores to Lisa Conley in 2006, in the "Highly Effective/Exceeds Expectations" category (2), yet she was one of two Directors who were laid off. Recent research demonstrates that managers show greater bias in favor of men over equally performing women in organizational cultures that promote meritocracy (Castilla and Benard 2010). This is one of the reasons that EEO/AA mandates encourage managers to scrutinize personnel decisions very carefully under circumstances like these, where men and women have similar qualifications and performance.

49. Of course, performance evaluations are not immune to gender bias and are thus imperfect for attaining equality goals (Castilla 2008; Chen and DiTomaso 1996; Roth 2006). Some comments in Lisa Conley's reviews over time suggest that gender stereotyping was occurring in her performance evaluations, and those stereotypes likely influenced the more subjective decision-making in the RIF as well. First, there is the rather bizarre reference to the cleanliness of Ms. Conley's office, which arises as a "Development Need" in 2001 and is later remarked upon in 2002 and again in 2005. While there is no objective documentation of the state of Ms. Conley's office, one has to wonder if a man with a messy office would have received the same emphasis on tidiness.

50. The second issue that arises spontaneously in the reviews is the reference to her work/family balance, yet there is no mention of work/family balance in the reviews of any male Directors in the Health Care Group. In his deposition, David Cyganowski acknowledges that work/life balance is also an issue for some men, and that men are also parents (Cyganowski depo., p. 153). However, work/family balance does not arise in any of the comments on male Directors' reviews. This emphasis on Lisa Conley's parental responsibilities without a similar mention of such responsibilities for her male colleagues suggests an awareness of her family status that is likely to produce a gender-biased perception of her as a worker and of her commitment to her career. Studies have demonstrated biases against mothers, whereby mothers are less likely to be hired or promoted, and are likely to receive lower monetary rewards than non-mothers, because of cultural beliefs that employment and motherhood are incompatible (Benard, Paik, and Correll 2007; Budig and England 2001; Correll, Benard, and Paik 2007; Kmec 2011; Lips and Lawson 2009; Ridgeway and Correll 2004; Roth 2006). In contrast, fathers tend to receive a "fatherhood bonus" (Hodges and Budig 2010; Kmec 2011; Roth 2006). Stereotypes of mothers include the idea that they are less committed to their jobs than non-

mothers because of their family responsibilities (Benard et al. 2007; Correll et al. 2007; Lips and Lawson 2009). These stereotypes lead to lower pay and blocked opportunities in the workplace for women with children (Budig and England 2001; Roth 2006). Highlighting Lisa Conley's family situation in her performance reviews, while not remarking on the family situation of a single male director, suggests the potential salience of these gender-related stereotypes in the Health Care group, which may have influenced subjective perceptions of Lisa Conley's performance relative to her male peers.

51. According to Francis Chin, Fred Hessler and David Cyganowski were responsible for identifying candidates for the November 2008 RIF. (Hessler and Cyganowski both argued that Chin and Brownstein compiled the initial lists of RIF targets and only consulted them afterwards.) Fred Hessler and David Cyganowski both described Lisa Conley's performance in her first two years as a Director as "strong" (Cyganowski depo., pp. 118-120; Hessler depo., pp. 55-58), and said that she was "highly effective," and "progressing in terms of taking on greater responsibilities" (Hessler depo., p.90). At the same time, Hessler indicated that there was no review of any documents or discussion of performance evaluations in connection with the November 2008 RIF (Hessler depo., p. 263). He did not, in fact, understand any concrete criteria for the RIF. "I don't know what criteria was used to be able to put people on that list in the first place" (Hessler depo., p. 286). His belief was that he needed to make a subjective judgment about which individuals would be likely to take clients or employees with them if they were terminated, and choose to terminate those who would be least likely to do so (Hessler depo., p. 263). The decision to lay off Lisa Conley was then based on managers' beliefs about the probability that would take clients with her or recruit people away to a competitor (Hessler depo., pp. 296-297). No managers, however, ever mentioned the diversity or EEO/AA implications for the Health Care Group of eliminating its only remaining female Director.

