# Exhibit 33

abilities of employees from a wide range of cultural values and traditions" (Employee Handbook, p. 6). The Handbook has an additional section of its Code of Conduct (Appendix F) that states:

> Citigroup believes that diversity in our staff is critical to our success as a global organization, and we seek to recruit, develop and *retain* the most talented people from a *diverse* candidate pool. Advancement at Citigroup is based on talent and performance. *We are fully committed to equal employment opportunity and compliance with the letter and spirit of the full range of fair employment practices and nondiscrimination laws*." (p. 70 – *emphasis added*)

Formal policies like this are part of most large organizations EEO/AA apparatus. These policies alone do not guarantee compliance or awareness of EEO/AA issues among rank-and-file managers, since policies on the books may not correspond closely with on-the-ground practices (Dobbin et al. 1993; Edelman 1990; 1992; Edelman, Fuller, and Mara-Drita 2001; Edelman and Petterson 1999; Sutton and Dobbin 1996; Sutton et al. 1994). In other words, policies may exist largely as an effort to provide legal protection, without any proverbial "teeth" to effect changes in behavior within the organization. However, accountability for the diversity effects of personnel decisions can reduce gender and racial inequality. Awareness that their organizations collect demographic information and might review it, can trigger an on-going self-critical cognitive process among decision-makers (Tetlock 1999).

      67.      Some organizational efforts to combat stereotyping and in-group preferences target managerial behavior through diversity training, which is designed to increase managers' awareness of how bias affects their actions and those of subordinates, and diversity evaluations, which are supposed to provide managers with feedback showing the effects of their decisions on diversity. The documents that I reviewed suggested that Citigroup had implemented both types of intervention and had an active diversity committee. In fact, the 1997 settlement in the Martens et al., v. Smith Barney case required Citigroup, which had acquired Salomon Smith Barney, to set up a substantial antidiscrimination apparatus at the organizational level. The Firm agreed to pay $33 million to resolve the claims by female brokers at a Smith Barney unit, and to spend $15 million on diversity programs designed to attract, *retain*, and promote women and minorities and promote equal opportunities at the firm and prevent harassment and discrimination. Citigroup also had to appoint a diversity monitor and an industrial psychologist for at least 4 years to oversee the policy changes (Martens, et al. v. Smith Barney Inc., 96 Civ. 3779). Research on

organizational diversity has shown that facing legal cases like Martens, et al. v. Smith Barney can lead to organizational learning and improvements in diversity. In fact, discrimination lawsuits and compliance reviews can improve managerial diversity even years after suits are settled (Kalev and Dobbin 2006; Skaggs 2008; 2009; Wooten and James 2004). Thus, one would expect significant awareness of EEO/AA issues among managers in Citi's PFD as well as substantial oversight of EEO/AA compliance in the RIF from HR and the legal department. However, contrary to this expectation, there is no evidence of oversight in the depositions or other documents submitted by the Defense in this case.

68. One of the strategies that Citi employed was to provide diversity training. David Brownstein and Mike Koessel acknowledged that they had received antidiscrimination training at Citi (Brownstein depo., p. 47; Koessel depo., pp. 125-127). However, some other managers had no recollection of any such training (e.g., Pellegrini depo., pp. 90-91), or said that they did not recall EEO training, but had seen "some Citi training videos that dealt with workplace dynamics, interaction broadly" (Green depo., p. 60).[10] Organizational research also reveals that attempting to reduce managerial bias with sensitivity training and feedback is often ineffective, and may actually activate stereotypes and thereby amplify their effects (Bendick, Egan, and Lofhjelm 2008; Edelman et al. 2001; Kalev et al. 2006; Kochan et al. 2003; Nelson et al. 1996). Thus, it is possible for diversity programs to backfire if they focus on changing managerial attitudes alone (Nelson et al. 1996).

69. However, accountability can also extend to "diversity performance" evaluations that assess managers' success in improving the representation and integration of women and minorities among recent recruits and promotions. Research suggests that these evaluations are considerably more effective for producing equal employment opportunity for under-represented groups than diversity training (Kalev et al. 2006). Diversity performance accountability is heightened when affirmative action plans annually evaluate their own workforces, specify goals for the representation of women and minorities based on labor market analyses, and develop timetables for achieving these goals. Organizations where managers are accountable for diversity performance tend to have better integration of women and minorities into management and the production of diversity action plans can heighten managers' antidiscrimination awareness

---

[10] Fred Hessler, the head of the Health Group, had previous experience with a hostile work environment sexual harassment claim in 1995, which may have been connected to Martens v. Smith Barney (Hessler depo., pp. 9-14).

