**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

AMY BARTOLETTI, CHIA SIU,  :
NADINE MENTOR, LISA CONLEY and  :
BRITTANY SHARPTON,  :    Civil Action No. 10 Civ. 7820 (LGS)
 :
               Plaintiffs,  :
 :
     v.  :
 :
CITIGROUP INC. and CITIGROUP GLOBAL  :
MARKETS INC.,  :
 :
             Defendants.  :
 :
-------------------------------------------------------------- x

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THOMPSON WIGDOR LLP

Douglas H. Wigdor, Esq.
Lawrence M. Pearson, Esq.
David E. Gottlieb, Esq.
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................2

    I.     Decision Making in the RIF ..............................................................................2

    II.    Disparate Gender Impact of the RIF.................................................................3

    III.   Discrimination Against Amy Bartoletti.............................................................5

    IV.   Discrimination Against Chia Siu ......................................................................9

    V.    Discrimination Against Nadine Mentor ..........................................................11

    VI.   Discrimination Against Lisa Conley ...............................................................15

    VII.  Discrimination Against Brittany Sharpton .....................................................18

ARGUMENT.....................................................................................................................20

    I.     Summary Judgment Standard.......................................................................... 20

    II.    Numerous Genuine Issues of Material Fact Exist as to Whether Gender was a Motivating Factor in the Decision to Terminate Plaintiffs' Employment.................21

         A.  Statistical Evidence Is Probative of Discrimination .......................................22

         B.  Bartoletti's Disparate Treatment Claims Must Proceed To Trial....................24

         C.  Siu's Disparate Treatment Claims Must Proceed To Trial..............................28

         D.  Mentor's Disparate Treatment Claims Must Proceed To Trial .......................30

         E.  Conley's Disparate Treatment Claims Must Proceed To Trial .......................33

         F.  Sharpton's Disparate Treatment Claims Must Proceed To Trial ...................35

    III.   Summary Judgment Cannot be Granted as to Plaintiffs' Disparate Impact Claims ...................................................................................................37

         A.  Legal Standard.................................................................................................37

B.  Plaintiffs Can Establish A Specific Employment Practice ..............................38

C.  Plaintiffs' Statistical Analysis Is Appropriate and Compelling......................39

D.  Plaintiffs Have Properly Alleged Impact Claims ...........................................40

CONCLUSION ....................................................................................................................41

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

Apicella v. Rite Aid Hdqtrs. Corp.,
    No. 10-cv-1679 (WFK), 2013 WL 1281560 (E.D.N.Y. March 27, 2013) ........................34

Ash v. Tyson Foods,
    546 U.S. 454 (2006) ................................................................................................27

Back v. Hastings on Hudson Union Free Sch. Dist.,
    365 F.3d 107 (2d Cir. 2004). ..................................................................................35

Berube v. Great Atlantic & Pacific Tea Co., Inc.,
    No. 06-cv-00197 (VLB), 2010 WL 3021522 (D.Conn. July 29, 2010) .....................32, 34

Bickerstaff v. Vassar College,
    196 F.3d 435 (2d Cir. 1999) ...................................................................................21

Byrnie v. Town of Cromwell Bd. of Educ.,
    243 F.3d 93 (2d Cir. 2001) ..................................................................21, 25, 27, 34

Chin v. Port Auth. of New York & New Jersey,
    685 F.3d 135 (2d Cir. 2012) ........................................................................ *passim*

Cityspec, Inc. v. Smith,
    617 F. Supp.2d 161 (E.D.N.Y. 2009) ......................................................................20

Coburn v. Rockwell Automation, Inc.,
    238 Fed. Appx. 112 (6th Cir. 2007) .........................................................................32

DeMarco v. Holy Cross High Sch.,
    4 F.3d 166 (2d Cir. 1993) ..................................................................................24, 35

E.E.O.C. v. Ethan Allen, Inc.,
    44 F.3d 116 (2d Cir. 1994) .....................................................................................24

Griggs v. Duke Power Co.,
    401 U.S. 424 (1971) ...............................................................................................37

Hollander v. Am. Cyanamid Co.,
    172 F. 3d 192 (2d Cir. 1999) ..................................................................................22

Holmes v. Brentwood Union Free Sch. Dist.,
    No. 03 Civ. 1084 (TCP)(AKT), 2006 WL 1581434 (E.D.N.Y. May 25, 2006) .........24, 31

Kourofsky v. Genecor Int'l, Inc.,
    459 F. Supp. 2d 206 (W.D.N.Y. 2006) ............................................................................ 40

McDonnell Douglas v. Green,
    411 U.S. 792 (1973) ...................................................................................................... 21

McGuinness v. Lincoln Hall,
    263 F.3d 49 (2d Cir. 2001) ........................................................................................... 27

Moylan v. Nat'l Westminster Bank USA,
    687 F. Supp. 54 (E.D.N.Y. 1998) ............................................................................ 26, 36

Murphy v. Gen. Elec. Co.,
    245 F. Supp. 2d 459 (N.D.N.Y. 2003) .......................................................................... 38

Ottaviani v. State of New York at New Paltz,
    875 F. 2d 365 (2d Cir. 1989) ........................................................................................ 22

Patterson v. McLean Credit Union,
    491 U.S. 164 (1989) ...................................................................................................... 27

Paup v. Gear Products, Inc.,
    327 Fed. Appx. 100 (10th Cir. 2009) ...................................................................... 32, 34

People v. New York City Tr. Auth.,
    59 N.Y.2d 343 (1983) .................................................................................................... 37

Petrovits v. New York City Tr. Auth.,
    95 Civ. 9872 (DAB), 2002 WL 338369 (S.D.N.Y. Mar. 4, 2002) ................ 26, 28, 36, 37

Ramos v. Marriott Int'l, Inc.,
    134 F.Supp.2d 328 (S.D.N.Y. 2001) .............................................................................. 21

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ................................................................................ 21, 26, 29, 36

Rifkinson v. CBS, Inc.,
    94 Civ. 7985 (KTD)(JCF), 1997 WL 634514 (S.D.N.Y. Oct. 14, 1997) .............. 27, 30, 36

Riley v. HSBC USA, Inc.,
    784 F. Supp.2d 181 (W.D.N.Y. 2011) ...................................................................... 27, 34

Robinson v. Metro-North Commuter R.R. Co.,
    267 F. 3d 147 (2d Cir. 2001) ........................................................................................ 37

Roge v. NYP Holdings, Inc.,
    257 F.3d 164 (2d Cir. 2001) ............................................................................ 31

Sabree v. United Bhd. of Carpenters and Joiners Local No. 33,
    921 F.2d 396 (1st Cir. 1990).............................................................................. 24

Santos v. Costco Wholesale, Inc.,
    271 F.Supp. 2d 565 (S.D.N.Y. 2003) ............................................................... 21

Silver v. N. Shore Univ. Hosp.,
    490 F. Supp. 2d 354 (S.D.N.Y. 2007) .............................................................. 32

Smith v. Xerox Corp.,
    196 F.3d 358 (2d Cir. 1999) ................................................................... 20, 23, 39

Summa v. Hofstra University,
    708 F.3d 115 (2d Cir. 2013) ........................................................... 27, 31, 34, 36

Tinker v. Sears, Roebuck & Co.,
    127 F.3d 519 (6th Cir. 1997)............................................................................. 32

Tomassi v. Insignia Financial Group, Inc.,
    478 F.3d 111 (2d Cir. 2007) .............................................................................. 20

Wado v. Xerox Corp.,
    991 F. Supp. 174 (W.D.N.Y. 1998).................................................................. 40

Watson v. Fort Worth Bank & Trust,
    487 U.S. 977 (1988) .......................................................................................... 37

Weiss v. JPMorgan Chase & Co.,
    332 F. App'x 659 (2d Cir. 2009) ................................................... 24, 31, 34, 35

Zubulake v. UBS Warburg LLC.,
    382 F. Supp. 2d 536 (S.D.N.Y. 2005) ........................................... 27, 30, 32, 36

## PRELIMINARY STATEMENT

Plaintiffs Amy Bartoletti, Chia Siu, Nadine Mentor, Lisa Conley and Brittany Sharpton present a record that raises dozens of material issues of fact that Defendants Citigroup, Inc. and Citigroup Global Markets, Inc. ("Citi") futilely attempt to eschew by failing to address material evidence, distorting the facts, disregarding the law and making outright misrepresentations.

Unable to demonstrate the absence of issues of fact regarding Plaintiffs' claims, Defendants instead resort to derision directed towards one of the five Plaintiffs.  By contrast, Defendants do not dispute – because they cannot dispute – that in November 2008, Frank Chin and David Brownstein supervised and controlled a reduction-in-force (the "RIF") within the Public Finance Department ("PFD") of Citi that resulted in the termination of:

- **Every** female in the Housing Group (including Bartoletti and Siu);

- **Every** female in the Infrastructure Group (including Sharpton);

- The **only** female Director out of 10 Directors in the Healthcare Group (Conley);

- The **only** female Director out of six Directors in the Southeast Group (Mentor); and

- The **only** female out of 17 Group Heads and Co-Heads in PFD (Bartoletti).

Defendants also do not dispute – because they cannot dispute – that in the RIF:

- **Every decision maker was male**;

- Across PFD, **women were 2.4 times more likely than men to be terminated**;

- A random process would generate the gender disparity in termination rates in the RIF **less than 7 times out of 1,000**; and

- When controlling for years of service, job title and group, a random process would generate the gender disparity of the RIF **less than 2 times out of 1,000**.

Defendants would have the Court believe that this is a mere anomaly – like betting on a coin landing on "heads" nine times in a row – which the Court should simply ignore.  As a matter of

law, these statistics are overwhelmingly sufficient to support both disparate treatment and disparate impact claims.

The evidence of gender discrimination is vast and far-ranging, and includes extensive statistical analysis, purging of women from Groups and certain jobs, shifting and false justifications, use of gender-based comments, treatment based on stereotypes as to a woman's role in the workplace, disparate assessment of qualifications, unequal compensation practices, exclusion of women from events, and a refusal to take responsibility for termination decisions. Defendants attempt to trivialize this action by claiming Plaintiffs allege only that the "wrong decision was made," a rote defense argument that ignores the evidence and reality.

Considered together or separately, Plaintiffs' claims and Defendants' assertions present a vast assortment of material issues of fact which preclude summary judgment.

## STATEMENT OF FACTS

### I. Decision Making in the RIF

PFD is a division within the Municipal Securities Division ("MSD") with about 15 product and regional Groups, each with a Head or Co-Heads.  In November 2008, Chin and Brownstein were the PFD Co-Heads.  (¶2).[1]  As Co-Heads, each was involved in personnel decisions, including hiring, promotions, bonuses and terminations.  (¶3).

