UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

AMY BARTOLETTI, CHIA SIU,  :
NADINE MENTOR, LISA CONLEY and  :
BRITTANY SHARPTON,  :  Civil Action No. 10 Civ. 7820 (LGS)
 :
               Plaintiffs,  :
 :
 :
         v.  :
 :
 :
CITIGROUP INC. and CITIGROUP GLOBAL  :
MARKETS INC.,  :
 :
 :
               Defendants.  :
 :
------------------------------------------------------------------ x

## PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Amy Bartoletti, Chia Siu, Nadine Mentor, Lisa Conley and Brittany Sharpton (collectively, "Plaintiffs"), by and through undersigned counsel, Thompson Wigdor LLP, pursuant to Local Civil Rule 56.1(b) and the individual rules of this Court, and in response to the Rule 56.1 Statement annexed to the Motion for Summary Judgment of Defendants Citigroup, Inc., and Citigroup Global Markets, Inc. (collectively, "Defendants," the "Company" or "Citi"), respectfully submit the following statement of material facts in dispute, which demonstrates that there are genuine issues of material facts to be tried. All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendant's Statement of Undisputed Material Facts pursuant to Rule 56.1 of the Local Civil Rules of the U.S. District Court for the Southern District of New York and responding to Defendants' motion for summary judgment. All exhibit ("Ex. __") citations are to the declaration of David E. Gottlieb ("DEG Dec.") unless otherwise noted.

A.   **Citigroup Global Markets Inc. and the Public Finance Department**[1]

1.     The Company is an equal opportunity employer that prohibits unlawful discrimination

and is dedicated to providing a work environment free of discrimination and harassment.  (See

LDB Decl. Ex. 27.)  The Company's Equal Employment Opportunity Policy and Sexual

Harassment / Unlawful Discrimination Policy expressly provides that all "[e]mployment

decisions will be made without regard to one's race, color, sex, gender identity or expression,

religion, national origin, age, sexual orientation, disability, veteran status, marital status,

citizenship status or any other basis prohibited by law."  (See id.)

**Response**

        Dispute.  Admit that Citi has a written policy that purports to prohibit discrimination and

harassment as stated, but dispute that Citi is a *bona fide* "equal opportunity employer" or that

Citi actually "prohibits unlawful discrimination" or is "dedicated to providing a work

environment free of discrimination and harassment" as contradicted by the weight of the entire

evidentiary record establishing that Plaintiffs were discriminated against.  (See e.g. LDB Dec.

Ex. 32; (RIF Data); DEG Dec. Ex. 30 (Killingsworth Report); DEG Dec. Exs. 31-33 (Roth

Report)).

2.     The Public Finance Department ("PFD") is one of several departments within the

Company's Municipal Securities Division, which consists of fifteen Product Groups (including

---

[1] Footnote 1 of Defendants' 56.1 contains defined terms, which Plaintiffs adopt herein:  Citations to the record will be as follows:  (1) Declaration of Leni D. Battaglia, "LDB Decl."; (2) Declaration of Francis Chin, "FC Decl."; (3) expert report of Dr. David E. Bloom, "Bloom Rep.," at LDB Decl. Exhibits ("Exs.") 29 & 30; (4) supplemental expert report of Dr. David E. Bloom, "Bloom Supp.," at LDB Decl. Ex. 31; (5) excerpted RIF population data, "RIF Data," at LDB Decl. Ex. 32; and (6) cited pages from deposition transcripts are attached in alphabetical order to the LDB Decl. as Exs. 1 through 26 and will be cited as follows:  Plaintiff Amy Bartoletti, "AB Dep."; David Brownstein, "DB Dep."; Francis Chin, "FC Dep."; Plaintiff Lisa Conley, "LC Dep."; David Cyganowski, "DC Dep."; Martin Feinstein, "MF Dep."; Nicholas Fluehr, "NF Dep."; Thomas Green, "TG Dep."; Fred Hessler, "FH Dep."; Dr. Mark R. Killingsworth, "MRK Dep."; Michael Koessel, "MK Dep."; Bart Livolsi, "BL Dep."; Plaintiff Nadine Mentor, "NM Dep."; Norman Pellegrini, "NP Dep."; Dr. Louise Roth, "LR Dep."; Plaintiff Brittany Sharpton, "BS Dep."; and Plaintiff Chia Siu, "CS Dep."

Healthcare, Housing, and Infrastructure) and Regional Groups (including the Southeast Region). (FC Decl. ¶¶ 4-5.)  Within these PFD Groups, professional employees could hold positions in a career that could progress, in order of increasing seniority, from Analyst to Associate to Assistant Vice President to Vice President to Director to Managing Director.  (Id.)  The PFD Groups varied widely in terms of required expertise, skills, and networks.  (Id.)  Accordingly, mobility of professionals across the different PFD Groups is virtually nonexistent.  (Id.)

**Response**

Dispute.  Dispute that the PFD Groups varied widely in terms of expertise, skills and networks and that mobility of professionals is virtually nonexistent, but admit the rest.  (Exs. 23, 24, Deposition of Norman Pellegrini ("Pell.") at 166 (Mentor was involved in multiple transactions not in the Southeast Group), 244-245 (Mentor also did work in the Northeast Group and other people in the Southeast Group did work for other Groups)); Ex. 1, Deposition of Amy Bartoletti ("Bart.") at 31-33 (Bartoletti moved from the Financial Institutions Group to the Housing Group in PFD)).

3.    Since 1993, Francis Chin has been a head of the PFD and, in early 2008, David Brownstein joined Chin as Co-Head.  (FC Decl. ¶ 2; FC Dep. 44-45.)  Each of the Product and Regional Groups within PFD is led by its own Head or Co-Heads who are responsible for running the business of their own Group, evaluating the employees in their Group, and making personnel decisions concerning those employees.  (FC Decl. ¶ 6; FC Dep. 134.)[2]

**Response**

Dispute.  Dispute that the Group Heads or Co-Heads are the only managers or officials responsible for running the business of their Group, evaluating the employees in their Group, or making personnel decisions regarding PFD employees.  (Ex. 14, Deposition of David

---

[2] The Regional Group Heads report to the Head of Regional Operations, Bartley Livolsi.  (FC Decl. ¶ 6.)

Cyganowski ("Cyg.") at 108-112 (explaining that compensation decisions were "a process driven by" Chin and Brownstein, once he became a Co-Head); Ex. 25, Deposition of David Brownstein ("Brown.") at 14, 40, 71 (explaining that he managed the Housing Group and that he and Chin performed all supervisory functions), 24-25 (Brownstein purporting to have gone out of his way to secure Siu a promotion), 16-17 (Chin and Brownstein are "ultimately responsible for what everyone does"); Ex. 10, Deposition of Nicholas Fluehr ("Fluehr") at 133-134 (explaining that Chin made compensation decisions for the entire Group), 96-97 (Chin decided to layoff individual despite the fervent efforts of Group Head Fluehr to keep the individual – "It was essentially presented to me [by Chin] as this is what is going to happen.  This is who we're going to lay off"); see also Defs.' 56.1 at ¶27 (stating that Brownstein and Chin made the decisions to termination Siu), ¶36 (stating that Brownstein retained management functions as to the Housing Group) and ¶41 (Brownstein and Chin made the decision to terminate Bartoletti); Chin Dec. at ¶17, 19 (same); Ex. 16, Deposition of Thomas Green ("Green") at 145-147 (Chin involved in decision to demote an employee), 165-167; Ex. 19, Deposition of Marty Feinstein ("Fein.") at 61 ("Frank Chin decides the bonuses [for Analysts and Associates]."), 69 (Chin and Brownstein make Analyst and Associate promotion decisions)).

**B.     The Financial Crisis of 2007-08 and Resulting Reductions in Force**

4.       Throughout 2007 and 2008, in the face of a severe, unprecedented, and sustained financial crisis, Citigroup underwent a significant restructuring.  (FC Decl. ¶¶ 7-9; DB Dep. 119, 123.)  In connection with the restructuring, businesses across Citigroup, including the 15 Groups in PFD, were required to help Citigroup achieve savings through four headcount reductions.  (FC Decl. ¶ 9.)  In late 2007, this restructuring resulted in the termination of 22 PFD employees, 14 men and eight women.  (See id. at ¶ 10; Bloom Rep. App. pp. 1-4; RIF Data.)  In March 2008,

there was another RIF, which resulted in four terminations in the PFD, three men and one woman. (See id.) In June 2008, there was a third RIF, which resulted in the layoff of another 15 PFD employees, 13 men and two women. (See id.)[3]

**Response**

Dispute. Admit that throughout 2007 and 2008 PFD attempted to achieve savings through four headcount reductions, but dispute that the cited evidence establishes that some competitors in the marketplace completely closed down their municipal bond departments as Defendants rely solely on uncorroborated, inadmissible and self-serving testimony. Dispute that the RIF was tied or connected in any way to previous "rounds" of layoffs as unsupported by any admissible evidence and contradicted by Chin who testified that RIF was not discussed until late October 2008. (Ex. 27, Deposition of Frank Chin ("Chin") at 25, 29-32).

5.     In early October 2008, Citigroup's announced intention to purchase Wachovia failed, which caused Citigroup's stock price to drop nearly 20%. (FC Decl. ¶ 11; TG at 163.) As a result, Citigroup's leadership came under increasing pressure and, in November 2008, the Company underwent another RIF. (FC Decl. ¶¶ 12-13.) The Groups in PFD were again required to participate. (Id.; TG at 163.)

**Response**

Dispute. Admit that Citi's stock price dropped in early October 2008, but dispute the reason for the drop in stock price as speculative, irrelevant and unsupported by the cited testimony. Admit that in November 2008 Citi underwent a RIF, but dispute that the cited testimony supports whether Citigroup's entire leadership came under increasing pressure and

---

[3] During this period of crisis, some competitors in the marketplace completely closed down their municipal bond departments. (CS Dep. 113-14; FC Decl. ¶ 8.)

further dispute any suggestion that the November RIF was in any way connected to any other RIF as not supported by the cited evidence. (Ex. 27, Chin at 25, 29-32).

6.      Each time a reduction occurred, the Group Heads each analyzed their Group and considered a variety of factors, including the reduction's overall effect on the existing business, when selecting employees for termination. (TG Dep. 31-33, 210-11, 214-16; FH Dep. 293-99, 300-06, 312-16, 318-25, 335-36, 338; DC Dep. 244, 292, 318, 328 56; NP Dep. 234-35, 274-78, 280-81, 284-85, 289-90, 352-56, 360-61; BL Dep. 26-27, 30-31, 47-48, 52-55, 70 73, 85-95; FC Decl. ¶ 14.) Specifically, for the November 2008 RIF, Chin instructed the Group Heads that they could not demote individuals or otherwise reduce employee salaries – he instructed them to cut compensation through headcount reductions. (FC Decl. ¶ 14; FC Dep. 28, 32-33, 38; see also TG Dep. 143-44, 188-89; FH Dep. 263-64; DC Dep. 101-2; NP Dep. 234 35; BL Dep. 30-31.) Chin explained to the Group Heads that it was important to consider compensation and the impact of what was happening in the marketplace on future business prospects. (Id.)[4]

**Response**

Dispute. Dispute that the Group Heads "selected" employees for termination as contradicted by witness testimony which shows that Chin and Brownstein selected the employees for termination. (Exs. 21, 22, Deposition of Fred Hessler ("Hessler") at 283-284 (Chin initially brought up a list of people for potential termination), 287 (Chin gave the initial list of names), 35 (Chin testified he took the "first cut" at trying to "figure out . . . what the population of a potential RIF would look like."); Ex. 14, Cyg. at 308 ("Chin and [] Brownstein would come up with an initial list, and ask for our comments. But it was their list."), 315 ("Q:

---

[4] As of this point in 2008, the PFD had been the number one ranked firm in public finance for approximately 14 of the prior 15 years (based on negotiated long term municipal issuance). (FC Decl. ¶ 3). Further, from at least 1997 through 2005, Citigroup was the top underwriter of negotiated and competitive long term municipal issuance. (Id.) Accordingly, one of the objectives of the PFD for the RIF was "how do we at Citi Public Finance try to stay number one in our business with a significantly reduced department and group." (TG Dep. 163-64, 198; FC Decl. ¶ 14.)

