the federal government to find certain solutions occurred after 2008), 158:14-159:6 (testifying that it is only his "personal view as of today" and "based on what he knows today" that leads Brownstein to believe that Koessel has more experience in the housing side of the Housing Group's business)).  Dispute that Koessel had "run" a Housing Industry conference in Washington, D.C., as that conference was largely planned by Fluehr before he was terminated. (Ex. 2, Bart. at 127:10-19).  Moreover, these purported activities did not generate revenue for Citi.  (Ex. 2, Bart. at 130:18-25).  Dispute the conclusory, argumentative and unsupported assertion that these purported activities "positioned Koessel as an industry thought leader," as the testimony cited says no such thing.

Dispute that Brownstein believed that Koessel had greater client relationships to maintain relevance in the housing space.  Between July and November 2008 alone, the Housing Group, as a result of Bartoletti's work, signed up two new clients, Kentucky Housing and New York City Housing and Development Corporation ("HDC").  (Ex. 2, Bart. at 101:23-104:12).  Kentucky was a huge prospect in 2008 and has become a very large client for Citi.  (Ex. 12, Koessel at 101:3-21).  Bartoletti also priced and closed at least three additional deals in September 2008. (Ex. 1, Bart. at 93-94, 128:22-129:12; see also Ex. 12, Koessel at 183:12-184:9 (admitting that Bartoletti participated in bringing in deals with the States of North and South Dakota deals, and that they generated revenue for Citi)).  Between July and November 2008, Bartoletti was "trying to make sure [Citi] didn't lose any clients . . . So [she] was really, really busy on the phone with clients, traveling, making sure [Citi] didn't lose anybody, and then trying to organize [the Housing Group] group and put together targets and make sure we had enough people focusing on the right accounts and making sure we were doing what we needed to do to grow the business." (Ex. 2, Bart. at 129:12-21).  In fact, Koessel took the Washington, D.C. conference over from

Fluehr because "[Bartoletti] had several live deals going on at the time so [she] was a little bit more worried about keeping [ ] clients and producing revenues and having time to be able to focus on that." (Ex. 2, Bart. at 127:23-128:5). When Fluehr was terminated in July 2008, Bartoletti actually flew to Alaska within 36 hours of to save the Alaska Housing client. (Ex. 1, Bart. at 100:8-22; Ex. 12, Koessel at 180:2-11).

Throughout her employment, Bartoletti's clients would "constantly" inform the Company that she did an "outstanding job" and "gave them great services, was very smart and intelligent." (Ex. 10, Fluehr at 135:8-15). Bartoletti was also lauded for having "fantastic client skills." (Ex. 39 at PL 14700 (July 2006 Bartoletti peer review); see also Ex. 12, Koessel at 165:12-15). Mr. Fluehr "received uniformly positive feedback from clients regarding Ms. Bartoletti." (Ex. 28 (Fluehr Aff.) at ¶12). Even Koessel admits she did an "excellent job with clients;" (Ex. 12, Koessel at 158:11-15). More specifically, Bartoletti had the primary relationship with Texas Housing, which Koessel did not work on at all and Brownstein believed to be a very big client. (Ex. 11, Fluehr at 215:23-216:9; Ex. 25, Brown. at 148:21-149:14). Bartoletti also held the primary relationship with the State of North Dakota, which even Koessel admitted was a "large client." (Ex. 12, Koessel at 99:15-20). When Bartoletti was terminated, North Dakota wanted to know what happened and felt "very exposed to Citi all of a sudden because the person they connected with at Citi was gone." (Ex. 13, Koessel at 219:3-20). Brownstein admits that Citi lost business because it terminated Bartoletti, including South Dakota and perhaps North Dakota. (Ex. 25, Brown. at 127:11-18).

Finally, Bartoletti's client relationships consistently generated more revenue for the Company than Koessel's relationships. (See, e.g., Ex. 37 PL 01685-88 (compiled revenue numbers) (showing that Bartoletti generated $10,000,000 more than Koessel from 2005 through

her termination); compare Ex. 37 at CGMI_BART 016973 (Bartoletti 2007 revenue sheet) with

Ex. 37 at CGMI_BART 015547 (Koessel 2007 revenue sheet), Ex. 12, Koessel at 149:15-150:9

(showing that Bartoletti generated approximately $1,000,000 more than Koessel in 2007, her last

full year of employment, and quite possibly much more according to Koessel's own

admissions)).  As such, it is implausible that Brownstein believed Koessel had greater client

relationships to maintain Citi's relevance in the housing "space."

40.     In contrast, Brownstein did not believe Bartoletti was well positioned to navigate clients

through the increasingly difficult economic landscape; she had not made efforts to establish

herself as a thought leader.  (DB Dep. 105-09, 154, 158.)  By her own admission, she had not

been engaged in industry conferences, meetings, or speaking events.  (AB Dep. 127 ("Q:  After

you were appointed co-head, did you arrange for any industry programs about the housing group

or the housing industry as a whole?  A:  I did not."), 127-31.)  Rather, Bartoletti was managing

deals and studying for her Series 53 licensing exam,[9] while Koessel was organizing and chairing

conferences and meeting with clients.   (See id. at 127-31; MK Dep. 179-183 (indicating that

Koessel was spearheading initiatives and meeting with State housing agencies and organizing

conferences while Bartoletti was managing people and whatever deals remained in the office).)

**Response**

Dispute.  Dispute that Brownstein did not believe Bartoletti was well-positioned to

navigate clients through the increasingly difficult economic landscape for the reasons cited in

response to ¶39. (See e.g., Exs. 1, 2, Bart. at 100:8-22, 101:23-104:12, 127:23-128:5, 128:22-

129:12, 129:12-21; Exs. 12, 13, Koessel at 99:15-20, 101:3-21, 149:15-150:9, 165:12-15, 180:2-

11, 183:12-184:9, 219:3-20; Exs. 10, 11, Fluehr at 135:8-15, 215:23-216:9; Ex. 37; Ex. 28

---

[9] Chin, who was responsible for establishing the regulatory requirements for the PFD, confirmed that neither he nor any regulatory body required Group Heads to hold a Series 53.  (FC Dep. 19-20, 113.)

(Fluehr Aff.) at ¶12; Ex. 25, Brown. at 127:11-18, 148:21-149:14; Ex. 37 PL 01685-88

(compiled revenue numbers) (showing that Bartoletti generated $10,000,000 more than Koessel

from 2005 through her termination); compare Ex. 37 at CGMI_BART 016973 (Bartoletti 2007

revenue sheet) with Ex.37 at CGMI_BART 015547 (Koessel 2007 revenue sheet), Ex. 12,

Koessel at 149:15-150:9 (showing that Bartoletti generated approximately $1,000,000 more than

Koessel in 2007, her last full year of employment, and quite possibly much more according to

Koessel's own admissions)).  Further dispute this proposition on the basis that, in the middle of

the financial crisis, Bartoletti was initially chosen to be the sole Head of the Housing Group over

Koessel.  (Ex. 39 at CGMI_BART 015172-74 (email correspondence concerning Bartoletti's

promotion to Group Head); Ex. 1, Bart. at 45:9-16).  Dispute that Bartoletti was not engaged in

any industry conferences, as she presented at one as late as October 2008.  (Bart. Dec. at ¶7).

Further dispute the fact that Bartoletti had not been engaged in "meetings," as the

quotation does not even support this assertion and the evidence demonstrates that she engaged in

numerous meetings with clients.  Indeed, as explained, Bartoletti was able to secure two new

clients between July and November 2008, Kentucky and New York City HDC.  (Ex. 2, Bart. at

101:23-104:12).  Bartoletti also priced and closed two additional deals in September 2008 that

generated revenue for Citi.  (Ex. 2, Bart. at 128:22-129:12; see also Ex. 12, Koessel at 183:12-

184:9 (admitting same)).  Between July and November 2008, Bartoletti was "trying to make sure

[Citi] didn't lose any clients . . . So [she] was really, really busy on the phone with clients,

traveling, making sure [Citi] didn't lose anybody."  (Ex. 2, Bart. at 129:12-21).  She even flew to

Alaska after Fluehr's termination to secure Citi's relationship with Alaska Housing.  (Ex. 12,

Koessel at 180:2-11); Bart. Dec. at ¶8; see also Ex. 2, Bart. at 131:2-8 (Bartoletti focused

primarily on, inter alia, "servicing clients.").  Between June and the time she was terminated,

Bartoletti also visited clients in North Dakota, Massachusetts, Connecticut, New York, Kentucky, New Jersey, Ohio and Tennessee, among others.  (Bart. Dec. at ¶8).  Moreover, from July to November 2008, Bartoletti was at work earlier and later than Koessel, and Koessel would disappear for hours in the middle of the day, resulting in Bartoletti "spending many more hours focused on work than [Koessel] was during that time period."  (Ex. 2, Bart. at 131:11-18).  Koessel "was not taking as much responsibility as [Bartoletti] for managing the overall accounts and for coming up with target lists and client lists and figuring out who was doing what."  (Ex. 2, Bart. at 131:23-132:4).

Thus, while Bartoletti managed deals and studied for the Series 53 exam, dispute that this is all she did from July to November 2008.

Dispute the implication that the Series 53 was not required of Group Heads.  Citi communicated to its employees that the Series 53 was a requirement to be a Group Head, and Bartoletti received an email stating this.  (Exs. 1, 2, Bart. at 55:20-22, 121:8-122:7; see also Ex. 28 (Fluehr Aff.) at ¶20 (it was always Fluehr's understanding that the Head of the Housing Group was required to have taken and passed the Series 53 examination)).  Koessel was told he needed to take the Series 53 in the summer of 2008 to be a Group Head.  (Ex. 12, Koessel at 44:5-45:4).  Koessel also testified that having a Series 53 license is an industry-wide requirement in order to be a Group Head.  (Ex. 12, Koessel at 42:2-11).  In fact, Koessel testified that he was not Head of the Housing Group prior to passing the Series 53 in 2010 (he had not passed it when Bartoletti was terminated) and that he was not permitted to use that title or put it on his business card until he passed the exam.  (Ex. 12, Koessel at 42:12-23, 169:8-170:3, 177:6-10).  Brownstein testified that a Series 53 is required for anyone who engages in supervisory-level functions.  (Ex. 25, Brown. at 14:10-15).  Koessel even unequivocally admitted that Bartoletti

55

was qualified to head the group per these regulatory considerations, whereas he had not passed

his Series 53 as required to head the group.  (Ex. 12, Koessel at 169:8-170:3).

41.    Brownstein also noted that several of Bartoletti's clients were in the student loan space

that the Company was abandoning and she had fewer relationships than did Koessel with large

housing clients.  (DB Dep. 93-94, 97, 98, 101-2, 105-8, 114-15, 125-30, 146-55, 158; see also

FC Dep. 197 ("Amy [spent a lot of time] on student loans, and Mike was purely a housing

banker.").)  In short, Brownstein believed Koessel was the better positioned than Bartoletti to

help important clients through the crisis and thus allow the Company to remain relevant in the

Housing space.  (Id.; FC Decl. ¶ 19)  In addition, given Bartoletti's comparatively higher

compensation (as a result of having matched the Morgan Stanley offer), Brownstein determined

that it was more cost-effective to have Koessel cover the business while management tried to

ascertain whether the group had any future.  (DB Dep. 105-8, 114-15, 118; FC Decl. ¶ 19.)  Chin

agreed with Brownstein's recommendation, and they selected Bartoletti to be let go in the fourth

RIF.  (FC Dep. 133, 137-38, 141-43, 197; FC Decl. ¶ 19.)