Nadine Mentor: Promoted Early and Later Belittled

52. Nadine Mentor was a newly promoted Director in the Southeast Group, who was still earning a VP's salary in 2008. In her annual performance reviews from 2005 to 2007, she received consistent rankings as Very Good/Highly Effective (2) or Outstanding/Exceptional (1) in most areas. Her manager overall ratings were 2 (Highly Effective) in 2005 and 2006, and 1 (Outstanding) in 2007. She also received highly positive manager comments in these reviews:

> "Nadine is equipped with the skill set and personality to become extremely successful. She is progressing nicely and we are in the business. I'm pleased with her performance and progress to date." Development Needs & Plans: "Continue to refine her marketing skills and apply her technical capability towards meeting her client needs. We are very pleased with Nadine's progress and performance." (2005 Year End Performance Review)
>
> "Nadine possesses all of the technical skills to be successful in the industry. She has done a good job in developing and monitoring various client relationships. She works well with her colleagues and is well respected within the group and PFD. She also is dedicated to the development of our junior professionals. We are pleased with Nadine's performance and progress. 2008 will be a growth year for Nadine since she will be acting as the lead banker for several large transactions and being a key member of a new business team for several major accounts in the Southeast." (Overall manager comments, 2006 Year End Performance Review)
>
> "Nadine has made great progress this year. In recognition of this, Nadine will be assuming a much higher level of responsibility in the new year. We are very pleased with her performance and development." (Overall manager comments, 2007 Year End Performance Review)

Other Directors in the Southeast Group (Michael Baldwin, Bryce Holcomb, and Guy Logan), also received very positive manager ratings and comments.

    53.    Nadine Mentor's immediate manager, Norman Pellegrini, had very positive views of her abilities and had recommended her early promotion to Director (Pellegrini depo., pp. 209-216). When asked why he had recommended her for an early promotion, he said:

> "Because of her past performance, but because of additional responsibility she was willing to assume." "She was going to become a member of, for lack of a better term, this new team that was going to be developed to cover big cities throughout the country, she was going to be traveling more…" (Pellegrini depo., pp. 213-214).

However, he acknowledged that in retrospect the early promotion may have made her more vulnerable to the RIF.

    54.    Similar to other managers, Norman Pellegrini said that the criteria for layoff in the RIF were based on which employees would have the least impact on the business (Pellegrini depo., pp. 232-235). These vague criteria were then met using subjective determinations based on "relationships, what business they are doing, what clients they will be able to take with them" (Pellegrini depo., p. 235). Pellegrini and Bartley Livolsi selected Nadine Mentor because she had

24

the least amount of developed business and they believed that she would have the least impact on business going forward (Pellegrini depo., pp. 283-284). However, efforts to pin down definitions of "developed business" and who was responsible for which clients in the depositions were unsuccessful. Norman Pellegrini described it as a "judgment call":

> You look at the accounts they are responsible for, you determine if they leave, how much it is going to impact your business as a whole, and you make an assessment, a judgment call" (p. 129).

Managers of the Southeast Group, Norman Pellegrini and Bartley Livolsi, did not however use any documents to compare Nadine Mentor to other Directors in the group when they made the decision to lay her off. "I guess I knew *innately*, you know, based upon running this group for six years, who had business, who didn't, based upon, you know, running the group" (Pellegrini depo., p. 287; *emphasis added*).

55. Bartley Livolsi, the head of the regional groups in the PFD, also indicated that he evaluated the performance of all employees in the group, but did so without reviewing their performance evaluations (Livolsi depo., pp. 32-33). He said:

> I am familiar with each and every person's performance. Not on each and every account. I know basically what their skills are. I know what their potential is. I know, through discussion with regional managers, what he views or they view as their potential, their capabilities. We discuss things like ramifications of losing a person, potential for the future, all of those come into play (Livolsi depo., p. 33).

He concluded, based on his subjective assessment, that Nadine Mentor was one of two employees who would have the least impact on the business.

56. Bartley Livolsi belittled Nadine Mentor's performance and abilities in ways that align with findings on cognitive biases against women. When asked about Ms. Mentor's abilities, he described her as "Enthusiastic, inexperienced" (Livolsi depo., p. 46). His assessment that she was "inexperienced," and emphasis on this point, conforms to double standards for women's performance, whereby women must prove themselves more than men before others evaluate their performance highly (Foschi 1996; 2000). In other words, men are often rewarded for their potential while women receive rewards only for their concrete performance. Regarding her performance, which received above average reviews, he said, "You know, my limited experience with her was that she was doing her job" (Livolsi depo., pp. 54-55). Livolsi especially belittled Nadine Mentor's early promotion to Director:

25

"I think that director is *a nice title* that is something that *a lot of people get* and have. It helps them in their stature within the industry, and generally it is *an irrelevant title*. It is a title within our division. It is a title that you could – we have directors that do vice president's work and we have vice presidents that do director's work" (Livolsi depo., p. 55; *emphasis added*).

"I am not suggesting that Nadine didn't earn it or didn't deserve it, all I am saying is that from my perspective that was a way of satisfying and encouraging employees to continue to be successful and work hard" (Livolsi depo., p. 56).

"My feeling was at that point, that although Nadine was maturing and growing and that title was a nice title, you know, to have on her business card, that *she was basically doing*, from what I could ascertain from Norm, *vice president's work*" (Livolsi depo., p. 56; *emphasis added*).