(Catalyst 2006; Kalev et al. 2006; SIFMA 2007). With respect to layoffs more specifically, heightened antidiscrimination accountability among decision-makers encourages more equitable layoff decisions and reduces the negative effects of downsizing on diversity, thus reducing gender and race bias in personnel decisions (Brooks & Purdie-Vaugns 2007; Castilla 2008; Kalev 2012; Tetlock 1985).

70. Citigroup's *Diversity Annual Report 2006* implies that Citigroup holds management accountable for diversity performance, thus implementing an organizational "best practice" for EEO/AA outcomes:

> At Citi, diversity is a core component of our management practices. *Citi businesses and managers develop annual diversity plans and are held accountable for progress against those plans.* Diversity reviews are held quarterly and culminate in an annual review of our franchise efforts with our Board of Directors. In 2006, 155 diversity reviews were conducted in our business."
> (Diversity Annual Report 2006, p. 5; *emphasis added*)

The report further indicates that:

> Executives and department managers are responsible for making good-faith efforts to achieve Affirmative Action goals. The primary responsibility for developing and monitoring each program is assigned to a senior Human Resources officer, and *progress on Affirmative Action efforts is regularly reviewed with senior management*." (Diversity Annual Report 2006, p. 36; *emphasis added*)

According to this report, the Management Committee is responsible for diversity training and service as mentors to members of under-represented groups, and senior managers' diversity efforts are linked to their compensation as part of the annual performance evaluation process. This suggests that there should be documentation of managers' diversity goals and performance, and oversight from HR. One would expect this accountability to extend to layoff decisions

71. However, the Defense in this case did not submit documentation of annual diversity plans for the managers in Citi's PFD, and none of the managers in the PFD mentioned accountability for EEO/AA or diversity outcomes in their depositions. Given that the Defense is

required to produce documents that Plaintiffs' Counsel requested,[11] this suggests that the managers in the PFD did not develop diversity plans that made them accountable for their diversity performance, even though Citi had a structure for diversity performance accountability in place. In their depositions, no managers described taking EEO/AA or diversity considerations into account in their decisions about whom to include in the RIF. Moreover, neither Human Resources nor the legal department appears to have engaged in any oversight of these policies and practices with respect to the 2008 RIF.

Monitoring and Oversight for Compliance with Diversity and EEO/AA Initiatives

72.     Within the documents that I reviewed, there is also no evidence that Citi's legal department or Human Resources department oversaw the RIF and ensured its compliance with Equal Employment Opportunity and Affirmative Action (EEO/AA) laws or Citi's diversity policies. Overall, the managers in Citi's PFD did not appear to have a strong awareness of antidiscrimination issues or laws, and none of the managers mentioned these issues in their decision-making about the RIF. For example, when asked if he was concerned about the fact that the last three remaining women in the Housing Group were all selected for layoff in November 2008, Francis Chin said, "It was not their – the fact of women was not part of my consideration about RIFs" (p. 182). When further pressed on whether the Municipal Securities Division does a good job of promoting women, he responded, "I believe it is a merit-based process and without regard for gender" (p. 183). He seemed unaware of any need to comply with antidiscrimination mandates, believing that merit was an equitable criterion. However, research has demonstrated over several decades that observers perceive white men to have more merit when their objective performance is the same as women's or minorities,' thus holding women and minorities to higher standards for performance than white men (Berger et al. 1977; Castilla and Benard 2010; Foschi 1996; 2000; Ridgeway 1997). This is the rationale for the existence of Affirmative Action laws and policies, which mandate greater scrutiny of candidates' merits in personnel decisions when comparing white men to traditionally under-represented groups. The research evidence thus points to the need for scrutiny of objective performance measures rather than reliance on subjective perceptions of merit.

---

[11] **DOCUMENT REQUEST NO. 15:** All documents and electronically stored information concerning any analyses, reports and/or studies conducted concerning the gender diversity of Defendants' Municipal Securities Division from January 1, 2006 to the present.