In November 2008, PFD underwent a RIF.[2]  All PFD employees were at risk for termination.  (¶72).  The decision making and termination selections were driven by Chin and Brownstein.  (¶73).  Early in the decision making process, a meeting was held between Chin, Brownstein, Fred Hessler, David Cyganowski, Bart Livolsi and Thomas Green.  (Id.).  Chin

---

[1] Paragraphs of Plaintiffs' Rule 56.1 Counterstatement referred to herein as "¶__."  Defendants' Brief in Support of their Motion for Summary Judgment referred to herein as "DB."

[2] The RIF was not discussed until late October 2008, when the Head of MSD told Chin PFD needed to reduce salaries.  (¶¶4, 9, 46).  Defendants have not introduced evidence showing a tie to previous layoffs.

testified he took the "first cut" at trying to "figure out . . . what the population of a potential RIF would look like." (Id.).  Hessler and Cyganowski testified consistently that Chin and Brownstein came up with the initial list of employees selected for termination.  (Id.).

Chin and Brownstein admitted to making the decisions to terminate Bartoletti and Siu. (¶3).  As to the other Plaintiffs, Chin and Brownstein discussed potential candidates with the Group Heads, who made recommendations from the initial list.  (¶74).  Chin wanted to "find out" who the Group Heads thought were the "weakest performers," but Chin and Brownstein retained complete discretion to select and approve all terminations.  (Id.).  No clear criteria were used by Chin and Brownstein or communicated to the Group Heads.  (¶75).  The Group Heads provided input based on their "innate" and "subjective" thought processes.  (Id.).  Neither Chin and Brownstein nor the Group Heads reviewed performance reviews, revenue sheets or salaries to assist in the selection process.  (Id.).  The RIF used no formal or objective criteria to make decisions that would critically impact PFD and the lives of those fired.

## II.     Disparate Gender Impact of the RIF

The RIF had a devastating and disparate impact on women in PFD.  Out of 40 female professionals, 13 were terminated (32%), whereas only 16 of 119 male professionals were terminated (13.5%).  (¶76).  PFD employed roughly three times as many men as it did women, yet fired a roughly equal number of men and women.  (Id.).  Citi fired all three women in Housing and all three in Infrastructure.  (Id.).  The only female Director in Healthcare, of 10, was terminated.  (Id.).  The only female Director in Southeast, of six, was terminated.  (Id.).  The only female out of 17 Group Heads or Co-Heads was terminated.  (Id.).  Simply put, women employed in PFD were much more likely to be terminated than men in November 2008.

Dr. Mark Killingsworth, a labor economist, conducted a statistical analysis of the RIF and concluded that the gender disparity was highly statistically significant, as a random selection process (e.g., picking names from a hat) would yield the same gender disparity in its results less than 7 times in 1,000, or the equivalent of 2.7 "standard errors" or deviations (the threshold for statistical significance is less than 5 times in 100 or 1.96 standard errors).  (¶77).  Killingsworth also conducted a probit regression analysis which controlled for factors such as years of service, job title or Group.  (Id.).  Under this analysis, the probability of a random process generating such a gender disparity dropped to less than 2 times in 1,000, or 3.123 standard errors.  (Id.).  Killingsworth concluded that the statistical analyses,

> constitute[s] very strong evidence that female PFD employees were substantially more likely to be terminated during the November 2008 RIF than were male PFD employees.  In particular, female PFD employees were terminated much more frequently than were male PFD employees who were the same in terms of years of service, job title and department. This adverse effect for women is large in the ordinary language sense and is clearly statistically significant at conventional test levels.

(¶78).  The male-favored impact is not surprising given PFD's male-dominated management, lack of formal criteria, failure to use any objective data, and the inconsistent considerations used by exclusively male decision makers.

Dr. Louise Roth, an organizational sociologist, explains that "decades of research [show] how inconsistent procedures and a lack of accountability for non-discriminatory outcomes lead to biases against women [] in the workplace" and "using subjective evaluation criteria amplifies these effects." (¶79).  Employers can "suppress social psychological influences" by increasing "the emphasis on criteria that are objective and thus less subject to status influences and stereotype bias."  (Id.).  By contrast, the RIF was conducted with strictly male decision makers, no decision making criteria and inconsistent considerations.  As such, "social science research

illuminates how the absence of formal criteria for termination, disregard of formal performance reviews, and a lack of monitoring and oversight by HR and the legal department, produced a disparate impact of the RIF by gender []." (Id.).[3]

### III. <u>Discrimination Against Amy Bartoletti</u>

Bartoletti joined Citi as an Analyst in 1992, and was quickly promoted and moved into PFD. (¶31). In 2003, she was promoted to Director. (Id.). In June 2008, Bartoletti's supervisor Fluehr was fired. (¶33). Bartoletti and Koessel were then the only Directors in the Group, and Chin decided Bartoletti should be Group Head over Koessel. (¶33). The decision was warranted because her "performance exceeded that of Mr. Koessel's in every category" and, "by all relevant performance metrics, Ms. Bartoletti was better suited to lead the Housing Group than Mr. Koessel." (¶41). However, management quickly forced Bartoletti to share the position when Koessel threatened to leave if he was not made Co-Head. (¶35). A few months later, Bartoletti was fired and Koessel retained despite her superior qualifications, performance, results, seniority and experience (as well as Koessel's threat to leave). Bartoletti's termination was part of the elimination of all women from Housing (3 of the 4 employees terminated were women, leaving only 3 men in the Group). (¶41).

Defendants' *post-hoc*, purported termination rationale that Bartoletti was not suited to leading clients through the financial crisis is false and pretextual. For example: (i) "clients [ ] would constantly tell [Fluehr] that [Bartoletti] did an outstanding job and she gave them great services, was very smart and intelligent"; (ii) she had "fantastic client skills"; (iii) Koessel admits she did an "excellent job with clients;" (Id.); and she was nominated for MD in 2008 because

---

[3] Citi's failure to take steps to reduce the impact of gender bias is notable given a "Diversity Analysis" previously conducted showing that in 2006, across MSD, **91%** of Managing Directors ("MDs") were men (53 men/5 women) and **87%** of Directors were men (105/16). (¶80). Cyganowski, MSD Diversity Committee Chair, had "no opinion" as to whether this was a problem and said these disparities were never addressed or discussed as a problem. (Id.).

"[c]lients admire and respect Amy and are very loyal to the exceptional job she does." (¶¶39, 82). Bartoletti's reviews also reflect mastery of client relations and development, as she received the highest ratings in numerous related categories. (¶81). Koessel was never nominated for promotion to MD, his supervisors did not hold him in high regard (Chin referred to him as a "f[**]king lunatic"), and his peer reviews note a lackluster work ethic and inability to handle stress or keep up with the pace in Housing. (¶83). Bartoletti's client relationships generated millions of dollars more than Koessel's historically and in 2007, her last full year with Citi. (¶39). She held primary relationships with some of the Group's most important clients, including Texas and North Dakota, and Citi admits that her firing endangered client relationships and cost Citi business. (Id.).

Bartoletti had plentiful management experience that Defendants conclusorily dispute. (¶33) (describing that Bartoletti acted on Group Head Fluehr's behalf in certain matters, as well as filling in for him when he was away, and that Brownstein testified that Bartoletti did all of Fluehr's work for him when Fluehr was an MD and Group Head). By contrast, Defendants admit that Koessel had no management experience. (¶ 33). Bartoletti also passed the Series 53 Exam before her termination, which was a requirement to be Group Head,[4] whereas Koessel had not and did not until years later. (¶40). Koessel admitted that Bartoletti was qualified to head the group for this reason, while he was not. (Id.).[5]

From July 2008, until her termination, Bartoletti was more focused on work and preserving the Group's client base than Koessel, brought in new clients, including the State of

---

[4] Citi denies that the Series 53 was required, even though Citi told employees that it was. (¶40). Koessel was told he needed to take the Series 53 in mid-2008 to be a Group Head, and that it is an industry requirement. (Id.).

[5] Due to superior performance, Bartoletti was consistently paid a larger bonus than Koessel. (¶¶41, 86). Citi asserts that higher bonuses were the result of inducing her to reject an offer from Morgan Stanley, but her compensation was higher before this, as well as in the years after, demonstrating her superiority in the eyes of management. (¶86).

Kentucky, a big client of Citi's, and closed at least three deals in late 2008. (¶39). Brownstein praised Bartoletti for these efforts. (¶84). Nevertheless, Koessel was retained and Bartoletti fired. Fluehr, who had supervised both only months before that RIF, explained that "the decision to retain Mr. Koessel instead of Ms. Bartoletti is completely irrational and cannot be justified." (¶41). The evidence of discriminatory treatment is overwhelming, and the record is replete with evidence of gender bias, including, *inter alia*: (i) every woman in the Housing Group was terminated in the RIF; (ii) every female terminated was more qualified than the men who were retained; (iii) the percentage of women laid off was 32.5% as compared to 13.5% of men; (iv) Brownstein had previously engaged in discrimination against women; (v) Brownstein made a special effort to befriend and professionally develop men in the Housing Group, but not women; and (vi) Bartoletti was not invited to a client event though she was one of the primary persons on the account; instead, a male colleague who was not on the account was invited. (¶41; supra at 3).

As such, Defendants are forced to cobble together inconsistent and shifting reasons for the decision to terminate Bartoletti. Chin testified that the "sole criterion" for the decision to terminate Bartoletti was that she "was the most highly compensated between herself and [Koessel]." (¶41). By contrast, Brownstein provided numerous inconsistent reasons for the decision. At first, Brownstein testified to a ***single*** purported reason having nothing to do with Bartoletti's compensation: "[t]he decision I made to have Mike stay and not Amy was because Mike had the capacity and capability and experience to serve in that thought leadership role as opposed to simply a banking role." (Id.).[6] Then, in separate colloquies, Brownstein added: (i)

---

[6] Brownstein's attempt to distinguish a "thought leadership" role from "a banking role" undercuts another of Citi's purported reasons; namely, that Koessel was "purely a housing banker." Defs.' 56.1 St. at ¶ 41. Bartoletti's peers noted that she was "probably the best banker in the group" and "all in all, a great banker." (¶41). Citi relies heavily on Koessel setting up a conference to support its claim that he was more of a thought leader than Bartoletti, but the

Bartoletti's compensation was a factor (but not the sole criterion); and (ii) Koessel purportedly had more experience in the housing business and stronger client relationships. (Id.). Citi's EEOC statement included another purported reason: that Bartoletti's "primary focus" supposedly was on the student loan business, which purportedly was "becoming extinct." (Id.).