So would it be fair to say – would it be unfair to say that you selected Lisa Conley for termination?  A:  I did not select Lisa Conley for termination.")); Ex. 25, Brown. at 16-17 (Chin and Brownstein are "ultimately responsible for what everyone does"); Ex. 19, Fein. at 76-78, 95-96 (explaining that he provides lists of names for RIFs to Chin, but that the lists "give[n] to Frank Chin do[ ] not have to be acted on and others can be added to it and subtracted from it"); Ex. 10, Fluehr at 96-97 (Chin decided in one of the prior layoffs to layoff an individual despite the fervent efforts of Group Head Fluehr to keep the individual – "It was essentially presented to me [by Chin] as this is what is going to happen.  This is who we're going to lay off")).

Dispute that each time a reduction occurred, the Group Heads analyzed their Group and analyzed a variety of factors as there were absolutely no formal criteria or factors the Group Heads were asked to consider or did consider in connection with the RIFs, the decision making in the RIFs was at best completely subjective, and the Group Heads were entirely inconsistent, contradictory and incredible as to the purported factors considered in any RIF.  (Ex. 22, Hessler at 286 ("Q: And do you know why these people were on, the people that were on the list were on the list? A: I don't know what criteria was used to be able to put people on that list in the first place. Q: So you don't know what criteria Frank Chin and maybe David Brownstein evaluated in coming up with that initial list of names? A:  No."); Ex. 27, Chin 29-32, (Frank Chin was simply told to reduce compensation by $20 Million), 207 ("Q: So [the Group Heads] could have considered taking anything into account, correct? A: Yeah, they could have -- I mean, since I didn't prescribe it, they clearly could have decided whatever was important in their decision-making.• So I didn't go through the criteria with them.") Ex. 16, Green at 143-144 (Frank Chin only gave the "general" criteria of reducing compensation and "head count" in the November 2008); Ex. 23, Pell. at 235 ("Q: How did you come to that determination? A: Subjectives"), 287

7

("I guess I just knew innately, you know, based upon running this group for six years, who had business, who didn't, based upon, you know, running the group."); see also infra ¶¶17, 27, 41, 50, 60 (each Plaintiff selected for different purported reasons)).

7.      The layoff decisions in each Group were made by the respective Group Heads, who compared individuals in the same or similar positions within their own Group.  (TG Dep. 31-33, 210-11, 214-16; FH Dep. 293-99, 300-06, 312-16, 318-25, 335-36, 338; DC Dep. 244, 292, 318, 328-56; NP Dep. 234-35, 274-78, 280-81, 284-85, 289-90, 352-56, 360-61; BL Dep. 26-28, 30-31, 47-48, 52-55, 70-73, 85-95; FC Decl. ¶¶ 14-15; Bloom Rep. p. 2.)  The Group Heads did not compare individuals in fundamentally dissimilar positions within their Groups; nor were they permitted to compare people in their Group with those in other Groups.  (Id.; see also BL Dep. 15, 101-2; NP Dep. 294-97.)

**Response**

Dispute.  Dispute the entirety of the paragraph as the layoff decisions in each Group were not made by the respective Group Heads.  (Exs. 21, 22, Hessler at 283-284 (Chin initially brought up a list of people for potential termination), 287 (Chin gave the initial list of names), 35 (Chin testified he took the "first cut" at trying to "figure out . . . what the population of a potential RIF would look like."); Ex. 14, Cyg. at 308 ("Chin and [] Brownstein would come up with an initial list, and ask for our comments.  But it was their list."), 315 ("Q:  So would it be fair to say – would it be unfair to say that you selected Lisa Conley for termination?  A:  I did not select Lisa Conley for termination."); Ex. 25, Brown. at 16-17 (Chin and Brownstein are "ultimately responsible for what everyone does"); Ex. 19, Fein. at 76-78, 95-96 (explaining that he provides lists of names for RIFs to Chin, but that the lists "give[n] to Frank Chin do[ ] not have to be acted on and others can be added to it and subtracted from it")).  Dispute that the Group Heads compared individuals in the same or similar positions within their own Group.

(See ¶¶6-8).  Dispute that did not compare individuals in fundamentally dissimilar positions within their Groups; nor were they permitted to compare people in their Group with those in other Groups.  (See ¶¶6-8).

8.      With the exception of the Housing Group, neither Chin nor Brownstein made a single termination decision—those decisions were left to the Group Heads.  (Id.; FC Decl. ¶ 15; FC Dep. 86-87 ("Q:  [D]id you participate in the selection of anybody for [the November 2008] layoff?  A:  No.  Q:  Did you ever recommend any names?  A:  No."), 93-95; DB Dep. 138, 219-20, 223, 229-30; LDB Decl. 28 p. 8; Bloom Rep. p. 2; see also MRK Dep. 46-47.)

**Response**

Dispute.  Dispute that "neither Chin nor Brownstein made a single termination decision—those decisions were left to the Group Heads," as an utterly disingenuous and self-serving proposition that is completely contradicted by the evidence.  (Ex. 21, 22, Hessler at 283-284 (Chin initially brought up a list of people for potential termination), 287 (Chin gave the initial list of names), 35 (Chin testified he took the "first cut" at trying to "figure out . . . what the population of a potential RIF would look like."); Ex. 14, Cyg. at 308 ("Chin and [] Brownstein would come up with an initial list, and ask for our comments.  But it was their list."), 315 ("Q: So would it be fair to say – would it be unfair to say that you selected Lisa Conley for termination?  A:  I did not select Lisa Conley for termination."); Ex. 25, Brown. at 16-17 (Chin and Brownstein are "ultimately responsible for what everyone does"); Ex. 19, Fein. at 76-78, 95-96 (explaining that he provides lists of names for RIFs to Chin, but that the lists "give[n] to Frank Chin do[ ] not have to be acted on and others can be added to it and subtracted from it")).  Further dispute Defendants' use of testimony from Killingsworth, an expert labor economist who performed statistical analysis of the male-female disparity of the November RIF, to support any factual assertions regarding the November RIF decision-making process as he is not a fact

witness and was not even tasked with determining the identity of the decision-makers. (Ex. 30
(Killingsworth Report)).

9.       The Plaintiffs, each of whom had been selected to remain through the first three RIF
rounds, were selected for termination in the November RIF. (See generally Complaint
("Compl."); see also RIF Data.) Overall, 29 PFD employees were let go in this RIF, 16 men and
13 women. (See FC Decl. ¶ 15; Bloom Rep. at App. p. 4; RIF Data.) Below is a chart
summarizing layoffs in the PFD through the four reductions in force over the period 2007-08.
(FC Decl. ¶ 21; see also Bloom Rep. App. pp. 1-4; RIF Data.)

| GROUP | RIF 1 | RIF 2 | RIF 3 | RIF 4 |
|---|---|---|---|---|
| Airports | 2 | 0 | 1 | 0 |
| Credit & Fin Products | 4 | 1 | 3 | 3 |
| Financial Structuring | 0 | 0 | 2 | 0 |
| Health Care | 2 | 0 | 4 | 4 |
| Housing | 2 | 1 | 2 | 4 |
| Infrastructure | 3 | 0 | 0 | 5 |
| Power | 0 | 0 | 1 | 2 |
| PR Transfer | 1 | 0 | 0 | 0 |
| Short Term Group | 0 | 0 | 0 | 0 |
| Central Region | 0 | 0 | 1 | 1 |
| Mid-Atlantic Region | 1 | 0 | 0 | 2 |
| Northeast | 0 | 0 | 0 | 3 |
| South East | 2 | 1 | 0 | 2 |
| South West | 1 | 1 | 0 | 2 |
| West | 4 | 0 | 1 | 1 |

**Response**

Dispute. Dispute any suggestion in the substance of the paragraph or the chart that there
were "rounds" of RIFs or that the November RIF was connected in any way to previous "rounds"
of layoffs as unsupported by any admissible evidence and contradicted by Chin who testified that
RIF was not discussed until late October 2008. (Ex. 27, Chin at 25, 29-32). Admit that in the
November RIF, 16 men and 13 women were terminated and admit that the chart accurately

reflects the RIF data provided by Defendants, but dispute the representation and the apparent suggestion that the RIFs that were in any way connected or tied together as unsupported by the cited evidence.

**C.**     **Plaintiff Sharpton's Employment with the Infrastructure Group**

10.     Sharpton first worked with the Company in the summer of 1996 as a Summer Analyst in the Housing Group, where she worked with Plaintiff Bartoletti.  (BS Dep. 193-94; see also MF Dep. 99, 101.)  Following her summer internship, Bartoletti was critical of Sharpton's quantitative skills and did not believe she was qualified for employment with the Housing Group or anywhere else in the Company.  (AB Dep. 189; NF Dep. 76-77; MF Dep. 103-05; TG Dep. 69-70.)[5]  Yet, Infrastructure Group Head Tom Green offered Sharpton an Analyst position with his Group and she accepted and began working in that Group in July 2007.  (BS Dep. 199; TG Dep. 69-70; MF Dep. 99-101.)[6]

**Response**

Dispute.  Dispute that Sharpton first worked with the Company in the summer of 1996; she began working for the Company in 2006.  (Ex. 8, Sharp. at 191:14-19).  Admit that Sharpton began as a Summer Analyst in the Housing Group, and that Bartoletti did not believe Sharpton should be given an offer in the Housing Group.  Dispute that Bartoletti did not believe she was qualified for employment elsewhere in the Company, as Bartoletti expressed an opinion solely with regard to the Housing Group.  (Ex. 2, Bart. at 189:11-22 ("I was asked if she should be given an offer into the housing group, and I did not think that she should be given an offer in the housing group [because] . . . housing is one of the most quantitative groups in public finance.");

---

[5] Bartoletti later recruited Sharpton to join this lawsuit. (BS Dep. 8-10.)
[6] The Analyst Program is a two-year entry-level program with an option for a third year whereby, at the conclusion of the second year, Analysts are either let go or invited to stay for a third year.  (MF Dep. 70, 106; DB Dep. 201; MK Dep. 203.)  At the conclusion of the third year, Analysts are either let go or move on to become Associates. (Id.)  Very seldom are Analysts promoted to Associate following their second year.  (MF Dep. 125-26; DB Dep. 181, 181; MK Dep. 233.)

Ex. 10, Fluehr at 76-77 (testifying only with regard to the Housing Group); Ex. 16, Green at 69-70 (cited by Defendants but does not even reference Bartoletti)).  Sharpton expressed interest in the Infrastructure Group and did not want to work in the Housing Group.  (Ex. 8, Sharp. at 198:5-16).  Dispute that that Tom Green offered Sharpton an Analyst position.  Sharpton was offered an Analyst position by Deirdre Flynn.  (Ex. 50 at CGMI_BART 000667) (Sharpton offer letter)).  That Defendants would insinuate that she was hired by Green into the Infrastructure Group is disingenuous, as Sharpton was offered an Analyst position eight months prior to being put in the Infrastructure Group.  (Compare Ex. 50 at CGMI_BART 000665-667 (Sharpton offer letter) with Defs.' 56.1 St. ¶10 ("Infrastructure Group Head Tom Green offered Sharpton an Analyst position with his Group and she accepted and began working in that Group in July 2007.")).  The decision to hire an Analyst is made months prior to the time Group assignments are decided.  (Ex. 8, Sharp. at 197:5-198:16).  Most importantly, Feinstein testified that he, and not Green, hired Sharpton and was responsible for putting her in the Infrastructure Group.  (Ex. 19, Fein. at 102:13-19, 104:20-23) (Q: "Why was [Sharpton] hired back as a regular Analyst?" A:  "Because I was told to hire her as a regular Analyst" . . . Q:  "Who decided to place [Sharpton] in the Infrastructure Group?" A:  "Probably myself and Ranier Perkins")).