**Response**

    Dispute.  Dispute that the testimony cited supports the proposition that "Brownstein also

noted that several of Bartoletti's clients were in the student loan space that the Company was

abandoning and she had fewer relationships than did Koessel with large housing clients."  For

instance, pages 93-94, 97, 98, 101-102 and 114-15 of the Brownstein deposition, cited by

Defendants, do not even reference the student loan business or the number of relationships

Bartoletti or Koessel had with large housing clients.  Dispute that "several" of Bartoletti's clients

were in the Student Loan "space."  "[I]n 2008, for example, [Bartoletti] only had four student

loan clients total, one of which was a co-managed client."  (Ex. 1, Bart. at 39:17-25).  By

contrast, in 2008 Bartoletti had approximately twenty housing clients and her "focus was to build

and grow the housing business." (Ex. 1, Bart. at 39:22-40:8). In both 2007 and 2008, Bartoletti

spent only about 10% of her time on student loan clients. (Ex. 1, Bart. at 43:9-44:5; see also Ex.

37, (CGMI_BART 016971-016973) (showing that Bartoletti completed only six student loan

transactions in 2007); Ex. 37 (CGMI_BART 016316-016318) \ (showing that Bartoletti

completed only four student loan transactions in 2008)).

Further dispute that Bartoletti had fewer relationships than did Koessel with large

housing clients for the reasons described in response to supra ¶¶39, 40. Dispute that Brownstein

believed Koessel was better-positioned than Bartoletti to help important clients through the crisis

and thus allow the Company to remain relevant in the Housing space for the reasons described in

response to supra ¶¶39, 40 (describing, *inter alia*, Bartoletti's relationships with major clients,

that Bartoletti's relationships generated far more revenue than Koessel's, that Bartoletti saved

client relationships and developed new ones from July to November 2008 and that Bartoletti's

clients became insecure with Citi after she was fired); see also, Ex. 28 at ¶¶9, 14, 15, 16

("Bartoletti's performance exceeded that of Mr. Koessel's in every category," "by all relevant

performance metrics, Ms. Bartoletti was better suited to lead the Housing Group than Mr.

Koessel," "[t]here is no question whatsoever that Ms. Bartoletti was better qualified than Mr.

Koessel to lead the Housing Group," and "the decision to retain Mr. Koessel instead of Ms.

Bartoletti is completely irrational and cannot be justified."); Ex. 2, Bart. at 168:22-169:16

(Brownstein actually believed Bartoletti was more qualified than Koessel because, *inter alia*: (a)

Citi had initially pegged her to be sole head of housing; (b) Bartoletti's bonuses were higher than

Koessel's; (c) Bartoletti was at Citi longer than Koessel; (d) Bartoletti had more housing

experience than Koessel; (e) Bartoletti had passed the Series 53 and Koessel had not; (f)

Bartoletti was given managerial responsibilities that Koessel was not; and (g) Bartoletti had been

nominated to MD and Koessel had not.); Ex. 28 at ¶13 (Bartoletti received higher discretionary

bonuses because of her superior performance); Exs. 10, 11, Fluehr at 199:25-200:6 (Koessel was

not nominated for MD); Ex. 12, Koessel at 80:20-81:14 (same)).

Admit that Bartoletti's compensation was higher than Koessel's, but dispute that this

played any role in the decision to terminate her employment.  Bartoletti and Koessel were paid

the exact same salary, and although Bartoletti's bonus compensation was higher, the bonus

component of both her and Koessel's compensation was entirely discretionary.  (Ex. 28 at ¶16).

"Thus, the decision whether to retain Bartoletti or Koessel was cost-neutral." (Ex. 28 at ¶16).

Moreover, Koessel received significant increases in base salary in 2009 and 2010.  (Ex. 38 at

CGMI_BART 01210 (Koessel salary figures)).

Dispute that the purported non-discriminatory reasons described in ¶41 were the actual

reasons for Bartoletti's termination.  Defendants have advanced numerous inconsistent reasons

for the decision.  First, Brownstein unequivocally testified to a single purported reason for the

termination of Bartoletti: "[t]he decision I made to have Mike stay and not Amy was because

Mike had the capacity and capability and experience to serve in that thought leadership role as

opposed to simply a banking role." (Brown. Ex. 25 at 106:9-13).  Then, in a completely separate

colloquy, Brownstein testified that Bartoletti's higher compensation was a factor in the decision.

(Ex. 25, Brown. at 114:15-115:8).  In yet another distinct colloquy, Brownstein added

Bartoletti's student loan work as a factor in the decision to terminate her.  (Ex. 25, Brown at

126:14-19); see also (Ex. 35 at Citi's *Bartoletti* EEOC position statement at p. 3 (page 3 overall

in Ex. 35) (citing as a reason for Bartoletti's termination that her "primary focus" was on student

loans, which was "becoming extinct")).  Later, after being confronted with Defendants' EEOC

position statement, Brownstein advanced different reasons for Bartoletti's termination; namely,

that Koessel purportedly had more experience in the housing business than Bartoletti and stronger client relationships.  (Ex. 25, Brown at 146:12-155:2).  However, Brownstein was forced to admit that his purported belief that Koessel had more experience in the housing business than Bartoletti was only based on what he knows "today" (*i.e.*, the day of his deposition on August 3, 2012) and not what he knew when he made the termination decision.  (Ex. 25, Brown. at 158:14-159:6).  Finally, while Brownstein advanced multiple inconsistent reasons for the decision to terminate Bartoletti, Chin testified that the "***sole criterion***" for the decision made by him and Brownstein was that "Amy was the most highly compensated between herself and Mike."  (Ex. 27, Chin at 141:17-143:6) (emphasis added).  Each of these reasons is also false for the reasons described in the response to ¶¶39-41.

Brownstein's drawing of a distinction between the "thought process" role and "simply a banking role" undercuts the purported importance of Koessel being "purely a housing banker," which is cited by Defendants in ¶41 as yet another justification to retain Koessel.  In any event, in her reviews, Bartoletti was lauded as "probably the best banker in the [Housing] group" and "all in all, a great banker."  (Ex. 39 at PL 14701, 14703).  Even Koessel admitted that Bartoletti was a "very good banker."  (Ex. 12, Koessel at 141:7-23).  Brownstein also admitted that Bartoletti was "very capable as a banker."  (Ex. 25, Brown. at 113:23-114:2).

There also is significant evidence demonstrating Bartoletti was terminated due to her gender, including the fact that, as described above, Defendants have advanced inconsistent and false non-discriminatory justifications for the decision.  The record is replete with other evidence of discriminatory animus.  (See, e.g., Ex. 1, Bart. at 48:9-49:19 (testifying to evidence of Brownstein's gender bias, including that: (a) every woman in the Housing Group was terminated in the November RIF; (b) each was selected instead of less-qualified men; (c) the percentage of

women laid off in the November RIF as compared to men; (d) Brownstein had engaged in discrimination against women in his prior role as Head of the Derivatives Group; (e) Brownstein made a specific effort to befriend the men in his group, take them out to meals, go drinking with them and even take them on vacations, which he did not do with female employees); Ex. 1, Bart. at 74:19-77:6 (Bartoletti was not invited golfing with a client even though she was one of the primary persons on the account and a male colleague who was not even on the account was invited instead); Ex. 1, Bart. at 80:19-81:13 (men occupy most or all of the higher level positions at Citi, and "all of the higher level positions within public finance and municipal securities, are held by men."); see also Ex. 29 (2006 MSD Diversity Report) (showing that in mid-2006 91% of MDs were male and 87% of Directors were male)). Moreover, as explained in Plaintiffs' response to infra at ¶77, the November RIF decision-making process resulted in a discriminatory outcome, the number of women as compared to men is statistically significant, there is less than 2 in 1000 chance (<0.002%) that the statistics are a mere coincidence and Citi's highest positions are occupied almost entirely by men. Other women within the PFD (in addition to the Plaintiffs herein and all of the women affected by the November 208 RIF) also were subjected to discrimination. (See, e.g., Ex. 2, Bart at 147:9-148:11).

42.     Bartoletti testified she has no idea how the termination decision was made, who made it, or what factors they considered. (AB Dep. 53, 56.)

**Response**

Dispute. The authority cited does not stand for the assertion. Bartoletti did not testify that she had no idea who made the decision, but rather that "I don't know specifically who made all of the decisions. I know there were several people involved, but I know Mr. Brownstein was one of the people involved in those decisions." (Ex. 1, Bart. at 53:16-25). The word "factors"

60

does not even appear in the cited sections of Bartoletti's deposition and, as explained in response to ¶41, Bartoletti expressly testified that gender discrimination motivated the decision.

43.　　After her employment with Citigroup ended, Bartoletti joined Fluehr at Ramirez and Co. due to her "loyalty" to Fluehr.  (AB Dep. 105-6, 235-36. 261-63.)  While at Ramirez, they shopped themselves as part of a team to other companies, and when Fluehr left Ramirez to go to Wells Fargo, Bartoletti also sought out job opportunities at Wells Fargo.  (Id.)

**Response**

　　Dispute.  Dispute that the reason Bartoletti joined Ramirez and Co. was due to her "loyalty" to Fluehr.  Bartoletti explicitly testified that "from an economic standpoint I truly believed at that time that I was going to be better off going to Ramirez."  (Ex. 2, Bart. at 253:17-254:3).  Admit that Fluehr and Bartoletti approached Wells Fargo for employment as a team.

**F.　　Plaintiff Conley's Employment with the Healthcare Group**

44.　　Conley was originally hired in 1997 by Fred Hessler and Dave Cyganowski as an Assistant Vice President in the Healthcare Group.  (LC Dep. 81, 85-86; FH Dep. 35-37). Throughout her employment, she worked in the Chicago office.  (LC Dep. 70.) Hessler and Cyganowski promoted Conley twice, first to Vice President in January 1999, and then to Director in January 2005.  (LC Dep. 90, 92-93; FH Dep. 38, 42-43; DB Dep. 11.). Conley's promotion to Director brought with it added responsibilities, including originating and delivering business and becoming a primary or lead relationship manager.  (DC Dep. 100-103; FH Dep. 48-49, 339.)

**Response**

　　Dispute.  Admit that Conley was originally hired in 1997 by Hessler and Cyganowski as an Assistant Vice President in the Healthcare Group.  Admit that Conley worked primarily in Chicago, but dispute that she worked exclusively in Chicago as the cited testimony does not

support that proposition.  Admit that Conley was promoted twice, but dispute that the cited

testimony supports the proposition that Hessler and Cyganowski were solely responsible for the

promotions. (Ex. 21, Hessler at 38 (stating only that he "recommended" promotion); Id. at 42-43)

(stating that all the Managing Directors and Directors were involved in the decision as well as

Chin and Ward)).  Admit that the promotion to Director came with added responsibility, but

dispute that the cited testimony supports the proposition that originating and delivering business

was a job responsibility of all Directors; rather, it was merely a factor considered in determining

who would become a Director.  Moreover, Hessler testified that they did not even expect Conley

to lead accounts.  (Ex. 22, Hessler at 339 ("Q:  What I'm asking you now is, at the time of her

termination was there an expectation that she should have been the lead on more than one

account?  A:  At that point in time, no.")).