Thus, he admitted that she had performed well, but also simultaneously dismissed her promotion, skills, and contribution to the group (Livolsi depo., p. 60).

57.     These remarks suggest that Bartley Livolsi minimized Nadine Mentor's accomplishments within Citi's PFD. This is what one would expect as a result of status processes, in which women's performance receives weaker subjective evaluations than men's when it is of equal quality, and in which evaluators hold women to higher standards for competence than men. By failing to scrutinize available performance indicators, Livolsi appears to have used subjective impressions to evaluate men more positively and to reduce the gender diversity of senior personnel within the Southeast regional group.

Terminating All Women in the Group: Housing and Infrastructure

58.     Two of the plaintiffs, Chia Siu and Brittany Sharpton, worked as analysts in the PFD before the November 2008. Both were part of layoffs that eliminated *all* of the women within their subgroups (Housing and Infrastructure) in November 2008. In terms of performance, the available data to compare these women to other analysts are thinner than the data for the Directors, and managers seemed to have less familiarity with the analysts and their performance in the depositions. The disparate gender impact of the RIF was also clearer at the Director level.

59.     However, Chia Siu clearly had excellent performance as an analyst and her managers had recommended her for an early promotion to Associate. She received a very glowing review in the summer of 2008, just months before her inclusion in the November RIF, and nearly all of her scores were 1s (Exceptional). Michael Koessel described her as

26

"quantitatively strong" (Koessel depo., p. 197), and "a very strong, good analyst, especially on the quantitative side of the business" (Koessel depo., p. 250). He also worked with Amy Bartoletti to retain Chia Siu in the Housing group and to obtain an early promotion to associate for her. Chia Siu's manager comments in her annual performance evaluations were extremely positive:

> "Chia is very reliable and does a fantastic job with clients and projects. She takes initiative and is a very valuable member of our housing group." "A Chia's skills are further refined, she should endeavor to further cement our client relations by expanding her client contact." "Great job! Keep up the super work."

> "You can give her any task and she will complete it in a timely manner. The work is done accurately and it is laid out in a format that is easy to follow and visually appealing. She will go through work product in a very meticulous manner and correct, update, and raise questions, resulting in a quality product. She has a good attitude and is very responsive to the wants and needs of individuals and the group. Understanding of concepts is quickly developed and understood." Rank out of entire Analyst class: Top 10% (2007 Performance Review)

The other analyst in the Housing group at the beginning of November 2008 was Tian (Tim) Yang, who had much weaker ratings than Chia Siu (3s for Effective, and 4s for Partially Effective). Tian Yang was ranked in the top 50% of his analyst class, well below the top 10% ranking that Chia Siu received. In fact, Mike Koessel indicated that he initially wondered why Tim was not laid off rather than Chia (Koessel depo., p. 312).

60.     The decision to include Chia Siu in the November 2008 RIF instead of Tian Yang appears to based on the calculation that she would react to the RIF by choosing to leave (Brownstein depo., p. 197). In fact, David Brownstein acknowledged that the co-heads of the group, Bartoletti and Koessel, had informed him that Chia Siu was doing "superb work" (Brownstein depo., p. 167) and that he had been involved in discussions about promoting her early to Associate (Brownstein depo., p. 175). However, David Brownstein included Chia Siu in the November 2008 RIF because he and Michael

27

Koessel believed that Chia Siu was likely to leave Citi after the layoff, even if she were excluded from the RIF. They appear to have made this judgment based partly on stereotypes of women as emotional and reactive. For example, Michael Koessel described her as "very upset about Nick's being laid off" (Koessel depo., p. 296) and "particularly *frazzled* by disruptions in the business and overwhelmed by, you know, workload impact that – people coming and going" (Koessel depo., p. 249; *emphasis added*). As with the comments on the tidiness of Lisa Conley's office, one wonders if an analyst's *upset* and *frazzled* emotional state would have influenced retention decisions about a male analyst – or even warranted comment. Similarly, the belief that Chia Siu might not remain at Citi for the long haul seems unlikely to be as salient in decisions about laying off a male analyst, since men more often get the benefit of the doubt (like when David Brownstein initially believed that Mike Koessel was "not interested" rather than unqualified to head the Housing group, and that his lack of apparent interest did not influence Brownstein's views of his abilities).

61. In the case of Brittany Sharpton, it is not clear why Thomas Green, the head of the Infrastructure group, chose to include her in the RIF instead of another analyst – particularly one with less experience. However, what is most notable about the analyst cases of Chia Siu and Brittany Sharpton is that the managers of these groups within the PFD did not attempt to retain any women after the November 2008 RIF, even at the most junior level. Given a choice between laying off a man or a woman, they chose to lay off the woman every time. Among the seven industry-focused groups and the six regional groups in the PFD, five had no remaining women after the November 2008 RIF (38.5% of the groups were all-male). Before the November 2008 RIF, only two of these thirteen groups (15.4%) – Power and Southwest – had no women. Yet despite the effect of dramatically reducing gender diversity in the PFD, the managers who oversaw Housing (Brownstein) and Infrastructure (Green) seemed aware of the EEO/AA implications of their RIF decisions and did not appear to do anything to avoid eliminating all of the women as part of their RIF strategy.