34

73. The lack of oversight of the diversity and EEO effects of the RIF is striking because experience with the Martens, et al. v. Smith Barney legal settlement and the development of stronger diversity, sexual harassment, and EEO/AA policies following it should have heightened awareness of EEO/AA compliance issues, and increased the oversight of the legal department. Organizations like Citigroup with previous experience with antidiscrimination litigation should have better oversight of the diversity implications of their layoff procedures (Kalev 2012). The presence of a large legal department should also have encouraged attorney review of the EEO/AA implications of the RIF (Kalev 2012). However, there is no evidence in the documents that I reviewed of any legal oversight of the PFD's RIF process.

74. In the depositions for this case, Human Resources (HR) and the legal department were both conspicuously absent from any consideration during the 2008 RIFs. Francis Chin and others observed that HR oversaw promotions, whether they were based on time in grade or were proposed as early promotions (Chin depo., p. 186), and HR initiated the RIF process (Brownstein depo., p. 52). David Brownstein said that he and Francis Chin submitted the list of names selected for termination to HR (Brownstein depo., p. 137). Yet, while group heads and senior managers (including David Brownstein, Francis Chin, David Cyganowski, Thomas Green, Fred Hessler, Bartley Livolsi, and Norman Pellegrini) acknowledged that they had laid off qualified people and that it was difficult to make distinctions between those they laid off and those who remained after the November 2008 RIF. This difficulty making strong distinctions makes their disproportionate selection of women all the more remarkable. They appear to have given little thought to EEO/AA issues or to have scrutinized the implications of their RIF decisions for diversity within the PFD. These managers rarely consulted or kept documentation of distinctions among the possible candidates for RIF that might have helped them to ensure EEO/AA compliance (Livolsi depo., pp. 137-138). None of them mentioned oversight from either HR or the legal department of the effects of this RIF on diversity or EEO/AA. This lack of awareness and oversight is extraordinary given that HR professionals in most large U.S. corporations like Citi are aware of EEO/AA compliance issues and know industry standards for ensuring compliance, and one would thus expect HR to work with the legal department on compliance issues surrounding layoffs (Kelly and Dobbin 1998; Yang and Konrad 2011).

## VI. Summary and Conclusions

35

75. Citi's PFD engaged in significant Reductions in Force in 2008 that disproportionately laid off qualified women, and especially women at more senior levels. The data reveal that the PFD became significantly more male-dominated after the November 2008 RIF. The women who remained in the PFD after the November 2008 RIF were also more likely to work at the lowest level (analyst) than before the RIFs, while women working at the more senior level of Director were particularly vulnerable to layoff. Some groups within the PFD laid off all of their remaining women in the November 2008 RIF, despite a lack of solid, documented performance distinctions that could justify such a radical violation of EEO/AA principles. Moreover, managers seemed wholly unaware of the EEO/AA and workforce diversity implications of their RIF decisions, and there appears to be no oversight from HR or the legal department at Citi.

76. I have summarized social science research that explains how a lack of formal criteria for personnel decisions encourages reliance on stereotypes and biased evaluations of men's and women's relative competence in the workplace, and how such evaluations could have produced the disparate gender impact of the PFD's November 2008 RIF. I have also summarized social science research on the use of performance evaluations to compare men and women and guide personnel decisions. Finally, I have summarized organizational research in social science on the features of personnel systems in organizations that minimize bias. This large body of social science research illuminates how the absence of formal criteria for termination, disregard of formal performance reviews, and a lack of monitoring and oversight by HR and the legal department, produced a disparate impact of the RIF by gender in Citi's PFD. This is not to say that Citi's PFD would have laid off no women in November 2008 if had followed formal criteria, if managers had scrutinized performance evaluations, and if HR and the legal department had evaluated the RIF for its EEO/AA implications. However, these measures would likely have produced a more proportionate impact on women in the PFD, and the RIF would probably have targeted fewer highly ranked women, like Directors, who were already heavily outnumbered by men.

77. What is striking in this case is the fact that Citi, as a firm, had strong EEO/AA and diversity-promoting mechanisms, and significant experience with antidiscrimination enforcement from a high-profile legal settlement in a gender discrimination suit. Yet the managers in the PFD did not apparently participate in diversity performance plans or have a

36

strong awareness of antidiscrimination issues when making their RIF decisions. Managerial incentives to increase diversity and accountability for diversity performance contribute to organizational environments where the representation of women and minorities at the top tends to improve over time. However, shortcomings of the EEO/AA and diversity apparatus in Citi's PFD in 2008 point to an environment that failed to create equal employment opportunity for women.

Signature        *[signature]*

Date             December 10, 2012