These purported reasons are false, in addition to being inconsistent. Bartoletti and Koessel were paid the same salary, and though her bonuses were higher, they were discretionary and, "[t]hus, the decision whether to retain Bartoletti or Koessel was cost-neutral." (Id.).[7] Brownstein himself undercut the dubious notion that the sole purpose of Citi's Housing Group going forward was to be a "thought leader" rather than a revenue generator by affirming on no fewer than three occasions the paramount importance of revenue. (¶38) (including, "[I]f we were going to remain in this business at all, long term, it had to be about revenues."). Bartoletti generated far more revenue than Koessel, spent much of 2008 in client visits and successfully preventing the loss of clients and was Citi's first choice to be Group Head. Supra at 5-6. Citi's contention that Koessel was more experienced is also untrue. (¶33) (including Chin's testimony that "[Bartoletti] was senior in terms of time and grade and service. I think people tend to equate that with being more qualified."). Experience could not have played a role in the decision because Brownstein admitted that his purported belief that Koessel had more experience was based on what he knows "today," and not in 2008, exposing this supposed explanation as false. (¶41).[8] Thus, Bartoletti does not assert that Defendants made the "wrong decision," but rather that Citi's proffered reasons are false and a pretext for her discriminatory firing.

---

conference was largely arranged by Fluehr before his termination, and Bartoletti herself attended various conferences in 2008 and presented at one as recently as October 2008. (¶40).

[7] Koessel actually received salary increases in 2009 (one month after Bartoletti was fired) and 2010. (¶41)

[8] The "student loan" justification is false. In 2008, Bartoletti had 4 student loan clients and 20 housing clients, which took up only about 10% of her time. (¶41). The business was not "becoming extinct," as Bartoletti generated

## IV.   Discrimination Against Chia Siu

Siu was hired as an intern by Citi in 2005 and was offered an Analyst position in Housing in July 2006.  (¶20).  By 2008, Siu was performing Associate-level work.  (Id.) (including Koessel testifying to same).  Siu received a near-perfect performance review, which Koessel admited.  (¶87).  Siu's strengths included her "remarkable attention to detail.  Everything you gave her was done correctly.  You never had to check her work.  Totally dependable.  Very hard working."  (Id.).  Simply put, "[e]verybody wanted to work with Chia.  She was fantastic."  (Id.).

In June 2008, Fluehr was terminated and Siu was concerned about job security because she believed Citi might eliminate the entire Group.  (¶22).  However, at no time did Siu think about leaving Citi or say to anyone that she might leave.  (¶23) (Q:  "Did you tell anyone in the group that you might quit?"  A:  "No. … I never thought of leaving.").[9]  Siu did discuss concerns regarding the Group with her supervisors, and felt that although she was offered a position as a Third Year Analyst,[10] a promotion to Associate would demonstrate Citi's commitment and reassure her about her future.  (¶23).  As a result, Siu's colleagues and supervisors attempted to secure an early promotion for her, including Koessel, who wrote: (i) "We need [Chia] as badly as we need anyone;" (ii) she should be rewarded for "truly exceptional performance;" (iii) "she was called upon to perform tasks above her job description, and she performed admirably;" (iv) "she is one of the two really exceptional analysts I have seen;" and (v) "If we lose Chia, too, we're sunk."  (¶25).  Siu was promoted.  (¶20, 25).  Three months later, she was terminated.  (¶28).

---

almost $900,000 in 2008 on student loan accounts.  (¶37).  Citi's contention that it was going to exit the student loan business when Bartoletti was fired is also false, as Koessel worked on a student loan proposal **after** her termination.  (¶31).  Chin had no idea how many student loan versus housing clients Bartoletti had in 2007 or 2008, further undermining the contention that he could have legitimately based her termination on that idea.  (¶ 85).

[9] Contrary to Citi's claims, Siu did not conduct a strategic job search, but limited her activities to networking and submitting her resume to a few random Craigslist postings (before her promotion), and she never interviewed or returned recruiter calls in 2008.  (¶23).

[10] Citi claims Siu's failure to sign this "offer" demonstrated a lack of interest in Citi, but Siu had already begun her third year, mooting the offer.  (¶23).  Moreover, Siu was told by Citi that signing the offer was unnecessary.  (Id.).

In the face of directly contradictory evidence, Defendants assert that Siu was terminated because, "despite the [promotion] offer, she did not want to commit to the Company," and Brownstein therefore supposedly terminated Siu on the basis that she would leave if she was not fired. DB at p. 9. Defendants' own testimony reveals this to be false. Brownstein testified that he did not know whether Siu ever stated she would leave after learning of her promotion. (¶25). Brownstein also testified that he did not recall speaking with Siu after she was promoted. (Id.). According to Koessel, Siu's supervisor and Co-Head of Housing, when asked if he talked with Brownstein or anyone else about Siu leaving after late summer 2008:

> A:     No, I think at that point we were convinced that this was a stable group and we were going to, you know, forge ahead. We had gone through a number of crises, Nick's being laid off, the managerial issue, Chia considering leaving. I think there was some sense of stability going into the fall.
>
> Q:     **So at that point in time you thought Chia was going to stay?**
>
> A:     **I thought so, yeah.**

(¶25) (emphasis added); id. (Koessel testifying that Siu had been "convinced [ ] to stay.")). Siu also confirmed that she did not raise any concern about a departure after the promotion. (¶¶27, 29) (including that Siu raised no concern after the promotion and that any insecurity was "addressed [ ] by giving me a promotion.")). Siu also expressed her desire to stay at Citi to various members of the Group. (¶25). Citi's claim that it fired Siu because it did not want her to leave is not only dubious on its face, but is exposed as false when contrasted with how Citi treated Koessel (promoting and retaining him) after he actually threatened to quit. Defendants' assertion that anyone was concerned Siu would leave voluntarily is refuted by the record.[11]

---

[11] Defendants' assertion that "Siu acknowledged that Brownstein's belief that Siu would leave was reasonable" is not supported by the cited testimony, which has purposefully been taken out of context. Defs.' 56.1 St. at ¶ 27. Siu was asked a hypothetical question, not about the mindset of Brownstein or any decisionmaker, but rather whether

Citi does not argue that it retained more qualified individuals.  However, it is significant that in Siu's place, Citi retained an underperforming and higher-earning Associate, Raymond High, and an inexperienced Analyst, Tian Yang.  Siu and High did the same work, but Siu completed more deals, her reviews were far better (High received a mediocre "3"), Siu was told by Koessel that she was one of the two most exceptional Analysts he had worked with (High was not the other), and Siu was assigned the most labor-intensive, complex projects.  (¶¶28, 88).  Their supervisor Fluehr noted that Siu was "more qualified than Raymond High" and "[he could] think of no set of circumstances in which Citi could have selected [ ] Ms. Siu for termination over [High]."  (¶28).  Yang, had just been hired and had only two or three months of housing experience (in contrast to Siu's several years), and received a middling 2008 performance review.  (¶28).  Siu was vastly more qualified than her male comparators, who kept their jobs.

**V.     Discrimination Against Nadine Mentor**

In the face of ***directly contradictory testimony***, Citi argues that Norman Pellegrini and Bart Livolsi decided to fire Mentor.  (DB at 31).  When asked who made the decision, Pellegrini responded: "I don't know the answer to that."  (¶¶58, 89).  Livolsi admitted: "I didn't select anyone."  (Id.).  Citi ignores that Chin and Brownstein were integrally involved in making and approving all decisions.  Supra at 2-3.

Mentor began her employment in February 2005 as a Vice President ("VP") in the Southeast Group with Pellegrini as her Group Head and Livolsi as her Regional Head.  (¶54).  At Citi, Mentor encountered a "boy's club" atmosphere which permitted, *inter alia*, stereotypical

---

"someone might" have a concern she "might leave" given her previous concerns.  (¶27).  Siu expressly testified that she did not know what "other people" think.  (Id.).

and gender-biased comments. (¶90). For instance, Mentor became known as the "princess"

around the office. (¶91). At first, Mentor tried not to let it bother her:

> [B]ut then it became like, oh, yeah, she's like the only female around. So
> I think it was a way of distinguishing me, making me different . . . I said
> I'm not a princess. He said you are a princess. I said, no, I'm not . . . it
> wasn't something that was perceived as positive . . . I [said] something like
> I'm not a princess, you know, I don't know if that's a good thing. But then
> I told him that other people started calling me princess, and I told some of
> my colleagues, like, don't call me princess. And they did it because
> [Pellegrini] was calling me princess so they felt like it was okay.

(Id.). Pellegrini does not deny calling Mentor a "princess." (Id.). This created a culture of

acceptance wherein Mike Baldwin, a male Director, was emboldened to regularly comment that

certain women were "hot" and that the men should "look at her legs." (¶92). Baldwin even

recommended hiring an analyst because "she's hot, wait till you see her." (Id.).

Moreover, Mentor was denied networking and professional development opportunities

that were commonly provided to her male co-workers, as illustrated by the following examples:

- Mentor told Pellegrini that she enjoyed playing golf, but she was excluded from many
  golf outings with clients, while male co-workers were consistently included. (¶93).

- Pellegrini, along with Baldwin and Mark Weinberg, would often have private "male-
  oriented" meetings behind closed doors. (¶94). Mentor would ask what they were
  talking about and they would respond: "It is just not good for girls' ears." (Id.)

- Mentor was excluded from male-only lunches who justified the exclusion by stating:
  "we're going to a burger place, aren't you watching your weight?" (¶95).

- On at least one occasion, Baldwin told Mentor that he took a client to a place he
  euphemistically called "a place where girls dance." (¶96).

Despite the chauvinistic environment, Mentor excelled and in January 2008 – in advance

of the normal promotion cycle – Mentor was promoted to Director "based on [her] excellent

reviews, excellent performance, and revenues that [she] was bringing into the firm." (¶97).

Livolsi observed that it was "easy to support [her] promotion" because she was "the complete

package," had "earned it," was a "rare talent" and "goes out and is able to get business." (¶98).

Pellegrini agreed, giving her the highest score on her performance reviews. (Id.). At the time of

her promotion, Pellegrini felt she was "on track to [become] a Managing Director." (¶99).

However, Mentor received none of the benefits of the promotion but all the added

scrutiny. Livolsi minimized Mentor's accomplishments, claiming the promotion to be an

"irrelevant title." (¶100). When promoted, she received no raise. (Id.). Thus, Mentor was paid

at a lower scale than all the other male Directors. (Id.). Pellegrini and Chin assured Mentor that

her January 2009 bonus would cover the difference, but she was fired before that happened.

(Id.). In contrast, and even though her performance exceeded male Directors, Mentor was held

to Director standards during the RIF. (Id.). Pellegrini even affirmed that Mentor might not have

been terminated if she had remained a VP. (Id.).[12]

Defendants' decision to retain Weinberg, a VP, over Mentor is indecipherable. Only 10

months before the RIF, Mentor was promoted from VP to Director. (¶97). Weinberg remained

at a lower level. (¶101). This constituted unequivocal recognition that Mentor was superior and

more important to the Group. Moreover, as Mentor received no raise, there was no financial

reason to terminate Mentor over Weinberg. However, Pellegrini testified that he did not even

remember if Weinberg was considered for termination. (Id.).