   Finally, dispute that Bartoletti "recruited" Sharpton to join this lawsuit as claimed in n. 5.  The cited testimony states only that Bartoletti introduced Sharpton to Plaintiffs' firm and suggested that Plaintiffs bring their claims together.

11. Director Steve Wood, with whom Sharpton worked extensively, noted that she had a multitude of performance issues, including absorbing basic business concepts and attention to detail.  (TG Dep. 105, 114-15, 243-46; LDB Decl. 33 at 1219; BS Dep. 237-38.)  In May 2008, Wood rated Sharpton as inferior to her peer, second-year Analyst Matthew Chin, whom he rated

a "Superior Candidate." (LDB Decl. 34 at 20499 & 20502.)  Director Kim Swain in the

Infrastructure Group had similar issues with Sharpton's skills and abilities.  (TG Dep. 115.)  In

fact, of all the people Sharpton worked with, (including both men and women), only one

individual, Managing Director Paul Creedon, had positive feedback concerning Sharpton, and

even he noted her performance deficiencies.  (Id. at 116, 130; see also MF Dep. 114-15.)

**Response**

     Dispute.  Dispute that "Sharpton worked extensively [with Wood]."  Brittany Sharpton

("Sharpton") testified that she "worked" with Wood, but did not state that she did so

"extensively." (Ex. 9, Sharp. at 237:22-23).  Dispute the assertion that Wood noted that

Sharpton "had a multitude of performance issues, including absorbing basic business concepts

and attention to detail."  To the contrary, Green admitted that Wood might have said that

"[Sharpton] paid good attention to detail."  (Ex. 17, Green at 244:10-13).  The rest of

Defendants' authority is inadmissible hearsay, and, in any event, does not support the assertion

that Wood said anything concerning Sharpton's ability to absorb "basic" concepts.  In fact,

Defendants cite Green's testimony for the proposition that Wood criticized Sharpton's ability to

grasp concepts.  However, in her July 2008 review, which was filled out by Green after

consulting with Wood, Sharpton received a rating of "exceeds expectations" in the category that

includes "grasps concepts and solution methods quickly." (Ex. 49 at CGMI_BART 000307-308

(Sharpton 2008 mid-year performance review); Ex. 16, Green at 111:7-114:9)).  Dispute that

Swain had similar issues with Sharpton's skill and abilities as the only authority cited is

inadmissible hearsay and, in any event, relies on Green's admittedly "limited memory." (Ex. 16,

Green at 115:19-24).  Sharpton never received any negative feedback from Swain. (Ex. 8, Sharp.

234:9:12).  Another of Sharpton's superiors, Mathilde McLean, also never expressed any

unhappiness to Sharpton about her performance.  (Ex. 8, Sharp. at 236:6-8).  Admit that Creedon

had positive feedback concerning Sharpton.  Dispute Defendants' assertion that Creedon noted

any performance deficiencies as it relies solely on inadmissible hearsay.  Admit that Wood rated

Matthew Chin ("M. Chin") higher than Sharpton, but dispute any significance as Sharpton and

M. Chin were rated identically by every other supervisor and received the exact same overall

rating, including from Green.  (Ex. 49 at CGMI_BART 001245, 020498, 020502) (various

appraisals of Sharpton and M. Chin each receiving a rating of B).  Moreover, Green, the

purported decision maker with regard to Sharpton's termination, admitted that he had never seen

the document in which Wood rated M. Chin higher than Sharpton.  (Ex. 16, Green at 194:11-24).

Further dispute any implication that Sharpton's performance was poor.  To the contrary,

her only formal performance review was very positive.  (Ex. 50 at CGMI_BART 000307-308

(Sharpton 2008 mid-year performance review).  She received ratings of "exceeds expectations"

in six different categories, including for "Proactively responds to challenges and issues[,]

completes projects expeditiously[,] grasps concepts and solution methods quickly[,] responds

well to pressure [and] demonstrates flexibility," and the highest rating, "superior," in the

category of "takes personal initiative in seeking to further develop quantitative skills."  (Id.).

The performance review also lauds Sharpton's ability to "work well," her "good work," "high

marks" and "handl[ing] well several important support roles."  (Id.).  According to the

Company's review of her performance, "Officers with whom [Sharpton] works directly report

that Brittany works very hard, juggles multiple assignments well and successfully handles [ ]

varied and unpredictable scheduling demands."  (Id.).  The overall rating for the review was

"trending" towards "exceeds expectations."  (Id.).  Green also admitted that Sharpton had shown

initiative, was a "hard worker" and had "good work ethic."  (Ex. 16, Green at 127:16-24, 136:9-

11).  Any claim that Sharpton was a poor performer is nothing more than a *post-hoc* pretext presented by Defendants to mask unlawful discrimination and cobble together a legal defense.

12.    By contrast, Green does not remember receiving <u>any</u> negative feedback concerning Matthew Chin, who received stellar reviews from his superiors.  (TG Dep. 109, 245-46; LDB Decl. Ex. 33 at 1216 ("good attention to details"), 1220 ("strong quantitative; drives the modeling," "attention to detail very strong," "good attitude," "very good analyst," "reaches for more.")

**<u>Response</u>**

Dispute.  Admit that Green purports not to remember receiving any negative performance feedback regarding M. Chin.  Admit that the cited documents state what is quoted by Defendants with the exception of "reaches for more," which is not contained in cited document.  Dispute, however, any inference that M. Chin's performance was in any way superior to that of Sharpton. The quoted praise was given by an Associate, not a Managing Director, Director or even a Vice President.  Moreover, the same document states that M. Chin needs to "understand the deals better," showing that he was having difficulty understanding deals.  (Ex. 50 at CGMI_BART 001220) (handwritten notes concerning M. Chin).  M. Chin also was "forbidden" from working with certain bankers, including Ms. McLean, because of his "outbursts and unprofessional behavior" when he "went off" on Ms. McLean, a female colleague, by "screaming, yelling, shouting, [and] slamming [the] desk."  (Ex. 9, Sharp. at 240:17-22; 344:17-345:20; Ex. 19, Fein. at 115:13-17).  M. Chin also was criticized for his lack of "commitment to hours."  (Ex. 50 at CGMI_BART 001215) (handwritten notes concerning M. Chin).  M. Chin also had a "run-in" with a Director in the Group.  (Ex. 17, Green at 229-230).  M. Chin's performance review, completed by Green, also noted that M. Chin "is also part of the larger group and that it is not his

job to choose which bankers' projects and assignments he will agree to work on." (Ex. 49 at

CGMI_BART 001149-50 (M. Chin 2008 mid-year performance review)).

13.    Sharpton had been told that her analytical modeling skills were limited. (BS Dep. 237-

41.) She acknowledged she had issues with "moving too slow and making errors." (BS Dep.

273, LDB Decl. Ex. 35 at 21329.) Sharpton acknowledged Swain's frustration, saying, "This is

taking me entirely too long and she is not happy at all." (BS Dep. 276-77; LDB Decl. Ex. 36 at

13611.) In another email, she confided "I don't rank high on the list and am not as analytically

talented as others in my group." (LDB Decl. Ex. 37 at 15012.)

**Response**

Dispute.  Dispute that Sharpton had been told that her analytical modeling skills were

limited.  Sharpton could not recall whether she had been told that her analytical modeling skills

were limited, and testified only that it was possible. (Ex. 9, Sharp. at 237:19-21).  Defendants'

blatant mischaracterization of this testimony is typical of their approach throughout their 56.1

Statement.  Dispute that Sharpton acknowledged that she moved too slow or made errors.  Page

273 of Sharpton's deposition contains no reference whatsoever to "moving too slow and making

errors," and the document cited by Defendants only stands for the proposition that Sharpton was

yelled at because she was purportedly perceived to have moved too slow or made errors, not that

Sharpton acknowledged actually doing either.  Dispute that "Sharpton acknowledged Swain's

frustration, saying, 'This is taking me entirely too long and she is not happy at all.'"  Sharpton

expressly testified that this statement was nothing more than a pessimistic outlook that was not

communicated to her by others, and that she did not know why Swain was unhappy. (Ex. 9,

Sharp. at 276:24-277).  This statement also referred only to a single assignment and is not

indicative of her performance, as evidenced by the praise she received from Defendants in her

reviews.  Admit that Sharpton wrote "I don't rank high on the list and am not as analytically

talented as others in my group." Dispute the significance of this document, as Sharpton made

clear that she was as analytically talented and did rank as high as the others in the group. (Ex. 8,

Sharp. at 220-224). When this email was written, Sharpton was anxious and stressed, and while

these thoughts "popped" into her mind, they are not accurate statements of Sharpton's

performance, as explained in response to ¶11 above. No one, including her supervisors, ever told

Sharpton that she was not as analytically talented as others in the Group. (Ex. 8, Sharp. at 224:7-

10).

14.     In one candid e-mail she sent to her close friend, mentor, and confidante at the Company,

Sherisse Pond, (BS Dep. 283-84), Sharpton acknowledged she was unable to effectively perform

her job and that Swain and others had valid complaints about her performance:

> I cannot do the most simple task and she is furious. . . .  This reflects horribly on
> me. . . .  **I am not a quant person and apparently it takes me 5 years to do a
> simple task like updating.**  I'm sure this would have taken anyone else like an
> hour MAYBE 90 min, but I think I have a block . . . .  **I just don't pick up on the
> simple thing they tell me to do.**  They get mad.  I look like a retarded black girl
> and the cycle continues.  I just really want to go home and never come back. . . .
>
> **This is my fault actually.**  If I had better sense then it would not take me so long
> to do things.  I would not have pushed this back because I would have known how
> to do it and felt confidently about doing it.  So, **my stupid @$$ knowingly put
> this off, did it wrong, took forever doing it over, and in the end the most
> value I added was updating some market update pages. . . .**
>
> . . . **I need a brain Pond. I really really do.**  No I am not feeling back [sic] for
> myself, but I truly do.  This is INSANE. **I KNOW they for SURE know they
> made a mistake by hiring me.  I didn't want to go down like this, but my
> miniscule brain cells cannot handle all of this.  They just cannot.**

(LDB Decl. Ex. 38 at 14238 (emphasis added).)  In a succinct self-assessment, Sharpton stated:

*"This is not the job for me. Period."* (LDB Decl. Ex. 36 at 13611 (emphasis added).)

**Response**

        Dispute.  Admit that Sharpton and Pond were close friends.  Dispute that "Sharpton

acknowledged she was unable to effectively perform her job and that Swain and others had valid

complaints about her performance." Sharpton testified that the email was "hyperbole," and it unquestionably is (*e.g.*, nothing took Sharpton 5 years to complete, and she does have a brain). Defendants' counsel even understood this. (See, e.g., Ex. 9, Sharp at 291:7-12 (Q: "You then go on, I take this as more hyperbole . . . That's more hyperbole; it doesn't take you ten years, right?)). Sharpton explained that the email was nothing more than "an emotional reaction. This is my personality, anybody that knows me very well it is just how I vent. I'm not a smoker. I'm not an alcoholic. So I cope by beating myself down with things that are not true." (Ex. 9, Sharp. at 289:19-24; see also Ex. 9, Sharp. at 290:21-25 ("My personality is to cope with things when someone has been demeaning you, cursing you out, condescending speaking to you, you say things that are not [ ] true, being pessimistic that no one else thinks.")). Admit that Sharpton made the statement "This is not the job for me. Period," but dispute any significance because, again, this statement was nothing more than venting to a friend when Ms. Sharpton was frustrated. (Ex. 9, Sharp. at 279:1-9). Further dispute the accuracy of the contents of either email in light of the profuse praise Sharpton received from her supervisors. See response to ¶11.

15.     During the first three RIFs in 2007-08, the Infrastructure group let go three men, including an Analyst. (No women were let go.) (TG Dep. 142, 156-57; BS Dep. 242-43, 293; RIF Data.) Sharpton expressed concern throughout each of these reductions, aware that her deficiencies could result in her termination. (LDB Decl. Ex. 39 at 14890 ("I'm so scared. I didn't think they would touch analysts, but they let go of the second year who sits right in from of me :-/ "), 13879 ("I'm about to get fired"), 14975 ("I'm scared now. . . . I don't want to delay this turn around and have my behind on the chopping board. . . . FOR SURE, they are doing us next."), 14008 ("I'm def gonna be fired today btw.").) Nevertheless, despite her struggles,

Group Head Green elected to retain Sharpton through each of these RIFs.  (See Compl. ¶ 111; see also RIF Data.)