45.    Conley, however, struggled in developing these skills.  (FH Dep. 335-36, 338-39.)

While she was a strong number two, working closely with Managing Director Dave Johnson, she

was less adept in a lead role.  (DC Dep. 120-23, 145-46; FH Dep. 72, 203, 294-98, 335-36, 338-

39.)  She had little business that she had developed and few, if any, significant client

relationships that viewed her as their primary trusted advisor.  (FH Dep. 335-36, 338-39; DC

Dep. 120-21, 154-55, 174-75.)  She had also shown that, when a client's main point of contact

for the account was not available, she was not helpful in stepping in and trying to deal with the

client's issue.  (DC Dep. 174-76, 349, 359-61.)  In addition, when provided with opportunities to

lead professional development initiatives, Conley did not follow through.  (DC Dep. 174-76,

335, 342-343; FH Dep. 341-42, 345-46.)

**Response**

Dispute.  Dispute that Conley struggled developing these skills as the cited testimony

does not support that proposition and further dispute as the documentary and testimonial

evidence establishes that Conley thrived in developing these skills. (Ex. 48, CGMI_BART 000682-000690; Ex. 21, Hessler at 81-85, 89-90, 92-93). Dispute that Conley was less adept at a lead role. (Ex. 21, Hessler at 89-90; Ex. 7, Conley at 102-106). Dispute that Conley had little business or few significant client relationships where she was their primary trusted advisor. (Ex. 47 at CGMI_BART 016354; Ex. 23, Pell. at 168-169 (testifying that the asterisk on revenue sheets denotes the lead banker); Ex. 7, Conley at 102-106, 129-130; Conley Dec. at ¶3)). Dispute that the cited testimony supports the proposition that Conley had shown that she was not available for clients or that she was not helpful in dealing with client issues, further dispute the implication that this factored into her termination (Ex. 22, Hessler at 340), and  dispute as inconsistent with various other reasons given for her termination. Dispute that Conley did not follow through with opportunities to for professional development as that proposition is contradicted by documentary evidence. (Ex. 48 at CGMI_BART 000682-000690; Ex. 22, Hessler at 335)).

46.    By November 2008, the Healthcare Group had already undergone two RIFs, and Conley had been selected by Hessler and Cyganowski for retention each time. (FH Dep. 254; see also RIF Data)  In those two RIFs, four of Conley's male Director-level colleagues were terminated. (Id.)[10]  In connection with the November RIF, Hessler assessed the skills, contributions and overall performance of the remaining employees in the Group. (Id. at 293-95.)  Hessler focused his analysis on an assessment of what moves could be made within the Group that would have the least impact on existing business while allowing the Group to successfully bring in new business going forward. (Id.)  Hessler also sought to identify those officers who would present the least risk associated with taking clients or other employees. (Id. at 293-95.)

---

[10] Conley believes all men were selected for termination for performance reasons, but all women were selected because of their gender. (LC Dep. 22-23, 30-31, 95, 116-17.)

**Response**

Dispute.  Dispute that by November 2008 the Healthcare Group had already undergone two RIFs as no time frame is provided in which to assess the proposition.  Dispute that the RIF was tied or connected in any way to previous "rounds" of layoffs as unsupported by any admissible evidence and contradicted by Chin who testified that RIF was not discussed until late October 2008, (Ex. 27, Chin at 25, 29-32).  Dispute that in any Hessler or Cyganowski "selected" anyone for termination or retention in any RIF as unsupported by the cited testimony; however, admit that prior to her termination, Conley was employed at Citi.  (See ¶6).  As to Footnote 11, dispute that the cited testimony supports the proposition that Conley believes all men were terminated for performance reasons and all women were selected because of their gender as Conley testified that she had no basis to believe the men were not discriminated against and that it was illegal to terminate four of the five female directors "in one fell swoop." (Ex. 7, Conley at 23).  Dispute that in connection with the November RIF, Hessler assessed the skills, contributions and overall performance of the remaining employees as completely unsupported by the cited testimony.  (Ex. 22, Hessler at 293-95).  Dispute that Hessler focused his analysis on an assessment of what moves could be made within the Group that would have the least impact on existing business while allowing the Group to successfully bring in new business going forward as completely unsupported by the cites testimony, further dispute that any termination decisions were made based on "his analysis" as contradicted by the testimony. (Id; Ex. 22, Hessler at 283-288, 292-293; Ex. 14, Cyg. at 308, 322-323; Ex. 15, Cyg. at 325, 346).  Admit that Hessler testified that he sought to identify those officers who would present the least risk associated with taking clients or other employees as contradicted by testimony, but dispute the truth of his testimony as contradicted by testimonial evidence and the weight of the entire evidentiary record which establishes that Conley was selected for the November RIF on

account of her gender.  (See, e.g., Ex. 7, Conley at 23-27).  Dispute that Hessler sought to identify any employees for the November RIF as unsupported by the cited testimony and contradicted by the testimonial evidence that he did not identify the individuals to be terminated. (Ex. 22, Hessler at 283-288, 292-293; Ex. 14, Cyg. at 308, 322-23; Ex. 15, Cyg. at 325, 346).

47.      Hessler readily concluded there was little risk of Johnson taking client with him, as many of the clients her serviced were long-term clients of the Company.  (Id.)  In the RIF, Johnson was the only Managing Director terminated, while three female Managing Directors were retained. (LC Dep. 30.)  Hessler and Cyganowski elected to retain the three female Managing Directors, using the same assessment.  (See FH Dep. 293-94, 328-29; DC Dep. 318-19.)  One of those, Teri Hartman, had been promoted to Managing Director upon Hessler and Cyganowski persuading a male senior Managing Director to take a step back in order to free up a slot for Hartman.  (FH Dep. at 243-47.)

**Response**

Dispute.  Dispute that Hessler made any conclusions in the November 2008 RIF as contradicted by the testimonial evidence that he did not identify the individuals to be terminated. (Ex. 22, Hessler at 283-288).  Dispute that Johnson was the only Managing Director terminated in the November 2008 RIF as unsupported by the cited testimony, but admit that three Managing Directors were maintained.  (Ex. 7, Conley at 30).  Dispute that Hessler and Cyganowski made any decisions to retain any employees as such proposition is contradicted by the testimony and further dispute that the cited testimony supports any portion of the stated proposition. (Ex. 22, Hessler at 283-288, 292-293; Ex. 14, Cyg. at 308, 314, 315, 323; Ex. 15, Cyg. at 325, 346). Dispute that the cited testimony supports the proposition that Hessler and Cyganowski persuaded a male Managing Director to take a step down, but admit the rest. (Ex. 21, Hessler at 243-47.).

48.     Hessler concluded that there was a "[v]ery low risk of [Conley] taking business and very low risk of her being able to recruit people who might otherwise still be in our group." (FH Dep. 296-97; see also DC Dep. 347-51.)  Similar to, and often in conjunction with, Johnson, Conley worked predominantly on long-term clients of the Group "and therefore the judgment was there would be low risk of [] losing that business because they were essentially institutionalized clients." (FH Dep. 298; accord id. at 300-302, 305-7, 312, 314, 335-36, 338-39.)[11]

**Response**

Dispute.  Dispute that Hessler made any conclusions in connections with the November RIF as contradicted by the testimonial evidence, but admit that Hessler testified as quoted.  (Ex. 22, Hessler at 283-288, 292-293).  Dispute that Conley worked predominantly on long-term clients of the Group as contradicted by the testimonial and documentary evidence that she developed and originated new business, but admit that Hessler testified as quoted.  (Ex. 48, CGMI_BART 000689-000690).

49.     Hessler believed that selecting any other Directors would be more damaging because there would be a greater risk of losing clients or personnel.  (FH Dep. 297 ("if you eliminated [] Michael Brown there was a high probability of losing clients"), 312-316 (identifying those clients), 298 & 300 (whereas Conley had a relationship with Nebraska Methodist, a small client, "Ryan Freel[] had a key relationship with SSM[,] there was a risk that we could lose that [big client]."), 303-4 ("Ryan had the best relationship with [SSM]), 318 ("Victor [Radina], if he were terminated and [were] to go to another firm, he could be very influential in hiring VPs and star associates."), 318-19 ("Charles Plimpton, [could take both] [p]eople and clients.  [H]e was a revenue generator[.]"), 319 ("Charles Lee, [he could take] [p]eople. . . .  And [] we were

---

[11] In fact, the Company did not lose any significant clients or deals because of terminating Conley.  (FH Dep. 327-28; DC Dep. 354; see also id.).)

concerned that if we terminated him, that we would lose that ability to have someone come in and work on complicated, complicated clients."), 319-20 ("Mike Irwin was [a] senior banker, revenue generator, and did and still does a lot to establish our brand in the industry."), 321-22 ("Kent Jackman, he was a senior banker . . . [and] had a lot of primary relationships with . . . some of our important critical clients."), 324-25 (Pat Sheehan "had established a number of relationships with [clients that had huge upside potential] that potentially could be a flight risk").

**Response**

Dispute.  Dispute that Hessler selected any employee for termination as contradicted by the testimonial evidence and the weight of the entire evidentiary record which establishes that Conley was selected for the November RIF on account of her gender, but admit that Hessler testified as quoted.  (Ex. 22, Hessler at 283-288, 292-293; Ex. 7, Conley at 23-27).

50.     Cyganowski concurred, noting that "all of the Directors that remained after the fourth RIF were ahead of Lisa Conley with respect to driving business and revenue."  (DC Dep. 292, 352-53.)  Cyganowski also noted that Conley had failed to follow through on professional development opportunities.  (Id. at 244, 292.)  Thus, while the other officers had successfully become the lead or originating contacts for clients who might leave if any of them were terminated, Conley had not done so, aside from one small client (Nebraska Methodist).  (FH Dep. 299, 335-36, 339; DC Dep. 244, 349-51, 298-300.)  For all these reasons, Hessler and Cyganowski included Conley in the November 2008 RIF.  (FH Dep. 329.)

**Response**

Dispute.  Dispute that Hessler and Cyganowski selected any employee for termination and therefore that Cyganowski "concurred" with any selection purported to be made by Hessler. (Ex. 22, Hessler at. 283-288, 292-293; Ex. 14, Cyg. at 308, 314, 315 ("I did not select Lisa Conley for termination"), 323; Ex. 15, Cyg. at 325, 346).  Dispute that Conley failed to follow

through on professional development opportunities, but admit that Cyganowski testified as such. (Ex. 48 at CGMI_BART 000690).   Dispute the implication that "professional development factored into Conley's termination. (Ex. 22, Hessler at 335).   Dispute that Conley had not become the lead or originated contact for clients who might leave if she was terminated and further dispute that Nebraska Methodist was a "small" client. (Ex. 48, CGMI_BART 000689-000690; Ex. 7, Conley at 104-105).   Dispute Hessler and Cyganowski selected or included Conley or any employee in the November RIF. (Ex. 22, Hessler at 283-288, 292-293; Ex. 14, Cyg. at 308, 314, 315 ("I did not select Lisa Conley for termination"), 323; Ex. 15, Cyg. at 325, 346).

51.     Conley admits she has no idea how the termination decision was made, who made it, or what factors they considered (LC Dep. 26-27, 95) and that, in fact, it was her lack of understanding that lead her to jump to the conclusion that she was "illegally fired." (Id. at 23.)