V. **How Organizational Policies and Practices Can Minimize Bias**

28

62.     When subjective impressions are the criteria for personnel decisions, cognitive biases that put women at a disadvantage are likely to operate – leading to gender inequality in the workplace. Organizations with highly subjective decision-making, lack of transparency in recruitment, promotion, termination and pay decisions, lack of accountability for equal employment opportunity goals, and a lack of procedural consistency for determining employment outcomes tend to have more inequality and less diversity than organizations with accountability, procedural consistency, and transparency in decision-making. In layoffs specifically, research has found that women and black workers have higher layoff rates than white men with similar credentials and work experience (Couch and Fairlie 2010; Fairlie and Kletzer 1998; Farber 1997; Gardner 1995; Haveman, Broschak and Cohen 2009). Recent research on the effects of downsizing suggests that layoffs tend to reduce managerial diversity, especially when layoff decisions are based on no formal rule, like in Citi's PFD (Kalev 2012). Moreover, layoff rules that treat the organizational division of labor as though it is gender- and race-neutral, as expressed in comments by Francis Chin ("I think we do things on the merit." "I believe it is a merit-based process and without regard for gender." Chin depo., p. 183), increases biases in favor of white men and thus reduces diversity (Castilla and Benard 2010; Kalev 2012).

63.     However, a disparate impact of personnel decisions by gender is not inevitable, and Citigroup could have engaged in its RIF in a way that avoided a discriminatory result. Organizations can suppress social psychological influences by increasing accountability for antidiscrimination outcomes and increasing the emphasis on criteria that are objective and thus less subject to status influences and stereotype bias (Baron and Pfeffer 1994; Chen and DiTomaso 1996; Kanter 1977; Krieger 1995; Reskin 2000; 2003; Roth 2006; Tetlock 1999). Industrial/Organizational psychologists and most Human Resources professionals are aware of this and understand organizational "best practices" that minimize the effects of cognitive biases. Research suggests that the biasing effects of stereotypes and in-group preferences decline when decision-makers are required to use other criteria to make personnel decisions (Reskin 2000; Roth 2006). One way to minimize the influence of stereotyping and in-group preferences is for organizations to replace subjective data and procedures with objective ones (Kanter 1977; Reskin 2000; Roth 2006).

64.     Performance evaluations in investment banking can involve subjective judgments because workers work in teams and observers may perceive each individual's contribution to the

29

team differently, and men and women with identical performance evaluations are often rewarded unequally (Castilla 2008; Roth 2006). However, performance evaluations can still provide information that reduces gender and race bias in personnel decisions, including terminations, especially if they use objective criteria for performance. In fact, large organizations like Citigroup have developed increasingly elaborate performance evaluation systems in response to the 1964 Civil Rights Act with the goal of providing data that will prevent managers from using arbitrary subjective considerations in promotion, pay, and dismissal decisions (Dobbin 2009). In general, using performance evaluations to make personnel decisions improves workforce diversity the requirement to analyze individualized information may trigger decision-makers' sense of accountability, even when faced with somewhat biased evaluations (Kalev 2012; Tetlock 1992). With respect to downsizing in particular, scrutiny of performance evaluations as the basis for layoff decisions produces better diversity outcomes than layoffs based on position, tenure, or *especially no formal rule* (Kalev 2012). For these reasons, it is all the more remarkable that Citi's PFD engaged in an RIF process with no formal rule, and did not use the available and extensive performance reviews that might have mitigated the disparate gender impact of the layoffs.

65. Experimental research suggests that even small increases in accountability can reduce the biasing effects of stereotyping and in-group preferences (Tetlock 1985; 1992). However, while experimental manipulations in laboratory require only minimal accountability to show an effect, organizational settings with meaningful differences in power require more substantial accountability structures (Kalev et al. 2006; Reskin 2000; Roth 2006; SIFMA 2007). This suggests the need for oversight or formal rules to keep cultural biases out of personnel decisions.

Citigroup EEO/AA and Diversity Policies

66. Citigroup has formal affirmative action, non-discrimination, and sexual harassment policies in place to comply with EEO/AA mandates. The Citigroup 2007 Employee Handbook articulates a standard EEO policy that states: "Recognizing the value of diversity, the Firm endeavors to encourage and support a work environment that benefits from the skills and

30