Pellegrini testified that in making his termination recommendations he considered his

employees' "developed business." (¶102). However, Pellegrini formulated many shifting and

malleable definitions of that term:

---

[12] Defendants want to "have their cake and eat it too." First, Defendants use Mentor's promotion to show that she
was not discriminated against. Second, Defendants claim her promotion was an "irrelevant title" to show that the
promotion did not indicate superior performance. (¶100). Third, Defendants posit that she should be held to the
scrutiny of Directors, even though she was a Director only in title. (Id.). Defendants cannot have it all three ways.

- Pellegrini testified that a client is "developed business" only if it is actively engaged in deals. (¶103). However, Pellegrini contradictorily testified that certain clients were "developed business" even if they had not done any transactions in years. (Id.).

- Pellegrini also testified that "developed business" is a client who would follow an employee if the employee left. (¶104). However, Pellegrini later testified that a client could be "developed business" even if the client did not follow the employee. (Id.).

- Pellegrini also testified, different from above, that "developed business" means any client an individual was responsible for representing in a non-supporting role. (¶105).

Additionally, Pellegrini could not even state whether Weinberg had more "developed business" than Mentor. (¶106). In fact, Mentor had more "developed business" than other *Directors*, such as Baldwin. (¶107). In 2008, her first year as a Director, Mentor staggeringly out-produced Baldwin; her deals generated $3,503,156 in revenue compared to $844,438 for Baldwin.[13] (Id.). Mentor led no fewer than six accounts with secured transactions in 2008, whereas Baldwin -- a third year Director – was responsible for only three school district deals. (¶111). School districts were Baldwin's primary focus; however, this business was extremely slow in 2008 and did not appear to have a significant future. (Id.).

Pellegrini admitted that Mentor's developed business included the Virgin Islands (one of Citi's largest clients with a $400,000,000 deal in the pipeline) and Broward County (with whom Mentor secured a $180,000,000 transaction in 2008). (¶112). Though Citi argues that the decision to fire Mentor was made before those deals were secured, the cited testimony does not speak to that point. (¶¶61,114). In fact, both deals were secured *before* Mentor was terminated. (¶¶61, 114). Moreover, the Virgin Islands account left Citi after learning that Mentor had been

---

[13] Defendants argue that revenue sheets are irrelevant because Group Heads testified they are of little value and were not considered. (DB at 30). This is particularly incredible given that Chin would have these documents prepared and then distributed to Group Heads annually, and Chin and Hessler each admitted using the revenue sheets in making other personnel decisions, such as compensation. (¶108). Moreover, Pellegrini admitted using revenue sheets to determine whether his employees had "developed business." (¶110).

terminated (one of the "developed business" definitions).  (¶116).  Furthermore, contrary to Defendants' argument, Pellegrini admitted that State of Connecticut deals were her developed business.  (¶115).

There is no definition of "developed business" under which Baldwin would have exceeded Mentor.  Nonetheless, Baldwin was safe purportedly "because of his business." (¶117).  Pellegrini failed to consult any revenue sheets, compensation data or even a single document in deciding that Mentor was deficient in her "developed business."  (¶118). Ultimately, Pellegrini admitted that the "developed business" standard amounted to recommending her based on "**[s]ubjectives**," and "knew **innately** . . . who had business, who didn't."  (¶119).  Pellegrini recommended the only female Director for termination based on his "innate" knowledge.

Pellegrini testified that he *did not even consider* Baldwin, and that many other male Directors were either not considered at all, or not considered seriously enough for Pellegrini to even remember at his deposition.  (¶120).  Ultimately, for a salary-reducing layoff, the sole female Director, who earned the least and generated more revenue than male comparators, and was promoted ahead of a VP who was retained, was fired.

## VI.   <u>Discrimination Against Lisa Conley</u>

Conley commenced employment in the Healthcare Group at Citi as an Assistant Vice President ("AVP") in 1997.  She was always a "strong" performer with an "excellent" work ethic.  (¶122).  In January 2005, she was promoted to Director.  (¶44).  Similar to Mentor, no one was willing to take ownership of the decision to fire her.  Defendants suggest Cyganowski made the decision, (DB at 15), but he testified: "I did not select Lisa Conley for termination."  (¶123).

Hessler directly attributed the decision to Chin, while Chin said it was Hessler.  (¶124).  Also, per Hessler and Cyganowski, Chin created the initial list of candidates.  (¶125).

Citi offers contradictory and inconsistent reasons for firing Conley.  Citi represented to the EEOC that one of the primary reasons was that "Conley did not appear to be interested in **professional development which was taken very seriously by the Healthcare Group**." (¶126).  When asked about this statement, Hessler responded: "**I have no idea what that even means** and **that did not enter into any discussions about her termination**." (Id.).  Hessler testified that the termination criteria discussed with Chin and Brownstein was limited *solely* to which employees presented "the least risk associated with taking clients or people." (¶127).  However, the EEOC Position Statement makes no reference to this.  (¶128).  Citi also claimed that complaints regarding Conley's availability were a factor, despite not identifying a single complaint until *after* she was terminated.  (¶129).  Separately, Hessler and Chin claimed that compensation was a consideration.  (¶130).

Defendants argue that the failure to "lead or originate" business was the primary reason for termination.  (DB at 13).  Importantly, Conley's reviews are all extremely positive, and show her greatest strength was her "exceptional" ability to lead clients and originate and deliver business.  (¶131).  Far from "struggl[ing] to develop these skills," (Id.), Conley,

> played a **key leadership role in securing several new accounts** . . . **successfully elevated her role on important accounts** . . . effectively managed the client relationships and deal terms . . . worked in partnership with the Central Region in their **new business efforts** to secure [clients].

(Id.) (emphasis added).  Moreover, although her supposed lack of leadership was cited as a reason for her termination, Hessler testified that they did not even expect her to lead accounts.  (¶132).  Further showing falsity, Cyganowski falsely testified he put negative comments on Conley's 2007 performance review – no such review or comments exist.  (¶133).

Conley excelled above the male Directors in both leading and generating business, was "primarily responsible" for maintaining at least 11 different client relationships and was the lead banker on others. (¶134). During 2008, Conley was the lead banker on transactions involving five clients and was the second-highest revenue producing Director at approximately $14,000,000. The average Director generated approximately $9,000,000. (¶135).

Conley surpassed many of her male comparators in all these regards, most particularly Ryan Freel. According to Hessler, Freel did not serve as lead banker on *any* accounts. (¶136). Furthermore, in both 2007 and 2008, Conley's deals generated multiples of the revenue generated by Freel (approximately $6,500,000 to $3,100,000 and $14,000,000 to $5,000,000, respectively). (¶137). Freel also had far less experience, as he only started in 2007. (¶138).

Amazingly, Conley was the lowest-paid Director in the Healthcare Group, earning only approximately $525,000 in 2007. (¶139).[14] The charts below show the glaring inverse relationship between Conley's compensation and production relative to her male comparators.[15]

 

The charts above unmistakably show that Conley was treated far worse than her male peers. FILED UNDER SEAL

---

[14] This disparity is not surprising, since PFD followed the same process for determining incentive compensation as it did for implementing RIFs. (¶147).
[15] Hessler testified that 2007 compensation figures were used in the November 2008 RIF determinations. (¶148).

17



FILED UNDER SEAL

It strains credulity that Citi terminated one of its highest revenue generating and lowest-paid Directors for supposed economic reasons, while lower-producing men who were paid more, and had worse reviews, were retained.[16]

Hessler and Cyganowski's recommendation is not surprising given that they expressed stereotypical skepticism regarding Conley's ability to be simultaneously successful in her personal and professional life *directly after she had two children*. In one performance review, only a few months after she gave birth to her second child, they stated that Conley "should strive to maintain a work/professional life balance **given her growing family**." (¶144). This theme continued and, after she had her third child, they encouraged Conley's continued growth but gratuitously added "**while maintaining a work/family balance**." (¶145). Cyganowksi did not critique the work/family balance of any male Director in any performance review. (¶146).

## VII.   Discrimination Against Brittany Sharpton

Sharpton was hired by Citi in 2006. (¶10). Marty Feinstein, PFD's head of Analysts, and not Green, later hired Sharpton and assigned her to the Infrastructure Group. (Id.). Sharpton excelled as an Analyst, as shown by her only and very positive performance review, despite Citi's assertions to the contrary. (¶11). For example, she received ratings of "exceeds expectations" in six different categories and the highest rating, "superior," in a seventh. (Id.).

---

[16] Conley's value was further confirmed after she was fired: (i) Heartland left Citi to follow Conley; (ii) Memorial South Bend ended its relationship with Citi; and (iii) Rush greatly reduced its relationship with Citi. (¶143).

Green's review of her performance noted that "Brittany works very hard, juggles multiple assignments well and successfully handles [ ] varied and unpredictable scheduling demands," and the overall rating was "trending" towards "exceeds expectations." (Id.). Green admitted Sharpton showed initiative, was a "hard worker" and had a "good work ethic." (Id.). In fact, Sharpton and male comparator Matthew Chin ("M. Chin") were rated exactly the same numerous times by virtually all their supervisors, including Green. (¶17). Citi attempts to discredit its own positive review of Sharpton with a few anxiety-induced emails to friends that even defense counsel agrees were hyperbole. (¶14). No decision maker claims to have been aware of these emails, and Citi does not assert any tie between the emails and her termination.

In November 2008, there were three Analysts in Infrastructure: Sharpton, Second Year M. Chin and First Year Alan Dockeray. DB at 6. Green, Chin and Brownstein fired Sharpton and all of the women (3 total) in the Group. (¶17). Sharpton was at least as qualified as M. Chin, and better qualified than Dockeray. (Id.).[17] In addition to their identical ratings, M. Chin lacked a "commitment to hours," had a "run-in" with a Director and was "forbidden" from working with a female colleague due to "outbursts and unprofessional behavior," including "yelling, shouting, [and] slamming [the] desk." (¶12). Dockeray had 4 months of experience, while Sharpton had over a year. (¶17). Finally, Sharpton held the required Series 63 license when fired, whereas Dockeray did not. (Id.) (requirement that Analysts pass the Series 63).