**Response**

Dispute.  Admit that from late 2007 through October 2008, three men were laid off in the Infrastructure Group, including an analyst, and that no women were laid off during that time. Admit the contents of the emails, but dispute that Sharpton's concern had anything to do with purported deficiencies.  There is nothing whatsoever in these emails or the record to support this intentional misrepresentation.  Sharpton explained that she was anxious because she was aware that cuts were being made and the economy was poor, and that everyone else was afraid they might be fired as well, but she did not believe she really would be fired.  (Ex. 8, Sharp. at 215:19-216:16; 227:22-24; 231:7-11).  Admit that Sharpton was not terminated prior to November 2008, but dispute that Green made these decisions as nothing cited to supports this assertion.  Further dispute that Sharpton struggled for the reasons explained in response to ¶11 above.

16.     In November 2008, the Infrastructure Group had three Analysts—two (Sharpton and Matthew Chin) in their second year and one (Alan Dockeray) in his first year.  (Id.)  Green decided to retain one Analyst at each level going forward.  (TG Dep. 210-11, 214-16.)  Green reasoned that, because there is a high turnover rate with analysts, especially after the second year, it was important to keep a first-year analyst to ensure there was an analyst in the future both to perform the work and to train any future incoming first-year analysts.  (Id.; see also MF Dep. 114; MK Dep. 244.)  This rationale was particularly true in the context of the financial crisis and the ongoing RIFs as Green believed he would not be able to hire an Analyst to replace any that left voluntarily.  (TG Dep. 210-11, 214-16.)  Accordingly, he needed to select one of the second-year Analysts for the RIF, either Sharpton or Matthew Chin.  (Id.)

**Response**

Dispute.  Admit that "the Infrastructure Group had three Analysts—two (Sharpton and Matthew Chin) in their second year and one (Alan Dockeray) in his first year."  Admit that Green retained one Analyst at each level, but dispute that he did so for nondiscriminatory reasons, and dispute the purported rationale described herein.  Green admitted that: (i) the only reason maintaining an Analyst at each "level" was purportedly important was in the event that an Analyst decided to leave the Company; (ii) he had no indication that Sharpton would leave Citi; (iii) Sharpton could have performed Dockeray's job; (iv) the difference in their salaries was insignificant; (v) the Group would have been able to function without a First Year Analyst; and (vi) he could have done without a First Year Analyst.  (Ex. 17, Green at 210:24-214:15).  Therefore, dispute that Green needed to select one of the Second Year Analysts for the RIF; by his own admissions he also could have selected Dockeray.  When asked whether Sharpton could have performed Dockeray's job duties, Green responded: "Both Brittany and Mr. Dockeray were Analysts."  (Ex. 17, Green at 211:25-212:5).

17.    By all measures, Matthew Chin was viewed as a stronger performer.  (TG Dep. 31-33, 193; LDB Decl. Exs. 34, 40 & 41.)  Accordingly, although he had retained her through the first three reductions, Green selected Sharpton for termination.  (TG Dep. 31-33, see also id. at 193 (noting that Chin was a stronger performer than Sharpton, as evidenced in LDB Decl. Ex. 34).)

**Response**

Dispute.  Dispute that "[b]y all measures, Matthew Chin was viewed as a stronger performer" for the reasons explained in response to ¶¶11-12.  Further dispute same on the basis that the authority cited does not support the proposition.  Instead, Green vaguely asserts that he "compared [Sharpton and M. Chin] in [his] mind which of those two on a comparative basis" and decided to retain M. Chin "because on a comparative basis Matt seemed to be the analyst to

keep within that class." (Ex. 16, Green at 32). However, LDB Decl. Ex. 34 actually shows that Green rated Sharpton and M. Chin **exactly the same**; both received "B"s. (LDB Decl. Ex. 34 at CGMI_BART 020498; Ex. 16, Green at 183:6-24 (Q: "And in that e-mail it appears that you graded Brittany Sharpton and Matt Chin the same; is that correct?" A: "I put them in the same B category" . . . Q: "So you rated them the same, correct?" A: "I rated them both B."); (Ex. 49 at CGMI_BART 001245, 020498, 020502) (various appraisals of Sharpton and M. Chin each receiving a rating of B)).

Defendants also misstate the record by asserting in their parenthetical that Green noted that M. Chin was a stronger performer. Green actually testified that only one page of LDB Decl. Ex. 34 indicated a "hint" of better performance on the part of M. Chin, **but Green admitted that he does not even recall seeing this page before the termination decision was made.** (Ex. 16, Green at 193:17-194:24). Therefore, the entire basis for Green's purported understanding that M. Chin was a better performer is something he was unaware of when he made the decision to terminate Sharpton.

Accordingly, admit that Green participated in the selection of Sharpton for termination (along with Frank Chin, Brownstein and Feinstein (see e.g., Ex. 16, Green at 24:9-25:8; 153-154, Ex. 8, Sharp. at 204; Ex. 19, Fein. at 111-112)), but dispute the advanced performance-related justification. Most importantly, Feinstein, who managed the Analyst program and reviews the Analyst's performance reviews, explicitly told Sharpton that her performance was not the reason for her termination, exposing Defendants' present contentions as false. (Ex. 8, Sharp. at 205:9-13; 245:16-246:9; 331:7-332:6; Ex. 19, Fein. at 15:17-25, 17:7-22).

Ms. Sharpton actually was terminated on account of her gender, which is evidenced, *inter alia*, by the fact that she was more qualified, experienced and tenured than both male

Infrastructure Analysts Dockeray and M. Chin.  (Exs. 8, 9, Sharp. at 204:16-25, 245:16-246:9; see also responses to ¶¶11-12).  Sharpton held a Series 63, while Dockeray did not.  (Ex. 8, Sharp at 176:19-24; Am. Comp. ¶119).  Analysts are required to pass this exam, and their employment "is contingent upon taking and passing [this] licensing exam[ ]."  (Ex. 50 at CGMI_BART 00665-000666 (Sharpton offer letter)); see also Ex. 19, Fein. at 82:3-25).  She also was better qualified to be retained than Dockeray because she has "more experience than Alan.  [She has] been there longer, worked on more deals than he has" and he would look to her for assistance on projects.  (Ex. 9, Sharp. at 349:16-22; 357:10-15).  Indeed, Mr. Dockeray was a first year Analyst and had no more than 4 months of experience, while Sharpton was a Second Year Analyst with over a year of experience at the position.  (Ex. 9, Sharp. at 349:23-350:4; Ex. 17, Green at 207).  Sharpton also interned at Citi and Raymond James prior to being hired by Citi as a full-time Analyst, giving her more total experience at Citi than M. Chin.  (Ex. 8, Sharp at 186:18-23).  Sharpton's performance was at least equal to M. Chin's, and she did not engage in screaming outbursts in the office that compromised her ability to work with her colleagues.  M. Chin also actively sought alternative employment while employed by Citi.  (Ex. 8, Sharp at 184:10-16).

Even prior to her termination, M. Chin and Dockeray received more favorable modeling work, while Sharpton received discriminatory, gender-based, stereotypically female administrative-type unfavorable job assignments.  (Ex. 8, Sharp. at 205:2-8, 209:13-212:10, 245:16-246:9).  Sharpton also was subjected to discriminatory comments on the part of M. Chin and others regarding how "hot women's butts were."  (Ex. 8, Sharp. at 207:11-23).  At least one male director in the Infrastructure Group was sexually harassing a female subordinate.  (Exs. 8, 9, Sharp. at 208:21-209:9; 242:20-23).  Green, who was involved in the decision to terminate

Sharpton, often played golf with male colleagues and went to charitable or social events with clients, but never did so with female colleagues.  (Ex. 16, Green at 61-66).  Finally, at the time of Sharpton's termination there were 16 employees in the Infrastructure Group, only three of whom were female, and all three females were terminated in the November, 2008 RIF, leaving the Group entirely male.  (Exs. 8, 9, Sharp. at 204:18-25; 244:6-14; 245:16-246:9; Ex. 16, Green at 173:5-15); LDB Dec. Ex. 32 (RIF data)).

18.     By her own admission, Sharpton was not a better performer than Matthew Chin.  In fact, in one of her e-mails to her confidante, she acknowledges Chin was more skilled:

> I KNOW I'm not competent in this stuff.  I KNOW I work far too slow.  I KNOW it takes me 10 years to learn a simple concept.  I KNOW I have not been paying close attention to detail as an analyst should.  When will [Kimberly Swain] learn just NOT to work with me.  I am no[t] the type of mind she wants.  ***She needs [another analyst like] Tanzeer or Matt Chin or You.  Not Brittany freakin Amrith Sharpton. . . .   I KNOW they for SURE know they made a mistake by hiring me.***

(LDB Decl. Ex. 38 (emphasis added).)  Even after filing her lawsuit, Sharpton was unable to testify at her deposition that she was the better candidate:

> Q:  Is it your belief that you were better qualified than Matthew Chin?
> A:  At least as qualified.
> Q:  But not better qualified?
> A:  . . . I don't know – at least as qualified.

(BS Dep. 342.)

**Response**

Dispute.  Admit that the quotation appears in Sharpton's email to Pond, but Sharpton testified that the email was "hyperbole," and it unquestionably is (*e.g.*, nothing took Sharpton 5 years to complete, and she does have a brain).  Defendants' counsel even understood this.  (Ex. 9, Sharp at 291:7:12 (Q:  "You then do on, I take this as more hyperbole . . . That's more hyperbole; it doesn't take you ten years, right?)).  Sharpton explained that the email was nothing

more than "an emotional reaction.  This is my personality, anybody that knows me very well it is just how I vent.  I'm not a smoker.  I'm not an alcoholic.  So I cope by beating myself down with things that are not true."  (Ex. 9, Sharp. at 289:19-24); see also Ex. 9, Sharp. at 290:21-25 ("My personality is to cope with things when someone has been demeaning you, cursing you out, condescending speaking to you, you say things that are not [ ] true, being pessimistic that no one else thinks.")).  Indeed, Defendants themselves acknowledge that this email was sent by Sharpton to a "confidante."  Sharpton also explained that the bolded portion and the portion immediately preceding that refers to the fact that Sharpton and Swain were a bad match because of Swain's management style, and does not represent an admission that M. Chin's performance was superior.  (Ex. 9, Sharp. at 292:5-19).  Finally, dispute the significance of this email given that, as explained above, Defendants viewed Sharpton's performance favorably and at least equal to that of M. Chin.  Admit that Sharpton was at least as qualified as M. Chin, and note that Defendants purposefully left out of their quotation revelatory testimony that was favorable to Sharpton; namely, "Certainly at least as qualified," which appears before the "I don't know." (Ex. 9, Sharp. at 342:23).

19.     In this lawsuit, Sharpton has asserted that she performed her job with the "highest degree of professionalism."  (Compl. ¶ 110.)  Yet, when discovery revealed that she engaged in highly unprofessional and unacceptable conduct—such as repeatedly referring to Caucasians as "saltines" or "crackers" or referring to one colleague as "vile" and a "devil"—she modified her assertion and claimed she performed "at the highest level of competence that Brittany Sharpton can muster."  (BS Dep. 256-74.)

**Response**

    Dispute.  Admit that "Sharpton [ ] asserted [in the Complaint] that she performed her job with the 'highest degree of professionalism'" and dispute any claim or inference that this

statement is not true.  (Ex. 9, Sharp. at 256:12-20 (Q:  "Do you believe that to be true?"  A: "Yes.").  Dispute that Sharpton ever modified this assertion or testified that she performed "at the highest level of competence that Brittany Sharpton can muster."  This quotation does not appear in the cited portion of or elsewhere in Sharpton's deposition.