**Response**

Dispute.  Dispute that Conley testified that she had "no idea" as to any of the items mentioned as unsupported by the cited testimony and further dispute that Conley testified that any purported lack of understand led her to conclude the she was illegally fired.  To the contrary, Conley testified that it was due to her understanding of the specific circumstances of her termination that led her to believe she was discriminated against. (Ex. 7, Conley at 23- 26, 201-202).

52.     To establish her purportedly superior qualifications, Conley relies on her "knowledge of the situation" (Conley Dep. 202) and that she was told "over the years [] that I was terrific and manage processes better than other kind[s] of midlevel bankers they had worked with. [T]hat's my answer."). (Id. at 204.)

**Response**

Dispute. Admit that Conley has superior qualifications, but dispute that Conley relies solely on her "knowledge of the situation" to establish such qualification as unsupported by the cited testimony and further dispute as Conley superior qualifications are demonstrated by, *inter alia*, her performance reviews, revenue sheets and the testimony of Hessler and Cyganowski. (Ex. 21, Hessler at 85, 89-90; Ex. 14, Cyg. at 33; Ex. 47, CGMI_BART 015462, 016354; Ex. 48, 000689-000690)

53.    Conley also attempts to rely on "revenue sheets" (that she saw for the first time in discovery and after filing her lawsuit), claiming these demonstrate she was more valuable and had more business and client relationships than other Directors.  (LC Dep. 202-3.)  Her reliance on these documents is entirely misplaced.  Both Hessler and Cyganowski testified that these documents merely indicate everyone who "touched" a deal in any capacity and tell nothing about the relative contribution of any individual or who maintained the key relationships with each client.  As a result, Hessler and Cyganowski testified that these sheets are of little to no value, and they certainly did not consider these "revenue sheets," when selecting individuals for termination.  (FH Dep. 170-71, 288-89, 310; DC Dep. 104-7, 246 ("I wouldn't review [these] at all. . . .  Frank [Chin] would have it sent to Fred and me [and] I ignored it, yes."), 247 ("Q:  So you and Fred [Hessler] never discussed this document?  A:  No."), 259 ("I'm telling you this is a report that is meaningless and is inaccurate.  So I'm not going to say that this is a listing of Lisa's revenue contribution for the year. . . .  I don't know whether these numbers are right or not.  And this report is meaningless to me as co-head.").)

**Response**

Dispute.  Admit that Conley's revenue sheets demonstrate that she was more valuable and had more business and client relationships than other Directors.  Dispute Defendants'

statement that Conley's "reliance on these documents is entirely misplaced" as that statement is not supported by any admissible evidence and constitutes an argument, not a statement of a "material fact as to which the moving party contends there is no genuine issue to be tried," as required by Local Rule 56.1(a).  Dispute that Hessler and Cyganowski testified that "revenue sheets merely indicate everyone who 'touched' a deal in any capacity and tell nothing about the relative contribution of any individual or who maintained the key relationships with each client" as Defendants have failed to cite to any admissible evidence to support that proposition in contravention of Local Rule 56.1(d).  Admit that Hessler and Cyganowski testified as cited, but dispute that either testified that the revenue sheets are "of little to no value," dispute the accuracy and truthfulness of the testimony as unsupported by the cited evidence, dispute that Hessler and Cyganowski "selected" any employee for termination.  (Ex. 22, Hessler at 283-288, 292-293; Ex. 14, Cyg. at 308, 314, 315, 323; Ex. 15, Cyg. at 325, 346).

**G.**    **Plaintiff Mentor's Employment with the Southeast Regional Group**

54.    Mentor and Pellegrini had worked together at UBS for several years.  (NP Dep. 55.) When Pellegrini was recruited to join PFD and lead its Southeast Regional Group, he did so upon the condition that he be allowed to bring several employees with him, including Mentor. (Id. at 55, 97-98, 105.)  Chin approved Pellegrini's request and Mentor was hired in June 2005 as a Vice President in the Southeast Regional Group, headed by Norm Pellegrini.  (Id. at 105.)

**Response**

Dispute.  Dispute that the cited testimony supports that Chin approved any request from Pellegrini, but admit the rest.

55.    Mentor displayed promise and abilities during her first two years of employment as a Vice President.  (Id. at 213-17.)  Although she had not yet developed many clients, Pellegrini believed she had the ability to do so in the future and he recommended an out-of-cycle

promotion of Mentor from Vice President to Director in early 2008.  (Id. at 213-17, 222, 254-55;
BL Dep. 55-56.)  Livolsi, who oversaw the different regional Groups, approved Pellegrini's
decision as "a way of [] encouraging [Mentor] to continue to be successful and work hard."  (BL
Dep. 55-56.)  Mentor was promoted to Director in early 2008.  (NP Dep. 223-24.)

**Response**

Dispute.  Admit that Mentor displayed promise and abilities during her first two years,
that Pellegrini believed she had the ability to do so in the future and he recommended an out-of-
cycle promotion in early 2008.  Admit that Mentor was successful and her success demonstrates
her deservedness of the promotion to Director, but dispute that Mentor received a bona fide
promotion. (Ex.18, Livolsi at 55).

56.     When it became clear that the Company would undergo a RIF in November 2008,
Pellegrini attempted to avoid having his Southeast Regional team impacted.  (Id. at 270, 272-73,
294.)  Prior to November 2008, three individuals from the group had already been terminated—
including a male Director, a male Associate, and a female Vice President—and Pellegrini had
tried to save additional costs by closing the Group's Atlanta office.  (Id. at 227; see also RIF
Data.)  Unfortunately, Pellegrini could not avoid having his Group participate in the November
RIF.  (NP Dep. 270, 272-73.)

**Response**

Dispute.  Dispute that Pellegrini attempted to avoid having his team impacted when it
became clear the Company would undergo a RIF in November 2008 as unsupported by the cited
testimony in which Pellegrini merely testified that he asked if there was anything he could do
only after the termination decisions were made.  (Ex. 24, Pell. at 270).  Dispute that prior to
November 2008 three people had "already been terminated" as no time frame is provided in
which to assess the proposition, dispute the suggestion that any previous RIFs have any

connection to the November RIF as unsupported by the cited testimony and data, and dispute that Pellegrini had tried to save additional costs by closing the Group's Atlanta office as completely unsupported by the cited testimony.  Dispute that Pellegrini made any bona fide attempt to avoid having his Group participate in the RIF.  (Ex. 24, Pell. at 270).

57.    Pellegrini and Livolsi discussed everyone within the group and, particularly regarding the Directors, analyzed who would have the least impact on the Group's business moving forward, including what business they were doing and what clients they could take with them.  (Id. at 234-35, 274-78, 284-85, 287-88; BL Dep. 26-27, 30-31, 32-39; 43-49, 53-54, 69-73, 79-82.)

**Response**

Dispute.  Dispute that everyone within the group or that all the Directors in the group were discussed or considered for termination as contradicted by the cited testimony.  (Ex. 24, Pell. at 278) ("Q: Well, did you consider all the directors in your group?  A: Not all of them, no; Q:  So they were never even part of consideration?  A: Not all of them, no.")).  Dispute that Pellegrini and Livolsi did any bona fide analysis as to who would have the least impact on the Group's business moving forward, including what business they were doing and what clients they could take with them and dispute that Pellegrini and Livolsi considered these factors at all as contradicted by the evidence.  (Ex. 23, Pell. at 68, 74-76, 113 -116, 118-119, 128-29, 130; Ex. 24, Pell. at 219, 277-278).

58.    Although Mentor was beginning to build business, and had shown potential in this area, the crisis of 2008 reduced the ability to wait on the potential.  (NP Dep. 220, 285, 289-90; BL Dep. 56 ("[s]he was doing basically, from what I could ascertain, [] vice president [] [level] work.").)  Pellegrini and Livolsi determined that eliminating Mentor would have the least impact on the Southeast Group's existing developed business.  (Pellegrini at 274-75, 284-85; Livolsi at 47-48, 53-55, 70-73, 85-95; Brown.  at 229-30).

**Response**

      Dispute.  Dispute that the cited testimony supports the proposition that "the crisis of 2008 reduced the ability to wait on the potential."  Admit that, since her promotion in 2008, Ms. Mentor had been building a business and had previously demonstrated potential in this area. Dispute that Pellegrini and Livolsi made any determinations with respect to Mentor's termination, including whether firing her "would have the least impact on the Southeast Group's existing developed business" (Ex. 24, Pell. at 299 (When asked who made the decision to fire Mentor, Pellegrini responded : "I don't know the answer to that"); Ex. 18, Livolsi at 128 (Livolsi admitting that he "didn't select anyone")) and further dispute on the basis that Pellegrini and/or Livolsi did not have a consistent or even coherent understanding of the term "developed business." (Ex. 23, Pell. at 68, 74-76, 113 -116, 118-119, 128-29, 130; Ex. 24, Pell. at 219, 277-278).

59.     In particular, Pellegrini and Livolsi felt that, by Fall of 2008, Mentor had less developed business than every other Director in the Group.  (NM Dep. 220, 274-75, 285, 289-90; BL Dep. 47-48, 52-55, 70-73, 85-95.)  In fact, Pellegrini felt Mentor had less developed business than Brent Wilder, another Director, and Wilder too was selected for termination in the November RIF.  (NM Dep. 285, 289-90.)

**Response**

      Dispute. Dispute that Livolsi ever discussed the term "developed business" with Pellegrini (Ex. 18, Livolsi at 68) (Q:  "Did you ever hear Mr. Pellegrini use the term 'developed business?'"  A:  "I don't recall that") or that the term itself has any identifiable meaning in the record (Ex. 23, Pell. at 68, 74-76, 113 -116, 118-119, 128-29, 130; Ex. 24, Pell. at 219, 277-278) see also ¶¶101-105), and further dispute that the cited testimony supports the stated proposition.

60.     Thus, Pellegrini, with approval of Livolsi, selected Mentor for termination because, as compared to any Director in the Southeast Group, he believed terminating her employment would have the least impact on business of any Director in the Southeast Group.  (NP Dep. 274-80, 284-85; BL Dep. 69-73, 79-82, 85-95.)  In fact, the Company did not lose any business because of terminating Mentor.  (NP Dep. 127, 284 ("Q:  Did you lose any business?  A:  I don't think we did.").)

**Response**

Dispute. Dispute that either Pellegrini or Livolsi selected Mentor or anyone else for termination (Ex. 24, Pell. at 299; Ex. 18, Livolsi at 128) and further dispute that Pellegrini considered who "who have the least impact on business" in making his recommendations to Chin and Brownstein as that would not have resulted in recommending Mentor. (See ¶¶101-105; Ex. 24 at CGMI_BART 016513-016514; Ex. 42 at CGMI_BART 022236, 022339, 022240; Ex 43, CGMI_BART 000714-000721; Mentor Dec. at ¶¶2-4)).  Dispute that the Company did not lose any business because of terminating Mentor, as the Virgin Islands account terminated its relationship with Citi because Mentor was fired.  (Ex. 6, Mentor at 166; Mentor Dec. at ¶ 2).

61.     The decision to terminate Mentor was made <u>before</u> she was able to help secure business <u>as part of a team</u> on both the Virgin Islands account (which was secured as part of an effort lead by the Co-Head of the Infrastructure Group, James Haddon, and senior Director Guy Logan), and the Broward County account (which was a client of Group Head Pellegrini dating back to tenure at UBS).  (BL Dep. 42-43, 88-89, 94; NP Dep. 58, 66, 108,110-12, 124-26, 165-66, 212, 284; NM Dep. 51-52, 54-55, 60-61, 63; <u>cf.</u> Compl. ¶ 85.)  Further, Mentor admitted at deposition she was assigned to the Company's established State of Connecticut account and merely assisted a Managing Director (Kristin Johnson).  (NM Dep. 51-52.)