Sharpton was also discriminated against in that M. Chin and Dockeray received favorable modeling work, while she received administrative assignments, was subjected to comments such

---

[17] Citi claims Green decided to eliminate a Second Year Analyst to maintain an Analyst at each level, but Green admitted: (i) the only reason maintaining an Analyst at each "level" was purportedly important was in case an Analyst left; (ii) he had no indication that Sharpton would leave Citi; (iii) Sharpton could have performed Dockeray's job; (iv) the difference in their salaries was insignificant; (v) the Group would have been able to function without a First Year Analyst; and (vi) he could have done without a First Year Analyst. (¶16).

as how "hot women's butts were" and was aware of a male Director in the Group sexually

harassing a female. (Id.). Green brought male colleagues to social, professional development or

client events, but never females. (Id.). Despite Citi's contention that Sharpton was terminated

for performance, she was told by Feinstein at the time that performance was not behind her

termination. (¶17). Finally, in what appears to be a strange error or attempt to belittle Sharpton,

Citi quotes Sharpton as testifying she performed "at the highest level of competence that Brittany

Sharpton can muster" (DB at 7), but this quotation does not appear in her deposition.

## ARGUMENT

### I.    Summary Judgment Standard

Summary judgment cannot be granted unless there is "no genuine issue as to any material

fact." F.R.C.P. 56(c). The Court must view all facts in the light most favorable to non-movants,

resolving ambiguities and drawing inferences in their favor. See Tomassi v. Insignia Financial

Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007); Cityspec, Inc. v. Smith, 617 F. Supp.2d 161, 168

(E.D.N.Y. 2009) ("[t]he Court should not grant summary judgment if there is any evidence in the

record that could reasonably support a jury's verdict for the non-moving party"). Summary

judgment is "inappropriate in the context of a workplace discrimination case because the

allegations usually require an exploration into an employer's true motivation and intent for

making a particular employment decision . . . [and] [e]mployers are rarely so cooperative as to

include a notation in the personnel file that the [adverse employment action] is for a reason

expressly forbidden by law." Santos v. Costco Wholesale, Inc., 271 F.Supp. 2d 565, 571

(S.D.N.Y. 2003) (citing Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999)).[18]

---

[18] Defendants cite no evidence to support their argument that claims against Citigroup, Inc. must be dismissed, and evidence shows they acted in concert regarding Plaintiffs' employment, including benefits and terminations, and Citigroup, Inc. is identified as one of Plaintiffs' employers in the Amended Complaint ("AC"). ((¶71); AC at ¶15)).

II.     **Numerous Genuine Issues of Material Fact Exist as to Whether Gender was a Motivating Factor in the Decision to Terminate Plaintiffs' Employment**

Title VII, the NYCHRL and NYSHRL are subject to the burden-shifting analysis set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  The burden of establishing a *prima facie* case under this analysis "is so minimal that some courts simply assume the existence of a prima facie case." Ramos v. Marriott Int'l, Inc., 134 F.Supp.2d 328, 338 (S.D.N.Y. 2001).  After a *prima facie* case is established, a defendant must establish a legitimate, non-discriminatory reason for the terminations.  McDonnell Douglas, 411 U.S. at 802-03.  If a defendant is able to do so, a plaintiff may then avoid summary judgment by establishing an issue of fact as to *either* the falsity of defendant's stated reason for termination *or* whether a discriminatory reason played a motivating factor.  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).  Citi acknowledges that Plaintiffs can establish an inference of discrimination and have conceded a *prima facie* case.  (DB at 17).  Therefore, Plaintiffs need only create an issue of fact as to the falsity of Citi's stated reasons to defeat its motion.  Plaintiffs can also defeat summary judgment by showing evidence of discrimination sufficient to create an issue of fact as to whether gender bias was a motivating factor, and need not establish that discrimination was the "real reason" for termination.  42 U.S.C. § 2000e–2(m) (codifying the "motivating factor" standard).

A.      **Statistical Evidence Is Probative of Discrimination**

Statistical evidence may be used to establish discriminatory treatment.  See, e.g., Hollander v. Am. Cyanamid Co., 172 F. 3d 192, 202 (2d Cir. 1999) ("As this court has held in several cases, disparate treatment plaintiffs may introduce statistics as circumstantial evidence of

---

Material issues of fact therefore exist regarding the single employer status of Citigroup, Inc. and Citigroup Global Markets, Inc. See Salemi v. Boccador, Inc., No. 02 Civ. 06648(GEL), 2004 WL 943869, at *4 (S.D.N.Y. Apr. 29, 2004) (Whether related entities qualify as a single employer is an "issue of fact;" summary judgment denied).

discrimination"); <u>Ottaviani v. State of New York at New Paltz</u>, 875 F. 2d 365, 370-371 (2d Cir.

1989) ("plaintiffs in a disparate treatment case frequently rely on statistical evidence").

Defendants acknowledge that "statistical analysis of selections in a RIF can provide

circumstantial evidence of an inference of discrimination." DB at 37.

 Statistical evidence conclusively shows that women suffered disparate treatment in the

RIF. Defendants terminated (i) all three women in Housing, (ii) both women in Infrastructure,

(iii) the only female Director among 10 Directors in Healthcare, (iv) the only female Director of

six Directors in Southeast, and (v) the only female out of 17 Group Head or co-Heads. (¶76).

The RIF eliminated 32.5% of female professionals within PFD (13 out of 40), while only 13.5%

of men were terminated (16 out of 119), exacerbating the existing underrepresentation of

women. (<u>Id.</u>). The results of the gender-imbalanced RIF are highly "statistically significant,"

meaning that the pattern of terminations is extremely unlikely to be the result of chance and far

more likely tied to gender. Defendants do not dispute that a random selection of PFD employees

would have generate the same gender disparity present in the RIF less than 7 times in 1,000,

equivalent to 2.7 standard errors. (¶77). When controlling for factors such as years of service,

job title or group, the likelihood of the gender disparity drops to less than 2 times in 1,000 (3.1

standard errors), further illustrating the gender-targeted and illegitimate nature of the RIF. (<u>Id.</u>).

The Second Circuit has consistently held that results of 2.0 standard errors or more generally

give rise to an inference of discrimination. <u>See, e.g.</u>, <u>Ottaviani</u>, 875 F. 2d at 372-73 (in the

disparate treatment context, "a finding of two to three standard deviations can be highly

probative of discrimination"); <u>Chin v. Port Auth. of New York & New Jersey</u>, 685 F.3d 135, 153

(2d Cir. 2012) (adverse impact with 13% chance probative of discrimination). Accordingly,

Plaintiffs' statistical showing is highly probative of disparate treatment of women in PFD.

Proper statistical analysis must consider the appropriate population for analysis, and here the proper population is the eligible RIF pool: PFD in November 2008.  See Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999).  Citi's argument that the proper populations for analysis are the small PFD Groups is futile, as all PFD employees were in the potential termination pool. Supra at 2-3.  Chin and Brownstein drove, controlled, supervised and approved the RIF from the top, and were integrally involved in selecting and approving all employees terminated.  Supra at 2-3.  Dr. David Bloom's statistical analysis, using the employee populations at each Group level, ignores this reality.  (¶¶66-70).  Thus, it is Bloom's statistical analysis, not Killingsworth's, that fails to consider the appropriate population for analysis.[19]

Citi relies on cases standing for the limited proposition that statistical analysis is not always sufficient on its own to defeat summary judgment.  See, e.g. DB at 37 (citing Vuona v. Merrill Lynch & Co., Inc., 10 Civ. 6529(PAE), 2013 WL 271745, at *11 (S.D.N.Y. Jan. 24, 2013) (statistics *alone* do not establish disparate treatment; plaintiff must also present issues of fact as to falsity or other evidence of discrimination).  Having established a *prima facie* case, Plaintiffs can defeat summary judgment by *either* establishing issues of fact showing pretext as to the falsity of Defendants' stated termination reasons *or* providing other evidence showing that gender was a motiving factor.  In addition to highly probative statistics, Plaintiffs have marshaled substantial additional evidence that they were subjected to gender discrimination and can further show that Citi's reasons for their terminations are false.

---

[19] Dr. Bloom's analysis is fundamentally flawed and is a "virtual handbook in how not to investigate possible sex differences in termination rates." (¶___).  Among other reasons, in looking at the individual Group level, where there is such a small number of observations, the analyses have "virtually no power to discern meaningful evidence on gender differences in terminations." (¶___).  Employers cannot insulate themselves from liability simply by arguing that decisional units were too small to allow for meaningful statistical analysis.

**B.     Bartoletti's Disparate Treatment Claims Must Proceed To Trial**

Citi's motion as to Bartoletti must be denied because there are no fewer than nine facts or disputes that create an issue of fact as to the truth of its purported rationale for her termination and whether the termination decision was motivated by discriminatory animus.

**First**, the decision makers with regard to Bartoletti's termination provided inconsistent purported justifications. Chin testified to a "sole criterion" – Bartoletti's higher compensation – whereas Brownstein testified to no fewer than five different reasons for the decision. Supra at 7-8. "Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive." Weiss v. JPMorgan Chase & Co., 332 F. App'x 659, 663 (2d Cir. 2009); E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (discrepancies between reasons permit "reasonable juror [to] infer that the explanations given by [a defendant]" are pretext); Holmes v. Brentwood Union Free Sch. Dist., No. 03 Civ. 1084 (TCP)(AKT), 2006 WL 1581434, at *6 (E.D.N.Y. May 25, 2006) (shifting reasons support finding of pretext).

**Second**, Defendants cannot point to contemporaneous evidence setting forth the reasons for Bartoletti's termination, raising an issue regarding pretext. See, e.g., DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993) (pretext inquiry considers whether the "putative non-discriminatory purpose was stated only after the allegation of discrimination") (citing Sabree v. United Bhd. of Carpenters and Joiners Local No. 33, 921 F.2d 396, 404 (1st Cir. 1990) (*post hoc* rationalization of actions will not suffice to rebut plaintiff's *prima facie* case)).

**Third**, Citi's purported justifications are objectively false. The Court must credit Chin's testimony and assume that Citi's only advanced justification is that Bartoletti earned more than Koessel. However, the termination decision was indisputably cost-neutral and Koessel received raises shortly after Bartoletti's termination (supra at 8). Moreover, other lower-earners

(including Siu, Mentor and Conley) were terminated in favor of higher-earning comparators, exposing falsity through inconsistency (supra at 11, 13, 17-18). Finally, this justification does not appear in the argument section of Citi's motion. See Byrnie, 243 F.3d at 106) (reversing summary judgment where "earlier explanation [ ] collaps[ed] during civil discovery" and new justification was advanced).

Brownstein's purported reasons are likewise false. The claim that the sole purpose of the Housing Group was to be a "thought leader" is undercut by Brownstein's affirmation of the overriding importance of revenue (supra at 8). It is also undercut by Citi's alternative assertion that Housing's mission would be to "guide clients through the crisis." Defs.' 56.1 St. at ¶ 26. Bartoletti spent much of 2008 visiting clients to retain them, obtaining new clients and closing deals, her clients generated millions more than Koessel's, her reviews were outstanding in the area of client relationships, she participated in conferences and she was Citi's first choice to be sole Head in the midst of the financial crisis, exposing the falsity of the claim that Koessel was more qualified to guide clients through the crisis. Supra at 5-8. Citi's claim that Bartoletti's focus was student loans is false, as she had four student loan clients compared with 20 housing clients and spent only 10% of her time on student loan work. Supra at n. 8. Citi's argument that it abandoned student loans also is false as Bartoletti generated almost $900,000 in revenue on student loan accounts in 2008 and Koessel worked on a student loan proposal after her termination (Id.). Finally, it is untrue that Koessel was more experienced than Bartoletti, and Brownstein admitted this was a *post hoc* purported justification. Supra at 8-9.