**D.    Plaintiff Siu's Employment with the Housing Group**

20.    Siu was hired as an Analyst for the Housing Group in July 2006 managed by Group Head Nick Fluehr.  (CS Dep. 57-58, 76.)  The Housing Group had two primary areas of focus:  State Housing Agencies and certain State Student Loan Issuers.  (FC Dep. 43-44.)  As an Analyst, Siu's duties included preparing financial analyses, preparing presentation books, and assisting with closings.  (DB Dep. 164-65.)

**Response**

Dispute.  Dispute that Siu was "hired" in 2006.  Siu was actually hired by Citi in 2005 for a one-year internship.  (Ex. 3, Siu at 56:21-57:24).  Admit that the Housing Group was managed by Group Head Nick Fluehr in July 2006.  Admit that the Housing Group had State Housing Agency clients and State Student Loan Issuer clients, but the authority cited does not support the proposition that these were "primary areas of focus."  (See response to ¶31, infra, for a comparison of Housing versus Student Loan clients).  Admit that Siu's duties included preparing financial analyses, preparing presentation books, and assisting with closings, but dispute any implication that Siu was performing only these duties or only the duties of an Analyst.  Koessel told Siu that she was doing Associate-level work in 2008, and Siu testified that she was doing so as well.  (Ex. 13, Koessel at 317:21-25 (testifying re same); Ex. 3, Siu at 64:6-7 ("I was performing at an associate function according to my supervisor")).  Koessel also admitted that after Fluehr was terminated, the roles of associates and analysts were "not dissimilar." (Ex. 13, Koessel at 279:14-18).  Siu testified that she was doing the same work as High, an Associate.

(Ex. 4, Siu at 197:14-19). In fact, Siu was actually offered a promotion to Associate in August 2008, barely three months prior to her termination. (Ex. 4, Siu at 157:24-158:6).

21.     The housing market was in many respects at the core of the financial crisis and, as the market deteriorated, the Group began shrinking. (CS Dep. at 70-71, 74-75, 79-84, 187-88; AB Dep. 162; FC Dep. 42-44, 87, 106-7, 151-52; DB Dep. 105-6, 119.) In the first two RIF rounds, Housing Group Head Fluehr selected three employees for reduction.[7] (See RIF Data.) In the third-round RIF, Fluehr was terminated. (FC Dep. 106-07.) After that third-round RIF, the Housing Group was reduced to seven employees. (Compl. ¶ 39; RIF Data.)

**Response**

Dispute. Admit that the Housing Group reduced in numbers during 2008, but dispute that the testimony and documents cited states anything with regard to whether the "housing market was in many respects at the core of the financial crisis." Dispute that Fluehr solely selected the Housing employees affected by the RIF for termination, as the authority cited does not address who made the decision. (Ex. 10, Fluehr at 96:23-98:8). Admit that Fluehr was terminated in June 2008, but dispute any suggestion in the substance of the paragraph that there were "rounds" of RIFs that were in any way connected or tied to the November RIF as unsupported by the cited evidence (the cited "RIF Data" contains only raw information concerning who employed by Citi at certain times and when certain individuals were terminated). (Ex. 27, Chin at 25, 29-32). Admit that seven employees remained in the Housing Group after Fluehr was terminated, but dispute any suggestion in the substance of the paragraph that there were "rounds" of RIFs that were in any way connected or tied to the November RIF as unsupported by the cited evidence

---

[7] Fluehr testified that, during the RIF processes in which he participated, he never saw a decision made that was based on gender. (NF Dep. 102, 111.)

(the cited "RIF Data" contains only raw information concerning who employed by Citi at certain times and when certain individuals were terminated) (Ex. 27, Chin at 25, 29-32).

22.    Siu was "devastated" and "shocked" by Fluehr's departure and the cutbacks in the Group. (CS Dep. 70-71, 74-75, 170-75, 177.) She believed the Group had already been reduced too much before the third-round RIF and that "it didn't make sense for [the Company] to cut [anyone] from [the Housing Group] when [they] were already short-staffed and [had] lost [] people earlier." (Id.) Siu had "a huge concern" that she might be fired following Fluehr's departure and, given that the Housing Group had been reduced to just seven employees, was concerned about the Company's commitment to the Housing Group and was unsure as to "whether management wanted to keep the group." (Id. at 84, 116.)

**Response**

Dispute.  Admit that Siu was shocked by the termination of Housing Group Head Fluehr, but dispute any suggestion that Siu was alone in her feelings, as she testified that "the people in my group … everyone was really shocked … we were shocked for a while." (Ex. 3, Siu at 71:17-19).  Further dispute that Siu was "devastated" or "shocked" by any terminations other than that of Fluehr, as her testimony regarding those feelings was limited to that specific termination.  (Ex. 3, Siu at 84:12-13 ("it was a huge concern, especially after Nick was let go")).  Admit that Siu was concerned about her job security due to her doubts about the Company's commitment to the Housing Group after the firing of Fluehr.  Defendants do not cite support in this paragraph for the asserted fact that the Housing Group was reduced to seven employees at the relevant time, and Ms. Siu did not refer to this in the testimony cited by Defendants.

23.    Siu conveyed these concerns to her supervisors and Company management and expressed that she might leave the Company.  (DB Dep. 176-78 ("[Siu] said she wasn't sure that she was going to stay [with the Company], that she still wasn't very comfortable and would think

about it."), 175-76 ("Amy [Bartoletti] and Mike [Koessel] were very concerned that Chia would leave[.]"); MK Dep. 304; CS Dep. 120-21, 133-40; AB Dep. 65-67, 198-99.)  Siu began actively looking for other jobs at the time, sending her resume to numerous other companies.  (CS Dep. 132-33; LDB Decl. Ex. 42; see also CS Dep. 85-86, 93-100.)  In addition, although Citigroup had extended Siu an offer to continue the Analyst program as a Third-Year Financial Analyst, Siu declined to sign the offer letter agreement because of her concerns with the Company's commitment to the Housing Group.  (DB Dep. 176-80, 186; AB Dep. 207; CS Dep. 120-21, 129-32, 151-52, 191-93.)  She did not want to sign anything that might bind her to the Company for a third year.  (CS Dep. 152, 156-57; LDB Decl. Ex. 43 at 12478; see also id.)

**Response**

Dispute.  Siu did not state to anyone that she might leave the Company.  (See, e.g., Ex. 3, Siu at 116:24-117:2 (Q:  "Did you tell anyone in the group that you might quit?"  A:  "**No.**") (emphasis added), 155:17-22 (Q:  "Did you tell Ms. Bartoletti that you were thinking of leaving?"  A:  "I never thought of leaving."  Q:  "Did you tell Mr. Koessel that you were thinking of leaving?"  A:  "No.")).  Rather, Siu expressed concern regarding the Company's commitment to the Housing Group and her resulting concern about her job security in the event the Company disbanded the Group in its entirety.  (Ex. 3, Siu at 84:10:15, 149:23-150:8).  The testimony of Koessel cited by Defendants does not in any way support their factual assertions.  (Ex. 13, Koessel at 204-206 (testifying that: (i) he cannot recall whether Siu told him she was interviewing, looking for another job or unhappy; (ii) Siu did not tell him she was dissatisfied with working in the housing group; (iii) it would be "stronger than what she expressed" to say that Siu had "very little interest in remaining with the housing group;" and (iv) Siu ultimately "stayed.")).  Likewise, nowhere in the cited testimony of Bartoletti does she state that Siu expressed to her that she might leave Citi.

Further dispute that Siu conducted an "active" job search, as she expressly testified that she did not conduct a strategic job search of any kind, and that she never saw a job comparable to her position at Citi. (Ex. 3, Siu at 85-87 (including testimony that Siu "wasn't actively looking," "did not apply for anything in particular" and "wasn't applying for anything."), 94:14-25, 141 ("I wasn't strategically looking for a job"), 143-144 (Siu did not call back interested potential employers)). Siu's activities were limited to networking and she submitted her resume to a few online postings for random finance position Craigslist postings; she never went on a job interview in connection with any of those jobs and never returned any recruiter calls in 2008. (Ex. 3, Siu at 141-144.)

Further dispute that Siu "declined" to sign the Third Year Analyst Terms of Employment or that she did not wish to bind herself to the Company for a third year. Rather, Siu asked her supervisor Ping Hsieh whether it was necessary to sign the Third Year document because she had already begun her third year as an Analyst with the Company, seemingly mooting the document. (Ex. 3, Siu at 149). Further, Siu openly and honestly discussed her concerns regarding the Housing Group with her supervisors Hsieh and Bartoletti, and stated that although the third-year Analyst offer provided her some reassurance regarding her future, a promotion to Associate would show an even greater commitment by Citi. (Ex. 3, Siu at 150, 153.) Siu therefore expressed her desire for reassurance that the Company wished her to stay, rather than Defendants' transparently false contention that Siu supposedly did not wish to remain. Most importantly, Siu testified that she did not sign the Third Year document because she was told directly by Defendants that it was not necessary to sign it, and she was being promoted to a different position than that to which the document applied. (Ex. 4, Siu 194:18-6.)

24.     The Housing Group valued Siu, thought she was a highly talented Analyst, and wanted her to stay.  (DB Dep. 175-77; MK Dep. 299-300; AB Dep. 204-05; see also CS Dep. 120-21, 129-30, 164-65; LDB Decl. Ex. 44.)  Brownstein—who began overseeing the Housing Group after Fluehr's departure—reached out to the Company's Human Resources Department, hopeful that he could provide assurances to Siu that she would be promoted to Associate after completing her third year of the Analyst program.  (Id.; FC Dep. 42-43; CS Dep. 165; Compl. ¶ 61.)  He went further, and inquired as whether a mid-year promotion was possible.  (DB Dep. 175-77, 179-81; MF Dep. 125-26; CS Dep. 120-21, 157-60; Compl. ¶ 61.)  Although Brownstein was informed that it was uncommon to promote anyone outside of the annual review process, he explained that Siu was a valued and talented employee, and he and the others in the Housing Group wanted to do what they could to convince Siu to stay.  (Id.)

**Response**

Dispute.  Admit that Siu was a highly talented analyst.  Dispute that she was valued and that the Company wanted her to stay to the extent that the Company, and Chin and Brownstein in particular, decided to terminate her employment.  Def. 56.1 at ¶27 ("Siu was chosen for inclusion in the RIF.").  Dispute that "Brownstein reached out to the Company's Human Resources Department, hopeful that he could provide assurances to Siu that she would be promoted to Associate after completing her third year of the Analyst program," as none of the cited testimony supports this factual assertion.  Admit that Siu was given a promotion, but dispute that Brownstein "inquired as whether [*sic*] a mid-year promotion was possible" as none of the cited testimony supports this factual assertion.  Admit that Siu was given a promotion, and that Brownstein testified that he told Siu the Housing Group would like her to continue with the Company.  Dispute to the extent that Defendants assert that Siu needed to be "convince[d] to stay," as she did not threaten to leave nor did she have any job offers and had not commenced an

active job search (nor was any member of the Housing Group's management aware of such).

(See response to ¶23, explaining that Siu never told anyone she was going to leave, and never

engaged in a strategic job search, but was only concerned about Citi's commitment to the

Housing Group).

25.     As a result of his efforts, Brownstein was able to get approval to promote Siu to

Associate in December or January, six months ahead of schedule.  (DB Dep. 180-81; CS Dep.

157-58; Compl. ¶ 61.)  Siu was grateful but, despite the offer, she did not want to commit to the

Company.  (DB Dep. 183-84, 177-80.  In fact, Brownstein recalls Siu telling him "I am not sure

if I am going to stay." (DB Dep. 183-84, 177-80 ("[W]e never got a full answer from Chia as to

whether she was going to stay. . . .  [S]he never told us that she was at a point to where she was

comfortable staying at the firm.").

**Response**

Dispute.  Defendants insist on asserting that Brownstein was responsible for the Siu

promotion, but there is no evidence cited to support this.  To the contrary, the evidence

demonstrates that Bartoletti, Koessel and Hsieh were the most supportive of the Siu promotion.