**Response**

Dispute. Admit that Mentor secured the Virgin Islands account, but dispute that a team at Citi had anything to do with it (Ex. 5, Mentor 138; Ex., Mentor at 166), dispute that the decision to terminate was made before she secured the business on Broward County or Virgin Islands accounts as unsupported by the cited testimony and flatly disputed, (Mentor Dec.at ¶ 2), and further dispute on the grounds that Pellegrini testified that Virgin Islands and Broward County were developed business for Mentor. (Ex. 23, Pell. at 125, 137-138). Dispute that Mentor admitted at her deposition that she merely assisted a Managing Director on the State of Connecticut account as unsupported by the cited testimony. (Ex. 23, Pell. at 140-141; Mentor Dec. at ¶ 3).

62.    Mentor testified she has no idea how the termination decision was made, who made the decision, or what factors were considered. (NM Dep. 101-2, 264.) She further testified that she has absolutely no information concerning the other Directors in her group, other than the fact that everyone else had more experience than she. (NM Dep. 74-76, 108-12.) Specifically, she testified that she has absolutely no information concerning what developed business or clients they had, which or how many transactions they worked on, or their prior relevant work experience. (Id. 74-76, 108-12.)[12]

**Response**

Dispute. Dispute that the cited testimony supports the proposition that "everyone else had more experience" than Mentor or that she knew that to be the case and further dispute that the cited testimony supports the proposition that Mentor had "absolutely no information

---

[12] Curiously, although Mentor alleged that she was "bringing in more revenues in 2008 and [] had more revenues coming down the pipeline than Mike Baldwin," she conceded that she not only had no idea whatsoever concerning Baldwin's business, but was also unsure of her own. (Id. at 108-10.) In fact, she conceded she had absolutely no information for any of the other officers in the Southeast Group. (Id. at 74-76, 108-12.)

concerning what developed business or clients they had, which or how many transactions they worked on, or their prior work experience." (Ex. 5, Mentor at 109-110; see also ¶¶101-105)

## H.   **Proper Statistical Analysis Reveals That No Discrimination Occurred**

63.    Killingsworth admittedly ignores that the decision making process occurred at the Group level.  For instance, he acknowledged in his deposition that his analysis did not take into account who made the termination decisions that Plaintiffs challenge, and he admitted that he had no understanding of how the different RIF decisions were made.  (MRK Dep. 48 ("Q:  Did you have any understanding of how the decisions were made.  A:  No."), 61 ("Q:  Who made the RIF decisions for [each of the Plaintiffs.]  A:  I can't name them."); see also Bloom Supp. pp. 1-2.))

**Response**

Dispute.  Dispute that Killingsworth "ignores that the decision making process occurred at the Group level" as a complete mischaracterization of the evidence and further dispute as it demonstrates a complete lack of understanding of Killingsworth's role as an expert and the scope of his expert report which was to review the RIF data and conduct a statistical analysis on the gender disparity in terminations (Ex. 30, Killingsworth Report at ¶3 ("I have been asked to review data on Citigroup's November 2008 reduction-in-force to determine whether (and if so to what extent) there were sex-related disparities in the composition of terminations within the [PFD] during this reduction-in-force")).  Dispute that the decision making process occurred at the Group level as the entire decision making process and ultimate decisions were driven, controlled, supervised and approved by Chin and Brownstein.  (Supra at ¶¶ 6-8.)

64.    Instead, he aggregates data from all 15 Public Finance Groups—including 11 in which none of the Plaintiffs worked.  (Id.)  In so doing, Killingsworth aggregates data across the entire PFD and treats the layoffs of the five plaintiffs as if they resulted from a single process involving all the employees in the PFD.  (Id.; Bloom Supp. 1-2.)  Killingsworth admitted his analysis does

not take account of how decisions were made. (MRK Dep. 158 ("[I]t is not an analysis of individual decisionmakers or of individual groups."); <u>see also</u> <u>supra</u> ¶¶6-8.) Thus, Killingsworth failed to identify the correct population for analysis. (Bloom Supp. pp. 1-4; <u>supra</u> ¶¶6-8.).

**<u>Response</u>**

Dispute. Admit that Killingsworth's statistical analysis of the November RIF considered the termination data across PFD, but dispute the use of the word "aggregate," (Ex. 20, Killingsworth at 56 ("Q: Does your analysis aggregate data across all of public finance? A: No."), 58 ("table 2 doesn't aggregate anything. It looks at individual people and it distinguishes them according to years of service, job title and department, as well as sex, of course.")), dispute that in considering the termination data across PFD his analysis does not take into account how decisions were made and further dispute that Killingsworth failed to identify the correct population for analysis as the entire PFD was at risk for termination (<u>infra</u> ¶ 72) and the termination decisions were made, approved and/or supervised across PFD at the senior management level by Brownstein and Chin. (<u>Supra</u> at ¶¶6-8). Moreover, although Plaintiffs dispute that the November RIF terminations were made at the Group level, Killingsworth's statistical analysis, in particular his probit analysis, analyzed the male-female termination disparity even when controlling for variables, including but not limited to, Group. (Ex. 20, Killingsworth at 59-61, 63-65 (explaining how the probit analysis controls for decisions being made at the Group level); Ex. 30, Killingsworth Report at ¶ 6-8 ("the probit analysis indicates whether female employees are more (or less) likely to be terminated relative to men who are otherwise the same in terms of these factors (years of service, job title and department)").

65.    Killingsworth was not even provided, and thus did not review, any of the deposition testimony of the decision makers in which they explain how their decisions were made. (MRK Dep. 164; <u>see also</u> LDB Decl. Ex. 47.)

**Response**

Dispute.  Admit that Killingsworth did not review the deposition testimony of the decision makers, Chin and Brownstein, but dispute the rest as the term "decision makers" is ambiguous and undefined by the cited evidence and further dispute whether the unspecified deposition testimony referred to accurately reflects how the termination decisions were made.

66.    Remarkably, Killingsworth only became aware after rendering his report and reviewing Defendants' report (Bloom Rep. & Bloom Supp.) that "different people made different decisions about people in different groups." (MRK Dep. 61-62.)

**Response**

Dispute.  Dispute that Killingsworth ever "became aware" that "different people made different decisions about people in different groups" as the evidence establishes that the termination decisions were all made, approved and supervised by Chin and Brownstein, not the individual Group Heads, (supra at ¶¶6-8), but admit that Killingsworth read Bloom's reports and that simply he recalled what Bloom wrote.  (Ex. 20, Killingsworth at 62 ("based on – I take Dr. Bloom's language, different people made different decisions about people in different groups. We could get Dr. Bloom's report out and I can show you exactly what I'm talking about.")).

67.    While Killingsworth concluded that women in PFD were more likely to be laid off than men, he has absolutely no idea as to which of the 15 Groups drove that conclusion, and has no opinion as to whether women in any particular Group—including the Groups in which the Plaintiffs worked—were more likely to be laid off than men in the Group.  (Id. at 65-66 ("Q: How can we tell which, [of the 15] different groups in [the PFD], if any, made decisions in a sex-neutral fashion?  A:  [My analysis] doesn't address that question.  This addresses what the overall impact is. . . ."), 59-60.)

**Response**

Dispute.  Admit that Killingsworth concluded that women in PFD were more likely to be laid off than men but dispute that characterization as a gross understatement (Ex. 30, Killingsworth Report at ¶ 4-11).  Dispute that "he has absolutely no idea as to which of the 15 Groups drove that conclusion, and has no opinion as to whether women in any particular Group—including the Groups in which the Plaintiffs worked—were more likely to be laid off than men in the Group" as vague, ambiguous and undecipherable, unsupported by the cited testimony and contrary to Killingsworth explanation that his probit analysis took into account differences in Group. (Ex. 20, Killingsworth at 59-61, 63-65 (explaining how the probit analysis controls for decisions being made at the Group level); Ex. 30, Killingsworth Report at ¶ 6-8 ("the probit analysis indicates whether female employees are more (or less) likely to be terminated relative to men who are otherwise same in terms of these factors (years of service, job title and department)")).

68.     Killingsworth further admitted that, although he is aware that each Plaintiff is claiming that a male in her Group should have been laid off instead of her, he has not studied, and has no opinion as to whether, the termination decisions of any of the five individual plaintiffs were influenced by gender.  (Id. at 46-47, 158-59 ("Q:  Do you have any opinion as to whether the decision to terminate Amy Bartoletti was influenced by gender?  A:  I haven't studied that, no."), 159-60 (answering the same for each Plaintiff).)[13]

---

[13] Plaintiffs have also offered the report of Dr. Louise Roth who, while conducting some statistical analyses, including analyses that contradict Killingsworth's, admits that she is not an expert on statistics or quantitative methodologies and defers, instead, to recognized experts such as Defendants' expert, Dr. David Bloom.  (LR Dep. 229-230.)  Yet even she recognizes that decisions were made at the Group level:  "Brownstein and Chin left it up to the group heads to select people for termination. . . ."  (LDB Decl. Ex. 28 at p. 8).

**Response**

Dispute.  Dispute that Killingsworth "admitted" or even intimated that he believes each Plaintiff is claiming that a male in her Group should have been laid off instead of her as completely unsupported by the cited testimony.  Dispute that Killingsworth "has no opinion as to whether, the termination decisions of any of the five individual plaintiffs were influenced by gender" as unsupported by the cited testimony and a misstatement of the testimony; rather, Killingsworth merely testified that while the statistical analysis demonstrated that women were far more likely to be terminated than men at highly statistically significant levels (supra at ¶¶6-8), he did not conduct any analysis of the decision makers' intent.  As to footnote 13, admit that Roth also conducted a statistical analysis, but dispute that it contradicts Killingsworth's analysis as Defendants have not even explained how the analysis are at all contradictory and in fact are entirely consistent (See, e.g., Ex. 31, Roth Report at ¶14 and Ex. 30, Killingsworth Report at ¶4 (both stating that 32.5% of women terminated), dispute that Roth admits she is not an expert on statistics or quantitative methods as unsupported and contradicted by the cited testimony (LBD Dec. Ex. 22, Roth at 229-230 ("I consider myself to be a competent methodologist" and "It would depend on what methods you were talking about.  So there are some methods that I am sufficiently well-versed in that I could do that, but I would not have the diversity of some of my colleagues who consider themselves methodologists"), and dispute that she defers to Dr. Bloom or recognized his expertise as unsupported by the cited testimony.  Dispute that Chin and Brownstein left it to the Group Heads to make the decisions (Supra at ¶¶6-8) and dispute that Roth "admitted" that "Chin left it up to the group heads to select people for termination" as mischaracterization of Roth's report wherein she simply explained how Chin and Brownstein testified regarding the decision making process and was not making any factual or credibility determinations therein.  (LBD Dec. Ex. 28 at ¶21).

69.     In stark contrast to Killingsworth's aggregated analysis across all of the PFD, the

Company's expert analyzed the decision at the appropriate Group and appropriate comparator

levels.  (See generally Bloom Rep. & Bloom Supp; see also supra ¶¶ 6-8.)