Thus, Bartoletti does not merely disagree with Citi's decision, but proffers documents and admissions of Citi employees to show that each purported reason for her termination is false. See Petrovits v. New York City Tr. Auth., 95 Civ. 9872 (DAB), 2002 WL 338369, at *7

(S.D.N.Y. Mar. 4, 2002) (denying summary judgment because although "Plaintiff's subjective belief that she possesses superior qualifications does not by itself support an inference of discrimination[,] Plaintiff here [ ]has done more than make mere allegations; her assertions are arguably supported by aspects of the factual record."). Moylan v. Nat'l Westminster Bank USA, 687 F. Supp. 54, 59 (E.D.N.Y. 1998), cited by Citi, supports Plaintiffs because summary judgment was denied where, as here, "[plaintiff] attacks not the business judgment of his superiors, but rather the credence of defendant's proffered reason for its treatment of him. The fact-finder thus will be asked to decide which of two explanations of [the defendant's] conduct it believes." Id. (citing U.S. Postal Serv. Bd. v. Aikens, 460 U.S. 711, 716 (1983)).[20]  Along with her conceded *prima facie* case, this evidence of falsity defeats summary judgment. See Reeves, 530 U.S. at 146-48 ("trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

Additional evidence of bias also supports a finding of pretext. **Fourth**, every woman in Housing was terminated in the RIF (3 of 4 fired were women of 7 total employees) and **fifth**, less qualified men were retained. Supra at 5-8. "Evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual." Summa v. Hofstra University, 708 F.3d 115, 130 (2d Cir. 2013). Comparator evidence alone is sufficient to defeat summary judgment. McGuinness v. Lincoln Hall, 263 F.3d 49, 56 (2d Cir. 2001) (issue of fact regarding discrimination based on comparator evidence even absent allegations of comments or history of discriminatory conduct); see also

---

[20] The cases cited by Defendants (DB at18-19) in support of their contention that an employee's self-assessment is insufficient to establish pretext are irrelevant because Plaintiffs present substantial objective evidence to rebut Defendants' fact claims, including documents and the testimony of Defendants' current and former employees, and do not rely on their own self-assessments. Moreover, the cases cited consist of cases in which the plaintiff conceded that no discrimination had occurred or presented no evidence whatsoever of discrimination.

Chin, 685 F.3d at 155 (claims survive where plaintiffs provide statistical evidence and qualifications evidence). Bartoletti's managerial experience, reviews and revenue sheets, as well as the admissions of Citi's employees, raise issues of fact regarding whether she was more qualified than Koessel.  Supra at 5-8; see also Ash v. Tyson Foods, 546 U.S. 454, 457 (2006) ("qualifications evidence may suffice . . . to show pretext"); Patterson v. McLean Credit Union, 491 U.S. 164, 187-88 (1989) (plaintiff may show pretext by showing she was better-qualified).

Even if qualifications alone do not create an issue of fact, they are probative of pretext. Byrnie, 243 F.3d at 103 ("disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification"); Riley v. HSBC USA, Inc., 784 F. Supp.2d 181, 205 (W.D.N.Y. 2011).  **Sixth**, Brownstein previously engaged in discrimination (¶41), which supports a finding of pretext. See Rifkinson v. CBS, Inc., 94 Civ. 7985 (KTD) (JCF), 1997 WL 634514, at *3 (S.D.N.Y. Oct. 14, 1997) (prior discrimination probative of intent); Zubulake v. UBS Warburg LLC., 382 F. Supp. 2d 536, 546 (S.D.N.Y. 2005) (same). **Seventh**, Brownstein's special efforts to befriend and professionally develop men in the Housing Group, but not women (¶41), and **eighth**, Bartoletti's exclusion from a client event in favor of a male when she was one of the primary persons on the account and the male was not on the account (supra at 7), also support a finding of pretext. See Zubulake, 382 F. Supp. 2d at 548. **Ninth**, that Citi retained Koessel even though Bartoletti passed the required Series 53 exam and he had not was against Citi policy and, therefore, probative of pretext. See Petrovits, 2002 WL 338369, at *8 ("Failure to follow internal procedures can, however, 'be evidence of pretext.'").[21]

---

[21] Bartoletti's promotions do not mitigate these issues.  When it came down to her or the only male Director, Citi terminated Bartoletti under circumstances that reveal that discrimination was its true motive.  See Phillips v. Dow Jones & Co., 04 Civ. 5178(DAB), 2009 WL 2568437, at *15 (S.D.N.Y. Aug. 17, 2009) (alleged discriminator previously promoted plaintiff, but "it is not the Court's role when determining whether summary judgment is appropriate to weigh the evidence for and against Plaintiff's theory.  That is the role of the jury at trial.").

Thus, Bartoletti's disparate treatment claims are supported by no fewer than nine facts or disputes creating a material issue of fact concerning Citi's motive in terminating Bartoletti.[22]

### C.    Siu's Disparate Treatment Claims Must Proceed To Trial

Citi's motion as to Siu must be denied because there are no fewer than nine facts or disputes that create an issue of fact as to the truth of its purported rationale for her termination and whether the termination decision was motivated by discriminatory animus.

**First**, contrary to their disputed contentions, Citi admits that by the fall of 2008 there was no concern that Siu would leave.  Koessel testified that the Group's management "were convinced that this was a stable group and we were going to, you know, forge ahead.  We had gone through a number of crises [including] Chia considering leaving.  I think there was some sense of stability going into the fall." (supra at 10-11 (also, Koessel believed Siu would stay)).  Koessel had *no* discussions with Brownstein regarding Siu's departure after the promotion offer.  (Id. (also noting that Siu had been "convinced [ ] to stay.")).  **Second**, Brownstein, who testified that Siu told him she was thinking of leaving (which must be disregarded as disputed), does not recall whether he spoke with Siu *after* the promotion.  Supra at 10.  **Third**, Siu confirms that she never thought of leaving Citi, never told anyone she was going to leave Citi, did not raise any concern after the promotion and expressed her desire to remain at Citi to numerous members of the Group.  Id.  **Fourth**, when Koessel announced his intent to resign if not made co-Head of Housing, he was promoted and not terminated. (¶35).  **Fifth**, Siu was fired although she was

---

[22] Defendants also claim that, "when asked why she believes Koessel was retained, Bartoletti claimed it was because Koessel had a "personal friendship" with Brownstein."  DB at 26-27.  However, Defendants cite nothing to support this quotation.  The quote simply does not exist.  Bartoletti was not asked this question, nor did she provide the answer somehow *quoted* by Defendants.  Defendants' misrepresentation is, at best careless, and at worst intended to misrepresent the record.  As a result, Defendants' related argument that the claims must fail because favoritism based on friendship does not equate to discrimination must be rejected.  Id.  In any event, whether nepotism is merely masking unlawful discrimination is an issue for the jury.  Dybdal v. Variable Annuity Life Ins. Co., No. 06-CV-5686(JBW), 2007 WL 4118944, at *8 (E.D.N.Y. Nov. 19, 2007).  When asked by Plaintiffs' counsel where the quote came from, Defendants' counsel provided an intentionally vague response:  "We stand by our submission."

paid less than High, which conflicts with Defendants' firing of Bartoletti purportedly because she earned more than Koessel. (¶88). Thus, the record contains ample evidence that Citi's purported justification for Siu's termination is false and, therefore, Citi's motion as to Siu's disparate treatment claims must be denied. See Reeves, 530 U.S. at 146-48.[23]

Additional evidence of bias also supports a finding of pretext. **Sixth**, every woman in the Housing Group was terminated in the RIF, and **seventh**, each female terminated was selected instead of less-qualified men (including Siu in comparison with High and Yang). See Summa, 708 F.3d at 130 ("evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual"); see also McGuinness, 263 F.3d at 56; Chin, 685 F.3d at 155 (comparator evidence alone, or coupled with statistics, is sufficient to show pretext). Defendants do not even dispute that Siu was more qualified than her comparators Yang and High. See DB at 22, n. 14. Any attempted dispute would be futile, as Defendants' own documented assessments of Siu, High and Yang's performance demonstrate that Siu was eminently more qualified than her male comparators. (¶28). **Eighth**, the fact that Brownstein engaged in prior discrimination, and **ninth**, that he made a special effort to befriend and professionally develop men in the Housing Group, but not

---

[23] Citi's claim that Siu admitted that her purported concerns may have factored into the termination decision must be rejected. Siu made clear that gender was the reason for her termination, and that any insecurity had already been addressed (as Citi concedes through Koessel). ((¶19) (including, Q: "Can you think of any other reason other than your gender why they would have let you go?" A: "No." Q: "How about the fact that you had previously indicated your insecurity with the future and the direction of the group, could that have been a factor?" A: "Yes, **but they already addressed that by giving me a promotion.**") (emphasis added)); see also ¶27). Thus, Siu did not admit that her purported insecurity was a factor in her decision, but rather that it had already been addressed. In any event, Siu only must proffer evidence that discrimination was a motivating factor, and not the sole reason, for the termination decision. See Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011).

women, also support a finding a pretext.  See Rifkinson, 1997 WL 634514, at *3; Zubulake, 382

F. Supp. 2d at 546, 548; Vuona, 2013 WL 271745, at *22. [24]

Thus, Siu's disparate treatment claims are supported by no fewer than nine facts or

disputes creating a material issue of fact concerning Citi's motive in terminating Siu.[25]

### D.    Mentor's Disparate Treatment Claims Must Proceed to Trial

Citi's motion as to Mentor must be denied because there are no fewer than 8 facts or

disputes that create an issue of fact as to the truth of its purported rationale for her termination

and whether the termination decision was motivated by discriminatory animus.

**First**, Chin and Brownstein disparately treated all women in the RIF at a highly

statistically significant level, and Mentor was one such victim.  Mentor was the only female out

of six Directors in her Group, yet she was fired.  Four out of five female Directors were fired in

the RIF.  The disparate treatment of women across the RIF demonstrates issues of fact as to the

discriminatory intent of the decision makers.  Supra at 22-24 (citing Hollander, 172 F. 3d at 202

(statistics can be used to establish disparate treatment), and others)).

**Second**, Pellegrini, Livolsi, Chin and Brownstein offered completely inconsistent and

shifting reasons for Mentor's termination including compensation and varying definitions of

"developed business," a term which one of her supervisors could not even recall being used.  As

detailed above, inconsistent and shifting reasons for an employer's supposed legitimate,

nondiscriminatory reason for firing an employee constitute evidence of pretext.  Weiss, 332 F.