(Ex. 41 at CGMI_BART 016042-46) (email correspondence concerning a promotion for Siu,

including, *inter alia*, Koessel writing: (a) "We need [Chia] as badly as we need anyone;" (b) she

should be rewarded for "truly exceptional performance;" (c) "she was called upon to perform

tasks above her job description, and she performed admirably;" (d) "she is one of the two really

exceptional analysts I have seen;" and (e) "If we lose Chia, too, we're sunk.").  The portions of

the Brownstein deposition cited simply do not address who was able to get approval from

Human Resources to promote Siu to Associate.  Dispute that "despite the offer, [Siu] did not

want to commit to the Company."  This assertion is incredibly disingenuous, as Brownstein

explicitly testified that he does not know whether Siu stated she would not stay after learning of

31

her promotion.  (Ex. 26, Brown. at 178:21-180).  Brownstein also testified that he does not even

recall whether he spoke with Siu after informing her that she was going to be promoted.  (Ex. 26,

Brown. at 184:17-21).  Dispute that Siu ever told Brownstein that she was not sure whether she

would stay.  (See, e.g., Ex. 3, Siu at 116:24-117:2 (Q:  "Did you tell anyone in the group that you

might quit?"  A:  "**No.**") (emphasis added); see also Ex. 2, Bart. at 205:17-23)).

Further dispute any suggestion that Siu was asked whether she intended to stay at Citi

and did not respond positively, or that Siu otherwise evinced any insecurity regarding her

position at the Company following her receipt of notice that she would be promoted to Associate.

(See e.g., response to ¶23).  In fact, according to Koessel, Siu's supervisor:

> Q:  Now, did you ever have any conversations with David Brownstein or anyone else for that matter, regarding Chia possibly leaving?
>
> A:  In the summer?
>
> Q:  After her week off.
>
> A:  **No, I think at that point we were convinced that this was a stable group and we were going to, you know, forge ahead.  We had gone through a number of crises, Nick's being laid off, the managerial issue, Chia considering leaving.  I think there was some sense of stability going into the fall.**
>
> Q:  **So at that point in time you thought Chia was going to stay?**
>
> A:  **I thought so, yeah.**

(Ex. 13, Koessel at 314:6-22; see also Ex. 13, Koessel at 302:20-21 (Siu had been "convinced [ ]

to stay.")).  Further dispute any assertion that Siu raised any concern about a departure after she

received her promotion.  (See, e.g., Ex. 4, Siu at 193:16-23 (Q:  "And do you know whether

anybody within the group in November 2008 would think that if we did additional layoffs and

32

you remained, that you might leave?"  A:  "No, **I never raised any more concern after, after they gave me the promotion.**") (emphasis added)).  In fact, Siu actually moved out of her home and got an apartment because she felt comfortable that Citi was committed to Housing and she planned on being there long-term.  (Ex. 2, Bart. at 206:14-23).

Dispute that Siu did not want to commit to the Company for all of the reasons described above, as well as the fact that her goal in inquiring about a promotion to Associate was precisely to solidify her future at the Company, and she had expressed her desire to remain at the Company to various members of the Housing Group.  (Ex. 3, Siu at 153:12:18, 157:25-159:21, 161:10-12).

26.     As part of the November 2008 RIF discussions, the Company strongly considered shutting down the Housing Group altogether.  (FC Dep. 42-44, 87, 106-7, 121, 151-52; FC Decl. ¶ 18.)  The student loan market had disappeared, and the housing market was under siege and was seen by many as the root cause of the financial crisis.  (Id.; see also NF Dep. 38-42.)  Ultimately, it decided not to fully exit the market, but instead to retain a skeletal staff to guide clients through the crisis.  (FC Dep. 42-44, 87, 106-7, 141-42; FC Decl. ¶ 18; DB Dep. 119.)  To maintain a functional skeletal group, Brownstein decided to have just a three person staff remain, including one Analyst.  (DB Dep. 197-98.)

**Response**

Dispute.  Admit that the Company considered closing its Housing Group.  However, dispute that the student loan market had "disappeared" for the reasons described in response to ¶37 (explaining that the student loan business has "not dried up," but actually had generated almost $900,000 in revenue in 2008, and Koessel worked on student loan deals after Bartoletti's termination).  Further dispute Defendants' assertion that the housing "market" was the root cause of the 2008 financial crisis to the extent that this contention is not adequately supported by the

record.  Admit that the Company decided not to exit the housing market in PFD, but dispute any contention that the Company's sole purpose in retaining the Housing Group was to "guide clients through the crisis" for the reasons described in response to ¶38 (exposing Defendants' admissions that new business and revenue generation was of the upmost importance to the Housing Group).  In fact, Defendants' contention here is contradicted by their own ¶38, which maintains that the sole purpose of the Housing Group was not to "guide clients," but rather to "maintain thought leadership in the market."  Admit that the Company decided to retain only three employees in the PFD Housing Group.

27.     Although Siu was a skilled and valued Analyst, Brownstein earnestly believed that Siu would quit following another RIF.  (Id. at 183, 197-98, 201-3; MK Dep. 307-11.)  Siu had believed the Group was short-staffed even before the third-round RIF and questioned the Company's commitment to Housing when it was reduced to just seven employees.  (CS Dep. 120-21, 129-32, 151-52, 156-57, 191-93.)  If the Group was again cut and only a skeletal staff of three were retained, Brownstein believed Siu would leave.  (DB Dep. 197-98.)  Although he had gone out of his way to get approval for an early promotion in an effort to convince Siu not to quit, Brownstein did not want to risk terminating the only other Analyst who supported the Group, only to then have Siu quit and leave the group with only two employees—and no Analyst and, therefore, Siu was chosen for inclusion in the RIF.  (Id. at 197-200; FC Decl. ¶ 20.)  Siu acknowledged Brownstein's decision based on his concern she would leave was reasonable.  (CS Dep. 196 ("Q:  Do you think that would be a reasonable concern that someone might given your prior expressions and concerns about the size of the group [] That it would be reasonable for someone to think that if the group shrunk to three, from seven to three, and you were one of the three, that you might leave? . . . A:  [T]hat could be a reason."), 210.)

**Response**

Dispute.  Dispute that Brownstein believed Siu would quit following another RIF.

According to Kossel (then co-Head of the Housing Group and Siu's supervisor):

> Q:     Now, did you ever have any conversations with David Brownstein or anyone else for that matter, regarding Chia possibly leaving?
>
> A:     In the summer?
>
> Q:     After her week off.
>
> A:     **No, I think at that point we were convinced that this was a stable group and we were going to, you know, forge ahead.  We had gone through a number of Crises, Nick's being laid off, the managerial issue, Chia considering leaving.  I think there was some sense of stability going into the fall.**
>
> Q:     So at that point in time you thought Chia was going to stay?
>
> A:     I thought so, yeah.

(Ex. 13, Koessel at 314:6-22) (emphasis added).  Thus, Siu's own supervisor, co-Head of Housing and current Citi employee Koessel admitted there was no concern that Siu would leave following the summer of 2008.  This is consistent with Siu's testimony concerning her telling numerous individuals, including her supervisors, that a promotion would soothe her concerns. (Ex. 3, Siu at 153:12:18, 157:25-159:21, 161:10-12).  Again, Siu did not tell anyone that she might leave the Company.  (See, e.g., Ex. 3, Siu at 116:24-117:2 (Q: "Did you tell anyone in the group that you might quit?" A: "**No.**") (emphasis added), 155:17-22 (Q: "Did you tell Ms. Bartoletti that you were thinking of leaving?" A: "I never thought of leaving."  Q: "Did you tell Mr. Koessel that you were thinking of leaving?" A: "No.")).  Thus, it is implausible that Brownstein terminated Sui because he believed she would leave as her concerns were not unique, nor did she tell anyone she might leave.  Moreover, when Koessel, a male employee

actually threatened to leave Citi, he was promoted and retained, not terminated.  (See response to ¶35).

Dispute that Siu admitted or acknowledged that any concern she would leave was reasonable, particularly following the announcement of her promotion to Associate.  (See, e.g., Ex. 4, Siu at 193:16-23 (Q:  "And do you know whether anybody within the group in November 2008 would think that if we did additional layoffs and you remained, that you might leave?"  A: "No, **I never raised any more concern after, after they gave me the promotion.**") (emphasis added)).  The testimony cited by Defendants is also purposefully taken out of context.  The question was completely hypothetical (i.e., Siu was not asked about the mindset of any decision-maker).  Moreover, prior to the quoted words "[t]hat could be a reason," Siu explicitly testified that she did not know how "other people" think.  (Ex. 4, Siu at 196:12-18).  After the quoted words, Siu testified that she was more qualified than her comparators.  (Ex. 4, Siu at 196:12-18).

28.     Siu was asked about other employees who were selected for termination in the multiple RIF rounds and, for each male who was selected for termination, including the Group Head Fluehr, Siu believed the decision was based on performance, but for each woman selected, it was based on gender.  (CS Dep. 207-210.)  Siu based her opinion primarily on articles she read that mass layoffs can be used to mask gender discrimination.  (Id. at 189-191.)

**Response**

Dispute.  Defendants' contentions misrepresent Siu's testimony and manufacture other testimony that she never gave.  Siu never testified that Fluehr was terminated because of his performance, and affirmatively testified that there was no one to compare him with regarding his qualifications.  (Ex. 4, Siu at 209:12-17 (Q:  "So Nick Fluehr was the least qualified person in the group when he was let go?"  A:  ". . . Nick Fluehr didn't have a counterpart.")).  Siu also did not testify that a single male was terminated for poor performance, but only that she was retained in

June 2008 over Henry Chen because of her own performance.  (Ex. 4, Siu at 207:22-208:13).

Siu explained earlier that Chen was terminated because he was "the most junior person in the

group."  (Ex. 3, Siu at 110:25-111:4).  Siu was asked only about a single female who was

terminated, Bartoletti, and testified that the only reason Koessel could have been retained over

Bartoletti was gender, because she was a great manager and had management experience that

Koessel did not because she had often performed Fluehr's role and work as Head of the Housing

Group.  (Ex. 4, Siu at 207:12-21).

Further dispute that Siu based her opinion primarily on articles she read that mass layoffs

can be used to mask gender discrimination.  First, the deposition testimony concerning the

referenced articles was related to Siu's belief that she had been terminated discriminatorily, and

not to the testimony from pages 207-210 of her deposition, as suggested by Defendants.

Moreover, Siu cited to and testified regarding many facts and pieces of evidence that support her

claim that she was selected for termination due to her gender.  For example, Siu testified

regarding the fact that every woman in the Housing Group was terminated in the November RIF.

(Ex. 4, Siu at 180:19-24, 183:6-12).  She also testified that far less-qualified males were retained

when she was fired, including Yang, who had very recently been hired and had only two or three

months of housing experience (in contrast to her several years of experience).  (Ex. 4, Siu at

184:3-11, 196:19-197:4).  Siu also testified that she was a better performer and more qualified

than High given that: (i) the two did the same work, but Siu completed more deals; (ii) her

performance review was the highest possible ranking; (iii) Siu was told by Koessel that she was

one of the two most exceptional Analysts he had worked with, and High was not the other; and

(iv) Siu was assigned to the most labor-intensive projects and complex financial models,

showing that her superiors were more confident in her abilities.  (Ex. 4, Siu at 196:7-201:2,

203:18-205:18; Ex. 41 at CGMI_BART 016043 (email correspondence concerning Siu being

one of two exceptional Analysts Koessel has ever worked with)).  Siu also testified that she was

more efficient than those retained over her, and she could accomplish more work in a shorter

time frame.  (Ex. 4, Siu at 196).  While Siu received the highest possible score on her last

performance review, a "1," High received a much worse overall score of "3" on his 2008

performance review, and Yang's 2008 review was filled with "3s" and "4s."  (Ex. 40 (Siu, High

and Yang performance reviews).  Siu also testified concerning the fact that she was terminated

almost immediately after being notified that she was being promoted.  (Ex. 4, Siu at 210:7-19).

She also testified that Bartoletti, another female terminated in the November RIF, was fired

instead of a less qualified male individual, Koessel, due to their gender.  (Ex. 4, Siu at 207:12-

21).