**Response**

        Dispute.  Dispute that characterization of Killingsworth's report as an "aggregated

analysis" as contrary to his testimony (Ex. 20, Killingsworth at 56 ("Q: Does your analysis

aggregate data across all of public finance? A: No."), 58 ("table 2 doesn't aggregate anything.  It

looks at individual people and it distinguishes them according to years of service, job title and

department, as well as sex, of course.")).  Dispute that the Bloom analyzed the "appropriate

Group and appropriate comparator levels" as the appropriate analysis was at the PFD level given

that the all employees in PFD were at risk for termination in the November RIF and the

November RIF decisions across PFD were made, approved and supervised by Chin and

Brownstein (supra at ¶¶6-8; infra ¶72)., but admit that the Company had Bloom conduct an

analysis.

70.     Defendants' report offers the only statistical evidence that takes account of the

appropriate populations for analysis (both the decision makers and comparators associated with

each of the five individual Plaintiffs).  (Id.; see also Bloom Supp. pp. 6-10.)  The analysis reveals

there are no statistically significant gender disparities in selection for layoff among individuals

who were similarly situated to each Plaintiff with respect to their position and Group.  (Bloom

Rep. pp. 7-13; Bloom Supp. p. 2.)  These statistical findings hold true not only for the November

RIF, but also for the three other RIF rounds that occurred in 2007-08.  (See id.; see also Bloom

Supp. pp. 2-5.)

**Response**

Dispute.  Dispute that Bloom's report takes into account the appropriate populations for analysis as his report completely ignored that all employees in PFD were at risk for termination and the November RIF decisions across PFD were made, approved and supervised by Chin and Brownstein.  (Supra at ¶¶6-8; infra ¶72).  Dispute that Bloom's analysis "reveals there are no statistically significant gender disparities in selection for layoff among individuals who were similarly situated to each Plaintiff with respect to their position and Group" as Bloom's report ignores that the appropriate analysis was at the PFD level given that all employees in PFD were at risk for termination and the November RIF decisions across PFD were made, approved and supervised by Chin and Brownstein.  (Supra at ¶¶6-8; infra ¶72).  Further dispute the relevance of Bloom's report and the meaningfulness of his purported analysis as it is "a virtual handbook in how not to investigate possible sex differences in termination rates," (Ex. 30, Killingsworth Rebuttal at ¶5), as, *inter alia*, (i) Bloom's cross-group regression analysis reduced data from as many as 200 observations to 15 or less which was highly unlikely to produce meaningful or statistically significant results, (ii) Bloom's cross-group regression analysis did not take differences in seniority and job title in his cross-group regressions, (iii) Bloom's cross-group regressions consider each RIF in isolation from the others, even though all of the RIFs occurred within a relatively short span of time, and (iv) Bloom's within-group exact tests have virtually no power to discern meaningful evidence on gender differences because of the number of employees considered in each group.  (Ex. 30, Killingsworth Rebuttal at ¶¶ 5, 6, 7, 15).  Dispute that Bloom's statistical findings hold true not only for the November RIF, but also for the three other RIF rounds that occurred in 2007-08 for the same reasons as the previous sentence, but further dispute on the basis that even when considering all the RIFs in PFD from 2007 through 2008, and controlling for years of service, job title and group, the likelihood of the resulting

disparate impact on women in a random process is less than 8 times in 1,000, which is highly statistically significant.  (Ex. 30, Killingsworth Rebuttal at ¶¶ 3-12).

## ADDITIONAL MATERIAL ISSUES OF FACT

71.     Citigroup, Inc. and its affiliates (including Citigroup Global Markets, Inc.) used common policies, processes and forms in administering reductions-in-force during 2008, including the November 2008 RIF in which Plaintiffs were terminated.  (Ex. 34 at PL 06427, PL 16232).  The "Citi Termination Information" document provided to Siu and other Plaintiffs refers generically to "Citi" throughout (covering Citigroup, Inc. and all its affiliates).  (Ex. 34, PL 06427 at n.1). Other employment documents regarding terminations and reductions-in-force that were provided to Plaintiffs and employees of other affiliates refer specifically to Citigroup, Inc. as the "Company," and apply identical employment policies and benefits to employees of Citigroup, Inc. affiliates and subsidiaries.  (Ex. 34 at PL 08322, PL 04666 (regarding the "Citigroup Pension Plan"); id. at PL 00482 (referring to Siu's enrollment in "Citigroup's" medical plan, demonstrating that Defendants jointly provide employee benefits)).  Such documents also expressly identify Citigroup, Inc. as the "plan sponsor" of the Citigroup, Inc. Separation Pay Plan (Ex. 34 at CGMI_BART 000007) and identify the General Counsel of Citigroup, Inc. as the "Agent for service of legal process" for all purposes and without distinction (even for matters involving subsidiaries or affiliates).  (Ex. 34 at PL 08331, CGMI_BART 000061).  Furthermore, Citigroup, Inc. maintained other umbrella employment policies and procedures across its subsidiaries and affiliates, such as the Citigroup, Inc. Ethics Hotline and the Citigroup Code of Conduct.  (Ex. 34 at CGMI_BART000016, CGMI_BART000067 ("All employees of Citigroup Inc., its subsidiaries and their affiliates ("Citigroup") are required to read and follow the

Citigroup Code of Conduct."), CGMI_BART000072 (common employment and discrimination policies)).

72.     All employees in PFD were considered at risk for termination. (Ex. 27, Chin at 34-35 (explaining that he looked across all geographic and industry lines within PFD); Ex. 18, Livolsi at 28-29 (in implementing a RIF, the leadership evaluates "the entire department and … to get the weakest candidates – it is not geographic, it is not from within any specific region.")); see also supra ¶¶6-8.

73.     The decision making and termination selections were driven by Chin and Brownstein. Early in the decision making process, a meeting was held between Chin, Brownstein, Hessler, Cyganowski, Livolsi and Green.  (Infra ¶126; Ex. 22, Hessler at 283-288, 292-293).  Chin testified he took the "first cut" at trying to "figure out . . . what the population of a potential RIF would look like." (Ex. 27, Chin at 35).  Hessler and Cyganowski testified consistently that Chin and Brownstein came up with the initial list of employees selected for termination. (Ex. 22, Hessler at 283-284 (Chin initially brought up a list of people for potential termination), 287 (Chin gave the initial list of names); Ex. 14, Cyg. at 308 ("Chin and [] Brownstein would come up with an initial list, and ask for our comments.  But it was their list.").

74.     Chin and Brownstein discussed potential termination candidates with the Group Heads, who made recommendations from the initial list. (Ex. 18, Livolsi at 128; see also supra ¶¶ 6-8). Chin said he wanted to "find out" who the Group Heads thought were their "weakest performers," but Chin and Brownstein retained complete discretion to select and approve all terminations. (Ex. 19, Fein. at 76-78, 95-96; Defs.' 56.1 St. at ¶¶ 27, 41; Chin Dec. at ¶ 17, 19; Ex. 27, Chin at 38, 96-97; Ex. 24, Pell. at 270; supra ¶¶ 6-8).

75.     No clear criteria were ever used by Chin and Brownstein or communicated to the Group Heads. (Ex. 22, Hessler at 286; Ex. 27, Chin 29-32, 207; Ex. 16, Green at 143-144).  The Group Heads provided input based on their "innate" and "subjective" thought processes.  (Ex. 23, Pell. at 235 ("Q: How did you come to that determination? A: **Subjectives**") (emphasis added)), 287 ("**I guess I just knew innately**, you know, based upon running this group for six years, who had business, who didn't, based upon, you know, running the group.") (emphasis added)).  Neither Chin and Brownstein nor the Group Heads reviewed performance reviews, revenue sheets or salaries to assist in the selection process.  (Exs. 21, 22, Hessler 264-265; Ex. 18, Livolsi 132; Ex. 25, Brown. at 124:23-125:5).  The RIF utterly lacked formal or objective criteria used to make critical decisions.

76.     The RIF had a devastating and disparate impact on females in PFD.  Out of 40 female professionals, 13 were terminated (32.5%).  (LDB Dec. Ex. 32 (RIF Data); Ex. 30 (Killingsworth Report at ¶4)).  By contrast, only 16 of 119 male professionals were terminated (13.5%).  (Id.). PFD employed roughly three times as many men as it did women, yet terminated a roughly equal number of men and women.  (Id.).  Citi terminated all three women in Housing and all three women in Infrastructure.  (LDB Dec. Ex. 32 (RIF Data); see also Ex. 31 (Roth Report at ¶16-18)).  The only female Director in Healthcare, of 10 Directors, was terminated.  (Id.).  The only female Director in Southeast, of six Directors, was terminated.  (Id.).  The only female out of 17 Group Heads or Co-Heads was terminated.  (Id.).  Simply put, women employed in PFD were under much greater threat of termination than men in November 2008.

77.     Dr. Mark Killingsworth ("Killingsworth"), a labor economist, conducted a statistical analysis of the RIF and concluded that the gender disparity was highly statistically significant, as a random selection process (e.g., picking names from a hat) would yield the same gender

disparity in its results less than 7 times in 1,000, or the equivalent of 2.7 "standard errors" or

deviations (the threshold for statistical significance is less than 5 times in 100 or 1.96 standard

errors). (Ex. 30 (Killingsworth Report at ¶5). Killingsworth also conducted a probit (or

regression) analysis which controlled for factors such as years of service, job title or Group. (Id.

at ¶¶6-10). Under this analysis, the probability of a random process generating such a gender

disparity dropped to less than 2 times in 1,000, or 3.123 standard errors. (Id.).

78.    Killingsworth concluded that the statistical analysis,

> constitute[s] very strong evidence that female PFD employees were
> substantially more likely to be terminated during the November 2008 RIF than
> were male PFD employees. In particular, female PFD employees were
> terminated much more frequently than were male PFD employees who were
> the same in terms of years of service, job title and department. This adverse
> effect for women is large in the ordinary language sense and is clearly
> statistically significant at conventional test levels.

(Id. at ¶11).

79.    Dr. Louise Roth, an organizational sociologist, explains that "decades of research [show]

how inconsistent procedures and a lack of accountability for non-discriminatory outcomes lead

to biases against women [] in the workplace" and "using subjective evaluation criteria amplifies

these effects." (Ex. 31 (Roth Report at ¶¶28, 33)). Employers can "suppress social

psychological influences" by increasing "the emphasis on criteria that are objective and thus less

subject to status influences and stereotype bias." (Ex. 32 (Roth Report) at ¶63). By contrast, the

RIF was conducted with strictly male decision makers, no decision-making criteria and

inconsistent considerations. (Supra ¶¶ 6-8). As such, "social science research illuminates how

the absence of formal criteria for termination, disregard of formal performance reviews, and a

lack of monitoring and oversight by HR and the legal department, produced a disparate impact of

the RIF by gender []." (Ex. 33 (Roth Report) at ¶73). Social scientific research also explains

that a subjective and discretionary process can have a disparate impact because, "[w]hen subjective impressions are the criteria for personnel decisions, cognitive biases that put women at a disadvantage are likely to operate – leading to gender inequality in the workplace." (Ex. 33 (Roth Report) at ¶62).

80.    Citi's failure to take steps to reduce the danger of gender bias is particularly notable given a "Diversity Analysis" previously conducted by Citi showing that in 2006, across MSD, **91%** of Managing Directors ("MDs") were men (53 men/5 women) and **87%** of Directors were men (105 men/16 women).  (Ex. 29 (2006 MSD Diversity Analysis).  Cyganowski, Chair of the MSD Diversity Committee, had "no opinion" as to whether this represented a problem and testified that these stark disparities were never addressed or discussed as a problem.  (Ex. 14, Cyg. at 70-71 (stating that he chaired the diversity committee from approximately 2003 to 2007), 84-85 ("no opinion" on the disparity between male and female directors and managing directors)).