App'x  at 663; Ethan Allen, Inc., 44 F.3d  at 120; Holmes, 2006 WL 1581434, at *6.

---

[24] Citi's argument that Siu's promotion vitiates her claims must be rejected.  Brownstein did not go "out of his way to get approval for early promotion." (¶¶24-25).  Moreover, Citi terminated Siu rather than a male under circumstances that reveal that discrimination was its true motive.  See Phillips, 2009 WL 2568437, at *15.  The contention that the basis for Siu's claims was an article she read is irrelevant and false. (¶28).

[25] Citi also claims that Siu "conclusorily claim[ed] that decisions to terminate men throughout the RIF process were based on performance, while decisions to terminate women must have been gender-based."  As explained in ¶28, Defendants completely fabricate this testimony.

**Third**, all of Defendants' stated reasons for termination are entirely false as demonstrated not only through the varying and inconsistent reasons provided, but also because each substantive reason is simply contradicted by the facts.  Mentor generated more revenue and led more accounts than her male counterparts, was paid less than every other Director, and had just been promoted rather than a male counterpart.  Issues of fact as to falsity of reason are alone sufficient to defeat summary judgment.  See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. 2001) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff.").

**Fourth**, Defendants did not even *consider* terminating Mentor's primary comparators, Weinberg and Baldwin.  For some other male Directors, Pellegrini could not recall if they were considered for termination.  Pellegrini engaged in a discriminatory recommendation process when he considered the sole female for termination but not her appropriate male comparators.  See Summa, 708 F.3d at 130; see also McGuinness, 263 F.3d at 56; Chin, 685 F.3d at 155.

**Fifth**, Pellegrini's gender bias is demonstrated by the discriminatory environment he created and fostered, including condescendingly referring to Mentor – in a setting where business transactions involving hundreds of millions of dollars were being put together – as "princess."[26] This name calling, and failure to address Mentor's complaints, create further issues of fact as to whether discriminatory animus was a factor when he recommended her termination.  See e.g. Ash, 546 U.S. at 456 (use of the word "boy" to refer to the plaintiff was probative evidence of

---

[26] Citi claims that Pellegrini and Livolsi could not have had discriminatory motives because they never previously demonstrated bias.  *First*, Mentor explicitly testified that Pellegrini treated her differently on account of her gender at UBS.  (¶121).  *Second*, the same actor inference is inapplicable here, infra at n. 28 and 29.  *Third,* Livolsi emphasized his belief that Mentor's promotion had very little significance.  (¶100).  *Fourth*, as stated above, Mentor can point to discriminatory comments by Pellegrini throughout her employment at Citi.  (¶91).

discrimination); Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007) ("verbal comments constitute evidence of discriminatory motivation").

**Sixth**, Pellegrini routinely excluded Mentor from networking and business development opportunities with clients and also excluded Mentor from male-only Director meetings. As discussed above, exclusion of female employees can create issues of fact as to whether discrimination played a motivating factor. See, e.g., Zubulake, 382 F. Supp. 2d at 548.

**Seventh**, Mentor was subjected to discriminatory treatment as to her compensation and promotion. Mentor was given perhaps the least desirable promotion possible where she received no raise but added scrutiny. Supra at 12-13. Mentor earned less than all of her similarly situated male colleagues. As such, Mentor was treated differently throughout her employment than her similarly situated male comparators.

**Eighth**, none of Mentor's superiors accepted responsibility for her termination. Failure of any of Mentor's superiors to accept responsibility is, standing alone, evidence of pretext. See, e.g., Berube v. Great Atlantic & Pacific Tea Co., No. 06 Civ. 00197 (VLB), 2010 WL 3021522, at, *7 (D.Conn. July 29, 2010) (finding pretext where "no single individual" in management took responsibility for the termination in question) (citing Paup v. Gear Products, Inc., 327 Fed. Appx. 100, 112 (10th Cir.2009); Coburn v. Rockwell Automation, Inc., 238 Fed. Appx. 112, 122 (6th Cir. 2007); Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 523 (6th Cir. 1997)).

Cumulatively, the inference of discrimination conceded by Defendants coupled with issues of fact as to falsity of reason, are sufficient to defeat summary judgment. However, Mentor has also established numerous additional issues of fact as to whether gender was a motivating factor behind her termination, precluding judgment as a matter of law.

### E.    Conley's Disparate Treatments Claims Must Proceed To Trial

Citi's motion as to Conley must be denied because there are no fewer than 11 facts or disputes that create an issue of fact as to the truth of its purported rationale for her termination and whether the termination decision was motivated by discriminatory animus.[27]

**First**, Conley was the only female director in Healthcare, yet she was the only Director out of 10 terminated in the Group. [28]  Moreover, Chin and Brownstein disparately treated women in the RIF at a highly statistically significant level, and Conley was one victim of that disparate treatment.  Supra at 22-24 (citing Hollander, 172 F. 3d at 202).

Moreover, Defendants' proffered reasons for Conley's termination have been incredibly shifting and inconsistent, and all the stated reasons are all demonstrably false:

- **Second**, to the EEOC, Defendants claimed that one reason was customer complaints about Conley.  However, Hessler and Cyganowski testified that Citi received no complaints about Conley during her tenure.

- **Third**, Hessler claimed that terminating Conley would have the "least impact on business."  Yet, Conley generated more revenue than all but one of one other Director and a significant client followed Conley to her new position.

- **Fourth**, Defendants claim that Conley did not "lead or originate business," but Conley's performance reviews documented her generation of new business as her greatest strength and noted that her skills in this area were "exceptional."

---

[27] Citi relies heavily on the bald assertion that each Plaintiff knew little about the RIF process. This has no bearing on whether Plaintiffs suffered discrimination. Nevertheless, Conley, for example, testified during her deposition that her knowledge of her performance and that of her male colleagues, and the firing of nearly all female Directors, formed the basis of her beliefs.  (¶51).  Discovery revealed that Conley's beliefs were well founded.  Citi's attempt to litigate what Plaintiffs knew about the decision making process is simply an effort to distract the Court.  Taken to its logical conclusion, if plaintiffs were limited to advancing discrimination claims only when they were present for the adverse employment decision in question, the antidiscrimination laws would be rendered meaningless.

[28] Defendants argue that "Conley[] attempt[s] to conjure up a sense of discrimination by claiming that she was the only female in the Healthcare Group is both unavailing and disingenuous" because there are three women in the Group who are Managing Directors. (DB at 30-31).  The mere fact that a select few women have been successful at Citi does not obviate the stark realities that women were: (i) significantly underrepresented in leadership roles throughout the entire Public Finance Department; (ii) nearly wiped out by the RIF; and (iii) not represented in the Director ranks of the Healthcare Group.

- **Fifth**, Chin and Hessler testified that the RIF was driven specifically by salary reductions, yet Conley was the lowest paid Director in Healthcare.

- **Sixth**, Defendants claim that Conley was fired because she did not "lead accounts," yet Conley led 11 accounts and Hessler said that he did not expect her to lead any.

- **Seventh**, Citi represented to the EEOC that lack of "professional development" was a basis for termination, yet Hessler testified that he had "no idea what that even means, and that did not enter into any discussions about her termination."

Supra at 16-18. These issues of fact as to the falsity are enough to establish pretext and preclude summary judgment. See Weiss, 332 F. App'x at 663 (and others cited above).

**Eighth**, Hessler, Cyganowski and Chin even gave inconsistent accounts about who made the *decision* to terminate Conley. Supra at 15-16. As with Mentor, this creates an issue of material fact sufficient to preclude summary judgment. Berube, 2010 WL 3021522, at *7; Paup, 327 Fed. App'x at 112; Coburn, 238 Fed. Appx. at 122.

**Ninth**, in making the RIF selections, Defendants disparately assessed Conley's qualifications relative men. Conley led more accounts and generated more revenue than almost all other male Directors (and in particular, Freel) and was the lowest paid Director. Supra at 16-18. Thus, issues of fact remain as to whether the decision to keep every single male Director over Conley was discriminatory. Byrnie, 243 F.3d at 103; Riley, 784 F. Supp.2d at 205.

**Tenth**, Conley was also treated differently from male Directors in the conditions of her employment. Conley was paid less than all of her lower performing, similarly situated male colleagues. This disparity relative to her male peers alone demonstrates disparate treatment. McGuinness, 263 F.3d at 56; Chin, 685 F.3d at 155; Summa, 708 F.3d at 130.

**Eleventh**, documented comments by Conley's supervisors demonstrate discriminatory stereotyping regarding a woman's ability to be both a successful mother and employee. Supra at 18. Apicella v. Rite Aid Hdqtrs. Corp., No. 10-cv-1679 (WFK), 2013 WL 1281560, at *6

(E.D.N.Y. March 27, 2013) ("stereotyped remarks about a woman's role in the family, and how that interacts with her work, may constitute evidence of discriminatory intent."); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 119 (2d Cir. 2004) (stereotyping in the view that a woman "would not show the same level of commitment [she] had shown because [she] had little ones at home" are probative of discriminatory intent). In fact, such evidence alone is enough to prove pretext. Id. at 122 ("stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex-based motive.").

Cumulatively, there are numerous issues of fact as to whether gender played a motivating role when Conley was fired rather than any of the nine male Directors or Weinberg.

### F.     Sharpton's Disparate Treatment Claims Must Proceed To Trial

Citi's motion as to Sharpton must be denied because there are no fewer than 11 facts or disputes that create an issue of fact as to the truth of its purported rationale for her termination and whether the termination decision was motivated by discriminatory animus.

**First**, Citi claims Sharpton was terminated because of her performance, but at the time of her termination, Feinstein told Sharpton that performance was <u>not</u> the reason she was fired. Supra at 20. This shifting inconsistency alone is sufficient defeat Citi's motion. See Weiss, 332 F. App'x at 663; Ethan Allen, Inc., 44 F.3d at 120; DeMarco, 4 F.3d at 171. **Second**, Citi claims Sharpton was fired because M. Chin had superior qualifications, but documents demonstrate that nearly every one of their supervisors, including Green, rated their performance identically. Supra at 19. **Third**, Sharpton's only formal performance review was very positive, with ratings of "exceeds expectations" in six categories, and she received other concrete praise. Id.[29]

---

[29] In contrast, her male comparator M. Chin received performance criticism for not being able to understand deals and his lack of commitment to working long hours, and was forbidden from working with certain bankers after engaging in aggressive outbursts at the office directed towards a female colleague. Supra at 19-20.