29.     Siu admitted that:  her prior expressed dissatisfaction with the future and direction of the

Group may have factored into the decision to include her in the November RIF (Id. at 210); that

she did not speak with any of the decision makers regarding the termination decision and, thus,

has no knowledge concerning the decision (Id. at 210-12); and that, up until the day of her

termination, nothing had ever occurred during her employment at Citigroup that ever made her

feel she was treated differently because of her gender.  (Id. at 213.)

**Response**

        Dispute.  Defendants are mischaracterizing the cited testimony, which reads:

        Q:      Can you think of any other reason other than your gender why they would have
                let you go?

        A:      No.

        Q:      How about the fact that you had previously indicated your insecurity with the
                future and the direction of the group, could that have been a factor?

        A:      Yes, **but they already addressed that by giving me a promotion.**

(Ex. 4, Siu at 210:16-25 (emphasis added)).  Thus, Siu explicitly stated that her gender was the

only reason Citi would have let her go, and that any purported insecurity with the future of the

group was already addressed by Citi when they gave her a promotion.  The "Yes" in the answer

quoted above is clearly reflexive rather than an adoption of the contention of Defendants'

counsel, and Siu's testimony is that any past insecurity would not have been a factor because it

was already dealt with from Citi's perspective (even according to her supervisor Koessel - see

¶27) (and, significantly, from her own perspective as well).

     Siu also did not testify to any "dissatisfaction," but rather was insecure regarding whether

the Company would eliminate the Housing Group altogether and was committed to her future at

the Company.  (Ex. 4, Siu at 191:14-192:3).  Furthermore, dispute that Siu supposedly

"admitted" that any purported "dissatisfaction" may have played a part in her termination.  Siu

repeatedly testified that she could not say what others were thinking at the time of her

termination, and only after several repetitions of the same question did she state that it was in the

realm of possibility (though not within her personal knowledge) that perceptions regarding her

intentions regarding her employment could have factored into the decision to terminate her

employment.  (See, e.g., Siu at 195:14-22 ("It never occurred to me that [it] would be an issue

that [anyone would be concerned about me leaving]," 196:12-13 ("I don't know how other

people think.")).  Additionally dispute that Siu had "no knowledge" regarding the decision to

terminate her employment.  Siu repeatedly testified that she did not know what other Company

employees were thinking at the time that termination decisions were made, but provided

extensive detail regarding the circumstances surrounding both her own termination and the

termination of Bartoletti, including factual evidence that seriously undermines and calls into

question the Company's purported reasons for the terminations.  Finally, dispute that Siu

supposedly said that nothing had occurred during her employment at Citigroup that made her feel she was treated differently because of her gender.  Among other evidence, Siu testified that she was terminated due to her gender, that all women in the Housing Group were terminated in November 2008 and that both she and Bartoletti were terminated despite the Company's retention of lesser-qualified and lower-performing male coworkers.  (see response to ¶28; Ex. 4, Siu at 210:16-19; LDB Dec. Ex. 32 (RIF data)).

30.     Siu admits that the basis of her discrimination claim is an article she read before her termination that suggests "that people sometimes use a mass layoff to mask gender discrimination."  (Id. at 190.)  Other than that article, she confirmed she has no basis for her belief that she was discriminated against.  (Id. ("Q: Any other basis for your belief that one reason you might be terminated was because of your gender?  A:  No.").)

**Response**

Dispute.  Siu did not testify or admit that an article she read was the only basis for her discrimination claims, and Defendants' quotation is presented without context and does not stand for their proposition for the reasons described in response to ¶28.  Siu's answer of "No" in response to the question quoted by Defendants does not at all indicate that the article read by Siu was the sole basis of her claims, particularly as she had previously testified regarding evidence of discrimination, and the question did not rule out the existence of or disclaim other evidence of gender discrimination to which Siu testified.  (See, e.g., response to ¶28.)

E.     **Plaintiff Bartoletti's Employment with the Housing Group**

31.     Bartoletti was hired by the Company as an Associate in 1993 into what eventually became the Housing Group.  (AB Dep. 34, 37.)  Throughout her tenure, a significant amount of

her work was on student loans.  (Id. at 36, 39-40; MK Dep. 44.)[8]  She was promoted several

times to Assistant Vice President, Vice President and, ultimately, Director.  (AB Dep. 33-34; NF

Dep. 88-90.)

**Response**

Dispute.  That Bartoletti was hired by the Company in 1993, as she was hired as an

analyst in 1992.  (Ex. 1, Bart. at 32:12-22).  Admit that Bartoletti was promoted to Assistant Vice

President, Vice President and Director.  Dispute the statement that a "significant" amount of

Bartoletti's work was on student loans, and dispute that the authority cited by Defendants even

supports this contention.  In fact, Ex. 12, Koessel at 44 does not even refer to student loan work.

Over time, Bartoletti's focus on student loan work "gradually fell off and as we let student loan

clients go with different transfers, my time was spent more and more and more on housing every

single year, up until the end when in 2008, for example, I only had four student loan clients total,

one of which was a co-managed client."  (Ex. 1, Bart. at 39:17-25).  By contrast, in 2008

Bartoletti had approximately twenty housing clients and her "focus was to build and grow the

housing business."  (Ex. 1, Bart. at 39:22-40:8).  In both 2007 and 2008 Bartoletti spent about

10% of her time on student loan clients.  (Ex. 1, Bart. at 43:9-44:5; see also Ex. 37,

(CGMI_BART 016971-016973) (revenue sheets showing that Bartoletti completed only six

student loan transactions in 2007); Ex. 37 (CGMI_BART 016316-016318) (revenue sheets

showing that Bartoletti completed only four student loan transactions in 2008)).  Therefore, also

dispute the assertion in Def. 56.1 ST, n. 8, that in 2008 a "significant" portion of Bartoletti's

clients were in the student loan area.  In fact, there were only three.  (Ex. 37 (CGMI_BART

---

[8] One of the reasons she was placed in the Group was because of her experience with student loans. (AB Dep. 36.)
Bartoletti focused on both student loan and housing clients, while Koessel exclusively covered housing clients. (FC
Dep. 115, 197; MK Dep. 143; AB Dep. 39-40.)  While Fluehr also did student loan work, Bartoletti was the only
Director who did student loan work.  (See id.)  In 2008, a significant portion of Bartoletti's clients were in the
student loan area.  (AB Dep. 40-41; NF Dep. 48-49).)

016316-016318) (revenue sheets showing that Bartoletti had only three student loan clients in 2008)). Admit that one of the reasons Bartoletti was placed in the Housing Group was because of her experience with student loans, but she also was placed in the Group because she was the only person who had direct housing experience. (Ex. 1, Bart. at 39:13:22). Dispute the assertion in Def. n. 8 that Koessel did not perform student loan work, as he did work on a student loan proposal subsequent to Bartoletti's termination. (Ex. 12, Koessel at 118:5-13).

32.     Bartoletti worked closely with her friend, Group Head Nick Fluehr, until his departure in July 2008. (AB Dep. 44, 85, 247; NF Dep. 77-78, 87-90; LDB Decl. Ex. 45.) In 2004, Fluehr was recruited by Morgan Stanley and he asked Morgan Stanley to consider hiring Bartoletti as well. (AB Dep. 177-79; NF Dep. 91-93.) Morgan Stanley made offers to both, and Fluehr informed Chin, the Head of Public Finance, of the Morgan Stanley offers. (Id.) To convince them to stay, Chin made counter-offers to Fluehr and Bartoletti, which included compensation increases to match the offers from Morgan Stanley. (AB Dep. 177-79; NF Dep. 94-95; FC Dep. 137-38.) As a result, Bartoletti's incentive compensation award for 2004 increased approximately 75%, jumping from $380,000 in 2003 to $662,500 in 2004. (See id.; LDB Decl. Ex. 46.) Fluehr also nominated Bartoletti for Managing Director. (AB Dep. 81.)

**Response**

Dispute. Admit that Bartoletti worked with Fluehr until his departure in July of 2008, but dispute the argumentative assertions that they worked "closely" and were "friends." None of the authority cited by Defendants supports these argumentative assertions. Admit that Fluehr was recruited by Morgan Stanley in 2004. Admit that Fluehr asked Morgan Stanley to consider hiring Bartoletti, and further state that he did so because she did "an outstanding job." (Ex. 10, Fluehr at 92:5-14). Admit that Morgan Stanley made offers to Fluehr and Bartoletti. Admit that the Company made counter-offers to Fluehr and Bartoletti, and that Bartoletti's incentive

compensation was $380,000 in 2003, and $662,500 in 2004.  Dispute that the increase was solely the result of the Company's counter-offer because: (a) Bartoletti's 2003 incentive compensation of $380,000 was over 40% greater than her incentive compensation in 2002; and (b) there was no "counter-offer" made in 2003.  (LDB Decl. Ex. 46).  Admit that Fluehr nominated Bartoletti for Managing Director.

33.    Citigroup terminated Fluehr's employment in July 2008, leaving the Housing Group without a Head.  (DB Dep. 90.)  Bartoletti was one of the two remaining Directors in the group, the other being Mike Koessel.  (FC. Dep. 147; DB Dep. 90-91, 104.)  Although neither had significant management experience, Brownstein and Chin initially asked Bartoletti to assume responsibility as Group Head—primarily because she had been employed with the Company longer than Koessel and they were not aware that Koessel would be interested in that position. (FC. Dep. 123-24, 126; DB Dep. 91-96, 99-100, 104; FC Decl. ¶ 16; MK Dep. 167-68, 171, 208-9.)

**Response**

Dispute.  Admit that Citigroup terminated Fluehr's employment in July 2008, that the Housing Group was left without a Head and that Bartoletti was one of the two remaining Directors in the Housing Group, the other being Koessel.  Admit that Koessel had no significant management experience.  Indeed, Koessel admits that he never even communicated compensation information or terminated a junior staff member while Fluehr was the Head of housing.  (Ex. 12, Koessel at 79:25-80:19).

Dispute that Bartoletti had no significant management experience.  Bartoletti had been "appointed" by Fluehr to be "head of the analysts and associates."  (Ex. 10, Fluehr at 71:20-72:6; see also Ex. 1, Bart. at 54:22-55:13 (testifying about her management experience, including being head of the analysts and associates); Ex. 12, Koessel at 79:5-18 (testifying that Bartoletti

was responsible for managing work flow when Fluehr was traveling)).  In this role, Bartoletti,

would "apportion[ ] workload assignments, and if work came in that needed response on a timely

basis, it was essential to have a person who had a handle on who was doing what, who had what

work, who had the capacity to handle additional work."  (Ex. 10, Fluehr at 72:7-15).  Bartoletti

also "assume[d] certain managerial responsibilities on [Mr. Fluehr's] behalf when [he] was

traveling or otherwise unavailable.  (Ex. 28 (Affidavit of Nicholas Fluehr) at ¶10; Ex. 1, Bart. at

54:22-55:13 (testifying regarding same)).   This included, among other things, conducting

reviews of junior staff members and communicating compensation awards to them, notifying a

junior staff member of his termination as part of a reduction in force in April 2008, as well as

frequently being required to resolve issues that arose between Mr. Koessel and junior staff

members."  (Ex. 28 (Fluehr Aff.) at ¶ 10; Ex. 1, Bart. at 54:22-55:13 (testifying regarding giving

reviews and notifying staff member of termination); Ex. 12, Koessel at 79:19-21 (testifying that

Bartoletti "probably played the dominant role in reviewing junior people"); Ex. 3, Siu at 125:24-

126:20, 207:14-17 (testifying that Bartoletti was "performing as [Fluehr] when [he] wasn't

around", including by notifying junior staff members of their bonus numbers.)).  According to

Fluehr, who supervised both Bartoletti and Koessel, "[t]here is no question that Ms. Bartoletti's

managerial experience and understanding of the working of the Housing Group far exceeded that

of Mr. Koessel's."  (Ex. 28 (Fluehr Adff.) at ¶11).  Finally, Brownstein testified that Bartoletti

did all of Fluehr's work for him while Fluehr was a Managing Director and Head of the Housing

Group.  (Ex. 25, Brown. at 133:3-8).