81.    Bartoletti's reviews also reflect mastery of client relations and development, as she received the highest ratings in numerous client-related categories.  (Ex. 36 at PL 14704-14705, CGMI_BART 303-304, 669-674, 676-680).

82.    Bartoletti was nominated for MD in 2008 because "[c]lients admire and respect Amy and are very loyal to the exceptional job she does" (Ex. 39 at CGMI_BART 001291 (promotion nominationform)).

83.    In contrast, Koessel's supervisors did not hold him in high regard (Chin negatively referred to him as a "f[**]king lunatic"), and his peer reviews note a lackluster work ethic and below average ability to handle stress and keep up with the fast pace of the Housing Group. (See, e.g., Ex. 28 at ¶ 8; Fluehr at 131:24-25, 138:12-22, 202 (including that Bartoletti

"consistently rated the highest;" Koessel's performance "below average," his peer reviews were "at the bottom of the pack")).  Koessel was never nominated for promotion to MD.  (Fluehr at 199:25-200:6; Koessel at 80:20-81:14).

84.     Brownstein was aware that Bartoletti was arranging and having meetings with clients following the termination of Mr. Fluehr as described in response to ¶40.   At no time during 2008 did Bartoletti receive negative feedback or criticism from anyone at Citi regarding her efforts to retain the Housing Group's clients.  In fact, she received universally great feedback from PFD's management on these efforts, including from Brownstein.

85.     Chin had no idea how many student loan clients versus housing clients Bartoletti had in 2007 to 2008.  (Ex. 27, Chin at 120:7:121:2).

86.     Bartoletti's incentive compensation was higher than Koessel's both before and after she received an offer from Morgan Stanley and Citi made a counter-offer that Bartoletti accepted. (Ex. 38 at CGMI_BART 015105-06 (chart showing Bartoletti and Koessel compensation); Ex. 10, Fluehr at 167:20-24, 176; LDB Decl. Ex. 46).

87.     Siu received a near-perfect performance review.  (Ex. 40 at CGMI_BART 305-06 (Siu 2008 performance review) (highest possible rating, "1," in every category save one, which was a "2."); Ex. 13, Koessel at 258:8-259:21 (admitting that Siu's last review was "a very strong review," "almost perfect" and "excellent.")).  Sui's strengths included her "remarkable attention to detail.  Everything you gave her was done correctly.  You never had to check her work. Totally dependable.  Very hard working." (Ex. 10, Fluehr at 82:17:22).  When asked if he was finished listing Sui's strength's, Fluehr testified: "I can go on.  I don't have a thesaurus, but you get the idea." (Ex. 10, Fluehr at 83:2-6).  Simply put, "Everybody wanted to work with Chia. She was fantastic." (Ex. 1, Bart. at 68:24-69:2).  Their supervisor Fluehr noted that Siu was

"more qualified than Raymond High" and "[he could] think of no set of circumstances in which Citi could have selected [ ] Ms. Siu for termination over [High]." (Ex. 28 (Fluehr Aff.) at ¶ 19).

88.     Siu was paid less than High. (Ex. 38 at CGMI_BART 15105-06) (chart showing Siu and High salary histories); Ex. 41, CGMI_BART 000871, 001206 (Siu and High salary histories).

89.     Chin and Brownstein were integrally involved in making and ultimately approved the decision to terminate Mentor. Pellegrini and Livolsi did not make the ultimate decision to terminate Mentor. (Ex. 24, Pell. at 299 (when asked who made the decision, responding "I don't know the answer that."); (Ex. 18, Livolsi at 128) (admitting that I "didn't select anyone")).

90.     At Citi, Mentor encountered a "boy's club" atmosphere which permitted, inter alia, stereotypical and gender based comments. (Ex. 5, Mentor at 105, 130).

91.     Mentor was known as the "princess" around the office. (Ex. 5, Mentor at 80-81). Pellegrini does not deny calling Mentor "princess." (Ex. 24, Pell. at 249-251). At first, Mentor tried not to let it bother her:

> [B]ut then it became like, oh, yeah, she's like the only female around. So I think it was a way of distinguishing me, making me different . . . I said I'm not a princess. He said you are a princess. I said, no, I'm not . . . it wasn't something that was perceived as positive . . . I [said] something like I'm not a princess, you know, I don't know if that's a good thing. But then I told him that other people started calling me princess, and I told some of my colleagues, like, don't call me princess. And they did it because [Pelligrini] was calling me princess so they felt like it was okay.

(Ex. 5, Mentor at 80-81).

92.     Baldwin would regularly comment that certain women were "hot" and that men should "look at her legs." (Ex. 5, Mentor at 87). Baldwin recommended hiring an analyst because "she's hot, wait till you see her." (Ex. 5, Mentor at 88).

93.     Mentor told Pellegrini that she enjoyed playing golf, but she was excluded from many golf outings with clients, while male co-workers were consistently included.  (Ex. 5, Mentor at 79).

94.     Pellegrini, along with Baldwin and Mark Weinberg, would often have private "male-oriented" meetings behind closed doors.  (Ex. 5, Mentor at 82).  Mentor would ask what they were talking about and they would respond: "It is just not good for girls' ears." Id.

95.     Mentor was excluded from male-only lunches who justified the exclusion by stating: "we're going to a burger place, aren't you watching your weight?" (Ex. 5, Mentor at 84).

96.     On at least one occasion, Baldwin told Mentor that he took a client to a place he euphemistically called "a place where girls dance." (Id.).

97.     Mentor was promoted to Director "based on [her] excellent reviews, [her] excellent performance, and [her] revenues that [she] was bringing into the firm." (Ex. 5, Mentor at 45-46).

98.     Livolsi observed that it was "easy to support [her] promotion" because she was "the complete package," had "earned it," was a "rare talent" and "goes out and is able to get business." (Ex. 43, CGMI_BART 20455 (email from Livolsi to Mentor); Ex. 18, Livolsi at 65). Pellegrini agreed, giving her the highest possible score on her performance reviews.  (Ex. 43 at CGMI_BART 000714-000721) (showing "exceptional" ratings)).

99.     At the time of her promotion, Pellegrini felt that Mentor was "on track to [become] a Managing Director." (Ex. 6, Mentor at 201).

100.    Mentor received none of the benefits of the promotion but all the added scrutiny. Livolsi minimized Mentor's accomplishments, claiming the promotion to be an "irrelevant title." (Ex. 18, Livolsi at 55).  When promoted, she received no raise.  Thus, Mentor was paid at a lower scale than all the other male Directors.  (Ex. 5, Mentor at 47-48; Ex. 44 (compensation

information for Mentor and comparators).  Pellegrini and Chin assured Mentor that her January

2009 bonus would cover the difference, but she was fired before that happened.  (Ex. 6, Mentor

at 155-56) (Chin told her "you're going to get, what you didn't get in 2008, we will make sure

that you get in 2009")).  In contrast, and even though her performance exceeded male Directors,

Mentor was held to Director standards during the November RIF.  (Ex. 23, Pell. at 217

(explaining her increased duties and responsibilities).  Pellegrini even affirmed that Mentor

might not have been terminated if she had remained a VP.  (Ex. 23, Pell. at 220) ("Q: Do you

feel that she would not have been terminated had she remained vice president?  A:  I don't

know.").

101.    Defendants terminated Mentor over Mark Weinberg who was retained.  (Ex. LDB Dec.

Ex. 32) (RIF Data).  Weinberg remained at a lower level.  (Ex. 23, Pell. at 225).  Pellegrini

testified that he did not even remember if Weinberg was considered for termination.  (Ex. 24

Pell. at 281).

102.    Pellegrini testified that in making his termination recommendations he considered his

employees' "developed business."  (Ex. 23, Pell. at 68, 74-76, 113 -116, 118-119, 128-29, 130,

219; Ex. 24, Pell. at 277-278).

103.    Pellegrini testified that a client is "developed business" only if the client is actively

engaged in deals.  (Ex. 23, Pell. at 76 ("Q: [] If you have a client but don't generate transactions

from it, there is no point? A: You say you have a client but you are not doing any business, I

guess that's correct."), 113 ("So you would have to do business with a client in order for it to be

considered developed business? Yes")).  However, Pellegrini contradictorily testified that certain

clients were "developed business" even if they had not done any transactions in years.  (Ex. 23,

Pell. at 118-119) (Pellegrini testified Miami Dade Expressway was his own "developed business" in 2008, even though they did no transactions with him since he left UBS in 2005).

104.    Pellegrini also testified that "developed business" is a client who would follow an employee if the employee left.   (Ex. 23, Pell. at 114-15) ("If that person was going to walk out the door and that business was going to go with them, then that's developed business."). However, Pellegrini later testified that a client could be "developed business" even if the client did not follow the employee. (Ex. 23, Pell. at 115-16) ("Q: So if Nadine walked out the door, Miami Dade would have followed her, correct? A: Not necessarily.").

105.    Pellegrini also testified, different from the definitions above, that "developed business" means any client an individual was responsible for representing a client in a non-supporting role. (Ex. 23, Pell. at 114 ("Q: So if you were on a supporting role for a client, that wouldn't be considered developed business? A: Correct.")).

106.    Additionally, Pellegrini could not even state whether Weinberg had more "developed business" than Mentor.  (Ex. 24, Pell. at 289 ("Q: Did Nadine have more developed business than Mark Weinberg?  A: I'm not sure")).

107.    In 2008, her first year as a Director, Mentor staggeringly out-produced Baldwin in revenue generation, creating $3,503,156 in revenue compared to $844,438 for Baldwin.  (Ex. 42 at CGMI_BART 016513-016514, 022236).

108.    Chin would have revenue sheets prepared and then distributed to Group Heads annually. (Ex. 21, Hessler at 19-20).

109.    Chin and Hessler each admitted using the revenue sheets in making other personnel decisions, such as compensation.  (Ex. 27, Chin at 63-64 ("Q: Did you review the revenue sheets when determining compensation? A: That was only part of it. Q: But it was part of it? A: Part of

it, yeah."); Ex. 22, Hessler at 321 ("Q: Did you review the revenue sheets when determining

compensation? A: That was only part of it. Q: But it was part of it? A: Part of it, yeah.")).

110.    Pellegrini admitted using revenue sheets to determine whether his employees had

"developed business." (Ex. 24, Pell. at 252-53) ("Q: So how do you know that he had a lot of

developed business? A: Because there was a document just like that, you know, just like the ones

you presented for every person in my group.").

111.    Mentor was responsible for no fewer than six accounts which secured transactions in

2008, whereas Baldwin – a third year Director – was responsible for only three school district

deals. (Decl. of Mentor at ¶3; Ex. 42 at CGMI_BART 016513-016514, 022236, 022239,

022240; Ex. 23, Pell. at 168-169) (testifying that the asterisk on revenue sheets denotes the lead

banker)). School districts were Baldwin's primary focus; however, this business was extremely

slow in 2008 and did not appear to have a significant future. (Decl. of Mentor at ¶4; Ex. 42 at

CGMI_BART 022236, 022239, 022240).