**Fourth**, there is a factual dispute as to Defendants' assertion that Citi could not have terminated Dockeray instead of Sharpton, as Defendants' claim that he could not be terminated was seriously undercut by Green's admissions at deposition. <u>Supra</u> at n. 17.[30] Sharpton does not rely on her own assessment of her skills and performance, but instead proffers Citi's evaluations, admissions and other evidence (<u>see</u> <u>Petrovits</u>, 2002 WL 338369, at *7; <u>Moylan</u>, 687 F. Supp. at 59; <u>supra</u> at n. 20) and these facts or disputes bearing on the truthfulness of Defendants' proffered reasons preclude summary judgment. See <u>Reeves</u>, 530 U.S. at 146-48.[31]

Additional evidence of bias also supports a finding of pretext. <u>Supra</u> at 18-20. **Fifth**, every woman in the Infrastructure Group was terminated in the RIF, and **sixth**, Sharpton was fired instead of less or equally qualified men. <u>See</u> <u>Summa</u>, 708 F.3d at 130; <u>see also</u> <u>McGuinness</u>, 263 F.3d at 56; <u>Chin</u>, 685 F.3d at 155 (comparator evidence alone, or coupled with statistics, is sufficient to show pretext). Sharpton was at least as qualified as M. Chin (based on Defendants' reviews and admissions) and Citi does not dispute that she was more qualified than Dockeray. Sharpton also was subjected to or made aware of other discriminatory acts, including **seventh**, being given less desirable and stereotypically female assignments; **eighth**, comments about "hot women's butts;" **ninth**, the sexual harassment of a female colleague; and **tenth**, Green affording men more professional development opportunities than women (<u>supra</u> at 19). See <u>Rifkinson</u>, 1997 WL 634514, at *3; <u>Zubulake</u>, 382 F. Supp. 2d at 546, 548 (other acts of discrimination probative of intent). **Eleventh**, the fact that Sharpton was terminated even though

---

[30] Citi's argument that Sharpton was not similarly situated to Dockeray fails given, *inter alia*, Green's testimony, when asked whether Sharpton could have performed Dockeray's job, that "both Brittan and Mr. Dockeray were Analysts." (¶16). Whether a plaintiff is similarly situated to a comparator presents a fact issue not for resolution on summary judgment, and Dockeray was similarly situated to Sharpton in all material respects; their circumstances need not be identical. See <u>Mandell v. Cnty. of Suffolk</u>, 316 F.3d 368, 379 (2d Cir.2003); <u>Beachum v. AWISCO New York</u>, 785 F. Supp. 2d 84, 94 (S.D.N.Y. 2011).

[31] Sharpton's anxiety-induced emails about her experiences at work are a red herring, and defense counsel recognized them to be hyperbolic. <u>Supra</u> at 19. Defendants do not claim her supervisors ever saw the emails, and documentary evidence demonstrates that Citi viewed Sharpton as a good performer. <u>Id.</u>

she held the required Series 63 and Dockeray did not supports a finding of pretext (supra at 19).

See Petrovits, 2002 WL 338369, at *8 ("Failure to follow internal procedures can [ ] 'be

evidence of pretext.'") (citing Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d

Cir.1997)).[32]

Thus, Sharpton's disparate treatment claims are supported by no fewer than 10 facts or

disputes creating a material issue of fact concerning Citi's motive in terminating Sharpton.

## III.   Summary Judgment Cannot be Granted as to Plaintiffs' Disparate Impact Claims

### A.   Legal Standard

Title VII, NYSHRL and NYCHRL also prohibit employment practices that are facially

neutral, but have a discriminatory impact.  People v. New York City Tr. Auth., 59 N.Y.2d 343,

348-49 (1983).  Disparate impact plaintiffs need not show discriminatory intent.  Griggs v. Duke

Power Co., 401 U.S. 424, 432 (1971).  To establish a *prima facie* case, a plaintiff need only (1)

identify the specific employment practice or policy challenged and (2) offer statistical evidence

of a kind and degree sufficient to show the practice in question has caused the harm to the

protected group.  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988).  Once

established, the burden shifts to the defendant to either challenge the statistical proof or show a

business necessity for the challenged practice.  Robinson v. Metro-North Commuter R.R. Co.,

267 F. 3d 147, 160-161 (2d Cir. 2001) (citing 42 U.S.C. §2000e-2(k)(1)(A)(i)).[33]

---

[32] Citi cannot avoid trial by claiming no comments were made about Sharpton's gender.  McGuinness, 263 F.3d at
56 (reversing summary judgment where "plaintiff has proffered no evidence of statements by defendant's agents
evincing hostile discriminatory animus").  Citi's assertions that Sharpton was hired and fired by Green are untrue.
Feinstein testified that he, not Green, hired Sharpton, and Green was not the sole decision maker regarding her
termination.  (¶¶ 10, 17).  The same-actor argument is a jury question.  See Phillips, 2009 WL 2568437, at *15.
[33] If a defendant argues business necessity, a plaintiff can rebut this by showing that an alternative practice could
have satisfied the necessity and avoided the disparate effect.  42 U.S.C. §2000e-2(k)(1)(B)(i).  Defendants have not
argued business necessity.  See DB at 38-40.

Separate and distinct from their disparate treatment claims, Plaintiffs can easily establish a *prima facie* disparate impact claim.  First, Plaintiffs have identified the challenged "specific employment practice" at issue: the wholly discretionary and subjective decision making process in the RIF which was driven, controlled, supervised and approved by Chin and Brownstein. Supra at 2-3.  Second, Plaintiffs have offered ample statistical evidence sufficient to show the practice in question harmed Plaintiffs as women in PFD.  Supra at 3-5.

**B.      Plaintiffs Can Establish A Specific Employment Practice**

Defendants argue that Plaintiffs' disparate impact claims do not identify a "specific employment practice," but their motion conspicuously fails to show how a "specific employment practice" is defined under applicable law and whether the RIF decision making process qualifies. DB at 39.  Disparate impact cases are *routinely* established based upon subjective decision making processes as a "specific employment practice."  See, e.g., Chin, 685 F.3d 135 (subjective promotions decision making process deemed a "specific employment practice"); Murphy v. Gen. Elec. Co., 245 F. Supp. 2d 459, 476 (N.D.N.Y. 2003) (RIF with subjective criteria sufficient).  In Chin, a strikingly similar case, the employer used a promotion decision making process that involved recommendations from a supervisor to a supervisory board, which in turn made recommendations to a superintendent who retained complete discretion.  The Second Circuit found that "the decision making process . . . was properly analyzed as one employment practice." Chin, 685 F.3d at 154-55.  Citi used a nearly identical (though more direct) process which included recommendations from Group Heads to Chin and Brownstein, who retained full discretion and authority as to termination decisions.

Moreover, the text of Title VII expressly provides that a "**decisionmaking process may be analyzed as one employment practice**" so long as "the complaining party can demonstrate

to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis." 42 U.S.C.A. § 2000e-2(k)(1)(B)(i) (emphasis added). Defendants do not argue that the RIF decision making process is "not capable of separation for analysis," (DB at 39-40), nor could they. See, e.g., Chin, 685 F. 3d 135. (recommendations from a board to the decision maker "not capable of separation for analysis" since "such recommendation was neither necessary nor sufficient for promotion and the weight it carried was both unclear and variable."). As a matter of law, the RIF decision making process is a "specific employment practice."

Furthermore, although such subjective decision making processes are as a matter of law actionable as "specific employment practices," social scientific research explains that such a process can have a disparate impact because, "[w]hen subjective impressions are the criteria for personnel decisions, cognitive biases that put women at a disadvantage are likely to operate – leading to gender inequality in the workplace." (¶79). Although employers can guard against such outcomes even where some element of subjectivity is unavoidable, such as by reviewing objective data, Defendants did not use any such safeguards or objective criteria. (¶79).

### C.    Plaintiffs' Statistical Analysis Is Appropriate and Compelling

Defendants argue that Plaintiffs did not identify the correct population for statistical analysis, and assert that the small PFD Groups should be analyzed. (DB at 40). Substantial evidence demonstrates that the entire PFD was at risk for termination and that the decision making in the RIF took place at the level of the PFD Co-Heads Chin and Brownstein, and did not take place at the Group level. (¶¶73-74). Therefore, Plaintiffs' analyses are appropriate. Supra at 2-5. Defendants' cited cases are inapposite. See, e.g., Smith, 196 F.3d at 368 (improper analysis where some units isolated and others pooled rather than analyzing entire process).

Defendants do not otherwise challenge the sufficiency of Plaintiffs' statistical results, although Killingsworth's statistical analysis demonstrates that the RIF had a highly statistically significant disparate impact on women in PFD (2.7 to 3.1 standard errors, equivalent to a probability of 7 or as little as 2 occurrences in 1,000).  (¶77).  Statistical significance is generally probative of discrimination at any figure above **2.0** standard errors.  Supra at 22-33.

### D.  Plaintiffs Have Properly Alleged Impact Claims

Defendants claim that Plaintiffs made only "passing reference" to disparate impact in the Amended Complaint, but cite at least seven paragraphs in which disparate impact was specifically alleged.  DB at 38.  Plaintiffs have identified a specific employment practice and statistical evidence shows blatant disparate impact against women.  These elements establish a *prima facie* disparate impact case.  Supra at 37-39.  Defendants' cited cases stand only for the proposition that where an employee cannot identify a "specific employment practice," a disparate impact claim will not survive (Kourofsky v. Genecor Int'l, Inc., 459 F. Supp. 2d 206, 215 (W.D.N.Y. 2006) (failure to establish a practice, other than that a RIF occurred)) and that a plaintiff must identify a facially neutral practice to establish disparate impact.  Wado v. Xerox Corp., 991 F. Supp. 174, 186 (W.D.N.Y. 1998) (plaintiff conclusorily claimed RIF was "a cover for behind-the-scenes intentional discrimination").

Plaintiffs maintain claims of intentional discrimination as well as disparate impact claims concerning the discriminatory impact of the facially neutral subjective RIF decision making process.  Plaintiffs may proceed on both a disparate impact and disparate treatment theory.  See, e.g., Chin, 685 F. 3d at 135 (disparate impact and disparate treatment claims based on subjective promotion process survive summary judgment); Wado, 991 F. Supp. at 186 (recognizing a plaintiff may pursue disparate treatment and disparate impact in the alternative).

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment should be denied in its entirety as numerous issues of material fact preclude summary judgment as to all causes of action alleged in the Complaint.

Dated: June 26, 2013
      New York, New York             Respectfully submitted,

                             THOMPSON WIGDOR LLP

By: _____
                         Douglas H. Wigdor
                         Lawrence M. Pearson
                         David E. Gottlieb

                         85 Fifth Avenue
                         New York, NY 10003
                         Telephone:  (212) 257-6800
                         Facsimile:  (212) 257-6845
                         dwigdor@thompsonwigdor.com
                         lpearson@thompsonwigdor.com
                         dgottlieb@thompsonwigdor.com

                         *Counsel for Plaintiffs*