       Dispute that Brownstein and Chin initially asked Bartoletti to assume responsibility as

Group Head.  The decision to initially name Bartoletti sole Group Head was Chin's, not

Brownstein's.  (Ex. 39 at CGMI_BART 015172-174 (email correspondence concerning

Bartoletti promotion to Group Head); Ex. 13, Koessel at 233:11-20).  Admit that Brownstein

communicated this initial decision.  Dispute that the reasons Bartoletti was initially asked to be

sole Group Head were that she had been employed by the Company longer and that Chin and

Brownstein were not aware that Koessel would want the position.  The purported notion that

Chin and Brownstein were unaware that Koessel would be interested in that position had nothing

to do with the decision to initially name Bartoletti sole Head of the Housing Group.  (Ex. 25,

Brown. at 135:3-6 ("[Q:]  If you knew Mr. Koessel was interested in becoming head of the

housing group, would you have approached him over Amy?  [A:]  No.").  Further dispute

Defendants' assertion regarding the reasons Bartoletti was initially asked to be sole Group Head

on the basis that the individuals who, according to Defendants, purportedly were the decision

makers testified inconsistently about their supposed reasons.  (Compare Ex. 27, Chin at 123:17-

23 (testifying that Bartoletti's tenure was the "sole criterion") with Ex. 25, Brown. at 100:14-17

(testifying that the reason Koessel was not asked was because Brownstein "did not believe [he]

would be interested in that position.")).  The true reasons included, *inter alia*, (i) concerns that

Bartoletti would leave the Company if she had to work for Koessel (Ex. 39 at CGMI_BART

015172-174), (ii) Bartoletti was senior in terms of "time and grade and service.  I think people

tend to equate that with being more qualified." (Ex. 27, Chin at 126:3-14); and (iii) Chin's

purported desire to see Bartoletti "prove herself and become an Managing [*sic*] Director" (Ex. 39

at CGMI_BART 015172-174).

34.     Bartoletti did not immediately agree to become Group Head.  (DB Dep. 98-100; AB Dep.

45-46, 115, 164; FC Decl. ¶ 16.)  Given Bartoletti's close relationship with Fluehr, there was

some concern Bartoletti would follow Fluehr to whichever company he went to work for after

the July RIF.  (DB Dep. 98-100; AB Dep. 86-88; LDB Decl. Ex. 45 at 1709.)  Indeed, Fluehr

went to Bank of America and Bartoletti did, in fact, speak to Bank of America about a job. (AB Dep. 86, 115-120; see also id.) Brownstein told Bartoletti he wanted her to remain at Citigroup and wanted to help her succeed. (LDB Decl. Ex. 45; AB Dep. 89-91; DB Dep. 104, 135-36; FC Decl. ¶ 16.) Brownstein also sought the assistance of Bartoletti's friend and Managing Director, John Heppolette, to convince her to accept the role. (AB Dep. 162-63, 155-58.)

**Response**

Dispute. Admit that Bartoletti took one of two days before she agreed to become Group Head, but dispute the argumentative use of the term "immediately." (Ex. 2, Bart. at 115:15-18). Dispute that there was concern that Bartoletti would follow Fluehr to whichever company he went to. The only authority cited supporting that proposition is Brownstein's testimony that Bartoletti told him she was considering leaving the Company, which is flatly disputed. (Declaration of Amy Bartoletti ("Bart. Dec.") at ¶5). Bartoletti also testified that she was not considering leaving the Company and going with Fluehr, and told two potential employers that she was not leaving the Company, including Bank of America. (Ex. 2, Bart. at 116:11-117:16). Admit that Brownstein told Bartoletti he wanted her to remain at Citi and wanted to help her succeed, but dispute the significance of this self-serving assertion. Bartoletti testified that Brownstein was being dishonest given the "subsequent layoff" in which he made the decision to terminate her. (Ex. 1, Bart. at 89:18-21). Dispute the statement that Brownstein also sought the assistance of Bartoletti's friend and Managing Director, Mr. Heppolette, to convince her to accept the role. The authority cited by Defendants does not support the statement because Bartoletti (upon which Defendants rely) testified that she did know what Mr. Heppolette was trying to do in speaking with her. (Ex. 2, Bart. at 162:16-163:11 (Q: "And so you thought Mr. Brownstein was using Mr. Heppolette to try to convince you to accept the position?" A: "I don't know what he was trying to do.")).

35.     When Koessel heard that Bartoletti had been offered the position to head the Group, he told Brownstein he wanted to be Co-Head and would explore other job opportunities if not also offered the position.  (MK Dep. 167-68, 171, 207-8; DB Dep. 136.)  Having reduced the Housing Group to just seven members, and not wanting to lose one of just two Directors, Brownstein and Chin agreed to ask Bartoletti and Koessel to be Co-Heads of the Housing Group, with Bartoletti to lead the student loans unit.  (FC Dep. 122, 130; DB Dep. 104 ("[I]f you [] made one of them head, the other one would have left.  And we wanted them both to stay."), 135-36 ("The reason that we named them co-heads [] was because we wanted to create as little turmoil as we could in trying to keep that group together."); FC Decl. ¶ 16; AB Dep. 46-47.)

**Response**

        Dispute.  Admit that Koessel told Brownstein he wanted to be Co-Head and would explore other job opportunities if not also offered the position, but dispute this rosy characterization of events.  Koessel threatened to quit if he was not named co-head.  (Ex. 1, Bart. at 45:17-46:4; Ex. 12, Koessel at 167:5-168:24 (testifying that he threatened to quit to Brownstein when he found out that Chin only wanted one head of Housing and was going to pick Bartoletti)).  Dispute that Brownstein and Chin "agreed" to ask Bartoletti and Koessel to be Co-Heads of the Housing Group – this decision was made by Brownstein alone.  (Ex. 27, Chin at 130:18-25 (testifying that the idea of co-heads was Brownstein's)).  Admit that Bartoletti was to lead the student loans unit because Koessel knew nothing about it, but dispute any implication that a significant portion of her time was spent working on student loans versus housing for the reasons described in response to ¶31.  (See also Ex. 1, Bart. 46:11-16).  Dispute that the reason Koessel and Bartoletti were named co-heads was because Citi wanted both to stay, as this is contradicted by Citi's EEOC position statement: "Bartoletti and Koessel were the only remaining directors in the group and neither had significant management experience.  As a result, in or

around July 2008, they were named co-heads of the Housing group." (Ex. 35 at Citi's *Bartoletti* EEOC position statement at p. 3 (page 3 overall in Ex. 35)). Further dispute that the reason Koessel and Bartoletti were named co-heads was because Citi wanted *both* to stay, as this is contradicted by Brownstein, who stated that Koessel was being made co-head to keep *Koessel* from quitting. (Ex. 1, Bart at 45:23-46:4).

36.   Because neither Bartoletti nor Koessel had significant prior managerial experience, Brownstein retained some of the functions of Group Head following Fluehr's departure, including selection of employees for fourth-round RIFs. (FC Dep. 43-44, 113-14, 123, 126 ("I didn't think either one was really qualified to run a group. . . .  They had never done it before, no experience."), 147; DB Dep. 90-91, 94-95, 104; FC Decl. ¶¶ 16-17.)

**Response**

Dispute. Admit that Koessel had no significant management experience, but dispute the same regarding Bartoletti for the reasons cited in response to ¶33. (Ex. 10, Fluehr at 71:20-72:6, 72:7-15; Ex. 1, Bart. at 54:22-55:13; Ex. 12, Koessel at 79:5-21; Ex. 28 (Fluehr Aff.) at ¶10, 11; Ex. 3, Siu at 125:24-126:20, 207:14-17; Ex. 25, Brown. at 133:3-8). Admit that Brownstein participated in the selection of employees for the November 2008 RIFs.

37.   By November 2008, the student loan business had become effectively nonexistent as problems in the credit markets essentially eliminated the viability of auction-rate securities, which were the primary funding vehicles for those clients, and the Company abandoned the business. (Id.; FC Dec. ¶ 18; FC Dep. 43-44 ("there was nothing I thought public finance could do to basically resurrect [the student loan] business."), 121.) After July 2008, the housing market underwent a precipitous downturn. (See supra ¶¶ 4-5, 21, 26.) Management considered disbanding the Housing Group in its entirety (id.; DB Dep. 105-6, 119, 131-32), and Bartoletti

herself "thought [] that the entire Housing Group would be let go [in November 2008.]"  (AB

Dep. 165.)

**Response**

  Dispute.  Dispute that the student loan business had become effectively non-existent by

November 2008.  (Ex. 28 (Fluehr Aff.) at ¶15).  In fact, in 2008, Bartoletti generated

approximately $900,000 in revenue on Student Loan accounts, including deals that closed at late

as July and August of 2008.  (Ex. 37 at CGMI_BART 016616-18 (revenue sheets showing

student loan transactions); see also Ex. 28 (Fluehr Aff.) at ¶15 (the student loan business had not

"dried up"); Ex. 12, Koessel at 118:5-13 (testifying about working on a student loan deal even

after Bartoletti's termination)).  This was revenue Koessel could not have generated because he

did not work on Student Loan business prior to Bartoletti's termination.  (Ex. 12, Koessel at

117:23-25).  Admit that Citi considered disbanding the Housing Group and that Bartoletti

believed the Housing Group might be disbanded in its entirety.

38.  As Brownstein described it:  "The conclusion was we would have a very slim housing

group with one near term purpose, and that was to have Citi continue to be somewhat of a

thought leader in the market when it comes to housing on the municipal side.  Clearly Citi was a

large player in the housing space overall . . . [but] our decision was [] to keep [] a very limited

footprint and its goal at that point wouldn't be about generating revenues [], but would be to

maintain thought leadership in the market."  (DB Dep. 105-6; FC Decl. ¶ 18.)  At the Director

level, the choice was between Bartoletti and Koessel.  (Id.)

**Response**

  Dispute.  Dispute that the sole purpose of the Housing Group was to be a "thought

leader" and not a revenue generator.  Specifically, in their EEOC position statement, the

Company lauded Koessel's purported efforts try to reinvigorate the Housing Group's "***business***."

(Ex. 35 at Citi's *Bartoletti* EEOC position statement at p. 3 (page 3 overall in Ex. 35)) (emphasis added).  "Business" refers to generating revenue as opposed to being a thought leader.  (See, e.g., Brown. at 126:22-127:18).  Moreover, Brownstein testified that revenue was "absolutely" "important" "[b]ecause we're in the business of making money."  (Ex. 25, Brown. at 130:25-6).  Brownstein also testified: "[U]ltimately, if we were going to remain in this business at all, long term, it had to be about revenues."  (Ex. 25, Brown. at 148:18-20).  Admit that Bartoletti and Koessel were the only Directors in the Housing Group in November 2008, but dispute the word "choice," as the support cited by Defendants for this word choice does not state that Citi was required to "choose" one or the other of the Directors to be terminated.

39.     Brownstein noted that through the financial crisis, Koessel had run a Housing Industry conference in Washington, D.C., had arranged and attended several meetings with the federal HUD agency and state Housing Finance Authorities across the country, and had conducted numerous meetings to strategize with and guide clients and others across the industry through an unprecedented crisis.  (DB Dep. 104-9, 131-32, 146-55, 158; MK Dep. 102-110.)  These activities positioned Koessel as an industry thought leader.  (DB Dep. 104-9, 131-32, 146-55, 158.)  Brownstein also believed Koessel had greater client relationships to maintain relevance in the housing space.  (DB Dep. 104-9, 128-29, 146-55, 158; see also MK Dep. 179-83.)

**Response**

        Dispute.  Admit that Brownstein noted that Koessel had run a Housing Industry conference in Washington, D.C., had arranged and attended several meetings with the federal HUD agency and state Housing Finance Authorities across the country, and had conducted numerous meetings to strategize with and guide clients.  Dispute the significance of this purported activity, as much of it took place after the decision to terminate Bartoletti was made.  (See, e.g., Ex. 25, Brown. at 153:13-22 (testifying that he is unsure whether Koessel's work with