112.    One of Citi's largest clients, the Virgin Islands, who had a $400 million deal in the

pipeline, was – per Pellegrini's admission – Mentor's developed business. (Ex. 23, Pell. at 137-

38 ("Q: What about Virgin Islands Government Public Finance Authority, was that considered

developed business for Nadine? A: I would say yes.  Q: Why? A: I mean, she took a lead role in

covering that, although we hadn't – she had great relationships there.  She was a person that – I

think we ultimately got appointed there and it was a result of her efforts"); Ex. 6, Mentor at 144

(explaining that she was the lead banker on Virgin Islands)).

113.    Mentor secured a $180 million transaction with Broward County in 2008 – which

Pellegrini also admitted was Mentor's "developed business" – its first transaction with Citi in

over 15 years. (Ex. 23, Pell. at 124-25 ("Q: Broward County, was that considered developed

business for Nadine?  A:  I'm sorry, which one?  Q:  Broward County.  A:  Nadine – I would say yes."); Ex. 5 Mentor at 54-55 (explaining that she secured the transaction)).

114.    The $400 million Virgin Islands deal and the $180 million Broward County deal were secured before Mentor's termination. (Decl. of Mentor at ¶ 2; Ex. 5, Mentor at 54-55 (explaining that the transaction was secured before she was terminated)).

115.    Pellegrini admitted that the State of Connecticut General Obligation ("GO") Bonds was her developed business. (Ex. 23, Pell. at 140-141 ("So I would say for the GO, yes, I would say it was developed business.")).

116.    Moreover, the Virgin Islands account left Citi after learning that Mentor had been terminated.  (Ex. 6, Mentor at 166 ("They decided not to continue with Citi.  Citi did not do that transaction" and "When I let my, my client know that I was terminated.  He said this was your account, Nadine, no Citi's account.")).

117.    Baldwin was safe from the November RIF purportedly "because of his business."  (Ex. 24, Pell. at 280 (as to whether Baldwin was considered for termination; Q:  Michael Baldwin? A:  Mike wasn't discussed.  I don't remember.  Q:  Why wasn't he discussed?  A:  Because of the, you know, because of his, because of his business.")).

118.    Pellegrini failed to consult any revenue sheets or compensation data or even a single document in deciding that Mentor was deficient in her "developed business." (Ex. 24, Pell. at 288-289; infra ¶ 119).

119.    Pellegrini admitted that the "developed business" standard amounted to recommending her based on "subjectives," and "knew **innately** . . . who had business, who didn't."  (Ex. 23, Pell. at 235 ("Q: How did you come to that determination? A: **Subjectives**") (emphasis added),

287 ("**I guess I just knew innately**, you know, based upon running this group for six years, who had business, who didn't, based upon, you know, running the group.") (emphasis added))).

120.    Pellegrini testified that he did not even consider Baldwin, and that many other male Directors were either not considered at all, or not considered seriously enough for Pellegrini to even remember at his deposition.  (Ex. 24, Pell. at 278 -282 (Q:  Michael Baldwin?  A:  Mike wasn't discussed.  I don't remember.)).

121.    Pellegrini treated Mentor differently on account of her gender at UBS.  (Ex. 5, Mentor at 36-38 (explaining how she was treated differently than men at UBS)).

122.    Conley commenced employment in the Healthcare Group at Citi as an AVP in 1997.  She was always a "strong" performer with an "excellent" work ethic.  (Ex. 48 at CGMI_BART 000690, 000342).

123.    Cyganowski testified that he "did not select Lisa Conley for termination."  (Ex. 14, Cyg. at 315) ("Q:  So would it be fair to say – would it be unfair to say that you selected Lisa Conley for termination?  A:  I did not select Lisa Conley for termination.")).

124.    Hessler directly attributed the decision to Chin, while Chin represented that it was Hessler.  (Ex. 21, Hessler at 37 (Chin ultimately approved the decision); Ex. 22, Hessler at 283-84 (Chin brought up the initial list of names), 287 (Chin verbally communicated the initial list of names); Ex. 27, Chin at 89 (Chin testified that he left the decision up to the Group Heads)).

125.    Per Hessler and Cyganowski, Chin created the initial list of termination candidates.  (Ex. 22, Hessler at 283-84 (Chin brought up the initial list of names); Ex. 14, Cyg. at 307-308 (explaining that for layoffs "Frank Chin and David Brownstein would come up with a list and would ask for our comments.  But it was their list.")).

126.    Defendants offer many contradictory and inconsistent reasons for firing Conley.

Defendants represented to the EEOC that one of the primary reasons for her termination was that

"Conley did not appear to be interested in professional development **which was taken very**

**seriously by the Healthcare Group**." (Ex. 35 at Citi's *Conley* EEOC position statement at p. 1

(page 9 overall in Ex. 35).  When asked about this very statement, Hessler responded: "**I have no**

**idea what that even means** and **that did not enter into any discussions about her**

**termination**." (Ex. 22, Hessler at 335 (emphasis added)).

127.    Hessler testified that the termination criteria discussed in meetings with Chin and

Brownstein was limited solely to which employees presented "the least risk associated with

taking clients or people." (Ex. 22, Hessler at 293-294, 316).

128.    However, the EEOC Position Statement makes no reference to concerns regarding taking

employees. (Ex. 35 at Citi's *Conley* EEOC position statement (page 9-12 overall in Ex. 35)).

129.    Defendants also claimed that complaints regarding Conley's availability factored into the

termination decision. (Ex. 35 at Citi's *Conley* EEOC position statement at p. 2 (page 10 overall

in Ex. 35); Ex 15, Cyg. at 349) (referencing "complaints for her existing clients" as one of the

reasons terminating Conley would have the least impact on business)). However, Defendants did

not identify a single complaint until *after* Conley was terminated. (Ex. 22, Hessler at 340-41

(referring to client complaints; "A:  But we were unaware of that at the time of termination.  Q:

So that they were never concerns that you discussed with Lisa?  A:  I didn't become aware of

that until after the termination when we were talking to her clients.").

130.    Hessler and Chin claimed that compensation was a consideration. (Ex. 22, Hessler at 333

("total compensation" was a consideration); Ex. 27, Chin at  38) (it was "important to consider

compensation")).

131.    Conley's performance reviews are extremely positive in all aspects and show that her greatest strength was her "exceptional" ability to lead relationships and originate and deliver business. Conley's 2006 Performance review stated:

> She played a **key leadership role in securing several new accounts** in 2006 . . . [and] also **successfully elevated her role on important accounts** . . . and effectively managed the client relationships and deal terms . . . She worked in partnership with the Central Region in their **new business efforts** to secure [clients].

(Ex. 48 at CGMI_BART 00690) (emphasis added)).

132.    Hessler testified that they did not even expect Conley to lead accounts. (Ex. 22, Hessler at 339 ("Q:  What I'm asking you now is, at the time of her termination was there an expectation that she should have been the lead on more than one account?  A:  At that point in time, no.")).

133.    Cyganowski falsely testified he put negative comments on Conley's 2007 performance review, but no such review exists.  (Ex. 14, Cyg. at 173-180).

134.    Conley excelled above the male Directors in both leading and generating business, was "primarily responsible" for maintaining at least 11 different client relationships and was the lead banker on others.  (Ex. 7, Conley at 178-179 (Conley led Memorial South Bend and Nebraska Methodist); Conley Decl. at ¶3).

135.    During 2008, Conley was the lead banker on transactions involving five different clients and was the second highest revenue producing Director at approximately $14,000,000.  (Ex. 47 at CGMI_BART 016354; Conley Dec. at ¶3).  In contrast, the average Director generated approximately $9,000,000.  (Ex. 47; see also Ex. 23, Pell. at 168-169) (testifying that the asterisk on revenue sheets denotes the lead banker)).

136.    Conley surpassed many of her male comparators in all these regards, most particularly Ryan Freel ("Freel").  According to Hessler, Freel did not serve as lead banker on *any* accounts.

(Ex. 21, Hessler at 161-162) (Freel not the lead banker on any clients on his revenue sheet); Ex. 21, Hessler at 181-182 (the revenue sheets are complete lists of deals); Ex. 47 at CGMI_BART 015486, 016388; (Ex. 7, Conley at 133 ("Q: Did Freel lead any accounts?  A:  No.")).

137.    In both 2007 and 2008, Conley generated multiples of the revenue generated by Freel (approximately $6,577,500 to $3,125,000 and $14,000,000 to $5,000,000, respectively).  (Ex. 47 at CGMI_BART 015462, 016345; CGMl_BART 015486, 016388).

138.    Freel also had significantly less experience than Conley, as he only started at Citi in 2006.  (Ex. 7, Conley at 133).

139.    Conley was the lowest paid Director in the Healthcare Group, earning only approximately $525,000 in 2007.  (Ex. 45 at CGMI_BART 000865-866; see also Ex. 7, Conley at 27)).

140.    ████████████████████████████████████████
████████████████████████████████████████
███████████████████

141.    Michael Irwin, who had recently been *demoted for performance reasons*, earned slightly more than Conley, but he generated approximately half the revenue, he had only "partially effective/needs improvement" marks on his reviews, and Cyganowski had reservations about his performance.  (Ex. 45 at CGMI_ BART 022395,022127; Ex. 47 at CGMI_BART 022154; Ex. 46 at CGMI_BART 022326-022333 ); (Ex. 14, Cyg. at 197) (explaining that he would have given all Directors a "1" meaning "exceptional" on their performance reviews other than Irwin).

142.    ████████████████████████████████████████
████████████████████████████████████
██████████████████████

143.    Conley's value was further confirmed after she was fired: (i) Heartland left Citi to follow Conley; (ii) Memorial South Bend ended its relationship with Citi; and (iii) Rush greatly reduced its relationship with Citi. (Ex. 7, Conley at 182).

144.    In one performance review, only a few months after she gave birth to her second child, they stated that Conley "should strive to maintain a work/professional life balance **given her growing family**."   (Ex. 48 at CGMI _ BART 000336; Conley Dec. at ¶ 2).

145.    After she had her third child, they encouraged Conley's continued growth but gratuitously added "**while maintaining a work/family balance**."  (Ex. 48 at CGMI_BART 000341-342; Conley Dec. at  ¶ 2).

146.    Conley did not have any problems with her work/family balance and was always able to handle all work-related obligations and commitments.  (Conley Dec. at ¶ 2).  Cyganowski did not critique the work/family balance of any of the male Directors in any performance review. (Gottlieb Dec. at  52).

147.    The disparity between Conley's compensation-to-revenue generation ratio relative to her male colleagues is not surprising given that PFD followed the same process for determining incentive compensation as it did for implementing RIFs.  Chin and Brownstein would simply "come up with a list" and ask for comments from the Group Heads.  (Ex. 14, Cyg. at 302).

148.    Hessler testified that 2007 compensation figures were used in the November RIF

determinations.  (Ex. 22, Hessler at 279-80) (in computer the salary reduction for the RIF, it was

based off 2007 total compensation)).


Dated: June 26, 2013
       New York, New York

                                              Respectfully submitted,

                                              THOMPSON WIGDOR LLP

                                              By: _____
                                                   Douglas H. Wigdor
                                                   Lawrence M. Pearson
                                                   David E. Gottlieb

                                              85 Fifth Avenue
                                              New York, NY 10003
                                              Telephone: (212) 257-6800
                                              Facsimile: (212) 257-6845
                                              dwigdor@thompsonwigdor.com
                                              lpearson@thompsonwigdor.com
                                              dgottlieb@thompsonwigdor.com

                                              *Counsel for Plaintiffs*